Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF ALASKA AT ANCHORAGE
 2

 3   UNITED STATES OF AMERICA for the use of
     NORTH STAR TERMINAL & STEVEDORE COMPANY,
 4   d/b/a NORTHERN STEVEDORING & HANDLING,
     and NORTH STAR TERMINAL & STEVEDORE COMPANY,
 5   d/b/a Northern Stevedoring & Handling, on
     its own behalf,
 6                   Plaintiffs,

 7        and

 8   UNITED STATES OF AMERICA for the use of
     SHORESIDE PETROLEUM, INC., d/b/a Marathon
 9   Fuel Service, and SHORESIDE PETROLEUM, INC.,
     d/b/a Marathon Fuel Service, on its own
10   behalf,
                     Intervening Plaintiffs,
11        and

12   METCO, INC.,
                     Intervening Plaintiff,
13
          vs.
14
     NUGGET CONSTRUCTION, INC.; SPENCER ROCK
15   PRODUCTS, INC.; UNITED STATES FIDELITY
     AND GUARANTY COMPANY; and ROBERT A. LAPORE,
16                   Defendants.
     _____/
17   Case No. A98-009 CIV (HRH)

18
               DEPOSITION OF BARBARA DIECKGRAEFF
19                 Pages 1 - 46 (inclusive)

20                    November 29, 2005
                         9:05 a.m.
21
                    Taken by the Defendants
22                            at
              Oles Morrison Rinker & Baker LLP
23            745 West Fourth Avenue, Suite 502
                   Anchorage, Alaska 99501
24

25   Reported by:  Caren S. Carlson
                   Registered Professional Reporter
```



Page 2

```
 1        APPEARANCES:
 2   For Plaintiffs:
 3        MR. MICHAEL W. SEWRIGHT, ESQ.
          Burr Pease & Kurtz
 4        810 North Street
          Anchorage, Alaska 99501
 5        (907) 265-5704
 6   For Intervening Plaintiffs:
 7        MR. STEVEN J. SHAMBUREK, ESQ.
          Law Office of Steven J. Shamburek
 8        425 G Street, Suite 630
          Anchorage, Alaska 99501
 9        (907) 522-5339
10   For Defendants, Nugget Construction
     Company, Inc., and USF&G:
11
          MR. TRAEGER MACHETANZ, ESQ.
12        MS. GLORIA HO, ESQ.
          Oles Morrison Rinker & Baker, LLP
13        745 Fourth Avenue, Suite 502
          Anchorage, Alaska 99501
14        (907) 258-0106
15   For Defendant, USF&G:
16        MR. HERBERT A. VIERGUTZ, ESQ.
          Barokas Martin & Tomlinson
17        1029 West Third Avenue, Suite 280
          Anchorage, Alaska 99501
18        (907) 276-8010
19   Also Present:
20        Mr. Doug Lechner
          Mr. John Smithson
21
     Taken by:
22        Caren S. Carlson
          Registered Professional Reporter
23
          BE IT KNOWN that the aforementioned deposition
24   was taken at the time and place duly noted on the title
     page, before Caren S. Carlson, Registered Professional
25   Reporter and Notary Public within and for the State of
     Alaska.
```

Page 3

```
 1        PROCEEDINGS.
 2             BARBARA DIECKGRAEFF,
 3   called as a witness herein, being first duly sworn to
 4   state the truth, the whole truth and nothing but the
 5   truth by the Notary, testified under oath as follows:
 6                    EXAMINATION
 7   BY MR. MACHETANZ:
 8        Q.  Ms. Diec- -- is it Deegraeff?
 9        A.  It's Dieckgraeff.
10        Q.  Dieckgraeff.  My name is Traeger Machetanz.  I
11   can appreciate a difficult pronounced name.
12        This is the opportunity I have to ask you some
13   questions about the lawsuit that you're in with Spencer
14   Rock Products and Nugget and its surety.  Have you ever
15   had your deposition taken before?
16        A.  I don't believe so.
17        Q.  Okay.  This is a time where I'll ask you
18   questions and then to the best of your ability, you need
19   to answer them.  Do you understand?
20        A.  Uh-huh.
21        Q.  The court reporter is taking down what is said
22   so in order for her to do that, you need to answer
23   audibly, in other words, a "yes" or "no."  Nodding your
24   head, she can't type.  Do you understand that?
25        A.  Yes.
```

Page 4

```
 1        Q.  During the course of this deposition, since
 2   she's typing, I'll try not to talk over your questions,
 3   will you please -- I'll try not to talk over your
 4   answers, will you please try not to talk over my
 5   questions?
 6        A.  Yes.
 7        Q.  From time to time I may ask you a question that
 8   is not very clear.  Will you let me know if you don't
 9   understand my question so I can try to make it clearer?
10        A.  Yes, I will.
11        Q.  From time to time your attorney may pose an
12   objection during this deposition.  Unless he instructs
13   you not to answer, you are to go ahead and answer my
14   question.  Do you understand that?
15        A.  Yes.
16        Q.  Okay.  You have been designated for this
17   deposition as a 30(b)(6) deponent.  Has that been
18   explained -- has the significance of that been explained
19   to you by your counsel?
20        A.  What's a 30(b)(6)?
21        Q.  Okay.  What that means is we ask for someone who
22   is most knowledgable about certain items on behalf of
23   Metco and you are the person who is selected to fulfill
24   that role.
25        A.  All right.
```

Page 5

```
 1        Q.  Are you familiar -- do you understand that?
 2        A.  Yes, I do.
 3        Q.  In other words, you speak for Metco and what you
 4   say is essentially Metco talking.  Do you understand?
 5        A.  Yes, I do.
 6        Q.  Now in preparation for this deposition, what
 7   steps did you take to prepare for it?
 8        A.  I went back over the file as near as I could.
 9   There's lots of paper and I didn't read all of it again.
10        Q.  Okay.  Did you talk to anybody other than your
11   counsel?
12        A.  No.  I talked it over with my husband and my son
13   who was working for us at the time.
14        Q.  Okay.  Approximately how much time did you spend
15   chatting with them?
16        A.  Not too much time.  It's all pretty clear in our
17   minds.  We didn't get paid.
18        Q.  Okay.  Did you talk to anyone other than your
19   husband, your son and your counsel in preparing for this?
20        A.  No.  Doug, a little bit
21        MR. MACHETANZ:  Okay.  Let's mark this as
22   Exhibit 1 if we could, please.
23        (Exhibit No. 1 marked.)
24        Q.  Handing you Exhibit 1.  Have you ever seen that
25   document before?
```

Page 6

1  A. Yes, I have.
2  Q. And taking a look at the items designated in
3  Paragraphs 1 through A, Items 1 through 6, are you
4  prepared to talk about those items?
5  A. Yes.
6  Q. Okay. Before we go through those items, I would
7  like to talk to you a little bit about yourself and about
8  Metco. Could you just give me a brief thumbnail
9  experience of your education and work history?
10 A. I graduated high school. I took a
11 correspondence course in accounting. And I went to work
12 for my husband and we started Metco in 1973 and I kept
13 books for him.
14 Q. Okay. And what does Metco do?
15 A. We started out with my husband doing diesel
16 service because that's what he was, was a diesel
17 mechanic, but Seward didn't have any concrete, didn't
18 have a concrete ready-mix plant so we put that in and did
19 excavation then. And we do it for the whole town is what
20 we do.
21 Q. Do you also provide trucking services for
22 customers?
23 A. Yes, we do.
24 Q. And repair services?
25 A. Sometimes when we're working for a contractor,

Page 7

1  we will. Seward is a small town that doesn't have
2  everything available, so sometimes we will help with
3  lubing and fixing oil leaks and things that keeps a piece
4  of equipment running. Nothing really big.
5  Q. Okay. And are you the person who prepares the
6  billings and keeps the records for Metco?
7  A. At the time that this happened, I was.
8  Q. Okay. And are most of your contracts done via
9  oral agreement?
10 A. Yes.
11 Q. Okay. And how often do you send out the
12 billings?
13 A. Monthly.
14 Q. And after the billing, when are payment --
15 payment due on a billing?
16 A. They're due between the 10th and the 15th of the
17 following month.
18 Q. Okay. So you try to send out your billings
19 between the 10th and the 15th and then --
20 A. We try to send them out right after the 1st so
21 they have time to get it paid by then.
22 Q. Okay. So if you had a billing that you send out
23 on, for example, June 1st, the billing would become due
24 on July 15th?
25 A. At least by July 15th, yes, between the 10th and

Page 8

1  the 15th. We kind of work that over orally with the
2  person we're doing the work for.
3  Q. Okay. And what do you do if you don't get a
4  payment?
5  A. Well, usually we do. But there are -- usually
6  we look for -- sometimes we contact the person,
7  personally we contact them and ask what the problem is
8  and why it isn't available. If it is a bonded job, which
9  this one was, we look towards the general contractor.
10 Q. Why is that?
11 A. Because we're in a small town, but everybody
12 knows that if it's a federally-contracted bonded job,
13 they're responsible for payment. If it's an arrears --
14 and that's why I contacted Randy Randolph right away.
15 Q. Okay.
16 A. See, June -- we started working for them the 3rd
17 of May and when June came around, it wasn't paid and
18 so...
19 Q. Let me ask you this, then. From what I
20 understand, it was your -- it was your understanding at
21 the time you were performing the contract relating to the
22 Homer project, that Nugget was the general contractor on
23 this project --
24 A. Yes, it was a Nugget barge.
25 Q. -- and had a bond that would provide payment in

Page 9

1  the event Spencer Rock didn't provide payment?
2  A. Yes.
3  Q. Okay. I presume at the time you had that
4  understanding, you made no distinction between what your
5  rights were if Spencer was considered a subcontractor or
6  if Spencer was considered a supplier?
7  A. It was a Nugget barge. He was working for
8  Nugget and we assumed that that was the way it would go.
9  Q. Okay. When you talk about understanding that
10 the general contractor on a federal project has a bond,
11 did you at the time you entered -- started performing
12 your work on this project, did you make any distinction
13 in your head as to whether Spencer was a subcontractor or
14 a supplier or did that simply not matter to you?
15 A. Truthfully, I didn't think about it.
16 Q. Okay. Let's talk about the initial contract you
17 had on this project. How did you become involved in the
18 project? What happened?
19 A. Bob LaPore approached my husband and wanted a
20 price for taking the rock from Alaska Railroad that was
21 coming down on the railroad and moving it from the siding
22 to the box at the barge. And he didn't give us enough
23 information to give him a good straight-forward bid, so
24 he thought he would just do it himself, but as soon as he
25 got down there he discovered he didn't have the equipment

Page 10

1 to do it. And so he come and asked us if we would help
2 him get it to the box to be loaded on the Nugget barge.
