Page 1

1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ALASKA

3

4    UNITED STATES OF AMERICA for the
     Use of SHORESIDE PETROLEUM, INC.,
5    d/b/a Marathon Fuel Service, on its
     own behalf,
6
               Plaintiffs,
7
        vs.
8
     NUGGET CONSTRUCTION, INC.; SPENCER
9    ROCK PRODUCTS INC.; UNITED STATES
     FIDELITY AND GUARANTY COMPANY; and
10   ROBERT A. LAPORE,

11             Defendants.

12   _____

     Case No. A98-009 CV (HRH)
13

14        30(b)(6) DEPOSITION OF SHORESIDE PETROLEUM, INC.

15                   Doug Lechner

16               Taken December 2, 2005
                 Commencing at 8:45 a.m.
17
              Volume I - Pages 1 - 82, inclusive
18

19

20               Taken by the Defendant
                        at
21           OLES, MORRISON, RINKER & BAKER
             745 W. Fourth Av., Suite 502
22             Anchorage, AK  99501

23

24

25   Reported by: Susan J. Warnick, RPR

EXHIBIT 1
Page 1 of 116

Case No. A98-009 Civil (HRH)                                        Doug Lechner

Page 2

1   A P P E A R A N C E S
2   For Plaintiff - Shoreside Petroleum, Inc.
3      LAW OFFICES OF STEVEN J. SHAMBUREK
       BY: Steven J. Shamburek
4      425 G Street, Suite 630
       Anchorage, AK 99501
5      (907) 522-5339
6   For Defendant - Nugget Construction:
7      OLES, MORRISON, RINKER & BAKER
       BY: Traeger Machetanz
8      745 W. Fourth Avenue, Suite 502
       Anchorage, AK 99501
9      (907) 258-0106
10  For ADF&G:
11     BAROKAS, MARTIN & TOMLINSON
       BY: Herbert A. Viergutz
12     1029 W. Third Av., Suite 280
       Anchorage, AK 99501
13     (907) 277-3533
14  For North Star:
15     BURR, PEASE & KURTZ
       BY: Michael Sewright
16     810 N Street
       Anchorage, AK 99501
17     (907) 276-6100
18
19  BE IT KNOWN that the aforementioned deposition was taken
20  at the time and place duly noted on the title page, before
21  Susan J. Warnick, Registered Professional Reporter and
22  Notary Public within and for the State of Alaska.
23
24
25

Page 3

1              P R O C E E D I N G S
2                 DOUG LECHNER,
3   called as a witness herein, being first duly sworn to
4   state the truth, the whole truth and nothing but the truth
5   by the Notary, testified under oath as follows:
6                 EXAMINATION
7   BY MR. MACHETANZ:
8   Q   Mr. Lechner, are you appearing today pursuant to a
9   30(b)(6) deposition notice?
10  A   Yes, I am.
11  Q   And are you prepared to testify on behalf of
12  Shoreside Petroleum, Inc., concerning the claims Shoreside
13  has brought against Nugget and its bonding company in this
14  matter?
15  A   Yes, I am.
16  Q   And would you please tell me what steps you have
17  taken to prepare for this deposition.
18  A   I have reviewed some documents. I've had some
19  discussions with Steve. And internally, company, just
20  trying to look at old records. I've talked to a past
21  controller of our company, trying to find some facts.
22  Q   Who would that individual be?
23  A   That was Ron Neibrugge.
24  Q   How long did you talk to Mr. Neibrugge?
25  A   About this topic?

Page 4

1   Q   Yes, sir.
2   A   About probably -- no less than five minutes, maybe.
3   Q   No less than five minutes?
4   A   Yeah -- or no more than five minutes. I'm sorry.
5   Q   That's okay. Anybody else within Shoreside that you
6   spoke with?
7   A   Just the owner of the company, Kurt Lindsey.
8   Q   And what did you speak with Mr. Lindsey about?
9   A   I've just -- essentially just telling -- just talking
10  about the case and where we're heading and the
11  depositions.
12  Q   What documents did you review?
13  A   I reviewed -- tried to review the legal documents.
14  Q   You're talking about the amended complaint, the
15  disclosures, all of that?
16  A   Yes.
17  Q   How about the underlying project records?
18  A   The underlying project records.
19  Q   For example, your invoices, the billings?
20  A   Okay.
21  Q   Your prior affidavit.
22  A   Those were in some of the documents that I've seen.
23  Q   Approximately how much time did you spend preparing
24  for this deposition?
25  A   Total time would be -- you know, I wouldn't say more

Page 5

1   than two hours maybe. A couple hours.
2   Q   That makes us about even.
3   A   Okay.
4   Q   Now, in connection with that, as the 30(b)(6)
5   representative for Shoreside, you understand that you
6   speak for the corporation?
7   A   Correct.
8   Q   Have you ever had your deposition taken before?
9   A   Not to my knowledge.
10  Q   You understand this is a question-and-answer process?
11  A   Uh-huh.
12  A   Yes.
13  Q   And because the court reporter is taking down the
14  questions, you're going to have to speak up and answer
15  audibly "yes" or "no;" a nod of the head won't work?
16  A   Yes.
17  Q   I will try not to talk over your answers. I would
18  appreciate it if you will try not to talk over my
19  questions. Can we try to accomplish that goal today?
20  A   Yes.
21  Q   The second thing is, I will try to ask coherent
22  questions. There's no guarantee of that. If there's a
23  question you don't understand, will you please let me know
24  so I can rephrase it?
25  A   Yes, I will.

2 (Pages 2 to 5)

EXHIBIT 1
Page 2 of 116

Page 6

1  Q  From time to time an attorney may pose an objection
2  during my questioning. If your -- unless your counsel
3  advises you not to answer the question, will you please
4  proceed to answer the question?
5  A  Yes.
6  Q  If at any time you want to take a break for whatever
7  reason, just let us know. This isn't an endurance
8  contest. The one request I have is, if I've asked you a
9  question, that you answer the question before you take the
10 break. Would you do that, sir?
11 A  Yes.
12 Q  Why don't we start then with your background. And by
13 that, I just want a thumbnail sketch of your highest level
14 of education and then a brief description of your work
15 history.
16 A  Sure. Highest level of education was one year of
17 college. And the work history: I started out actually as
18 part owner of a fuel company after that one year of
19 college.
20 Q  What fuel company was that?
21 A  Marathon Fuel. And I sold it in 1991. It was sold
22 to Shoreside Petroleum, and I've been involved with
23 Shoreside Petroleum ever since, currently in the capacity
24 of vice president of marketing.
25     MR. SHAMBUREK: Traeger, if we could note. He's

Page 7

1  a distinguished graduate of Seward High.
2      MR. MACHETANZ: Coming from Palmer, I'm not sure
3  if I'm willing to stipulate to the term "distinguished" in
4  connection with Seward High.
5      MR. SHAMBUREK: His performance, not the school.
6      MR. MACHETANZ: Oh, okay.
7      MR. SEWRIGHT: And we're just 10 minutes into
8  the deposition, too.
9  BY MR. MACHETANZ:
10 Q  All right. Let's talk about -- what were you doing
11 during the period of 1995 through 2000 for Shoreside?
12 A  I was vice president of marketing.
13 Q  What involvement did you personally have in
14 connection with the agreements between Spencer Rock and
15 Shoreside for the purchase of fuel and lubricant?
16 A  I handled all the pricing, and I put together the
17 proposal for the project.
18 Q  And approximately when was that, sir?
19 A  19 -- I guess it was spring -- actually winter of
20 1997, which would be, like, January or February. I don't
21 know the exact time, but approximate.
22 Q  Tell me, what does Shoreside do?
23 A  We're a wholesale/retail fuel company. We actually
24 sell fuel to gas stations, construction companies, heating
25 fuel to residential customers. We sell lubricant

Page 8

1  products. Currently it owns a couple of retail gas
2  stations.
3  Q  And how does Shoreside charge its customers? Or
4  particularly, how did Shoreside charge Spencer Rock for
5  the goods and services it provided?
6  A  No different than any of our normal course of
7  business. We actually have provided product to them,
8  quoted them a price, they accepted. Probably didn't
9  charge high enough, but we have certain formulas we use in
10 our processes.
11 Q  Let's then talk about the initial agreement. When
12 were you initially contacted by Spencer Rock wherein
13 Shoreside was requested to provide goods for Spencer Rock?
14 A  I believe it was -- we actually did some business
15 with Spencer Rock prior to this Homer project with Nugget.
16 And that was about a year and a half, I believe, possibly,
17 I guess, a year earlier, that they were doing some work.
18     MR. MACHETANZ: Let's mark this as Exhibit 1, if
19 I could, please.
20     (Exhibit 1 marked.)
21 BY MR. MACHETANZ:
22 Q  Do you recognize this as one of the documents you
23 reviewed?
24 A  Yes, I do.
25 Q  And if you would turn -- it starts on -- the fax

Page 9

1  number starts at page two at the top; do you see that,
2  sir?
3  A  Uh-huh.
4  Q  Could you turn to I guess what would be described --
5  or what would be fax number page 19 on this. There's no
6  real rhyme or reason to this. Specifically what I'd like
7  to turn your attention to is a Marathon Fuel Service
8  credit application?
9  A  Okay.
10 Q  And I believe -- if you would turn to the subsequent
11 page. Is that the first page of the application?
12 A  Yes, that is correct. Page 18.
13 Q  And then did you participate in the preparation of
14 this credit agreement?
15 A  No, I did not.
16 Q  Do you know the circumstances surrounding the
17 preparation of this credit agreement?
18 A  And I should say, I guess my involvement -- I may
19 have given them a copy of our credit application --
20 Q  Okay.
21 A  -- but I didn't play a part in approval. And the
22 process is it goes to our controller and thereby gets
23 approved also by the president and owner of the company.
24 Q  Was this credit application approved?
25 A  Yes, I believe it was.

Case No. A98-009 Civil (HRH)                                              Doug Lechner

Page 10

1   Q   And there was a credit application for Spencer Rock
2   Products, Inc.?
3   A   That is correct.
4          MR. SEWRIGHT:  Can we go off the record for a
5   moment?
6          (Off record.)
7   BY MR. MACHETANZ:
8   Q   I was rolling then and now I've forgotten where I
9   was.
10         Okay.  This application was provided by Spencer
11  Rock Products, Inc., to you.  And what is the underlying
12  information that Shoreside relies upon in determining
13  whether a credit application will be granted?
14  A   They look at -- they have certain criteria that they
15  look at as far as specific credit ratings.  We do credit
16  reports, credit background checks, use the information
17  that they provide, amongst other references that they also
18  provide.
19  Q   Did Nugget play any role in the application,
20  consideration, or agreement to this credit application?
21  A   To my knowledge, they didn't.  But Nugget had a
22  separate credit app -- application.
23  Q   Are you aware of any services -- do you provide
24  services and goods or goods only?
25  A   We call it service.  We of course, like anything, any

Page 11

1   delivery, you have to have service to back it up.  But we
2   do provide goods along with the service.
3   Q   So essentially what you do is you provide fuel and,
4   as part of the provision of fuel, you deliver the fuel --
5   A   That is true.
6   Q   -- or the lubricants or whatever to the location?
7   A   That is correct.
8   Q   Now, subsequent to the execution of this agreement,
9   did Spencer Rock purchase any goods from Shoreside prior
10  to the Homer Spit project?
11  A   Yes, they did.
12  Q   Do you have in your mind an estimation of the
13  approximate amount of goods purchased by Spencer Rock from
14  Shoreside prior to the Homer Spit project?
15  A   I don't have that number.  I'd have to go back and
16  look what that number was.  I couldn't give you an exact
17  dollar or even a -- try to hit a ball park.
18  Q   Any sort of range of magnitude you could give?
19  A   It was several thousand dollars.  I know that.
20  It wasn't, you know, a hundred dollars.  Yeah.
21  Q   That's good enough.
22         As part of that purchase, would they purchase
23  fuel in rail cars?
24  A   Yes, they did.
25  Q   Explain to me how that works.  Specifically at the

Page 12

1   location of the mine, how the fuel cars get there, how
2   they're picked up, and all of that.
3   A   After the order is placed -- the customer has placed
4   their order -- we then go ahead and order the fuel in a
5   tank car, which is a rail car.  And we will have the
6   railroad deliver it to this spot; in this case it was the
7   Spencer pit.
8          And the railroad takes care of the dispatching;
9   they coordinate it with Spencer.  And from there our hands
10  are free from it.  We don't do anything with -- as far as,
11  you know, how long their offload time is.  It's within
12  their time frame to get it off-loaded.  And then as soon
13  as its done, we do get notified by the customer, and then
14  we will release that car to the railroad.
15  Q   Now, explain to me how a fuel car works.  Does the
16  car itself remain at the location or is it -- is the tank
17  off-loaded from the rail car?
18  A   The tank -- actually, the rail car stays on location;
19  it's a fixed unit.  So it actually stays in place on the
20  tracks.
21  Q   So this traveling tank, I take it there's some sort
22  of spur or little off-shoot of track where it rests while
23  it's being used?
24  A   Yes, I believe so.  Spencer has their own siding.
25  It's call the Spencer siding.

Page 13

1   Q   And then, when the tank is emptied or is of no
2   further use to Spencer, how do you pick it up and take it
3   away?  Explain that to me.
4   A   Yeah.  That's what I was mentioning.  I said earlier
5   the railroad actually will come pick it up after we give
6   them notice that the car has been emptied.
7          Spencer Rock also can notify the railroad as
8   well that the car has been emptied or whoever customer we
9   have can actually notify the railroad themselves and send
10  them a release that the tank is empty and ready to be sent
11  back to the refinery.
12  Q   Is there anything that would preclude you, after you
13  have delivered the tank, from taking back the tank before
14  it is empty?
15  A   Yes.  If a customer didn't use all the fuel, it can
16  be shipped back to our facility, and we have pumped off
17  the remaining product and given credit back to the
18  customer for fuel not used.
19  Q   Now, when this credit agreement was executed, am I
20  correct that Spencer was to pay all invoices within 30
21  days of date of invoice unless specified?
22  A   I believe that's what it says on the credit app.
23  Q   Was anything modified about that?  In other words,
24  was the 30-day payment from invoice modified at all?
25  A   Not to my knowledge.

