Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF ALASKA AT ANCHORAGE

 3   UNITED STATES OF AMERICA for the
     use of NORTH STAR TERMINAL &
 4   STEVEDORE COMPANY, d/b/a NORTHERN
     STEVEDORING & HANDLING, and NORTH
 5   STAR TERMINAL & STEVEDORING COMPANY,
     d/b/a Northern Stevedoring &
 6   Handling, on its own behalf,

 7        Plaintiffs,

 8   vs.

 9   UNITED STATES OF AMERICA for the
     use of SHORESIDE PETROLEUM, INC.,
10   d/b/a Marathon Fuel Service, and
     SHORESIDE PETROLEUM, INC., d/b/a
11   Marathon Fuel Service, on its own
     behalf,

12
          Intervening Plaintiffs,
13
     and
14
     METCO, INC.,
15
          Intervening Plaintiff,
16
     vs.
17
     NUGGET CONSTRUCTION, INC.; SPENCER
18   ROCK PRODUCTS, INC.; UNITED STATES
     FIDELITY AND GUARANTY COMPANY;
19   and ROBERT A. LAPORE,

20        Defendants.

21   _____
     Case No. A98-009 CIV (HRH)
22
                DEPOSITION OF JACK GOODWILL
23
                  Taken March 16, 2006
24             Commencing at 12:34 p.m.

25        Volume I - Pages 1 - 91, inclusive
```

Case No. A98-009 Civil (HRH)                                                    Jack Goodwill

---

Page 2

```
 1
 2
 3              Taken by the Defendants
                          at
 4          Oles Morrison Rinker & Baker, LLP
            745 West Fourth Avenue, Suite 502
 5                   Anchorage, Alaska
 6
 7      Reported by:
           Mary A. Vavrik, RMR
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
        Taken by:
 2
            Mary A. Vavrik, RMR
 3
 4      BE IT KNOWN that the aforementioned deposition was
 5      taken at the time and place duly noted on the title
 6      page, before Mary A. Vavrik, Registered Merit
 7      Reporter and Notary Public within and for the State
 8      of Alaska.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              A-P-P-E-A-R-A-N-C-E-S
 2    For Plaintiff North Star Terminal & Stevedore
      Company and the witness:
 3
 4        Michael W. Sewright
          Burr, Pease & Kurtz
          810 N Street
 5        Anchorage, Alaska 99501
          (907) 276-6100
 6
      For Intervening Plaintiffs Shoreside Petroleum, Inc.
 7    and Metco, Inc.:
 8        Steven J. Shamburek
          Law Office of Steven J. Shamburek
 9        425 G Street, Suite 630
          Anchorage, Alaska 99501
10        (907) 522-5339
11    For Defendants Nugget Construction, Inc. and United
      States Fidelity and Guaranty Company:
12
          Thomas R. Krider
13        Oles Morrison Rinker & Baker, LLP
          701 Pike Street, Suite 1700
14        Seattle, Washington 98101-3930
          (206) 623-3427
15
      For Defendant United States Fidelity and Guaranty
16    Company:
17        Herbert A. Viergutz
          Barokas Martin & Tomlinson
18        1029 West 3rd Avenue, Suite 280
          Anchorage, Alaska 99501
19        (907) 276-8010
20    Also present:
21        John Smithson
          Nugget Construction, Inc.
22
      Witness:
23
          Jack Goodwill
24        P.O. Box 594
          Seward, Alaska 99664
25
```

Page 5

