Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF ALASKA AT ANCHORAGE
 2
    UNITED STATES OF AMERICA for the
 3  use of NORTH STAR TERMINAL &
    STEVEDORE COMPANY, d/b/a NORTHERN
 4  STEVEDORING & HANDLING, and NORTH
    STAR TERMINAL & STEVEDORE COMPANY,
 5  d/b/a Northern Stevedoring &
    Handling, on its own behalf,
 6
                Plaintiffs,
 7
          and
 8
    UNITED STATES OF AMERICA for the
 9  use of SHORESIDE PETROLEUM, INC.,
    d/b/a Marathon Fuel Service, and
10  SHORE PETROLEUM, INC., d/b/a
    Marathon Fuel Service, on its own
11  behalf,

12              Intervening Plaintiffs,

13        and

14  METCO, INC.,

15              Intervening Plaintiff,

16      vs.

17  NUGGET CONSTRUCTION, INC.; SPENCER
    ROCK PRODUCTS, INC.; UNITED
18  STATES FIDELITY AND GUARANTY
    COMPANY; and ROBERT A. LAPORE,
19
                Defendants.
20  _____/
    No. A98-009 CIV (HRH)
21
            DEPOSITION OF JEFFREY "JEFF" BENTZ
22            Pages 1 - 221 (inclusive)

23                 November 21, 2005
                     8:33 a.m.
24

25
```

EXHIBIT 2
Page 1 of 105

73

Case No. A98-009 Civil (HRH)                                          Jeffery Bentz

---

Page 2

```
 1
 2
 3                          Taken at:
 4      The Law Offices of Oles Morrison Rinker & Baker
                 745 West 4th Avenue, Suite 502
 5                      Anchorage, Alaska
 6
 7
 8
 9
10        Reported by:  Leslie J. Knisley
                       Shorthand Reporter
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 4

```
 1                      I-N-D-E-X
 2   JEFFREY "JEFF" BENTZ          NOVEMBER 21, 2005
 3            EXAMINATION
 4                                PAGE
 5       BY MS. HO                  6
         BY MR. VIERGUTZ           209
 6
     NUMBER        EXHIBITS        PAGE
 7
 8     1    Renotice of Deposition,      9
            6 pages
 9     2    North Star's Second        35
            Supplemental Disclosures,
10          7 pages
11     3    North Star's Responses to  55
            Defendant's First Set of
12          Discovery Requests,
            17 pages
13
14     4    Copy of four business cards,  61
            1 page
15     5    North Star's Amended Complaint, 70
            26 pages
16
17     6    Credit application and various  71
            documents, 9 pages
18     7    Affidavit of Jack Goodwill,    89
            25 pages
19
20     8    Current rates and invoices,   93
            9 pages
21     9    Daily notes of operations,    110
            13 pages
22
23    10    Invoices and timecards,       115
            34 pages
24
25
```

---

Page 3

```
 1         A-P-P-E-A-R-A-N-C-E-S
 2
     For Plaintiffs:
 3
         MR. MICHAEL W. SEWRIGHT
 4       Burr, Pease & Kurtz, PC
         810 N Street
 5       Anchorage, AK  99501
              (907) 276-6100
 6
     For Shoreside Petroleum:
 7
         MR. STEVEN J. SHAMBUREK
 8       Law Office of Steven J. Shamburek
         425 G Street, Suite 630
 9       Anchorage, AK  99501
              (907) 250-0044
10
     For Nugget Construction, Inc.:
11
         MS. GLORIA Y. HO
12       MR. TRAEGER MACHETANZ
         Oles Morrison Rinker & Baker, PC
13       745 West 4th Avenue, Suite 502
         Anchorage, AK  99501-2136
14            (907) 258-0106
15   For USF&G:
16       MR. HERBERT A. VIERGUTZ
         Barokas Martin & Tomlinson
17       1029 West 3rd Avenue, Suite 280
         Anchorage, AK  99501
18            (907) 276-8010
19   Also Present:
20       MR. JOHN SMITHSON, Nugget Construction
         MR. DOUG LECHNER, Metco, Inc.
21
     Reported by:
22
         LESLIE J. KNISLEY
23       Shorthand Reporter
24
25
```

---

Page 5

```
 1            I-N-D-E-X, continued
 2    11    Material Contract, 4 pages     143
 3    12    Support agreement, 1 page     145
 4    13    Bill of sale, 1 page         170
 5    14    Letter to Army Corps of      185
            Engineers, 8/4/97, 2 pages
 6
      15    Copies of two business cards,  188
 7          1 page
 8    16    Letter from U.S. Army Corps of  194
            Engineers, 8/21/97, 1 page
 9
      17    Letter to U.S. Army Corps of   196
10          Engineers, 8/25/97, 3 pages
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

2 (Pages 2 to 5)

EXHIBIT 2
Page 2 of 105

74

Case No. A98-009 Civil (HRH)                                                    Jeffery Bentz

Page 6

1           PROCEEDINGS
2         JEFFREY "JEFF" BENTZ,
3  was solemnly sworn by the Notary Public to tell
4  the truth, the whole truth, and nothing but the
5  truth, testified as follows:
6           EXAMINATION
7  BY MS. HO:
8      Q    Good morning, Mr. Bentz.
9      A    Good morning.
10     Q    How are you?
11     A    Pretty good.
12     Q    My name is Gloria Ho, and I represent
13 Nugget Construction Company and United States
14 Fidelity and Guaranty Company in this case.
15 Today I'm here to take your deposition.
16         You have just been administered an oath
17 to tell the truth, and that is the same oath that
18 you would be given if you were testifying in a
19 court of law.
20         Do you understand that, sir?
21     A    Yes.
22     Q    And, essentially, the oath that you
23 have just taken and the testimony that you'll be
24 providing today is as if you were testifying
25 before a judge or a jury -- Court or jury.

Page 7

1         Do you understand that, sir?
2      A    Yes.
3      Q    Have you ever been in a deposition
4  before?
5      A    Yes.
6      Q    So you do understand the procedures?
7      A    Yes.
8      Q    And if I ask a question which you don't
9  understand or you're unclear about, you will tell
10 me so that I can rephrase that question for you,
11 correct?
12     A    Yes.
13     Q    Thank you, sir. Now, your attorney may
14 from time to time make objections, and if he does
15 so, unless he specifies you not to answer, would
16 you please answer my question?
17     A    Yes.
18     Q    I appreciate that. Today we are
19 entitled to your best recollection of the events.
20 As you know, this is a very long litigation, so
21 try your best today to provide accurate and
22 honest answers. I appreciate that.
23         Would you do so?
24     A    Yes.
25     Q    If you do need to take a recess, please

Page 8

1  let us know. I understand that you are on some
2  medications; is that correct?
3      A    Yes.
4      Q    Have you taken any medication in the
5  past 24 hours?
6      A    Yes.
7      Q    Do you think these medications would
8  impair your ability to testify today?
9      A    No.
10     Q    Have you taken any alcoholic beverages
11 in the last 24 hours?
12     A    No.
13     Q    Great. Now, you must answer my
14 questions with a verbal "yes" or "no," not with
15 gestures, otherwise the court reporter cannot
16 take that down. You understand that, correct?
17     A    Yes.
18     Q    Thank you. If you feel that you need
19 to review a document, please do so. I may or may
20 not show you, depending on the circumstances.
21         Is there any other reason that you can
22 think of today as to why you would not be able to
23 give testimony?
24     A    No.
25     Q    Thank you, Mr. Bentz. Now, today I

Page 9

1  will first introduce Exhibit No. 1.
2         (Exhibit 1 marked.)
3  BY MS. HO:
4      Q    Would you please take a look at this
5  document? Would you please take a minute or so
6  to look through the document?
7         Do you recognize it, Mr. Bentz?
8      A    Well, I'm not sure. Give me a moment
9  to read it.
10     Q    Okay. Sure.
11         MS. HO: While we do that, would you
12 like to go around the room and tell us who you
13 are so we can make your presence known today?
14         MR. SEWRIGHT: Are you asking us to
15 identify ourselves for the record for the court
16 reporter?
17         MS. HO: Yes. Please do so.
18         MR. SEWRIGHT: Mike Sewright of Burr,
19 Pease and Kurtz representing North Star and its
20 designee, Jeff Bentz.
21         MR. SHAMBUREK: Steve Shamburek
22 representing Shoreside Petroleum, Inc. and Metco,
23 Inc., and I'm here with Doug Lechner with
24 Shoreside Petroleum.
25         MR. VIERGUTZ: Herb Viergutz, USF&G,

3 (Pages 6 to 9)

EXHIBIT 2
Page 3 of 105

75

Page 10

1   with Barokas, Martin and Tomlinson.
2        MR. SMITHSON:  John Smithson with
3   Nugget Construction.
4   BY MS. HO:
5        Q    Mr. Bentz, have you had a chance to
6   look through the document?
7        A    Yes.
8        Q    And do you recognize what it is?
9        A    I believe so.
10       Q    Okay.  And for the record, this is
11  Nugget Construction and USF&G's Second Renotice
12  of Taking a 30(b)(6) Deposition to North Star.
13       So as you look through the document and
14  as you sit here today, do you appear today
15  consenting to be the corporate designee for North
16  Star?
17       A    Yes.
18       Q    And are you also appearing today in
19  your personal capacity?  To the extent that you
20  have --
21       MR. SEWRIGHT:  Counsel --
22       Q    -- any personal knowledge of the events
23  or the questions that I'm asking, will you be
24  answering on that basis or on behalf of the whole
25  company?  I just want to clarify that.

Page 11

1        MR. SEWRIGHT:  Counsel, he's here as a
2   designee for the company.  To the extent he has
3   personal knowledge, he'll also testify to that,
4   but...
5        MS. HO:  That's fine.  I just wanted to
6   clarify that.
7        Q    All right.  Now, are you ready and able
8   to testify to the list of examination topics that
9   are in this deposition notice?
10       A    Which are?
11       Q    Which are, if you go to No. 1 on Page
12  3, essentially the allegations in North Star's
13  Amended Complaint dated August 31st, 2005 against
14  Nugget Construction and USF&G.
15       A    Uh-huh.
16       Q    Paragraph No. 2, basically to the
17  topics in North Star's 26(a) initial disclosures
18  and subsequent supplemental disclosures.
19       Are you prepared to testify on those
20  today?
21       A    Yes.
22       Q    Okay.  And then paragraph No. 3, the
23  topics referenced in Nugget's and USF&G's first
24  set of discovery requests that were propounded to
25  North Star on or about October 12, 2005.

Page 12

1        Are you prepared to testify on those
2   topics today?
3        A    I'm here to testify on anything that I
4   have any knowledge of.
5        Q    Okay.  I appreciate that, Mr. Bentz.
6        Now, you understand that as a designee
7   of North Star, that you have an obligation to
8   give a response that would be binding on North
9   Star.
10       Do you understand that, sir?
11       MR. SEWRIGHT:  Counsel, you're asking
12  him for a legal conclusion.  Please don't get
13  into that.
14       MS. HO:  I'm not getting into that.
15  I'm just asking if he has an understanding.
16       MR. SEWRIGHT:  Objection to the form of
17  the question.
18       MS. HO:  That's noted.
19       A    Again, I'm here to testify on anything
20  that I have any knowledge about.
21  BY MS. HO:
22       Q    Thank you.  Outside of your discussions
23  with counsel, what did you do to prepare for your
24  testimony today?
25       A    Reams and reams of binders.  I didn't

Page 13

1   go through all the binders.  I looked at some
2   pictures that Mike showed me on Friday.  I've
3   reviewed our document stating what our position
4   is.
5        Q    Your document; which document are you
6   referring to?
7        A    There's so many documents, I don't
8   know.  But, you know, I know the basic facts of
9   the case and from what I can recall, and that's
10  all I'm here to testify on today.
11       Q    Okay.  Now, who else within North Star
12  would have knowledge of these topics?
13       A    I believe that's all in our list -- I
14  think you have a list.  I've read somewhere the
15  list of names of people that might have
16  knowledge.  That's --
17       Q    I'm specifically asking about people
18  within your company, North Star.
19       A    That would have knowledge about this?
20       Q    Uh-huh.
21       MR. SEWRIGHT:  Presently employed by
22  North Star?
23       MS. HO:  Presently employed.
24       A    Pretty much just myself.
25  BY MS. HO:

76

Page 14

