Case No. A98-009 Civil (HRH)                                                    Jeffery Bentz

Page 98

1    A    It wasn't used -- it's not a normal
2  thing. It would be done in an emergency
3  situation.
4    Q    Now, looking at the job description on
5  the first page of this Exhibit No. 8, it says,
6  longshore, longshore casual, longshore skill.
7        Can you distinguish for me what these
8  three terms mean?
9    A    Yeah. The basic longshore that's
10  listed there would be a registered individual
11  who's an actual member of the union, has
12  registration status, that is working a particular
13  job that does not require a skill category.
14  Maybe a skilled individual, but that particular
15  day he may be just pulling chain or something.
16    Q    Pulling chain. Literally or
17  figuratively?
18    A    No, literally could be pulling chains.
19    Q    What about a longshore casual?
20    A    That would be somebody that's not a
21  registered member of the work force, that gets
22  dispatched through the union hall to the
23  employer, that's working a nonskilled job.
24    Q    Okay. And longshore skilled is what it
25  is -- says what it is? A skilled longshoreman?

Page 99

1    A    Yes.
2    Q    And what about the gang boss, what is
3  that?
4    A    That would be the union's supervisor on
5  the job basically.
6    Q    Now, are these gang bosses usually
7  dispatched by North Star on any particular job?
8    A    Depending on what type of work you're
9  doing, you're required to hire one.
10    Q    You're required to hire one.
11    A    Basically it's an intermediary between
12  the company representative and the longshore work
13  force.
14    Q    Now, to your knowledge or North Star's
15  knowledge, was a gang boss dispatched to the
16  Homer Spit project?
17    A    You know, without -- I'm sure that it
18  was. Hang on a second. I can tell you.
19    Q    Okay.
20    A    Looks like a hatch boss was.
21    Q    So on page 2 of the document where it's
22  identified as you see on the lower right-hand
23  corner, Nugget 007207 for identification
24  purposes -- do you see this Bates numbering here?
25    A    Nugget what?

Page 100

1    Q    007207 on the bottom right-hand corner.
2    A    Yeah, I see that.
3    Q    So we can identify this document
4  through that number. It says hatch boss, and I
5  don't see that on the rate sheet that's on page
6  1.
7    A    Hatch boss and a gang boss, it's a
8  slightly different position.
9    Q    How so?
10    A    The terms are used interchangeably, but
11  it's generally somebody who's worked there longer
12  or has a few more skills.
13    Q    Worked at North Star longer?
14    A    Yeah. It's more of a terminology thing
15  with the longshore union.
16    Q    And has more skills than a gang boss?
17    A    It's more of a function of whether or
18  not they're aboard the vessel or if they're
19  aboard the beach side of the work, but they're
20  used interchangeably.
21    Q    Okay. Now, it also says gearman, and
22  it wasn't on the rate sheet. What's a gearman?
23    A    A gearman is like the guy that gets all
24  the rigging and whatnot together. This rate
25  sheet that's on the front is not a full

Page 101

1  description of all of the different categories.
2    Q    Okay. Now, was a subsequent rate sheet
3  supplied to Nugget or Spencer or LaPore?
4    A    I don't know. I don't know.
5    Q    But to the best of your knowledge, this
6  rate sheet that's effective 1997 was at least
7  used initially in the Homer Spit project?
8    A    I don't know.
9    Q    All right. Now, on the second page of
10  this nine-page document, could you please look on
11  the top -- it looks to be cuff off -- but do you
12  recognize North Star Terminal & Stevedore
13  Company, and it has the phone number?
14    A    Yeah. It's cut off on the top?
15    Q    Right. Are these normal billing
16  invoices that are issued by North Star?
17    A    It looks similar to something that
18  would have been invoiced back in those days,
19  yeah.
20    Q    This particular date is May 8th, 1997.
21    A    Uh-huh.
22    Q    Now, on these invoices, are they
23  printed out and sent out on the same day? Say,
24  here, May 8, 1997. So North Star prints this
25  invoice out. Does it send it out also on the

98

Case No. A98-009 Civil (HRH)                                    Jeffery Bentz

Page 102

1   same day?
2       A    Generally.  It could be the 9th, could
3   be the 10th.
4       Q    And then with this particular document,
5   it looks like the bill was addressed to Nugget
6   Construction Barge and Owners, care of Spencer
7   Rock Products, Inc., Box 224063, Anchorage,
8   Alaska 99524.  Do you disagree with that?
9       A    I don't disagree with that.
10      Q    Now, it looks like on this document the
11  vessel Nugget Construction Barge started on May
12  1st, 1997 and finished on May 5th, 1997.  Is that
13  particular time frame one barge loading to your
14  knowledge?
15      A    I don't know.  This could have been for
16  the week.
17      Q    Could have been for the week.
18      A    It says it's for those days.  I don't
19  know without seeing the actual timecards whether
20  or not --
21      Q    I will show you those in a moment.
22  Then on the right-hand side to those time dates
23  it says, Port Seward; Pier, ARR Dock; and
24  Operation, Load Rock.
25      A    Uh-huh.

Page 103

1       Q    Are those specific terms that you can
2   recognize?
3       A    I recognize it.
4       Q    Can you define that in terms of --
5       A    It says that we're at the Port of
6   Seward and that the dock in Seward is the Alaska
7   Railroad dock and that we were loading rock.
8       Q    Okay.  I just needed you to clarify
9   that ARR.  And then if you turn to the next page,
10  what is identified as Nugget 007208, it says on
11  top, North Star Terminal & Stevedore Company with
12  the phone, the federal I.D. number.
13          Do you disagree that that is not North
14  Star's information back in 1997?
15      A    I don't disagree with that.
16      Q    And the date of this invoice was May
17  15th, 1997, correct?  Do you see that on the
18  first section?
19      A    Yes.
20      Q    And it was addressed -- or this one is
21  addressed to Nugget Rock Barge and Owners, care
22  of Spencer Rock Products, Inc.; is that correct?
23      A    That's what it says.
24      Q    With a start date of 5/13/97 and a
25  finish date of 5/14/97; is that correct?

Page 104

1       A    That's what it says.
2       Q    Let's go on to the next page, Nugget
3   007209, which is also stating that this invoice
4   was addressed to Nugget Construction and Owners,
5   care of Spencer Rock Products, Inc.; is that
6   correct?
7       A    That's what it says.
8       Q    And the date was May 22nd, 1997; is
9   that correct?
10      A    Uh-huh.
11      Q    Let's turn to the next page, Nugget
12  007210.  It looks like another North Star invoice
13  that's billed to Nugget Construction and Owners,
14  care of Spencer Rock Products at the address of
15  Box 244063, Anchorage, Alaska.
16          Do you disagree with that?
17      A    Disagree with what it says?  No.
18      Q    And it's dated May 22nd, 1997?
19      A    Right.
20      Q    It looks like the job was started on
21  May 20th, 1997 and ended May 20th, 1997; is that
22  correct?
23      A    That's what it says.
24      Q    If you turn to the next page, Nugget
25  007211.  That's the Bates number on the lower

Page 105

1   right-hand corner.
2       A    Uh-huh.
3       Q    And it looks also to be a North Star
4   invoice that is addressed to Nugget Construction
5   and Owners, care of Spencer Rock Products, Box
6   244063, Anchorage, Alaska dated 5/29/97.
7           Do you agree with that?
8       A    I see that.  Can I ask a question?
9       Q    Sure.
10      A    What are all these Nugget numberings on
11  the bottoms of these?
12      Q    These documents were in Nugget's files,
13  and these were produced to your counsel.  And it
14  appears that these were documents that are copies
15  from North Star, perhaps at one point, or perhaps
16  from Spencer Rock, but these are documents that
17  were in Nugget's files and which we produced to
18  counsel.
19      A    Okay.
20      Q    That's why we identified it with a
21  Bates number, so we don't get confused as to
22  where these documents originated from.
23      A    Okay.
24      Q    Okay.  Now looking at 007211, did --
25          MR. SEWRIGHT:  Counsel, for the record,

99

Page 106

1 these are documents that were found in Nugget's
2 records, that I found in Nugget's records way
3 back in 1998. They are Nugget documents.
4 BY MS. HO:
5    Q   Okay. Mr. Bentz, turning to the next
6 page, 007212 Nugget Bates stamp also it looks to
7 be a North Star invoice to Spencer Rock Products,
8 Inc., Box 244063, Anchorage, Alaska dated
9 June 12th, 1997; is that correct?
10   A   That's what it says.
11   Q   And then a start date of 6/9/97 and an
12 end date of 6/10/97, correct?
13   A   Yes.
14   Q   The next page, Nugget 007213, dated
15 June 19th, '97, and addressed to Spencer Rock
16 Products, Inc., Box 244063, Anchorage, Alaska,
17 start date 6/1107, finish date 6/11/97.
18       Do you disagree with that?
19   A   That's what it says.
20   Q   And finally on the last page of this
21 exhibit, 007214, Nugget Bates stamp. Also what
22 seems to be a North Star invoice to Spencer Rock
23 Products, Box 244063, Anchorage, Alaska, start
24 date 6/25, end date 6/27/97; is that correct?
25   A   That's what it says.

Page 107

1    Q   Now, this series of documents in this
2 exhibit looks to be what are invoices from North
3 Star on its services and equipment that was used
4 on the Homer Spit project.
5       Do you disagree?
6    A   I don't disagree.
7    Q   And it also looks like all of these
8 invoices were sent to Spencer Rock Products.
9       Do you disagree with that?
10   A   It looks like they were all sent to who
11 they were addressed to, yes.
12   Q   Okay. Now, it looks like on these
13 invoices that it was being sent to Spencer Rock.
14 Any reason why you only sent it to Spencer Rock
15 at the time or North Star sent them to Spencer
16 Rock at the time?
17       MR. SEWRIGHT: Objection to the form of
18 the question; assuming facts not in evidence.
19 BY MS. HO:
20   Q   Mr. Bentz, would you please answer
21 that? Is there any reason why North Star would
22 have not sent it to anyone other than Spencer
23 Rock Products?
24   A   Is there any reason North Star would
25 not have sent it to anybody other than Spencer

Page 108

1 Rock Products?
2    Q   Right.
3       MR. SEWRIGHT: Objection to the form.
4    A   I'm not sure what you're asking.
5 BY MS. HO:
6    Q   Well, it looks like North Star
7 exclusively sent their invoices to Spencer Rock
8 Products at their business, at Spencer Rock
9 Products --
10   A   I don't know if that's true or not. It
11 looks like these invoices were sent to this
12 address.
13   Q   Okay. Which was Spencer Rock Products'
14 address?
15   A   Whether duplicates were sent out or
16 not, I don't know.
17   Q   Okay. Was there any reason that North
18 Star wouldn't have sent the invoices to Nugget
19 Construction Company?
20       MR. SEWRIGHT: Object to the form.
21   A   Is there any reason why we would not
22 have sent them to them?
23 BY MS. HO:
24   Q   Uh-huh, to Nugget, back in May and June
25 of '97.

