Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA AT ANCHORAGE

UNITED STATES OF AMERICA for the
use of NORTH STAR TERMINAL &
STEVEDORE COMPANY, d/b/a NORTHERN
STEVEDORING & HANDLING, and NORTH
STAR TERMINAL & STEVEDORE COMPANY,
d/b/a Northern Stevedoring &
Handling, on its own behalf,

       Plaintiffs,

   and

UNITED STATES OF AMERICA for the
use of SHORESIDE PETROLEUM, INC.,
d/b/a Marathon Fuel Service, and
SHORE PETROLEUM, INC., d/b/a
Marathon Fuel Service, on its own
behalf,

       Intervening Plaintiffs,

   and

METCO, INC.,

       Intervening Plaintiff,

   vs.

NUGGET CONSTRUCTION, INC.; SPENCER
ROCK PRODUCTS, INC.; UNITED
STATES FIDELITY AND GUARANTY
COMPANY; and ROBERT A. LAPORE,

       Defendants.
_____/
No. A98-009 CIV (HRH)

DEPOSITION OF JEFFREY "JEFF" BENTZ
Pages 1 - 221 (inclusive)

November 21, 2005
8:33 a.m.

MIDNIGHT SUN COURT REPORTERS * (907) 258-7100

Case No. A98-009 Civil (HRH)                    Jeffery Bentz

Page 206

1      MS. HO:  Objection noted.
2    Q    Please answer.
3    A    I can't tell you any exact dates.
4    Q    Would anybody at North Star other than
5  yourself know the answer to that question?
6    A    I don't know if anybody at North Star
7  can think back eight years and remember an exact
8  date that their thought process changed on a
9  particular subject.  That's why we're all
10  reflecting on all these documents.
11    Q    My next in question to you is:  Do you
12  have any knowledge or does North Star have any
13  knowledge that the United States Corps of
14  Engineers ever communicated to you or North Star
15  that it was not satisfied with Nugget's
16  performance on the Homer Spit project?
17      MR. SEWRIGHT:  Object to the form of
18  the question.
19    A    I don't recall having seen a document
20  like that.
21  BY MS. HO:
22    Q    Okay.  So to your recollection or to
23  your knowledge there was no communication, oral
24  or written, where the United States Corps of
25  Engineers had indicated that Nugget's performance

Page 207

1  was deficient on this project?
2    A    No, that's not true.  I believe they
3  did indicate that in the response on August the
4  21st.  In the next to the last paragraph it says,
5  "We remind you that under Contract Clause I.55,
6  Payments Under Fixed-Price Construction
7  Contracts, you are not to request for progress
8  payments that which you intend to withhold from a
9  subcontractor or supplier."
10      And I believe that there's another
11  letter that came from the Corps -- if you could
12  help me find it -- I don't know if it was a
13  response to the August 25th letter from Nugget,
14  but there's another Corps letter out there
15  somewhere, is there not?
16      MR. SEWRIGHT:  Oh, there are several.
17  BY MS. HO:
18    Q    If you have it --
19    A    There's another Corps letter that
20  indicates that they were unhappy with the
21  performance and that in fact they were not to
22  withhold payments from anybody that was
23  downstream.
24      MR. SEWRIGHT:  Counsel, there was one
25  letter from the Corps where the Corps said, we

Page 208

1  believe, Nugget, that you have taken over the
2  work of Spencer and it is your responsibility to
3  pay everybody.
4    A    Yeah.  It said something like, you have
5  taken over the actual work in the quarry and,
6  therefore, you're responsible to the people doing
7  the work for you.  That's what it said.
8  BY MS. HO:
9    Q    That's a letter that I think I saw too,
10  but I don't think it pertains particularly to the
11  North Star services.
12    A    Since you have it in your hand and
13  we're talking about it, shouldn't it be marked as
14  an exhibit so we can discuss it?
15    Q    No, this is the same Exhibit No. 16.
16      MR. SHAMBUREK:  Isn't it RRO/40?  It's
17  a two-page document.  That might make life
18  easier.  I think you might find it referenced in
19  Shoreside's discovery.
20      MR. SEWRIGHT:  You want us to go off
21  the record?
22      MR. MACHETANZ:  Yeah.
23      (Short break taken.)
24  BY MS. HO:
25    Q    Mr. Bentz, are you ready?