3 And we had handled some Spencer Rock before for some
4 project, so we knew a little bit about Bob and we knew
5 that Nugget was involved and we said, "Yeah, we would do
6 that."
7     Q. Do you recall about when that was?
8     A. Well, it had to have been in May because we
9 started working for him the 3rd of May.
10    Q. Okay. So it was almost immediately after Bob
11 LaPore spoke with Metco that Metco commenced work?
12    A. Yeah, he asked us to.
13    Q. At that time, did you believe your contract was
14 with Spencer Rock?
15    A. We believed our contract was with Spencer Rock,
16 but we expected him to get paid by Nugget and Nugget
17 would be responsible. We do work for general contractors
18 all the time and the general is the one that covers it.
19 It's his umbrella that covers it.
20    Q. Okay. Now when you entered into the contract
21 with Spencer Rock, what terms did you discuss with Bob
22 LaPore?
23    A. I really don't know because my husband talked
24 with him. I assumed and my husband told me no different
25 that it would be pay as we always do.

Page 11

1     Q. And does that mean billing at or around the 1st
2 with payment by the 10th or 15th?
3     A. Yes.
4        (Mr. Sewright entered proceedings.)
5     Q. Now when you entered into this contract, did you
6 discuss any equipment rates or charges like that?
7     A. We have a definite scale that we go by and we
8 didn't do any different with Bob, so I'm sure that they
9 discussed -- we furnished loaders and trucks and Bob
10 furnished an excavator that he rented from somewhere,
11 maybe two, I'm not sure, but we put operators on them.
12    Q. Did Bob and Metco discuss the specific number of
13 trucks and loaders that he would want?
14    A. I'm sure they talked about it. We probably
15 had -- I think we furnished two trucks at the most and
16 one of them we beefed up a little bit so it would be
17 better for riffraff because they were big rock.
18    Q. Did Nugget participate at all in these initial
19 discussions?
20    A. Nugget wasn't there at the initial discussion,
21 but my husband did talk to Randy at one time.
22    Q. When?
23    A. I can't say the date. I just don't know the
24 date, but Randy expressed that he wanted us to give Bob
25 the support that we could because he thought Bob was kind

Page 12

1 of overwhelmed.
2     Q. Do you know when he said that?
3     A. No, I don't.
4     Q. Do you know when that -- you said you don't know
5 when that occurred?
6     A. Huh-uh.
7     Q. Do you know anything else about this discussion
8 between Randy and your husband?
9     A. That's all I know.
10    Q. Do you know if there are any notes to that
11 discussion?
12    A. No. I'm sure they were just out probably by the
13 barge or by the siding.
14    Q. Probably during the work?
15    A. Probably.
16    Q. When you entered into this agreement -- and when
17 I'm referring to you, I'm referring to Metco since you're
18 the 30(b)(6) designee.
19    A. Uh-huh.
20    Q. At the point your husband and Bob finished these
21 discussions, did your husband or did Metco believe it had
22 had a contract with Spencer?
23    A. Yes.
24    Q. Okay. And did it provide services in response
25 to that agreement or pursuant to that agreement?

Page 13

1     A. Yes. We were aware that -- that Nugget needed
2 this rock and that Bob LaPore was furnishing it.
3     Q. I understand that. And at the time you
4 commenced work, you had no discussions with Nugget about
5 this project; is that correct?
6     A. That's correct.
7     Q. When Metco first provided services to the
8 project, was material already at the siding area for
9 transport to the barge area?
10    A. Yes. That was -- our job was to move it from
11 the siding to the box that would be loaded onto the
12 barge.
13    Q. Okay. Did you also provide fuel, oil, and
14 maintenance to Bob LaPore's equipment?
15    A. No fuel. And a few days after we got into the
16 job, Bob LaPore had talked to one of our mechanics down
17 there working on ours and told him he would like him to
18 lube his equipment and watch for oil leaks and keep them
19 running. And that was relayed to me in a little note
20 from the mechanic and we agreed to do that.
21    Q. Okay. Now that was a conversation between Bob
22 LaPore and your husband?
23    A. I think that was a -- I think that was a
24 conversation between Bob LaPore and the mechanic on duty.
25    Q. Okay.

Page 14

1  A. But we wanted to offer Bob as much support as
2  possible. We knew he had a deadline to meet.
3  Q. The box you're referring to, are you talking
4  about loading the material in a skip box?
5  A. I don't know. I just know it was to a box and
6  it was something that they kind of built themselves or
7  manufactured or put some things on it to make it work for
8  what they wanted it for.
9  Q. Who -- did Bob notify you when the rock was
10 ready for transport to the box?
11 A. Actually, we're right across from the railroad
12 siding and we were always aware when the rock came down.
13 And I think it was word of mouth passed down to us, too.
14 Q. So you could see the railroad unload the rock
15 and you knew it would be time for you to go to work?
16 A. Right. It wasn't always a convenient time,
17 either. It just came.
18 Q. And you would go out, then, and load the rock,
19 transport it to the box and drop it off?
20 A. Uh-huh. And Bob did, too. He had a hard time
21 keeping -- he didn't know the people like we did and he
22 had a hard time keeping drivers for his trucks and loader
23 operators.
24 Q. How do you know that? Did Bob complain to you
25 about that?

Page 15

1  A. Yeah. And we would have to send a loader
2  operator down to take over if he didn't have someone.
3  Q. So Bob would sometimes call and say, "I'm having
4  problems. I don't have an operator. Can you" --
5  A. And it wasn't always Bob. It was sometimes one
6  of his men.
7  Q. Okay.
8  A. So they evidently had been told to call on us if
9  they needed something.
10    Let's talk about how you would keep track of the
11 time you spent performing your services. Looking at your
12 discovery request.
13    MR. MACHETANZ: Actually let's mark these
14 discovery responses, let's mark these as Exhibit 2, if we
15 could.
16    (Exhibit No. 2 marked.)
17 Q. (By Mr. Machetanz) Handing you what's noted as
18 Exhibit 2. I don't want to bore you with the legalese of
19 this, so let's go back to Page 7 of 50, if we could,
20 please --
21 A. This?
22 Q. -- of the attached documents. I'm sorry, I
23 wasn't clear on that.
24 A. That's okay.
25 Q. Can you identify what Page 7 of 50 of the

Page 16

1  attached documents is?
2  A. Yes. That's a time card for -- I think it's
3  5/3. It's stapled and I can't read it, but I think it's
4  5/3/97.
5  Q. So from this, on this it says, "Customer," for
6  example, and it says, "Spencer Rock."
7  A. Yes. It's a daily time card and we require
8  daily time cards of our employees.
9     MR. SHAMBUREK: Can we agree it says 5/4 of '97?
10 This is stapled lower down on the sheet.
11    MR. MACHETANZ: Sure. It does say 5/4 of '97.
12 A. Yeah, I see. Okay. 5/4. And this was a
13 mechanic who worked for us.
14 Q. (By Mr. Machetanz) And the customer reflects who
15 your contract is with?
16 A. Yes.
17 Q. And then that helps you decide who to charge?
18 A. Exactly. Now you see there's a second line that
19 says, "fuel," a quarter of an hour, but that doesn't have
20 Spencer there. The first line deals with Spencer and he
21 fixed tires and adjust -- did adjusting on the equipment
22 that was Spencer's.
23 Q. Okay. And then am I correct what you do is you
24 take these and aggregate them for a billing at the end of
25 the month? In other words, all the things that say

Page 17

1  "Spencer" on them you select --
2  A. Yes, I try to keep up with it daily. Okay.
3  Q. And so if we look at one of these time cards,
4  let's go back, say, to Page 12 of 50.
5  A. Uh-huh.
6  Q. Where you see the Don Sutherland time card,
7  10418. There's two separate customers; one is Zubeck and
8  one is Spencer. Do you see that?
9  A. Correct.
10 Q. And from that, you can tell that Zubeck is to be
11 charged for four and a half hours and Spencer is to be
12 charged for eight hours; is that correct?
13 A. Right. That's correct.
14 Q. And I take it the time cards indicate -- are
15 filled out the day the work is performed?
16 A. Yes.
17 Q. And the job description describes what's being
18 done?
19 A. Yes.
20 Q. So in other words, on 5/13 -- let me go back to
21 the one I was talking about. For example, on 5/14/97,
22 Don Sutherland hauled rock for Spencer to the -- is that
23 to the railroad dock?
24 A. Yes. He hauled from the siding down to that
25 box.

Page 18

1   Q. Okay,
2   A. And it was with our GMC truck.
3   Q. Okay. And to perform that work, the purpose --
4   your purpose was specifically to haul rock, put it in the
5   box for the barge to be loaded?
6   A. Yeah, that was my understanding.
7   Q. Okay. Now if we continue on, after you get to
8   Page 50 of 50, you start with statements -- you start
9   with statements. Do you see where we have 1 of 6 and 2
10  of 6, Ms. Dieckgraeff?
11  A. Yes.
12  Q. Do Pages 1 and 2, which are listed as 1 and 2,
13  do those reflect the charges which you had made for this
14  project?
15  A. This shows where -- this was overtime that I
16  credited Bob because he complained about the overtime.
17  He hadn't paid the bill and I -- and we talked to him in
18  our office, right in the office. And I said, "Bob, you
19  haven't paid." And he said, "No, I haven't been paid by
20  Nugget," but he said, "the overtime is eating me up."
21  And I said, "Well, you have to pay overtime." And he
22  said, "I don't pay overtime." Well, we had heard that he
23  wasn't paying his drivers overtime and I showed him the
24  law that you need to pay it, but I said, "If it will help
25  you pay, we will credit you the overtime," and that's

Page 19

1   what I did.
2   Q. Okay. Now let me -- let me ask you a question.
3   If we look at Pages 1 and 2 of this document, does that
4   show the various charges and credits for this project?
5   A. Yes. And you can see on this was -- this was
6   after I had already billed it, but I went back and
7   credited it to each separate invoice so he would know
8   what was the overtime for that invoice.
9   Q. So this is an invoice to Spencer Rock Products?
10  A. This is a statement to Spencer Rock.
11  Q. Is there a different sort of invoice that you
12  utilize?
13  A. Yeah. These are invoices next -- those are
14  statements, the 1 and 2 of 6 and then the next page is an
15  invoice.
16  Q. Okay. Let's -- pardon me. Should the statement
17  accurately reflect the various invoices to Spencer Rock
18  Products?
19  A. Now would you repeat that?
20  Q. Okay. You've described Pages 1 and 2 as a
21  statement?