Midnight Sun Court Reporters  (907) 258-7100

EXHIBIT 1
Page 4 of 116

Case No. A98-009 Civil (HRH)                                        Doug Lechner

Page 14

1  Q   Was it your experience that Spencer met its 30-day
2  payment obligations up to the spit project?
3  A   Yes, I believe so.
4  Q   Explain to me -- when it says to pay all invoices
5  within 30 days of date of invoice, explain to me
6  Shoreside's invoicing procedure.
7  A   Generally, our procedure is to invoice the customer
8  in a monthly period from the first of the month through
9  the 31st of the month.  And at the 1st of the following
10 month we will send out a statement to the customer for
11 full payment.
12        And generally we do give a grace period.  It can
13 be within, you know, 30 days past the 1st that we can go
14 up to, prior to seeking further action.
15 Q   Let me see if I understand, then.  So your March --
16 for services that would be rendered in March of, say, '97,
17 those services would be aggregated and sent out in an
18 invoice on or about April 1st, correct?
19 A   Correct.
20 Q   The customer would then have 30 days in which to pay
21 that?
22 A   That's correct.  And I just wanted to clarify that
23 too, unless there was some special terms, you know, for
24 the specific invoice, you know, or specific arrangement.
25 Q   You're not aware of any special terms for Spencer at

Page 15

1  any point; are you?
2  A   No, as far as specific terms, I'm not at this point.
3  Q   So the March bills would be sent out in April.  And
4  you would, per the terms of your agreement, expect payment
5  May 1st?
6  A   Correct.  If that's our normal practice.
7  Q   Is that your normal practice?
8  A   That's normal practice, correct.
9  Q   And under your normal practice, if you don't receive
10 payment by May 1st -- in other words, it's beyond 30 days
11 due -- what do you do then?
12 A   The finance department will start making phone calls
13 and further pursue the customer for payment and take more
14 specific direct action.
15 Q   Do you have some sort of tickler system or
16 computerized system that notifies you when an invoice is
17 more than 30 days past due?
18 A   Yes.
19 Q   Who was responsible, during the period of the Homer
20 Spit project, for speaking with the customer if an invoice
21 was more than 30 days past due?
22 A   Ron Neibrugge was our controller at the time.  He
23 oversees that department.  And I don't know specifically
24 at the time if he would have contacted them personally.
25 It would have been possibly him or he would have had one

Page 16

1  of the accounting clerks contact an individual for an
2  overdue payment.
3  Q   Let's turn now to the Homer Spit project itself.
4  Tell me how Shoreside became involved in that project.
5  A   We became involved in the project when we were
6  contacted to supply fuel for the project from Spencer Rock
7  and Nugget Construction.  We provided fuel and lube for
8  the Spencer pit rock quarry operation and also provided
9  fuel for the tug boats that Nugget was using to haul the
10 rock from Seward to Homer.
11 Q   Let's break those down separately.  Who contacted you
12 about providing fuel for -- initially -- for the Spencer
13 pit?
14 A   Well, initially Bob LaPore was one of the contacts.
15 And then there was also an individual by the name of Randy
16 Randolph that I spoke with also.  Both those individuals I
17 talked with.
18 Q   For the Spencer pit?
19 A   Yeah, that's correct.
20 Q   Who did you understand at the time -- when did these
21 contacts take place?
22 A   For this project -- this would be the winter of
23 '96-97 -- it would be either -- maybe that fall.  I don't
24 know specifically the exact time, but it would be
25 someplace in that window of time of winter of '96-97.

Page 17

1  Q   And at the time of this contact, who did you
2  understand you would be providing fuel to at the Spencer
3  pit?
4  A   For the Spencer pit project, Spencer Rock was
5  supposedly going to be doing rock work out there at the
6  quarry, and that's who we'd be delivering the fuel to for
7  this initial part of the project.
8  Q   Who did you understand would be paying for the fuel
9  delivered at the Spencer Rock quarry?
10 A   At the time, Spencer Rock was the company that we
11 were billing the invoices to.  But we did know that Nugget
12 Construction was the general contractor.
13 Q   During the initial contact for the delivery of
14 rock -- or the delivery of fuel to the quarry, did
15 Mr. LaPore or Mr. Randolph ever indicate that Nugget was
16 going to guarantee payment of the billings to Spencer Rock
17 for the fuel?
18 A   The only thing that was mentioned about Nugget's
19 payment was when Bob LaPore said he was getting paid by
20 Nugget to pay for his -- for the portion of fuel -- he'd
21 be paying directly -- being paid directly by Nugget.
22 Q   So you understood that you would be supplying fuel to
23 Spencer, who would be supplying rock to Nugget?
24 A   Well, we didn't feel -- as supplier, we felt he was a
25 contractor, a subcontractor for the project, and that it

Page 18

1  was a bonded project.
2  Q    That was significant to you?
3  A    Maybe not as much at the time as it is now, but we
4  definitely recognized that any job, especially a federal
5  job, that are bonded projects.
6  Q    And was it fair to say that, when you learned that
7  this was -- at the time you understood this was a federal
8  project, did that have any significance on your decision
9  to extend credit at that time or is that something that's
10 simply become more important to you once Spencer ceased to
11 pay your bills?
12 A    Both companies, Nugget and Spencer, both had credit
13 at the time before this project, so that wasn't a
14 decision.  That didn't play any part, you know, in the
15 decision.
16 Q    The bonded nature of the project?
17 A    I should say that wouldn't be a decision because they
18 already had established credit, so that wouldn't be
19 necessary at that time.  Although, you know, we certainly
20 view those projects in a different light.
21 Q    Now?
22 A    Uh-huh.
23 Q    Hindsight.  Okay.
24       So at the time of the decision to provide fuel
25 to the Spencer quarry, with respect to that provision of

Page 19

1  fuel, there was no mention of Nugget other than Spencer
2  was being paid by Nugget.  And Mr. LaPore told you that?
3        MR. SHAMBUREK:  I was just going to say, I think
4  it's a compound question.  Object to form.  But go ahead.
5        THE WITNESS:  I guess I'm trying to figure out
6  how to answer that.  Of course Nugget's name was brought
7  up quite a bit, you know, through this whole project.  So
8  specifically to say -- they weren't mentioned.  But as far
9  as payment, there was not a mention that Nugget's going to
10 pay the fuel bill.
11 BY MR. MACHETANZ:
12 Q    Now, there was a separate provision of fuel for the
13 Nugget barge; is that correct?
14 A    "Separate provision" meaning --
15 Q    In other words, you had a separate agreement,
16 separate and apart with Nugget, to provide fuel for the
17 Nugget barge?
18 A    It wasn't Spencer Rock that was paying for the fuel.
19 Q    Exactly.
20 A    It was Nugget.
21 Q    And who contacted you at Nugget regarding payment for
22 the fuel -- or the provision of fuel for the Nugget barge?
23 A    I don't know specifically who that contact was for
24 the barge itself.  I know we had a lot of dealings with
25 Randy Randolph for the project, and I just couldn't tell

Page 20

1  you exactly who it was that negotiated that.
2  Q    Let's talk about the conversations with LaPore and
3  Randolph relating to the provision of fuel at the Spencer
4  quarry.  Did you participate in those conversations?
5  A    The only time I participated is when they contacted
6  me about fuel for the quarry.
7  Q    Can you describe for me those contacts.
8  A    The initial contacts, like I mentioned, that
9  winter -- during the winter of '96-97 when we got the
10 phone calls regarding some price quotes for fuel for the
11 project; I believe they were bidding on the project at the
12 time.  And I had conversations with Randy Randolph.  I
13 don't know how many, but they were over the phone, for
14 fuel prices for the Spencer pit project.
15       And Bob LaPore, I think my first contact with
16 him about this specific project was he came into town and
17 I met with him at the office as well and discussed fuel
18 prices and facilitating supplying fuel for the project.
19 Q    And then you offered -- you provided quotes for fuel
20 for Spencer; is that correct?
21 A    That's correct.
22 Q    Were those reduced to a written document?
23 A    I can't recall if actually that was on a faxed
24 document that we quoted it to him or quoted him over the
25 phone.

Page 21

1  Q    It may be that it was simply an oral quote, then?
2  A    That's correct.  It could have been.
3        I did at one time -- I know I did have a quote,
4  a written quote, but I don't know if it was specifically
5  for this project or not.
6  Q    And then, assuming it's not in writing, how do you
7  remember then the proper price to charge for your fuel?
8  Because I imagine you're pretty busy.
9  A    Exactly.  Right.  At the time in -- here's the
10 situation.  If -- fuel fluctuates like anything, so we can
11 gave them a price based on today; we can't guarantee them
12 that price, you know, if they're looking at a price
13 estimate four months from now.  As you are well aware,
14 probably filling up your car, it's pretty hard to
15 determine what the price is out there.
16       If we did quote a price to them on a verbal
17 quote, I could have possibly -- I would have put those in
18 notes someplace.  And then, at the time, we will give an
19 estimate and, prior to them getting the fuel, we'll
20 actually lock in that price prior to them taking delivery
21 of the rail car quantity.
22 Q    How do you do that?
23 A    As soon as we order the fuel from the refinery, on
24 that price on that day, that will be the price.  So we'll
25 know our cost; we can thereby charge the customer

Page 22

1   accordingly.
2   Q    Now, in addition to providing -- and then did you
3   thereafter begin to provide -- or did you subsequently
4   begin to provide fuel to the Spencer quarry?
5   A    Yes, we did.
6   Q    Did you provide any other goods to Spencer in
7   connection with this?
8   A    We provided just strictly lubricants, gasoline, and
9   diesel fuel.
10  Q    Where did you provide that to?
11  A    Excuse me.  Where?
12  Q    Yes, sir.
13  A    It went to the Spencer pit.
14  Q    Were any of your goods and services provided in
15  Seward itself?
16  A    Yes, there was some.  It was a smaller portion, but
17  there was some -- I believe some fueling of equipment in
18  Seward.  And possibly the delivery of some lubricant, some
19  oil.
20  Q    Would we be able to determine -- I understand the
21  concept of a fuel car.  Now, with respect to the
22  lubricants -- and you draw a distinction between
23  lubricants, gas, and diesel fuel, I believe.
24       The fuel car provides what, gasoline or diesel
25  fuel?

Page 23

1   A    Diesel fuel, yeah.
2   Q    Okay.  Separate gas and lube.  How do they come out
3   to the quarry?
4   A    We actually don't deliver them to the quarry.  So
5   they would have to take delivery themselves, the customer.
6   So if the customer ordered it, they would have to pick it
7   up in Seward or possibly even Anchorage.
8   Q    So they pick it up and then bring it out?
9   A    Correct.
10  Q    And all of the fuel, lubrication, and diesel fuel
11  that was delivered to the Spencer rock quarry was billed
12  to Spencer Rock; is that correct?
13  A    I believe all the invoices that we did were for
14  Spencer Rock at that time.
15  Q    And that was because, at the time of the purchase and
16  delivery of those services, you believed your contract was
17  with Spencer Rock for those goods delivered to the quarry?
18  A    Wouldn't necessarily say it's a contract.  We -- it's
19  for the entire project.  It was to provide rock to the
20  Homer Spit project.
21  Q    But for purposes of you providing gas, diesel fuel,
22  and lubricants, those goods that were provided were billed
23  to Spencer Rock?
24  A    On the initial phase, that's correct.
25  Q    And that's what I want to talk about, the initial

Page 24

1   phase.  And during that initial phase, you believed that
2   your agreement was with Spencer Rock to pay for those?
3   A    Our agreement was with -- Spencer Rock was the one we
4   were providing fuel to; that is correct.  We were still
5   looking -- we view the project as a bonded job.  It's a
6   federal project.  So we still know that there is still
7   some coverage, as well.
8   Q    So in other words, in your mind, your contract was
9   with Spencer Rock, but you had a bond in place in case
10  Spencer Rock failed to pay you.  Is that a fair summary?
11  A    I think that's a fair assessment.
12  Q    And during the period of time you were -- at some
13  point you spoke with Randy Randolph, I believe.
14  A    Correct.
15  Q    And he indicated that Nugget was taking over for
16  Spencer Rock and -- let's see -- and that all future fuel
17  and lube purchases were to be billed directly to Nugget
18  Construction; is that correct?
19  A    Yes.  Correct.
20  Q    And he also told you that Nugget Construction would
21  not pay for past purchases by Spencer Rock?
22  A    That's what he told me.
23  Q    Prior to that discussion, had you had any
24  conversations with Nugget Construction where Nugget told
25  you that they would pay for Spencer Rock's purchases of

Page 25

1   fuel, gas, and lubrication?
2   A    I spoke with Randy Randolph.  And I guess that was
3   still -- the unclear question at the time was who he was
4   representing, was whether he was with Spencer or whether
5   he was with Nugget.  Randy was the one I had the
6   conversation with in particular to both of those contacts.
7   Q    My question though, sir, is simply this:  At any
8   point prior to your conversation identified in your
9   affidavit with Randy Randolph, did anybody tell you that
10  Nugget would pay for the goods provided by Shoreside to
11  Spencer Rock?
12  A    Nobody from Nugget, other than Randy Randolph, that I
13  had discussions with prior to --
14  Q    But when you had these discussions with Randy
15  Randolph, did Randy Randolph ever indicate to you that
16  Nugget would pay for those?
17  A    The one conversation I had when I asked him, he said
18  that they wouldn't pay for them.
19  Q    And your other conversations with Randy Randolph,
20  were they all in this pre-agreement phase?
21  A    No.  I had many conversations -- or not many.  I just
22  had several conversations with him during the course of
23  the project for supplying fuel.
24  Q    Now, after you started providing fuel, lubricants,
25  gasoline to the project, did you have any discussions with

Case No. A98-009 Civil (HRH)                                           Doug Lechner

Page 26

1   Bob LaPore about payment for the fuel, oil, and lube?
2   A    Prior to the Homer --
3   Q    Discussions --
4   A    Prior to the Homer project? I'm sorry to --
5   Q    My fault, not yours.
6   A    Okay.
7   Q    As I understand, you talked with Randy Randolph and
8   Bob LaPore about reaching an agreement?
9   A    Right.
10  Q    Subsequent to that, you began to provide services
11  to --
12  A    Correct.
13  Q    -- Spencer?
14       My understanding is that Bob LaPore ordered --
15  was it three tank cars of fuel oil from Shoreside?
16  A    I believe that's correct.
17  Q    One was in February, one was in April, and one was in
18  May?
19  A    Uh-huh.
20  Q    Who would he order those tank cars from? Were you
21  the individual?
22  A    Yes, that's correct.
23  Q    And when he ordered them, what did he tell you, just,
24  we need another tank car?
25  A    That is correct.