```
 1              P-R-O-C-E-E-D-I-N-G-S
 2          (Exhibit No. 1 marked.)
 3              JACK GOODWILL,
 4      called as a witness herein, being first duly sworn
 5      to state the truth, the whole truth and nothing but
 6      the truth by the Notary, testified under oath as
 7      follows:
 8              EXAMINATION
 9      BY MR. KRIDER:
10      Q    Mr. Goodwill, could you please state and spell
11      your name for the record?
12      A    Jack Goodwill.  J-A-C-K G-O-O-D-W-I-L-L.
13      Q    Mr. Goodwill, my name is Tom Krider.  I'm an
14      attorney for Nugget and USF&G in this matter.  Have
15      you ever had your deposition taken before?
16      A    Maybe once.
17      Q    Do you recall what that was for?
18      A    It was for a ship that we had loaded in Seward
19      years ago, and they didn't pay the money that they
20      owed for the services rendered, and I think at some
21      point in time they came back into the country.  We
22      had a -- we seized the ship, so I had to give a
23      statement about the loading of the ship.
24              MR. SEWRIGHT:  Mr. Goodwill, you are
25      going to have to make an extra effort to speak up.
```

5

Page 6

1  This room, we have noticed before, has a pretty loud
2  fan, and it interferes with the reporter's ability
3  to hear.  Also, can we identify everybody else here
4  at the deposition?  Myself, Mike Sewright,
5  representing North Star Terminal & Stevedore Company
6  and the witness.
7          MR. SHAMBUREK:  Pardon?
8          MR. KRIDER:  Mike is just asking
9  everybody to introduce themselves for the record.
10         MR. SHAMBUREK:  Steve Shamburek.  I
11  represent plaintiff and use plaintiff Shoreside
12  Petroleum, Inc., and plaintiff and use plaintiff,
13  Metco, Inc.
14         MR. VIERGUTZ:  Herb Viergutz,
15  USF&G.
16         MR. KRIDER:  And John Smithson is
17  here on behalf of Nugget.
18  BY MR. KRIDER:
19  Q   Mr. Goodwill, did your counsel go over with you
20  this morning the general parameters of a deposition,
21  in terms of it being a question and answer session
22  and that I'm going to be asking you questions with
23  regard to the Spencer Rock Products Homer Spit
24  project?
25  A   Yes.

Page 7

1  Q   It's critical, because the court reporter is
2  taking down everything that we say here, that you
3  give audible answers, yesses and nos instead of
4  uh-huhs or shoulder shrugs or head nods.  If there
5  is a question that you do not understand, I'd be
6  happy to rephrase it for you.  And obviously, as
7  Mr. Sewright pointed out, it's kind of a noisy room,
8  so if you can speak up so I can hear you and the
9  court reporter can hear you, that would be great.
10     I'd like to go back to the prior time that you
11  were deposed.  You said that there was a situation
12  in which you had not been paid for services
13  rendered.  Is that what you testified to in terms of
14  your prior deposition?
15  A   You know, it's been -- it's been so long ago,
16  I'm not sure if I just did an affidavit or if it was
17  a deposition.
18  Q   You said the circumstances were that you had
19  not been paid.  Do you remember who it was you had
20  not been paid by?
21  A   No, I don't recall.
22  Q   Do you recall who had hired you?
23  A   It was a logging steamship company.  I just
24  don't remember.
25  Q   Was the steamship company U.S. based?

Page 8

1  A   No.
2  Q   You said something about them coming back into
3  the country?
4  A   Right.
5  Q   Now, you had been hired by the actual vessel?
6  A   Correct.
7  Q   And do you recall approximately what time frame
8  that deposition took place in?
9  A   Gosh, I've worked for North Star for 25 years.
10  It's probably 15 years ago, maybe.  I'm not certain.
11         MR. KRIDER:  I'm going to ask the
12  court reporter -- you asked him about his mailing
13  address before we started, is that correct, and you
14  have that for purposes of the record?
15         THE COURT REPORTER:  (Nods head.)
16  BY MR. KRIDER:
17  Q   Mr. Goodwill, are you currently employed?
18  A   Right now, no.  I'm semi-retired.  I worked for
19  North Star 25 years.  I currently don't work in the
20  winter.  I work for the Alaska Railroad, summer
21  employment.
22  Q   And when did you cease working for North Star?
23  A   Around 2002, I believe it was.
24  Q   And what was the reason for your departure?
25  A   They sold the company and did some

Page 9

1  restructuring.
2  Q   And was your position eliminated?
3  A   Yes.
4  Q   And you said that was roughly in 2002?
5  A   Yes.
6  Q   Do you remember what portion of 2002; early,
7  late?
8  A   About mid.
9  Q   Do you know whether or not the operations at
10  Seward for North Star had declined prior to your
11  being laid off?
12  A   Yes, it had.
13  Q   Do you know how significantly?
14  A   Very significantly.
15  Q   Do you have an understanding as to why that
16  happened?
17  A   Yes.
18  Q   And what is your understanding?
19  A   The Alaska Railroad made it an open dock, so
20  North Star didn't have an exclusive contract on the
21  dock, and Southeast Stevedoring was able to obtain a
22  terminal use permit, and they were able to do the
23  stevedore work for the cruise ships, which was
24  probably 90 percent of the work in the port.
25  Q   Now, there is two ports in Seward, correct?

Page 10

1   A   There is three docks. One is owned by the
2   city, which is the Seward Marine Industrial Center.
3   And then there is the Alaska Railroad freight dock,
4   and then there is the Alaska Railroad cruise ship
5   dock.
6   Q   Okay. And the two Alaska Railroad docks, are
7   they basically right next to each other?
8   A   Yes.
9   Q   And the exclusive rights that North Star had
10  was for which dock?
11  A   The freight dock wasn't built at that time of
12  the -- of the Nugget operation. It was just the
13  cruise ship dock at that time, I believe.
14  Q   Okay. So at the time in the 1997 time frame
15  when the events involving this litigation occurred,
16  there was only two docks in Seward?
17  A   Yes.
18  Q   Alaska Railroad dock and the city dock?
19  A   Yeah. We don't want to include, I don't think,
20  the loading docks, like the coal facility where they
21  load it with the chute. That is considered a dock.
22  And then there was an abandoned dock across the bay
23  for wood chips, but those were more or less for
24  loader head operations.
25  Q   Would it be fair to say that for the rock

Page 11

1   loading that took place for this project, that there
2   were only two docks available in Seward for doing
3   that?
4   A   Yes, sir.
5   Q   Is the city dock also referred to as the 4th of
6   July dock?
7   A   Yes, sir.
8   Q   And what's the best common phrase for the
9   Alaska Railroad dock, just that?
10  A   It used to be just the railroad dock, but now
11  it's cruise oriented, so now it's the cruise ship
12  dock.
13  Q   Now, you mentioned earlier that you had worked
14  for North Star for 25 years. Is that an exact
15  figure, or do you recall a date that you actually
16  started?
17  A   I started longshoring in '75, and then I
18  longshored through halfway through '77. And I
19  started work for them in 1977, about mid-year.
20  Q   '77 as a permanent employee for North Star?
21  A   Yes, sir.
22  Q   And what was your role when you were first
23  hired on?
24  A   I was a dock supervisor.
25  Q   And how long did you perform in that role?

Page 12

1   A   I think my whole career has kind of been
2   centered around supervising that dock, just with a
3   little more authority as time went on.
4   Q   All right. Well, let's go ahead and focus,
5   then, on the 1997 time period. What was your title
6   in 1997?
7   A   I was the vice president for Northern
8   Stevedoring & Handling Corporation.
9   Q   And what did your duties entail?
10  A   They involved all the services that would be
11  required to operate that terminal to provide the
12  labor and equipment, the time sheet portion,
13  payroll, billing, rates.
14  Q   So all of those functions actually took place
15  within Seward?
16  A   Yes, sir.
17  Q   Where was the main offices for North Star?
18  A   Anchorage.
19  Q   So each of the facilities for North Star had
20  their own accounting systems?
21  A   We used the same computer. We subbed out
22  the -- to a computer company to actually print out,
23  you know, the checks, the payroll portion, and as
24  the years went on, they kind of merged together. We
25  were pretty much isolated. When I first started

Page 13

1   there was -- the Shingletons were there, and they
2   were -- did all their own book work, and then as --
3   when they moved on, then Anchorage started taking a
4   little more and more of some of the paperwork.
5   Q   Had North Star bought a local Seward stevedore
6   company when they first got into Seward? You
7   mentioned somebody had been there.
8           MR. SEWRIGHT: Object to the form of
9   the question. Foundation hasn't been laid that this
10  witness would know.
11  BY MR. KRIDER:
12  Q   You mentioned that somebody had been there and
13  then transitioned out. I'm curious as to what the
14  circumstances were of those folks. Had they been
15  prior owners, prior employees?
16  A   Prior employees. He was the vice president and
17  his wife was the office manager.
18  Q   Do you know how long North Star had operations
19  in Seward?
20  A   Early '50s, I believe it was.
21  Q   Had North Star always owned the company that it
22  was operating in Seward?
23          MR. SEWRIGHT: Object, form of the
24  question, foundation.
25          MR. KRIDER: Withdrawn.

7

Case No. A98-009 Civil (HRH)                                                    Jack Goodwill

Page 14

1    MR. SEWRIGHT: I was barely around in
2  the '50s.
3  BY MR. KRIDER:
4  Q    Did you report to anybody in the Seward office?
5  A    In the Seward office.
6  Q    Correct.
7  A    Until -- I did report to Gail Shinglenton until
8  he retired, and then I reported to Anchorage.
9  Q    And when did he retire?
10  A    Probably 20 years, maybe; 15, 20 years.
11  Q    So did everybody within Seward report to you,
12  or were there independent lines of supervision
13  directly to Anchorage other than through you in
14  1997?
15  A    No. I was the person in charge.
16  Q    So all functions at Seward reported to you?
17  A    Yes.
18  Q    What's your first recollection of Spencer Rock
19  Products and the Homer Spit rock project?
20    MR. SEWRIGHT: Do you understand the
21  question?
22    THE WITNESS: Yes. It was Bob LaPore
23  made contact with me and was -- told me about this
24  job that Spencer Rock and Nugget Construction were
25  working together on. And he kind of came down just

Page 15

1  to get his feelers out and said that Nugget
2  Construction and himself had -- what their intent
3  was and plans were, what they were hoping to do in
4  the future. And that was in '96, I believe.
5  BY MR. KRIDER:
6  Q    So he actually came to Seward?
7  A    Yes.
8  Q    And where did you meet him?
9  A    In my office at the Alaska Railroad dock.
10  Q    Do you remember whether you took any notes of
11  that meeting with Mr. LaPore?
12  A    I don't recall. Just -- specifically, I think,
13  when someone like that would -- I don't recall if I
14  had notes or not.
15  Q    Did Mr. LaPore ask you for pricing at that
16  meeting?
17  A    No. It was just -- I'm not sure if he had been
18  to Seward before. I think he was just kind of
19  looking around and kicking around the idea and
20  looking at the facility, looking at the equipment,
21  and basically said there was a large quantity of
22  rock that they wanted to put on the barges. They
23  were just kind of feeling it out, probably for the
24  feasibility.
25  Q    Did he talk to you any about his plan for

Page 16

1  getting rock from his quarry onto the barges
2  themselves?
3  A    I don't recall if it was at that meeting or if
4  it was -- you are still referring to the initial
5  first contact or --
6  Q    Correct.
7  A    I believe he did to the extent that his idea,
8  which was a very good one, was to have something
9  there like in the way of a bucket or a net or
10  whatever, but the bucket seemed to make the most
11  sense because you could back a truck right up and
12  dump the whole load right into the bucket, and away
13  you go with the whole truckload. That was kind of
14  what we centered our thought on, the loading
15  process.
16  Q    So the skip bucket notion actually arose in the
17  very first meeting?
18  A    That's what I'm not certain about time-wise. I
19  think we kind of -- I don't really recall if it was
20  over like the next week or the -- if it was -- you
21  know, I can't time frame it down to the exact date.
22  Q    Prior to when work began, did Mr. LaPore make
23  more than one trip to Seward?
24  A    I don't -- I don't recall. I think -- I think
25  he was doing more research on the bucket idea up in

Page 17

1  the Anchorage area.
2  Q    But you only recall in, let's say, 1996 of him
3  having been to your offices once?
4  A    Yes.
5  Q    Did he tell you during that meeting who was
6  going to be responsible for the barges?
7    MR. SEWRIGHT: Object to the form of
8  the question. Responsible in what way?
9  BY MR. KRIDER:
10  Q    Do you understand my question?
11  A    I believe I do. He said that Nugget
12  Construction was going to have a barge and we would
13  load the rock onto the Nugget Construction barge,
14  and they were going to charter a barge, basically.
15  From day one, basically, everything was Nugget and
16  Spencer. They were kind of like a team is the way
17  he kind of, you know, laid it out. These guys were
18  working on this project very closely together, and
19  they just -- you know, that was -- they were going
20  to be working out all the details and getting back
21  with us.
22  Q    In what way exactly did Mr. LaPore communicate
23  to you that Spencer and Nugget were a team?
24  A    He said that they were working together, and he
25  said that Spencer and Nugget were working on or

MIDNIGHT SUN COURT REPORTERS (907) 258-7100

EXHIBIT 1
Page 5 of 69

Case No. A98-009 Civil (HRH)                                                                 Jack Goodwill

Page 18

1   soliciting this job or this bid together, and --
2   Q   Is that a statement he made to you during his
3   visit to your offices in 1996?
4   A   Yes.
5   Q   Is there anything else he said that led you to
6   believe that Spencer and Nugget were operating as a
7   team?
8   A   At that first meeting?
9   Q   Correct.
10  A   No.
11  Q   Any other time in 1996 did he tell you
12  something that led you to believe that Spencer and
13  Nugget were operating as a team?
14  A   I don't recall the date, but when they were
15  awarded the contract.
16  Q   And what did he say then?
17  A   He called up and said that Nugget Construction
18  was awarded the contract and that we were on for
19  loading rock.
20  Q   So what about that made you believe that they
21  were a team?
22  A   That he was going to be making the rock in the
23  quarry and loading the railcars and bringing it down
24  and that Randy was going to be loading the barges.
25  Q   When did Mr. LaPore ask you for pricing?

Page 19

1   A   The pricing took a little bit of time because
2   we had to go -- we had to -- I got involved with
3   Anchorage because we were going to have to set up a
4   meeting with the union to try to get reduced manning
5   because a crane gang is normally like ten men, and a
6   foreman is like 11 guys.  And for this type of
7   operation here, we needed to reduce manning, so we
8   had to go to the union first and have a meeting with
9   them because it was something that was -- they had
10  to agree at at a local port level because we were
11  reducing the manning down to four guys and a gear
12  man and a dispatcher, so it took a little while.
13  Q   Why was there a reduced manning required for
14  this job?
15  A   Because it was more automated.  It would be
16  foolish to have four guys in the hole, a hatch boss
17  and a hatch tender standing over on the deck of a
18  barge when they are -- when they are loading it with
19  rock, so --
20  Q   So who made the decision that the full crew was
21  not necessary?
22  A   It was pretty obvious it wasn't going to work
23  if we didn't get the manning reduced down.  It
24  wouldn't be cost effective having 12 guys on the
25  payroll versus basically four.

Page 20

1   Q   Is that a discussion you had with Mr. LaPore?
2   A   I did make reference to that to him.
3   Q   And what was his reaction to that inquiry?
4   A   Basically he wanted to know the outcome of the
5   meeting as soon as possible so we know how to
6   proceed.  I don't recall the time frame there, but I
7   believe it was -- it was pretty short.  I mean, the
8   guys were very receptive.  They were very happy to
9   see the work, you know, potentially coming their
10  way.
11  Q   Mr. Goodwill, you have been handed what's been
12  marked as Exhibit 1.  It is an August 20, 1996 fax
13  from Jack Goodwill to Robert LaPore at Spencer Rock.
14  Do you recognize this document?
15        MR. SEWRIGHT:  Wait a second,
16  Counsel.  He's had it in front of him about five
17  seconds.  Let's let the witness review it and read
18  it.  Off the record.
19        (Off the record.)
20  BY MR. KRIDER:
21  Q   Mr. Goodwill, do you recognize this document?
22  A   I recognize my name and some of the knowledge
23  on there.  I don't actually recognize the document,
24  per se, from when I originally done it.
25  Q   On a document of this type, would you have

Page 21

1   actually been the one to sit down and type this up,