```
 1    Q   Just yourself, okay.
 2        Then, let's talk about your company
 3  today.  The first thing is:  Are North Star
 4  Terminal and Stevedoring Company and Northern
 5  Stevedoring and Handling two different companies?
 6    A   They were at the time that this
 7  incident took place.
 8    Q   Okay.  Which is back in what year, to
 9  your best recollection?
10    A   '97.
11    Q   1997.  And what about currently?
12    A   Currently, it's only North Star
13  Terminal and Stevedoring Company, LLC.
14    Q   And where is the principle place of
15  business for the LLC?
16    A   Our headquarters is in Anchorage.
17    Q   In Anchorage.  What is the current
18  business address?
19    A   The mailing address is P.O. Box 102019,
20  Anchorage, Alaska.
21    Q   And do you have a telephone number for
22  the business, sir?
23    A   907-272-7537.
24    Q   Okay.  And who are the current
25  officers, directors, shareholders, or owners of
```

Page 15

```
 1  North Star?
 2    A   Of the LLC, there's two ownership
 3  members.
 4    Q   Would you please identify them?
 5    A   One is Southeast Stevedoring
 6  Corporation and the other one is NSTS Holdings.
 7    Q   Back in 1997 who were the shareholders,
 8  officers, or directors of North Star?  At that
 9  time there were two companies, sir.  Do you
10  recall --
11    A   In '97 they were basically the same,
12  the shareholders were basically the Redlich
13  family.
14    Q   Okay.  And are they in Anchorage,
15  Alaska?
16    A   No, they reside in California.  Did at
17  that time.
18    Q   I see.  Do you have any contact with
19  them whatsoever?
20    A   Not very frequently.  They no longer
21  have an ownership in the company.
22    Q   Okay.  Now, can we establish for the
23  record that North Star Terminal and Stevedoring
24  Company is a d/b/a of Northern Stevedoring and
25  Handling?
```

Page 16

```
 1    A   Correct.
 2    Q   Okay.  And then --
 3        MR. SEWRIGHT:  Object to the form of
 4  the question.  I think you, unless I
 5  misunderstood, I think you reversed the order
 6  there.
 7    A   I think you might have, also.
 8  BY MS. HO:
 9    Q   Okay.  Then, why don't you correct me.
10    A   The parent company in '97 was North
11  Star.
12    Q   Okay.  The parent company in 1997 was
13  North Star.
14    A   Yes.
15    Q   And as of today, why don't you identify
16  the full complete name of the company.
17    A   I already did.  It's North Star
18  Terminal and Stevedore Company, LLC.
19    Q   And that is the entity --
20    A   That's the only entity today.
21    Q   Okay.  That's the only entity today
22  that's bringing this lawsuit against my clients,
23  Nugget and USF&G, correct?
24        MR. SEWRIGHT:  Counsel, object to the
25  form of the question; calling for legal
```

Page 17