Page 109

1    A   Generally we only send invoices to one
2 address, if that's what you're asking.
3    Q   Right. And is there --
4    A   I don't know if copies were requested
5 to be sent to a separate address or not.
6    Q   To your knowledge, most if not all of
7 these invoices from North Star were sent to
8 Spencer Rock Products?
9       MR. SEWRIGHT: Object to the form of
10 the question.
11       MS. HO: That's noted, Counsel.
12   Q   Now, according to these invoices, does
13 it actually show the load-outs that North Star
14 Stevedores performed on the project?
15   A   Five load-outs.
16   Q   Five load-outs. Even though it looks
17 to be eight invoices, if you look again on this
18 document.
19   A   So what is your question?
20   Q   So essentially, to North Star's
21 knowledge, it only loaded five barges for the
22 project?
23   A   That's what the documentation showed.
24 I believe we loaded five barges.
25   Q   Now, do you recall when the first

100

Page 110

1  load-out occurred?
2     A   I don't personally recall, but it
3  appears it happened sometime in or about May of
4  '97.
5     Q   And what about the second load-out?
6     A   I couldn't attest to the date. I don't
7  remember.
8     Q   Okay. Third load-out?
9        MR. SEWRIGHT: Are you asking him to
10 just repeat what's on the invoice?
11       MS. HO: No. Just from his
12 recollection.
13    A   I don't remember the actual dates. The
14 only thing that I have to jog my memory are the
15 invoices themselves and things of that nature.
16 BY MS. HO:
17    Q   Okay. Let me get another document that
18 might assist your recollection.
19       (Exhibit 9 marked.)
20       MS. HO: Why don't we go off the record
21 while we review this one.
22       (Short break taken.)
23 BY MS. HO:
24    Q   Now, I've handed you what has been
25 marked as Defendants' Exhibit No. 9. If you go

Page 111

1  through and count the pages and make sure you
2  have 13 pages; that's what I have. Make sure you
3  have the same.
4        MR. SEWRIGHT: How many, Counsel?
5        MS. HO: Thirteen.
6     A   Yeah.
7  BY MS. HO:
8     Q   Okay. This set of documents I found
9  when I was looking through documents at Michael's
10 office last Thursday, so these were produced by
11 your counsel.
12       As you flip through each page, do you
13 recognize what these documents are?
14       MR. SEWRIGHT: Counsel, they were very
15 likely produced back in 1998, too. Let's
16 stipulate that a lot of the documents you found
17 in my office were documents that were previously
18 produced.
19       MS. HO: Whether or not that's true,
20 I'm not sure. But to the extent that they are,
21 let it be. Because, again, this has been a very
22 long litigation with lots of documents going back
23 and forth. To my knowledge, this is the first
24 time I've seen it, so I will ask Mr. Bentz if --
25       MR. SEWRIGHT: How long have you been

Page 112

1  in this case?
2        MS. HO: Two months. I'm very excited.
3     Q   Okay, Mr. Bentz. Now, as you look
4  through these documents, do you recognize what
5  these are?
6     A   I don't know that I've spent any time
7  looking at these particular documents. They look
8  like basic daily notes of the operations that
9  would have been -- or could have been produced in
10 Seward.
11    Q   Now, it says on the first page of this
12 Exhibit No. 9, Northern Stevedoring & Hdlg.,
13 Alaska Railroad Dock, Seward, Alaska, and it's
14 got on the side a picture of anchors. Were those
15 at any point used as logos by North Star?
16    A   No.
17    Q   So, do you dispute that these are North
18 Star's documents?
19    A   No, I don't dispute that they could be.
20 This would not be something that's used in all
21 the ports, but it looks like something that Jack
22 might have put together.
23    Q   Jack Goodwill?
24    A   Uh-huh.
25    Q   Now, do you recognize the handwriting?

Page 113

1  Let's just look at the first page. Do you
2  recognize the handwriting?
3     A   Not necessarily, no.
4     Q   This looks like May 1st, 1997. Looks
5  like the times in and out of some of the
6  stevedore workers. Would you agree?
7     A   There's a variety of things that --
8        MR. SEWRIGHT: Hold on a second.
9  Counsel, I'm going to object to this line of
10 questioning unless you can establish foundation.
11    A   What is it you want to know from me?
12 I'll be happy to tell you anything you want to
13 know.
14 BY MS. HO:
15    Q   Sure. These were documents that were
16 in your counsel's office and they look like
17 diaries and logs that were kept by somebody at
18 North Star. I'm just trying to figure out who
19 these people might have been and if you have any
20 knowledge of them.
21       It says on the first page, Northern
22 Stevedoring and Handling. Is there any reason
23 that these documents would not have come from
24 North Star's files?
25    A   I can't think of any.

29 (Pages 110 to 113)
EXHIBIT 2
Page 29 of 105

101

Page 114

1    Q   So just looking through it, on all
2  these 13 pages these are handwritten notes on
3  what looks like to be the job at Seward, Alaska,
4  by North Star at the Alaska Railroad dock.
5        MR. SEWRIGHT:  Objection to the form of
6  the question and continuing objection on
7  foundation basis.
8  BY MS. HO:
9    Q   Mr. Bentz, are these documents, this
10 North Star Stevedore, Alaska Railroad documents
11 that are in your hands, are these forms at one
12 time produced by North Star, written up by North
13 Star?  Someone in North Star has written it and
14 handed it to a North Star stevedore and this is
15 what you use as a diary log?
16   A   No.  The answer to your question is no.
17   Q   So what document within North Star
18 would show which employee was actually at the
19 five loadings?
20   A   That would be our timecards.
21   Q   That would be your timecards.  Let me
22 see if I have those here.
23        MR. SEWRIGHT:  Could we go off the
24 record for a moment?
25        MS. HO:  Sure.  Go ahead.

Page 115

1        (Exhibit 10 marked.)
2  BY MS. HO:
3    Q   I've handed you what has been marked as
4  Defendants' Exhibit No. 10, which is a 34-page
5  document that what looks to be the invoices
6  that we just talked about in the previous
7  exhibit.
8    A   Exhibit No. 9?
9    Q   No. 8.  And then also attached to each
10 invoice it looks to be timecards for North Star's
11 employees on the Homer Spit project.
12   A   Uh-huh.
13   Q   Do you disagree?
14   A   No, I don't disagree.
15   Q   So as we go through each document, I
16 just want you to at least verify that these were
17 some of the employees who were at the job site at
18 that particular time.  So let's go through that.
19        On the first page is the invoice dated
20 May 8th, 1997.  And it says Bill No. 105 in the
21 amount of $21,369.46; is that correct?
22   A   That's what it says.
23   Q   And then attached to that invoice what
24 looks to be six pages of copies of timecards.  It
25 says, Northern Stevedoring and Handling, Port,

Page 116

1  Seward, date 5/1/97, ARR dock, Spencer Rock. and
2  that's the second page of this exhibit.
3    A   That's what it says.
4    Q   Okay.  Lemas, that's the name,
5  L-e-m-a-s, and then capital S.  Do you have any
6  knowledge whether or not he was a stevedore on
7  the job for the project on that date?
8    A   Yeah.  That would be Stan Lemas, and it
9  appears that he was the gearman on May 1st.
10   Q   Is he still with North Star?
11   A   He works as an -- he's a longshore
12 employee.  He gets dispatched out of the hall.
13 He's no longer in Seward.  He now resides in
14 Dutch Harbor.
15   Q   Okay.  His job description looks like
16 mount r-e-u-t-a-m-a-t-i-c.  What's that?
17   A   It's a device that is spring-loaded,
18 kind of like a key chain that's spring-loaded
19 when you pull your keys out.  It's used to keep
20 the bucket from flying around when you're
21 handling things like rock.  It attaches to the
22 crane.
23   Q   What bucket are you referring to?
24   A   As an example, a bucket.
25   Q   Just generally?

Page 117

1    A   Yeah.
2    Q   Page 3 of this document says, Northern
3  Stevedoring and Handling, date, 5/2/97, and R.
4  Hibbetts and Stan Lemas.  Is Mr. Hibbetts still
5  with North Star?
6    A   He's still a member of the longshore
7  union.
8    Q   And it looks like their job description
9  was to rig the bucket and they worked for a total
10 of eight hours?
11   A   Yes.
12   Q   ST time.  Okay.  And then we'll go to
13 the next page.  And it looks like North Star's
14 timecards dated May 3rd, 1997, and it looks to be
15 six North Star employees.  The first one C.
16 Norman.  Is he still with the company?  Who is
17 that?
18   A   He's still a longshoreman.
19   Q   What's the first name?  Do you know?
20   A   Carl.
21   Q   Carl.  And C. Marshall.  What's the C
22 stand for?
23   A   Charles.
24   Q   Charles Marshall.  Is he also with
25 North Star?

102

Case No. A98-009 Civil (HRH)                                                Jeffery Bentz

Page 118

1    A   He's still a longshoreman.
2    Q   But he's not with North Star?
3    A   Longshoremen can be dispatched to
4  multiple employers, so he may work for North Star
5  one day and he may work for somebody else another
6  day.
7    Q   Okay. And then the next person looks
8  like U-n-r-e-i-n.
9    A   Uh-huh.
10   Q   Who's that?
11   A   I believe his first name is Dale.
12   Q   Is he also --
13   A   I think he might have retired.
14   Q   The next person is G. Nelson?
15   A   Uh-huh.
16   Q   Who's that?
17   A   Gilbert Nelson.
18   Q   Is he still with North Star?
19   A   I believe he's out on a permanent
20  disability.
21   Q   R. Richey, R-i-c-h-e-y. Who's that?
22   A   Bob Richey.
23   Q   Is he still with North Star?
24   A   No, I believe he's retired as well. He
25  was also a longshoreman, so he worked for

Page 119

1  multiple employers.
2    Q   Now, looking at this timecard, do you
3  dispute any of the hours which looks to be 20
4  OT that North Star was provided on May 3rd, 1997?
5    A   I don't dispute anything about this,
6  no.
7    Q   And then on the next page, also May
8  3rd, '97, North Star timecards. The first person
9  is D. Owens. Who's that?
10   A   Dennis Owens.
11   Q   Is he still with North Star?
12   A   I believe he's either retired or
13  getting ready to retired. Also a longshoreman,
14  though.
15   Q   And J. Thomas, the next person?
16   A   I'm not sure who that is.
17   Q   And the next person, D. Sorenson?
18   A   Yeah, Dale Sorenson. I believe he's
19  either retired or getting ready to retire.
20   Q   And then Hibbetts, Richey and Lemas.
21  And then the next page is May 4th, 1997. Also a
22  North Star timecard is what it appears to be.
23  Mr. Marshall we've discussed, Mr. Norman, Mr.
24  Unrein.
25      Mr. Hamilton. Who is that? J.

Page 120

1  Hamilton.
2    A   Just a longshoreman.
3    Q   What's his first name?
4    A   Not sure.
5    Q   Is he still working for North Star?
6    A   I think he may be retired or moved only
7  because I haven't seen him around in a while.
8    Q   Would you dispute that this is a North
9  Star timecard submitted for the project?
10   A   Northern Stevedoring timecard, yeah.
11   Q   Go on to the next page. Looks like a
12  timecard for North Star dated 5/4/97, and it
13  looks like it's Mr. Owens, Mr. Thomas,
14  Mr. Sorenson, Mr. Hibbetts, Mr. Richey, Mr. Lemas
15  for a total of 44 OT hours.
16      Do you disagree with that?
17   A   No.
18   Q   And then the next page was the 5/15/97
19  invoice to Spencer Rock Products from North Star,
20  Bill No. 117 for a total of $11,579.22.
21      Do you disagree with that?
22   A   Do I disagree with what?
23   Q   With the document stating the invoice
24  number, the date, the price.
25   A   No, I don't disagree with that.