Page 209

1    A    Sure.
2      MS. HO:  Well, I'm going to end my
3  questions now, and I'm opening the floor to any
4  one of you who wants to examine and question Mr.
5  Bentz.
6      EXAMINATION
7  BY MR. VIERGUTZ:
8    Q    Good afternoon.
9    A    Good afternoon.
10    Q    I don't want any legal conclusions.  I
11  just want your understanding, your own personal
12  understanding as a layman.  If I sue you in
13  business -- you're a businessman.  If I sue you,
14  do you have a right to go to trial, or do you
15  have to settle that case?
16    A    I have a right to go to trial.
17    Q    And have you ever spoken to anyone at
18  USF&G?
19    A    On this matter?
20    Q    Yes.
21    A    Not that I can recall.
22    Q    Do you know whether anyone at North
23  Star ever has?
24    A    I do not know.
25    Q    Would it be the normal course of

53  (Pages 206 to 209)

4460750:                    Exhibit F
                            Page 2 of 5

Case No. A98-009 Civil (HRH)                    Jeffery Bentz

---

Page 210

1  business that you would make such a contact, or
2  could anyone do that?
3      A   It could be any number of maybe three
4  different individuals that can -- well, my
5  controller could have made a call like that,
6  since he was involved with things like
7  collections and insurance and things of that
8  nature.
9          It could have been Jack Goodwill since
10 it was his job.  Could have been Scott Francis,
11 who was vice president.  Those are the only
12 individuals I can think of, but in the normal
13 course, something like that, it would probably be
14 me as you have stated.
15     Q   Who is your controller?
16     A   Steve Brazier at the time.
17     Q   B-r-a-s-i-e-r?
18     A   Z-i-e-r, I believe.
19     Q   In reviewing your files, did you see
20 any communication written between you and USF&G?
21     A   Not that I recall.
22     Q   Okay.  If you'd look at Exhibit 5,
23 please, paragraph 38.  If you'd read that
24 paragraph and be so kind as to tell me when
25 you've completed that.

---

Page 211

1      A   I've read it.  What was your question?
2      Q   I haven't asked you yet, but I will.
3      A   Okay.
4      Q   What is your understanding of bad faith
5  nonpayment?
6      A   Depends on the circumstance.
7      Q   In this circumstance.
8      A   What's meant by this?
9      Q   Yes.
10     A   From a layman's terms, from me?
11     Q   Yeah.
12     A   I believe that USF&G was probably
13 fairly aware that there was a problem with their
14 customer at the time that they were bonding
15 Nugget because of the various correspondence that
16 was going on, and they did absolutely nothing and
17 I believe that was negligent.
18     Q   What is the problem with their
19 customer?
20     A   I'm sorry?
21     Q   You said there was a problem with their
22 customer.
23     A   Oh, it was obvious that something had
24 gone wrong with this project in order for their
25 to be special agents and all this stuff going on

---

Page 212

1  that's led to us being here today.  USF&G, to the
2  best of my knowledge, never stepped up and did
3  anything, and I believe that that was negligent
4  because they were bonding the job.
5      Q   Do you know the difference between
6  negligence and bad faith?
7      A   Depending on the circumstance, yeah.
8          MR. SEWRIGHT:  Are you calling for a
9  legal conclusion now?
10         MR. VIERGUTZ:  No, just his
11 understanding.
12     Q   What is that understanding in this
13 circumstance?
14     A   What do you mean?
15     Q   The difference between negligence and
16 bad faith.
17     A   I think they're kind of similar on this
18 particular circumstance, in my own mind.  I mean,
19 I'm not a lawyer so I don't write legal language,
20 and I know that things can be interpreted
21 different depending on the words you use.  But
22 USF&G's failure in this particular case, in my
23 opinion, was the fact that they did nothing.
24 They didn't step in to either settle it.  They
25 didn't step in to put pressure, at least in my