22  A. Yes.
23  Q. And my question is, should this statement fairly
24  reflect the various charges and credits to Spencer Rock
25  Products?

Page 20

1   A. Yes, it shows them all.
2   Q. Okay. And where I see, for example, date 5/3/97
3   --
4   A. Right. That was --
5   Q. -- does that reflect the day the services were
6   performed?
7   A. Yes.
8   Q. And it describes what was being provided, a
9   loader and dump truck?
10  A. Yes.
11  Q. And then the reference of 019075, what is that?
12  A. 019075, that's the invoice number.
13  Q. Okay. Would you invoice on a daily basis?
14  A. I tried to, yes.
15  Q. Okay. So at the end of the day, on 5/3, you
16  would ideally provide --
17  A. Yeah, it may have been done the next day because
18  the men turned their time in at the end of the day, so it
19  was probably the next day or a couple of days later, but
20  I didn't credit the overtime until June 30th.
21  Q. I understand. When we're talking about these
22  invoices, the first one you provided Mr. LaPore was on
23  5/3/97 -- perhaps 5/4/97.
24  A. Uh-huh.
25  Q. Throughout the time that you were providing

Page 21

1   Mr. LaPore a copy of these invoices, did you at any point
2   prior to late June provide Nugget with a copy of the
3   invoices?
4   A. I talked to Nugget -- to Randy of Nugget, I
5   believe it was on the 26th of June, and I faxed him
6   copies of everything that we had billed up to then. We
7   hadn't billed everything at a time. We were billing it,
8   but I just showed him up to then what was overdue.
9   Q. Before that point, had you spoken at all with
10  Nugget or before that point had you provided Nugget with
11  any of the invoices?
12  A. No.
13  Q. Before that point, had you spoken with anybody
14  at Nugget concerning Spencer Rock's nonpayment?
15  A. No, because it really wasn't due until the 15th
16  of June and that's when we got concerned, when it became
17  due and it wasn't paid.
18  Q. Okay. Let's talk about that. I see there's a
19  significant number of charges on 5/4 -- 5/3 and 5/4. Do
20  you see that? I'm looking at your statement again.
21  A. Yeah, 5/3 and 5/4.
22  Q. Would that reflect the first barge loading?
23  A. It was the first one that we helped with.
24  Q. Okay. And then I see there's more equipment
25  charges that appears on the 13th, 14th and 15th. Do you

Page 22

1  see that?
2      A. Uh-huh, and on the 9th.
3      Q. The 9th is equipment maintenance; is that
4  correct?
5      A. That's right.
6      Q. And would that be providing the maintenance that
7  Bob LaPore requested from your mechanic?
8      A. Well, I'm not -- I'm sure it was because that
9  looks like the first maintenance that we did. We didn't
10 do it right from the very beginning when we started. It
11 was a few days afterwards.
12     Q. Okay. And then we see another charge on the
13 13th, 14th and 15th. Do you see that?
14     A. That's maintenance, loader, truck, et cetera,
15 and I sent -- I don't seem to have the invoices that show
16 that. They're not here.
17     Q. Okay. The question I have is really a fairly
18 simple one. Would that reflect the second barge loading?
19     A. I can't tell you that because I don't know when
20 the barge was full. I don't know how many loads they had
21 to bring down when they considered the barge full.
22     Q. Okay. So is it fair to say you don't know how
23 much -- how many tons were loaded on the barge?
24     A. I don't know.
25     Q. Okay. But as I understand, your service to

Page 23

1  Spencer was to provide the transport from the siding to
2  the skip box?
3      A. Yes.
4      Q. Given that fact, and given the fact that there
5  is a substantial charge for trucks, operators, loaders
6  and trucks, on the 13th, 14th and 15th, is it fair to say
7  that that probably reflects another barge loading on that
8  date?
9         It could have been --
10        MR. SEWRIGHT: Objection, foundation.
11        MR. SHAMBUREK: I also object to the extent it
12 calls for speculation, except I think --
13     A. Yeah, I just don't know when the barge was
14 loaded and when we were waiting for more rock. I don't
15 know how much the barge holds.
16     Q. Okay. Could you turn to Pages 12, 13 and -- 12?
17 Let's start with Page 12 of 50. 12 of 50 that was the
18 one we looked at previously. Do you have that before
19 you?
20     A. Uh-huh.
21     Q. Do you see the time card for Donald Sutherland
22 on 5/14/97 indicates "haul rock"?
23     A. Yes.
24     Q. And I presume that would then be reflected in
25 the truck and operator for 5/14/97?

Page 24

1      A. Uh-huh.
2      Q. Since he's hauling rock, would that then
3  indicate to you that, in fact, Metco was hauling rock to
4  the barge on 5/14?
5      A. Yes, it would. The GMC truck -- it looks like
6  Don relieved Rocky because they were using the same
7  truck.
8      Q. Okay. On Page 14, we see another charge by Don
9  Sutherland, Time Card Number 10423, "Spencer, haul rock,
10 fourteen and a half hours."
11     A. Uh-huh.
12     Q. Would it be fair to say based on that, that the
13 work that was being performed on the 15th was also
14 hauling rock to load a barge?
15     A. Right.
16     Q. Okay.
17     A. It was hauling from the siding from the railroad
18 down to the barge.
19     Q. Okay. And on the 16th -- I'm looking at Page
20 16, there's a reference on the 16th to stock piling
21 filter rock, under the Spencer filling. Do you know what
22 that reflects?
23     A. He was using our 966 loader and he was stock
24 piling it. I don't know whether the barge wasn't there
25 and they were just stock piling or whether he meant that

Page 25

1  it was going in the box. He had to be loading trucks or
2  loading the box. I'm not sure which.
3      Q. Okay. Now tell me, do you recall at any point
4  the stock pile that Metco was loading from and delivering
5  to the box as being completely exhausted?
6      A. I don't -- I don't know. I don't know.
7      Q. Let's turn to the work on the 17th.
8      A. The next one?
9      Q. Yes. Seems to work out nicely, Page 17
10 discusses the 17th. Doug Jewell appears to be stock
11 piling from 1:00 to 5:30. Do you know, and similarly
12 Jim -- I can't read that --
13     A. Pipkin.
14     Q. -- Pipkin also appears to be stock piling. Do
15 you know what that work reflects?
16     A. He was stock piling rock and I don't know
17 whether they're piling it waiting for a barge or whether
18 it's -- it just says "stock pile," so I assume they're
19 stock piling it. I know we had to clean up the siding.
20     Q. Okay. Do you recall when you had to do that?
21     A. As far as I knew, that was just part of the job
22 is to keep the siding clear.
23     Q. Okay. Do you know if the entries on the 16th or
24 17th would reflect that cleanup, since it refers to stock
25 piling rather than trucking?

Page 26

1  A. Well, it looks like one person relieved the
2  other person, it looks like, but they -- so the loader
3  was continuously running for ten and three-quarters
4  hours, it looks like.
5  Q. Would that suggest to you that that's part of
6  the pad cleanup then?
7  A. No. That was the rock itself that we were
8  moving.
9  Q. Okay.
10 A. The cleanup for -- it makes kind of a mess and
11 the cleanup itself came afterwards, I'm sure.
12 Q. Okay. Now I believe you first became -- when
13 did you first become concerned about Bob LaPore and
14 Spencer Rock Products not paying you?
15 A. Well, probably the 15th of June.
16 Q. Okay. What did you do then?
17 A. We talked to him in the office about if he had
18 been paid.
19 Q. And what did Bob LaPore tell you?
20 A. He had not been paid. That he would get us
21 money just as soon as he could and complained about
22 overtime.
23 Q. So when you met with Mr. LaPore, he represented
24 to you that he had not been paid for the first two -- at
25 all for any of the work that he had done?

Page 27

1  A. Yeah. He said he had not been paid. And Randy,
2  when I called him the 26th of June, he told me that Bob
3  LaPore had not been paid.
4  Q. Well, let's continue with your discussion with
5  Bob LaPore on or about 6/15. He said he had not been
6  paid. What else did he tell you?
7  A. He complained about the overtime.
8  Q. Okay. Anything else?
9  MR. SHAMBUREK: The only objection, did you
10 establish that they talked on the 15th?
11 MR. MACHETANZ: I said, "On or about the 15th."
12 A. On or about, I don't know what the date was.
13 Q. He complained about the overtime. He said he
14 hasn't been paid. Do you recall anything else?
15 A. No. I showed him a copy of the law where he
16 should pay overtime.
17 Q. Did he tell you that he would pay in the future
18 or what did he --
19 A. He didn't.
20 Q. Okay. What -- after that meeting with Bob
21 LaPore, what did you do next? As of the 15th -- at or
22 around the 15th, you had spoken with him and he said he
23 hasn't been paid and as I understand it, he didn't give
24 you any promises he would get paid in the future; is
25 that --

Page 28

1  A. Well, he said he would pay us as soon as he
2  could. And we continued to bill him because it was --
3  the rock was still coming down.
4  Q. And at that point, he was behind in payments and
5  it indicated -- and had made no payments; correct?
6  A. Uh-huh.
7  Q. And he indicated he, himself, had not been paid?
8  A. Yes.
9  Q. Now you continued to provide services at that
10 point?
11 A. And it was between the 15th and the 26th that I
12 got in touch with Doug to find out if they had been paid
13 and got in touch with Jack Goodwill from Northern
14 Stevedore.
15 Q. Why -- if you haven't been paid, why did you
16 continue to provide services?
17 A. Because it was a bonded job and we were sure he
18 would get paid.
19 Q. So one of your -- your understanding was that if
20 Mr. LaPore didn't pay you because it was a bonded job,
21 you could get the payment from Nugget?
22 A. Right. And Nugget was aware that we were
23 involved.
24 Q. Okay. So after the -- on or around the 15th,
25 then you spoke with Mr. Lechner?

Page 29

1  A. Uh-huh.
2  Q. Do you recall when you spoke with Mr. Lechner?
3  A. No, but I think you got here a copy of a note he
4  sent my son.
5  Q. Okay. Let's see if we can -- that may be --
6  A. Yeah, it's Page 42 of 50. And I thought I
7  should --
8  Q. That was on the 28th of July?
9  A. Uh-huh.
10 Q. Okay. Do you know if you had a conversation
11 with Mr. Lechner before this?
12 A. I don't remember talking with Doug before, but
13 it was -- I continued to be concerned because we didn't
14 get paid and I...
15 Q. Now I believe you said you spoke to Randy on
16 either the 26th or 27th?