Page 27

1   Q    At any point -- did you have other conversations with
2   Bob LaPore during the period of time that Shoreside was
3   providing fuel, lube, and -- well, fuel and lube to
4   Spencer Rock Products?
5   A    Yes, I did.
6   Q    In any of those conversations, did you discuss with
7   Bob LaPore payment for that or that he had overdue bills?
8   A    I can't recall the exact date that I had my first
9   discussion with him on the overdue payment part.
10       And also Ron Neibrugge have had some
11  contacts with him as well, or through our accounting
12  department. I'm not sure of the exact date, if that was
13  prior to Nugget taking over the pit or not.
14       MR. MACHETANZ: Let me mark this as Exhibit 2,
15  please.
16       (Exhibit 2 marked.)
17  BY MR. MACHETANZ:
18  Q    Handing you Exhibit 2, can you identify that, sir?
19  A    Yes, I can.
20  Q    What is it, sir?
21  A    It's a letter to Jane Poling with USF&G regarding a
22  proof of claim form for the Homer Spit project.
23  Q    Now, this indicates -- your proof of claim is for
24  goods you provided to Spencer Rock which were unpaid; is
25  that correct?

Page 28

1   A    That's correct.
2   Q    And to the extent that you provided fuel to Spencer
3   Rock pit on behalf of Nugget Construction after Shoreside
4   declined to grant Spencer Rock, Shoreside had been paid
5   for that in full by Nugget?
6   A    I believe so.
7   Q    Now, if you would turn to the statement. There are
8   -- can you explain to me in your statement form what the
9   reference number is?
10  A    The reference number is referencing a specific
11  invoice for fuel delivery.
12  Q    And then the date, does that reference the date that
13  the fuel was provided?
14  A    That is correct.
15  Q    Let me ask you, specific to the deliveries of tank
16  cars -- and if you look at page -- turn back to Exhibit 1,
17  if you could, please, sir. Exhibit 1, sir. And I'm
18  looking at two invoices. I believe they're the invoices
19  for the fuel cars.
20  A    There. That is correct.
21  Q    Now, there's a reference here to 5/21/97 and 4/8/97;
22  do you see that?
23  A    Yes, I do.
24  Q    Does 5/21/97 reflect the actual date that the car is
25  delivered to the site and dropped off or is that the date

Page 29

1   that the order is placed and then you set in motion
2   whatever it is you have to do with the railroad?
3   A    That is the date that actually the car was filled and
4   then ready for shipment to the Spencer quarry.
5   Q    Do you know when the car -- that's the date the car
6   was filled. Do you know when in fact the car actually
7   arrived at the Spencer quarry?
8   A    I don't have that specific date, but the railroad
9   documentation would show that.
10  Q    Typically, how long does it take after the car is
11  filled for the car to be delivered to the Spencer quarry?
12  A    Generally it would be within a -- probably a 10-day
13  period.
14  Q    Ten-day period. Okay.
15       How would we be able to determine specifically
16  when this tank was delivered to the Spencer quarry?
17  A    We would have to look at the railroad dispatch. They
18  would actually have a bill of lading that would show that
19  date.
20  Q    Would you have that in your files?
21  A    We possibly would.
22  Q    Now, I see -- turning back to Exhibit 2 -- I see two
23  rather large charges for tank cars. Are the remaining
24  amounts that we see here fuel or lubricants that were
25  purchased in town and sent out to -- that Spencer Rock

Midnight Sun Court Reporters (907) 258-7100

EXHIBIT 1
Page 8 of 116

Page 30

1   Products would have to purchase in town?
2   A   That's correct. I'm not sure which ones specifically
3   or if we put some fuel into some of their equipment
4   directly in Seward. Yeah.
5       MR. MACHETANZ: Let's mark this as Exhibit 3.
6       (Exhibit 3 marked.)
7   BY MR. MACHETANZ:
8   Q   Handing you Exhibit 3, do you recognize that, sir?
9   A   Yes, I do.
10  Q   What is it?
11  A   They're invoices for fuel billed to Spencer Rock.
12  Q   Do you recognize the signature -- starting at the
13  second page, that's M -- it looks like MO or -- do you
14  know who that is?
15  A   I don't. I could take a guess that his name is Mark,
16  a fellow that worked for Spencer.
17  Q   What did Mark do for Spencer?
18  A   I think -- I believe he was one of the -- actually, I
19  couldn't tell you exactly what he did. But he just worked
20  for Spencer Rock in the Seward area, operating some
21  equipment.
22  Q   Mark Jones? I'm basing that on -- I look at Nugget
23  009138 and it looks like Jones is the one legible --
24  that's the one --
25  A   Yeah, right. Right. Exactly.

Page 31

1       MR. SHAMBUREK: Which page?
2       MR. MACHETANZ: 009141. It appears that Mr.
3   Jones let his guard down once and made a legible
4   signature.
5       MR. VIERGUTZ: As well on 9130, you can see it
6   as well.
7   BY MR. MACHETANZ:
8   Q   So we see signatures from Mr. Jones and Mr. LaPore;
9   is that correct?
10  A   That is correct. And I'm just not sure on the Mark,
11  if that's the same Mark. And I can't even actually
12  remember quite his name. And, unfortunately, he's not
13  with us anymore.
14  Q   You mean he's passed away?
15  A   Yeah.
16  Q   Now, in connection with these, I see one of the tanks
17  was sent out on April 8th for $21,503 and there were
18  additional charges for goods during the month of April; is
19  that correct?
20  A   That is correct.
21  Q   So the goods that were provided in April would have
22  been billed to Spencer on or shortly after May 1st; am I
23  correct?
24  A   For their purchases, that is correct.
25  Q   And so, as of June 1, under the agreement, the April

Page 32

1   billings would have been past due; is that fair?
2   A   That is correct.
3   Q   Now, as of June 1, what steps did you take to
4   determine what -- or when you were going to get paid by
5   Spencer for the April invoices?
6   A   I know there were some conversations. I personally
7   had a couple conversations with Bob LaPore and our
8   accounting staff as well -- that we had several
9   discussions on getting payment. And at the time, Bob
10  LaPore said he hadn't been paid by Nugget and was awaiting
11  payment from Nugget.
12  Q   So Bob LaPore said he hadn't been paid?
13  A   Correct.
14  Q   Now, did he tell you that he was going to pay you?
15  A   Yes, he did.
16  Q   How soon after the first did you have these
17  discussions with Bob LaPore?
18  A   I couldn't tell you exactly the day, but it was
19  within -- I'm sure I talked to him within probably the
20  first week of the month.
21  Q   And did you keep any notes of your conversations with
22  Bob LaPore?
23  A   Any notes I have relating to that should have been
24  provided.
25  Q   Is it your habit -- is it your practice to keep notes

Page 33

1   of your conversations regarding debt collection?
2   A   I don't get specifically involved in the debt
3   collection on a daily basis.
4   Q   Well, for past due accounts, is it typical for you to
5   keep notes of your telephone conversations?
6   A   I personally try to keep some notes on some of my
7   conversations, not all of them.
8   Q   In reviewing your files in preparation for this
9   deposition, or at any point during this litigation, have
10  you reviewed any notes of conversations with Bob LaPore
11  concerning a past due account in June of 1997?
12  A   I don't think I've seen anything specifically
13  relating to that.
14  Q   You believe that your conversations with Bob LaPore
15  were in the first week. You had at least one. Tell me
16  the follow-up conversations with Bob LaPore.
17  A   The follow-up conversations -- you know, like I
18  mentioned, I did have several conversations with him. But
19  I don't know specifically if it was relating to the back
20  payments or the invoices. And then also our accounting
21  department would have had, I'm sure, several conversations
22  with him as well.
23  Q   Who specifically?
24  A   I couldn't tell you if it was Ron himself or again --
25  Ron Neibrugge -- or possibly one of his accounting staff.

Case No. A98-009 Civil (HRH)    Doug Lechner

Page 34

1  Q   Was a $25,000 -- let's say $22,000 in past due
2  amounts be considered a significant past due account to
3  Shoreside?
4  A   Yes.
5  Q   So that would demand close scrutiny, I imagine?
6  A   Yes.
7  Q   And then was there also concern given the fact, as of
8  June 1st, you had this overdue account and you'd just
9  provided another $20,000 worth of fuel to -- 20,000
10  plus -- to Spencer Rock Products?
11  A   Could you say that again?
12  Q   Okay. As of June 1 --
13  A   Right.
14  Q   -- you had an outstanding debt of around 22, $23,000?
15  A   Correct.
16  Q   In May you continued to charge for additional lube
17  materials?
18  A   Correct.
19  Q   And you also had filled an order for about $21,000
20  for fuel in another tank car?
21  A   Correct.
22  Q   So by that point he's approaching 45,000?
23  A   Correct.
24  Q   And as of about June 1st, the tank car was probably
25  being delivered or close to delivery or had just been

Page 35

1  delivered at the Spencer quarry; is that correct?
2  A   Correct.
3  Q   And obviously, if $25,000 was a large amount of money
4  for Shoreside, then 45,000 was a real large amount of
5  money?
6  A   That's correct.
7  Q   So when did you contact Nugget about this?
8  A   Well, specifically -- and one of the reasons why I
9  got -- I believe that it went over the credit limit amount
10  to get that high was that there was a conversation with
11  Bob LaPore about payment for the prior car. He was going
12  to receive some money from Nugget within the following 10
13  days or two weeks; I don't know the specific time frame.
14  But he was promised some money from Nugget to get those
15  paid and had assured us that we would be paid for it. So,
16  thereby, I believe that's when we released that second
17  car, or that particular car of fuel.
18  Q   So that car may have been held for a while until you
19  had a chance to talk to Bob LaPore and get his assurances?
20  A   I don't think we held the car. But before we would
21  place an order, correct, then we would have talked to him.
22  Q   So let me see if I understand this. What was
23  Spencer's credit limit?
24  A   I believe it was 20,000. It's under the -- it's
25  written on the credit application.

Page 36

1  Q   Can you show me that, because I'm obviously not
2  attentive. Ah, amount of approved credit, 20,000?
3  A   Correct.
4  Q   So you provided -- let me see if I understand this.
5  As of the time you provided the second fuel car to
6  Spencer, Mr. LaPore had exceeded his credit limit with
7  Shoreside?
8  A   It would appear, at that time, that's correct.
9  Q   And because you were concerned about that before you
10  filled that second order, you spoke with Mr. LaPore and
11  said, you're over your limit, you haven't paid us, what
12  are you going to do. Is that a fair statement?
13  A   I don't know what the exact conversation was, you
14  know, at the time, how that went, but I'm certain that
15  there was some conversation relating to the past due
16  amount.
17  Q   And Mr. LaPore told Shoreside that he was waiting for
18  payment from Nugget and, when he got that payment, he
19  would pay Shoreside; is that --
20  A   That's correct, to my knowledge.
21  Q   At that time, did your call Nugget to confirm this
22  was the case or anything?
23  A   I specifically didn't. I don't know if Ron did
24  himself.
25  Q   Based on Mr. LaPore's statement to you, you then went

Page 37

1  and released the car to Mr. LaPore?
2  A   We did release the car to Spencer pit.
3  Q   Without receiving any payment from Mr. LaPore --
4  A   I believe that was the case.
5  Q   -- and even though he was above his credit limit?
6  A   Yes.
7  Q   Now, by June 1st, he's more than twice above his
8  credit limit; is that correct?
9  A   That is correct, it would appear, from the limit on
10  the credit application. And granted, that was back in
11  '95, so there could have been some increase in that as
12  well.
13  Q   Are you aware of anything indicating an increase
14  here?
15  A   I haven't seen anything.
16  Q   Now, continuing on, comes to the 1st of the month and
17  you haven't been paid. And Mr. LaPore again tells you,
18  still haven't been paid by Nugget; when I get paid, you'll
19  get paid; is that correct?
20  A   I'm not sure of the exact wording he used, but it was
21  definitely he was waiting on some payment from Nugget to
22  get paid.
23  Q   And these contacts were in the first week of June?
24  A   Thereabouts, yeah.
25  Q   So when do you finally contact Nugget?

Midnight Sun Court Reporters  (907) 258-7100

EXHIBIT 1
Page 10 of 116

Case No. A98-009 Civil (HRH)                                    Doug Lechner

Page 38

1    A    You know, they actually may have been some contacts
2    with Nugget in and around that time. I know I had, like I
3    mentioned, several conversations with Randy Randolph, who
4    I didn't know was working with Nugget until he actually
5    provided me that he was specifically with Nugget. I
6    thought he was Spencer Rock involvement. But he was
7    essentially stepping in as a Nugget representative. And I
8    had several conversations with him, and he was speaking
9    poorly about Spencer and --
10   Q    Did that cause you concern, that he was speaking
11   poorly about Spencer? Was he telling you that he had
12   concerns about Spencer's performance?
13   A    He was -- he had some specific comments about Bob
14   LaPore, but I can't recall exactly what they were. But
15   since he was a partner in Spencer, I couldn't understand
16   why.
17   Q    How did you know he was a partner in Spencer?
18   A    Well, this is what I was told by Bob LaPore.
19   Q    Okay. You were told that by Bob LaPore.
20        When were you told that?
21   A    I don't have that exact time. And that was just in
22   conversation. I don't know that's a fact, but that's what
23   I was told, that he was a partner.
24   Q    Did you ever ask Randy if he was a partner of Spencer
25   Rock Products?