2   or would you have handwritten it and given it to
3   somebody else to type for you?
4        MR. SEWRIGHT:  Object to the form of
5   the question, foundation.
6        THE WITNESS:  I don't recall.  A lot
7   of times I do work, and sometimes the office girl
8   would do it.  It just depends on what day of the
9   week it was, if there is payroll going on or
10  whatever activities we were doing, you know, loading
11  fish or loading logs or --
12  BY MR. KRIDER:
13  Q   All right.  So in the first paragraph, the last
14  sentence of that paragraph says, "The manning we
15  discussed during our meeting on August 14th has been
16  accepted by the ILWU for this movement of rock."  Do
17  you see that?
18  A   Uh-huh.
19  Q   Does that refresh your recollection about your
20  discussions with Mr. LaPore regarding the manpower
21  required for this job?
22  A   No, because this isn't the manning we actually
23  used, and it's not the -- it's not the loading that
24  we actually -- it's not the method that we used to
25  load the barge.

6 (Pages 18 to 21)

EXHIBIT 1
Page 6 of 69

Case No. A98-009 Civil (HRH)                                                    Jack Goodwill

Page 22

1   Q    It says that, "During our meeting on August
2   14th." Do you recall if that's the first meeting
3   that you had with Mr. LaPore?
4   A    No, I do not.
5   Q    In your reading of this, do you believe that
6   you had a face-to-face meeting with Mr. LaPore about
7   this, or do you believe this was over the telephone?
8   A    I don't recall.
9   Q    Now, you said this is not the configuration of
10  labor that you used. Do you recall why you were
11  telling him this configuration if you had already
12  had your meeting with the union?
13  A    This --
14      MR. SEWRIGHT: You need more time to
15  review it, sir?
16      THE WITNESS: Nah. This must have
17  been Bob's original. I'm not certain, but this must
18  have been his original intent was to load it out of
19  railcars, and that never took place.
20  BY MR. KRIDER:
21  Q    Would it have been possible to do that?
22  A    It could, but -- it could. Just when you are
23  loading directly from the railcar to the barge, you
24  are always going to have that down time with the
25  barge while your cars go back to be reloaded. And

Page 23

1   it's awful expensive on a per day charge there for
2   that barge to be sitting there while the cars go
3   back to be reloaded and then come back to the barge
4   again.
5   Q    So was the decision on manpower a process that
6   took more than one step with the union?
7   A    I don't recall if they waived the rules on that
8   or not. Normally the employer will present what he
9   wants done, and then they will ask you to go away
10  and they will have their own meeting with the body
11  itself and have a vote on it. They have to call a
12  special meeting on all that stuff, so I would say
13  one or two days, maybe, if everything went --
14  Q    I guess the reason for my question was, you
15  said that the configuration that's listed on this
16  fax is not the configuration that you used, correct?
17  A    Yes.
18  Q    So my question is: Did you have to go back to
19  the union again to get permission for the final
20  configuration of manpower?
21  A    I would say yes.
22  Q    Do you have a specific recollection of more
23  than one meeting with the union on this project?
24  A    I don't -- don't recall.
25  Q    In the last paragraph, there is a sentence that

Page 24

1   says, "This pencils out at $4.37 per short ton." Do
2   you see that?
3   A    Yes.
4   Q    Do you know why you made that conversion in
5   this fax?
6   A    Why I made that conversion?
7       MR. SEWRIGHT: Object to the form of
8   the question, and objection as to foundation. It
9   seems like the witness has a hard time refreshing,
10  but if you can answer it, sir --
11      THE WITNESS: That's -- why I put
12  that in there. I don't recall.
13  BY MR. KRIDER:
14  Q    Were you proposing to bill Mr. LaPore on a per
15  ton basis?
16      MR. SEWRIGHT: Object to the form of
17  the question. Haven't laid foundation that he
18  remembers.
19      THE WITNESS: I don't remember.
20  BY MR. KRIDER:
21  Q    Was there ever a discussion between you and
22  Mr. LaPore about billing this on a per ton basis, as
23  opposed to a time and material basis?
24  A    I don't recall.
25  Q    Did Mr. LaPore ever ask you to bid it on a lump

Page 25

1   sum unit price basis?
2   A    I don't recall.
3   Q    Now, did you testify a little bit ago that that
4   is your signature at the bottom of the page?
5   A    Yes, it is.
6   Q    Do you recognize any of the other handwriting
7   that's on here?
8   A    That's my handwriting, except for the blue
9   label on the corner.
10  Q    The record can show that that's actually the
11  court reporter's sticker.
12      MR. SEWRIGHT: Saying Exhibit 1. You
13  might ask him if that number at the bottom is his.
14  BY MR. KRIDER:
15  Q    I presume the number at the bottom isn't yours,
16  either.
17  A    No, sir.
18  Q    The 00s ending in a 7. In the handwritten
19  portion it says, 2/14 start, with a will above it,
20  April. Do you recall what that refers to?
21  A    No.
22  Q    The note below it, "4/21, Bob said start 4/21 a
23  building bucket." Is that a correct reading of
24  that?
25  A    Yes.

10

Page 26

1  Q    Do you know whether it's possible that those
2  two notes above each other were at different times?
3         MR. SEWRIGHT: Object to the form of
4  the question.
5         THE WITNESS: I don't recall. It's
6  been too long ago for me.
7  BY MR. KRIDER:
8  Q    How about the reference to "Mark Jones in
9  yard;" do you know what that means?
10 A    No, I don't.
11        (Exhibit No. 2 marked.)
12 BY MR. KRIDER:
13 Q    Mr. Goodwill, you have been handed what's been
14 marked as Exhibit 2. It is a January 27, 1997
15 letter from North Star Terminal & Stevedore Company
16 to Dear Valued Customer. Would you please take a
17 look at that and let me know whether or not you
18 recognize this document?
19        MR. SEWRIGHT: For the record, that's
20 the first page of that's dated January 27, 1997.
21 I'm just doing that for the record, Mr. Goodwill.
22 Go ahead and review the entire document.
23 BY MR. KRIDER:
24 Q    Do you recognize this document --
25 A    No, I do not. This is a -- all this stuff was

Page 27

1  done up in Anchorage --
2  Q    So --
3  A    -- to my knowledge. I mean, I don't -- I
4  didn't do any of this.
5  Q    Do you know whose name that is as the credit
6  manager, the signature of the transmittal letter?
7  A    Yes. That's Gerry Meherg.
8  Q    And he worked out of Anchorage?
9  A    It's a she.
10 Q    She?
11 A    Yeah, she worked up in Anchorage. She's
12 retired.
13 Q    So although most of the operations were
14 contained within Seward, at least the credit
15 application process was done out of Anchorage?
16 A    Yes.
17 Q    Had you ever seen any of this document before
18 the following pages having been filled out?
19        MR. SEWRIGHT: Object to the form of
20 the question. You mean has he seen the form of this
21 stuff before?
22        MR. KRIDER: I want to know if he's
23 seen this actual document as it's filled out.
24        MR. SEWRIGHT: Oh.
25 BY MR. KRIDER:

Page 28

1  Q    Did you ever see this document as it's filled
2  out during the course of your performance on this
3  job?
4  A    No.
5         MR. SEWRIGHT: I think it's attached
6  to your affidavit.
7         THE WITNESS: I mean, I thought he
8  was referring to when it was actually done up. I
9  didn't do any of this. I mean, I've seen it.
10 BY MR. KRIDER:
11 Q    But after performance had ceased after you were
12 done with the job, you saw it for the first time?
13 A    Might have been. I'm not --
14 Q    Do you recall seeing it during the job?
15 A    I don't recall.
16 Q    Do you recall talking to Mr. LaPore about the
17 need for filling out one of these credit
18 applications?
19 A    I don't -- I didn't.
20 Q    So when Mr. LaPore talked to you about engaging
21 North Star for services, did you tell him what the
22 contractual arrangements would have to be?
23        MR. SEWRIGHT: Object to the form of
24 the question.
25        THE WITNESS: No. I believe he might

Page 29

1  have come to Anchorage. I'm not certain. And
2  evidently this paperwork had to have been done up
3  here, but I mean, I would be assuming to say that.
4  I wasn't -- I haven't seen it.
5  BY MR. KRIDER:
6  Q    But did you explain to him how the -- how North
7  Star engaged in its business practices in terms of
8  how it would agree to get paid, whether there would
9  be purchase orders, those types of things during
10 your discussions with Mr. LaPore?
11        MR. SEWRIGHT: Object to the form of
12 the question.
13        THE WITNESS: With past customers, I
14 know I'm just going to have to say that we would
15 bill out weekly for the work that's been performed.
16 There would be a weekly billing.
17 BY MR. KRIDER:
18 Q    But did you have that conversation with
19 Mr. LaPore?
20 A    Yes. I would say yes.
21 Q    Was there a discussion with Mr. LaPore about
22 there being purchase orders involved in the
23 transaction?
24 A    No.
25 Q    Or about there being a formal contract signed

Page 30

1 as part of the transaction?
2 A   No.
3 Q   Was there any discussion about what of the
4 other -- what other nonmonetary terms would be
5 involved in the transaction?
6 A   Such as?
7 Q   Such as the types and terms that are
8 represented in your --
9 A   Oh, you mean these documents?
10 Q   -- confidential credit application form.  If
11 you look on the fourth page of this exhibit, there
12 is a list of terms for the agreement.
13 A   That one?  I did not go over this with Bob.  I
14 believe this was all done in Anchorage.
15 Q   I'm just curious as to whether or not you had a
16 general conversation with Bob about this type of
17 thing.
18 A   No.
19 Q   So what was your understanding of the actual
20 arrangement between you and Bob as to what work you
21 were going to perform and what price you were going
22 to charge him?
23        MR. SEWRIGHT:  Object to the form of
24 the question.  When?
25 BY MR. KRIDER:

Page 31

1 Q   In 1997 when you performed the work.
2 A   Well, when everything kind of was shaken out
3 and we were getting close to doing the work,
4 everything was going to be done on man hours and
5 equipment.  And, you know, just basic operation,
6 rock was going to come down and be dumped in the
7 yard and stacked and then brought to us on trucks.
8 Q   Was there a formal schedule or was at that on
9 an as-needed basis?
10        MR. SEWRIGHT:  Object to the form of
11 the question.
12        THE WITNESS:  Well, what dictated the
13 schedule was we would load the barge and it would go
14 to Homer to be off-loaded, and then by the time it
15 got back they wanted the rock there and wanted us --
16 we were like on-call until they got back with the
17 next barge.  It was a good operation.  It was slick.
18 It was -- moved a lot of rock.
19 BY MR. KRIDER:
20 Q   But the -- to use your words, the arrangement
21 was you were there on an as-needed basis?
22 A   Yes.  They didn't need us unless the barge was
23 there empty to be loaded.
24 Q   Did you have an understanding as to the exact
25 quantity of material that you would be required to

Page 32

1 load?
2 A   Yeah.  You mean per barge or --
3 Q   Total for the entire project.
4 A   Correct.
5 Q   What was your understanding?
6 A   50,000 ton.
7 Q   Was that a fixed amount or was it variable, in
8 your understanding?
9        MR. SEWRIGHT:  Object to the form of
10 the question.
11        THE WITNESS:  No.  They knew what
12 they needed for the job down there.  Right around
13 50,000 tons is what I was told.  We were going to
14 have approximately 10 barges.
15 BY MR. KRIDER:
16 Q   That -- only 5,000 per barge; is that what your
17 understanding was?
18 A   This is what -- I think the barge held 7,000
19 ton, something like that.  I don't know if some of
20 that weight was given up with that wear deck being
21 added on there or not.
22 Q   Did Mr. LaPore ever promise you that you would
23 load 50,000 tons?
24 A   Yes.
25 Q   How so?

Page 33

1 A   He said this is what the scope of the work is
2 and this is what you are going to load.
3 Q   And he did that verbally?
4 A   Yes.
5 Q   Did anybody at Nugget ever promise you 50,000
6 tons worth of work?
7        MR. SEWRIGHT:  Object to the form of
8 the question.
9        THE WITNESS:  Don't recall if I
10 talked with Randy about that or not.  I don't
11 recall.
12        (Exhibit No. 3 marked.)
13 BY MR. KRIDER:
14 Q   You have been handed what's been marked as
15 Exhibit 3.  You will note on the face of it that it
16 previously was marked as Exhibit 4 to Mr. Bentz'
17 deposition.  Do you recognize this document?
18 A   I recognize the cards on here.
19 Q   And can you briefly describe this document,
20 please, for the record?
21 A   It's business cards.  Frank gave me the one for
22 Island, and Bob gave me the one for Spencer, and
23 Randy gave me the other two, I believe.
24 Q   Did you -- strike that.  Do you know whether or
25 not these had been all compiled together and

12

Case No. A98-009 Civil (HRH)                                                    Jack Goodwill

| Page 34 | Page 36 |
|---|---|
| 1  attached to a sheet of paper or something at one | 1  (Exhibit No. 4 marked.) |
| 2  point, or -- | 2  BY MR. KRIDER: |
| 3  A  I believe they were. I think that's my | 3  Q  Exhibit 4 is an April 30, 1997 document from |
| 4  handwriting at the top, "Karen," so I'm thinking I | 4  Jack Goodwill to George Palmer at Majestic |
| 5  might have faxed these to Anchorage. | 5  Insurance. Take a look and let me know whether or |
| 6  Q  And what was your understanding as to what each | 6  not you recognize this document. |
| 7  of the employers representing these business cards | 7  MR. SEWRIGHT: Could we go off the |
| 8  role was in this job? | 8  record while the witness reviews the document? Is |
| 9  A  Bob was going to get the rock out of the quarry | 9  that okay, Mr. Krider? |
| 10  down to Seward, and Frank was captain on the | 10  MR. KRIDER: Sure. |
| 11  tugboat. He was going to do the hauling to and from | 11  (Off the record.) |
| 12  Seward to Homer and then back. And then Randy was | 12  BY MR. KRIDER: |
| 13  my superior, more or less, that I -- he's the one | 13  Q  Do you recognize this document, Mr. Goodwill? |
| 14  that gave me all the instructions on what he wanted | 14  A  Yes. |
| 15  and when he wanted it and how much. He was the -- | 15  Q  And is this a document you sent to |
| 16  pretty much my main -- main person that was in | 16  Mr. Palmer -- |
| 17  charge of the operation. | 17  A  Yes. |
| 18  Q  What was your understanding as to who | 18  Q  -- that we were referring to earlier? |
| 19  Mr. Randolph was representing? | 19  A  Yes. It's a long time ago. |
| 20  A  He was representing Nugget Construction. | 20  Q  In your experience working for North Star as a |
| 21  Q  At any time did he tell you he was working for | 21  supervisor and later vice president, was it unusual |
| 22  Spencer? | 22  for vessel owners to ask for proofs of insurance? |
| 23  A  No, sir. | 23  A  We have had other customers ask for them. It |
| 24  Q  Do you recall there being a question about | 24  may not have been on vessels. You know, like if you |
| 25  insurance for the barge being provided by North Star | 25  are going to lift a million dollar transformer for |

| Page 35 | Page 37 |
|---|---|
| 1  on this project? | 1  somebody or something of high value. |
| 2  A  Yes. | 2  Q  So sometimes the owner of the goods would ask? |
| 3  Q  And what do you recall that entailing? | 3  A  Uh-huh. |
| 4  A  I had to give the information down to our | 4  Q  So Randy wasn't the first person to ever ask |
| 5  office in California, or the office that did the | 5  for proof of insurance from North Star, in your |
| 6  insurance. I think his name was Palmer. Give him a | 6  experience, is that correct? |
| 7  little synopsis of what was involved; you know, | 7  A  That's correct. |
| 8  50,000 ton of rock, we were going to load it onto | 8  (Exhibit No. 5 marked.) |
| 9  the barge and whatnot, and we wanted to have | 9  BY MR. KRIDER: |
| 10  insurance for that. | 10  Q  Mr. Goodwill, Exhibit 5 that you have just been |
| 11  Q  And what generated that request? | 11  handed is designated as the Affidavit of Jack |
| 12  A  Randy. | 12  Goodwill. Please take a moment to look through that |
| 13  Q  And what was your understanding of why Randy | 13  and let me know whether or not you recognize this |
| 14  was asking you? | 14  document. |
| 15  A  He was very thorough. He wanted to have a | 15  MR. SEWRIGHT: Could we go off the |
| 16  document there to make sure we had insurance. | 16  record, Tom? |
| 17  Q  Was he simply requesting proof that North Star | 17  MR. KRIDER: Sure. |
| 18  was insured, or was he asking for additional | 18  (Off the record.) |
| 19  insurance to cover the barge, as well? | 19  (A break was taken.) |
| 20  MR. SEWRIGHT: Object to the form of | 20  BY MR. KRIDER: |
| 21  the question. | 21  Q  Have you had a chance to look that over? |
| 22  THE WITNESS: I don't know what he | 22  A  Yes, sir. |
| 23  was -- I can't tell you what he was actually | 23  Q  Mr. Goodwill, do you recognize this document? |
| 24  thinking, but I think if I was in his position I'd | 24  A  Yes. |
| 25  want the same -- same type of insurance. | 25  Q  And did you draft this document? |

MIDNIGHT SUN COURT REPORTERS (907) 258-7100

13

Page 38

1        MR. SEWRIGHT: Object to the form of