```
 1  conclusion.  These events go back to '97.
 2        MS. HO:  Well, I just want to make sure
 3  that we know which company is suing my clients,
 4  because at the time that --
 5        THE WITNESS:  Isn't it documented?
 6        MS. HO:  It is --
 7        MR. SEWRIGHT:  Same objection.
 8        MS. HO:  -- but I just wanted to make
 9  sure.  And you're here today as the corporate
10  representative, so we will have the best
11  knowledge of this, sir.
12  BY MS. HO:
13    Q   So, again, which company today is suing
14  my clients?
15        MR. SEWRIGHT:  Same objection.
16  BY MS. HO:
17    Q   Mr. Bentz, would you please answer the
18  question?
19    A   North Star Terminal and Stevedore
20  Company is the active LLC, is the active company
21  name.
22    Q   And I will refer to them as North Star,
23  unless you --
24    A   That's fine.  North Star is fine.
25    Q   That sounds good.  Thank you.
```

Page 18

1        Now, are you a current officer,
2    director, shareholder, or owner of North Star?
3        A    I'm the president and CEO of North
4    Star.
5        Q    And how long have you been the
6    president and CEO?
7        A    Since 1995.
8        Q    1995. How many employees are currently
9    employed with North Star?
10       A    We have a variety of permanent,
11   full-time employees.  Most of our employees come
12   out of dispatch halls from various labor
13   organizations, union halls, so it's a difficult
14   question to answer.  It's different every day.
15       Q    Different every day.  So why don't you
16   explain to us what dispatch hall you're referring
17   to and how the employees are actually hired
18   within North Star.
19       A    We have some permanent, full-time
20   employees that reside with the company and report
21   a 40-hour week.  We have some that are daily
22   dispatched from a union hall, like any other
23   union hall, where you call and arrange a dispatch
24   or send in a written request and get a laborer
25   for the day.

Page 19

1        Q    Okay.  And of these two categories of
2    employees, the second type, the unionized one, do
3    you have a list of current names and addresses
4    for them?
5        A    At any particular given time.  Some of
6    those are registered union members, and some of
7    them are casual union members that come and go.
8        Q    So at any point in time when they
9    worked for North Star, you actually go out and
10   obtain their Social Security number, address,
11   telephone number, contact information, so on and
12   so forth; is that correct?
13       A    All the necessary information that
14   we're legally obligated to have.
15       Q    Thank you.  And as for your current
16   employees that have the 40-hour workweek, you
17   also have their current information so that they
18   can legally work within your company; is that
19   correct?
20       A    Correct.
21       Q    Then, how would you classify the number
22   of employees, if you collectively put these two
23   types of workers?
24       A    It changes from any particular given
25   year.

Page 20

1        Q    So, say, back in 1996, per se --
2        A    I couldn't tell you how many man-hours
3    we had in 1996.
4        Q    In 1997?
5        A    I couldn't tell you right now how many
6    hours we had in 1997.
7        Q    Okay.  And what about today?
8        A    I couldn't tell you how many hours
9    exactly we have through today.
10       Q    Well, who would know within your
11   company?
12       A    I could make a phone call and find out.
13   I do not have the number of man-hours presently
14   through today's date.
15       Q    And who would you call?
16       A    I would call my accounting department
17   to find out.
18       Q    Is that accounting department within
19   North Star?
20       A    Yes.
21       Q    And who is employed in that department?
22   How many staff members do you have there?
23       A    Four.
24       Q    Four.  And who are they?
25       A    Susan Kent-Biro is one.  Do you want

Page 21

1    their names or --
2        Q    Yes, please.
3        A    Susan Springer.  We have a new gal,
4    Cheryl McDonald and Laura Marshall.
5        Q    Okay.  Now, you have an accounting
6    department within North Star.  What other
7    departments do you have within North Star?
8        A    Well, basically it's -- we have
9    accounting, and we have a variety of operations
10   managers that deal with the individual ports, and
11   we have a couple of salespeople.
12       Q    Okay.  And the operations managers, who
13   are they currently?
14       A    We have Steve Black in Dutch Harbor,
15   Wayne Barrowcliff in Homer, Brad Robertson in
16   Anchorage, he also takes care of Seward, and Ryan
17   Sontag in Valdez.
18       Q    Now, of these four employees that
19   you've just listed, to your knowledge and
20   recollection do you know if these four
21   individuals have had any dealings with the Homer
22   Spit project?
23       A    No, none that I can think -- Laura
24   Marshall worked for us then, but she didn't
25   really have any dealings other than the

78

Page 22

1  invoicing. She probably did have something to do
2  with the invoicing.
3      Q    Okay. So you have an accounting
4  department; you have the operations managers
5  department. Which other departments do you have
6  within North Star currently today?
7      A    As far as departments, there really
8  aren't any other departments.
9      Q    Okay. Why don't you explain to us the
10 kind of business that North Star engages in.
11     A    We engage currently in contract
12 stevedoring, which is the physical loading and
13 unloading of materials on and off of vessels. We
14 also do heavy equipment leasing and project
15 management-type work and various construction
16 projects. We deal with lifting, heavy-lift type
17 operations, things of that nature.
18     Q    Okay. And the stevedores, what do they
19 generally do for North Star?
20     A    Stevedores.
21     Q    Stevedores, yes.
22     A    Longshoremen, are we talking about?
23     Q    Yes.
24     A    They could do anything from operating
25 forklifts to lashing containers and other cargo

Page 23

1  to the deck of a barge. Running different types
2  of equipment, things of that nature.
3      Q    To the best of your recollection, in
4  this particular case, on the Homer Spit project,
5  North Star just had their stevedores on the
6  project; is that correct?
7      A    I'm not quite sure what you're asking.
8      Q    Back in 1997/1998, that time frame, to
9  the best of your recollection, North Star had its
10 stevedores working on the Homer Spit project; is
11 that correct?
12     A    Again, do you want to rephrase that to
13 longshoremen? We did have some longshoremen on
14 that job, yes. We also had some management.
15     Q    Okay. So can you tell us the
16 difference between the longshoremen and the
17 stevedores?
18     A    Stevedore can be used in a number of
19 ways. It can be used as the profession itself,
20 stevedoring company; it's a type of company.
21     Q    Right.
22     A    Some people refer to the labor as a
23 stevedore or a longshoreman.
24     Q    Okay. So a longshoreman has similar
25 duties as a stevedore or something different?

Page 24

1      A    They can be one and the same. It's a
2  difference in terminology. Attorney, lawyer;
3  stevedore, longshoreman.
4      Q    I appreciate that clarification. And
5  generally what are the job duties for a stevedore
6  that is hired by North Star?
7      A    You asked that question already, but
8  I'll answer it again. They may operate different
9  types of machinery. They may send up a load.
10 They may lash down cargo on the deck of a barge.
11 They may be working the barge.
12     Q    And the same as to the equipment; they
13 handle equipment for the company?
14     A    Yes.
15     Q    Now, are these equipment owned or
16 leased by North Star?
17     A    Generally owned.
18     Q    And does North Star have a different
19 fee structure for the equipment that are owned as
20 opposed to leased? If you say "generally owned,"
21 is there any situation where North Star would
22 lease the equipment?
23     A    There are times when we might lease a
24 piece of equipment and re-rent it or re-lease it
25 to a customer.

Page 25

1      Q    In that particular case, is there a
2  different fee structure?
3      A    I can't really answer that question.
4  I'm not quite sure how you're asking it.
5      Q    To the extent that you have to charge a
6  customer for the use of the equipment, do you
7  charge a higher rate if it's your own equipment
8  or a lower rate if it's not --
9      A    The only time I would lease equipment
10 is if I didn't have it in my inventory, so it
11 would naturally be a different fee structure I'd
12 incur on that because I wouldn't have that in my
13 current inventory.
14     Q    Now, in which states is North Star
15 licensed to do business?
16     A    Alaska.
17     Q    Just in Alaska?
18     A    That's correct.
19     Q    Okay. And generally who does North
20 Star provide business to?
21     A    Various steamship companies, barge
22 companies, construction companies, diving
23 companies. Anything that's around the water. We
24 do work for the oil companies. We do work for
25 the military.

79

Page 26

1    Q    Now, what is North Star's custom and
2  practice in obtaining these different business
3  accounts, the ones that you just mentioned?  For
4  example, does North Star go out and solicit these
5  companies, or these companies knock on North
6  Star's door and say, okay, I need some of your
7  employees to help us with this project?
8    A    Both.
9        MR. SEWRIGHT:  Objection; form of the
10 question.
11 BY MS. HO:
12   Q    Let me ask you first:  What is North
13 Star's custom and practice in obtaining business?
14   A    It's a variety of things.  We do some
15 advertising.  We do some door-to-door type sales.
16 We have a web site.  We have customers that come
17 to us.  It's a fairly small niche business, so
18 most of our customers already know us; we already
19 know most of our customers.  It's a fairly small
20 list.
21   Q    Small world.  So who is the person in
22 charge at North Star for managing these business
23 accounts?
24   A    That's a pretty general term.
25   Q    Okay.  So why don't you narrow it down

Page 27

1  for me.
2    A    Why don't you ask a specific question
3  and I'll answer it.
4    Q    Well, then, who at North Star is
5  responsible for obtaining these accounts?  Is
6  there a particular person?
7    A    Everybody at North Star participates to
8  some degree in trying to find business and secure
9  business.
10   Q    What is North Star's custom and
11 practice in investigating whether the other
12 companies that you want to do business with is
13 financially capable to pay for North Star's
14 services?
15   A    In some cases it's based on historical
16 practices and relationships that we've had with
17 the companies.  In some cases we get a credit ap.
18 In some cases -- it just depends.
19   Q    Now, if North Star ascertains that a
20 particular company is not financially viable to
21 do business with, what does North Star
22 do?  Do you back out of the deal?
23   A    It doesn't happen very often.
24   Q    Okay.  Then, does North Star ask for a
25 personal guarantee from these potential

Page 28

1  companies?
2    A    We may.  We may do a variety of things.
3  Each individual case and customer can be
4  different.
5    Q    Would you say one type of way to
6  consummate a potential business would be to enter
7  into a security agreement with the potential
8  business?
9        MR. SEWRIGHT:  Objection to the form of
10 the question.
11 BY MS. HO:
12   Q    Now, Mr. Bentz, you said there are a
13 variety of ways you're referring to.  How does
14 North Star --
15   A    We already named some of those.  It's a
16 fairly -- like I said, it's a very small niche
17 industry.  Most of the people that we do business
18 with have been in business for some time.
19   Q    Does North Star hold regular corporate
20 board meetings?
21   A    We do have an annual meeting.
22   Q    You have an annual meeting.  And when
23 does that usually take place?
24   A    It can be different each year.
25   Q    And would it be once or twice a year?

Page 29

1  How often?
2    A    There's only one annual meeting.
3    Q    One annual meeting.  Who usually
4  attends?
5    A    Could be some of the board of
6  directors, myself.
7    Q    Okay.  Board of directors of North
8  Star.  Would you list them, please?
9    A    The board of directors for North Star;
10 it's an LLC, so there's two member companies,
11 which I've already stated who they are.
12   Q    And then there are people within those
13 two separate LLCs that are invited to attend the
14 board meetings; is that correct?
15   A    The two companies that are the member
16 companies and North Star have their own boards of
17 directors, I think.
18   Q    Now, are there any minutes or notes
19 that are taken for these board meetings?
20   A    Generally, on the annual meeting.
21   Q    Were any board meetings held at North
22 Star back in 1997, to the best of your
23 recollection?
24   A    I would assume that there was an annual
25 meeting then.

MIDNIGHT SUN COURT REPORTERS * (907) 258-7100

EXHIBIT 2
Page 8 of 105

Page 30

1    Q    And what about in 1998?
2    A    I would presume there was an annual