Page 121

1    Q   And if you turn to the next page, it
2  says North Star's timecard. What appears to be
3  May 13th, 1997, and it also lists Thomas, Owens,
4  Nelson, Hamilton, Richey, and Lemas.
5      Do you disagree with that?
6    A   No.
7    Q   Okay. Just want to make sure that
8  these are what it purports to be, North Star
9  timecards.
10   A   Let me make your job a little bit
11  easier. These all appear to be invoices that
12  were generated by Northern Stevedoring and
13  Handling. They all appear to be legitimate
14  timecards where labor was paid for the hours that
15  they worked. I can't, since I was not personally
16  there, attest that they were on the job on those
17  particular days. It would indicate that they
18  were, and we've never had any reason to believe
19  otherwise.
20   Q   Now that you've stated that, who else
21  in North Star would be able to verify whether or
22  not these timecards are legitimate or not since
23  you weren't personally there?
24   A   They were legitimate because they got
25  dispatched for these hours, they got paid for

103

Case No. A98-009 Civil (HRH)                                              Jeffery Bentz

Page 122

1  these hours, and we invoiced for these hours.
2      Q    Now, within each loading for those time
3  periods, was there a particular foreman or hatch
4  boss or gang boss?  If you looked at the name,
5  would you be able to recognize that that was
6  their position on that particular job on that
7  particular date?
8          MR. SEWRIGHT:  Where are we now?
9          MS. HO:  I'm just asking whether
10 looking through the timecards he can distinguish
11 who a gang boss or --
12     A    Yeah, the hatch boss would be indicated
13 in the classification, to answer your question.
14 BY MS. HO:
15     Q    Okay.  Say, for example, so we have a
16 clear record, page 4 of this exhibit which is
17 dated 5/3/97, it looks like Mr. Unrein was
18 classified as an H/B, so he was one of the hatch
19 bosses on that job on that day?
20     A    That's what it appears, yes.
21     Q    So in North Star's custom and practice
22 would the hatch boss be equivalent to a foreman
23 or a manager on that job?
24     A    No.
25     Q    Okay.  Explain.

Page 123

1      A    The way that it works in the union is
2  our representative can't just go and tell any
3  particular guy what job to do. There has to be a
4  lead guy for the longshoremen to communicate
5  through.
6      Q    Who would that be usually?
7      A    It could either be a gang boss or a
8  hatch boss or a walking boss.  There's three
9  different designations.  Depends on the job.
10     Q    And those are usually North Star
11 employees?
12     A    No, they're longshoremen.  The
13 supervisor is our own manager.
14     Q    So would a North Star supervisor be on
15 a job site?
16     A    Some jobs.
17     Q    Was a North Star supervisor on the
18 Homer Spit project?
19     A    I presume that Jack was present for
20 some or part of the loadings.
21     Q    Now, would you recall or have any
22 knowledge of which particular loading Jack
23 Goodwill was present for?
24     A    I couldn't tell you which ones he was
25 present or not present for.

Page 124

1      Q    To your knowledge, of the five loadings
2  that North Star provided on the Homer Spit
3  project, it was Jack Goodwill who would have been
4  the supervisor on each and every job?
5      A    He would have been the North Star
6  representative.
7      Q    And who would he have contacted on the
8  project if, say, something went awry
9  like -- strike that.
10         When Jack Goodwill was on the project
11 and he had, say, a problem arise with one
12 loading, say the first loading, who would he call
13 at North Star to identify the problem and discuss
14 potential solutions to the problem?
15         MR. SEWRIGHT:  Object to the form of
16 the question.  I'm not instructing you not to
17 answer.  If you can answer that, good luck.
18     A    Depends on what the problem is.  I
19 mean, you know, if a guy got hurt -- your
20 question is too vague.
21 BY MS. HO:
22     Q    Well, I just to be sure if at the time,
23 1997, was it you, Mr. Bentz, or let's say
24 another individual -- does Mr. Brad Roberts ring
25 a bell?  Was he ever an employee of North Star?

Page 125

1      A    Brad Robertson?
2      Q    Uh-huh.  Brad Robertson.
3      A    Brad Robertson is a current employee of
4  North Star.
5      Q    What's his position there?
6      A    He's an operations manager for
7  Anchorage.
8      Q    But to your knowledge was he ever on
9  the Homer Spit project?
10     A    No.
11     Q    What about Mr. Steve Post?
12     A    No, I don't believe he had anything to
13 do with the project either.  I don't know if he
14 had any correspondence.  I can't even tell you
15 what year he actually started, if it was before
16 or after that.
17     Q    Now, is Mr. Post still with North Star?
18     A    Yeah.
19     Q    What's his position?
20     A    He's vice president.
21     Q    And do you know when he was hired?
22     A    I believe it was after this date.
23     Q    So to your knowledge, you don't believe
24 Mr. Post would have any information or knowledge
25 about this litigation?

32 (Pages 122 to 125)

EXHIBIT 2
Page 32 of 105

104

Case No. A98-009 Civil (HRH)                                                    Jeffery Bentz

Page 126

1    A   No, he was hired after this.
2    Q   So at least back in 1997, if
3  Mr. Goodwill had any concerns to discuss about
4  the project, it would have been you?
5    A   It could have been me or he could have
6  gone to Scott Francis, if you're talking about a
7  problem where he'd need to go up the food chain,
8  so to speak.
9    Q   So Scott Francis, at that time in 1997
10 what was his position with North Star?
11   A   I don't know if he was general manager
12 or vice president then.
13   Q   Is he still with the company?
14   A   No.
15   Q   Do you have any knowledge of where to
16 locate Mr. Francis?
17   A   No.
18   Q   Okay.  Now, going back to Exhibit No.
19 10.  These are all the timecards that were
20 submitted by North Star and that were sent
21 presumably to Spencer Rock Products?
22       MR. SEWRIGHT:  Object to the form of
23 the question.
24   A   Sent to the address --
25 BY MS. HO:

Page 127

1    Q   Were these timecards submitted to
2  Spencer Rock Products at any time?
3    A   It appears that these invoices were
4  sent to the addressee on the invoice.
5    Q   What about the attaching timecards, who
6  would they have been sent to, if anybody?
7    A   They may or may not have been sent to
8  anybody.  I don't know.
9    Q   Do you know or does North Star know if
10 during the time of the barge loadings if the
11 timecards were submitted to Nugget?
12   A   I don't know.
13   Q   Did you have a particular role on the
14 Homer Spit project --
15   A   I'm sorry?
16   Q   -- back in 1997?
17       Was your role, r-o-l-e, your
18 role specific --
19   A   My personal role?
20   Q   Yes -- or as a corporate representative
21 of North Star back in 1997?
22   A   Back in '97?  I was president of the
23 company in '97.
24   Q   And did you have any particular
25 dealings with Nugget Construction Company back in

Page 128

1  1997?
2    A   Specifically, I don't know.
3    Q   You don't recall?
4    A   I don't recall what all involvement I
5  might have had with Nugget in '97.
6        MR. SEWRIGHT:  Are you talking about
7  this project?
8        MS. HO:  This project, 1997.
9    A   On this project?  I don't think I had
10 much direct involvement.
11 BY MS. HO:
12   Q   No direct involvement.  What about your
13 direct involvement with Spencer Rock Products?
14   A   I don't think I had much in way of any
15 direct involvement with them either.
16   Q   What did you understand Spencer Rock
17 Products' role on the project to be in 1997?
18   A   What was my understanding in '97?
19   Q   Uh-huh.
20   A   That they were going to be mining some
21 rock for the project.
22   Q   And did you understand that Spencer
23 would be a material supplier for the project?
24       MR. SEWRIGHT:  Objection; form of the
25 question.

Page 129

1  BY MS. HO:
2    Q   Mr. Bentz, would you answer that,
3  please?
4    A   Again, I knew that they were going to
5  be mining some rock for the project.
6    Q   But you didn't have any information
7  whether or not Spencer Rock was doing so as a
8  supplier or as a subcontractor?
9    A   Define what you're talking about
10 between supplier and subcontractor.
11       MR. SEWRIGHT:  Object to the question;
12 calling for a legal conclusion.
13 BY MS. HO:
14   Q   Mr. Bentz, you testified earlier that
15 North Star does business with bonded government
16 projects?
17   A   Sometimes.
18   Q   Now, to North Star's understanding and
19 to your understanding, in a bonded project with
20 the government, what would be considered a
21 material supplier on the project?
22   A   I can't answer that question.
23   Q   But North Star has had such dealings.
24   A   We don't supply just material.
25   Q   Has North Star ever had a direct

33 (Pages 126 to 129)

105

Case No. A98-009 Civil (HRH)                                                    Jeffery Bentz

Page 130

1  contract as a prime contractor, say, with the
2  federal government?
3      A   I don't think as a prime contractor,
4  no.  It depends on what you're talking about.  We
5  do work for the military where it's a sole-source
6  contract, but not where we have necessarily subs
7  working underneath us or anything like that.
8      Q   But North Star has had dealings with
9  the federal government and how those contracts
10 work, correct?
11     A   Yeah.  Usually we're somewhere down the
12 line, though, as a subcontractor or something of
13 that nature.
14     Q   Does North Star inquire -- say, for
15 example, if North Star considers itself a
16 supplier to a supplier on a federal bonded
17 contract, is North Star's normal business custom
18 and practice to inquire of the first tier
19 supplier what their role and position would be?
20         MR. SEWRIGHT:  Object to the form of
21 the question.
22     A   Give me an example.
23 BY MS. HO:
24     Q   Well, for example, in this case.  Did
25 North Star actively inquire of Spencer Rock what

Page 131

1  its role would be in the project?
2      A   We did not -- I don't know what all we
3  inquired on at the time that the job was set up.
4      Q   So you don't know, but who in North
5  Star would know?
6      A   Who would remember?
7      Q   Who would recall, or who do you think
8  would recall?
9      A   I don't know.
10     Q   Would Jack Goodwill?
11     A   He may recall.  I don't know.  You'd
12 have to ask him.
13     Q   I probably will.  But to your
14 recollection, you never inquired of Spencer Rock
15 what their role in the Homer Spit project was?
16     A   I don't remember what all inquiries
17 that I had in '97.
18     Q   But to your understanding, Spencer Rock
19 Products was a separate and distinct company from
20 Nugget Construction Company, correct?
21     A   I don't know that.
22     Q   Well, what information did you have
23 from Spencer Rock?
24     A   Back then we had the information that's
25 been presented to you.  But, you know, it seemed

Page 132

1  to be rather confusing, I guess, to some degree.
2      Q   Well, if it was confusing, didn't North
3  Star at least inquire and clarify the confusion
4  for itself at least for purposes of the project?
5      A   What confusion are you referring to?
6      Q   Well, you're the one who said
7  confusion.  You tell me.
8      A   Tell you about the confusion?
9      Q   Yes.
10     A   Well, I mean, originally the job was
11 set up -- apparently was set up from Spencer, but
12 it appears that we were taking direction from
13 what we thought was a Nugget employee at the
14 time, and as it turned out, it appears that he
15 was employed by several people.
16     Q   It appears, but at the same time did
17 you actively inquire of the role of the
18 individuals you're referring to?
19     A   I did not actively inquire.
20     Q   And did anybody at North Star?
21     A   I don't know.
22     Q   So there's no representation by Nugget
23 that any of its employees were taking control of
24 the operations of Spencer Rock?
25     A   Is that a statement?