---

Page 213

1  perspective from what I've seen, put pressure on
2  their client to get squared up with their
3  customers or their vendors or whatever you want
4  to call a person that's, you know, owed money.
5      Q   And that's based entirely on lack of
6  documents that you've seen?
7      A   I've got nothing to show me that USF&G
8  stepped up and said, hey, Nugget, you need to do
9  something about this; this is a problem.
10     Q   Why do you believe they should have
11 done something?
12     A   Can I use an example?
13     Q   Sure.
14     A   Let's say that I'm handling a million
15 dollar transformer and something goes wrong and I
16 drop it.  I have an insurance company.  My
17 insurance company, I've got to look to them for
18 direction.  They would direct me, hey, you know,
19 you've got a lot of things going against you
20 here.  It's a bad sling; you used a bad sling and
21 it broke.  I don't think you should fight this; I
22 think you better settle it.  We better settle it
23 because it's going to be cheaper than if we take
24 it to the fourth quarter.
25         I don't see anything in this case where

---

54  (Pages 210 to 213)

44607!          Exhibit F
Page 3 of 5

Case No. A98-009 Civil (HRH)                    Jeffery Bentz

Page 214

1  USF&G did that.  I would expect my bonding
2  company to give me good advice in that respect.
3  I would expect my insurance company in my example
4  to settle a case like that.
5      Q    Sure.  How do you know that didn't
6  occur?
7      A    I have no knowledge whether it did or
8  did not, but there's nothing to show that it did
9  occur.
10     Q    And nothing to show it didn't, wouldn't
11 that be correct, that you've read?
12     A    I don't know.  Just the lack of seeing
13 anything that would indicate that there was a
14 push -- right up to the point in time when we got
15 a settlement, which I believe was a joint
16 settlement offer, after all this crap has gone on
17 here just recently.  I think we were offered
18 $20,000.  Bad faith in my opinion.
19     Q    But you have no piece of paper to show
20 me in your records --
21     A    I don't know whether the $20,000 offer
22 that came as a joint settlement offer from Nugget
23 and USF&G is in writing or if it was only oral or
24 verbal, so I don't know.
25     Q    But you don't know if USF&G told this

Page 215

1  person, pay a million dollars and pay it now?
2      A    No.
3          MR. SEWRIGHT:  For the record, you're
4  referring to Mr. Smithson?
5          MR. VIERGUTZ:  Yes.
6      A    I do not know that, you're correct.
7  BY MR. VIERGUTZ:
8      Q    Could go either way, couldn't it?
9  Could have happened; could not have happened?
10         MR. SEWRIGHT:  Object to the form of
11 the question.
12     A    Right.  I have not seen any
13 documentation.  I would presume in a case that's
14 of this potential magnitude where you've got
15 several people claiming that they've been injured
16 financially, there would be something in writing
17 back and forth between the two of you that would
18 indicate such, and that that would have come out
19 in the discovery process somehow or another where
20 we would have seen USF&G in fact was pushing
21 their client to settle it.
22 BY MR. VIERGUTZ:
23     Q    Why should they push their client to
24 settle it?
25     A    Depends.  Could depend on a number of

Page 216

1  factors.
2      Q    What?
3      A    Financial wherewithal of their client
4  to pay the claim or they're going to feel like
5  it's going to come back on their nickel,
6  relationship with the client, the amount of
7  bonding you do for people like the Corps of
8  Engineers.  The Corps doesn't like stuff coming
9  back on them.
10         There's a whole series of factors that
11 are business decisions that a prudent business
12 person would make that would lead to any number
13 of various possibilities to answer your question.
14     Q    Could one possibility be that they
15 believe that you're wrong and Nugget's right?
16     A    Do you really want me to answer that
17 question?
18     Q    Yes.
19     A    I don't believe you believe that.
20 How's that for an answer?
21     Q    It's not an answer.
22         MR. SEWRIGHT:  It is an answer.
23     A    It's an answer.  I don't believe that
24 you believe that.
25 BY MR. VIERGUTZ:

Page 217

1      Q    I want a yes or no.
2      A    Ask the question again.
3      Q    Could one of the possibilities be that
4  USF&G believes that you're wrong and Nugget's
5  right?
6      A    It could be a possibility.
7      Q    Okay.  Then we go to nonsettlement.
8  What do you mean -- what's your understanding of
9  that?
10     A    I'm sorry.  What paragraph is that?
11     Q    Same paragraph.  It's just the word
12 after nonpayment.
13         MR. SEWRIGHT:  Object to the form of
14 the question, if that is a question.
15     A    Which part of it?
16 BY MR. VIERGUTZ:
17     Q    Nonsettlement, just that word; what
18 does that mean to you?
19     A    We haven't got paid.  We haven't got
20 squat.
21     Q    And is it correct that USF&G does not
22 have to settle the case just like you don't have
23 to settle it if you choose not to; isn't that
24 correct?
25     A    We can take it all the way.

55  (Pages 214 to 217)

44607          Exhibit F
                    Page 4 of 5

Case No. A98-009 Civil (HRH)                    Jeffery Bentz

---

Page 218

1    Q    You bet.  Why can't they?
2    A    They can.
3    Q    Why is it bad faith if they make that
4    choice?
5        MR. SEWRIGHT:  Object to the form.
6    A    I guess it depends how much knowledge
7    they have about the case.  Early on in this case,
8    real early on, if I was USF&G, I might believe
9    what you just suggested might be one of the
10   possibilities, but I don't believe USF&G believes
11   that today.
12   BY MR. VIERGUTZ:
13   Q    And then it says, "and/or refusal to
14   discuss settlement."
15       Again, you're a businessman.  If you
16   get sued, you don't have to settle; you and I
17   have agreed on that, correct?
18   A    Correct.
19   Q    And so you don't even have to discuss
20   settlement with me if I sue you, do you?
21       MR. SEWRIGHT:  Object to the form.
22   A    Don't have to.
23       MR. SEWRIGHT:  Calls for a legal
24   conclusion.
25   A    I don't have to.

---

Page 219

1    Q    No.
2        MR. VIERGUTZ:  No further questions.
3    Thanks for your time.
4        MR. SHAMBUREK:  I don't have any.
5        MR. SEWRIGHT:  I have no questions.
6    We're done.
7        MS. HO:  Right.  Thanks for appearing.
8        (Proceedings concluded at 2:47 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 220

1        WITNESS CERTIFICATE
2    JEFFREY "JEFF" BENTZ   Taken November 21, 2005
3    I hereby certify that I have read the foregoing
     deposition and accept it as true and correct,
4    with the following exceptions:
5    _____
6    PAGE   LINE   CORRECTION
7    ____   ____   _____
8    ____   ____   _____
9    ____   ____   _____
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15   ____   ____   _____
16   ____   ____   _____
17   ____   ____   _____
18
19
20
21
22   _____
     Date      JEFFREY BENTZ
23
24   (Use additional paper to note corrections as needed,
     signing and dating each page.)    (LK)
25

---

Page 221

1        REPORTER'S CERTIFICATE
2
3        I, LESLIE J. KNISLEY, Shorthand Reporter
4    and Notary Public in and for the State of Alaska do
5    hereby certify:
6        That the witness in the foregoing
7    proceedings was duly sworn; that the proceedings
8    were then taken before me at the time and place
9    herein set forth; that the testimony and proceedings
10   were reported stenographically by me and later
11   transcribed under my direction by  computer
12   transcription; that the foregoing is a true record
13   of the testimony and proceedings taken at that
14   time; that the witness requested signature; and
15   that I am not a party to nor have I any interest in
16   the outcome of the action herein contained.
17       IN WITNESS WHEREOF, I have hereunto
18   subscribed my hand and affixed my seal this 15th
19   day of December, 2005.
20
21
22       LESLIE J. KNISLEY
         Notary Public for Alaska
         My Commission Expires:  12/31/06
23
24
25

56 (Pages 218 to 221)

446075                    Exhibit F
                          Page 5 of 5