17 A. The 27th.
18 Q. The 27th?
19 A. Uh-huh.
20 Q. And that's because after you had the
21 conversation, you faxed him the invoices; is that
22 correct?
23 A. Right.
24 Q. Now before -- between the time you spoke with
25 Mr. LaPore and the ten days after or approximately --

Page 30

1    A. Or around ten days.
2    Q. -- sure, sure -- on or around ten days when you
3 spoke with Randy, do you recall talking with any other
4 suppliers?
5    A. No.
6    Q. What did you do between the ten days from when
7 you first spoke with Mr. LaPore and speaking -- and I'm
8 using ten days as an approximate, I'm sorry, it's just I
9 guess I got it stuck in my mind so I'm using it -- what
10 steps did you take to ensure you would be paid between
11 those two dates?
12    A. We talked to Bob, you know, and realized he
13 hasn't been paid and we continued to do the work until
14 the 26th. I think the 26th I think is the last day that
15 we worked for him. And I think it was then that we
16 became aware that Nugget kind of took over there and
17 started loading the barge themselves.
18    Q. Okay. Last provided services on 6/26 or --
19 6/26, you belive?
20    A. Yeah, uh-huh. And I don't know whether we did
21 it the very next day or whether there was any rock in or
22 how that happened, but the 26th was the last work that we
23 did.
24    Q. And then you spoke with Randy on the 27th?
25    A. Right.

Page 31

1    Q. And tell me what did Randy tell you.
2    A. He told me that Bob LaPore had not been paid and
3 I -- and I faxed him the invoices. He gave him his fax
4 number.
5    Q. Anything else he told you?
6    A. I don't recall anything. It was a long time
7 ago.
8    Q. Certainly. Now at any point in this time,
9 did -- in this conversation, did Randy say, "Don't worry,
10 Nugget will pay you"?
11    A. No, he did not say that.
12    Q. At any point until the 26th, did anybody from
13 Nugget tell you that Nugget would pay you?
14    A. Nope.
15    Q. At any point --
16    A. He did say to continue to give him support,
17 which we did.
18    Q. When did he tell you that?
19    A. That's when he talked to my husband and I don't
20 know the date of that. But Randy was around because he
21 gave us a card.
22    Q. Okay. During the time of performance, did
23 anyone from Spencer -- from Spencer tell you that Nugget
24 would pay your bills?
25    A. No.

Page 32

1    Q. But you were comfortable you would ultimately
2 get paid because this was a bonded project?
3    A. Yes, we were. It was Nugget's barge and they
4 were a federally-bonded job.
5    Q. And during this period of time until you last
6 provided services on the 26th, you believed you had a
7 contract with Spencer?
8    A. Yes.
9    Q. And you had no contract negotiations with
10 Nugget?
11    A. No, we didn't contract with Nugget. We
12 contracted with Spencer, but it was Nugget's barge and it
13 was ultimately going to be their rock.
14    Q. Okay. Would it change your opinion about
15 Nugget's obligation for this if, in fact -- would it
16 change your opinion about Nugget's obligations to you if,
17 in fact, Nugget had paid Mr. LaPore for the first two
18 barge loads of rock?
19    A. That's why I asked Randy and he said, "No, had
20 not been paid."
21    Q. Would it change your opinion if, in fact,
22 Randy -- about Nugget's responsibility if, in fact, Randy
23 was wrong and Nugget had paid for the first two barge
24 loads of rock?
25    A. I don't understand that.

Page 33

1    Q. Okay. As I understand, one of your underlying
2 premises throughout this is Bob LaPore didn't get paid
3 and he told you he didn't get paid and as a consequence
4 of that, Nugget owes you the full amount for the services
5 you provided. Now if I could show you documentation that
6 would indicate that, in fact, Nugget had paid Bob LaPore
7 for the first two barge loads of rock, would that change
8 your view -- and that LaPore did not tell you the truth
9 and LaPore took that money and didn't pay you -- would
10 that change your view about Nugget's, I guess legal term
11 would be culpability, but I guess responsibility for
12 paying your bills?
13        MR. SHAMBUREK: If I could -- if you understand
14 I have to object to the extent it calls for a legal
15 conclusion.
16        MR. MACHETANZ: Certainly.
17    A. I asked Randy if Bob had been paid and he said,
18 no, he hadn't been. So then I understood that Bob had
19 not been paid and was having trouble paying us and I
20 assumed that Nugget would eventually pay him, that he
21 could pay us, but if they didn't, I felt that we had a
22 way of being covered by their bond.
23    Q. Okay.
24    A. So if there was a wrangle between Spencer and
25 Nugget, then that was between them. When we worked as a

Page 34

1  general contractor before and often we had to sign a
2  paper that we paid everything before we got paid --
3     Q. Okay.
4     A. -- the final pay. And that's why, then, I
5  wanted to go further and make sure that all the people in
6  the other areas knew that we had not been paid.
7     Q. Okay. Now let me -- okay. Now -- and it
8  remains your current position that Nugget is responsible
9  for paying Metco under the terms of the bond; is that
10 correct?
11    A. Yes, I always felt that.
12    Q. Because you provided material to Spencer who
13 provided it -- or services to Spencer who provided it to
14 Nugget who was the general contractor?
15    A. Uh-huh, and it went on a Nugget barge.
16    Q. Okay. Now are there any other reasons you
17 believe that Nugget has an obligation to pay you other
18 than that bonding relationship?
19        MR. SHAMBUREK: I only object to the extent it
20 mischaracterize her testimony because she also referred
21 to conversations with Randy and the delivery to the
22 Nugget barge, but with that, you can answer.
23    A. I guess I would just have to restate that I
24 believe that -- that -- that when you were bonded, all
25 the little people were supposed to get paid.

Page 35

1     Q. Okay.
2     A. And we were one of the little people. And it's
3  from -- even though we had an oral contract, that's
4  really how we operate there and we've never had such a
5  problem before.
6     Q. Okay.
7     A. And when we acted as a general, we had to inform
8  the head guys that everybody was paid.
9     Q. Do you believe that Nugget ever defrauded you?
10    A. You mean on this whole thing?
11    Q. Yes.
12    A. I kind of feel they didn't hold up to their
13 responsibility.
14    Q. Because they didn't pay -- because the bond
15 hasn't paid you and Nugget hasn't paid you?
16    A. Yes.
17    Q. Is there any -- other than them not holding up
18 to their responsibility, is there any other reason or
19 basis that you have for believing that Nugget's defrauded
20 you or misrepresented facts to you?
21        MR. SEWRIGHT: Objection to the form.
22    Q. You may answer.
23    A. The rock comes from inland and it was going to
24 Homer and how was it going to get there? It had to be --
25 Seward was the ideal spot to bring it and load it onto

Page 36

1  the barge. They needed the rock for the project. And I
2  feel that they had a responsibility to make sure that all
3  these little steps were taken and were covered. That's
4  just how it goes. I mean, you weren't going to truck it
5  all the way to Homer, so that's -- it was all part of the
6  same job, it was loaded on the Nugget barge. Nugget got
7  the rock and they used the rock in the project.
8     Q. If Nugget, in fact, paid LaPore for the rock, do
9  you believe they should have to pay twice for that rock?
10    A. Well, they should have -- if Nugget did pay
11 LaPore, which Randy told me they did not, but if they had
12 paid LaPore, then they should have insisted on getting
13 something written from LaPore saying he paid his bills.
14 He didn't.
15    Q. You don't believe he did that?
16    A. I don't think he got the money.
17    Q. Okay. If he got the money, would that change
18 your view towards Nugget?
19    A. Not really, because it was Nugget's
20 responsibility to make sure that the bills were paid.
21 They were the big guy and they had to make sure that all
22 this stuff was handled in a kosher way.
23    Q. Do you have any other reasons why you believe
24 that Nugget acted improperly in this entire process?
25    A. That says it all, the fact that they did not

Page 37

1  follow through with anything and they were aware of it.
2     Q. Okay. Now let me ask you just another couple of
3  questions. Seward is a small community and you probably
4  enter into agreements with a variety of the contractors
5  going down there; is that correct?
6     A. Yes.
7     Q. In your experience, is it typical for you to
8  share those agreements with other third parties?
9     A. Not necessarily, but it's never any big secret.
10    Q. Could you understand why one of your clients
11 wouldn't want you to divulge the terms of your agreement
12 with him to another party?
13    A. It's really very aboveboard usually. This
14 contractor is working for this job and they ask us to
15 help them do that job. And everybody knows that that
16 person is working for that job. There's never any -- we
17 probably don't know all the ins and outs of the contract.
18 We don't have a copy of it.
19    Q. And does that seem appropriate to you?
20    A. As long as it's not trying to defraud somebody,
21 I think it's probably correct.
22    Q. Are you familiar -- you've said your -- your
23 family has worked as general contractors before; is that
24 correct?
25    A. Yes, we have.

Page 38

1  Q. Are you familiar with the concept of back
2  charging?
3  A. Not really.
4  Q. Okay. Have you ever been involved in a lawsuit
5  before?
6  A. One lawsuit. We had to go to court for someone
7  who didn't pay us.
8  Q. In the lawsuit, if one party believes there's
9  money owed and the other party doesn't believe there's
10 money owed, either for a legal reason or a factual
11 reason, do you believe it's appropriate for the defendant
12 to defend on those grounds?
13     MR. SEWRIGHT: Objection to the form of the
14 question.
15 Q. In other words, if you say there's money owed
16 and I disagree with you, is it wrong for me to continue
17 to not pay you because I believe I don't owe you the
18 money?
19 A. Well, you see how we bill. We bill when they do
20 the work and it's very cut and dried and we never
21 overcharge, we never bill for something we didn't do.
22 And so when I bill it, I expect to be paid for it.
23 Q. I'm not talking about this specific instance.
24 A. No, I understand that.
25 Q. What I'm saying is more of just a general

Page 39

1  proposition. If you were sued and you believed you had
2  legitimate defenses, do you believe you had a right to
3  raise those defenses in the lawsuit?
4     MR. SEWRIGHT: Object to the form of the
5  question.
6  A. I suppose you could put your cards on the table,
7  too.
8  Q. And would you agree with me that by asserting
9  those defenses, I'm not acting in bad faith?
10    MR. SEWRIGHT: Pending objection.
11 A. No, but there is a certain responsibility that
12 someone has when they take on a job and that -- the
13 previous lawsuit was a fellow who didn't finish the job
14 and didn't want to pay us for what we had done. And we
15 had a meeting with the judge and the judge said he has to
16 pay and he paid.
17    MR. MACHETANZ: Okay. Can we take about a
18 five-minute break?