Page 39

1    A    No, I didn't.
2    Q    Now, during this time that was Randy was speaking
3    poorly of Bob LaPore -- was that occurring in May, prior
4    to the delivery of the second shipment?
5    A    I actually think it was sooner than that. And that's
6    when I believe Nugget actually stepped up with some
7    equipment to get involved in the project.
8    Q    How did you know that Nugget stepped up to get
9    involved in the project?
10   A    Because Randy had told me that they were placing some
11   equipment out there at the site to speed things up.
12   Q    So let me see if -- so as of the time you filled the
13   order on May 21st, we -- let me see if the following facts
14   are true. Spencer is over its credit limit, correct?
15   A    It's over what it says on here. And I don't know
16   specifically that that didn't get raised verbally.
17   Q    You don't know if there's any raise of that?
18   A    I don't know, yeah.
19   Q    And you were concerned, I believe you testified,
20   about the fact that it appeared to be over his credit
21   limit; is that correct?
22   A    It's definitely what it says on the credit
23   application. It would certainly trigger at least some
24   alert.
25   Q    So it appears that Spencer is over its credit limit

Page 40

1    as of the ordering of the second car. Spencer has not
2    been paid by Nugget, according to Bob LaPore?
3    A    Correct.
4    Q    Nugget is speaking poorly of Bob LaPore -- or Randy
5    Randolph is saying that Bob LaPore is not doing a good job
6    in the Spencer quarry; is that correct?
7    A    Said it was slow.
8    Q    Nugget is actually providing equipment, according to
9    Randy Randolph, in the Spencer quarry as of that time?
10   A    Uh-huh. That's correct.
11   Q    You're aware of all of those facts, and you authorize
12   the shipment of the second $20,000 fuel car?
13   A    That's correct.
14        MR. SHAMBUREK: Can we take a break?
15        THE WITNESS: And, actually, I do need to go to
16   the bathroom. That would be nice.
17        MR. MACHETANZ: All right. Well, we aim to
18   please. Go right ahead.
19        (Recess taken.)
20        (Exhibit 4 marked.)
21   BY MR. MACHETANZ:
22   Q    When you spoke with Mr. Randolph, and Mr. Randolph
23   indicated that Nugget was putting equipment into the
24   quarry to assist in the quarry operation, did you
25   understand that -- did Mr. Randolph tell you that Nugget

Page 41

1    was doing that for free?
2    A    I didn't know what the arrangement was.
3    Q    So you didn't know if -- are you familiar with the
4    term "backcharge"?
5    A    I've heard it before.
6    Q    What does the phrase "backcharge" mean to you?
7    A    I'm going to assume it means to bill for something
8    done in the past.
9    Q    Are you familiar with the terms as used in the
10   construction industry?
11   A    Like I say, I've heard it used, but I don't know the
12   specifics of it.
13   Q    For example, if a general contractor provides a
14   subcontractor with a piece of equipment and charges the
15   subcontractor for that piece of equipment, have you used
16   it -- heard it used in that context?
17   A    I may have.
18   Q    In other words, backcharging the subcontractor for
19   the use of an EX 750.
20   A    Okay.
21   Q    Now -- and you didn't know whether Nugget was
22   backcharging Spencer for free or -- was backcharging
23   Spencer for there services or was providing the equipment
24   for free; is that correct?
25   A    I don't know the arrangement that they had.

Page 42

1  Q   And that's not something you inquired into?
2  A   No.
3  Q   Now, when you agreed to provide the next rail car in
4  May of '97, did the fact that this was a bonded job have
5  any influence on that decision?
6  A   We definitely had some comfort that Nugget was the
7  general contractor, and that it was a bonded job.
8  Q   What comfort did the -- I understand you receiving
9  comfort from the fact that it was a bonded job.
10      What comfort did you take from the fact that
11 Nugget was the general contractor on the project?
12 A   We had some prior business dealings with them before,
13 and we hadn't had any problems with them.
14 Q   They seemed like a stand-up company to you?
15 A   We didn't have any problems with them, yeah, from the
16 one job we did prior to that.
17 Q   Now, given the facts that we discussed prior to the
18 break and given the fact that you would be extending
19 another 21 or $22,000 in credit to LaPore for this next
20 fuel shipment, when did you contact Nugget and tell them
21 you were looking to them or their bond to pay for this
22 credit if LaPore couldn't pay?
23 A   I didn't contact them. Ron Neibrugge, I believe it
24 was, that contacted them.
25 Q   When did Mr. Neibrugge contact them?

Page 43

1  A   I don't know the specific date when he contacted
2  them, you know, by phone. I know we did have some
3  correspondence with them.
4  Q   Was that before or after Randy Randolph contacted
5  you?
6  A   I believe that was after Randy had contacted me.
7  Q   So you didn't initiate any conversations with Nugget
8  about LaPore's financial situation until after Randy
9  Randolph contacted you, that you were aware of?
10 A   That I am aware of. And I'm not going to say that
11 they didn't -- that there wasn't some conversation prior
12 to that. There could have been.
13 Q   But you didn't know of any?
14 A   I don't know specifically of any instance.
15 Q   And you are the 30(b)(6) representative of Shoreside?
16 A   At this point. But -- and I do want to clarify that
17 Ron Neibrugge, who's listed in here, was our controller
18 for 10 years and, of course, I didn't handle the finance
19 portion.
20 Q   And you were able to contact Mr. Neibrugge and
21 discuss this before your deposition?
22      MR. SHAMBUREK: I'm just going to have to
23 object. These are very, very, very factually specific
24 questions. He can talk about the corporation and its
25 practices and whatnot. But you're asking about a

Page 44

1  conversation that somebody else in the company had and you
2  have to present that to the individual. I think he's done
3  a commendable job meeting his 30(b)(6) duties. I think
4  you would have to agree that, to have him be able to
5  testify as to when somebody made conversations during that
6  period of time is beyond the realm of 30(b)(6).
7       MR. MACHETANZ: Well, we may disagree about the
8  scope of 30(b)(6).
9  BY MR. MACHETANZ:
10 Q   Now could you please answer the question. You were
11 able to contact Mr. Neibrugge before your deposition,
12 correct?
13 A   Correct.
14 Q   And was there any time limit on the amount of time
15 you could speak with Mr. Neibrugge?
16 A   Nobody gave me a time limit.
17 Q   How much time did you spend speaking with him?
18 A   Specifically about this case, only, like I mentioned
19 earlier, less than -- no more than five minutes.
20 Q   Now, in connection with the conversation that you had
21 with Randy Randolph, I believe, if we have Exhibit 4 in
22 front of you -- right there (indicating) -- it says, "In
23 June I received a phone call from Randy Randolph."
24      Do you see that, sir?
25 A   Yes.

Page 45

1  Q   When in June?
2  A   I don't know the specific date. I would have put
3  that in there if I knew.
4  Q   Well, given SRP's nonpayment as of June 1st and the
5  fact that they had just given a 20,000 -- you had advanced
6  another 20,000 for a fuel car, would it be fair to say it
7  must have been early in June or you would have contacted
8  him?
9  A   I'm assuming it would be early June. I can get the
10 direct -- I'm certain I could find that date.
11 Q   How could you find the date?
12 A   If we look back through the records from when we
13 started invoicing -- when they took over the direct
14 project.
15 Q   The question I have, though, sir, is: As of June
16 1st -- well, would it be fair to say that you would have
17 contacted Nugget early in June if Nugget hadn't have
18 contacted you, given the situation with Bob LaPore?
19      MR. SHAMBUREK: Do you mean Spencer?
20      MR. MACHETANZ: I mean Shoreside.
21 BY MR. MACHETANZ:
22 Q   Would that be Shoreside's practice?
23 A   To contact a --
24 Q   The general contractor if the sub is over 30 days'
25 past due and is more than twice its credit amount.

Case No. A98-009 Civil (HRH)                                          Doug Lechner

Page 46

1  A   It certainly could be -- we would certainly contact
2  them as probably a -- a very good possibility that we
3  could.
4  Q   That would be a prudent commercial practice?
5  A   It could.
6  Q   Wouldn't it be?
7  A   I just don't know specifically on this case, you
8  know, whether or not we did contact them or not.  So I
9  can't, again, you know, speak for the controller.
10 Q   Well, would it be fair to say that -- is it your
11 belief, sir, that the conversation with Randy Randolph
12 occurred in early June?
13 A   About Nugget taking over the project?
14 Q   Yes, sir.
15 A   Yes.
16 Q   Now, in that same conversation, Mr. Randolph stated
17 that Nugget would not pay for past purchases by Spencer
18 Rock.  Do you see that in paragraph six?
19 A   Yes, I do.
20 Q   And that accurately narrates your conversation?
21 A   Yes.
22 Q   Now given that fact, and given -- given that fact,
23 what steps did you take to retrieve the $21,000 fuel car
24 that you had sent to Spencer rock quarry in late May?
25       MR. SHAMBUREK:  I'm going to just object because

Page 47

1  it assumes facts in evidence.  He never stated that they
2  tried to retrieve the rail car.
3  BY MR. MACHETANZ:
4  Q   Did you make any effort to attempt to retrieve the
5  rail car?
6  A   No, I didn't.
7  Q   Are you aware of anybody within Shoreside who tried
8  to retrieve the rail car?
9  A   No.
10 Q   Are you aware of anything that would have precluded
11 you retrieving that rail car?
12 A   Not to my knowledge.
13 Q   Now, that rail car was ordered by Bob LaPore of
14 Spencer Rock Products, correct?
15 A   I believe so, yes.
16       MR. SHAMBUREK:  Let me interpose just an
17 objection -- and then you can go on -- is that most of
18 these questions are irrelevant, but sometimes it's easier
19 just to allow somebody to inquire.  The court had already
20 found that all of this fuel was used for the use and
21 benefit of the project.  So to argue something to the
22 contrary seems like a stretch.  Having made that
23 objection, that this analysis or this inquiry appears
24 irrelevant, why don't you go ahead and ask your questions.
25       MR. MACHETANZ:  I will.  And I will use it in my

Page 48

1  next summary judgment motion and we'll determine whether
2  it's relevant or not.
3  BY MR. MACHETANZ:
4  Q   Now, in response to that -- you had this fuel
5  delivered.  Mr. Randolph told you Nugget wasn't going to
6  pay for past due Spencer Rock Products' purchases.  And he
7  told you this, the best of your recollection, in early
8  June.
9        Why didn't you take any steps to retrieve the
10 fuel car?
11 A   Again, to go back, you know, during that time, I
12 don't know exactly how much fuel was used.  It was already
13 invoiced out.  The fuel was there.  We're not sure exactly
14 how much fuel was used out of that car.
15       And specifically, the project had to still
16 continue on, whether it be Nugget, Spencer, or whoever;
17 they're both within the box.  We felt they're both -- it's
18 a bonded project.  It's for a rock quarry on Homer Spit.
19 It's all going for the same purpose.  It didn't matter,
20 you know, if it was Spencer or Nugget, and -- which one it
21 was; it was for the same project.
22       We just know that, when we look at that Homer
23 Spit -- which I drove by there.  When I looked and seen
24 that rock down there, I know that every rock they got
25 there was with our fuel.

Page 49

1  Q   But you could have had the railroad pick up the rail
2  car, bring it back, pumped it out, and offered a credit
3  for the unused fuel.  There was nothing that precluded
4  Shoreside from doing that?
5  A   Correct.
6  Q   Now, I also see that -- when did you specifically cut
7  off credit to Spencer Rock Products?
8  A   I believe it was -- I don't have the exact date in
9  June, but it's right in -- sometime here in June.
10 Q   How do you notify your sales force or your stores or
11 your gas stations that Spencer is no longer entitled to
12 use credit?
13 A   We'll verbally -- we can verbally or written notice.
14 Q   Do you have any indication of when that verbal -- do
15 you have any firsthand knowledge of when that verbal or
16 written notice was provided?
17 A   I don't.
18 Q   Who would be responsible for providing that verbal or
19 written notice?
20 A   Ron Neibrugge, our controller.
21 Q   And you don't know when Mr. Neibrugge provided that
22 notice?
23 A   I don't know when he did.
24 Q   And you don't have any -- as you sit here today, you
25 don't recall any specific written documentation showing

Case No. A98-009 Civil (HRH)                                           Doug Lechner

Page 50

1   that Spencer Rock Products -- you have not seen, to the
2   best of your recollection, any written indication of when
3   Spencer Rock Products' credit was cut off?
4   A   I haven't seen anything written, but we're a small
5   company, you know; we're not a -- 500 employees. So
6   easily, you know, a phone call, and two key people know,
7   and it's a done -- you know, several people know, and it's
8   a done deal.
9   Q   Do you have any recollection of any telephone
10  messages or such indicating Spencer Rock Products' credit
11  has been cut off?
12  A   I'm not sure of the time. You know, there was
13  conversation about -- they certainly being cut off from
14  credit, but I just can't recall the exact date. And
15  again --
16  Q   Now, you had this conversation with Randy Randolph.
17  What did you do after the conversation, with respect to
18  Spencer Rock Products' credit?
19  A   I'm not sure if they continued to get fuel right, you
20  know, within a couple days after that or if we withheld
21  any future fuelings to them. I don't know. I actually
22  don't know.
23  Q   You don't know when the directive to cut off credit
24  to Spencer Rock Products came in relation to your
25  discussion with Randy Randolph; is that correct?

Page 51

1   A   I don't know the exact date.
2   Q   But in fact, as soon as you heard -- from Randy
3   Randolph's statement, you made the decision not to
4   extend --
5   A   No.
6       MR. SHAMBUREK: That exceeds anything he's
7   testified to.
8       MR. MACHETANZ: I haven't finished my question
9   yet. Why don't you let me finish my question and then you
10  can pose an objection. You can pose an objection to
11  form. But simply these long dissertations about what your
12  position is really isn't appropriate here, Steve.
13      MR. SHAMBUREK: It's not a long dissertation.
14  What you're doing is you're going over and over the same
15  thing. You're saying here that, immediately after this
16  conversation -- he's not even sure what the conversation
17  is -- you made a decision. Ask him questions. Don't keep
18  revising things and suggesting that he's previously
19  testified to them. You can ask him questions about what
20  he did and when, but you're summarizing it incorrectly and
21  then asking another question.
22      MR. MACHETANZ: Steve, I was going to ask a
23  leading question. So why don't you shut up until the
24  question is over. And then, if you have a legitimate
25  objection, make it. Don't interrupt me.