2   the question. What do you mean, Counsel? Did he
3   personally type it up or did he submit information
4   for it?
5   BY MR. KRIDER:
6   Q   Did you write this document?
7   A   Word for word, you mean?
8   Q   Correct.
9   A   No.
10  Q   Do you know who did?
11  A   Yes.
12  Q   And who is that?
13  A   Mr. Sewright.
14       MR. SEWRIGHT: My office typed it up,
15  Counsel.
16  BY MR. KRIDER:
17  Q   I'm asking who wrote it.
18  A   I basically wrote it and they typed it.
19  Q   Did you write it by hand?
20  A   No. With tape recording.
21  Q   So you dictated it and then gave them the tape?
22  A   (Nods head.)
23  Q   Did you review this after it had been typed?
24  A   Yes.
25  Q   Did you make any edits to it after it was

Page 39

1   typed?
2   A   I don't recall. It's been eons to me ago.
3   Q   At the sixth page of the exhibit, there is a
4   signature. Is that your signature?
5   A   Yes, it is, Jack Goodwill.
6   Q   At the time you signed this, you believe that
7   everything in here was true and accurate?
8   A   Yes, sir.
9   Q   And that you had personal knowledge of all of
10  the statements made herein?
11  A   Yes, sir.
12  Q   Has anything occurred since the date when you
13  signed this to change your mind about whether or not
14  everything in here is true and accurate?
15  A   What do you mean on that? As far as things I
16  didn't know about, you mean, or just --
17  Q   Is there any reason for you to doubt the
18  accuracy and truth, in your view, of this statement
19  today as opposed to when you originally signed it?
20       MR. SEWRIGHT: I'm going to object to
21  the form of the question unless we give the witness
22  time to read every line. If you want to go off the
23  record and he can review every line -- that's a
24  pretty broad question, Counsel. I mean, he just --
25  he just glanced at it before and looked at it

Page 40

1   quickly and recognized that it was an affidavit that
2   he had signed.
3        THE WITNESS: I don't know if I'm --
4   this is what I did, and I believe in this, but I
5   mean, I don't know if you are trying to imply or --
6   things I know now years later just in -- you know,
7   that have changed, like the outcome of things. What
8   are you --
9   BY MR. KRIDER:
10  Q   Sitting here today, is there any reason for you
11  to doubt the truth or accuracy of this affidavit as
12  you sit here today?
13       MR. SEWRIGHT: Object to the form of
14  the question.
15       THE WITNESS: What I'm -- at the time
16  I signed this, this is what I believed.
17  BY MR. KRIDER:
18  Q   I understand that. My question is: As you sit
19  here today, is that still true?
20       MR. SEWRIGHT: Same objection,
21  continuing objection, unless the witness is given
22  time to read every line. You want to give him that
23  time right now, Mr. Krider?
24       THE WITNESS: Well, this is my
25  affidavit and this is what I believe.

Page 41

1   BY MR. KRIDER:
2   Q   And my question is whether or not, as you sit
3   here today, what you believed to be true in 1998 you
4   no longer believe to be true as stated in this
5   affidavit.
6        MR. SEWRIGHT: Object to the form of
7   the question.
8        THE WITNESS: I never thought of it
9   like that.
10  BY MR. KRIDER:
11  Q   Let me ask it a different way: Is there
12  anything in your knowledge that's occurred since
13  1998 that may have changed your view regarding the
14  facts as stated in this affidavit?
15       MR. SEWRIGHT: Same objection. Off
16  the record while the witness reviews the document;
17  is that okay, Tom?
18       MR. KRIDER: Actually, I'd rather we
19  stayed on the record.
20       THE WITNESS: Yes, I believe that
21  this is -- I feel the same today as I did back then.
22  This is my document, and I believe in it.
23  BY MR. KRIDER:
24  Q   So as you sit here today, everything stated in
25  this affidavit you still believe to be true and

11 (Pages 38 to 41)

EXHIBIT 1
Page 11 of 69

14

Case No. A98-009 Civil (HRH)                                    Jack Goodwill

Page 42

1   accurate?
2   A   Yes.
3   Q   In paragraph 5 of your affidavit on page 3,
4   toward the latter part of that there is a
5   discussion. It says, "Also, when I had questions
6   regarding the suitability of the wear deck on the
7   barge for the large stones being loaded, it was
8   Mr. Randolph, project manager for Nugget
9   Construction, who provided me with a letter." Do
10  you see that?
11  A   Yes.
12  Q   What made you question the wear deck?
13          MR. SEWRIGHT: Where is that again,
14  Counsel?
15          MR. KRIDER: Paragraph 5, second to
16  last sentence.
17          THE WITNESS: I didn't want to -- a
18  wear deck is a wear deck, and it's put on there for
19  normal wear and tear of loading the barge. And I
20  didn't want to put some little cracks in it or have
21  another special -- if it was going to go on to be
22  used for something else, I was just concerned; I
23  didn't want to damage that wear deck. So I wanted
24  to know what his intent was with it. He said, no,
25  that the wear deck is going to come off. It's just

Page 43

1   put on there just for loading the rock.
2   BY MR. KRIDER:
3   Q   So you had some concern that you might damage
4   the wear deck?
5   A   Yes.
6   Q   And did Mr. Randolph assure you that wasn't an
7   issue?
8   A   Yes.
9          (Exhibit No. 6 marked.)
10  BY MR. KRIDER:
11  Q   Mr. Goodwill, you have been handed what's been
12  marked as Exhibit 6, which is a Nugget Construction,
13  Inc. material contract to Spencer Rock Products.
14  I'm going to presume you have never seen this
15  before, but is that accurate on my part?
16  A   Yes.
17  Q   The reason I have handed it to you is I'd like
18  you to turn to the second page and have you read
19  Section 3.
20  A   Okay.
21  Q   The first part of it, it says, "All material
22  furnished under this agreement is to be furnished
23  F.O.B., contractor provided barge deck, Seward,
24  Alaska." Do you understand what that means?
25          MR. SEWRIGHT: Object to the form of

Page 44

1   the question, Counsel. He said -- you haven't laid
2   a foundation that he had anything to do with this
3   agreement or what it would agree.
4          MR. KRIDER: I'm asking if he
5   understands what "F.O.B., contractor provided barge
6   deck" means.
7          MR. SEWRIGHT: Continuing objection
8   because I've seen that mean many things, and I've
9   seen legal disputes over that term before, sir.
10          MR. KRIDER: I'm asking for his
11  understanding.
12          MR. SHAMBUREK: I object to the
13  extent that it calls for a legal conclusion.
14          MR. KRIDER: That's fine.
15  BY MR. KRIDER:
16  Q   Do you have an understanding of what "F.O.B.,
17  contractor...barge deck" means?
18  A   F.O.B., free on board.
19  Q   Free on board, contractor...barge deck, what's
20  your understanding of what that means in your
21  industry?
22          MR. SEWRIGHT: Continuing objections.
23          THE WITNESS: This is between Nugget
24  and Spencer.
25  BY MR. KRIDER:

Page 45

1   Q   Correct.
2   A   I don't know what their intent is there.
3   Q   Did you have an understanding during the course
4   of the project as to who was responsible for the
5   rock until it was loaded onto the barge?
6          MR. SEWRIGHT: Object to the form,
7   foundation.
8          THE WITNESS: No.
9   BY MR. KRIDER:
10  Q   You didn't know whose rock it was that you were
11  loading?
12  A   We were loading Nugget rock.
13  Q   And what gave you that impression?
14  A   It was my impression that this whole operation
15  was a Nugget Construction project. I mean,
16  that's -- everything was done by Nugget.
17  Q   Who was your contract with for loading of the
18  barge?
19          MR. SEWRIGHT: Object to the form of
20  the question, calls for legal conclusion.
21  BY MR. KRIDER:
22  Q   Who did you understand your contract to be with
23  for loading of the barge in 1997 while the work was
24  being performed?
25          MR. SEWRIGHT: Same objection.

EXHIBIT 1
Page 12 of 69

15

Case No. A98-009 Civil (HRH)                                    Jack Goodwill

Page 46

1     THE WITNESS: I always thought it was
2  Spencer and Nugget.
3  BY MR. KRIDER:
4  Q    Why would you think it was Nugget?
5  A    Because they were the ones that were directing
6  everything. They were the ones that told us when to
7  load the barge, how much on the barge, what type of
8  rock on the barge, when to expect the barge back.
9  Randy was the -- was the guy in charge. He told me
10  how he wanted the invoices done. I mean, he was --
11  he didn't let one thing go by him. He was --
12  Q    And who were those invoices sent to,
13  Mr. Goodwill?
14     MR. SEWRIGHT: Object to the form of
15  the question. Which invoices?
16  BY MR. KRIDER:
17  Q    Invoices for this project.
18  A    They were sent to -- they were supposedly sent
19  to Nugget Construction and -- Nugget Construction
20  barge and/or owner, Spencer Rock. That's how they
21  were supposed to be sent.
22  Q    In your declaration -- or your affidavit on
23  page 2 on paragraph 2, it says, the last full
24  sentence at the bottom of the page, "Mr. LaPore
25  requested that Northern Stevedore & Handling load

Page 47

1  the rock upon the barge which Nugget would be
2  providing starting in the springtime." Do you see
3  that?
4  A    Yes.
5  Q    Did you understand that it was Mr. LaPore at
6  Spencer who made the request for you to perform this
7  work?
8     MR. SEWRIGHT: Mr. Krider, where are
9  you? I haven't caught up yet.
10     MR. KRIDER: Page 2, paragraph 4.
11     MR. SEWRIGHT: What's the question,
12  again?
13     MR. KRIDER: Could you please read
14  back the question?
15     (The requested record was read.)
16     MR. SEWRIGHT: Object to the form of
17  the question, and particularly unless you time it
18  to -- object to the form of the question.
19  BY MR. KRIDER:
20  Q    Was it your understanding that Mr. LaPore
21  requested that you perform this work?
22     MR. SEWRIGHT: I'm going to object to
23  the form of the question as to timing. There is a
24  reference to mid-August here, 1996. Then later he
25  said LaPore called him. And that's -- it's in the

Page 48

1  context of that call that the rest of this sentence
2  is here, that call that Nugget had gotten the job.
3     THE WITNESS: To me you are taking
4  that sentence out of context. I mean, my intent in
5  making this statement was Bob called me and said
6  Nugget was awarded the job. We got the work and we
7  are going to have you put that rock on the barge
8  that Nugget is going to provide.
9  BY MR. KRIDER:
10  Q    Who was going to have you do that?
11  A    Nugget was.
12  Q    Why was Mr. LaPore calling on behalf of Nugget,
13  if you know?
14  A    Just like I said there, he called and said --
15  informed me that Nugget Construction had obtained
16  the contract. He was very happy. So was I.
17  Q    And who did you believe you were working for at
18  the time you loaded those barges?
19  A    Nugget.
20  Q    And why is that?
21  A    Because Nugget was in charge. They were the
22  people that were there. They -- they were the ones
23  that were telling us what to do, what type of rock,
24  how much rock.
25  Q    Did Nugget ever pay you for any of those

Page 49

1  loadings?
2  A    I'm not supposed to give a smart answer, but --
3  Q    Strike that. Did Nugget ever promise to pay
4  you for any of those loadings?
5  A    No.
6     MR. SEWRIGHT: Object to the form of
7  the question.
8  BY MR. KRIDER:
9  Q    If your contract was with Nugget, why was there
10  a credit application sent to Spencer Rock Products?
11     MR. SEWRIGHT: Object to the form.
12     THE WITNESS: That was done in
13  Anchorage. I mean, I didn't -- I did not do that.
14  BY MR. KRIDER:
15  Q    So who told Anchorage that Mr. LaPore required
16  a credit report -- a credit application?
17     MR. SEWRIGHT: Object to the form,
18  foundation.
19     THE WITNESS: Of course, I informed
20  Anchorage that we were going to load rock from the
21  Spencer quarry to a Nugget Construction barge. They
22  took it from there to have Bob fill out the
23  paperwork, evidently.
24  BY MR. KRIDER:
25  Q    And you never told them you would be working on

16

Case No. A98-009 Civil (HRH)                                                    Jack Goodwill

Page 50

1  behalf of Spencer Rock?
2           MR. SEWRIGHT: Is that a question?
3           MR. KRIDER: That's a question.
4           THE WITNESS: I figured we would be
5  working for Spencer Rock and Nugget Construction
6  together. I mean, that's -- everything was -- they
7  were together, to me, from day one, until Randy
8  came.
9  BY MR. KRIDER:
10 Q   From day one until Randy came. When did Randy
11 come?
12 A   When Randy came, they had a barge come in to
13 the north dock with some equipment on it, and they
14 were going to unload that.
15 Q   And who did you bill for that work?
16 A   Nugget Construction.
17 Q   And was that invoice paid?
18 A   Yes, sir.
19 Q   So, then, when did Randy get involved with the
20 Spencer Rock Products project?
21          MR. SEWRIGHT: Object to the form of
22 the question, Spencer Rock Products project. You
23 are assuming facts not -- well, you are
24 characterizing the case, Counsel.
25          THE WITNESS: Randy wanted to make

Page 51

1  sure everything was lined up for that barge to be
2  loaded in a timely fashion. He was there -- when
3  was that -- it was in May, I think it was, wasn't
4  it? He's the one that told us when to have the --
5  all the ordering for all the men to load all the
6  barges came from Randy, you know, when the barge
7  would be there, what time to start, what time he
8  wanted it under way to meet the schedule down into
9  Homer.
10 BY MR. KRIDER:
11 Q   What else did Randy tell you to do, other than
12 those four things I think you have just mentioned?
13 A   Whenever I was going to do a bill, I would
14 check with him to see how he wanted it sent because
15 he was in charge.
16 Q   You requested a mailing address for every
17 single bill?
18 A   I asked him in the beginning how he wanted this
19 done because he was the one that was in charge.
20 Q   And what did he tell you?
21 A   He told me how to send it. He said he wanted
22 it sent to Spencer Rock.
23 Q   And you did that, didn't you?
24 A   Yes.
25 Q   So I'm confused now. You said earlier that you

Page 52

1  believe your contract was with Nugget. Then later
2  you said you thought it was with both of them. Who
3  did you believe you were working on behalf of when
4  loading the barges in this project?
5  A   Nugget Construction.
6  Q   Not working for Spencer at all?
7  A   No.
8  Q   During the course of 1997, did you --
9  A   In my past history of doing all your loading
10 and unloading, that rock was -- from its first place
11 of rest on the dock, when it goes on to that barge,
12 that's whoever has got the barge chartered. That's
13 why I figured that we were working for Nugget
14 Construction. The movement of the rock down by
15 the -- by the trucks, that was the part that Spencer
16 was paying for. The actual picking up of the rock
17 in the bucket and placing it onto the barge, that
18 goes -- that charge goes to the -- the barge.
19 Q   Okay. Describe that for me again, please.
20 A   There's a dock side and there is a dock side
21 charge normally in stevedore work. If we are going
22 to unload pipe off of a ship, for example, that goes
23 to the shipping line. The handling of that loading
24 to a truck or to a rail car, that goes usually to
25 the consignee or the dock side charge. It was my

Page 53

1  impression or my -- that's what I believe, that
2  Spencer was paying for the rock to be moved down to
3  the dock and dumped into the bucket, and as soon as
4  that bucket went airborne with that crane, it was
5  going to go onto that barge, that was Nugget's
6  responsibility.
7  Q   At what point did North Star's efforts begin in
8  that process you just described?
9  A   That's what I figured it was all along.
10 Q   I'm asking you, describe the -- let's say the
11 railyard to the dock side and then dock side to the
12 barge, were you involved in the rail side to the
13 dock side portion of this?
14 A   No.
15 Q   You were only responsible for dock side to
16 barge side, right?
17 A   From when the dump truck dumped that load of
18 rock into the skip bucket from the yard, we loaded
19 it onto the barge.
20 Q   And you believed all that work was being done
21 on behalf of Nugget?
22 A   Yes, sir.
23 Q   Mr. Goodwill, in your attempts to get paid for
24 this work, did you ever send any letters to the
25 Corps of Engineers?

17

Page 54

1  A   Yep. Yes, sir, I did. I think that's what it
2  was.
3  Q   Were those letters that you sent to the Corps
4  of Engineers intending to be honest statements of
5  your position on this project?
6          MR. SEWRIGHT: Object to the form of
7  the question.
8          THE WITNESS: Yes.
9  BY MR. KRIDER:
10  Q   So please explain for me, then, if you turn
11  back to Exhibit 7 at the back of your affidavit, why
12  it is that in the first sentence of your letter
13  dated August 4, 1997 you told the Corps of Engineers
14  that "Northern Stevedoring has been working for
15  Spencer Rock Products, Inc. from May 1 to June 26,
16  1997"?
17          MR. SEWRIGHT: Let's let the witness
18  read the whole letter. Go ahead and take time, sir,
19  to read the whole letter.
20          THE WITNESS: Yeah, I read that. I
21  should have made mention of Nugget at the same time.
22  BY MR. KRIDER:
23  Q   Well, now, if you believed you were working for
24  Nugget, why did you tell the Army Corps of Engineers