3 meeting then.
4    Q    And does North Star keep these records
5 of the board meetings and minutes?
6    A    Generally, we keep a copy of them.
7    Q    Do you think North Star would have a
8 copy of these minute notes from 1997/1998?
9    A    We very well might, yeah.
10       MS. HO: Michael, would you be able to
11 produce these documents without a formal
12 discovery request?
13       MR. SEWRIGHT: I would prefer a formal
14 discovery request, and then I'll send one right
15 back to you for Nugget.
16       MS. HO: That's assuming Nugget has any
17 of these.
18    Q    I appreciate that, Mr. Bentz.
19       Let's talk about your education. Let's
20 start with high school. Did you go to high
21 school around here, in Anchorage?
22    A    Yes.
23    Q    Which one?
24    A    West.
25    Q    West. You have an affinity there,

Page 31

1 Michael.
2       What about college? Where did you go
3 to college?
4    A    Western Washington University in
5 Bellingham, Washington.
6    Q    What degree did you receive?
7    A    A business degree.
8    Q    Business degree. And after that, did
9 you go to any other institution?
10    A    No.
11    Q    Do you have any professional degrees or
12 licenses?
13    A    Such as?
14    Q    Say, a general contractor's or a
15 specific contracting business that you might have
16 and you might go and obtain a professional degree
17 in.
18    A    None such as that, no.
19    Q    Is there any professional license or
20 degrees that are specific to a stevedoring
21 company that you might have to obtain?
22    A    Huh-uh.
23    Q    So just a general business degree would
24 be sufficient for this kind of company?
25    A    That's correct.

Page 32

1    Q    Are you currently enrolled in any
2 institutions to obtain another degree of some
3 sort?
4    A    No.
5    Q    Have you been deposed before?
6    A    Yes.
7    Q    And were you deposed personally or as a
8 North Star company representative?
9    A    I believe as a North Star company
10 representative.
11    Q    Do you recall which cases those were?
12    A    No, not exactly.
13    Q    Was it since you have been CEO and
14 president of North Star?
15    A    I'm not sure whether I've been deposed
16 before or after I was the president of North
17 Star.
18    Q    Okay.
19    A    I believe before.
20    Q    Before you were president of North
21 Star?
22    A    I believe.
23    Q    Now, was it -- what kind of case was
24 it? Do you recall?
25    A    Well, actually I was asking Mike about

Page 33

1 that earlier. I wasn't sure which one. I mean,
2 we've had a couple of cargo claims and we've had
3 a couple of personal injury claims in the last 20
4 years. And to be honest with you, I can't
5 remember which case it was that I was deposed on.
6    Q    Of these cases, generally, what was the
7 result? Did you settle out or --
8    A    I'm not sure I'm following you. Did we
9 win or lose?
10    Q    Yes.
11    A    I believe in most cases we've been
12 successful, yes.
13    Q    Do you have any knowledge of any other
14 lawsuit between North Star and any of the
15 defendants in this case, aside from this
16 particular one? For example, North Star and
17 Nugget in another case?
18    A    That particular example, no.
19    Q    Okay. And North Star against USF&G?
20    A    Other than this case?
21    Q    Other than this case.
22    A    No.
23    Q    North Star against Mr. Robert LaPore,
24 other than this case?
25    A    No.

Page 34

1    Q    And North Star against -- strike that.
2         Mr. Bentz, are you married?
3    A    Yes.
4    Q    And do you have any children?
5    A    Yes.
6    Q    How many children do you have?
7    A    Between --
8         MR. SEWRIGHT: I'm going to object to
9    the relevancy of this. What does that have to do
10   with this case?
11        MS. HO: Michael, let me just ask the
12   questions. After I ask my next question, you can
13   object.
14   Q    Mr. Bentz?
15   A    I helped raise six children.
16   Q    That's great. Congratulations.
17        Now, is your wife or any of your
18   children officers or representatives of North
19   Star --
20   A    No.
21   Q    -- in any capacity?
22   A    No.
23   Q    Thank you. How about your previous
24   employment? Prior to your joining to North Star,
25   what were your jobs?

Page 35

1    A    I worked in an ice cream parlor once.
2    Q    That must be nice. Free ice cream.
3         Where was this at?
4    A    In Anchorage.
5    Q    Any other employment prior to North
6    Star?
7    A    Worked up in a gold mine once.
8    Q    Did you find any gold?
9    A    Worked at a car rental place once when
10   I was in high school.
11   Q    Okay. Was that all?
12   A    I'm sure I've had some other jobs, but
13   I've pretty much been with North Star my entire
14   career.
15   Q    I appreciate that. Let me introduce
16   another exhibit.
17        (Exhibit 2 marked.)
18   BY MS. HO:
19   Q    Okay. Mr. Bentz, would you take a
20   moment to review this document?
21        Do you recognize it, Mr. Bentz?
22   A    I recognize the title of it. I haven't
23   read it all, so I'm not sure if it's identical to
24   the one that I've probably seen.
25   Q    You go ahead and take the time to

Page 36

1    review that.
2    A    It looks familiar.
3    Q    Are you ready, Mr. Bentz?
4    A    For what?
5    Q    To identify this document, otherwise I
6    will.
7    A    It looks similar to one I've seen, yes.
8    Q    So, for the record, this is North
9    Star's Second Supplemental Disclosures that's
10   dated on or about October 18th of 2005.
11        Would you agree, Mr. Bentz?
12   A    To what?
13   Q    To the date of this document, which is
14   the second to the last page, Page 6 of 7.
15   A    What was your question?
16   Q    Do you recognize the date?
17   A    October 18th --
18   Q    -- 2005?
19   A    Uh-huh.
20   Q    Thank you. Would you please turn to
21   Page 5 of 7 under the paragraph Damages?
22   A    Okay.
23   Q    Okay. Now, under Paragraph C, Damages,
24   under the Miller Act it says that essentially
25   North Star alleges that it's owed under the

Page 37

1    Miller Act a principal sum of $124,724.98; is
2    that correct?
3    A    That's what this document says, yes.
4    Q    And then --
5         MR. SEWRIGHT: Counsel, for the record,
6    these were calculated as of May 16th, 2005.
7         MS. HO: Okay. That's noted.
8    Q    Now, if you look on the second part of
9    this, it's State Law Claims, and then
10   Subparagraph A lists the State Law Claims. It
11   has breach of contract, promissory estoppel,
12   quasi-contract, agency, detrimental reliance,
13   unjust enrichment and restitution, quantum
14   meruit, equitable subordination and constructive
15   trust.
16        And you list -- or North Star lists
17   damages calculating to $564,235 or $346,466; is
18   that correct?
19   A    Is what correct?
20   Q    The numbers that are listed on the
21   State Law Claims for Paragraph A.
22   A    The numbers that -- what you just said
23   is true, yes.
24   Q    Okay. Just a question here in
25   terms -- is North Star asking for this particular

Page 38

1  amount under the State law claims, Paragraph A,
2  in addition to the amount that was just listed
3  under the Miller Act?
4     A   I'm sorry.  Are you asking me to
5  interpret what the totals are?
6     Q   I'm just trying to clarify whether
7  North Star is expecting damages under the Miller
8  Act for that sum plus the damages for the State
9  Law Claims.  Are you combining the two numbers?
10        MR. SEWRIGHT:  Objection to the form of
11 the question; legal conclusion.
12 BY MS. HO:
13    Q   Well, we want to find out what the
14 basis of the calculation is.
15    A   Isn't it stated right here?
16    Q   Well, you tell me.  It looks like North
17 Star is asking for about 125,000 under the Miller
18 Act and then it's asking for another
19 approximately $565,000 or $347,000, depending on
20 which prejudgment interest we're looking at,
21 under the State Law Claims, Paragraph A.
22        I mean, as a North Star corporate
23 representative, we just want to be sure what the
24 basis of these calculations are.  Are these
25 separate and distinct numbers that you're asking

Page 39

1  for, or are these combined on top of?  Are you
2  stacking these damage numbers?
3     A   I'm sorry.  I don't understand what you
4  mean by stacking the damage numbers.
5     Q   Well, for example, is North Star
6  expecting simply to be paid under the Miller Act
7  124,000 plus the State Law Claims of about
8  565,000, to make it the simplest?
9         MR. SEWRIGHT:  Objection to the form of
10 the question; mischaracterization.
11    A   It says in here that we have the amount
12 that was owed us, attorney's fees and interest,
13 the amount of money that we didn't receive
14 because the work was taken away from us.  I can
15 tell you what it all amounts to, but I can't, you
16 know, as far as what part of it's Miller Act,
17 what part of it's State claim, what part of
18 it's -- all the legalese part, I can't get into
19 the legalese part.
20    Q   I'm not expecting you to.
21        MR. SEWRIGHT:  Counsel, they're not
22 stacked.
23 BY MS. HO:
24    Q   Okay.  So they're not stacked.  So it's
25 mutually --

Page 40

1     A   The same number under the Miller Act
2  flows down into the State law claim.  You can see
3  the numbers are identical where it floats down.
4  It's rounded.  So I'm not quite sure I understand
5  your question.  We're not asking for the same
6  thing twice.
7     Q   Okay.  So you're just asking for one
8  specific amount?  It's either/or; mutually
9  exclusive?
10        MR. SEWRIGHT:  The question's already
11 been answered.
12 BY MS. HO:
13    Q   Well, Mr. Bentz, you're the corporate
14 representative.  North Star is asking for alleged
15 sums against my client, and we want to be sure
16 how you calculate this.  It has to be very clear.
17        Are you intending to claim Miller Act
18 damages as well as the State law claim damages
19 and then add everything up together, which would
20 probably be over and above the original 125,000
21 that North Star is seeking?
22        MR. SEWRIGHT:  Objection; form of the
23 question; asked and answered.
24 BY MS. HO:
25    Q   Mr. Bentz, are you going to answer

Page 41

1  that?
2     A   Again, there's no duplication of the
3  same amount twice, if that's what you're asking.
4     Q   Right.  The same thing goes for
5  Paragraph C, Damages, State Law Claims,
6  Subparagraph B, tortious misrepresentation, and
7  nondisclosure including fraud, negligence, and
8  tortious interference.  Those are the State law
9  claims and, again, you're asking or North Star is
10 asking for approximately 565,000 or the
11 alternative 347,000.
12        MR. SEWRIGHT:  Objection, Counsel.
13 Misstates the response under State law claims.
14 There's an additional sum of approximately
15 $80,000 for lost profit.
16        MS. HO:  Thank you, Counsel.  I was
17 getting to that.
18        MR. SEWRIGHT:  That's just under the
19 State Law Claims.
20 BY MS. HO:
21    Q   Again, Mr. Bentz, we want to be sure
22 that you're not stacking --
23        MR. SEWRIGHT:  Actually, I'm incorrect.
24 There is some issue as to breach of contract for
25 that additional amount too, but that was stated

Page 42

1  in here.
2      MS. HO:  Stated where?
3      MR. SEWRIGHT:  I thought it was.  "May
4  also be awardable as additional breach of
5  contract damages."  I'm sorry if I misstated it.
6      MS. HO:  That's fine.
7      Q   These are very serious allegations that
8  North Star has lodged against our clients, and
9  it's a lot of money that you guys are allegedly
10  asking us to pay, so we want to be very clear as
11  to how North Star is calculating these damages.
12      MR. SEWRIGHT:  Are you done preaching?
13      MS. HO:  I'm not preaching here, sir.
14      Q   Mr. Bentz, again, for the record, these
15  are separate numbers?
16      A   There are no duplicates.
17      Q   Okay.  Thank you.
18      Now, Mr. Bentz, do you know who is
19  Robert LaPore?
20      A   I'm sorry?
21      Q   Do you know who is Robert LaPore?
22      A   I know the name Robert LaPore.
23      Q   Have you met him personally?
24      A   I'm not sure.  I'm not sure if I've met
25  him personally or not.

Page 43

1      Q   Have you had any communications with
2  him in correspondence or phone?
3      A   I don't believe so.
4      Q   Okay.  And who within North Star would
5  have had such contacts?
6      A   Jack Goodwill had most of the contact
7  with Robert LaPore.
8      Q   Anybody else within North Star who had
9  those contacts with Mr. LaPore?
10      A   I'm not sure who all has spoken with
11  Robert LaPore.
12      Q   Does North Star keep any business
13  records or notes that would reflect who would
14  have communications with Mr. LaPore?
15      A   No, no, unless a particular individual
16  kept a personal note or something.
17      Q   What about Mr. Vernon Rush?  Have you
18  personally met Mr. Rush?
19      A   I don't know.
20      Q   Do you know who he is?
21      A   I've heard the name.  I can't say that
22  I've ever met him.  I don't know.  I might have
23  met him at some business function, but I don't
24  know.
25      Q   Some business function.  What kind of a

Page 44

1  business function?
2      A   It's a small business world that we
3  live in with contracting-type business.  So
4  there's various association meetings, EGC,