Page 133

1          MR. SEWRIGHT:  Objection to the form of
2  the question.
3  BY MS. HO:
4      Q   I'm asking you.
5      A   You didn't ask me a question.
6      Q   Well, then let me ask you:  To your
7  knowledge do you know if Nugget Construction
8  Company or any of its representatives or
9  employees made representations to anyone at North
10 Star that it was taking control of the operation?
11     A   Through their actions they did.
12     Q   There was no oral representation, was
13 there?
14     A   Certainly there was.
15     Q   There was -- can you specify them?
16         MR. SEWRIGHT:  There's Jack Goodwill's
17 affidavit and everything.
18         MS. HO:  No, I'm talking about --
19         MR. SEWRIGHT:  Are you talking about
20 him personally or representations made to North
21 Star?
22 BY MS. HO:
23     Q   No, this is on your knowledge, Mr.
24 Bentz, and North Star's knowledge to provide
25 specific --

MIDNIGHT SUN COURT REPORTERS * (907) 258-7100

EXHIBIT 2
Page 34 of 105

Page 134

1     MR. SEWRIGHT: Okay. Objection;
2  compound question. Which one do you want?
3  BY MS. HO:
4     Q   Well, let's go through both.
5        First, let's talk about North Star's
6  understanding and belief of which individuals
7  within Nugget Construction Company represented to
8  North Star that they were taking control of the
9  operations or alleged control.
10    A   It appeared that way through their
11  actions by the fact that Mr. LaPore was not
12  making contact with Jack to schedule and do the
13  work and discuss the work with him; it was Randy
14  Randolph. And at the time Randy Randolph was
15  presenting himself as a Nugget employee --
16    Q   But the barge loadings --
17    A   -- is what the business cards indicate,
18  I believe.
19    Q   And it also indicated that Mr. Randolph
20  was an LDR Engineering employee.
21    A   Well, we don't know when that timecard
22  was -- or when that name card was actually
23  received, do we?
24    Q   Well, that's why I'm asking you. They
25  were produced from your files. I want to know if

Page 135

1  you know what time period they were produced.
2     A   Everything that I've read in the case,
3  which a lot of what I understand is from reading
4  the documents, just like a lot of what you
5  understand is from reading the documents because
6  I was not in Seward at the time.
7     Q   Well, Mr. Bentz, I appreciate your
8  understanding, but please don't impose your
9  understanding of what I understand in the case.
10    A   I would never do that.
11    Q   Thank you. Now, in terms of what
12  Nugget Construction employees or representatives
13  allegedly indicated to North Star's personnel, do
14  you have a specific communication, a specific
15  time frame that you're referring to that would
16  substantiate this alleged conduct?
17    A   I believe if you look in Mr. Goodwill's
18  document where -- under his statement it says
19  that the loading was directed by Randy Randolph.
20    Q   Now, did North Star have an exclusive
21  agreement with Nugget to load the barges?
22    MR. SEWRIGHT: Object to the form of
23  the question.
24  BY MS. HO:
25    Q   They didn't, did they?

Page 136

1     A   What do you mean did we have an
2  exclusive --
3     Q   Well, when North Star loads these
4  barges, the original agreement was with Spencer
5  Rock, correct?
6     A   That's correct.
7     Q   And then there was no subsequent
8  agreement to modify that relationship between
9  Spencer Rock and North Star, correct?
10    MR. SEWRIGHT: Objection to the form of
11  the question; calls for a legal conclusion.
12  BY MS. HO:
13    Q   To your understanding of the facts of
14  this case, was there any communications written
15  or oral that would have altered that relationship
16  between Spencer Rock and North Star?
17    MR. SEWRIGHT: Same objections.
18    A   If you read all the documents, it
19  appears that way.
20  BY MS. HO:
21    Q   That no written or oral communications
22  or documentation changed the relationship between
23  Spencer Rock and North Star?
24    MR. SEWRIGHT: Continuing objection.
25    A   Well, I think that the relationship

Page 137

1  changed as a function of -- if you read the
2  entire story, if you read the whole novel,
3  instead of one chapter, to me it seems rather
4  obvious what happened.
5  BY MS. HO:
6     Q   I'm not asking for the whole chapter.
7  We're talking about a specific time frame, 1997,
8  when Mr. LaPore and Spencer Rock entered an
9  agreement with North Star.
10       Do you disagree with that event
11  occurring?
12    A   Disagree with what event occurring?
13  They contracted us to do work.
14    Q   Right.
15    A   Uh-huh, Mr. LaPore did contract us to
16  do some work.
17    Q   Right. And then there's no subsequent
18  agreement or alteration between North Star or
19  Spencer Rock that changed that relationship?
20    MR. SEWRIGHT: Same continuing
21  objections.
22  BY MS. HO:
23    Q   Is that correct, Mr. Bentz?
24    A   No, I don't agree with what you're
25  saying, the way you're wording it.

167

Case No. A98-009 Civil (HRH)                                          Jeffery Bentz

Page 138

1    Q   Well, then can you point to any
2  particular document or communications that would
3  show that that relationship between North Star
4  and Spencer Rock changed?
5    A   Yeah.
6    Q   Okay.  Go ahead.
7    A   Jack's affidavit, for one, says that
8  Randy Randolph was the one directing him.  If you
9  go and you read in the testimony of all this, it
10  says that Bob LaPore ended up driving a truck and
11  that he wasn't actually doing what he was hired
12  to do.  If you read it, it says that there was a
13  support agreement in place that we were never
14  informed of.
15    Q   Never informed of the support
16  agreement.  When was the first time you had
17  knowledge of the support agreement?
18    A   After all the work had been done.
19    Q   And did you expect that those kind of
20  agreements that were privy between my client,
21  Nugget Construction Company, and Spencer Rocks
22  would have been shown to the world?
23    MR. SEWRIGHT:  Objection to the form of
24  the question, Counsel.
25    A   No, what I would expect is that if I

Page 139

1  received money from somebody that wasn't mine, it
2  belonged to somebody else because they performed
3  the work, that I'd make sure they got the money
4  for it.  That's what I would expect.
5  BY MS. HO:
6    Q   And that enforcement of your monies due
7  should have been between North Star and Spencer
8  Rock because that was the agreement between the
9  two entities, correct?
10    A   I disagree with you wholeheartedly.
11    Q   I disagree with you, too, sir.
12    A   That's your prerogative.  We disagree
13  with each other, Mrs. Ho.
14    MR. SEWRIGHT:  Since we've established
15  we disagree, can we just end right now?
16  BY MS. HO:
17    Q   Let's not do that.  Let's turn to
18  Exhibit 7, which is Mr. Jack Goodwill's
19  affidavit, and then you look at page 5, paragraph
20  10, last sentence starting with --
21    A   Page 5, you said?
22    Q   Page 5, yes.
23    A   Okay.
24    Q   Read that to yourself.
25    MR. SEWRIGHT:  Did you point out a

Page 140

1  particular paragraph?
2    MS. HO:  Yes, paragraph 10.
3    MR. SEWRIGHT:  Thank you.
4  BY MS. HO:
5    Q   Now, after reading that --
6    MR. SEWRIGHT:  Have you had a chance to
7  look at all of paragraph 10?
8    THE WITNESS:  No, no.
9  BY MS. HO:
10    Q   Go ahead and look at that.  Just that
11  last sentence.
12    A   What?  Nugget was calling the shots?
13    Q   No, that's a complete
14  mischaracterization of Mr. Goodwill's affidavit.
15  I'm asking you to read the last --
16    MR. SEWRIGHT:  Objection, Counsel.  I'm
17  going to read from this affidavit, top of page 6,
18  "Which also demonstrates to me that Nugget was
19  calling the shots."  Now, how is that a
20  mischaracterization of the exhibit?
21    MS. HO:  Counsel, I'm asking Mr. Bentz
22  to read paragraph 10 on page 5.
23    Q   Why are you on paragraph 6, sir?
24    A   It's not.  It's page 6; it's still
25  paragraph 10, the end of paragraph 10.

Page 141

1    Q   The sentence before that.  I already
2  stated for the record starting with the word
3  "when."
4    A   Do you want me to comment on one
5  sentence?
6    Q   I will ask -- and if you read it for
7  the record, please.  "When I" -- or if you want,
8  I'm happy to read it for the record.  Whichever
9  way you want.
10    A   Go ahead.
11    Q   Okay.  "When I" -- meaning Jack
12  Goodwill -- "demanded payment from Nugget through
13  Randy Randolph, Mr. Randolph told me that Nugget
14  believed Spencer Rock owed Northern Stevedoring
15  the money and that, as far as he was concerned,
16  payment was a matter between Spencer Rock and
17  Northern Stevedoring."
18    He said it was not Nugget's problem.
19    A   In his opinion.
20    Q   Do you disagree with that?
21    A   Do I disagree with his opinion?  I
22  can't disagree with his opinion; it's his
23  opinion.
24    Q   Well, then your opinion is,
25  essentially, that you think my clients are owing

36 (Pages 138 to 141)

EXHIBIT 2
Page 36 of 105

108

Page 142

1  you monies, right?
2    A   Absolutely.
3    Q   Well, that's absolutely incorrect
4  because at any time to North Star's knowledge --
5        MR. SEWRIGHT:  Counsel, will you ask
6  questions and not argue your case?  If you want
7  to argue your case, do it in front of the judge
8  and the jury.  Don't argue with the witness, who
9  is my client.
10 BY MS. HO:
11   Q   Okay, Mr. Bentz.  I don't want to argue
12 with you, but to your knowledge was there any
13 time that my client, Nugget Construction Company,
14 orally or writtenly (ph) said that it was ever
15 going to assume Mr. LaPore's responsibilities in
16 its agreement with --
17   A   Absolutely.
18   Q   Okay.  Cite that time, sir.
19   A   When they entered into the support
20 agreement without our knowledge and went in and
21 took over the quarry.
22   Q   They went in with a support agreement;
23 that has nothing to do with North Star.  That
24 agreement was with Spencer Rock and with Nugget
25 Construction Company.

Page 143

1        MR. SEWRIGHT:  Objection.
2    A   Ms. Ho, they stepped into the shoes of
3  the client that we were supposed to be working
4  for and they directed us to do the work.  They
5  then collected the money, intercepted the money
6  that never got paid to the person that we were
7  supposed to work for so that we could get our
8  money.
9  BY MS. HO:
10   Q   Mr. Bentz, those are serious
11 allegations against my client.  If you have any
12 particular knowledge or fact of a specific
13 incident that shows that, please cite that.
14       Now, Mr. Bentz, I will submit to you
15 the support agreement as between my client and
16 Spencer Rock and Robert LaPore.
17       Would you please mark this as an
18 exhibit?
19   A   Are we done with Exhibit 10 for now?
20   Q   For now.
21       (Exhibit 11 marked.)
22       MR. SEWRIGHT:  Do you want him to look
23 at the whole exhibit or just the last page?
24 BY MS. HO:
25   Q   While you're at it, why don't you look

Page 144

1  at the whole exhibit, which consists of five
2  pages.  Is that what you have, Mr. Bentz?
3    A   Yeah, five pages.
4    Q   Okay.  Great.  Now, this is Exhibit No.
5  11, which contains the material contract between
6  Spencer Rock Products and Nugget Construction
7  Company and also the subsequent support agreement
8  between Nugget Construction Company and Spencer
9  Rock Products dated April 23rd, 1997.
10       Do you disagree with that?
11   A   I haven't finished reading it yet.
12       MR. SEWRIGHT:  Counsel, for the record,
13 let's establish these documents are really two
14 separate documents; the four-page what is
15 entitled Material Contract dated on or about the
16 middle of January, 1997; and then a subsequent
17 support agreement, a separate document, dated
18 April 23, a one-pager.  I mean, because you have
19 them stapled together as one exhibit, I wanted to
20 point out they're separate documents.
21       MS. HO:  I'll identify them as Nugget
22 007224 through Nugget 00728.
23       MR. SHAMBUREK:  Would it help to mark
24 the Support Agreement as Exhibit 12?
25       MR. SEWRIGHT:  I think so.