19    THE WITNESS: Sure.
20    (Recess taken.)
21    MR. MACHETANZ: I have no further questions,
22 Mrs. Dieckgraeff. Thank you for coming down here and
23 other counsel may have some questions.
24    MR. VIERGUTZ: Could you mark that Exhibit 3?
25    (Exhibit No. 3 marked.)

Page 40

1           EXAMINATION
2  BY MR. VIERGUTZ:
3  Q. And if would you turn to Page 18. And I'm
4  sorry, I'm getting deaf in my old age. What is your
5  name? I'm sorry.
6  A. Barbara.
7  Q. Barbara. And your last name?
8  A. Is Dieckgraeff.
9  Q. How do you spell your last name?
10 A. D-I-E-C-K-G-R-A-E-F-F.
11 Q. Is it German?
12 A. Yes.
13 Q. Are you from there?
14 A. One of my husband's ancestors was in 1980 -- in
15 1854.
16 Q. Wow.
17    MR. SEWRIGHT: Why don't you tell her your last
18 name?
19 Q. From the east side.
20 Did you ever talk to anyone from USF&G, the bonding
21 company for Nugget?
22 A. No.
23 Q. Do you know if anyone from Metco did?
24 A. I don't believe so.
25 Q. And when you spoke of that other lawsuit you

Page 41

1  were involved in, who was the contractor?
2  A. You know, I can't think of his name right now,
3  he was doing work for GTE, General Telephone, and he
4  was -- and we had never worked for him before, but he did
5  pay us.
6  Q. But that was what the suit was about, you sued
7  him because he didn't pay you?
8  A. Yes, that's what it was about.
9  Q. Was -- has there ever been any history since you
10 were in business in 1973, I believe, of you obtaining
11 payment from a bonding company?
12 A. I don't believe we had. I don't think we've
13 ever had that problem.
14 Q. Okay. Is that the only suit you were involved
15 in?
16 A. Uh-huh. Well, we had an accident one time and
17 we had an attorney that represented us, but we never did
18 go to court.
19 Q. The suit that you were involved with, with this
20 contractor, you sued the contractor but not a bonding
21 company; is that correct?
22 A. Yes. I think we had a bonding representative
23 there.
24 Q. But your suit was against the contractor?
25 A. Yes.

Page 42

1  Q. All right. If I sue you, do you believe I have
2  to settle a case with you?
3  A. If you sue me?
4  Q. Yes.
5  A. Well, usually something is settled, either it's
6  decided you don't have to pay or you do have to pay.
7  Q. But during the lawsuit, if you believe in your
8  position, do you believe you have to settle with me?
9  A. No.
10  Q. You can take it to the bitter end if you choose?
11  A. You can, yes.
12  Q. You don't have any idea why USF&G has chosen not
13  to settle this case, do you?
14  A. No, I don't. I assume they would.
15  Q. And you don't have any knowledge of any
16  communications or lack of communications between Nugget
17  and USF&G?
18  A. No, not really. I wrote to the Army Corps of
19  Engineers and I wanted them all to know that we hadn't
20  been paid and I assumed that's what the bond is for.
21      MR. VIERGUTZ: I thank you for your time, ma'am.
22      MR. MACHETANZ: I think you're free to go back
23  to Seward.
24      MR. SHAMBUREK: I thank you for your courtesy.
25      THE REPORTER: How would you like to handle

Page 43

1  signature?
2      MR. SHAMBUREK: Read and sign.
3      (Proceedings adjourned at 10:15 a.m.)

Page 44

1           CERTIFICATE
2
3  BARBARA DIECKGRAEFF           November 29, 2005
4
5      I hereby certify that I have read the foregoing
   deposition and accept it as true and correct, with the
6  following exceptions:
7  ================================================
8  PAGE   LINE    CORRECTION
9  ____   ____    _____
10 ____   ____    _____
11 ____   ____    _____
12 ____   ____    _____
13 ____   ____    _____
14 ____   ____    _____
15 ____   ____    _____
16 ____   ____    _____
17 ____   ____    _____
18 ____   ____    _____
19
20 ____   ____    ____
21
22 _____   _____
   Date                 Barbara Dieckgraeff
23
   (Use additional paper to note corrections as needed,
24 signing and dating each page.)    (CC)
25

Page 45

1           REPORTER'S CERTIFICATE.
2
3      I, CAREN S. CARLSON, Registered Professional
4  Reporter and Notary Public in and for the State of
5  Alaska, do hereby certify:
6      That the witness in the foregoing proceedings
7  was duly sworn; that the proceedings were then taken
8  before me at the time and place herein set forth; that
9  the testimony and proceedings were reported
10 stenographically by me and later transcribed under my
11 direction by computer transcription; that the foregoing
12 is a true record of the testimony and proceedings taken
13 at that time; that the witness requested signature; and
14 that I am not a party to nor have I any interest in the
15 outcome of the action herein contained.
16     IN WITNESS WHEREOF, I have hereunto subscribed
17 my hand and affixed my seal this 8th day of December,
18 2005.
19
20
21
22 _____
   CAREN S. CARLSON
23 Notary Public for Alaska
   My Commission Expires: 05-30-09

```
                                                    Page 46
 1         INDEX TO DEPOSITION.
 2
 3    Barbara Dieckgraeff          November 29, 2005
 4
 5              EXAMINATION
 6                                PAGE
 7
        BY MR. MACHETANZ --------------------------- 3
 8      BY MR. VIERGUTZ ---------------------------- 40
 9
10           * * * * * * * * *
11
12
13    NO.     DESCRIPTION                      PAGE
14    1    Notice Of Taking 30(b)(6) Deposition -- 5
15    2    Metco's Discovery Responses ------------ 15
16    3    Metco's Amended Complaint -------------- 39
17
18
19
20
21
22
23
24
25
```

### A
ability 3:18
aboveboard 37:13
accept 44:5
accident 41:16
accounting 6:11
accurately 19:17
acted 35:7 36:24
acting 39:9
action 45:15
additional 44:23
adjourned 43:3
adjust 16:21
adjusting 16:21
affixed 45:17
aforementioned 2:23
age 40:4
aggregate 16:24
ago 31:7
agree 16:9 39:8
agreed 13:20
agreement 7:9 12:16 12:25,25 37:11
agreements 37:4,8
ahead 4:13
Alaska 1:1,23 2:4,8,13 2:17,25 9:20 45:5,23
Amended 46:16
AMERICA 1:3,8
amount 33:4
ancestors 40:14
Anchorage 1:1,23 2:4,8 2:13,17
answer 3:19,22 4:13,13 34:22 35:22
answers 4:4
anybody 5:10 21:13 31:12
appears 21:25 25:10,14
appreciate 3:11
approached 9:19
appropriate 37:19 38:11
approximate 30:8
approximately 5:14 29:25
area 13:8,9
areas 34:6
Army 42:18
arrears 8:13
asked 10:1,12 32:19 33:17
asserting 39:8
assume 25:18 42:14
assumed 9:8 10:24 33:20 42:20
attached 15:22 16:1
attorney 4:11 41:17
audibly 3:23

available 7:2 8:8
Avenue 1:23 2:13,17
aware 13:1 14:12 28:22 30:16 37:1
a.m 1:20 43:3
A98-009 1:17

### B
back 5:8 15:19 17:4,20 19:6 38:1 42:22
bad 39:9
Baker 1:22 2:12
Barbara 1:18 3:2 40:6 40:7 44:3,22 46:3
barge 8:24 9:7,22 10:2 12:13 13:9,12 18:5 21:22 22:18,20,21,23 23:7,13,15 24:4,14 24:18,24 25:17 30:17 32:3,12,18,23 33:7 34:15,22 36:1,6
Barokas 2:16
based 24:12
basis 20:13 35:19
beefed 11:16
beginning 22:10
behalf 1:5,10 4:22
believe 3:16 10:13 12:21 21:5 26:12 29:15 34:17,24 35:9 36:9,15,23 38:9,11 38:17 39:2 40:24 41:10,12 42:1,7,8
believed 10:15 32:6 39:1
believes 38:8
believing 35:19
belive 30:19
best 3:18
better 11:17
bid 9:23
big 7:4 11:17 36:21 37:9
bill 18:17 28:2 38:19,19 38:21,22
billed 19:6 21:6,7
billing 7:14,15,22,23 11:1 16:24 21:7
billings 7:6,12,18
bills 31:24 33:12 36:13 36:20
bit 5:20 6:7 10:4 11:16
bitter 42:10
Bob 9:19 10:4,10,21 11:8,9,12,24,25 12:20 13:2,14,16,21 13:24 14:1,9,20,24 15:3,5 18:16,18 22:7 26:13,19 27:2,5,20

30:12 31:2 33:2,6,17 33:18
bond 8:25 9:10 33:22 34:9 35:14 42:20
bonded 8:8,12 28:17,20 32:2 34:24
bonding 34:18 40:20 41:11,20,22
books 6:13
bore 15:18
box 9:22 10:2 13:11 14:3,4,5,10,19 17:25 18:5 23:2 25:1,2,5
break 39:18
brief 6:8
bring 22:21 35:25
built 14:6
Burr 2:3
business 41:10

### C
C 2:1 3:1
call 15:3,8
called 3:3 27:2
calls 23:12 33:14
card 16:2,7 17:6 23:21 24:9 31:21
cards 16:8 17:3,14 39:6
Caren 1:25 2:22,24 45:3,22
Carlson 1:25 2:22,24 45:3,22
case 1:17 42:2,13
CC 44:24
certain 4:22 39:11
Certainly 31:8 33:16
CERTIFICATE 44:1
certify 44:5 45:5
cetera 22:14
change 32:14,16,21 33:7,10 36:17
charge 16:17 22:12 23:5 24:8
charged 17:11,12
charges 11:6 18:13 19:4,24 21:19,25
charging 38:2
chatting 5:15
choose 42:10
chosen 42:12
CIV 1:17
clean 25:19
cleanup 25:24 26:6,10 26:11
clear 4:8 5:16 15:23 25:22
clearer 4:9
clients 37:10
come 10:1

comes 35:23
comfortable 32:1
coming 9:21 28:3 39:22
commenced 10:11 13:4
Commission 45:23
communications 42:16 42:16
community 37:3
company 1:3,4,15 2:10 40:21 41:11,21
complain 14:24
complained 18:16 26:21 27:7,13
Complaint 46:16
completely 25:5
computer 45:11
concept 38:1
concerned 21:16 26:13 29:13
concerning 21:14
conclusion 33:15
concrete 6:17,18
consequence 33:3
considered 9:5,6 22:21
Construction 1:14 2:10
contact 8:6,7
contacted 8:14
contained 45:15
continue 18:7 27:4 28:16 31:16 38:16
continued 28:2,9 29:13 30:13
continuously 26:3
contract 8:21 9:16 10:13,15,20 11:5 12:22 16:15 32:7,9 32:11 35:3 37:17
contracted 32:12
contractor 6:25 8:9,22 9:10 34:1,14 37:14 41:1,20,20,24
contractors 10:17 37:4 37:23
contracts 7:8
convenient 14:16
conversation 13:21,24 29:10,21 31:9
conversations 34:21
copies 21:6
copy 21:1,2 27:15 29:3 37:18
Corps 42:18
correct 13:5,6 16:23 17:9,12,13 22:4 28:5 29:22 34:10 37:5,21 37:24 41:21 44:5
CORRECTION 44:8
corrections 44:23
correspondence 6:11

counsel 4:19 5:11,19 39:23
couple 20:19 37:2
course 4:1 6:11
court 1:1 3:21 38:6 41:18
courtesy 42:24
covered 33:22 36:3
covers 10:18,19
credit 18:25 20:20
credited 18:16 19:7
credits 19:4,24
culpability 33:11
current 34:8
customer 16:5,14
customers 6:22 17:7
cut 38:20

### D
D 3:1
daily 16:7,8 17:2 20:13
date 11:23,24 20:2 23:8 27:12 31:20 44:22
dates 30:11
dating 44:24
day 17:15 20:5,15,17 20:18,19 30:14,21 45:17
days 13:15 20:19 22:11 29:25 30:1,2,6,8
deadline 14:2
deaf 40:4
deals 16:20
December 45:17
decide 16:17
decided 42:6
Deegraeff 3:8
defend 38:12
defendant 2:15 38:11
Defendants 1:16,21 2:10
defenses 39:2,3,9
definite 11:7
defraud 37:20
defrauded 35:9,19
delivering 25:4
delivery 34:21
deponent 4:17
deposition 1:18 2:23 3:15 4:1,12,17 5:6 44:5 46:14
described 19:20
describes 17:17 20:8
description 17:17 46:13
designated 4:16 6:2
designee 12:18
Diec 3:8
Dieckgraeff 1:18 3:2,9

EXHIBIT 1

3:10 18:10 39:22
  40:8 44:3,22 46:3
diesel 6:15,16
different 10:24 11:8
  19:11
difficult 3:11
direction 45:11
disagree 38:16
discovered 9:25
discovery 15:12,14
  46:15
discuss 10:21 11:6,12
discussed 11:9
discusses 25:10
discussion 11:20 12:7
  12:11 27:4
discussions 11:19
  12:21 13:4
distinction 9:4,12
DISTRICT 1:1,1
divulge 37:11
dock 17:23
document 5:25 19:3
documentation 33:5
documents 15:22 16:1
doing 6:15 8:2 41:3
Don 17:6,22 24:6,8
Donald 23:21
Doug 2:20 5:20 25:10
  28:12 29:12
dried 38:20
drivers 14:22 18:23
drop 14:19
due 7:15,16,23 21:15
  21:17
duly 2:24 3:3 45:7
dump 20:9
duty 13:24
D-I-E-C-K-G-R-A-E...