Page 52

1   BY MR. MACHETANZ:
2   Q   Now, my question to you is: After you had this
3   discussion with Randy Randolph, had you decided at that
4   point that credit would be cut off to Spencer Rock
5   Products?
6   A   I don't have the exact date that -- when we did cut
7   off credit to Spencer Rock in front of me. And certainly
8   I could find it, digging through the several boxes of
9   paper. You know, this thing happened obviously, as you
10  know, eight and a half years ago, almost nine years.
11      That -- it may have happened prior to that --
12  there may have been discussions. I know he was on very,
13  very tight credit terms, but the promise that Nugget would
14  pay was in the forefront of our mind, that we were assured
15  that Nugget was going to pay him; we were going to be paid
16  in full.
17  Q   Where did this promise from Nugget come from?
18  A   It came from Spencer Rock.
19  Q   Bob LaPore?
20  A   I believe so.
21  Q   Nugget at no point promised you they would pay you
22  for Bob LaPore's credit; did they?
23  A   Not to my knowledge.
24  Q   Now, who was present for this discussion to put -- to
25  cut off Bob LaPore's credit?

Page 53

1   A   That would have been Ron Neibrugge and the president
2   of the company, Kurt Lindsey, and myself.
3   Q   Do you know if there was any record kept of that
4   discussion or decision?
5   A   No written record that I am aware of.
6   Q   Spencer continued to purchase on credit in June of
7   '97; is that correct?
8   A   That is correct. Yes.
9   Q   And at the time they were purchasing on credit in
10  June, they were two times over the credit limit depicted
11  in their credit application, correct?
12  A   Yes, but there again, I want to restate that that
13  credit application was a year and a half prior to this
14  project. That's not a set-in-stone number. And that can
15  be raised or rescinded, you know, prior to that.
16  Q   Have you seen any indication -- any written
17  indication -- that the credit application limitation was
18  of raised?
19  A   I haven't seen anything in writing on it, but that's
20  not to say it hadn't been done verbally.
21  Q   Are you aware of any verbal discussions about that?
22  A   Obviously, we raised it. We gave him credit over his
23  $20,000 limit, so we did give -- we did raise his limit.
24  Q   When you made that decision to raise his limit, what
25  additional financial information did you request from

Page 54

1  Spencer Rock Products?
2  A   I don't know if any particular that they requested
3  from Spencer Rock. We just knew that it's a bonded job.
4  Again, it was a bonded job, they were a subcontractor to
5  Nugget, and that we would be paid in full.
6  Q   Are you aware of any financial investigation into
7  Spencer Rock Products which was conducted prior to
8  releasing the second tank car?
9  A   Not to my knowledge.
10 Q   Do you believe Nugget defrauded Shoreside?
11 A   Well, they haven't paid their bill, and we're out
12 50-some thousand dollars that we haven't been paid for.
13 Q   Other than the fact that you haven't been paid
14 $50,000, can you explain to me why Shoreside believes it
15 has been defrauded by Nugget?
16 A   They certainly didn't represent themselves with their
17 subcontractors, using -- how do I say this? We felt it's
18 pursuant for any contractor that's bonded that they will
19 hold true to their payment, to seeing that this -- a job
20 is done. And of course we have letters from the Army
21 Corps of Engineers that states that we certainly should
22 have been paid by the general contractor.
23 Q   What was it that specifically Nugget misrepresented
24 to you -- as in Shoreside?
25 A   Payment.

Page 55

1  Q   And how did Nugget represent to you that they would
2  pay you?
3  A   Again, it's a bonded job through their bond. And, as
4  a general contractor, they have an obligation to all
5  subcontractors to make sure we're paid in whole and in
6  full.
7  Q   Assuming this was not a bonded job -- this was a
8  private project, no bond was issued -- how in that
9  scenario would you believe Nugget has defrauded Shoreside?
10 A   Of course, that's an assumption on your part.
11 Q   Absolutely. I want you to assume it for purposes of
12 this --
13 A   And for me to assume that, too, Traeger, I'm -- each
14 specific project or contract would be different, you know,
15 looked at differently. You know, this was a bonded
16 project; we felt very comfortable with it. We would
17 certainly view that differently as a nonbonded project.
18 Q   Other than the fact that this was a bonded project
19 and that you haven't been paid on a bonded project, how
20 has Nugget defrauded you?
21     MR. SEWRIGHT: Object to form.
22     THE WITNESS: Again, by not paying.
23 BY MR. MACHETANZ:
24 Q   Other than the fact that you have not been paid, how
25 has Nugget been defrauded?

Page 56

1      MR. SEWRIGHT: Continuing objection as to form
2  of question.
3      THE WITNESS: I'm not sure what you're driving
4  at.
5  BY MR. MACHETANZ:
6  Q   I want to know what specific facts support
7  Shoreside's allegation that it has been defrauded, other
8  than the fact that Nugget has not paid Shoreside for the
9  amounts on the Spencer Rock Products quarry?
10 A   I don't think we'd be sitting here today -- if we had
11 been paid, we wouldn't be sitting at this table right now.
12 Q   I think that's probably a fair statement.
13 A   Okay. Good.
14 Q   But my question is -- you understand you've made
15 allegations of fraud and misrepresentation and all sorts
16 of high crimes and misdemeanors.
17     MR. SHAMBUREK: Now, I object there. It's not
18 high crimes and misdemeanors.
19     MR. SEWRIGHT: I'll join in the objection.
20     MR. MACHETANZ: That question I will rephrase.
21     MR. SEWRIGHT: There was no question there.
22 BY MR. MACHETANZ:
23 Q   You've alleged that Nugget has defrauded Shoreside
24 and that Nugget has misrepresented facts to Shoreside.
25 And you've told me that the basis for that is that Nugget

Page 57

1  hasn't paid Shoreside.
2      And I'm trying to determine: What are the
3  misrepresentations or fraudulent acts you are complaining
4  of other than the fact that Nugget hasn't paid Shoreside
5  on a bonded project?
6      MR. SEWRIGHT: Continuing objection to this line
7  of questioning, as to form, and calling for legal
8  conclusions.
9  BY MR. MACHETANZ:
10 Q   You may answer.
11 A   Again, I'll go back to payment and what it's all
12 about, and integrity and trust. You know, we put forth a
13 lot of effort on our part to see this whole project
14 through so they could commence and finish the Homer rock
15 project. And I think we were a big part of that. And for
16 the general contractor to not hold up to their obligation,
17 that is a misrepresentation.
18 Q   And the obligation that you're talking about is your
19 understanding of the obligation of the general contractor
20 to pay a second-tier supplier --
21     MR. SHAMBUREK: Again, it calls for a legal
22 conclusion.
23 BY MR. MACHETANZ:
24 Q   -- on a bonded project; is that a fair summary of
25 your position?

Page 58

1   A   To pay a subcontractor?
2   Q   When you refer to "pay a subcontractor," who are you
3   referring to?
4   A   To -- us and Spencer.
5   Q   So you feel that Nugget had an obligation to pay you?
6   A   Yes.
7   Q   What do you believe Nugget had an obligation to
8   provide to pay Spencer?
9   A   I'm not privy to all their financial dealings, but
10  all's I know is that we were told Spencer would be paid by
11  Nugget. They told us that they weren't paid; therefore,
12  they didn't pay us.
13  Q   That was Bob LaPore?
14  A   Spencer Rock.
15  Q   Other than nonpayment to Shoreside, what actions by
16  Nugget were taken in bad faith and/or were deliberate
17  reckless, malicious, outrageous, and/or with reckless
18  indifference to Shoreside's rights?
19      MR. SEWRIGHT: Continuing objection as to form
20  as previously stated.
21      THE WITNESS: Well, again, if you didn't get
22  paid for something, I think that all those could sum that
23  up.
24  BY MR. MACHETANZ:
25  Q   Other than the nonpayment, what other actions?

Page 59

1   A   I think there was many listed in previous hearings,
2   too, and results that have been documented.
3   Q   I want your testimony, sir.
4   A   Again, you know, we just -- I feel, without getting
5   into legal jargon, our -- we feel it's nonpayment.
6       MR. MACHETANZ: Can we take about a
7   three-minute break to see if I have any other questions.
8       (Recess taken.)
9       MR. MACHETANZ: Mr. Lechner, I have no further
10  questions. Thank you for your time. Mr. Viergutz may
11  have some questions, or other folks.
12          EXAMINATION
13  BY MR. VIERGUTZ:
14  Q   Good morning, Mr. Lechner.
15  A   Good morning.
16  Q   How are you?
17  A   Real good, thank you.
18  Q   Did you ever speak to anyone from USF&G?
19  A   I didn't.
20  Q   You did not?
21  A   I didn't.
22  Q   And did anyone from Shoreside, to your knowledge --
23  A   Ron Neibrugge, I believe, had some discussion or
24  correspondence with someone from USF&G.
25  Q   I'm going to ask you specifically about speaking.

Page 60

1       Do you know whether he did or didn't?
2   A   Yeah, I don't, Herb, if he had a conversation with a
3   person. I do know there is correspondence, though.
4   Q   Right. And you sent this Exhibit 2 -- that's Ron,
5   correct?
6   A   Correct. Yeah.
7   Q   And to your knowledge, did USF&G respond to this
8   letter?
9       MR. SHAMBUREK: Which exhibit?
10      MR. VIERGUTZ: Exhibit 2.
11      MR. SHAMBUREK: Exhibit 2.
12      MR. SEWRIGHT: First page, right?
13      THE WITNESS: I don't know about the response to
14  that specific letter, or that they did actually respond
15  back in writing or called.
16  BY MR. VIERGUTZ:
17  Q   Do you have any recollection of seeing any
18  correspondence to Shoreside from USF&G in your file?
19  A   I do have the letter of course that we sent, but I
20  don't know about the correspondence back. That possibly
21  could be, but I --
22  Q   Have you produced to your attorney all records of
23  Shoreside?
24  A   Yes, we have.
25  Q   And how big is that? Is it a stack two inches or one

Page 61

1   inch or three boxes?
2   A   I do know we have a box in controller's office about
3   that size (indicating) for documents, but that's just the
4   ongoing case. As far as what we've turned over to our
5   attorney, it's been everything that I believe has been
6   presented --
7   Q   Do you --
8   A   -- in the case.
9   Q   I'm sorry. I didn't mean to interrupt you.
10      You don't know -- without taking into
11  consideration the pleadings or what's generated in this
12  case, you don't know how big Shoreside's file is in and of
13  itself?
14  A   I don't, specifically.
15  Q   You talked earlier about bills of lading from the
16  railroad, that type of thing.
17      Where would they be located?
18  A   Of course those would probably be -- if they were --
19  they would be in that file if they were related
20  specifically to this project. I don't know if we actually
21  received those from the railroad, because we -- only on
22  the car we would receive back -- if we received fuel back.
23  Q   Shoreside's amended complaint at paragraph 38 -- and
24  I'll read it to you, if I could: "Claimant realleges and
25  incorporates the other allegations herein. Upon

Page 62

1  information and belief and subject to further evidence as
2  is provided by disclosure and in discovery, USF&G is also
3  liable to claimant under Alaska law for the bad faith
4  nonpayment, nonsettlement, and/or refusal to discuss
5  settlement of claimant's claims brought under the Miller
6  Act and Stateline herein of which USF&G was notified.
7  USF&G has repeatedly failed to address payment to the
8  claimant for the goods and services despite demand.
9  Claimant is entitled to recover such damages plus interest
10 and attorney fees from USF&G."  And that's paragraph 38.
11      Is it your position that the nonpayment of your
12 invoices is the bad faith nonpayment that's referred to in
13 this paragraph?
14      MR. SEWRIGHT:  Object as to form.
15      THE WITNESS:  We do feel either way, either
16 through nonpayment by Nugget or USF&G, they're
17 similarly -- feel the same.
18 BY MR. VIERGUTZ:
19 Q   And other than the nonpayment, has USF&G committed
20 any other act of bad faith that you're aware of?  You
21 personally.
22      MR. SEWRIGHT:  Continuing objection as to form
23 of the question.  Also calls for legal conclusions.
24      THE WITNESS:  It certainly -- as it relates to
25 this, we felt with all the disclosure, through everything

Page 63

1  that's on the table, that there should have been more
2  representation by the bondholder if the general contractor
3  was not taking action.  And with the information that we
4  had and what has been put in front of everyone, we
5  certainly felt and still feel that, through the acts of
6  some of the officers of Nugget Construction that were tied
7  in with Spencer Rock somehow through this port agreement,
8  we certainly felt that there is that issue, I guess.
9  BY MR. VIERGUTZ:
10 Q   You're not aware personally of any communications
11 between USF&G and Nugget, correct?
12 A   No.
13 Q   You don't have any idea what communications existed
14 or didn't exist between those entities; is that correct?
15 A   That is --
16      MR. SHAMBUREK:  I would just observe that all of
17 those documents were marked as privileged, so none of them
18 would be available.  But he can answer from there.
19      THE WITNESS:  No.
20 BY MR. VIERGUTZ:
21 Q   And USF&G was not, to your knowledge, on site and on
22 the project; is that correct?
23 A   That's correct.
24 Q   So what they did not do properly is pay you?
25 A   That is correct.