25  that you had been working for Spencer Rock Products?

Page 55

1  A   He's the one that initially set it up.
2  Spencer -- what I'm saying is I probably should have
3  said in that letter working for Spencer and Nugget.
4  Q   So Mr. Goodwill, did you ever ask Bob LaPore
5  for payment on your invoices?
6  A   Yes.
7  Q   And if you believe you were working for Nugget,
8  why did you ask Mr. LaPore for payment on your
9  invoices?
10  A   That's where Randy told me to send the bill to.
11  Q   But if you believe you were working for Nugget,
12  why were you asking Mr. LaPore to pay your invoices?
13          MR. SEWRIGHT: Asked and answered.
14          MR. KRIDER: I don't believe he did
15  answer it.
16          MR. SEWRIGHT: He did answer it,
17  Counsel. You want to argue about it, we can, but he
18  did answer it. Asked and answered. He said Randy
19  Randolph said to send the bills to Spencer.
20          MR. KRIDER: That doesn't explain why
21  he then asked Spencer for payment.
22          MR. SEWRIGHT: Counsel, it does to
23  me.
24          THE WITNESS: Randy said that's how
25  to direct the bills for us to get paid, so that's

Page 56

1  what I did. And once the bills were sent, we didn't
2  get paid. So I figured it must be -- need to be a
3  change here or something, but a lot of work taking
4  place with no payment being received from anyone.
5  BY MR. KRIDER:
6  Q   And who is the first person you asked for
7  payment, Mr. Randolph or Mr. LaPore?
8  A   I first asked Randy how he wanted the bills to
9  be directed, and that's -- he said that's what he
10  wanted done. And so --
11  Q   But, sir, my question was: Who did you first
12  ask for payment from, Mr. LaPore or Mr. Randolph?
13  A   Mr. LaPore.
14  Q   And do you recall approximately when you had
15  the first conversation with Mr. Randolph about
16  payment?
17  A   Not offhand. I'm trying to think. I know we
18  had done work because we did, like, three barges in
19  one month, so -- so normally you had to give them
20  like 30 days, anyway. So I don't recall the actual
21  date, but I -- I know it would more than likely have
22  been in June sometime, I think. But I'm not
23  certain.
24  Q   Do you know if it was before or after you had
25  performed your last loading of the barges?

Page 57

1  A   Like I say, I'm not -- not sure on that time
2  frame. It all went so fast. We did three barges in
3  one month.
4  Q   But your recollection is that it wouldn't have
5  been prior to the first of June?
6  A   I wouldn't think so.
7  Q   Now, did Mr. Randolph ever tell you that you
8  would be paid by Nugget?
9  A   Not directly. He said that -- send your bills
10  to Spencer Rock and get your payment.
11  Q   And who will get your payment?
12  A   We will get paid.
13  Q   By sending your invoices to Spencer?
14  A   Yeah.
15  Q   Did he ever tell you that Nugget would pay you?
16  A   He just said we'd get paid.
17  Q   Did he ever tell you whether Nugget would pay
18  you?
19  A   He didn't make reference to that.
20          MR. SEWRIGHT: Object to the form of
21  the question.
22  BY MR. KRIDER:
23  Q   On page 5, paragraph 9, in the middle of the
24  paragraph you say, "I understood it was a federal
25  project and had no doubt Northern Stevedoring would

15 (Pages 54 to 57)

18

Page 58

1  be paid, if necessary from the payment bond, because
2  I was dealing directly with the owner of Spencer
3  Rock and the product manager for Nugget
4  Construction." Do you see that?
5  A   Yes, sir.
6  Q   Other than your knowledge that it was a federal
7  job, was there any other reason that you had for
8  believing that Northern Stevedore would be paid?
9         MR. SEWRIGHT:  Object to the form of
10 the question.
11        THE WITNESS:  What are you saying,
12 again?
13 BY MR. KRIDER:
14 Q   You say here that you had no doubt you would be
15 paid because there was a bond.  Did you have any
16 other assurances from anybody else that you would be
17 paid, other than the fact that the bond was in
18 existence?
19 A   I'm not --
20        MR. SEWRIGHT:  Asked and answered,
21 and continuing objection to form.
22 BY MR. KRIDER:
23 Q   You can answer the question.
24 A   I think my train of thought at the time was
25 that it was a federal job, and I was kind of under

Page 59

1  the impression -- I'm not a lawyer or anything, but
2  I was -- being as it was a federal job, I always
3  thought that it was -- they came in and made sure
4  all the -- the little guys were paid before they
5  made the final payment to the main -- the main
6  worker.
7  Q   And did you believe that Northern Stevedore was
8  covered under that bond for that purpose?
9  A   Yes, sir.
10 Q   Did you feel you had any other protection for
11 assuring that you would get paid?
12        MR. SEWRIGHT:  Object to the form of
13 the question.
14        THE WITNESS:  I never gave it any
15 other thought.  I mean, I'd put my time in for our
16 company and go home at night.
17 BY MR. KRIDER:
18 Q   Down in paragraph 10, in the middle of the
19 paragraph there is a sentence that says, "He
20 acknowledged that the money was due Northern
21 Stevedoring, he had no quarrel there, but said he
22 was unable to pay."  Do you see that?
23 A   Yes.
24 Q   Did Mr. LaPore acknowledge to you that he was
25 responsible to pay you the sums you had invoiced?

Page 60

1         MR. SEWRIGHT:  Object to the form of
2  the question.
3         THE WITNESS:  Well, that's when it
4  kind of all came out that Nugget hadn't paid him is
5  what he was saying, so he couldn't pay us.
6  BY MR. KRIDER:
7  Q   But did he acknowledge that he was responsible
8  for paying you?
9         MR. SEWRIGHT:  Continuing objection,
10 calls for a legal conclusion.
11        THE WITNESS:  I don't know.  Alls I
12 wanted was the money.  We wasn't getting any, and it
13 was getting pretty outstanding, I mean, months into
14 it.
15 BY MR. KRIDER:
16 Q   Did Mr. LaPore ever indicate to you that he
17 owed you the money?
18        MR. SEWRIGHT:  Continuing objection.
19        THE WITNESS:  I don't recall if it
20 was his actual words or --
21 BY MR. KRIDER:
22 Q   Did he ever tell you words to the same effect?
23 A   Alls I recall is that he said he wasn't --
24 hasn't received his funds yet.  He couldn't pay us
25 until he received his funding.

Page 61

1  Q   In your mind, did that acknowledge that he was
2  responsible to pay you?
3  A   Not necessarily.
4  Q   What else would it have meant, in your view?
5  A   It means the money was forthcoming either from
6  Nugget or the only other player there.
7  Q   But it was your impression that Mr. LaPore
8  intended to be the one to pay you?
9  A   That's where we sent the bill.
10 Q   So you expected to be paid by Spencer?
11        MR. SEWRIGHT:  Object to the form of
12 the question.
13        THE WITNESS:  You know, that's --
14 that's the way Randy wanted it set up, and that's
15 what we did.
16 BY MR. KRIDER:
17 Q   Did you expect to be paid by Spencer?
18 A   I just expected to be paid.
19 Q   You had no expectation as to who you were going
20 to get that money from?
21        MR. SEWRIGHT:  Object to the form.
22        THE WITNESS:  I figured the money was
23 going to come from Nugget.
24 BY MR. KRIDER:
25 Q   Directly or through Spencer?

19

Page 62

1  A    Through Spencer.
2  Q    Did you have an understanding that Spencer Rock
3  Products was a subcontractor or supplier to Nugget?
4  A    I didn't get into that.
5  Q    Did you have any understanding whether or not
6  there was a contractual relationship between Nugget
7  and Spencer?
8  A    I wasn't aware of any.
9  Q    Did you ever consider it?
10  A    No.
11          MR. SEWRIGHT: I'm going to object to
12  the form of the question, Counsel, because by asking
13  "did you ever consider it," that could mean -- that
14  could include today. If you are referring just back
15  to 1997 -- was that the intent of the question?
16          MR. KRIDER: Yeah.
17  BY MR. KRIDER:
18  Q    Did you consider whether or not there was a
19  contractual relationship between Nugget and Spencer
20  during 1997 while you were performing this work?
21  A    I thought they were in it together. I mean,
22  you know, everything was Spencer and Nugget. I
23  mean, I didn't know what -- I wasn't privy to any
24  type of information or any type of documents they
25  had going together, but it seemed like everyone

Page 63

1  worked well together, and the rock came and it was
2  brought down, we loaded it and everything was
3  smooth. I enjoyed working with all of them, Randy,
4  Bob. It was a good operation.
5  Q    Did you know who brought the material to the
6  dock side?
7  A    They were -- yeah, I recognized a couple of the
8  kids there. They drove -- locals. The trucks were
9  a little weathered, a little worn.
10  Q    Do you know who they worked for?
11  A    No. I didn't really ask them who they were
12  actually working for.
13  Q    At the bottom of page 10 -- I'm sorry.
14  Paragraph 10, page 5, sentence says, "At about the
15  same time, Nugget moved its loading operation to the
16  other side of the bay in Seward and loaded the other
17  five barge loads of stone that summer from the city
18  dock there, which also demonstrates to me that
19  Nugget was calling the shots." Do you see that
20  sentence?
21  A    Yes.
22  Q    Did you have an understanding in the summer of
23  1997 as to why Nugget moved the loading of rock to
24  the other dock?
25  A    Did I have an understanding why Nugget moved to

Page 64

1  the other dock? Pretty much.
2  Q    And what was your understanding?
3  A    Nobody had paid us for the five previous
4  barges, and it come to a point that we were not
5  going to load any more of the rock for nothing.
6  Q    Is it your understanding that in July of 1997
7  the dock that you were using was capable of being
8  used for loading rock?
9  A    The other dock?
10  Q    No, the dock that you were -- the railroad
11  dock.
12  A    What was that, again?
13  Q    Was it your understanding that in July of 1997
14  the cruise ship dock was still capable of being used
15  to load rock?
16  A    Yes.
17  Q    Was there a conflict with cruise ships in that
18  dock at the time?
19  A    Not to my knowledge.
20  Q    Was it possible that there could have been a
21  conflict with cruise ships?
22          MR. SEWRIGHT: Object to the form of
23  the question. Everything -- so many things are
24  possible.
25          THE WITNESS: If you show me the

Page 65

1  cruise ship schedule, I could tell you if there
2  would have been, but -- would have been now, you are
3  fishing out there, but it depends on a lot of
4  things: the scheduling of the barge, when it was
5  going to come back, if there was -- we never had
6  that many cruise ship days, so I'd have to
7  look at the schedule.
8  BY MR. KRIDER:
9  Q    So did you tell --
10  A    It never came up in the time frame that they
11  were using the dock.
12  Q    Did you tell somebody at Spencer or at Nugget
13  that Northern Stevedoring would no longer load rock
14  until it had been paid for the first five barge
15  loads?
16  A    No. It may have been from Anchorage. I don't
17  actually personally recall, but people were starting
18  to get a little nervous around there after doing
19  five barges and having $100,000 out.
20  Q    But somebody within Northern Stevedoring
21  instructed that you would no longer load barges on
22  this project until you had been paid?
23          MR. SEWRIGHT: Object to the form of
24  the question, lack of foundation with this witness,
25  unless he knows.



Page 66

1       THE WITNESS: I --
2   BY MR. KRIDER:
3   Q    Were you told to no longer perform work on this
4   project by somebody at Northern Stevedoring?
5   A    I don't recall at this time. I might get
6   refreshed or something, but --
7   Q    What would you need to see to refresh your
8   recollection?
9   A    I don't know. I don't think it's covered in
10  any of this affidavit stuff here, is it? I would
11  have to go through some more paperwork. I mean,
12  it's been eight years, going on nine.
13  Q    So what's your understanding or your
14  recollection as to why you stopped loading rock?
15  A    I'm pretty sure we were asking for some of the
16  funding for work and services already performed, and
17  no one come up with any money, so I think that Randy
18  took the operation to the other side.
19  Q    Well --
20  A    I mean, that's --
21  Q    I'm a bit confused by that statement, though.
22  Did the lack of being paid make Northern Stevedore
23  state that it would no longer perform work unless it
24  was paid, or was there an affirmative decision on
25  behalf of Spencer or Nugget to move the operation?

Page 67

1       MR. SEWRIGHT: Object to the form of
2   the question, compound. You are asking two
3   questions there, at least.
4       THE WITNESS: I don't know if they
5   got something officially in writing or if it was
6   verbal or if Randy just went ahead and moved. I
7   don't recall at this time.
8   BY MR. KRIDER:
9   Q    But it's your recollection that Northern
10  Stevedoring was no longer going to perform work
11  unless it got paid; is that your recollection?
12      MR. SEWRIGHT: Object to the form of
13  the question.
14      THE WITNESS: That is my -- my
15  thought on it, but I mean, I do have people I answer
16  to that could make other decisions.
17  BY MR. KRIDER:
18  Q    And is it your understanding that as a result
19  of Northern Stevedoring's decision to not perform
20  any work because it wasn't getting paid, that Nugget
21  and Spencer then took the operation to the other
22  dock?
23      MR. SEWRIGHT: Object to the form of
24  the question.
25      THE WITNESS: You know, to be honest,

Page 68

1   I don't recall if it was because we didn't get the
2   money or Randy just left on his own accord. He's a
3   very smart individual.
4   BY MR. KRIDER:
5   Q    So now your testimony is that the decision
6   might not have been made by Northern Stevedoring to
7   refuse service?
8   A    I'm just saying that that's a possibility. I
9   mean, I don't really -- I really don't recall at
10  this time, I mean, unless you have got some
11  documentation from Northern Stevedoring or North
12  Star.
13  Q    Did you ever talk to Mr. LaPore about the move
14  to the other dock?
15  A    I don't believe so. I'm not certain.
16  Q    Did you ever talk to Randy Randolph about the
17  move to the other dock?
18  A    I'm not certain, not at this time.
19  Q    Did you ever talk to anybody with either
20  Spencer or Nugget about the move to the other dock?
21  A    You know, I'm sure something took place, but,
22  you know, I'm not sure of what mode or who it was
23  with or -- or how it was done, you know, whether it
24  was done through Anchorage or me. I'm sure there
25  was -- we are all consenting adults there. I'm sure

Page 69

1   something took place, but I'm not certain how it,
2   you know, came about.
3   Q    Do you remember having a specific conversation
4   with anybody at Northern Stevedoring about the move
5   to the other dock?
6   A    Not per se, but like I say, I'm sure that it --
7   something took place, but I just don't --
8   Q    Who would you expect that decision to have been
9   made by?
10      MR. SEWRIGHT: Object to the form of
11  the question.
12      THE WITNESS: Scott Francis, Jeff
13  Bentz. I mean, I just --
14  BY MR. KRIDER:
15  Q    Would you do anything to refresh your
16  recollection about this other than speak to one of
17  those two individuals?
18      MR. SEWRIGHT: Object to the form of
19  the question.
20  BY MR. KRIDER:
21  Q    If you were attempting to refresh your
22  recollection about the events that we are discussing
23  here, is there something else you would look at or
24  somebody else you would talk to other than those two
25  individuals?

Page 70

1    MR. SEWRIGHT: Object to the form.
2    THE WITNESS: So you are asking what
3 would I do to refresh my memory on that?
4 BY MR. KRIDER:
5 Q   Correct.
6 A   Okay, you know, I don't have any written record
7 of -- you know, I'm not an employee of North Star or
8 Northern Stevedoring anymore, so that's -- that's
9 another chapter in my life. I mean --
10 Q   So is your answer that there is nothing else
11 that you would do other than speak to those two
12 individuals?
13    MR. SEWRIGHT: Object, Counsel. That
14 wasn't his answer. Object to the form.
15    MR. KRIDER: I'm asking him to
16 clarify the answer.
17    THE WITNESS: I don't have any other
18 resources. I mean, I don't have any written record.
19 I don't have nothing. I mean, you know, I'm Jack
20 Goodwill, citizen of Seward.
21 BY MR. KRIDER:
22 Q   If you would please turn to Exhibit 6 in your
23 affidavit, it's after the pictures.
24 A   After the pictures? Okay.
25 Q   Do you recognize this as one of the invoices

Page 71

1 for this project?
2    MR. SEWRIGHT: Which page of
3 Exhibit 6?
4    MR. KRIDER: One of eight.
5    THE WITNESS: One of eight? Yes.
6 This is an invoice.
7 BY MR. KRIDER:
8 Q   Now, the invoice is addressed to Nugget
9 Construction Barge & Owners, care of Spencer Rock
10 Products, Inc. Do you see that?
11 A   Yes, sir.
12 Q   In your experience at Northern Stevedoring
13 and/or North Star, was it typical to have the vessel
14 owner's name at the top of an invoice and the actual
15 billing address secondary?
16 A   Yes, whatever ship or vessel we worked, that
17 would be on the first line.
18 Q   Is it unusual for the ship and the bill to
19 address to be different entities?
20    MR. SEWRIGHT: Object to the form of
21 the question. It calls for speculation.
22    THE WITNESS: Not necessarily,
23 because different things are chartered, you know.