5  Resource Development Council.  I might have met
6  any number of the people who are in these
7  documents at some time or another, but then again
8  I don't know if I have or not.
9      Q   In these usual circumstances when you
10  go to these meetings and you meet these people in
11  the industry, do you take their business cards
12  and whatnot?
13      A   Sometimes; not always.
14      Q   But you wouldn't recollect whether or
15  not you had met this particular person at any
16  particular meeting?
17      A   I already stated, I don't know if I've
18  met Mr. Rush or not.
19      Q   And anybody at North Star that you know
20  of who might have met Mr. Rush?
21      A   I don't know.  I can't speak for
22  somebody else.  I don't --
23      Q   I'm not asking you to speak for
24  somebody else.  I'm asking you to speak on behalf
25  of North Star.

Page 45

1      A   What's the question?
2      Q   Do you have any recollection or do you
3  know of anybody within North Star who might have
4  had contact with Mr. Rush?
5      MR. SEWRIGHT:  Object to the form of
6  the question.
7  BY MS. HO:
8      Q   Your answer would be you do not know?
9      A   I'm not certain.
10      Q   Who in North Star would know?  Would
11  you be able to contact somebody within North Star
12  and say, have you met Mr. Rush, or, have you had
13  previous dealings with Mr. Rush?
14      A   No.  I'm the only one -- you asked
15  earlier on who else at North Star was still an
16  employee that had any knowledge of this case, and
17  I told you I was the only one that's still an
18  employee that would have any knowledge of this
19  case.  Therefore, I don't have anybody at North
20  Star that I could call to ask if they'd had any
21  dealings with Mr. Rush.
22      Q   Now, what about Mr. Goodwill?  You just
23  said that he had some dealings with Mr. LaPore.
24  Isn't that somebody you can consult with within
25  North Star?

84

Case No. A98-009 Civil (HRH)                                          Jeffery Bentz

Page 46

1     A    He's no longer employed at North Star.
2     Q    So Mr. Goodwill is not employed with
3  North Star?
4     A    No.
5     Q    What was Mr. Goodwill's position back
6  in 1997?
7     A    He was basically an operations manager
8  for Seward.
9     Q    And how long was Mr. Goodwill employed
10  with North Star?
11     A    I couldn't tell you the exact number of
12  years. I think he went for work for us starting
13  sometime in the '70s.
14     Q    Do you know when Mr. Goodwill ended his
15  employment with North Star?
16     A    I believe it was in '9 -- I'm not
17  certain, but I think it was around 2002.
18     Q    Do you have any information of his
19  current whereabouts?
20     A    I believe he lives in Seward still. He
21  was born and raised there.
22     Q    What about Mr. Herschell Hall? Have
23  you had any personal dealings with Mr. Hall?
24     A    I don't know.
25     Q    Do you know of anybody within North

Page 47

1  Star who's had dealings with Mr. Hall?
2     A    Not that I know of, but I don't know
3  the man, so.
4     Q    Now, is it your understanding that
5  Mr. LaPore and Mr. Rush and Mr. Hall were
6  associated with Spencer Rock Products during the
7  Homer Spit project?
8     A    I don't know.
9     Q    Have you gone through the pleadings?
10     A    There's boxes of documents similar to
11  what's in your chair there. I've seen a lot of
12  names and a lot of different things, you know,
13  over the course of the eight years.
14     Q    Okay, Mr. Bentz. So you understand
15  this is a very long litigation, lots of events
16  and lots of people involved?
17     A    Sure.
18     Q    Thank you. Do you know of a Spencer
19  Rock Products, Incorporated?
20     A    I know the name.
21     Q    Has North Star done business with
22  Spencer Rocks previous to the Homer Spit project?
23     A    I'm not sure.
24     Q    Well, who would know, Mr. Bentz?
25     A    We would have to go back and try to

Page 48

1  find records to indicate if they've ever been
2  invoiced prior to this project. I don't believe
3  so, but that's just from my own recollection.
4     Q    And what about after the Homer Spit
5  project? Did North Star and Spencer Rock enter
6  into business relationships?
7     A    Not that I know of.
8     Q    So, to your recollection and to North
9  Star's, this particular relationship between
10  North Star and Spencer Rock on the Homer Spit
11  project is the one and only business dealing that
12  it had with each another?
13     A    To the best of my recollection.
14     Q    Have you ever dealt with any other
15  person at Spencer Rock on the Homer Spit project,
16  other than the people I just listed earlier?
17     A    I'm not sure.
18     Q    You don't have any recollection of
19  anybody else from Spencer Rock that you might
20  have had business with?
21     A    At the time, not that I know of. I
22  think I've spoken with Randy Randolph before.
23     Q    Randy Randolph. What kind of
24  communications did you have with Mr. Randolph?
25     A    I'm not certain. I know I've met him

Page 49

1  before.
2     Q    In what capacity did you speak with
3  Mr. Randolph? On a personal basis or as a
4  company representative of North Star?
5     A    Probably both. I've seen him before at
6  various functions.
7     Q    Okay. Now, let's talk about North
8  Star's business recordkeeping. How long does
9  North Star maintain its business records
10  generally?
11     A    Depends on what you're talking about.
12     Q    Well, what specific types of records
13  does North Star keep?
14     A    Well, we keep all of our records the
15  legal required time, seven years, and some things
16  we have, just for historical reasons, photographs
17  from going all the way back to the '50s. There
18  is no set policy in place that says that you keep
19  all your letters for X number of years or
20  anything like that. So other than the legal
21  requirements, it's an issue of space and whether
22  or not we feel something is important enough to
23  keep or not.
24     Q    And what about the computer systems
25  within North Star? Currently, are there computer

13 (Pages 46 to 49)

EXHIBIT 2
Page 13 of 105

Page 50

1   back-up systems like servers?
2       A   Yes.
3       Q   And North Star employees and personnel,
4   do they e-mail each other?
5       A   Certainly.
6       Q   Now, these e-mails are backed up in the
7   servers. Did you produce them? Did North Star
8   produce them?
9       A   Does North Star produce what?
10      Q   Did North Star produce copies of these
11  e-mails in its discovery responses? Do you have
12  any knowledge of that?
13      A   I'm not certain. When I asked the
14  question the other day, the same question -- or
15  Mike asked the same question back to you --
16      MR. SEWRIGHT: When I asked the
17  question of Mr. Smithson.
18      A   Yeah, Mr. Smithson on that, I did go
19  back and I did find some e-mails on the subject,
20  which I gave to Mike on Friday.
21      MS. HO: Okay. Now, Mike I was at your
22  office last Friday. I don't recall seeing any
23  current e-mails.
24      MR. SEWRIGHT: No, you were at my
25  office Thursday morning.

Page 51

1       MS. HO: Okay. Thursday morning.
2       MR. SEWRIGHT: And I just recently
3   received these. There are just a few. They have
4   mixed proprietary information involving other
5   jobs or issues. I think like a couple are
6   attorney-client privilege, and I haven't had a
7   chance to go through them and ready them for
8   production.
9       MS. HO: Okay. So would you --
10      MR. SEWRIGHT: This is Monday morning.
11  That was Friday. And you were over at my office
12  Thursday.
13      MS. HO: So after you have a chance to
14  look at those and ascertain whether or not
15  privilege applies, are you willing to produce
16  them to respond to discovery requests?
17      MR. SEWRIGHT: We will meet our
18  responsibilities.
19      MS. HO: I appreciate that. And when
20  are you expected to do that?
21      MR. SEWRIGHT: Pretty soon.
22      MS. HO: Okay. Now, if I have
23  questions on those e-mails, I'm going to ask
24  Mr. Bentz here to follow up on some questions.
25      MR. SEWRIGHT: You're going to ask him

Page 52

1   about the e-mails?
2       MS. HO: If anything is pertinent to
3   this particular case that might go to the claim
4   of the defense.
5       MR. SEWRIGHT: Well, we're going to
6   have a problem there because a lot of it's
7   attorney-client privilege and proprietary
8   information. There's no confidentiality
9   stipulation in this case yet. I would suggest
10  you get them first, or get what is discoverable
11  first, likely after we enter into a stipulation,
12  and we cross that bridge when we come to.
13      MS. HO: Okay. In the meanwhile, I'll
14  reserve our client's right to examine those
15  documents and to question the corporate designee
16  or someone within North Star who has knowledge of
17  those e-mails. As you say, we'll cross that
18  bridge when we get there.
19      MR. SEWRIGHT: Understood. Just as I
20  look forward to seeing all those e-mails that
21  Mr. Smithson is going to find for me. All those
22  e-mails back and forth between Nugget personnel
23  and USF&G and whoever else.
24      MS. HO: Well, again, we stated to you
25  that we were going to do that and we'll uphold

Page 53

1   our duty under the discovery rules.
2       MR. SEWRIGHT: Understood.
3   BY MS. HO:
4       Q   Now, Mr. Bentz, as for the computer
5   information within the business in North Star,
6   you've produced those to your attorney. Does
7   North Star's employees have personal computers at
8   home that they use for work?
9       A   No.
10      Q   How about PDAs or any other mobile
11  device?
12      A   There's a couple of us that have
13  Blackberries, but only recently.
14      MR. SEWRIGHT: We're talking about
15  1997?
16      MS. HO: Counsel, I'm talking currently
17  and then I'll go back to 1997 -- those weren't
18  around.
19      Q   But to the extent that any computer
20  systems were in effect in 1997 within North Star,
21  would you have any ability to retrieve those
22  documents either in hard copy form or perhaps you
23  might have a computer disk floating around?
24      A   What documents are you referring to?
25      Q   That refers to the Homer Spit project

860

Case No. A98-009 Civil (HRH)                                           Jeffery Bentz

Page 54

1   within North Star's files.
2      A   We just addressed that. Anything that
3   had the word Nugget in it, I gave to Mike.
4      Q   So then are you aware as a corporate
5   representative of any other nonprivileged
6   document on this Homer Spit project for this
7   litigation that has not been produced to my
8   clients?
9      A   No.
10     Q   So you've basically turned over your
11  office?
12     A   Everything.
13     Q   Everything. And you've asked every
14  employee within North Star to turn over their
15  documents?
16     A   Yes.
17         MR. SEWRIGHT:  Counsel, I have not
18  asked the client to reproduce to me so I can
19  reproduce to you pleadings in this case.
20         MS. HO:  Well, that's something that
21  you had asked for and we've done all our --
22         MR. SEWRIGHT:  No, no. I never asked
23  you for pleadings in this case. I asked you for
24  pleadings in the State case which is a different
25  matter.

Page 55

1          MS. HO:  It's a different matter, which
2   we've produced to you those documents which are
3   not privileged.
4      Q   As far as this case is concerned, I
5   just want to be sure that North Star has once
6   again gone through its offices. Other than the
7   pleadings and copies thereof, are there any other
8   nonprivileged documents within North Star that
9   you think has not been produced to our clients?
10     A   No. I think everything has been
11  produced to you. Unfortunately, the same hasn't
12  come in the other direction.
13     Q   What's this now?
14     A   Unfortunately, the same hasn't come
15  this direction.
16     Q   I think we have. I think your counsel
17  has noticed that. He was in our office a couple
18  of weeks ago looking at about six or seven boxes
19  of documents.
20         MR. SEWRIGHT:  You don't need to
21  comment on what you think I've noted.
22  BY MS. HO:
23     Q   I'm going to introduce another document
24  here. Just take a moment to review that.
25         (Exhibit 3 marked.)

Page 56

1   BY MS. HO:
2      Q   Mr. Bentz, do you recognize this
3   document?
4      A   I haven't read the whole thing. Do you
5   want me to read the entire document?
6      Q   No. Just look through and see if you
7   recognize it and if you recall signing this
8   document.
9          (Short break taken.)
10     A   Okay. Go ahead.
11     Q   Mr. Bentz, you've taken a few moments
12  to look over what is marked as Defendants'
13  Exhibit No. 3.
14         Do you recognize this document?
15     A   It looks similar to one I've seen
16  before.
17     Q   So this is North Star's Responses to
18  Defendants' First Set of Discovery Requests.
19  That's on the first page.
20         Do you see that, sir?
21     A   Yes.
22     Q   Do you disagree?
23     A   No.
24     Q   And then on page 17, if you would
25  please turn to that, it's dated November 15th,

Page 57

1   2005; is that correct?
2      A   Yes.
3      Q   And then on page 16, the page before
4   that, is a verification page. Do you recognize
5   the signature there?
6      A   Yes.
7      Q   And whose signature is that?