Page 145

1        MS. HO:  Let's go ahead and do that.
2  That's fine.
3        (Exhibit 12 marked.)
4  BY MS. HO:
5    Q   Now, Mr. Bentz, you've reviewed
6  Defendants' Exhibit No. 11 and Defendants'
7  Exhibit No. 12, have you not?
8    A   I've read 11, yeah.
9    Q   Okay.  And Exhibit 11 is the Material
10 Contract between Nugget Construction Company and
11 Spencer Rock Products; is that correct?
12   A   That's what it says.
13   Q   Okay.  If you turn to page 2 of Exhibit
14 No. 11 and go to Section No. 4 on the bottom of
15 the page --
16   A   Yeah.
17   Q   -- you can read that paragraph to
18 yourself, and it runs over to the next page,
19 Nugget 007226.
20       MR. SEWRIGHT:  Section what?
21       MS. HO:  Section 5.  Section 5 runs at
22 the end of the second page and goes into the top
23 of the third page.
24       THE WITNESS:  Okay.
25       MR. SEWRIGHT:  Which one do you want

109

Case No. A98-009 Civil (HRH)                                              Jeffery Bentz

Page 146

1  him to read?
2      MS. HO: Section 5, just that paragraph
3  for now.
4      THE WITNESS: Okay.
5  BY MS. HO:
6      Q   Now, in light of the arrangement
7  between North Star and Spencer Rock, did
8  Mr. LaPore or anyone at Spencer Rock mention to
9  North Star or anyone at North Star that it had a
10 Material Agreement with my client, Nugget
11 Construction?
12     A   I don't know.
13     Q   You don't know. You don't personally
14 know?
15     A   You just asked me if anybody at North
16 Star -- you asked me a very broad, general
17 question. I don't know the answer to your
18 question.
19     Q   Okay. You don't have any knowledge of
20 any particular person who might have any
21 information that Mr. LaPore would have disclosed
22 this Material Agreement?
23     A   That's correct.
24     Q   In, say, North Star's general business
25 practices, does North Star generally disclose its

Page 147

1  agreements to other parties who are not privy to
2  the information?
3      A   No, not the way you worded the
4  question. That are not privy to it, no.
5      Q   In general, does North Star's practices
6  include providing copies of its agreements to
7  Vendor A -- between Vendor A and North Star, for
8  example, to Vendor B, Vendor C, so on and so
9  forth?
10     A   Depends on what type of agreement
11 you're referring to.
12     MR. SEWRIGHT: I object to the form of
13 the question.
14 BY MS. HO:
15     Q   Now, did Mr. LaPore or anyone at
16 Spencer Rock ever indicate to anyone at North
17 Star, including yourself, that in the material
18 support agreement that if any liability was ever
19 raised against Nugget Construction Company, that
20 Nugget Construction Company would have the right
21 to retain any of the payments?
22     MR. SEWRIGHT: Object to the form of
23 the question. You just said material support
24 agreement. What are you talking about?
25 BY MS. HO:

Page 148

1      Q   Strike that previous question.
2      Just referring to the Material
3  Contract, Section No. 5.
4      A   Restate the question.
5      Q   Did anyone at North Star ever have any
6  information provided by Spencer Rock Products
7  that if Spencer Rock Products was not to conform
8  to this Material Contract that Nugget
9  Construction Company had a right to retain any of
10 its payments that were due to them?
11     MR. SEWRIGHT: Object to the form of
12 the question; confusing.
13     A   Confusing and you've laid no time
14 frame. Before or after?
15 BY MS. HO:
16     Q   Back in 1997, the whole --
17     A   I have no idea.
18     Q   You have no idea. You wouldn't know
19 whether or not anyone at North Star would have
20 such knowledge?
21     A   Wouldn't have any idea.
22     Q   If you go down to Section No. 10 on
23 page 3 of the Material Contract between Spencer
24 Rock and Nugget Construction Company it says,
25 "The Seller" -- which is Spencer Rock -- "shall

Page 149

1  indemnify the Contractor against and save him
2  harmless from any and all claims, suits or
3  liability for injuries to property, injury to
4  persons, including death, and from any other
5  claims, suits, or liability on account of any
6  negligent act or omission of the Seller" -- which
7  is Spencer Rock -- "or any of his officers,
8  agents, employees, or servants," which includes
9  Mr. LaPore.
10     Now, after reading that particular
11 section to yourself and as I've read aloud on the
12 record, does anyone at North Star, including
13 yourself, dispute the fact that Mr. LaPore and
14 Spencer Rock had a responsibility to my clients
15 that if anyone at Spencer Rock, including
16 Mr. LaPore, had engaged in any negligent act or
17 omission, that it was going to save my client
18 from liability? Essentially --
19     A   Yes.
20     Q   -- the responsibility is just on
21 Spencer Rock.
22     MR. SEWRIGHT: I'm going to object to
23 the form of the question; calls for legal
24 conclusion and all kinds of things.
25     MS. HO: Counsel, I appreciate the

38 (Pages 146 to 149)

110

Case No. A98-009 Civil (HRH)                                                    Jeffery Bentz

Page 150

1  objection is noted for the record.
2       THE WITNESS:  Just hold on a second.
3  Could you please reread her question as she
4  stated it?
5       (Question read back by the reporter.)
6       MR. SEWRIGHT:  Same objections.
7    A   I'm not sure how to answer your
8  question.
9  BY MS. HO:
10   Q   Okay.  Let me break it down for you.
11      In North Star's understanding, there
12  was North Star and Spencer Rock which had the
13  business relations, is that correct, in 1997 that
14  North Star provide stevedoring job duties on the
15  project for Spencer Rock; is that correct?
16      MR. SEWRIGHT:  Continuing objection to
17  the form of the question; legal conclusion.
18   A   We were originally contacted by
19  Mr. LaPore to load rock onto a barge pending
20  their successful outcome at getting the work, was
21  how it was originally parlayed to me.  That's my
22  understanding of how the whole situation started.
23  BY MS. HO:
24   Q   Okay.
25   A   You know, but whether or not Spencer

Page 151

1  did something negligent or not, which would lead
2  to clause 10 being held -- you know...
3    Q   I just want to show you now that you
4  have a chance to look -- you're saying that my
5  clients didn't disclose this contract to you and
6  whatnot.  There are terms and conditions that are
7  specific between the parties who are engaged in
8  the agreement just like North Star has certain
9  obligations and duties under its contract with
10  its vendors or suppliers; isn't that correct?
11   A   Yes.
12      MR. SEWRIGHT:  I'm going to object to
13  the form of the question.
14      You can go ahead and try to answer.
15  I'm just objecting for the record.
16   A   If I receive money for services that I
17  provided because of a subcontract and somebody
18  actually produced that work so that I could get
19  that money for that, I'd make sure they got paid
20  for their services.  That's their money.
21  BY MS. HO:
22   Q   But then --
23   A   It's a federal job.  The reason there's
24  bonding on federal jobs is so the federal
25  government ensures that their general contractors

Page 152

1  have paid the people that they have to pay.
2    Q   And that's what Nugget Construction
3  Company has done.  Your counsel has revealed all
4  the documents on vendors and subcontractors and
5  whatnot on this particular project.
6       But with respect between North Star and
7  Spencer Rock and the business arrangement there,
8  it was Spencer Rock who was responsible for
9  ultimately paying for North Star's services.
10   A   Originally that's what we thought, but
11  there's, you know, after we'd done the work, we
12  learned of all these other things that indicate
13  that in fact we weren't really even working for
14  Spencer Rock.  We were working for Nugget.
15   Q   But there's no oral or written
16  communications in effect that would indicate
17  that, sir.
18   A   I think there are plenty of facts here
19  to indicate that.
20   Q   You're being ambiguous.  I don't know
21  what facts you're referring to.
22      MR. SEWRIGHT:  Counsel, I'm really, I'm
23  really -- in the jurisdiction you just don't make
24  those kind of statements and argue with a witness
25  at a deposition.  I'm really starting -- I'm not

Page 153

1  going to get upset -- but I'm pointing out to you
2  that that's unusual, so...
3       MS. HO:  Counsel, I appreciate your
4  objection.
5       MR. SEWRIGHT:  And I'm going to have a
6  continuing objection to your argumentative
7  questions, your assuming facts not in evidence,
8  your speeches, et cetera.  And just because you
9  end your speech with an "isn't that correct,"
10  doesn't turn it into a question and it doesn't
11  turn it into a proper question.  So I will
12  continue to object.  I have a continuing line of
13  objections to these types of questions.
14      MS. HO:  Counsel, I appreciate your
15  objections.  They're noted for the record.  I
16  have not been discourteous to your client.  We're
17  just trying to ascertain the validity of the
18  claims and the allegations.
19      MR. SEWRIGHT:  I didn't claim you were
20  being discourteous.
21      MS. HO:  I'm not being argumentative.
22      MR. SEWRIGHT:  That I do claim.
23  BY MS. HO:
24   Q   Mr. Bentz, if North Star is a party to
25  this litigation, then my clients are entitled to

MIDNIGHT SUN COURT REPORTERS * (907) 258-7100

Page 154

1  ascertain whether or not your claims are valid,
2  and we're just trying to ask you today --
3      A   Absolutely.  Ask away.
4      Q   Okay.  Appreciate that.  Would you like
5  to take a quick break at this moment?
6      A   No.  Go ahead.
7      Q   Sounds good.  Now, would you turn to
8  Defendants' Exhibit No. 12?
9      A   Okay.
10     Q   And identify that please for the
11 record, if you would.  Do you recognize what it
12 is?
13     A   I've seen it before.
14     Q   It is the Support Agreement between
15 Nugget Construction and Spencer Rock dated
16 April 23rd, 1997.
17     A   Uh-huh.
18     Q   And if you look on paragraph 3 from the
19 top, the second sentence says, "NCI" -- meaning
20 Nugget Construction -- "agrees not to charge a
21 profit on such costs."
22         Do you see that?
23     A   I see where it says that.
24     Q   Okay.  Then the sentence previous,
25 "NCI shall keep a separate accounting of the

Page 155

1  costs associated with said support and charge an
2  additional G&A expense fee."
3         Do you see that also?
4      A   Hang on just a second.
5      Q   Okay.
6      A   On that paragraph 3?
7      Q   Yes, sir.
8      A   You didn't read the whole paragraph,
9  but you referenced the whole paragraph.  Would
10 you read the rest of that paragraph, please?
11     Q   Okay.  You read it out loud, please.
12 Can you see that?
13     A   "NCI shall deduct from the partial pay
14 estimates earned by SRP sufficient funds to keep
15 the account of SRP current with the goal of
16 minimizing any impact on SRP funds or their
17 payment on lines of credit."
18     Q   Okay.  Appreciate that.  Now, you were
19 present at Mr. Smithson's deposition last week,
20 weren't you?
21     A   Yes.
22     Q   Do you recall Mr. Smithson indicating
23 that Nugget Construction Company didn't profit on
24 this Homer Spit project?
25     A   I don't recall that exact statement,

Page 156

1  no.
2      Q   Did you have any recollection that
3  Mr. Smithson testified last week that in fact
4  Nugget Construction had to expend monies and
5  costs to correct the nonconforming material that
6  was provided by Spencer Rock?
7      A   What does that have to do with them
8  paying us, though?
9      Q   This is a separate question.  I'll get
10 there.
11         Do you recall Mr. Smithson's testimony?
12     A   I recall parts of the testimony from
13 last week.
14         MS. HO:  Lunch is here.  Do you want to
15 eat?
16         THE WITNESS:  Sure.
17         MS. HO:  Let's go ahead and do that.
18         (Lunch break taken from 12:13 to 1:05 p.m.)
19         MR. SEWRIGHT:  Could we have additional
20 legal counsel from Oles Morrison identified for
21 the record?
22         MR. MACHETANZ:  Traeger Machetanz.
23 BY MS. HO:
24     Q   Okay.  Mr. Bentz, you've had an
25 opportunity to have your lunch.  Are you all set

Page 157

1  for this afternoon?
2      A   For now.
3      Q   Sounds good.  Let's continue then.
4         I want to direct your attention to
5  Exhibit 8, which is the rate sheet and invoices
6  that were propounded to Spencer Rock from North
7  Star.  I want to ask you some questions about the
8  actual performance of the contract between North
9  Star and Spencer Rock.
10         Now, we talked earlier about it was
11 Mr. Jack Goodwill who spoke with Mr. LaPore at
12 the Seward dock; is that correct?
13     A   If that's what was said earlier.
14     Q   Is that your recollection?
15     A   That's my recollection.
16     Q   Okay.  Now, during the performance of
17 the project, who at North Star knew or do you
18 know who was driving the trucks carrying the
19 material to the barges?
20     A   I do not know the employees that were
21 driving the trucks to the barges.  They weren't
22 our personnel.
23     Q   Okay.  To your knowledge, whose
24 personnel were they?
25     A   I'm not certain.