  40:10
d/b/a 1:4,5,8,9

                E
E 2:1,1 3:1,1
east 40:19
eating 18:20
education 6:9
eight 17:12
either 14:17 29:16
  38:10 42:5
employees 16:8
Engineers 42:19
ensure 30:10
enter 37:4
entered 9:11 10:20
  11:4,5 12:16
entire 36:24
entries 25:23
equipment 7:4 9:25

11:6 13:14,18 16:21
  21:24 22:3
ESQ 2:3,7,11,12,16
essentially 5:4
establish 27:10
et 22:14
event 9:1
eventually 33:20
everybody 8:11 35:8
  37:15
evidently 15:8
Exactly 16:18
EXAMINATION 3:6
  40:1 46:5
example 7:23 16:6
  17:21 20:2
excavation 6:19
excavator 11:10
exceptions 44:6
exhausted 25:5
Exhibit 5:22,23,24
  15:14,16,18 39:24,25
expect 38:22
expected 10:16
experience 6:9 37:7
Expires 45:23
explained 4:18,18
expressed 11:24
extent 23:11 33:14
  34:19

                F
fact 23:4,4 24:3 32:15
  32:17,21,22 33:6
  36:8,25
facts 35:20
factual 38:10
fair 22:22 23:6 24:12
fairly 19:23 22:17
faith 39:9
familiar 5:1 37:22 38:1
family 37:23
far 25:21
fax 31:3
faxed 21:5 29:21 31:3
federal 9:10
federally-bonded 32:4
federally-contracted
  8:12
feel 35:12 36:2
fellow 39:13
felt 33:21 34:11
FIDELITY 1:15
file 5:8
filled 17:15
filling 24:21
filter 24:21
final 34:4
find 28:12

finish 39:13
finished 12:20
first 3:3 13:7 16:20
  20:22 21:22,23 22:9
  26:12,13,24 30:7
  32:17,23 33:7
five-minute 39:18
fixed 16:21
fixing 7:3
follow 37:1
following 7:17 44:6
follows 3:5
foregoing 44:5 45:6,11
form 35:21 38:13 39:4
forth 45:8
foundation 23:10
four 17:11
fourteen 24:10
Fourth 1:23 2:13
free 42:22
fuel 1:9,9 13:13,15
  16:19
fulfill 4:23
full 22:20,21 33:4
furnished 11:9,10,15
furnishing 13:2
further 34:5 39:21
future 27:17,24

                G
G 2:8
general 8:9,22 9:10
  10:17,18 34:1,14
  35:7 37:23 38:25
  41:3
German 40:11
getting 36:12 40:4
give 6:8 9:22,23 11:24
  27:23 31:16
given 23:4,4
GLORIA 2:12
GMC 18:2 24:5
go 4:13 6:6 9:8 11:7
  14:15,18 15:19 17:4
  17:20 34:5 38:6
  41:18 42:22
goes 36:4
going 25:1 32:13 35:23
  35:24 36:4 37:5
good 9:23
Goodwill 28:13
graduated 6:10
grounds 38:12
GS 3:1
GTE 41:3
GUARANTY 1:15
guess 30:9 33:10,11
  34:23
guy 36:21

guys 35:8

                H
half 17:11 24:10
hand 45:17
Handing 5:24 15:17
handle 42:25
handled 10:3 36:22
Handling 1:4,5
happened 7:7 9:18
  30:22
hard 14:20,22
haul 18:4 23:22 24:9
hauled 17:22,24
hauling 24:2,3,14,17
head 3:24 9:13 35:8
heard 18:22
help 7:2 10:1 18:24
  37:15
helped 21:23
helps 16:17
HERBERT 2:16
hereunto 45:16
high 6:10
history 6:9 41:9
HO 2:12
hold 35:12
holding 35:17
holds 23:15
Homer 8:22 35:24 36:5
hour 16:19
hours 17:11,12 24:10
  26:4
HRH 1:17
Huh-uh 12:6
husband 5:12,19 6:12
  6:15 9:19 10:23,24
  11:21 12:8,20,21
  13:22 31:19
husband's 40:14

                I
idea 42:12
ideal 35:25
ideally 20:16
identify 15:25
immediately 10:10
improperly 36:24
inclusive 1:19
INDEX 46:1
indicate 17:14 24:3
  33:6
indicated 28:5,7
indicates 23:22
inform 35:7
information 9:23
initial 9:16 11:18,20
inland 35:23
ins 37:17

insisted 36:12
instance 38:23
instructs 4:12
interest 45:14
Intervening 1:10,12
  2:6
invoice 19:7,8,9,11,15
  20:12,13
invoices 19:13,17 20:22
  21:1,3,11 22:15
  29:21 31:3
involved 9:17 10:5
  28:23 38:4 41:1,14
  41:19
items 4:22 6:2,3,4,6

                J
J 2:7,7
Jack 28:13
Jewell 25:10
Jim 25:12
job 8:8,12 13:10,16
  17:17 25:21 28:17,20
  32:4 36:6 37:14,15
  37:16 39:12,13
John 2:20
judge 39:15,15
July 7:24,25 29:8
June 7:23 8:16,17
  20:20 21:2,5,16
  26:15 27:2

                K
keep 13:18 15:10 17:2
  25:22
keeping 14:21,22
keeps 7:3,6
kept 6:12
kind 8:1 11:25 14:6
  26:10 30:16 35:12
knew 10:4,4 14:2,15
  25:21 34:6
know 4:8 10:23 11:23
  12:2,4,4,7,9,10 14:5
  14:5,21,24 19:7
  22:19,20,22,24 23:13
  23:15 24:21,24 25:6
  25:6,11,15,16,19,23
  27:12 29:10 30:12,20
  31:20 37:17 40:23
  41:2 42:19
knowledgable 4:22
knowledge 42:15
KNOWN 2:23
knows 8:12 37:15
kosher 36:22
Kurtz 2:3

                L

EXHIBIT 1
Page 15 of 18

lack 42:16
LaPore 1:15 9:19
   10:11,22 13:2,16,22
   13:24 20:22 21:1
   22:7 26:13,19,23
   27:3,5,21 28:20
   29:25 30:7 31:2
   32:17 33:2,6,8,9 36:8
   36:11,12,13
LaPore's 13:14
late 21:2
law 2:7 18:24 27:15
lawsuit 3:13 38:4,6,8
   39:3,13 40:25 42:7
leaks 7:3 13:18
Lechner 2:20 28:25
   29:2,11
legal 33:10,14 38:10
legalese 15:18
legitimate 39:2
let's 5:21 9:16 15:10,13
   15:14,19 17:4 19:16
   21:18 23:17 25:7
   27:4 29:5
line 16:18,20 44:8
listed 18:12
little 5:20 6:7 10:4
   11:16 13:19 34:25
   35:2 36:3
LLP 1:22 2:12
load 14:18 24:14 35:25
loaded 10:2 13:11 18:5
   22:23 23:14 36:6
loader 14:22 15:1 20:9
   22:14 24:23 26:2
loaders 11:9,13 23:5
loading 14:4 21:22
   22:18 23:7 25:1,2,4
   30:17
loads 22:20 32:18,24
   33:7
long 31:6 37:20
look 6:2 8:6,9 17:3 19:3
looked 23:18
looking 15:11 21:20
   24:19
looks 22:9 24:5 26:1,2
   26:4
lots 5:9
lower 16:10
lube 13:18
lubing 7:3

**M**
Machetanz 2:11 3:7,10
   5:21 15:13,17 16:11
   16:14 27:11 33:16
   39:17,21 42:22 46:7
maintenance 13:14

22:3,6,9,14
manufactured 14:7
Marathon 1:8,9
mark 5:21 15:13,14
   39:24
marked 5:23 15:16
   39:25
Martin 2:16
material 13:8 14:4
   34:12
matter 9:14
ma'am 42:21
mean 11:1 35:10 36:4
means 4:21
meant 24:25
mechanic 6:17 13:20
   13:24 16:13 22:7
mechanics 13:16