Page 64

1  Q   And you were here for the other depositions, Mapco
2  and North Star, correct?
3  A   Yes, I was.
4  Q   And you heard me ask the same questions I'm going to
5  ask you, that, if I sue you, you do not have to settle
6  that case; isn't that correct?
7  A   It's, I guess, your prerogative.
8  Q   And if you choose not to settle that case, that's
9  entirely your decision; isn't it?
10      MR. SEWRIGHT:  Continuing objection as to form.
11      THE WITNESS:  It certainly could be, yes.
12 BY MR. VIERGUTZ:
13 Q   And if you choose not to discuss settlement with me,
14 is that also your choice?
15 A   That could be, but that's not our choice.
16 Q   In this case?
17 A   Yes.
18 Q   But it's my choice; is that correct?
19 A   Yes, it can be your choice.
20      MR. VIERGUTZ:  I have no further questions.
21      MR. MACHETANZ:  Mike?
22      MR. SEWRIGHT:  No.
23      MR. SHAMBUREK:  I do have some questions.
24          EXAMINATION
25 BY MR. SHAMBUREK:

Page 65

1  Q   You sent a letter to the Army Corps of Engineers and
2  stated that Shoreside hadn't been paid for the product,
3  correct?
4  A   That is correct.
5  Q   And you received a response or a copy of a response
6  from the Corps of Engineers to Nugget?
7  A   That is correct.
8  Q   Were you aware from that letter that the contract
9  between Nugget and the Corps of Engineers included a
10 provision that Nugget not ask for any future progress
11 payments unless all suppliers and subcontractors were
12 paid?
13 A   That is correct.
14 Q   And are you aware if Nugget made requests for
15 progress payments after that letter?
16      MR. MACHETANZ:  Leading.  Foundation.
17      THE WITNESS:  Meaning that --
18 BY MR. SHAMBUREK:
19 Q   They requested payments from the Corps of Engineers
20 after you had made demand for payment?
21      MR. MACHETANZ:  Same objection.
22 BY MR. SHAMBUREK:
23 Q   You can answer.
24 A   Could you repeat the first --
25 Q   Is it your understanding that Shoreside sent a letter

Page 66

1  to the Corps of Engineers --
2  A   That is correct.
3  Q   -- stating that they hadn't been paid?
4  A   That's correct.
5  Q   Are you aware if Nugget Construction made requests
6  for progress payments to the Corps of Engineers after that
7  time?
8  A   Yes, they did.
9  Q   And they didn't make -- Nugget didn't make a payment
10 to -- or all the payments to the suppliers and
11 subcontractors?
12        MR. MACHETANZ: Leading. Foundation.
13        THE WITNESS: They didn't make a payment to us
14 or Spencer Rock.
15 BY MR. SHAMBUREK:
16 Q   Do you view that as an act of bad faith?
17 A   Yes, I do.
18 Q   And were you aware from your review of the pleadings
19 if the defendants challenged whether or not this was a
20 federal project?
21 A   Yes.
22 Q   Were you aware that this was a federal project?
23 A   Yes, I was.
24 Q   And do you view that as an act of bad faith?
25 A   Yes, I do.

Page 67

1  Q   And is it your understanding that Shoreside made a
2  number of attempts to settle this case?
3  A   Many. Yes, I'm --
4        MR. MACHETANZ: Leading. And also irrelevant.
5        THE WITNESS: Yes, I was aware.
6  BY MR. SHAMBUREK:
7  Q   And are you aware if USF&G actually ever initiated
8  any settlement conferences with -- settlement conferences
9  with Shoreside?
10        MR. MACHETANZ: Same objections.
11        THE WITNESS: I'm not aware of any.
12 BY MR. SHAMBUREK:
13 Q   Now, have you seen a business card of Randy Randolph
14 that states that he was affiliated with Spencer Rock
15 Products?
16 A   I had seen one, yes.
17 Q   And had you seen a business card that indicated that
18 Randy Randolph was affiliated with Nugget Construction
19 Company?
20 A   Yes.
21 Q   Did you ever receive any communication from Randy
22 Randolph when he clarified when he was working for one
23 company versus another?
24 A   Yes.
25 Q   When did he communicate with you?

Page 68

1  A   He communicated to me in the spring of this project
2  and also later in summer.
3  Q   And what was the nature of his communication?
4  A   It was regarding fueling for equipment for Spencer
5  and for the whole entire project.
6  Q   Did he ever indicate that he ceased working for
7  Spencer Rock Products?
8  A   There is no indication given to us that he was.
9  Q   And you had provided fuel to Nugget Construction
10 prior to the spring of 1997?
11 A   That is correct.
12 Q   And that was pursuant to a credit application that
13 Nugget Construction had filled out and provided to
14 Shoreside Petroleum?
15 A   That is correct.
16 Q   And you hadn't had any problem with payment from
17 Nugget at that time?
18 A   No, we hadn't.
19 Q   You had dealt with an entity previously called Trecon
20 (ph); isn't that correct?
21 A   Yes, that's correct.
22 Q   And is it your understanding that Craig Pointer had
23 an affiliation with Trecon?
24 A   That is correct.
25        MR. MACHETANZ: Leading.

Page 69

1  BY MR. SHAMBUREK:
2  Q   Are you aware if -- well, what was Trecon's
3  involvement with the Spencer quarry?
4  A   They had done a project at the Spencer quarry as
5  well. And I can't recall what they provided the material
6  for the specific project on.
7  Q   And in response to some questions from -- I'm sorry.
8  A   Oh, no. Go ahead.
9  Q   In response to some questions from Mr. Machetanz you
10 were talking about the credit practices. Is it possible
11 that credit was extended in this case because Shoreside
12 was confident it would be paid from one of the parties
13 that it could look to for payment?
14        MR. MACHETANZ: Leading. Foundation.
15        THE WITNESS: Well, again, I'll repeat what I've
16 said all along, is, we did look to the general contractor,
17 as a bonded project, for payment.
18 BY MR. SHAMBUREK:
19 Q   And when Shoreside provided fuel directly to Nugget,
20 did they dispute any of the charges or the quality of the
21 fuel?
22 A   Not to my knowledge.
23 Q   And did Bob LaPore and/or Spencer Rock Products
24 question the -- any of the billing that you provided them
25 for the fuel, lube, and diesel?

Page 70

1  A    No.
2  Q    They had no dispute over quality or date of delivery?
3  A    No.
4  Q    Now, if you had attempted to retrieve the fuel from
5  that delivery in May, is it possible that that could have
6  resulted in perhaps even some legal action by Bob LaPore
7  to challenge your reclamation?
8        MR. MACHETANZ: Leading. Speculation.
9        THE WITNESS: We didn't have any legal recourse
10  to repossess that fuel at the time -- at the time of that
11  product, to my knowledge.
12       MR. SHAMBUREK: I have no other questions.
13       MR. MACHETANZ: I have a few questions then.
14          FURTHER EXAMINATION
15  BY MR. MACHETANZ:
16  Q    You just testified you had no legal recourse to
17  reclaim the rail car; is that correct?
18  A    To my knowledge.
19  Q    At the time that you delivered the rail car, you had
20  unpaid invoices from Spencer Rock Products; is that
21  correct?
22  A    That's correct.
23  Q    And as of June 1, those were beyond the 30 days past
24  due; weren't they?
25  A    I believe so. Look back in the records, I'm sure it

Page 71

1  was, but --
2  Q    You also testified, I believe, in response to
3  counsel's questioning, that Bob LaPore never disputed the
4  amounts owed; is that correct?
5  A    To my knowledge, he didn't dispute the amounts owed.
6        (Exhibit 5 marked.)
7  BY MR. MACHETANZ:
8  Q    Have you ever seen that affidavit before?
9  A    No, I don't believe I have seen this. If I did, I
10  don't recall it.
11  Q    You don't? Well, let's take a look at that.
12       Paragraph three states, "Spencer Rock ordered
13  two rail cars for fuel from Shoreside/Marathon for the
14  Homer Spit project. The first was ordered and paid for.
15  The second was ordered in April, 1997, and has not yet
16  been paid for." Do you see that, sir?
17  A    Yes.
18  Q    Do you believe -- I believe you previously testified
19  that Spencer had ordered three rail cars; is that correct?
20  A    For this particular project?
21  Q    Yes.
22  A    I believe -- I don't know which ones for --
23  Q    February, April, and May?
24  A    Yes. I'm not sure if that was specifically to --
25  yes, a February --

Page 72

1        MR. MACHETANZ: Mark this as 6.
2        (Exhibit 6 marked.)
3  BY MR. MACHETANZ:
4  Q    Can you identify that, sir?
5  A    Yes. It's a February 4th invoice.
6  Q    No. Exhibit 6, can you identify that, sir?
7  A    Oh, yes. Yes.
8  Q    Now, let's look at the second page of that, paragraph
9  5. You state, Mr. LaPore made three rail tank purchases:
10  February 4th, April 8th, and May 21st, 1997, correct?
11  A    Uh-huh.
12  Q    Is that consistent with your recollection?
13  A    Yes, that is.
14  Q    Now, let's take a look at the affidavit of Robert
15  LaPore, Deposition Exhibit 5, paragraph three. LaPore
16  says that only two rail cars were ordered.
17       Do you see that, sir?
18  A    For the Homer Spit project?
19  Q    Uh-huh.
20  A    I see that.
21  Q    So a fair reading of deposition [sic] 5 and 6, would
22  it be fair to say that Mr. LaPore disagreed with the
23  assertion by Shoreside that Shoreside had ordered -- or
24  that Spencer had ordered a rail car on May 21st?
25       MR. SEWRIGHT: Objection to the form of

Page 73

1  question. Unintelligible, especially at the beginning.
2        MR. SHAMBUREK: It might be easier if you re-ask
3  it, but that's your call.
4        MR. MACHETANZ: Okay. I'll do that. I'd hate
5  to be considered unintelligible.
6  BY MR. MACHETANZ:
7  Q    In Exhibit 6, you state that LaPore ordered three
8  purchases.
9  A    Uh-huh. Correct.
10  Q    In Exhibit 5, LaPore only indicates there's two
11  purchases, correct?
12  A    Now he states that he ordered two rail cars of fuel.
13  The first was ordered and paid for; the second, ordered in
14  April of '97, has not yet been paid for. That's
15  incorrect.
16  Q    Do you recall, though -- does this refresh your
17  recollection that Spencer disputed supplying -- or
18  ordering the May 21st rail car?
19  A    That they disputed ordering the May 21st?
20  Q    Yes, sir.
21  A    We have never been notified that there's a dispute.
22  Q    Really.
23  A    From Bob LaPore.
24       MR. SHAMBUREK: Let me object to the extent it
25  calls for a legal conclusion, but we can try to address

Page 74

1  that later.
2       MR. MACHETANZ: Okay.
3  BY MR. MACHETANZ:
4  Q   Would you turn to --
5       MR. SEWRIGHT: I'm going to object to some of
6  those questions, too, Traeger, as misstating LaPore's
7  entire affidavit.
8  BY MR. MACHETANZ:
9  Q   Would you turn to page four of this affidavit.
10      MR. SEWRIGHT: Which one?
11      MR. MACHETANZ: Exhibit 5.
12 BY MR. MACHETANZ:
13 Q   Looking at the certificate of service, who is the
14 third counsel there?
15 A   Mr. Steve Shamburek.
16 Q   Is that your counsel?
17 A   That's correct.
18 Q   And it's your testimony as you sit here today that
19 Mr. LaPore never advised you that he disputed the May 21st
20 shipment?
21      MR. SHAMBUREK: I just object to the extent it
22 calls for a legal conclusion, but he can answer.
23 BY MR. MACHETANZ:
24 Q   Go ahead.
25 A   There was no discussions that I had with him on it.

Page 75

1  Q   And you've never subsequently been aware that
2  Mr. LaPore disputed the May 21st shipment?
3  A   Correct.
4       MR. MACHETANZ: I have no further questions
5  pending review of the subsequent documents produced by
6  your counsel yesterday.
7       MR. SHAMBUREK: I have a few follow-on
8  questions.
9            FURTHER EXAMINATION
10 BY MR. SHAMBUREK:
11 Q   Would you take a look at paragraph five of the LaPore
12 affidavit. And if I could read this, does it say, "No
13 other material was ordered by Spencer Rock. Mr. Randy
14 Randolph ordered all remaining rail cars of fuel on behalf
15 of Nugget Construction Company, Inc."
16      Is it possible that Mr. LaPore viewed that
17 order, purchase number three on May 21, 1997, as an order
18 by Randy Randolph in his capacity with Nugget Construction
19 Company, Inc.?
20      MR. MACHETANZ: Speculation, leading, lack of
21 foundation.
22      MR. SEWRIGHT: It isn't lack of foundation.
23 He's using the affidavit you were using, counsel.
24      MR. MACHETANZ: There's not an objection, is
25 there, from you? There's not a question pending. Why are

Page 76

1  you yapping away?
2       MR. SEWRIGHT: Traeger, stop acting like a
3  little pit bull.
4       Hey, I'm objecting to your misstating what's
5  going on and to your objection. You want to sit back down
6  and stop being an idiot?
7       MR. MACHETANZ: No, I'm not being an idiot.
8  You're being --
9       MR. SEWRIGHT: I'll stand up here.
10      MR. MACHETANZ: Okay. Now, I have a right to
11 make an objection.
12      MR. SEWRIGHT: And I have a right to make an
13 objection and I just did. Now sit down, Traeger. Let's
14 go.
15      MR. MACHETANZ: I'm opposing a little
16 commentary. That's not appropriate.
17      MR. SEWRIGHT: Counsel -- I've stated my
18 objection.
19      MR. MACHETANZ: Your objection to an objection.
20 Okay.
21      MR. SEWRIGHT: That's correct.
22      THE WITNESS: If you could --
23      MR. SHAMBUREK: I'll rephrase the question
24 again.
25 BY MR. SHAMBUREK:

Page 77

1  Q   Is it possible that Mr. LaPore viewed that third
2  purchase of fuel, on or about May 21, 1997, as having been
3  made by Randy Randolph in his capacity as a representative
4  of Nugget Construction Company, Inc.?
5  A   Yes.
6       MR. MACHETANZ: Foundation, leading,
7  speculation.
8  BY MR. SHAMBUREK:
9  Q   And paragraph six says, "Once Nugget Construction
10 Company, Inc., became involved in the pit through the
11 support agreement, Spencer Rock had no control over
12 Nugget, the ordering of the fuel, or the running of the
13 pit whatsoever."
14      Having read that statement in Mr. LaPore's
15 affidavit, might that explain why he did not regard his
16 company, Spencer Rock Products, as liable for that third
17 purchase?
18      MR. MACHETANZ: Speculation, leading,
19 foundation.
20      THE WITNESS: Yes, that's correct.
21 BY MR. SHAMBUREK:
22 Q   And you don't see anything in his affidavit here
23 where he challenges the quantity of fuel provided by
24 Shoreside Petroleum?
25 A   Quantity or quality, that is correct.