24 Like a ship could be owned by someone but chartered
25 by a different line.

Page 72

1 BY MR. KRIDER:
2 Q   And in that case, you would still put the
3 vessel owner's name at the top and then the vessel
4 line who you are billing to as the secondary billing
5 address?
6    MR. SEWRIGHT: Object to the form of
7 the question.
8    THE WITNESS: Yeah, we put the
9 vessel -- name of the vessel and/or owners on the
10 top, and second you would -- say, like, if it was
11 Daiichi or Toko, or whoever was bringing the product
12 in to have the ship chartered, would be on the next
13 line.
14 BY MR. KRIDER:
15 Q   Is there a reason why you put the vessel name
16 on the invoice?
17    MR. SEWRIGHT: Object to the form.
18    THE WITNESS: That's company policy
19 at the time.
20 BY MR. KRIDER:
21 Q   Do you know if there is a reason for doing
22 that?
23 A   I believe so.
24 Q   And what's your understanding of that?
25 A   I don't know if it's correct or not, but in --

Page 73

1 100 percent, but in the maritime industry, that
2 services rendered to a vessel, I believe that
3 somehow if the customer doesn't pay, maybe it's
4 someone that has that chartered, I think there is
5 some maritime law or some legal ramifications that
6 you can go back on the vessel. I'm not certain of
7 details or, you know, everything that's involved in
8 it, but I just know there are some legal -- legal
9 stuff that could take place.
10    MR. KRIDER: Actually, this is a good
11 time for a break.
12    MR. VIERGUTZ: Can I ask the witness
13 one question? Did you have any communication at all
14 with USF&G, the bonding company for Nugget?
15    THE WITNESS: No, sir.
16    MR. VIERGUTZ: Thanks.
17    MR. KRIDER: Off the record.
18    (A break was taken.)
19    (Exhibit No. 7 marked.)
20    MR. SEWRIGHT: Before you begin, Mr.
21 Krider, just for the record, Mr. Viergutz is absent.
22 He did tell us that we could proceed without him
23 after he asked the question that seemed most
24 important to him, which he did.
25 BY MR. KRIDER:

22

Page 74

1  Q   Mr. Goodwill, you have been handed Exhibit 7
2  entitled Second Affidavit of Jack Goodwill. Have
3  you had a chance to review that?
4  A   Yes, sir.
5  Q   And do you recognize this document?
6  A   Yes, sir.
7  Q   And on page 6 of this document --
8  A   Okay.
9  Q   -- is that your signature?
10 A   Yes, sir.
11 Q   And at the time you signed this document, were
12 all of the statements contained therein true and
13 accurate?
14 A   Yes, sir.
15 Q   As you sit here today, do you believe all of
16 the statements contained herein are still true and
17 accurate, to the best of your knowledge?
18 A   Yes, sir.
19 Q   If you turn to page 2, paragraph 2, the bottom
20 of that paragraph, sentence says, "Open account
21 arrangements were made with Spencer Rock for that
22 work, and credit was extended to Spencer Rock by
23 written agreement on that basis, as set out in my
24 previous affidavit submitted December 7, 1998 in
25 this matter." Do you see that sentence?

Page 75

1  A   Yes.
2  Q   After reading that sentence, do you still deny
3  that you had an agreement with Spencer Rock Products
4  for the loading of this material onto the barge?
5        MR. SEWRIGHT: I object. I think it
6  states the testimony wrong. Object to the form of
7  the question.
8        THE WITNESS: Yes, we had a written
9  agreement with Spencer Rock.
10 BY MR. KRIDER:
11 Q   And you actually extended him -- Spencer Rock
12 credit by performing work on its behalf, did you
13 not?
14 A   Yes.
15 Q   Does it say anywhere in this affidavit that
16 during the course of this project you had an open
17 account arrangement with Nugget for this work and
18 extended a credit -- extended credit to Nugget for
19 the work you performed?
20       MR. SEWRIGHT: Counsel, are you
21 reading the same first sentence in paragraph 2 that
22 I am? You are asking him for a legal conclusion,
23 does the affidavit say what it already says. Object
24 to the form.
25       THE WITNESS: When I see Spencer

Page 76

1  Rock, I see Spencer Rock and Nugget Construction.
2  That's just where my mind clicks in this operation,
3  and for this particular job of loading these barges,
4  that's --
5  BY MR. KRIDER:
6  Q   So, then, why did you separate them in the
7  first sentence of that paragraph?
8        MR. SEWRIGHT: I object to the
9  characterization. He doesn't split them. He
10 says -- the sentence speaks for itself. It says --
11       MR. KRIDER: Objection, speaking
12 objection.
13       MR. SEWRIGHT: Counsel, he -- you say
14 why does he split them in the first sentence, and he
15 doesn't split them.
16       MR. KRIDER: State your objection for
17 the record, please.
18       MR. SEWRIGHT: You are misstating the
19 evidence, to the form of the question; in other
20 words, you are just plain wrong in your assumption.
21 You are asking him to assume your assumption.
22       MR. KRIDER: Counsel, please stop.
23 BY MR. KRIDER:
24 Q   Mr. Goodwill, in the first sentence --
25       MR. SEWRIGHT: You asked me to state

Page 77

1  my objection.
2  BY MR. KRIDER:
3  Q   In the first sentence of that paragraph, you
4  list both Spencer and Nugget, do you not?
5  A   Yes, sir.
6  Q   In the last sentence of that paragraph you only
7  list Spencer Rock, don't you?
8  A   Yes, sir.
9  Q   Why is there a distinction between those?
10       MR. SEWRIGHT: Objection, the
11 document speaks for itself, or that paragraph does.
12       THE WITNESS: To me these two are so
13 together, when I say Spencer, to me it's also
14 Nugget.
15 BY MR. KRIDER:
16 Q   So why did you include Nugget Construction in
17 the first sentence?
18 A   Because it was for both of them.
19 Q   On the last -- in the last sentence, did you
20 intend that to also mean Nugget Construction?
21 A   No.
22 Q   On page 4 in paragraph 7 --
23 A   Okay.
24 Q   -- would you agree with me that this paragraph
25 is here to indicate that you had other billing

23

Page 78

1 arrangements and relationships with Nugget outside
2 of this project?
3          MR. SEWRIGHT: Object to the form of
4 the question. You are asking him to characterize
5 the entire paragraph?
6          MR. KRIDER: I've characterized it,
7 and I've just asked him if he agrees.
8          MR. SEWRIGHT: I object to the form.
9 The question is also compound.
10         THE WITNESS: I think in partial, my
11 intent of this part -- and maybe it didn't come out
12 right or whatever, but was to say that Nugget
13 Construction was aware of our -- our billing
14 practices and rates, and we have done other work,
15 you know, for them in the form of labor and
16 equipment that they used of ours. And this pretty
17 much lists the various invoices.
18 BY MR. KRIDER:
19 Q    And are those invoices attached to your
20 affidavit?
21 A    I believe they are.
22 Q    And in all of those invoices, have they been
23 billed directly to Nugget?
24 A    Nugget, Nugget, Nugget, Nugget -- yes, sir.
25 And I -- and I didn't have any open account credit

Page 79

1 form that I knew of put in place, but I didn't deny
2 these guys, you know, our services. I mean --
3 Q    Didn't you testify earlier today that credit
4 arrangements were handled out of Anchorage?
5 A    Yes.
6 Q    And that you were not even aware whether or not
7 Spencer had engaged in credit?
8 A    That's true. So I might have been -- maybe I
9 was negligent by doing it, or maybe I did make a
10 call and see if they did. I don't recall at this
11 time, but that was probably the normal procedure
12 that you would do.
13 Q    I don't remember whether you actually answered
14 the question of whether or not all of the invoices
15 for the work described in paragraph 7 were sent
16 directly to Nugget.
17 A    I said yes, I believe. I'm not sure. Corbin,
18 Corbin, Corbin Drive. Yes, sir, they were.
19 Q    In paragraph 9 on page 5, the last full
20 sentence on the page has contained within it the
21 statement, "Mr. Randolph was present during the
22 loading of the barges and was making all the
23 decisions on the loading of the barges; what type of
24 rock to load, the quantity to load, arrival and
25 departure of the barges, et cetera." Do you see

Page 80

1 that?
2 A    Yes, sir.
3 Q    What other et ceteras can you recall?
4 A    He also would call me and tell me what time he
5 wanted the longshoremen dispatched so they could
6 commence loading on the barge.
7 Q    Okay. What else?
8 A    And he -- he made sure that the guys on the tug
9 were up there watching the loading and that when we
10 became close to -- to being loaded, that they had
11 the engines warmed up so we would be able to just
12 drop the lines off and they could go immediately
13 instead of incurring additional expenditures for
14 line handlers. He kept in pretty close contact with
15 the barge crew, and then Bob would come down and
16 check with him. He pretty much was out in the yard
17 where they were loading the trucks, and come down
18 and check with him two or three times during the
19 day. I don't know if they were lining up railcars
20 or whatever. But -- but --
21      What else? That's all I can think of at the
22 moment.
23 Q    Are any of Mr. Randolph's actions in this
24 regard unusual for an individual who is responsible
25 for the vessel, in your experience?

Page 81

1 A    No. I think he did a very good job. He stayed
2 right on top of it.
3 Q    Mr. Goodwill, the skip bucket that was used to
4 load rock on the barges, who owned that at the time
5 of the performance?
6          MR. SEWRIGHT: Object to the form of
7 the question. It calls for a legal conclusion.
8 BY MR. KRIDER:
9 Q    Do you know whose skip bucket it was?
10 A    I believe -- I'm not certain, but I'm thinking
11 that was Spencer Rock's.
12 Q    Do you know whether or not --
13 A    I don't -- I don't know any of the details or
14 what all had to be done to get it made. It was kind
15 of in a hurry thing, you know.
16 Q    Do you know whether or not Northern Stevedoring
17 procured that skip box from Spencer Rock Products at
18 some point in the future?
19 A    I believe there was a movement in that
20 direction. I can't recall, but I think that was
21 what was being discussed. I'm not certain, but
22 I'm -- that's -- I'm -- I know there was talk of it.
23 Q    Did the skip bucket remain in Northern
24 Stevedoring's possession in Seward after the project
25 was over?

24

Case No. A98-009 Civil (HRH)                                                      Jack Goodwill

Page 82

1  A   No.
2  Q   Do you know what happened to it?
3  A   Man, I'm not certain. I believe it went to
4  Anchorage, but I can't remember what method of
5  transportation because it was so wide. It would
6  have to go on a railcar.
7         MR. SEWRIGHT: He's asking if you
8  know.
9         THE WITNESS: No, I don't, for
10 certain.
11 BY MR. KRIDER:
12 Q   Am I correct in your prior testimony today that
13 you believe that in May and June of 1997 with regard
14 to the loading of the rock that you had a contract
15 with Nugget Construction for that work?
16        MR. SEWRIGHT: Object to the form of
17 the question. Not the contract part, but -- you
18 understand the question?
19        THE WITNESS: Yep. A written
20 contract?
21 BY MR. KRIDER:
22 Q   Written or oral.
23 A   No written contract. The only thing I have to
24 go on for the oral is I was told by Randy where to
25 send the bill.

Page 83

1  Q   So that's the only evidence that you have of an
2  oral contract between Northern Stevedoring and
3  Nugget is Randy's instruction on where to send
4  billing?
5  A   Yes.
6  Q   Are you aware of whether or not there was an
7  investigation by the Army of Nugget's practices on
8  this project?
9  A   No, sir.
10 Q   During the course of your performance, did you
11 ever see a copy of the infamous support agreement?
12 A   No, sir.
13 Q   Have you seen one since then?
14 A   You know, there was some paperwork made
15 available to me, but I don't believe I read that
16 one. I did not.
17 Q   Mr. Goodwill, if you had not received billing
18 instruction from Mr. Randolph, do you think your
19 actions with regard to loading the rock on this
20 project would have been any different?
21        MR. SEWRIGHT: Counsel, I didn't hear
22 that. Would you go over that one again?
23        MR. KRIDER: Could you please restate
24 the question?
25        (The requested record was read.)

Page 84

1         THE WITNESS: I believe that the
2  invoices would be sent in the same fashion, Nugget
3  Construction Barge and/or Owners at the top and with
4  Spencer Rock on the second line. I think they would
5  be sent in the same fashion.
6  BY MR. KRIDER:
7  Q   So Mr. Randolph's involvement didn't cause you
8  to change how you were performing your work, did it?
9  A   No.
10 Q   In your 25 years working for Northern
11 Stevedoring, have you ever been involved directly
12 with an instance of back charges being exchanged
13 between you and a client or a subvendor? Do you
14 know what the term back charges means?
15 A   For services, like, rendered or something,
16 something that you do?
17 Q   Right. Has anybody ever deducted a Northern
18 Stevedoring invoice that you are aware of because of
19 perhaps damage that you did in handling material?
20 A   I wish I could say no, but yes, we did damage a
21 couple things.
22 Q   And is it normal for there to be a deduction on
23 the final billing as a result of that?
24        MR. SEWRIGHT: Object to the form of
25 the question.

Page 85

1         THE WITNESS: Let me think. It
2  varied. Sometimes they might make a deduction, but
3  normally they would pay the invoice and we would get
4  a whole separate bill. I mean, yeah, that's pretty
5  much what we would do. They normally pay it and
6  then we would get something, you know, after the
7  deductible.
8  BY MR. KRIDER:
9  Q   So you said deductible. Is that what your last
10 answer was?
11 A   Yes.
12 Q   Is it your experience when those things happen
13 there are usually insurance claims involved?
14 A   Yes.
15 Q   Have you ever worked for a contractor?
16        MR. SEWRIGHT: Object to the form of
17 the question.
18        THE WITNESS: What kind of
19 contractor?
20 BY MR. KRIDER:
21 Q   Somebody who constructs things.
22 A   Like buildings and --
23 Q   Correct.
24        MR. SEWRIGHT: Object to the form.
25 You mean as an employee of the contractor?

22 (Pages 82 to 85)

Page 86

1    MR. KRIDER:  Either.  Either as an
2  owner of a contracting entity or as an employee of a
3  contracting firm.
4    MR. SEWRIGHT:  Do you understand the
5  question?
6    THE WITNESS:  Uh-huh.
7    MR. SEWRIGHT:  Okay.
8    THE WITNESS:  Yes.
9  BY MR. KRIDER:
10  Q    And when was that?
11  A    Down in Petersburg.  Let's see.  This goes back
12  a long ways.  It was a contractor.  We went into
13  little villages and put in floats and drove piling
14  and put in the creosote.  And that would have been
15  back in the '70s.
16  Q    And what was your position?
17  A    I was kind of a go-for, and I was a cook.
18  Q    Camp cook?
19  A    Yeah, for the barge.  It was Martinez.
20  Martinson.  That was the name of it.  Martinson.  We
21  went around and did little jobs.  Let's see.  Any
22  other contractors.  Nothing else official, just --
23  Q    I guess we will just get this on the record.
24  What's your mailing address?
25  A    Box 594, Seward, Alaska 99664.

Page 88

1  and go off the record.  Let me take a couple
2  minutes.  I may be done.
3    (A break was taken.)
4    (Exhibit No. 8 marked.)
5  BY MR. KRIDER:
6  Q    Mr. Goodwill, you have been handed Exhibit 8,
7  which is a document your Counsel -- North Star's
8  Counsel provided to me prior to your deposition
9  today.  Have you ever seen this document before?
10  A    No, sir.
11  Q    Have you had a chance to review this?
12  A    Yes, sir.
13  Q    Do any of the descriptions of purported phone
14  notes with Mr. LaPore ring a bell to you of
15  conversations that you had?
16  A    It's nothing that -- not mine.
17    MR. KRIDER:  I have no further
18  questions.
19    MR. SEWRIGHT:  I have no questions of
20  the witness at this time.
21    MR. SHAMBUREK:  I have none.
22    MR. KRIDER:  Thank you, Mr. Goodwill.
23    THE WITNESS:  You are welcome.
24    MR. KRIDER:  Off the record.
25    (Proceedings adjourned at 3:23 p.m.)

Page 87

1  Q    Do you have a physical address?
2  A    It's 535 Ballaine Avenue.
3  Q    Still in Seward?
4  A    Yes, sir.
5  Q    Mr. Goodwill, what did you do in preparation
6  for your deposition today?
7  A    Today?
8  Q    What did you do prior to today or today in
9  preparation of your deposition?
10  A    Oh, it's been so darn long.  I looked over my
11  two affidavits and a few papers, legal counsel.
12  Q    Did you speak to anybody other than counsel?
13  A    No.
14  Q    When was the last time you spoke with
15  Mr. Bentz?
16  A    2002, I believe.  2002, right after I got my
17  pink slip.
18  Q    Was that by phone or did you see him in person?
19  A    It was over the phone.
20  Q    Did you talk about this case at all?
21  A    No, sir.
22  Q    Is Northern Stevedoring or North Star paying
23  you anything for being here today?
24  A    No, sir.
25    MR. KRIDER:  Why don't we go ahead

Page 89

1         C-E-R-T-I-F-I-C-A-T-E
2    I hereby certify that I have read the
3  foregoing transcript and accept it as true and
4  correct, with the following exceptions:
5  ===============================================
6  PAGE    LINE    CORRECTION
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18
                    _____
19  Date        JACK GOODWILL
20  (March 16, 2006)
21
         (Use additional paper to note corrections
22  as needed, signing and dating each page.)
   (MV)
23
24
25

EXHIBIT 1
Page 23 of 69

26

Page 90