8      A   Looks like mine.
9      Q   Good. And that's Mr. Bentz and you are
10  the president of North Star. And you've reviewed
11  these discovery responses, correct?
12     A   Somewhat.
13     Q   Somewhat. "Somewhat" meaning that
14  before you signed these you had a chance to look
15  through these?
16     A   Yes.
17     Q   Now, let's go to page 9. Would you
18  please turn to there? And I'm asking you
19  specifically on Request for Production No. 4, I'm
20  asking North Star to produce any joint
21  prosecution and/or joint defense agreements
22  between North Star and Metco. And it looks like
23  there is none.
24         To the best of your recollection, North
25  Star does not have such documents with Metco?

15 (Pages 54 to 57)

87

Page 58

1     A    No.
2     Q    No written agreement?
3     A    No.
4     Q    Anything oral outside of
5   attorney-client work product privileges
6   whatsoever?
7     A    No.
8     Q    Nobody at North Star, including
9   yourself, has kept memorandums, notes,
10  correspondence to the effect of any conversations
11  with representatives of Metco?
12    A    No.
13    Q    Thank you.  Then, turn to page 10 if
14  you will, and Request for Production No. 5.
15  Again, it's asking North Star to produce any
16  documents that were between North Star and Metco.
17        To your knowledge, have all the
18  documents been produced that are nonprivileged?
19    A    Yeah.
20    Q    And the same with Request for
21  Production No. 6.  We're asking for all possible
22  joint prosecution and/or joint defense agreements
23  between North Star and Shoreside Petroleum,
24  Incorporated.
25        To your knowledge, are you aware of any

Page 60

1         MR. SEWRIGHT:  Other than counsel.
2   BY MS. HO:
3     Q    Other than counsel.
4     A    Not that I'm aware of.
5     Q    And the same with Request for
6   Production No. 10.  Any and all joint prosecution
7   and/or joint defense agreements between North
8   Star and Mr. Robert LaPore?
9     A    No.
10    Q    No written agreements.  And any
11  communications taken by North Star's employees
12  and representatives outside of privileges
13  asserted by your attorney?
14    A    No.
15        MR. SEWRIGHT:  Counsel, I guess a
16  clarification.  Of course there was a personal
17  guarantee.  It was documentation that has been
18  produced.
19        MS. HO:  I've seen that.  We'll get to
20  that at another point today.
21        MR. SEWRIGHT:  You don't have to get to
22  it.  I just wanted to clarify that there were
23  those documents.
24        MS. HO:  Okay.  There were some, and I
25  understand that.  We'll get to those later.

Page 59

1   written agreements between the two companies?
2     A    No.
3     Q    Nothing written, correct?
4     A    No.
5     Q    Anything oral in terms of North Star's
6   employees or representatives might have come some
7   conversations or communications with Shoreside
8   Petroleum and perhaps one of the employees have
9   written down notes to that effect?
10        MR. SEWRIGHT:  About this matter?
11        MS HO:  Yes, outside of attorney-client
12  and attorney work product.
13    A    Not that I know of.
14  BY MS. HO:
15    Q    Thank you.  Let's turn to page 11 if
16  you will, and we're asking for any possible joint
17  prosecution and/or joint defense agreements
18  between North Star and Spencer Rock Products,
19  Incorporated.
20        To your knowledge, are you aware of any
21  written agreements?
22    A    No.
23    Q    And anything in terms of communications
24  between North Star employees and Spencer Rock
25  Product employees?

Page 61

1     Q    If you would please turn to page 14 and
2   Request for Production No. 19, indicating that we
3   would like to have North Star produce documents
4   that reflect their original contract or project
5   agreement between North Star and Spencer Rock
6   Products.
7         Were there any written agreements
8   between North Star and Spencer Rock Products on
9   the Homer Spit project?
10    A    Anything that was in writing you have.
11    Q    Okay.  And any subsequent modifications
12  to that original agreement that was not produced,
13  to your knowledge?
14    A    There is nothing that's in writing that
15  has anything to do with this project that hasn't
16  been produced to you.
17    Q    Thank you, Mr. Bentz.  I'm going to
18  mark this as another exhibit.
19        (Exhibit 4 marked.)
20  BY MS. HO:
21    Q    This is Defendants' Exhibit No. 4.
22        Mr. Bentz, would you please take a
23  moment to review this document?
24        Do you recognize it, Mr. Bentz?
25    A    This particular document?

Page 62

1    Q    Yes, sir.
2    A    I'm not sure if I've seen it or not
3    before.
4         MR. SEWRIGHT: This isn't something
5    that my client produced, is it?
6         MS. HO: Yes, it is. It was produced
7    at your offices last Thursday.
8         MR. SEWRIGHT: Part of that stuff
9    that -- the Jack Goodwill package?
10        MS. HO: Yes.
11        MR. SEWRIGHT: Okay.
12   BY MS. HO:
13   Q    So this particular document shows a
14   copy of four separate and distinct business
15   cards. I'll list the first one as Spencer Rock
16   Products, Incorporated --
17        MR. SEWRIGHT: Objection to the
18   characterization.
19   BY MS. HO:
20   Q    Okay. Then I'll have Mr. Bentz
21   describe it.
22        Would you please state for the record:
23   What do you see on this document? For example,
24   on the upper left-hand corner there's a copy of
25   what looks to be a business card. Can you tell

Page 63

1    me what name it is?
2         MR. SEWRIGHT: Objection to the form of
3    the question. The documents speak for
4    themselves, unless you can establish that
5    Mr. Bentz created these documents, that he
6    created these business cards.
7         MS. HO: Counsel, this particular
8    document was disclosed to me by you from North
9    Star's files.
10        MR. SEWRIGHT: These are copies of
11   business cards. Unless you can establish that he
12   created the business cards, the documents speak
13   for themselves.
14        MS. HO: And this document was produced
15   in North Star's files. Now, Mr. Bentz --
16        MR. SEWRIGHT: Same point; same
17   objection.
18        MS. HO: Counsel, your objection is
19   noted.
20   Q    I will ask Mr. Bentz again: Would you
21   please tell me for the record, what do you see in
22   terms of the copy of the business card in the
23   upper left-hand corner, the first one there?
24   A    What specifically do you want me to
25   tell you?

Page 64

1    Q    It says Spencer Rock Products,
2    Incorporated; is that correct?
3    A    It says that on the upper left-hand
4    corner of this page.
5    Q    Okay. And then it looks like on that
6    particular copy of the business card, the
7    business address is 1301 Dowling, No. 109, P.O.
8    Box 244063, Anchorage, Alaska 99524. Is that
9    what you see, also?
10   A    I see that on this page, yeah.
11   Q    Okay. And then on the lower part of
12   the document, on the lower left-hand side, there
13   is a copy of a business card of LDR Engineering
14   Services. Would you agree with me, sir? Do you
15   see that?
16   A    I see the words LDR Engineering
17   Services on this document.
18   Q    And do you see the name L.D. "Randy"
19   Randolph, comma, PE on that business card?
20   A    Yes.
21   Q    Now, this business card, a copy
22   thereof, was found in North Star's files. Do you
23   have any knowledge who might have retrieved this
24   business card?
25   A    I have no personal knowledge of who

Page 65

1    might have retrieved this business card.
2    Q    If you look to the right of that
3    particular copy of that business card, you see
4    another business card that states Nugget
5    Construction, Inc.; is that correct?
6    A    Uh-huh.
7    Q    And you also see the name L.D. "Randy"
8    Randolph, comma, PE, Senior Engineer; is that
9    correct?
10   A    I see that on this document, yeah.
11   Q    Now, do you know or does North Star
12   know when they received this copy of the business
13   card from Randy Randolph?
14   A    I do not know.
15   Q    Do you know of anyone else within North
16   Star who might know?
17   A    No.
18   Q    So these business cards that were found
19   in North Star's files could have been given at
20   any time since the inception of North Star to
21   present, correct?
22        MR. SEWRIGHT: Objection; form of the
23   question.
24   BY MS. HO:
25   Q    Mr. Bentz.

89

Case No. A98-009 Civil (HRH)                                          Jeffery Bentz

Page 66

1    A    I don't know who or when these business
2    cards were actually received, if they in fact are
3    even business cards.
4    Q    Okay.  Now, looking at this particular
5    document and the copy of the business cards by
6    Mr. Randolph, did anyone at North Star ask
7    Mr. Randolph which company he was working for
8    during the Homer Spit project?
9    A    I don't know.
10   Q    Did you ask Mr. Randolph?
11   A    I don't recall if I did or not.
12   Q    Okay.  To your understanding, what role
13   did Mr. Randolph play in the Homer Spit project?
14   A    I can't attest to what his entire role
15   was.  We were taking directions from Randy
16   Randolph.
17       MS. HO:  Objection; move to strike;
18   nonresponsive.
19       MR. SEWRIGHT:  That's not --
20   BY MS. HO:
21   Q    Now, Mr. Bentz, I asked you if you know
22   what role Mr. Randolph played and you said --
23   A    I'm sorry.  Could you rephrase?
24   Q    I asked you what role, to your
25   knowledge, Mr. Randolph played.

Page 67

1        MR. SEWRIGHT:  And he said they took
2    directions from him.
3        MS. HO:  Took directions from whom?
4        MR. SEWRIGHT:  From Mr. Randolph.
5    A    From Randy Randolph.
6        MR. SEWRIGHT:  That's a role.
7    BY MS. HO:
8    Q    That's a role?
9    A    Yes.
10   Q    Did you personally take directions from
11   Mr. Randolph?
12   A    No.
13   Q    Who do you know at North Star that took
14   directions from Mr. Randolph?
15   A    That used to work for North Star, Jack
16   Goodwill.
17   Q    Jack Goodwill.  But he's no longer with
18   the company; is that true?
19   A    That's correct.
20   Q    Do you have a current business address
21   and contact information for Mr. Goodwill?
22   A    I told you he still lives in Seward, to
23   the best of my knowledge.
24   Q    Okay.  But do you have an exact address
25   for him, sir?

Page 68

1    A    I believe he's still in the same house.
2    I believe he still lives in the same house in
3    Seward.
4    Q    In Seward.
5        MR. SEWRIGHT:  We gave you his address,
6    Counsel.
7        MS. HO:  Okay.  I'll look through the
8    file and ascertain that.
9    Q    We can get to Mr. Randolph's role here.
10   Now, you're claiming that Mr. Randolph gave
11   directions.  Do you have any specific time period
12   you're referring to?  Any specific instance?
13   A    I can't tell you the exact dates, but I
14   know that Mr. Randolph was the one directing
15   Mr. Goodwill as to when to load the rock and when
16   to call the crew for and that sort of thing.
17   Q    Any specific instance that you know of
18   that would indicate this allegation?
19       MR. SEWRIGHT:  Object to the form of
20   the question.
21   BY MS. HO:
22   Q    Sir, you've testified that --
23   A    Well, what exactly is your question?
24   Q    You're claiming that Mr. Randolph had
25   control over Mr. Goodwill.  Do you have any

Page 69

1    specific instance you're referring to, sir?
2    A    The days that we were -- the days prior
3    to or the days of loading the barges are the
4    times when he was the one directing our company
5    when to start work and what to load.
6    Q    When to start work and when to load.
7    Well, do you have any specific time and dates for
8    those?
9    A    I don't personally have the specific
10   times and dates logged in my memory, no.  It was
11   eight years ago.
12   Q    Correct.  And Mr. Goodwill is no longer
13   with the company.
14   A    He's readily available in Seward.
15   Q    He's readily available.
16   A    Yes.
17   Q    Okay.  Well, we'll get to that
18   allegation in a moment here.
19       MR. SEWRIGHT:  What?  That he's readily
20   available?
21       MS. HO:  No, your allegation that
22   Mr. LaPore was in control.
23   Q    Let's look at North Star's Amended
24   Complaint.  Mr. Bentz, please take a few moments
25   to read this document.

MIDNIGHT SUN COURT REPORTERS * (907) 258-7100

EXHIBIT 2
Page 18 of 105

90

Page 70

1          (Exhibit 5 marked.)
2          MR. VIERGUTZ:  Can we go off record
3    just a second?
4          MS. HO:  Sure.
5          (Short break taken.)
6    BY MS. HO:
7       Q    Okay.  We've just taken a break and
8    we're back on record here.
9          Before I get to North Star's Third
10   Amended Complaint, let me --
11         MR. SEWRIGHT:  The what Amended
12   Complaint?
13      A    You want me to quit reviewing this?
14   BY MS. HO:
15      Q    Did you get a chance to look at the
16   document?
17      A    Not in total yet, no.
18      Q    Okay.  Well, why don't you finish
19   reviewing that.
20         MR. SEWRIGHT:  Did you say Third
21   Amended Complaint or did I mishear?
22         MS. HO:  Let me correct.  North Star's
23   Amended Complaint dated on or about August 31st,
24   2005.
25         MR. SEWRIGHT:  Right.

Page 71