112

Page 158

1    Q   If you're not certain, then who would
2    know within North Star?
3    A   Whoever was employed -- oh, North Star?
4    Jack would have known who those individuals were.
5    He might have even known them personally. I
6    don't know.
7    Q   Did you talk to Jack Goodwill prior to
8    today as to which persons he dealt with at that
9    Seward dock who were --
10   A   For the trucking of the material?
11   Q   Yes, for the trucking of the material.
12   A   Not that I recall.
13   Q   Do you know or does anyone at North
14   Star know how many tons of rock were loaded on
15   each barge?
16   A   Presently? Would anybody presently
17   know?
18   Q   For the Homer Spit project --
19   A   Back then Jack probably would have
20   known.
21   Q   Is he the only person in North Star
22   that would have known that?
23   A   Laura also might have known.
24   Q   And who's Laura? Her full name,
25   please.

Page 159

1    A   Marshall. We talked about her earlier.
2    She's one of the accounting staff. She resides
3    in Seward, and she probably or may have been one
4    of the ones that put the invoices together. She
5    may know some of the people that were in the
6    trucks.
7    Q   But she didn't personally physically go
8    to the dock to see who was driving the truck?
9    A   Her office is on the dock.
10   Q   It's on the dock. Now, is Laura still
11   an employee of North Star?
12   A   Yes, she is.
13   Q   And she would be made available, if
14   needed to, regarding this particular matter, her
15   knowledge about the dock loadings and who was
16   present there?
17   A   I'm not sure I understand what you're
18   asking.
19   Q   If I were to ask for Ms. Laura to be
20   deposed, the accountant who you just testified
21   had an office near the dock who would probably
22   know these people who were at the dock --
23   MR. SEWRIGHT: Object to the
24   characterization.
25   BY MS. HO:

Page 160

1    Q   Just basically asking you, Mr.
2    Bentz --
3    A   She was the only other North Star
4    permanent employee that was located at that
5    facility. What she knows or doesn't know, I
6    can't tell you.
7    Q   And then it would be your testimony
8    that Mr. Jack Goodwill would be the best person
9    to obtain this information from?
10   A   He would be the most knowledgeable
11   person, yes.
12   Q   What role, if any, did Nugget play
13   during the barge loading that you know of?
14   A   The work was being directed by Randy
15   Randolph.
16   Q   Directed by Randy Randolph. But
17   weren't these barges Nugget's interest and it was
18   their responsibility to make sure that the barges
19   were loaded properly?
20   A   I can't tell you what their
21   responsibility is.
22   Q   Well, to your understanding --
23   MR. SEWRIGHT: Objection to the form --
24   please give me time to state the objection and
25   I'll be done. Objection to the form of the

Page 161

1    question as to the last two questions.
2    MS. HO: Mr. Sewright, I appreciate
3    your objections. They're noted for the record.
4    Q   Unless you're directing the witness not
5    to answer, please, Mr. Bentz, if you would answer
6    the question.
7    A   Restate the question.
8    Q   What role, if any, did Nugget play
9    during the barge loading to your understanding or
10   to North Star's understanding?
11   A   What I knew then or what I know now?
12   Q   What you knew back in 1997. Let's
13   start there.
14   A   I can't recall everything that I knew
15   or knew about in 1997.
16   Q   Okay.
17   A   Be more specific.
18   Q   Well, it appears that it was Jack
19   Goodwill who had conversations with LaPore, is
20   that your understanding, back in 1997 for each of
21   those barge loadings?
22   A   It appears from reading his affidavit
23   that he was the one that had some contact.
24   Q   And you did not at that time?
25   A   I don't remember having any

113

Page 162

1  conversation with Mr. LaPore. I may have. It
2  was eight years ago.
3      Q   You might have. What do you mean you
4  might have? Describe for me, please.
5      A   I might have talked to any number of
6  our customers back in 1997.
7      Q   I'm specifically referring to this
8  particular project.
9      A   I don't remember any specific
10  conversation, but that doesn't mean that there
11  wasn't one. It just means I don't remember one
12  today.
13      Q   Would there be any notes or memoranda
14  within North Star that might reflect these --
15      A   If there is, you would have it.
16      Q   Now, Mr. Bentz, do you have any records
17  or does North Star have any records reflecting
18  the tonnage that was loaded on the barges?
19      A   In '97, it depends on
20  whether -- depends on whether Nugget was paying
21  the railroad directly and had a terminal use
22  agreement or -- the only information that we
23  would have would be what was turned into the
24  railroad for purposes of billing for wharfage.
25      Q   Do you know if North Star has copies of

Page 163

1  those records?
2      A   I don't know. I don't believe so.
3  There was a switch at some juncture where the
4  railroad was doing their own as opposed to us
5  doing that for them, and I don't remember exactly
6  when that is.
7      Q   Is there anyone within North Star who
8  might have possession of those records, if in
9  fact any were produced to North Star during this
10  litigation?
11      A   If they did, the most logical person
12  would be Laura.
13      Q   Okay. Could you please check with
14  Laura and make sure that North Star has or
15  doesn't have these types of records regarding
16  tonnage loaded for each barge loading?
17      A   When he instructs me to, I will.
18      MR. SEWRIGHT: I will take that as a
19  question and request directed to me.
20      MS. HO: Well, to the extent that is an
21  informal discovery request to you --
22      MR. SEWRIGHT: Let's do this. I
23  already requested that your prior request be made
24  a formal request. Could you just add that one to
25  the other one we mentioned?

Page 164

1      MS. HO: We'll put that on the record,
2  that I've asked for any records from North Star
3  reflecting tonnage loaded by barge, and I will do
4  so in formal discovery as well.
5      Q   Earlier you testified that Nugget was
6  directing the barge loadings at the Seward dock.
7  What specific conduct are you referring to?
8      A   It's my understanding that Randy
9  Randolph was the one -- the person in front, if
10  you will, that was making contact with my
11  employee, Jack Goodwill, directing him when the
12  barge loading was going to take place, et cetera,
13  et cetera, basically making the call-out.
14      Q   Making the call-out.
15      A   That's what we call it.
16      Q   Okay. Now, do you know or does anyone
17  in North Star know which specific barge loading
18  are we referring to? Are we talking about the
19  first barge loading, the second barge loading,
20  the third, fourth, or fifth when we're referring
21  to the conversation allegedly that occurred
22  between Mr. Goodwill and Mr. Randy Randolph?
23      MR. SEWRIGHT: Objection to the form of
24  the question.
25  BY MS. HO:

Page 165

1      Q   Mr. Bentz, if you will answer the
2  question.
3      A   From what I recollect, and a lot of my
4  recollection is from reading all of the various
5  documents, it appears that starting from the
6  first barge and continuing through. I don't know
7  how many of the barges there were actually direct
8  conversations.
9      Q   But there were five barge loadings, and
10  we've gone through the documents this morning and
11  you have also testified there were five barge
12  loadings, correct?
13      A   There appears to be five barge loads,
14  and there appears to be more invoices than five
15  barge loads.
16      Q   And you don't have any firsthand
17  knowledge about these conversations allegedly
18  between Mr. Randolph and Mr. Goodwill; is that
19  correct?
20      A   I was not part of the conversations.
21      Q   Now, other than notifying North Star of
22  when to load the barges, what other alleged
23  directions were given by Nugget employees or
24  representatives?
25      A   I can't say. I don't know.

114

Page 166

1    Q    You cannot pinpoint any specific
2  communication that would indicate Nugget
3  directed --
4    A    Other than what's on record already, I
5  don't know of anything else.
6    Q    Okay. So in North Star's beliefs and
7  your beliefs, for that matter, when did Nugget
8  start directing the activities of the barge -- do
9  you consider it after the first barge loading by
10 North Star?
11   A    You already asked that question. I've
12 answered it twice. Starting with the first
13 barge.
14   Q    Okay. Now, if that's the case then,
15 was there any indication by North Star that in
16 its minds and its belief that Nugget had taken
17 over the agreement between Spencer and North
18 Star?
19   A    Through their actions.
20   Q    Well, what actions are you referring
21 to?
22   A    The fact that an employee that's
23 supposedly a Nugget employee, but as it turns out
24 is a Spencer owner and has got his own business
25 and everything else going on, was directing us to

Page 167

1  do the work.
2    Q    Directing you to do the work. What
3  work are you referring to? These are Nugget's
4  barges. They had an interest in ensuring that no
5  damage would have been done to these barges;
6  isn't that true?
7        MR. SEWRIGHT:  Object to the form of
8  the question; compound. You had about three or
9  four things in there topped off with "isn't that
10 true."
11       MS. HO:  Thank you, Counsel. Let me
12 rephrase.
13   Q    First of all, when Nugget was at the
14 barges and so-called what you testified as
15 directing the barge loadings, isn't it true that
16 Nugget had an interest in these barges and how
17 these barges were handled?
18       MR. SEWRIGHT:  Same objection.
19   A    I can't --
20       THE WITNESS:  Traeger, do you want to
21 switch places with her? Because if you're going
22 to be feeding her the questions, I might as well
23 be sitting across the table from you, which I'll
24 be more than happy to do.
25       MR. SEWRIGHT:  Do you want to respond,

Page 168

1  Traeger?
2        MR. MACHETANZ:  I'd be happy to do
3  that.
4        THE WITNESS:  Let's go.
5        MR. MACHETANZ:  Do you have any
6  objections to it, Counsel?
7        MR. SEWRIGHT:  Let's just go off the
8  record for a moment.
9        (Short discussion off the record.)
10       MS. HO:  Let's go back on the record,
11 then.
12   Q    Now, we were talking about tonnage.
13       Do you know or does anybody at North
14 Star know who determined the number of trucks
15 that would arrive at the barge?
16   A    I don't know.
17   Q    Who would know at North Star?
18   A    Probably Spencer and Nugget would know
19 how many trucks were arriving.
20   Q    Was Goodwill there? Was Goodwill
21 present at the barges when the trucks were
22 arriving?
23   A    You'll have to ask him.
24   Q    But to your knowledge you don't
25 personally know.

Page 169

1        Now, when did Spencer Rock ever tell
2  Nugget to your knowledge or to anyone at North
3  Star's knowledge that it had a contract with my
4  client, Nugget Construction Company?
5    A    I'm sorry?
6    Q    When to your knowledge or North Star's
7  knowledge did Spencer Rock ever communicate to
8  North Star that Nugget had a contract with North
9  Star?
10   A    Did -- could you please repeat the
11 question?
12       MR. MACHETANZ:  You used the word
13 Spencer.
14       THE WITNESS:  I'd like for her to
15 repeat the question.
16       MR. SEWRIGHT:  Object to the form. Do
17 you want to rephrase, or do you want her to read
18 it?
19       (Question was read by the reporter.)
20   A    I can't answer that. I don't know the
21 answer to that question.
22 BY MS. HO:
23   Q    Okay. So there was no purported
24 communication that you know of from Spencer?
25   A    From Spencer to us that Nugget had a

115

Case No. A98-009 Civil (HRH)                                          Jeffery Bentz

Page 170

1  contract with us? Not that I know of. Not that
2  I can recall.
3      Q   Thank you, sir. Now, during the
4  performance of the barge loadings, who owned the
5  skip box that was being used?
6      A   You know, I don't know the answer to
7  that question. I'm not sure.
8      Q   Who would know the answer to the
9  question?
10     A   I don't know. At one particular point
11  in time I think that skip box was offered to us
12  to buy it. I don't know who built it. It looked
13  similar to one that I've seen before. I don't
14  know what to tell you about it.
15     Q   Let me introduce a document here. This
16  was also found in Michael's office when I
17  reviewed documents last week.
18         MR. SEWRIGHT: Has this been marked as
19  an exhibit?
20         MS. HO: Can we have that marked as an
21  exhibit, please?
22         (Exhibit 13 marked.)
23  BY MS. HO:
24     Q   You've looked at Exhibit No. 13.
25         Do you recognize this document?