meet 14:2
meeting 27:20 39:15
men 15:6 20:18
mess 26:10
met 26:23
Metco 1:12 4:23 5:3,4
   6:8,12,14 7:6 10:11
   10:11 11:12 12:17,21
   13:7 24:3 25:4 34:9
   40:23
Metco's 46:15,16
MICHAEL 2:3
mind 30:9
minds 5:17
mischaracterize 34:20
misrepresented 35:20
money 26:21 33:9
   36:16,17 38:9,10,15
   38:18
month 7:17 16:25
Monthly 7:13
Morrison 1:22 2:12
mouth 14:13
move 13:10
moving 9:21 26:8

**N**
N 2:1 3:1
name 3:10,11 40:5,7,9
   40:18 41:2
near 5:8
necessarily 37:9
need 3:18,22 18:24
needed 13:1 15:9 36:1
   44:23
negotiations 32:9
never 35:4 37:9,16
   38:20,21 41:4,17
nicely 25:9
Nodding 3:23
nonpayment 21:14

Nope 31:14
North 1:3,4 2:4
Northern 1:4,5 28:13
Notary 2:25 3:5 45:4
   45:23
note 13:19 29:3 44:23
noted 2:24 15:17
notes 12:10
Notice 46:14
notify 14:9
November 1:20 44:3
   46:3
Nugget 1:14 2:10 3:14
   8:22,24 9:7,8 10:2,5
   10:16,16 11:18,20
   13:1,4 18:20 21:2,4,4
   21:10,10,14 28:21,22
   30:16 31:10,13,13,23
   32:10,11,17,23 33:4
   33:6,20,25 34:8,14
   34:15,17,22 35:9,15
   36:6,6,8,10,18,24
   40:21 42:16
Nugget's 32:3,12,15,16
   32:22 33:10 35:19
   36:19
number 11:12 20:12
   21:19 24:9 31:4

**O**
O 3:1
oath 3:5
object 23:11 33:14
   34:19 39:4
objection 4:12 23:10
   27:9 35:21 38:13
   39:10
obligation 32:15 34:17
obligations 32:16
obtaining 41:10
occurred 12:5
offer 14:1
office 2:7 18:18,18
   26:17
oil 7:3 13:13,18
okay 3:17 4:16,21 5:10
   5:14,18,21 6:6,14 7:5
   7:8,11,18,22 8:3,15
   9:3,9,16 10:10,20
   12:24 13:13,21,25
   15:7,24 16:12,23
   17:2 18:1,3,7 19:2,16
   19:20 20:2,13,15
   21:18,24 22:12,17,22
   22:25 23:16 24:8,16
   24:19 25:3,20,23
   26:9,12,16 27:8,20
   28:24 29:5,10 30:18
   31:22 32:14 33:1,23

34:3,7,7,16 35:1,6
   36:17 37:2 38:4
   39:17 41:14
old 40:4
Oles 1:22 2:12
operate 35:4
operator 15:2,4 23:25
operators 11:11 14:23
   23:5
opinion 32:14,16,21
opportunity 3:12
oral 7:9 35:3
orally 8:1
order 3:22
outcome 45:15
outs 37:17
overcharge 38:21
overdue 21:8
overtime 18:15,16,20
   18:21,22,23,25 19:8
   20:20 26:22 27:7,13
   27:16
overwhelmed 12:1
owe 38:17
owed 38:9,10,15
owes 33:4

**P**
P 2:1,1 3:1
pad 26:6
page 2:24 15:19,25
   17:4 18:8 19:14
   23:17 24:8,19 25:9
   29:6 40:3 44:8,24
   46:6,13
Pages 1:19 18:12 19:3
   19:20 23:16
paid 5:17 7:21 8:17
   10:16 18:17,19,19
   21:17 26:18,20,24
   27:1,3,6,14,23,24
   28:7,12,15,18 29:14
   30:10,13 31:2 32:2
   32:17,20,23 33:2,3,6
   33:17,19 34:2,2,6,25
   35:8,15,15 36:8,12
   36:13,20 38:22 39:16
   42:20
paper 5:9 34:2 44:23
Paragraphs 6:3
pardon 19:16
part 25:21 26:5 36:5
participate 11:18
parties 37:8
party 37:12 38:8,9
   45:14
passed 14:13
pay 10:25 18:21,22,24
   18:25 27:16,17 28:1

28:20 31:10,13,24
   33:9,20,21 34:4,17
   35:14 36:9,10 38:7
   38:17 39:14,16 41:5
   41:7 42:6,6
paying 18:23 26:14
   33:12,19 34:9
payment 7:14,15 8:4
   8:13,25 9:1 11:2
   28:21 41:11
payments 28:4,5
Pease 2:3
Pending 39:10
people 14:21 34:5,25
   35:2
perform 18:3
performance 31:22
performed 17:15 20:6
   24:13
performing 8:21 9:11
   15:11
period 32:5
person 4:23 7:5 8:2,6
   26:1,2 37:16
personally 8:7
PETROLEUM 1:8,9
piece 7:3
pile 25:4,18
piling 24:20,24,25
   25:11,14,16,17,19,25
Pipkin 25:13,14
place 2:24 45:8
Plaintiff 1:12
Plaintiffs 1:6,10 2:2,6
plant 6:18
please 4:3,4 5:22 15:20
point 12:20 21:1,9,10
   21:13 25:3 28:4,10
   31:8,12,15
pose 4:11
position 34:8 42:8
possible 14:2
premises 33:2
preparation 5:6
prepare 5:7
prepared 6:4
prepares 7:5
preparing 5:19
Present 2:19
presume 9:3 23:24
pretty 5:16
previous 39:13
previously 23:18
price 9:20
prior 21:2
probably 11:14 12:12
   12:14,15 20:19 23:7
   26:15 37:3,17,21
problem 8:7 35:5 41:13

EXHIBIT 1
Page 16 of 18

problems 15:4
proceedings 11:4 43:3
  45:6,7,9,12
process 36:24
Products 1:15 3:14
  19:9,18,25 26:14
Professional 1:25 2:22
  2:24 45:3
project 8:22,23 9:10,12
  9:17,18 10:4 13:5,8
  18:14 19:4 32:2 36:1
  36:7
promises 27:24
pronounced 3:11
proposition 39:1
provide 6:21 8:25 9:1
  12:24 13:13 20:16
  21:2 23:1 28:9,16
provided 13:7 20:8,22
  21:10 30:18 32:6
  33:5 34:12,13,13
providing 20:25 22:6
Public 2:25 45:4,23
purpose 18:3,4
pursuant 12:25
put 6:18 11:11 14:7
  18:4 39:6

            Q
quarter 16:19
question 4:7,9,14 19:2
  19:23 22:17 38:14
  39:5
questions 3:13,18 4:2,5
  37:3 39:21,23

            R
R 2:1 3:1
railroad 9:20,21 14:11
  14:14 17:23 24:17
raise 39:3
Randolph 8:14
Randy 8:14 11:21,24
  12:8 21:4 27:1 29:15
  30:3,24 31:1,9,20
  32:19,22,22 33:17
  34:21 36:11
rates 11:6
read 5:9 16:3 25:12
  43:2 44:5
ready 14:10
ready-mix 6:18
realized 30:12
really 7:4 10:23 21:15
  22:17 35:4 36:19
  37:13 38:3 42:18
reason 35:18 38:10,11
reasons 34:16 36:23
recall 10:7 25:3,20

  27:14 29:2 30:3 31:6
Recess 39:20
record 45:12
records 7:6
reference 20:11 24:20
referred 34:20
referring 12:17,17 14:3
refers 25:24
reflect 18:13 19:17,24
  20:5 21:22 22:18
  25:24
reflected 23:24
reflects 16:14 23:7
  24:22 25:15
Registered 1:25 2:22
  2:24 45:3
relating 8:21
relationship 34:18
relayed 13:19
relieved 24:6 26:1
remains 34:8
remember 29:12
rented 11:10
repair 6:24
repeat 19:19
reported 1:25 45:9
reporter 1:25 2:22,25
  3:21 42:25 45:4
REPORTER'SCER...