Case No. A98-009 Civil (HRH)                                          Doug Lechner

Page 78

1  Q   And he doesn't question here, based on your review,
2  that it was used for the Homer project; is that correct?
3  A   That is correct.
4  Q   And you've received many copies of legal documents
5  from my office, correct?
6  A   That is correct.
7  Q   And some of those may be sent to Mr. Neibrugge for
8  review?
9  A   That is correct.
10 Q   So it's possible that you may have -- you or Mr.
11 Neibrugge may have reviewed this document?
12 A   That is correct.
13 Q   And you don't have any reason to believe that
14 Mr. LaPore disputes that a third delivery of fuel was made
15 to -- or for the use of the Spencer quarry or the Homer
16 project?
17     MR. MACHETANZ:  Leading.
18 BY MR. SHAMBUREK:
19 Q   You can answer.
20 A   That's correct.
21 Q   And in response to any of the questions posed this
22 morning, you also incorporate all of Shoreside Petroleum's
23 prior discovery responses?
24     MR. MACHETANZ:  Objection.  Overbroad.
25 BY MR. SHAMBUREK:

Page 79

1  Q   You can answer.
2  A   Say that again?
3  Q   In response to all the questions today, do you
4  incorporate all of the prior responses of Shoreside
5  Petroleum to prior discovery requests?
6      MR. MACHETANZ:  Overbroad.
7      THE WITNESS:  Yes, I do.
8      MR. SHAMBUREK:  That's all the questions I have.
9      MR. MACHETANZ:  Anything else?  Done.
10     (Proceedings adjourned at 11:00 a.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 80

1      C E R T I F I C A T E
2      I hereby certify that I have read the foregoing
3  transcript and accept it as true and correct, with the
4  following exceptions:
5  ==================================================
6  PAGE   LINE   CORRECTION
7  ____  ____   _____
8  ____  ____   _____
9  ____  ____   _____
10 ____  ____   _____
11 ____  ____   _____
12 ____  ____   _____
13 ____  ____   _____
14 ____  ____   _____
15 ____  ____   _____
16 ____  ____   _____
17 ____  ____   _____
18
19 _____   _____
   Date          DDD
20
21    (Use additional paper to note corrections as
   needed, signing and dating each page.)        (SW)
22
23
24
25

Page 81

1      REPORTER'S CERTIFICATE
2      I, SUSAN J. WARNICK, RPR, and Notary Public in
3  and for the State of Alaska do hereby certify:
4      That the witness in the foregoing proceedings was
5  duly sworn; that the proceedings were then taken before me
6  at the time and place herein set forth; that the testimony
7  and proceedings were reported stenographically by me and
8  later transcribed under my direction by computer
9  transcription; that the foregoing is a true record of the
10 testimony and proceedings taken at that time; and that I
11 am not a party to nor have I any interest in the outcome
12 of the action herein contained.
13     IN WITNESS WHEREOF, I have hereunto subscribed my
14 hand and affixed my seal this _____ day of _____,
15 2005.
16
17
       _____
18     SUSAN J. WARNICK,
       Registered Professional Reporter
19     Notary Public for Alaska
20
   My Commission Expires:  April 8, 2006
21
22
23
24
25

Case No. A98-009 Civil (HRH)                                              Doug Lechner