```
1              REPORTER'S CERTIFICATE
2          I, MARY A. VAVRIK, RMR, Notary Public in
3   and for the State of Alaska do hereby certify:
4          That the witness in the foregoing
5   proceedings was duly sworn; that the proceedings
6   were then taken before me at the time and place
7   herein set forth; that the testimony and proceedings
8   were reported stenographically by me and later
9   transcribed under my direction by computer
10  transcription; that the foregoing is a true record
11  of the testimony and proceedings taken at that time;
12  that the witness requested signature; and that I am
13  not a party to nor have I any interest in the
14  outcome of the action herein contained.
15         IN WITNESS WHEREOF, I have hereunto
16  subscribed my hand and affixed my seal this _____
17  day of _____ 2006.
18
19         _____
           MARY A. VAVRIK,
20         Registered Merit Reporter
           Notary Public for Alaska
21
22         My Commission Expires:  November 5, 2008
23
24
25
```

Page 91

```
1              INDEX TO DEPOSITION
2   WITNESS:  JACK GOODWILL                 PAGE
3          Examination by Mr. Krider ........... 5
4   EXHIBIT    DESCRIPTION                 PAGE
5   No. 1    8/20/96 fax ....................... 5
    No. 2    January 27, 1997 letter with ....... 26
6            attachments
    No. 3    Copies of business cards ........... 33
7   No. 4    4/30/97 document................... 36
    No. 5    Affidavit of Jack Goodwill ......... 37
8   No. 6    Nugget/Spencer Rock material ....... 43
             contract
9   No. 7    Second Affidavit of Jack Goodwill .. 73
    No. 8    Phone notes ........................ 88
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