1          MS. HO:  Okay.  Off record a minute.
2          (Short break taken.)
3          (Exhibit 6 marked.)
4    BY MS. HO:
5       Q    Mr. Bentz, you've just taken a few
6    moments to review what has been marked as
7    Defendants' Exhibit No. 4.
8          Do you recognize this document?
9       A    Actually I believe it's Exhibit No. 5.
10      Q    That's right, Exhibit 5.
11         Do you recognize this document, sir?
12      A    I just reviewed it.
13      Q    Is it North Star's Amended Complaint
14   dated on or about August 31st, 2005?  The date is
15   noted on page 25 of 26.
16      A    Yes.
17      Q    Okay.  And as you were reviewing
18   through this document, do you recall whether or
19   not you had any input into the drafting of this
20   document?
21      A    Not all the legalese, no.
22      Q    But just the general facts surrounding
23   the claims?
24      A    Yes, Mike and I talked about the facts
25   surrounding the claims.

Page 72

1       Q    And anybody else at North Star that you
2    know of that had discussions --
3       A    Not on this Amended Complaint.  Not
4    that I know of.
5       Q    Okay.  So it was just basically you and
6    your counsel?
7       A    Yes.
8          MR. SEWRIGHT:  And several boxes of
9    pleadings given this year and everything that's
10   developed in this case, including two summary
11   judgments and two appeals.
12         MS. HO:  Okay.  I'll get back to it in
13   a moment.
14      Q    Let me introduce Exhibit No. 6 to you.
15   Take a moment to look through that document,
16   which was produced by your counsel last Thursday.
17         MR. SEWRIGHT:  Actually, Counsel, I
18   think this was first produced about eight years
19   ago.
20         MS. HO:  Well, my first time of seeing
21   this document was in your office last Thursday.
22   It might have been produced earlier.
23         MR. SEWRIGHT:  And for the record, it's
24   a collection of documents.  Exhibit 6 is a
25   collection of documents.

Page 73

1    BY MS. HO:
2       Q    It has nine pages, Mr. Bentz.  If you
3    would go through the document and count how many
4    pages you have on this particular Exhibit No. 6.
5          MR. SEWRIGHT:  She's asking you to
6    count the pages, Jeff.
7    BY MS. HO:
8       Q    Do you have nine pages?
9       A    I have nine pages.
10      Q    Do you recognize this nine-page
11   document?
12      A    I haven't reviewed them yet.  You asked
13   me to count them.
14      Q    Okay.  Go ahead and look at them.
15         Have you had a chance to look through
16   this nine-page document?
17      A    Yes.
18      Q    Looking on the first page, do you see
19   the title North Star Terminal & Stevedore
20   Company?
21      A    Uh-huh.
22      Q    Is that a company logo for North Star
23   back in 1997?
24      A    Very well probably was.
25      Q    Okay.  Is this logo currently used by

Page 74

1  North Star?
2     A   Something different, slightly different
3  from that.
4     Q   But do you dispute that this is a North
5  Star Terminal and Stevedore Company document, at
6  least produced from your files?
7     A   No, I don't dispute that.
8         MR. SEWRIGHT:  Counsel, what's the
9  logo?  The star?
10 BY MS. HO:
11    Q   It looks like it's a star.  Do you
12 agree, Mr. Bentz?
13    A   Looks like a star with five points on
14 it.
15    Q   And it's dated January 27, 1997,
16 correct?
17    A   Uh-huh.
18    Q   And do you see the name G. Meherg,
19 M-e-h-e-r-g, credit manager?
20    A   Uh-huh.
21    Q   Is Mr. Meherg still with North Star?
22    A   It's a Ms. and, no, she's not.  She's
23 retired.
24    Q   She's retired.  Is she back in 1997 the
25 person who handled this type of -- what looks

Page 75

1  like a commercial credit application?  At least
2  the first sentence, "Dear Valued Customer:
3  Enclosed you will find our new commercial credit
4  application."
5     A   She probably would have.  That would
6  have been one of her responsibilities then.
7     Q   Currently, is there a credit manager
8  within North Star?
9     A   We don't really have credit managers
10 per se, no.
11    Q   Now, if you'll please turn to page 2 of
12 this nine-page document.  Do you recognize the
13 North Star Terminal and Stevedore Company title
14 listed on the top there?
15    A   Yes.
16    Q   And you also see the star company logo?
17    A   Yes.
18    Q   And do you dispute that this is a
19 document that is not from North Star's files?
20        MR. SEWRIGHT:  Objection; form of the
21 question.
22    A   You said it's a document not from North
23 Star's files; that doesn't make any sense.
24 BY MS. HO:
25    Q   Let's rephrase that, then.  Do you

Page 76

1  agree, then, that this is a document that was
2  produced by North Star?
3     A   It could have been produced by North
4  Star, yes.
5     Q   Do you see the line that says
6  "Confidential Credit Application, Commercial
7  Accounts," on the top right underneath the logo?
8     A   Yes, I see that.
9     Q   Is it North Star's practice to have its
10 credit applications confidential, meaning that
11 the information provided by the applicant is not
12 disclosed to third parties?
13    A   Yeah.  We wouldn't do that.
14    Q   Okay.  What is North Star's custom and
15 practice in extending lines of credit to the
16 business customers?
17    A   You asked that in the first hour, and I
18 told you that it really depends on the customer.
19 It's a very tight-knit market.  So sometimes,
20 yes, because we haven't done business with them,
21 and sometimes, no, because they've got a good
22 reputation in the marketplace.
23    Q   Appreciate the clarification.  Does
24 North Star solicit the customer in making credit
25 available?

Page 77

1     A   Could you ask that question again?
2     Q   Does North Star actively solicit --
3  some car companies, for example, if I'm
4  interested in purchasing a car, sometimes they'll
5  ask, do you need a line of credit?  So, at least
6  from my perspective, the car company is
7  soliciting me.
8         Does North Star do that in its business
9  with its potential customers?
10        MR. SEWRIGHT:  Object to the form of
11 the question.
12 BY MS. HO:
13    Q   Mr. Bentz, do you understand the
14 question?
15    A   No, it's not a very well-asked
16 question, I don't believe.
17    Q   Then, I'll ask you again, Mr. Bentz:
18 Does North Star solicit its potential customers
19 regarding extending a line of business -- line of
20 credit?
21        MR. SEWRIGHT:  Same objection.
22    A   It's still not a properly posed
23 question.
24 BY MS. HO:
25    Q   It's a very simple question.  It's not

20 (Pages 74 to 77)

Case No. A98-009 Civil (HRH)                                      Jeffery Bentz

Page 78

1   rocket science.
2       A   Do we solicit our customers to grant
3   them credit?
4       Q   Well, yes. I mean, do you say, okay,
5   our company has lines of credit which we can
6   grant to a business?
7       A   We don't grant lines of credit.
8       Q   Do you solicit them?
9       A   We don't solicit lines of credit.
10      Q   Okay. Then, do potential customers
11  reveal to you that they might have a financial
12  difficulty in working with North Star and do
13  they, these potential customers, ask North Star,
14  do you have any way of assisting us so that we
15  can consummate this agreement to work with North
16  Star?
17          MR. SEWRIGHT: Objection to form of the
18  question.
19      A   That's not our general way of doing
20  business as you have posed the question.
21  BY MS. HO:
22      Q   Then how does North Star generally do
23  this business regarding its commercial accounts
24  and credit applications?
25      A   Most of our customers have been

Page 79

1   long-time customers of North Star. When we come
2   across a new business, depending on the volume of
3   business, the length and duration of the
4   business, the type of business, whether or not
5   it's a federally-funded project, a bondable
6   project, not bonded project, we may or may not do
7   any number of variety of different ways to try to
8   secure our future.
9       Q   Thank you, Mr. Bentz. That's what I
10  needed clarification on.
11          If you would please turn to page 4 of
12  this nine-page document. It says Agreement on
13  top. And it looks to be Spencer Rock Products
14  and a signature of what looks to be Robert LaPore
15  and what looks to be dated January 28th, 1997.
16          Do you disagree with what's stated on
17  this agreement?
18      A   Do I disagree with what's stated on the
19  agreement?
20      Q   In terms of what I've just noted. The
21  company name, the signature and the date.
22      A   Yes, that's right.
23          MR. SEWRIGHT: Objection. Counsel, the
24  document speaks for itself.
25          MS. HO: Well, I just want to be sure

Page 80

1   that Mr. Bentz is reading what I am.
2       Q   Mr. Bentz, paragraph 3, would you
3   please read that aloud for the record?
4       A   Well, I don't have my reading glasses
5   with me and this is fairly illegible. But,
6   "Applicant agrees to notify North Star Terminal &
7   Stevedore Company promptly of any changes in
8   ownership of the business conducted under the
9   account name and agrees to liability for all
10  charges to the business conducted under the
11  account name unless and until North Star Terminal
12  reviews written notice of a change in ownership
13  of that business."
14      Q   And then it looks like Mr. LaPore has
15  signed that agreement. Was there any dispute by
16  North Star that this particular agreement signed
17  by Mr. LaPore was unacceptable to North Star?
18      A   Not that I know of.
19      Q   Now, during the time that Mr. LaPore
20  and Spencer Rocks had a business engagement with
21  North Star, did Mr. LaPore or anyone at Spencer
22  Rocks notify North Star that there was an
23  ownership of business?
24          MR. SEWRIGHT: Object to the form of
25  the question.

Page 81

1   BY MS. HO:
2       Q   Mr. Bentz?
3       A   Did anybody notify us of ownership of
4   Spencer?
5       Q   No. Did anyone -- first, did
6   Mr. LaPore notify you --
7       A   Hold on just a second. Could you
8   reread the question back to me that she asked?
9           (Question read by the reporter.)
10  BY MS. HO:
11      Q   Let me rephrase that.
12      A   Doesn't make any sense.
13      Q   The question is: First, did Mr. LaPore
14  at any time notify North Star that Spencer Rocks,
15  Incorporated had a change of ownership in terms
16  of its business?
17      A   Define "change in ownership."
18      Q   Well, you tell me. When North Star
19  became doing business as a limited liability
20  company, didn't it have to go through legal steps
21  to make sure that the form of the entity was --
22      A   There are some customers, some people
23  that we had contracts with that we had to notify.
24  We didn't have to notify a lot of people.
25      Q   Right. And in this case with Spencer

21 (Pages 78 to 81)

EXHIBIT 2
Page 21 of 105

93

Page 82

1  Rock Products, did anyone from Spencer Rock
2  Products notify North Star that it had any change
3  of ownership?
4     A   I don't know.
5     Q   Did Mr. LaPore notify North Star that
6  Spencer Rock had any change of business
7  ownership?
8     A   Ownership or practice?
9     Q   Ownership.
10    A   I don't know.
11    Q   So to your knowledge and to North
12 Star's knowledge, Spencer Rock operated as
13 Spencer Rock; nobody took over their business,
14 nobody assumed their business, correct?
15        MR. SEWRIGHT:  Objection to the form of
16 the question.
17    A   That's not what you asked.  You just
18 asked a separate question.
19 BY MS. HO:
20    Q   To your knowledge, then, does North
21 Star have any information that would indicate
22 that Spencer Rock operated under a different
23 company name?  That's the first question.
24    A   I don't know if they operated under a
25 different company name or not.

Page 83

1     Q   And the second question to that is:
2  Does North Star or do you know whether or not
3  anybody else at Spencer Rock notified North Star
4  that it ever had any change of its ownership of
5  that business within Spencer Rocks?
6     A   I don't know of any notification it
7  received explaining any legal ownership changes
8  with Spencer Rock.
9     Q   Okay.  Now, you've just read paragraph
10 3, and according to that paragraph, then, isn't
11 it true that Spencer Rock Products, Incorporated
12 agreed to be liable for North Star's charges on
13 this account?
14        MR. SEWRIGHT:  Object to the form of
15 the question.
16 BY MS. HO:
17    Q   Well, it says here, paragraph 3 that,
18 Applicant agrees to notify North Star promptly of
19 any changes in ownership in the business
20 conducted and agrees to liability to all charges
21 for the business conducted under the account
22 name.
23        So, by virtue of this particular
24 agreement by Mr. LaPore and Spencer Rock, isn't
25 it true that Mr. LaPore and Spencer Rock agreed

Page 84

1  to be liable to North Star for its charges?
2         MR. SEWRIGHT:  Same objection.
3     A   This agreement says that Robert LaPore
4  while we were working for Spencer is supposed to
5  pay us on time.
6     Q   Right.  So it was Mr. LaPore and/or
7  Spencer Rock who was liable for those charges
8  while North Star was working for Spencer Rock and
9  LaPore?
10        MR. SEWRIGHT:  Same objection; also
11 calls for a legal conclusion.
12 BY MS. HO:
13    Q   Mr. Bentz?