Page 171

1      A   Just from seeing it recently.
2      Q   Okay. And what is it?
3      A   It appears to be a bill of sale.
4      Q   And it looks like it's a bill of sale
5  between Spencer Rock and North Star; is that
6  correct?
7      A   That's what it appears to be, yes.
8      Q   And it looks like it's dated
9  September 30th, 1997?
10     A   Yes.
11     Q   Do you disagree?
12     A   No.
13     Q   And it looks like it's been signed by
14  Robert LaPore on behalf of Spencer Rock Products
15  and John -- could you make out the name?
16     A   I believe it's John Armstrong.
17     Q   Who is John Armstrong?
18     A   He was the Anchorage operations manager
19  on or about the time in question.
20     Q   And is he still with the company?
21     A   No.
22     Q   And do you know his whereabouts?
23     A   I believe he works for Totem Ocean
24  Trailer Express.
25     Q   Now, did Mr. Armstrong have any

Page 172

1  dealings with the Homer Spit project?
2      A   Not that I know of.
3      Q   It looks like this bill of sale was
4  referring to "bulk product handling skip bucket
5  and all attachments necessary, FOB Seward,
6  Alaska."
7      A   Yes.
8      Q   Do you recollect this particular bill
9  of sale regarding the skip bucket?
10     A   Not other than seeing it this last
11  week.
12     Q   And do you have any recollection or
13  anybody at North Star have any recollection if
14  this particular skip bucket was used on the Homer
15  Spit project?
16         MR. SEWRIGHT: Object to the form of
17  the question.
18     A   I don't know whether this is the same
19  bucket in question. I can only presume that it
20  would be.
21  BY MS. HO:
22     Q   Okay. Well, was the skip bucket that
23  was used on the project at any time damaged in
24  any way that you know of?
25     A   Not that I remember.

Page 173

1      Q   Would anybody at North Star know of
2  perhaps some damage that might have occurred on
3  that skip bucket?
4      A   If it happened on the job, the only one
5  that I can think of would be Jack.
6      Q   So Jack would know about that, then.
7  And essentially who would have the power to hire
8  the drivers at the Seward dock at the time of the
9  barge loadings?
10         MR. SEWRIGHT: Object to the form of
11  question. Can you specify what drivers?
12         MS. HO: The drivers from Spencer Rock
13  quarry over to the Seward dock.
14         MR. SEWRIGHT: Object to the form of
15  the question; lack of foundation.
16  BY MS. HO:
17     Q   Noted. Please answer the question.
18     A   We were not hired to do that work, so I
19  have no idea how that arrangement came about.
20     Q   So the only arrangement you know of was
21  North Star's arrangement with Spencer Rock for
22  stevedoring services on that project, correct?
23         MR. SEWRIGHT: Object; form of the
24  question.
25     A   The only work that I'm aware that we

44 (Pages 170 to 173)

EXHIBIT 2
Page 44 of 105

Page 174

1  were contracted to do was load rock onto the
2  Nugget barges.
3  BY MS. HO:
4      Q    Okay.  Now, let's get to the Amended
5  Complaint, which is Exhibit No. 5.  Would you
6  please direct your attention there?  Let's direct
7  your attention to page 10 of 26 of Exhibit No. 5,
8  and this is paragraph 18 under the Miller Act
9  Claims under the cause of actions, and midway
10 through the paragraph.  Let me read it.
11         Are you there yet, sir?
12     A    If you're referring to paragraph 18?
13     Q    Yes.  Paragraph 18, which runs into
14 page 10 of 26.
15     A    Let me read the paragraph.
16     Q    Sure.  I'm just directing you to the
17 middle section of page 10.
18     A    That's all right.  I'll read the whole
19 paragraph.
20     Q    Let me know when you're done reading so
21 we can continue.
22     A    I will.
23     Q    Thank you.
24     A    Okay.
25     Q    Let me direct your attention to the

Page 175

1  middle part of the paragraph where it states,
2  "Nugget, not Spencer, directed the loading of the
3  quarried rock onto Nugget's barge by North Star."
4         Do you see that sentence?
5      A    Yes, I do.
6      Q    What factual basis does North Star have
7  for this allegation?
8      A    It's in some of the affidavits, I
9  believe.
10     Q    Which affidavit are you referring to?
11     A    I believe it's in Jack Goodwill's
12 affidavit for sure, and I'm not sure
13 about -- I've read it in more than one location.
14 I can't presently tell you which locations other
15 than that, but I've read it in more than one of
16 the affidavits, including possibly Bob LaPore's
17 deposition.
18     Q    Well, Bob LaPore had a couple of
19 depositions in this case and probably another --
20     A    Well, that's why I can't remember
21 exactly which document.
22     Q    For purposes of today, what you
23 recollect is what you've read in this affidavit
24 of Jack Goodwill that's been submitted as an
25 exhibit, correct?

Page 176

1         MR. SEWRIGHT:  Objection;
2  mischaracterizing his testimony.
3  BY MS. HO:
4      Q    Please answer my question.
5      A    I already answered your question.
6      Q    So that's what you confirm?
7      A    No.  I told you I believe I've read it
8  in more than one of the documents that's on
9  record, and the one that comes to mind that I
10 know I've read it in was Jack Goodwill's
11 affidavit.
12     Q    Okay.  If that's the case, then, if
13 you're purporting that there's evidence of
14 Nugget's directing the loading of the quarried
15 rock as in this allegation here, and you've read
16 some of the other documents, aside from those
17 documents what other factual basis do you have
18 for this allegation?
19     A    Which allegation?
20     Q    This particular allegation that,
21 "Nugget, not Spencer, directed the loading of the
22 quarried rock onto Nugget's barge by North Star"?
23     A    I think to really characterize that
24 question fully you have to read the entire
25 paragraph and not an excerpt out of the

Page 177

1  paragraph.
2      Q    Well, Mr. Bentz, your client has a
3  litany of allegations, serious allegations
4  against my clients.  We have to piecemeal each
5  one and make sure that they're valid
6  substantiations for each allegation.  I'm asking
7  you specifically, and you've stated throughout
8  today's deposition, that Nugget was the one
9  directing North Star, not Spencer.
10        What specific conduct and act are you
11 referring to?
12        MR. SEWRIGHT:  You just said -- who is
13 Mr. Bentz's client?  You just said Mr. Bentz's
14 client had --
15        MS. HO:  North Star.  Let me rephrase
16 that.
17     Q    To the extent that Mr. Bentz and North
18 Star has alleged that Nugget Construction Company
19 has been directing the barge operations at the
20 Seward dock, what specific factual basis do you
21 have for these allegations?
22     A    Well, where would you like to start?
23 When the support agreement was signed without our
24 knowledge prior to our commencement of the work?
25     Q    Was that so?

117

Case No. A98-009 Civil (HRH)                                                    Jeffery Bentz

Page 182

1     Q    Separate and distinct from this
2  particular lawsuit?  What did you do?
3     A    Well, it's in the record that we tried
4  to get paid from him, and he told us that he
5  didn't have the money to pay us because the money
6  had been taken from Nugget from the Corps and he
7  had no means to pay us for those services.
8     Q    He had no means to pay --
9        I'm going to take a five-minute break.
10       MR. MACHETANZ:  Off record.
11       (Short break taken.)
12  BY MS. HO:
13    Q    Okay.  Let's get back to Exhibit No. 5,
14  and I'm going to direct you to page 11 of 26,
15  paragraph 19.
16       Would you read that quickly?
17    A    Exhibit No. 5 what?
18    Q    Exhibit No. 5, North Star's Amended
19  Complaint, page 11 of 26, paragraph 19.
20    A    Okay.
21    Q    The part that says, "Nugget secretly
22  and deceptively converted Spencer into a
23  'strawman' in its ongoing dealings with North
24  Star."
25       What factual basis do you or North Star

Page 183

1  have to support this allegation?
2     A    Well, there's -- in Bob LaPore's own
3  affidavit, and I don't know if it's an affidavit
4  or an actual deposition, he basically indicates
5  that.
6     Q    But you don't have any specific time
7  period or specific communication that you had
8  with anybody regarding this?
9     A    Through the course of this case I
10  believe it came out in various documents,
11  including Mr. LaPore's testimony.
12    Q    But to your knowledge, you do not have
13  any personal knowledge as to the factual basis
14  for this allegation?
15    A    The factual basis for the allegation.
16    Q    Right, that Nugget secretly and
17  deceptively converted Spencer into a strawman?
18       MR. SEWRIGHT:  Object to the form of
19  the question.
20    A    I believe that the facts that have been
21  presented to date lead one to be able to come to
22  that conclusion.
23  BY MS. HO:
24    Q    But I'm asking you for your personal
25  knowledge.

Page 184

1     A    That is from my personal knowledge.  My
2  personal knowledge is everything that I read,
3  hear, things that I do.
4     Q    Thank you, Mr. Bentz.  I appreciate
5  that.
6        MR. SEWRIGHT:  Please let him finish
7  his response, Ms. Ho.
8        MS. HO:  Okay.  Will do.
9     Q    Now, would you please turn to page 12
10  of 26 in this same exhibit, North Star's Amended
11  Complaint, paragraph 21, and read that to
12  yourself, please?
13    A    Okay.  I've read that paragraph.
14    Q    Okay.  Now, paragraph 21 starts with,
15  "While hiding that secret relationship from the
16  United States of America with which it had
17  contracted and others, including North Star, and
18  while causing Spencer and North Star and other
19  similarly situated providers of services for the
20  project to go unpaid for their services, Nugget,
21  in order for it to receive payment from the
22  federal government, falsely certified to the
23  Corps of Engineers that all laborers and
24  suppliers had in fact been paid, as required by
25  the Federal Prompt Pay Act," and it cites the

Page 185

1  statute.
2        Do you have any reason to disagree with
3  what I've just read into the record?
4     A    No.
5     Q    Now, what factual basis do you or North
6  Star have in regards to hiding the secret
7  relationship from the United States Government?
8     A    Well, it appears, if I'm not mistaken,
9  when we were having difficulty getting paid, I
10  had Jack send a letter to the federal government,
11  to the Corps.  And I believe the response from
12  the Corps indicates that -- indicates to them
13  that since it appeared that they had taken over
14  the quarry and whatnot, that they in fact kind of
15  assumed some of those responsibilities and should
16  pay their vendors.
17    Q    Let me introduce the document which I
18  believe you might be referring to, but correct me
19  if I'm wrong.
20       (Exhibit 14 marked.)
21  BY MS. HO:
22    Q    Take a moment to review this document.
23       Have you had a chance to review the
24  document?
25    A    I have.