  45:1
representative 41:22
represented 26:23
  41:17
request 15:12
requested 22:7 45:13
require 16:7
response 12:24
responses 15:14 46:15
responsibility 32:22
  33:11 35:13,18 36:2
  36:20 39:11
responsible 8:13 10:17
  34:8
restate 34:23
riffraff 11:17
right 4:25 7:20 8:14
  14:11,16 17:13 18:18
  20:4 22:5,10 24:15
  28:22 29:23 30:25
  39:2 41:2 42:1
rights 9:5
Rinker 1:22 2:12
ROBERT 1:15
rock 1:14 3:14 9:1,20
  10:3,14,15,21 11:17
  13:2 14:9,12,14,18
  16:6 17:22 18:4 19:9
  19:10,17,24 23:14,22
  24:2,3,9,14,21 25:16

  26:7,14 28:3 30:21
  32:13,18,24 33:7
  35:23 36:1,7,7,8,9
Rocky 24:6
Rock's 21:14
role 4:24
running 7:4 13:19 26:3

            S
S 1:25 2:1,22,24 45:3
  45:22
saying 36:13 38:25
says 16:5,6,9,19 25:18
  36:25
scale 11:7
school 6:10
seal 45:17
second 16:18 22:18
secret 37:9
see 8:16 14:14 16:12,18
  17:6,8 18:9 19:5 20:2
  21:18,20,24 22:1,12
  22:13 23:21 24:8
  29:5 38:19
seen 5:24
select 17:1
selected 4:23
send 7:11,18,20,22
  15:1
sent 22:15 29:4
separate 17:7 19:7
service 1:9,9 6:16
  22:25
services 6:21,24 12:24
  13:7 15:11 20:5 28:9
  28:16 30:18 32:6
  33:4 34:13
set 45:8
settle 42:2,8,13
settled 42:5
Seward 6:17 7:1 35:25
  37:3 42:23
Sewright 2:3 11:4
  23:10 35:21 38:13
  39:4,10 40:17
Shamburek 2:7,7 16:9
  23:11 27:9 33:13
  34:19 42:24 43:2
share 37:8
sheet 16:10
SHORESIDE 1:8,9
show 19:4 22:15 33:5
showed 18:23 21:8
  27:15
shows 18:15 20:1
side 40:19
siding 9:21 12:13 13:8
  13:11 14:12 17:24
  23:1 24:17 25:19,22

sign 34:1 43:2
signature 43:1 45:13
significance 4:18
significant 21:19
signing 44:24
similarly 25:11
simple 22:18
simply 9:14
skip 14:4 23:2
small 7:1 8:11 37:3
Smithson 2:20
somebody 37:20
son 5:12,19 29:4
soon 9:24 26:21 28:1
sorry 15:22 30:8 40:4,5
sort 19:11
speak 5:3
speaking 30:7
specific 11:12 38:23
specifically 18:4
speculation 23:12
spell 40:9
Spencer 1:14 3:13 9:1
  9:5,6,13 10:3,14,15
  10:21 12:22 16:6,20
  16:20 17:1,8,11,22
  19:9,10,17,24 21:14
  23:1 24:9,21 26:14
  31:23,23 32:7,12
  33:24 34:12,13
Spencer's 16:22
spend 5:14
spent 15:11
spoke 10:11 28:25 29:2
  29:15,24 30:3,7,24
  40:25
spoken 21:9,13 27:22
spot 35:25
stapled 16:3,10
STAR 1:3,4
start 18:8,8 23:17
started 6:12,15 8:16
  9:11 10:9 22:10
  30:17
state 2:25 3:4 45:4
statement 19:10,16,21
  19:23 21:20
statements 18:8,9
  19:14
STATES 1:1,3,8,15
stenographically 45:10
steps 5:7 30:10 36:3
Stevedore 1:3,4 28:14
Stevedoring 1:4,5
Steven 2:7,7
stock 24:20,23,25 25:4
  25:10,14,16,18,19,24
straight-forward 9:23
Street 2:4,8

stuck 30:9
stuff 36:22
subcontractor 9:5,13
subscribed 45:16
substantial 23:5
sue 42:1,3
sued 39:1 41:6,20
suggest 26:5
suit 41:6,14,19,24
Suite 1:23 2:8,13,17
supplier 9:6,14
suppliers 30:4
support 11:25 14:1
  31:16
suppose 39:6
supposed 34:25
sure 11:8,11,14 12:12
  16:11 22:8 25:2
  26:11 28:17 30:2,2
  34:5 36:2,20,21
  39:19
surety 3:14
Sutherland 17:6,22
  23:21 24:9
sworn 3:3 45:7

            T
table 39:6
take 5:7 15:2 16:24
  17:14 30:10 39:12,17
  42:10
taken 1:21 2:21,24 3:15
  36:3 39:20 45:7,12
talk 4:2,3,4 5:10,18 6:4
  6:7 9:9,16 11:21
  15:10 21:18 40:20
talked 5:12 10:23
  11:14 13:16 18:17
  21:4 26:17 27:10
  30:12 31:19
talking 5:4 14:3 17:21
  20:21 29:12 30:3
  38:23
Telephone 41:3
tell 17:10 22:19 25:3
  26:19 27:6,17 31:1,1
  31:13,18,23 33:8
  40:17
ten 26:3 29:25 30:1,2,6
  30:8
term 33:10
TERMINAL 1:3,4
terms 10:21 34:9 37:11
testified 3:5
testimony 34:20 45:9
  45:12
thank 39:22 42:21,24
thing 35:10
things 7:3 14:7 16:25

EXHIBIT 1
Page 17 of 18

| | | | | |
|---|---|---|---|---|
| think 9:15 11:15 13:23 13:23 14:13 16:2,3 23:12 29:3 30:14,14 30:15 36:16 37:21 41:2,12,22 42:22 | **U** | 17:20 38:15 | **18** 40:3 | **7** 15:19,25 |
| | uh-huh 3:20 12:19 14:20 17:5 20:24 22:2 23:20 24:1,11 28:6 29:1,9,19 30:20 34:15 41:16 | work 6:9,11 8:1,2 9:12 10:11,17 12:14 13:4 14:7,15 17:15 18:3 24:13 25:7,9,15 26:25 30:13,22 38:20 41:3 | **1854** 40:15 | **745** 1:23 2:13 |
| | | | **1973** 6:12 41:10 | |
| | | | **1980** 40:14 | **8** |
| third 2:17 37:8 | | | | 8th 45:17 |
| thought 9:24 11:25 29:6 | ultimately 32:1,13 | | **2** | 810 2:4 |
| | umbrella 10:19 | worked 16:13 30:15 33:25 37:23 41:4 | **2** 15:14,16,18 18:9,12 18:12 19:3,14,20 46:15 | |
| three-quarters 26:3 | underlying 33:1 | | | **9** |
| thumbnail 6:8 | understand 3:19,24 4:9 4:14 5:1,4 8:20 13:3 20:21 22:25 27:23 32:25 33:1,13 37:10 38:24 | working 5:13 6:25 8:16 9:7 10:9 13:17 37:14 37:16 | **2005** 1:20 44:3 45:18 46:3 | 9th 22:2,3 |
| time 2:24 3:17 4:7,7,11 4:11 5:13,14,16 7:7 7:21 8:21 9:3,11 10:13,18 11:21 13:3 14:15,16,20,22 15:11 16:2,7,8 17:3,6,14 20:18,25 21:7 23:21 24:9 29:24 31:6,8,22 32:5 41:16 42:21 45:8,13 | | | | 9:05 1:20 |
| | | | **258-0106** 2:14 | 907 2:5,9,14,18 |
| | | worry 31:9 | **26th** 21:5 27:2 28:11 29:16 30:14,14,22 31:12 32:6 | 966 24:23 |
| | | wouldn't 37:11 | | 97 16:9,11 |
| | understanding 8:20 9:4,9 18:6 28:19 | Wow 40:16 | | 99501 1:23 2:4,8,13,17 |
| | | wrangle 33:24 | **265-5704** 2:5 | |
| | understood 33:18 | written 36:13 | **27th** 29:16,17,18 30:24 | |
| | UNITED 1:1,3,8,15 | wrong 32:23 38:16 | **276-8010** 2:18 | |
| | unload 14:14 | wrote 42:18 | **28th** 29:8 | |
| | use 1:3,8 44:23 | | **280** 2:17 | |
| tires 16:21 | USF&G 2:10,15 40:20 42:12,17 | **Y** | **29** 1:20 44:3 46:3 | |
| title 2:24 | | Yeah 10:5,12 15:1 16:12 18:6 19:13 20:17 21:21 23:13 27:1 29:6 30:20 | | |
| **TODEPOSITION** 46:1 | usually 8:5,5 37:13 42:5 | | **3** | |
| told 10:24 13:17 15:8 27:2 31:2,5 33:3 36:11 | | | **3** 39:24,25 46:7,16 | |
| | utilize 19:12 | | 3rd 8:16 10:9 | |
| | | | 30th 20:20 | |
| Tomlinson 2:16 | **V** | **Z** | 30(b)(6) 4:17,20 12:18 46:14 | |
| tons 22:23 | variety 37:4 | Zubeck 17:7,10 | | |
| touch 28:12,13 | various 19:4,17,24 | | **39** 46:16 | |
| town 6:19 7:1 8:11 | VIERGUTZ 2:16 39:24 40:2 42:21 46:8 | **0** | | |
| track 15:10 | | 019075 20:11,12 | **4** | |
| Traeger 2:11 3:10 | | 05-30-09 45:23 | **40** 46:8 | |
| transcribed 45:10 | view 33:8,10 36:18 | | **42** 29:6 | |
| transcription 45:11 | vs 1:13 | **1** | **425** 2:8 | |
| transport 13:9 14:10 14:19 23:1 | | **1** 1:19 5:22,23,24 6:3,3 18:9,12,12 19:3,14 19:20 46:14 | **46** 1:19 | |
| | **W** | | | |
| tried 20:14 | W 2:3 | | **5** | |
| trouble 33:19 | waiting 23:14 25:17 | 1st 7:20,23 11:1 | **5** 46:14 | |
| truck 18:2 20:9 22:14 23:25 24:5,7 36:4 | want 11:13 15:18 37:11 39:14 | 1:00 25:11 | 5/13 17:20 | |
| | | 10th 7:16,19,25 11:2 | 5/14 24:4 | |
| trucking 6:21 25:25 | wanted 9:19 11:24 14:1 14:8 34:5 42:19 | 10:15 43:3 | 5/14/97 17:21 23:22,25 | |
| trucks 11:9,13,15 14:22 23:5,6 25:1 | | 1029 2:17 | 5/3 16:3 20:15 21:19,21 | |
| | wasn't 8:17 11:20 14:16 15:5,23 18:23 21:15,17 24:24 | 10418 17:7 | 5/3/97 16:4 20:2,23 | |
| true 44:5 45:12 | | 10423 24:9 | 5/4 16:9,11,12 21:19,19 21:21 | |
| truth 3:4,4,5 33:8 | | 12 17:4 23:16,16,17,17 | | |
| Truthfully 9:15 | watch 13:18 | 13 23:16 | 5/4/97 20:23 | |
| try 4:2,3,4,9 7:18,20 17:2 | way 9:8 33:22 36:5,22 | 13th 21:25 22:13 23:6 | 5:30 25:11 | |
| | went 5:8 6:11 19:6 34:15 | 14 24:8 | 50 15:19,25 17:4 18:8,8 23:17,17 29:6 | |
| trying 37:20 | weren't 36:4 | 14th 21:25 22:13 23:6 | 502 1:23 2:13 | |
| turn 23:16 25:7 40:3 | West 1:23 2:17 | 15 46:15 | 522-5339 2:9 | |
| turned 20:18 | we're 6:25 8:2,11 14:11 20:21 | 15th 7:16,19,24,25 8:1 11:2 21:15,25 22:13 23:6 24:13 26:15 27:10,11,21,22 28:11 28:24 | | |
| twice 36:9 | | | **6** | |
| two 11:11,15 17:7 26:24 30:11 32:17,23 33:7 | we've 35:4 41:12 | | **6** 6:3 18:9,10 19:14 | |
| | WHEREOF 45:16 | | 6/15 27:5 | |
| | witness 3:3 39:19 45:6 45:13,16 | 16 24:20 | 6/26 30:18,19 | |
| type 3:24 | | 16th 24:19,20 25:23 | 630 2:8 | |
| typical 37:7 | word 14:13 | 17 25:9 | | |
| typing 4:2 | words 3:23 5:3 16:25 | 17th 25:7,10,24 | **7** | |

EXHIBIT 1
Page 18 of 18