Page 82

```
 1              INDEX TO DEPOSITION
 2   WITNESS:  Doug Lechner              PAGE
 3   Examination by Mr. Machetanz:          3
     Examination by Mr. Viergutz:         59
 4   Examination by Mr. Shamburek:        64
     Further examination by Mr. Machetanz:   70
 5   Further examination by Mr. Shamburek:   75
 6
 7
     EXHIBIT                    PAGE
 8
     No. 1                       8
 9   No. 2                      27
     No. 3                      30
10   No. 4                      40
     No. 5                      71
11   No. 6                      72
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Case No. A98-009 Civil (HRH)                                         Doug Lechner

Page 1

## A

able 22:20 29:15 43:20
  44:4,11
Absolutely 55:11
accept 80:3
accepted 8:8
accomplish 5:19
account 33:11 34:2,8
accounting 16:1 27:11
  32:8 33:20,25
accounts 33:4
accurately 46:20
act 62:6,20 66:16,24
acting 76:2
action 14:14 15:14 63:3
  70:6 81:12
actions 58:15,25
acts 57:3 63:5
actual 28:24
addition 22:2
additional 31:18 34:16
  53:25 80:21
address 62:7 73:25
ADF&G 2:10
adjourned 79:10
advanced 45:5
advised 74:19
advises 6:3
affidavit 4:21 25:9 71:8
  72:14 74:7,9 75:12
  75:23 77:15,22
affiliated 67:14,18
affiliation 68:23
affixed 81:14
aforementioned 2:19
aggregated 14:17
ago 52:10
agree 44:4
agreed 42:3
agreement 8:11 9:14
  9:17 10:20 11:8
  13:19 15:4 19:15
  24:2,3 26:8 31:25
  63:7 77:11
agreements 7:14
Ah 36:2
ahead 12:4 19:4 40:18
  47:24 69:8 74:24
aim 40:17
AK 1:22 2:4,8,12,16
Alaska 1:2 2:22 62:3
  81:3,19
alert 39:24
allegation 56:7
allegations 56:15 61:25
alleged 56:23
allow 47:19
all's 58:10
amended 4:14 61:23

## AMERICA 1:4

amount 11:13 35:3,4,9
  36:2,16 44:14 45:25
amounts 29:24 34:2
  56:9 71:4,5
analysis 47:23
Anchorage 1:22 2:4,8
  2:12,16 23:7
and/or 58:16,17 62:4
  69:23
answer 5:14 6:3,4,9
  19:6 44:10 57:10
  63:18 65:23 74:22
  78:19 79:1
answers 5:17
anybody 4:5 25:9 47:7
anymore 31:13
apart 19:16
app 10:22 13:22
appear 36:8 37:9
appeared 39:20
appearing 3:8
appears 31:2 39:25
  47:23
application 9:8,11,19
  9:24 10:1,10,13,19
  10:20,22 35:25 37:10
  39:23 53:11,13,17
  68:12
appreciate 5:18
approaching 34:22
appropriate 51:12
  76:16
approval 9:21
approved 9:23,24 36:2
approximate 7:21
  11:13
approximately 4:23
  7:18
April 14:18 15:3 26:17
  31:17,18,21,25 32:5
  71:15,23 72:10 73:14
  81:20
area 30:20
argue 47:21
Army 54:20 65:1
arrangement 14:24
  41:2,25
arrived 29:7
asked 6:8 25:17
asking 43:25 51:21
assertion 72:23
assessment 24:11
assist 40:24
assume 41:7 55:11,13
assumes 47:1
assuming 21:6 45:9
  55:7
assumption 55:10

assurances 35:19
assured 35:15 52:14
attempt 47:4
attempted 70:4
attempts 67:2
attention 9:7
attentive 36:2
attorney 6:1 60:22 61:5
  62:10
audibly 5:15
authorize 40:11
Av 1:21 2:12
available 63:18
Avenue 2:8
awaiting 32:10
aware 10:23 14:25
  21:13 37:13 40:11
  43:9,10 47:7,10 53:5
  53:21 54:6 62:20
  63:10 65:8,14 66:5
  66:18,22 67:5,7,11
  69:2 75:1
a.m 1:16 79:10
A98-009 1:12

## B

back 11:1,15 13:11,13
  13:16,17 28:16 29:22
  33:19 37:10 45:12
  48:11 49:2 57:11
  60:15,20 61:22,22
  70:25 76:5
backcharge 41:4,6
backcharging 41:18,22
  41:22
background 6:12 10:16
bad 58:16 62:3,12,20
  66:16,24
BAKER 1:21 2:7
ball 11:17
barge 19:13,17,22,24
BAROKAS 2:11
based 21:11 36:25 78:1
basing 30:22
basis 33:3 56:25
bathroom 40:16
began 26:10
beginning 73:1
behalf 1:5 3:11 28:3
  75:14
belief 46:11 62:1
believe 8:14,16 9:10,25
  12:24 13:22 14:3
  20:11 22:17,23 23:13
  24:13 26:16 28:6,18
  30:18 33:14 35:9,16
  35:24 37:4 39:6,19
  42:23 43:6 44:21
  47:15 49:8 52:20

  54:10 55:9 58:7
  59:23 61:5 70:25
  71:2,9,18,18,22
  78:13
believed 23:16 24:1
believes 54:14
benefit 47:21
best 48:7 50:2
beyond 15:10 44:6
  70:23
bidding 20:11
big 57:15 60:25 61:12
bill 19:10 29:18 41:7
  54:11
billed 23:11,22 24:17
  30:11 31:22
billing 17:11 69:24
billings 4:19 17:16 32:1
bills 15:3 18:11 27:7
  61:15
bit 19:7
boats 16:9
Bob 16:14 17:19 20:15
  26:1,8,14 27:2,7 32:7
  32:9,12,17,22 33:10
  33:14,16 35:11,19
  38:13,18,19 39:3
  40:2,4,5 45:18 47:13
  52:19,22,25 58:13
  69:23 70:6 71:3
  73:23
bond 24:9 42:21 55:3,8
bonded 18:1,5,16 24:5
  42:4,7,9 48:18 54:3,4
  54:18 55:3,7,15,18
  55:19 57:5,24 69:17
bondholder 63:2
bonding 3:13
box 48:17 61:2
boxes 52:8 61:1
break 6:6,10 16:11
  40:14 42:18 59:7
brief 6:14
bring 23:8 49:2
brought 3:13 19:6 62:5
bull 76:3
BURR 2:15
business 8:7,14 42:12
  67:13,17
busy 21:8

## C

C 2:1 3:1 80:1,1
call 10:25 12:25 36:21
  44:23 50:6 73:3
called 3:3 60:15 68:19
calling 57:7
calls 15:12 20:10 57:21
  62:23 73:25 74:22

capacity 6:23 75:18
  77:3
car 12:5,5,14,15,16,17
  12:18 13:6,8 21:14
  21:21 22:21,24 26:24
  28:24 29:3,5,5,6,10
  29:11 34:20,24 35:11
  35:17,17,18,20 36:5
  37:1,2 40:1,12 42:3
  45:6 46:23 47:2,5,8
  47:11,13 48:10,14
  49:2 54:8 61:22
  70:17,19 72:24 73:18
card 67:13,17
care 12:8
cars 11:23 12:1 26:15
  26:20 28:16,19 29:23
  71:13,19 72:16 73:12
  75:14
case 1:12 4:10 12:6
  24:9 36:22 37:4
  44:18 46:7 61:4,8,12
  64:6,8,16 67:2 69:11
cause 38:10
ceased 18:10 68:6
certain 8:9 10:14 36:14
  45:10
certainly 18:19 39:23
  46:1,1 50:13 52:7
  54:16,21 55:17 62:24
  63:5,8 64:11
certificate 74:13 81:1
certify 80:2 81:3
challenge 70:7
challenged 66:19
challenges 77:23
chance 35:19
charge 8:3,4,9 21:7,25
  34:16
charges 29:23 31:18
  41:14 69:20
checks 10:16
choice 64:14,15,18,19
choose 64:8,13
circumstances 9:16
claim 27:22,23
claimant 61:24 62:3,8
  62:9
claimant's 62:5
claims 3:12 62:5
clarified 67:22
clarify 14:22 43:16
clerks 16:1
close 34:5,25
coherent 5:21
collection 33:1,3
college 6:17,19
come 13:5 23:2 52:17
comes 37:16

EXHIBIT 1
Page 23 of 116

Case No. A98-009 Civil (HRH)                                    Doug Lechner

Page 2

**comfort** 42:6,8,9,10
**comfortable** 55:16
**Coming** 7:2
**commence** 57:14
**Commencing** 1:16
**commendable** 44:3
**commentary** 76:16
**comments** 38:13
**commercial** 46:4
**Commission** 81:20
**committed** 62:19
**communicate** 67:25
**communicated** 68:1
**communication** 67:21
68:3
**communications** 63:10
63:13
**companies** 7:24 18:12
**company** 1:9 3:13,19
3:21 4:7 6:18,20 7:23
9:23 17:10 42:14
44:1 50:5 53:2 67:19
67:23 75:15,19 77:4
77:10,16
**complaining** 57:3
**complaint** 4:14 61:23
**compound** 19:4
**computer** 81:8
**computerized** 15:16
**concept** 22:21
**concern** 34:7 38:10
**concerned** 36:9 39:19
**concerning** 3:12 33:11
**concerns** 38:12
**conclusion** 57:22 73:25
74:22
**conclusions** 57:8 62:23
**conducted** 54:7
**conferences** 67:8,8
**confident** 69:12
**confirm** 36:21
**connection** 5:4 7:4,14
22:7 31:16 44:20
**consideration** 10:20
61:11
**considered** 34:2 73:5
**consistent** 72:12
**construction** 1:8 2:6
7:24 16:7 17:12
24:18,20,24 28:3
41:10 63:6 66:5
67:18 68:9,13 75:15
75:18 77:4,9
**contact** 16:1 17:1,13
19:23 20:15 35:7
37:25 42:20,23,25
43:20 44:11 45:23
46:1,8
**contacted** 8:12 15:24

16:6,11 19:21 20:5
42:24 43:1,4,6,9 45:7
45:17,18
**contacts** 16:14,21 20:7
20:8 25:6 27:11
37:23 38:1
**contained** 81:12
**contest** 6:8
**context** 41:16
**continue** 48:16
**continued** 34:16 50:19
53:6
**continuing** 37:16 56:1
57:6 58:19 62:22
64:10
**contract** 23:16,18 24:8
55:14 65:8
**contractor** 17:12,25
41:13 42:7,11 45:24
54:18,22 55:4 57:16
57:19 63:2 69:16
**contrary** 47:22
**control** 77:11
**controller** 3:21 9:22
15:22 43:17 46:9
49:20
**controller's** 61:2
**conversation** 25:6,8,17
35:10 36:13,15 38:22
43:11 44:1,20 46:11
46:16,20 50:13,16,17
51:16,16 60:2
**conversations** 20:2,4
20:12 24:24 25:19,21
25:22 27:1,6 32:6,7
32:21 33:1,5,7,10,14
33:16,17,18,21 38:3
38:8 43:7 44:5
**coordinate** 12:9
**copies** 78:4
**copy** 9:19 65:5
**corporation** 5:6 43:24
**Corps** 54:21 65:1,6,9
65:19 66:1,6
**correct** 5:7 9:12 10:3
11:7 13:20 14:18,19
14:22 15:6,8 16:19
19:13 20:20,21 21:2
23:9,12,24 24:4,14
24:18,19 26:12,16,22
26:25 27:25 28:1,14
28:20 30:2 31:9,10
31:19,20,23,24 32:2
32:13 34:15,18,21,23
35:1,2,6,21 36:3,8,20
37:8,9,19 39:14,21
40:3,6,10,13 41:24
44:12,13 47:14 49:5
50:25 53:7,8,11 60:5

60:6 63:11,14,22,23
63:25 64:2,6,18 65:3
65:4,7,13 66:2,4
68:11,15,20,21,24
70:17,21,22 71:4,19
72:10 73:9,11 74:17
75:3 76:21 77:20,25
78:2,3,5,6,9,12,20
80:3
**CORRECTION** 80:6
**corrections** 80:21
**correspondence** 43:3
59:24 60:3,18,20
**cost** 21:25
**counsel** 6:2 74:14,16
75:6,23 76:17
**counsel's** 71:3
**couple** 5:1 8:1 32:7
50:20
**course** 8:6 10:25 19:6
25:22 43:18 54:20
55:10 60:19 61:18
**court** 1:1 5:13 47:19
**coverage** 24:7
**Craig** 68:22
**credit** 9:8,14,17,19,24
10:1,13,15,15,16,20
10:22 13:17,19,22
18:9,12,18 35:9,23
35:25 36:2,6 37:5,8
37:10 39:14,20,22,25
42:19,22 45:25 49:2
49:7,12 50:3,10,14
50:18,23 52:4,7,13
52:22,25 53:6,9,10
53:11,13,17,22 68:12
69:10,11
**crimes** 56:16,18
**criteria** 10:14
**currently** 6:23 8:1
**customer** 12:3,13 13:8
13:15,18 14:7,10,20
15:13,20 21:25 23:5
23:6
**customers** 7:25 8:3
**cut** 49:6 50:3,11,13,23
52:4,6,25
**CV** 1:12

---

**D**

**D** 3:1
**daily** 33:3
**damages** 62:9
**date** 13:21 14:5 27:8,12
28:12,12,24,25 29:3
29:5,8,19 43:1 45:2
45:10,11 49:8 50:14
51:1 52:6 70:2 80:19
**dating** 80:21

**day** 21:24 32:18 81:14
**days** 13:21 14:5,13,20
15:10,17,21 35:13
45:24 50:20 70:23
**DDD** 80:19
**deal** 50:8
**dealings** 19:24 42:12
58:9
**dealt** 68:19
**debt** 33:1,2 34:14
**December** 1:16
**decided** 52:3
**decision** 18:8,14,15,17
18:24 42:5 51:3,17
53:4,24 64:9
**declined** 28:4
**Defendant** 1:20 2:6
**defendants** 1:11 66:19
**definitely** 18:4 37:21
39:22 42:6
**defrauded** 54:10,15
55:9,20,25 56:7,23
**deliberate** 58:16
**deliver** 11:4 12:6 23:4
**delivered** 13:13 17:9
23:11,17 28:25 29:11
29:16 34:25 35:1
48:5 70:19
**deliveries** 28:15
**delivering** 17:6
**delivery** 11:1 17:13,14
21:20 22:18 23:5,16
28:11 34:25 39:4
70:2,5 78:14
**demand** 34:5 62:8
65:20
**department** 15:12,23
27:12 33:21
**depicted** 53:10
**deposition** 1:14 2:19
3:9,17 4:24 5:8 7:8
33:9 43:21 44:11
72:15,21 82:1
**depositions** 4:11 64:1
**describe** 20:7
**described** 9:4
**description** 6:14
**despite** 62:8
**determine** 21:15 22:20
29:15 32:4 48:1 57:2
**determining** 10:12
**diesel** 22:9,23,24 23:1
23:10,21 69:25
**different** 8:6 18:20
55:14
**differently** 55:15,17
**digging** 52:8
**direct** 15:14 45:10,13
**direction** 81:8

**directive** 50:23
**directly** 17:21,21 24:17
30:4 69:19
**disagree** 44:7
**disagreed** 72:22
**disclosure** 62:2,25
**disclosures** 4:15
**discovery** 62:2 78:23
79:5
**discuss** 27:6 43:21 62:4
64:13
**discussed** 20:17 42:17
**discussion** 24:23 27:9
50:25 52:3,24 53:4
59:23
**discussions** 3:19 25:13
25:14,25 26:3 32:9
32:17 52:12 53:21
74:25
**dispatch** 29:17
**dispatching** 12:8
**dispute** 69:20 70:2 71:5
73:21
**disputed** 71:3 73:17,19
74:19 75:2
**disputes** 78:14
**dissertation** 51:13
**dissertations** 51:11
**distinction** 22:22
**distinguished** 7:1,3
**DISTRICT** 1:1,2
**document** 20:22,24
78:11
**documentation** 29:9
49:25
**documented** 59:2
**documents** 3:18 4:12
4:13,22 8:22 61:3
63:17 75:5 78:4
**doing** 7:10 8:17 17:5
40:5 41:4 49:4 51:14
**dollar** 11:17
**dollars** 11:19,20 54:12
**Doug** 1:15 3:2 82:2
**draw** 22:22
**driving** 56:3
**dropped** 28:25
**drove** 48:23
**due** 15:11,17,21 32:1
33:4,11 34:1,2 36:15
45:25 48:6 70:24
**duly** 2:20 3:3 81:5
**duties** 44:3
**d/b/a** 1:5

---

**E**

**E** 2:1 3:1,1 80:1,1
**earlier** 8:17 13:4 44:19
61:15

EXHIBIT 1
Page 24 of 116

early 45:7,9,17 46:12
    48:7
easier 47:18 73:2
easily 50:6
education 6:14,16
effort 47:4 57:13
eight 52:10
either 16:23 62:15,15
employees 50:5
emptied 13:1,6,8
empty 13:10,14
endurance 6:7
Engineers 54:21 65:1,6
    65:9,19 66:1,6
entire 23:19 68:5 74:7
entirely 64:9
entities 63:14
entitled 49:11 62:9
entity 68:19
equipment 22:17 30:3
    30:21 39:7,11 40:8
    40:23 41:14,15,23
    68:4
ES 2:1
especially 18:4 73:1
essentially 4:9 11:3
    38:7
established 18:18
estimate 21:13,19
estimation 11:12
evidence 47:1 62:1
EX 41:19
exact 7:21 11:16 16:24
    27:8,12 36:13 37:20
    38:21 49:8 50:14
    51:1 52:6
exactly 19:19 20:1 21:9
    30:19,25 32:18 38:14
    48:12,13
examination 3:6 59:12
    64:24 70:14 75:9
    82:3,3,4,4,5
example 4:19 41:13
exceeded 36:6
exceeds 51:6
exceptions 80:4
Excuse 22:11
executed 13:19
execution 11:8
exhibit 8:18,20 27:14
    27:16,18 28:16,17
    29:22 30:5,6,8 40:20
    44:21 60:4,9,10,11
    71:6 72:2,6,15 73:7
    73:10 74:11 82:7
exist 63:14
existed 63:13
expect 15:4
experience 14:1

Expires 81:20
explain 11:25 12:15
    13:3 14:4,5 28:8
    54:14 77:15
extend 18:9 51:4
extended 69:11
extending 42:18
extent 28:2 73:24 74:21
_____
            F
F 80:1
facilitating 20:18
facility 13:16
fact 29:6 34:7 38:22
    39:20 42:4,9,10,18
    45:5 46:22,22 51:2
    54:13 55:18,24 56:8
    57:4
facts 3:21 39:13 40:11
    42:17 47:1 56:6,24
factually 43:23
failed 24:10 62:7
fair 18:6 24:10,11 32:1
    36:12 45:6,16 46:10
    56:12 57:24 72:21,22
faith 58:16 62:3,12,20
    66:16,24
fall 16:23
familiar 41:3,9
far 10:15 12:10 15:2
    19:8 61:4
fault 26:5
fax 8:25 9:5
faxed 20:23
February 7:20 26:17
    71:23,25 72:5,10
federal 18:4,7 24:6
    66:20,22
feel 17:24 58:5 59:4,5
    62:15,17 63:5
fees 62:10
fellow 30:16
felt 17:24 48:17 54:17
    55:16 62:25 63:5,8
FIDELITY 1:9
figure 19:5
file 60:18 61:12,19
files 29:20 33:8
filled 29:3,6,11 34:19
    36:10 39:12 68:13
filling 21:14
finally 37:25
finance 15:12 43:18
financial 43:8 53:25
    54:6 58:9
find 3:21 45:10,11 52:8
finish 51:9 57:14
finished 51:8
first 3:3 9:11 14:8

20:15 27:8 32:16,20
    33:15 37:23 60:12
    65:24 71:14 73:13
firsthand 49:15
five 4:2,3,4 44:19 75:11
fixed 12:19
fluctuates 21:10
folks 59:11
following 14:9 35:12
    39:13 80:4
follows 3:5
follow-on 75:7
follow-up 33:16,17
force 49:10
forefront 52:14
foregoing 80:2 81:4,9
forgotten 10:8
form 19:4 27:22 28:8
    51:11 55:21 56:1
    57:7 58:19 62:14,22
    64:10 72:25
formulas 8:9
forth 57:12 81:6
found 47:20
foundation 65:16 66:12
    69:14 75:21,22 77:6
    77:19
four 21:13 74:9
Fourth 1:21 2:8
frame 12:12 35:13
fraud 56:15
fraudulent 57:3
free 12:10 41:1,22,24
front 44:22 52:7 63:4
fuel 1:5 6:18,20,21 7:15
    7:23,24,25 9:7 11:3,4
    11:4,23 12:1,4,15
    13:15,18 16:6,7,9,12
    17:2,6,8,14,17,20,22
    18:24 19:1,10,12,16
    19:18,22,22 20:3,6
    20:10,14,17,18,19
    21:7,10,19,23 22:4,9
    22:21,23,24,25 23:1
    23:10,10,21 24:4,16
    25:1,23,24 26:1,15
    27:3,3 28:2,11,13,19
    29:24 30:3,11 34:9
    34:20 35:17 36:5
    40:12 42:20 45:6
    46:23 47:20 48:4,10
    48:12,13,14,25 49:3
    50:19 61:22 68:9
    69:19,21,25 70:4,10
    71:13 73:12 75:14
    77:2,12,23 78:14
fueling 22:17 68:4
fuelings 50:21
full 14:11 28:5 52:16

54:5 55:6
further 13:2 14:14
    15:13 59:9 62:1
    64:20 70:14 75:4,9
    82:4,5
future 24:16 50:21
    65:10
_____
            G
G 2:4 3:1
gas 7:24 8:1 22:23 23:2
    23:21 25:1 49:11
gasoline 22:8,24 25:25
general 17:12 41:13
    42:7,11 45:24 54:22
    55:4 57:16,19 63:2
    69:16
generally 14:7,12
    29:12
generated 61:11
getting 17:19 21:19
    32:9 59:4
give 11:16,18 13:5
    14:12 21:18 53:23
given 9:19 13:17 34:7
    42:17,18 45:4,5,18
    46:22,22,22 68:8
go 10:4 11:15 12:4
    14:13 19:4 40:15,18
    47:17,24 48:11 57:11
    69:8 74:24 76:14
goal 5:19
goes 9:22
going 5:14 17:5,16 19:3
    19:9 32:4,14 35:11
    36:12 41:7 43:10,22
    46:25 48:5,19 51:14
    51:22 52:15,15 59:25
    64:4 74:5 76:5
good 11:21 40:5 46:2
    56:13 59:14,15,17
goods 8:5,13 10:24,24
    11:2,9,13 22:6,14
    23:17,22 25:10 27:24
    31:18,21 62:8
grace 14:12
graduate 7:1
grant 28:4
granted 10:13 37:10
guarantee 5:22 17:16
    21:11
GUARANTY 1:9
guard 31:3
guess 7:19 8:17 9:4,18
    19:5 25:2 30:15 63:8
    64:7
_____
            H
habit 32:25

half 8:16 52:10 53:13
hand 81:14
Handing 27:18 30:8
handle 43:18
handled 7:16
hands 12:9
happened 52:9,11
hard 21:14
hate 73:4
haul 16:9
head 5:15
heading 4:10
heard 41:5,11,16 51:2
    64:4
hearings 59:1
heating 7:24
held 35:18,20
Herb 60:2
Herbert 2:11
hereunto 81:13
Hey 76:4
high 7:1,4 8:9 35:10
    56:16,18
highest 6:13,16
Hindsight 18:23
history 6:15,17
hit 11:17
hold 54:19 57:16
Homer 8:15 11:10,14
    15:19 16:3,10 23:20
    26:2,4 27:22 48:18
    48:22 57:14 71:14
    72:18 78:2,15
hours 5:1,1
HRH 1:12
hundred 11:20
_____
            I
idea 63:13
identified 25:8
identify 27:18 72:4,6
idiot 76:6,7
imagine 21:8 34:5
immediately 51:15
important 18:10
inch 61:1
inches 60:25
included 65:9
inclusive 1:17
incorporate 78:22 79:4
incorporates 61:25
incorrect 73:15
incorrectly 51:20
increase 37:11,13
INDEX 82:1
indicate 17:15 25:15
    68:6
indicated 24:15 40:23
    67:17

EXHIBIT 1
Page 25 of 116