MIDNIGHT SUN COURT REPORTERS (907) 258-7100

27

**A**

abandoned 10:22
ability 6:2
able 9:21,22 80:11
absent 73:21
accept 89:3
accepted 21:16
accord 68:2
account 74:20 75:17
  78:25
accounting 12:20
accuracy 39:18 40:11
accurate 39:7,14 42:1
  43:15 74:13,17
acknowledge 59:24
  60:7 61:1
acknowledged 59:20
action 90:14
actions 80:23 83:19
activities 21:17
actual 8:5 27:23 30:19
  52:16 56:20 60:20
  71:14
added 32:21
additional 35:18 80:13
  89:21
address 8:13 51:16
  71:15,19 72:5 86:24
  87:1
addressed 71:8
adjourned 88:25
adults 68:25
affidavit 7:16 28:6
  37:11 40:1,11,25
  41:5,14,25 42:3
  46:22 54:11 66:10
  70:23 74:2,24 75:15
  75:23 78:20 91:7,9
affidavits 87:11
affirmative 66:24
affixed 90:16
aforementioned 4:4
ago 5:19 7:15 8:10 25:3
  26:6 36:19 39:2
agree 19:10 29:8 44:3
  77:24
agreement 30:12 43:22
  44:3 74:23 75:3,9
  83:11
agrees 78:7
ahead 12:4 26:22 54:18
  67:6 87:25
airborne 53:4
Alaska 1:2 2:4 3:5,9,18
  3:24 4:8 8:20 9:19
  10:3,4,6,18 11:9 15:9
  43:24 86:25 90:3,20
Alls 60:11,23
AMERICA 1:3,9

amount 32:7
Anchorage 1:2 2:4 3:5
  3:9,18 12:18 13:3
  14:8,13 17:1 19:3
  27:1,8,11,15 29:1
  30:14 34:5 49:13,15
  49:20 65:16 68:24
  79:4 82:4
and/or 46:20 71:13
  72:9 84:3
answer 6:21 24:10 49:2
  55:15,16,18 58:23
  67:15 70:10,14,16
  85:10
answered 55:13,18
  58:20 79:13
answers 7:3
anybody 14:4 33:5
  58:16 68:19 69:4
  84:17 87:12
anymore 70:8
anyway 56:20
application 27:15
  30:10 49:10,16
applications 28:18
approximately 8:7
  32:14 56:14
April 25:20 36:3
area 17:1
argue 55:17
Army 54:24 83:7
arose 16:16
arrangement 30:20
  31:20 75:17
arrangements 28:22
  74:21 78:1 79:4
arrival 79:24
asked 8:12 51:18 55:13
  55:18,21 56:6,8
  58:20 73:23 76:25
  78:7
asking 6:8,22 35:14,18
  38:17 44:4,10 53:10
  55:12 62:12 66:15
  67:2 70:2,15 75:22
  76:21 78:4 82:7
assume 76:21
assuming 29:3 50:23
assumption 76:20,21
assurances 58:16
assure 43:6
assuring 59:11
as-needed 31:9,21
attached 28:5 34:1
  78:19
attachments 91:6
attempting 69:21
attempts 53:23
attorney 5:14

audible 7:3
August 20:12 21:15
  22:1 54:13
authority 12:3
automated 19:15
available 11:2 83:15
Avenue 2:4 3:18 87:2
awarded 18:15,18 48:6
aware 62:8 78:13 79:6
  83:6 84:18
awful 23:1
A-P-P-E-A-R-A-N-C...
  3:1
A98-009 1:21

**B**

back 5:21 7:10 8:2
  16:11 17:20 22:25
  23:3,3,18 31:15,16
  34:12 41:21 46:8
  47:14 54:11,11 62:14
  65:5 73:6 84:12,14
  86:11,15
Baker 2:3 3:13
Ballaine 87:2
barely 14:1
barge 17:12,13,14
  19:18 21:25 22:23,25
  23:2,3 31:13,17,22
  32:2,16,18 34:25
  35:9,19 42:7,19
  43:23 44:5,17,19
  45:5,18,23 46:7,7,8,8
  46:20 47:1 48:7
  49:21 50:12 51:1,6
  52:11,12,17,18 53:5
  53:12,16,19 63:17
  65:4,14 71:9 75:4
  80:6,15 84:3 86:19
barges 15:22 16:1 17:6
  18:24 32:14 48:18
  51:6 52:4 56:18,25
  57:2 64:4 65:19,21
  76:3 79:22,23,25
  81:4
Barokas 3:17
based 7:25
basic 31:5
basically 10:7 15:21
  17:14,15 19:25 20:4
  38:18
basis 24:15,22,23 25:1
  31:9,21 74:23
bay 10:22 63:16
began 16:22
beginning 51:18
behalf 1:6,11 6:17
  48:12 50:1 52:3
  53:21 66:25 75:12

believe 8:23 10:13
  13:20 15:4 16:7
  17:11 18:6,12,20
  20:7 22:5,7 28:25
  30:14 33:23 34:3
  39:6 40:4,25 41:4,20
  41:22,25 48:17 52:1
  52:3 53:1 55:7,11,14
  59:7 68:15 72:23
  73:2 74:15 78:21
  79:17 81:10,19 82:3
  82:13 83:15 84:1
  87:16
believed 40:16 41:3
  53:20 54:23
believing 58:8
bell 88:14
Bentz 33:16 69:13
  87:15
best 11:8 74:17
bid 18:1 24:25
bill 24:14 29:15 50:15
  51:13,17 55:10 61:9
  71:18 82:25 85:4
billed 78:23
billing 12:13 14:22
  29:16 71:15 72:4,4
  77:25 78:13 83:4,17
  84:23
bills 55:19,25 56:1,8
  57:9
bit 19:1 25:3 66:21
blue 25:8
board 44:18,19
Bob 14:22 25:22 30:13
  30:16,20 33:22 34:9
  48:5 49:22 55:4 63:7
  80:15
Bob's 22:17
body 23:10
bond 58:1,15,17 59:8
bonding 73:14
book 13:2
boss 19:16
bottom 25:4,13,15
  46:24 63:13 74:19
bought 13:5
box 3:24 81:17 86:25
break 37:19 73:11,18
  88:3
briefly 33:19
bringing 18:23 72:11
broad 39:24
brought 31:7 63:2,5
bucket 16:9,10,12,16
  16:25 25:23 52:17
  53:3,4,18 81:3,9,23
building 25:23
buildings 85:22

built 10:11
Burr 3:4
business 29:7 33:21
  34:7 91:6

**C**

California 35:5
call 23:11 48:1,2 79:10
  80:4
called 5:4 18:17 47:25
  48:5,14
calling 48:12 63:19
calls 44:13 45:20 60:10
  71:21 81:7
Camp 86:18
capable 64:7,14
captain 34:10
car 52:24
cards 33:18,21 34:7
  91:6
care 71:9
career 12:1
cars 22:25 23:2
case 1:21 50:24 72:2
  87:20
caught 47:9
cause 84:7
cease 8:22
ceased 28:11
Center 10:2
centered 12:2 16:14
certain 8:10 16:18
  22:17 29:1 56:23
  68:15,18 69:1 73:6
  81:10,21 82:3,10
CERTIFICATE 90:1
certify 89:2 90:3
cetera 79:25
ceteras 80:3
chance 37:21 74:3
  88:11
change 39:13 56:3 84:8
changed 40:7 41:13
chapter 70:9
characterization 76:9
characterize 78:4
characterized 78:6
characterizing 50:24
charge 14:15 23:1
  30:22 34:17 46:9
  48:21 51:15,19 52:18
  52:21,25
charges 84:12,14
charter 17:14
chartered 52:12 71:23
  71:24 72:12 73:4
check 51:14 80:16,18
checks 12:23
chips 10:23

EXHIBIT 1
Page 25 of 69