14    A   Yes.
15    Q   Wouldn't you agree that it was
16 Mr. LaPore, and when he signed this agreement
17 with North Star that it was Mr. LaPore on behalf
18 of Spencer Rock Products, that he would be the
19 one liable to North Star?
20        MR. SEWRIGHT:  Continuing objection.
21 BY MS. HO:
22    Q   Mr. Bentz, it's not rocket science
23 here.
24    A   Are you calling me stupid?
25    Q   No, I'm not calling you stupid.

Page 85

1     A   Why don't you rephrase the question?
2     Q   Okay.  Then, why don't you turn to page
3  9 of this Exhibit No. 6.
4     A   The last page?
5     Q   Yes, sir.
6     A   Go ahead.
7     Q   Now, could you read for the record what
8  the document states in terms of the title?
9     A   It says, Individual Personal Guarantee.
10    Q   Okay.  And then could you read the
11 first paragraph?
12    A   Well, it's titled "To:  North Star
13 terminal and Stevedore Company," and then it
14 says, "In consideration" -- I can't read it.
15 Sorry about that.
16        MR. SEWRIGHT:  Let the record reflect
17 Counsel handed Mr. Bentz a cheap pair of reading
18 glasses, which may or may not help.
19    A   "In consideration of extension of
20 credit to applicant, and/or forbearance from
21 immediate collection of any existing indebtedness
22 to you, I/we hereby unconditionally guarantee,
23 jointly and severally, punctual payment and
24 performance of all applicant's obligations,
25 present and future, to North Star Terminal and

94

Page 86

1  Stevedore Company."
2  BY MS. HO:
3    Q   And it's dated January 28th, 1997; is
4  that correct?
5    A   That appears to be the date.
6    Q   And it appears that Mr. LaPore has
7  signed this individual personal guarantee?
8    A   It happens that he did.
9    Q   At any time did North Star dispute this
10  particular individual personal guarantee signed
11  by Mr. LaPore?
12    A   Did we dispute the document?
13    Q   Yeah.
14    A   Not to the best of my knowledge.
15    Q   Did you ever -- strike that.
16       Now, according to this particular
17  individual personal guarantee that was signed by
18  LaPore, then isn't it true that Mr. LaPore agreed
19  to be personally liable for all of North Star
20  charges on the Homer Spit account?
21    A   It appears that at that date he agreed
22  to those conditions.
23    Q   Was there any modifications of this
24  particular guarantee that you or North Star knows
25  of?

Page 87

1    A   Not to this document that I know of.
2    Q   Any oral representations by either
3  North Star or LaPore that would render this
4  guarantee null and void?
5    A   I don't know. I'm not sure how the law
6  would view whether or not this was null and void
7  pending what actually took place in this case.
8    Q   I'm not asking you for legal
9  conclusions. I'm asking if there are any facts
10  or any conversations, any meetings between anyone
11  at North Star, including yourself and Mr. LaPore,
12  that would dispute this personal guarantee?
13    A   I don't know of anything that would
14  dispute the document.
15    Q   To your understanding are there any
16  other incidents that might have occurred during
17  these years of litigation that might have
18  rendered the guarantee unenforceable?
19    A   I might need to know something else,
20  some more knowledge about the law to know that.
21  I mean, given everything that's taken place in
22  this particular set of circumstances, I don't
23  know whether this is still a legally binding
24  document or not.
25    Q   Is North Star continuing to enforce its

Page 88

1  rights against Mr. LaPore and Spencer Rocks?
2       MR. SEWRIGHT:  Objection; form of
3  question; calls for legal conclusion.
4  BY MS. HO:
5    Q   In layman's terms, is North Star still
6  chasing after Mr. LaPore and/or Spencer Rocks?
7    A   We're still looking to get paid what's
8  due us on the job.
9    Q   And you're looking also to Mr. LaPore
10  and/or Spencer Rocks?
11    A   Certainly we have.
12    Q   Now, isn't it true that according to
13  page 2 of this nine-page document, it says
14  Confidential Credit Application, and essentially
15  these types of credit applications are not
16  disclosed to third parties, including my clients,
17  USF&G and Nugget Construction; is that correct?
18    A   Ordinarily I don't believe we share the
19  documents.
20       MR. SEWRIGHT:  Are you saying, Counsel,
21  that we should have had a confidentiality
22  stipulation before this was produced?
23       MS. HO:  No, I'm not saying that.
24       MR. SEWRIGHT:  You may be right.  Maybe
25  we should enter into that pretty soon.

Page 89

1       MS. HO:  We can discuss that.
2    Q   Back on January 27, 1997 the intent of
3  this particular nine-page credit application was
4  the information contained was confidential and
5  nobody but North Star and Spencer Rocks and/or
6  Mr. LaPore were privy to the information that was
7  provided, correct?
8    A   Not that I know of.
9    Q   Okay. Thank you. Let's talk about the
10  actual agreement that North Star had loading rock
11  on the Homer Spit project.
12       Who did North Star contact to discuss
13  the project initially?  Do you know, or do you
14  know of anybody at North Star who would know that
15  information?
16       MR. SEWRIGHT:  Object to the form.
17    A   I don't know who the first contact was
18  made through or by.
19  BY MS. HO:
20    Q   Okay.
21    A   In other words, I don't know if it was
22  Randy that talked to Jack or if it was Spencer or
23  LaPore that talked to Jack first.  I'm not
24  certain.
25       (Exhibit 7 marked.)

23 (Pages 86 to 89)

95

Case No. A98-009 Civil (HRH)                                          Jeffery Bentz

Page 90

1 BY MS. HO:
2    Q   Mr. Bentz, please take a few moments to
3 review what is marked as Defendants' Exhibit No.
4 7.
5        We can go off the record.
6        (Short break taken.)
7 BY MS. HO:
8    Q   Mr. Bentz, did you take a few moments
9 to review what is marked as Defendants' Exhibit
10 No. 7?
11    A   Yes.
12    Q   And do you recognize this document?
13    A   I think I've seen it before.
14    Q   It is the Affidavit of Mr. Jack
15 Goodwill dated on or about December blank 1998.
16 That's page 6.
17        MR. SEWRIGHT: It's about December 7,
18 Counsel, if you see the postmark -- or I don't
19 know what that is.  The Postmaster served as the
20 Notary Public, the Postmaster of Seward, Alaska,
21 December 7th.
22        MS. HO:  Okay.  Thank you for that
23 clarification.
24    Q   And all the attaching exhibits to
25 Mr. Goodwill's affidait; do you agree with that,

Page 91

1 Mr. Bentz?
2    A   Do I agree they're attached?
3    Q   Yes.
4    A   Yeah.
5    Q   Now, I want to have you turn your
6 attention to page 2, paragraph 3.  You can read
7 that to yourself or you're welcome to read it
8 aloud for the record.
9    A   I see that.
10    Q   Now, after reading that paragraph, do
11 you have any recollection or knowledge of who
12 contacted whom with respect to the initialization
13 of the Homer Spit project between North Star and
14 Spencer Rock?
15    A   No, I don't.
16        MR. SEWRIGHT:  Object to the form.
17    A   No, I don't.  I know that it appears
18 that Mr. LaPore contacted Mr. Goodwill in August
19 of '96.
20 BY MS. HO:
21    Q   August of '96.  Okay.  And then
22 essentially what Mr. Goodwill is testifying in
23 this affidavit in paragraph 3, it looks like the
24 sentence before the last, he said he wanted us --
25 "he" referring to Mr. LaPore -- would you

Page 92

1 disagree with that -- to load the stone onto a
2 barge the next year?
3    A   It appears in August of '96 that
4 Mr. LaPore contacted Jack Goodwill inquiring
5 about potentially having us do some work for him.
6    Q   Right.  And then would you please read
7 paragraph 4 to yourself?
8    A   Okay.
9    Q   Okay.  And it appears, then,
10 Mr. Goodwill, according to paragraph No. 4, had
11 indicated Mr. LaPore informed him that Nugget had
12 obtained the award from the federal government on
13 this contract and that it would be Spencer Rock
14 Products who would be supplying the rock,
15 correct?
16    A   That's what this says, yes.
17    Q   And then Mr. Goodwill also testified in
18 paragraph 4 that it was orally agreed that
19 Northern Stevedoring was to bill Spencer Rock for
20 the loading based on the labor and equipment used
21 and a time and material basis.
22        Is that correct, Mr. Bentz?
23    A   That's what this says.
24    Q   Okay.  Then, as a consequence on
25 January 29th, 1997 Spencer Rock agreed to the

Page 93

1 credit terms with North Star Terminal and
2 Stevedore Company doing business as Northern
3 Stevedoring; is that correct?
4    A   That's what it says.
5    Q   Okay.  I'm going to submit another
6 document as an exhibit.
7        (Exhibit 8 marked.)
8 BY MS. HO:
9    Q   I'll give you a moment to look at that.
10    A   Go ahead.
11    Q   Okay.  Please note for the record that
12 while we had this moment for Mr. Bentz to review
13 the document that his counsel was speaking with
14 him.
15        Now, on this Exhibit No. 8 --
16        MR. SEWRIGHT:  Counsel, we were off the
17 record, weren't we?
18        MS. HO:  We were on the record.
19        MR. SEWRIGHT:  I thought you said off
20 the record while he was -- I thought we were off
21 the record.  Were we off the record or not?
22        THE REPORTER:  No.
23        MR. SEWRIGHT:  This on and off the
24 record is a tricky business here.
25 BY MS. HO:

MIDNIGHT SUN COURT REPORTERS * (907) 258-7100

Case No. A98-009 Civil (HRH)                                              Jeffery Bentz

Page 94

1    Q   For that matter, as we move on with the
2  deposition and we're looking at Defendants'
3  Exhibit No. 8 -- would you count the number of
4  pages that you have in your hand?
5    A   Appears to be nine.
6    Q   This nine-page document in Exhibit No.
7  8, the first page it says Northern Stevedore &
8  Handling Corporation, Box 497, Seward, Alaska
9  99664. Do you recognize -- is that a
10 company -- is that North Star?
11   A   This was a Northern -- looks like
12 Northern letterhead or something back then.
13   Q   And do you recognize the forklift truck
14 picture?  Is that one of the logos that North
15 Star used to have?
16   A   Yeah, it might have been.
17   Q   And do you see the title Current Rates
18 for Labor & Equipment 1996, Effective 1/97?
19   A   Uh-huh.
20   Q   Now, are these the rates that were
21 established by North Star back in 1997?
22   A   This might have been a rate sheet for a
23 particular type of equipment rental --
24   Q   Okay.  Now, it says --
25   A   -- and labor.

Page 95

1    Q   Paragraph I, Labor Rates and Paragraph
2  II, Equipment Rates.
3    A   Uh-huh.
4    Q   To your knowledge, was this the rate
5  sheet that was used in the Homer Spit project?
6    A   This may have been the rate sheet -- it
7  appears that this is our published rates, if you
8  will, back at that particular point in time.  I
9  would have to verify the numbers to make sure,
10 but...
11   Q   Who would be responsible for coming up
12 with these rates?
13   A   I would.
14   Q   And what basis do you have for these
15 rates in terms of, do you look at other
16 publications or industry standards?
17   A   Yeah, the rental rates for the
18 equipment we generally would have used blue book
19 or something of that nature and then we would
20 have modified it for Alaska. It's slightly
21 higher.
22   Q   And usually -- or in North Star's
23 custom and practice, are these rates based on a
24 time and material?
25   A   We do a variety of different types of

Page 96

1  invoicing depending on what the job is.
2    Q   Particularly to this Homer Spit
3  project, what was your knowledge or North Star's
4  knowledge as to how these rates were applied?
5    A   Time and materials.
6    Q   Now, if you look at Paragraph I, it
7  says Labor Rates and then Job Description, and
8  this is on page 1 of the document.
9        S/T, what does that stand for?
10   A   The S/T?
11   Q   Yes.
12   A   That would stand for straight time.
13   Q   What would that mean?
14   A   That would be the hours between 8:00
15 and 3:00; in other words, 8:00 to noon and 1:00
16 to 3:00, Monday through Friday, on that
17 particular labor contract.
18   Q   And do you have any particular rate
19 sheets for the weekends?
20   A   No, it doesn't work like that.
21   Q   Now, what about the O/T, what does that
22 stand for?
23   A   That would be overtime.
24   Q   And that's also Monday through Friday?
25   A   No.  Overtime would be anything outside

Page 97

1  of the original hours that I told you that were
2  not considered to be penalty time or triple time
3  or early start time or any number of other
4  particular categories.
5    Q   Now, overtime can mean weekends, work
6  by stevedores that would fall over the weekends?
7    A   Could be on the weekend; could be in
8  the evening.
9    Q   And penalty O/T, that's penalty
10 overtime?
11   A   Yes.
12   Q   Can you explain that term, please?
13   A   How much time do you have?  The labor
14 contract is fairly complicated for penalty
15 overtime hours.  If you worked them too many
16 hours before giving them a break, if you worked
17 through a meal hour, worked after midnight, if
18 you worked after 15 hours, any number of things
19 could trigger that.
20   Q   And you just mentioned about triple
21 time, and that's not stated on this particular
22 document?
23   A   No.
24   Q   Triple overtime wasn't used back in
25 1997 to your knowledge?