MIDNIGHT SUN COURT REPORTERS * (907) 258-7100
EXHIBIT 2
Page 47 of 105

119

Case No. A98-009 Civil (HRH)                                                    Jeffery Bentz

Page 186

1    Q   And this purports to be a North Star
2   letter signed by Mr. Jack Goodwill, vice
3   president at the time for North Star, dated
4   August 4th, 1997 to the Army Corps of Engineers.
5        Do you disagree with that?
6    A   Yes, I disagree with that.
7    Q   In what way?
8    A   He was vice president of Northern
9   Stevedoring and Handling, not North Star.
10   Q   Now, when Jack Goodwill wrote this
11  letter on behalf of Northern Stevedoring and
12  Handling, at the time that was the legal entity
13  that was bringing suit against my client?
14       MR. SEWRIGHT: Object; calls for a
15  legal conclusion.
16   A   You characterized Mr. Goodwill as being
17  the vice president of North Star.
18  BY MS. HO:
19   Q   My prior statement, you have corrected
20  me. But I'll have you correct that Mr. Jack
21  Goodwill was vice president of Northern
22  Stevedoring and Handling, according to this
23  letter.
24   A   That's correct.
25   Q   And at that time, on August 4th, 1997,

Page 187

1   that particular company, Northern Stevedoring and
2   Handling, was the one notifying the Corps of
3   Engineers --
4    A   That's correct.
5    Q   Okay. Now, in the first paragraph it
6   says, and you may read along, "Northern
7   Stevedoring has been working for Spencer Rock
8   Products, Inc. from May 1st to June 26th, 1997.
9   In that time frame Northern loaded five barges of
10  rock for the Homer Spit."
11       Do you disagree with that, sir?
12   A   Do I disagree with what this says? No.
13   Q   With what Mr. Goodwill wrote in his
14  letter to the Army Corps of Engineers.
15   A   Not so far.
16   Q   Okay. And on page 2, in that last
17  paragraph Mr. Goodwill wrote to the Army Corps of
18  Engineers, "Northern Stevedoring did agree to
19  direct the invoices for loading the rock to the
20  ZB286 Nugget Construction barge, for the Army
21  Corps of Engineers Homer Spit upgrade to Spencer
22  Rock."
23       Do you disagree with that, sir?
24       MR. SEWRIGHT: Object, Counsel.
25  Disagree with that's what was written or that --

Page 188

1   BY MS. HO:
2    Q   That was what was presented by
3   Mr. Goodwill at the time, who was the vice
4   president of Northern Stevedoring and Handling,
5   to the U.S. Army Corps of Engineers on August
6   4th, 1997.
7    A   What you've read is what's on this
8   letter, yes.
9    Q   Okay. Do you disagree or -- strike
10  that.
11       To your knowledge did North Star ever
12  communicate to the U.S. Corps of Engineers about
13  its nonpayment of stevedoring services on the
14  Homer Spit project, other than this particular
15  letter to the U.S. Corps of Engineers?
16   A   When they sent their investigators up
17  here.
18   Q   Okay. Let me show you another exhibit.
19       (Exhibit 15 marked.)
20  BY MS. HO:
21   Q   Take a moment to look at this Exhibit
22  No. 15. This particular document was disclosed
23  to me last Thursday when I was at Mr. Sewright's
24  offices reviewing documents.
25       Having looked at this document, it

Page 189

1   appears to be copies of two business cards. One,
2   Michael C. Curran, C-u-r-r-a-n, Special Agent,
3   Department of the Army, Criminal Investigation
4   Command, San Francisco Fraud Field Office. And
5   it lists his address and telephone number.
6   That's the first name written there.
7        Do you see that, sir?
8    A   Uh-huh.
9    Q   And then the second on the bottom part
10  of the document says, Wilbert, W-i-l-b-e-r-t, M.
11  Craig, C-r-a-i-g, Special Agent, Department of
12  the Army, Criminal Investigation Command, and he
13  is at 33 New Montgomery Street, Suite 1840, San
14  Francisco, California 94105.
15       Is that what you see there too, sir?
16   A   I see that.
17   Q   Okay. Now, at any time did you or
18  anyone at North Star have conversations with
19  either Mr. Curran or Mr. Craig?
20   A   Yes.
21   Q   Do you recollect the time period of
22  this communication?
23   A   I don't. They actually came to my
24  office.
25   Q   They came to your office. You don't

MIDNIGHT SUN COURT REPORTERS * (907) 258-7100

EXHIBIT 2
Page 48 of 105

Case No. A98-009 Civil (HRH)                                                      Jeffery Bentz

Page 190

1  recollect the time period, but both these agents,
2  Mr. Curran and Mr. Craig, came to your office at
3  the same time or at separate times?
4     A   I believe that both of them came at the
5  same time, and I believe it was these two
6  individuals.
7     Q   Okay. Were there any other individuals
8  from the Corps of Engineers, Criminal
9  Investigation Command that came to you or North
10 Star?
11    A   Not that I can remember.
12    Q   Do you recall if it was just one
13 particular meeting or more than one meeting with
14 these two agents?
15    A   I can recall one meeting. Whether
16 there was another one or not or whether they met
17 with somebody else or not, I don't know.
18    Q   In that one meeting who do you recall
19 were present?
20    A   Well, I know I was there and I know
21 there were two agents there, and I believe Mike
22 might have been there. And if memory holds me
23 true, don't hold me on this, but I think Steve
24 Brazier, who was my controller at the time, was
25 there.

Page 191

1     Q   Can you spell his last name, please?
2     A   It's B-r-a-z-i-e-r.
3     Q   And is Mr. Brazier still with North
4  Star?
5     A   No, he moved down south.
6     Q   Do you happen to know his whereabouts?
7     A   I don't currently.
8     Q   Thank you.
9     A   He was in Texas last I heard.
10    Q   Now, do you have any knowledge of who
11 might have instigated this criminal
12 investigation?
13    A   I don't recall all the facts behind it,
14 no.
15    Q   Was it perhaps somebody within North
16 Star who would have contacted these agents?
17    A   No, I don't believe -- we didn't start
18 the agent thing. We wrote the one letter to the
19 Corps and it was sometime after that, I recall,
20 that these agents showed up.
21    Q   Okay. To your knowledge, do you think
22 somebody -- some representative from Metco might
23 have called the special agents?
24    A   I don't know.
25    Q   Would anybody within North Star know?

Page 192

1     A   I don't know.
2     Q   Do you know if Mr. LaPore was made
3  aware of these alleged investigations?
4     A   I don't know.
5     Q   What about Nugget? Are you aware that
6  Nugget was made aware of these alleged criminal
7  investigations?
8     A   Only through reading the
9  correspondence. At the time I would not have
10 known.
11    Q   Anybody else at North Star who might
12 have known?
13    A   Not that I can think of.
14    Q   Okay. Did you or anyone at North Star
15 receive any confirmation, either written or oral,
16 that an alleged criminal investigation would be
17 pursued after this meeting that you had with
18 these two agents?
19    A   No, they didn't tell us what their plan
20 was.
21    Q   Okay.
22    A   I don't recall any specific comment
23 coming from them in that regard.
24    Q   So to your recollection there were no
25 follow-up conversations with Mr. Curran or

Page 193

1  Mr. Craig?
2     A   I'm not certain. This was a long time
3  ago.
4     Q   Now, were you or anyone at North Star
5  ever made aware by the U.S. Corps of Engineers
6  that it, the U.S. Corps of Engineers, did not
7  know about the Support Agreement between Nugget
8  and Spencer Rock?
9     A   I'm sorry. Can you ask the question
10 again?
11    Q   Were you or anyone at North Star ever
12 made aware by the U.S. Corps of Engineers or by
13 anyone else that the U.S. Corps of Engineers did
14 not know about the Support Agreement between
15 Nugget and Spencer Rock? What I'm getting at --
16       MR. SEWRIGHT: Are you including
17 correspondence from the Corps?
18       MS. HO: Yes, correspondence from the
19 Corps.
20    A   There's a letter that came back from
21 the Corps to Jack Goodwill.
22       MS. HO: Okay. Let's see.
23       MR. SEWRIGHT: I think there was also
24 correspondence between Nugget and the Corps, Ms.
25 Ho.

Case No. A98-009 Civil (HRH)                                                    Jeffery Bentz

Page 194

1    MS. HO:  Let me submit this particular
2 document as an exhibit for the record.
3    (Exhibit 16 marked.)
4 BY MS. HO:
5    Q    Take a moment to review this document.
6    MR. SEWRIGHT:  Ms. Ho, I think there
7 was a letter from the Corps after this letter
8 informing -- after they received information from
9 Nugget.
10    MS. HO:  Let's at least look at this
11 document first and we can trace the flow of
12 documents here.
13    Q    You're taking your time to look at this
14 document.  Have you seen this document before?
15    MR. SEWRIGHT:  Are you done yet?
16    THE WITNESS:  Just about.
17    MS. HO:  Go ahead.
18    Q    You've taken your time to review
19 Defendants' Exhibit No. 16.
20    Do you recognize this document?
21    A    I've seen it before.
22    Q    Okay.  And it looks like it's an
23 August 21st, 1997 letter from Thomas Johnson at
24 the Department of the Army to Nugget Construction
25 Company with a cc on the bottom to Northern

Page 195

1 Stevedoring and Handling Corporation.
2    Do you agree with that, sir?
3    A    Uh-huh.
4    Q    And this is the purported letter that
5 was provided by the Department of the Army to
6 Nugget indicating to Nugget that North Star had
7 some disagreements with the payments on the
8 project -- nonpayment on the project.
9    MR. SEWRIGHT:  Object to the form of
10 the question.  Is there a question?
11 BY MS. HO:
12    Q    I just wanted to see if Mr. Bentz had
13 any knowledge of this particular document, that
14 this was the correspondence between the
15 Department --
16    A    I've read this before.
17    Q    Okay.  At least to your knowledge it's
18 in North Star's files and North Star is aware of
19 the existence of this particular document,
20 correct?
21    A    Yes.
22    MR. SEWRIGHT:  We submitted it to the
23 Corps, as a matter of record.
24    MS. HO:  I just want to be sure.  Like
25 you said, this is a ten-year litigation and we

Page 196

1 have lots of history on it.  Let's go ahead and
2 I'm going to submit to you another -- we're done
3 with that particular exhibit.
4    (Exhibit 17 marked.)
5 BY MS. HO:
6    Q    Take a moment to look at that, if you
7 will.  Let's go off the record while he does
8 that.
9    (Short break taken.)
10 BY MS. HO:
11    Q    Back on the record.  I'll hand you what
12 is marked as Defendants' Exhibit No. 17.  This
13 was produced to your counsel when he was over at
14 our offices.
15    MR. SEWRIGHT:  Let's just make the
16 record clear.  This is marked with a Nugget Bates
17 number.  It's something that I obtained back in
18 1998 during the first round of this litigation,
19 and then you came over to my office Thursday and
20 asked that it be copied for you, what I had
21 obtained from your office before.
22    MS. HO:  Okay.  This particular exhibit
23 was a copy off of our documents here?
24    MR. SEWRIGHT:  This one was?
25    MS. HO:  Yeah, because it has a Nugget

Page 197

1 stamp on it.
2    MR. SEWRIGHT:  And that stamp didn't
3 exist in '98.  Thanks for the clarification.  My
4 error.
5 BY MS. HO:
6    Q    Mr. Bentz, have you seen this
7 particular document before?
8    A    I believe so.
9    Q    This is an August 25th, 1997 letter
10 that was written by Mr. Randolph at Nugget
11 Construction to Mr. Dave Scott at the U.S. Army
12 Corps of Engineers.
13    Do you agree with that?
14    A    It appears to be a letter that was
15 written to the addressee.
16    Q    Okay.  Now, this is in response
17 to -- this is a letter that is in response to the
18 prior exhibit that I just showed you, the Corps
19 of Engineers letter.
20    MR. SEWRIGHT:  Counsel, object; lack of
21 foundation.  I don't know if this is --
22    MS. HO:  Okay.  Let me establish that.
23    Q    Now, on Exhibit No. 17 if you go down
24 one-third down the way of the document it says,
25 Subject, Northern Stevedoring/Your Serial Letter

MIDNIGHT SUN COURT REPORTERS * (907) 258-7100

122