

## OLES MORRISON & RINKER LLP

John Lukjanowicz

L A W Y E R S

**SURETY CLAIM**

**MAR 0 4 1998**

March 3, 1998

**VIA FEDERAL EXPRESS**

**PRIVILEGED WORK-PRODUCT**
**DOCUMENT**

Jane Bennett Poling, Esq.
Surety Claims Specialist
UNITED STATES FIDELITY
   and GUARANTY COMPANY
Mailstop: LB0201
6225 Centennial Way
Baltimore, MD  21209

|  |  |  |
|---|---|---|
| Re: | Principal: | Nugget Construction, Inc. |
|  | Bond Number: | 99-0120-50298-96-5 |
|  | Project: | Homer Spit Repair and Extension |
|  | Claimant: | Shoreside Petroleum, Inc. ("Shoreside") |

Dear Ms. Poling:

This letter follows up our telephone conversations and respective voicemail messages over the last several weeks concerning the above-referenced matter.  As you know, to date, four claims under the Miller Act have been asserted against Nugget Construction, Inc. ("NCI" or "Nugget"), and its payment bond surety, United States Fidelity and Guaranty, by the following entities, in the following amounts:

| Name of Claimant | Principal Amount Claimed to be Due |
|---|---|
| Spencer Rock Products | $1,425,707.84 |
| Northern Stevedoring & Handling Corp. | $ 124,724.98 |
| Chugach Rock Corporation | $ 86,444.84 |
| Shoreside Petroleum, Inc. | $ 53,062.93 |
| Total | $1,689,940.59 |

I understand that United States Fidelity and Guaranty Company already has denied the Miller Act claims asserted by Spencer Rock Products, Northern Stevedoring & Handling Corp., and Chugach Rock Corporation.  We urge you to deny the claims of Shoreside Petroleum, as well.

Jane Bennett Poling, Esq.
March 3, 1998
Page 2

Although NCI has separate defenses to each of the claims asserted by the various claimants, Nugget's primary defense to the claims of Northern Stevedoring, Chugach Rock and Shoreside Petroleum is predicated on the fact that Spencer Rock Products was a material supplier, rather than a subcontractor, to NCI on the referenced Project, and that the vendors to Spencer Rock Products are therefore not afforded protection under the Miller Act. As you requested, we explain this position in greater detail below.

## BACKGROUND

In order to put Nugget's position into perspective, I believe a bit of background would be helpful. When Nugget decided to bid on Invitation for Bid No. DACW85-96-B-0017, the Homer Spit Repair and Extension Project ("Project"), Nugget obviously knew that it needed a large quantity of rock to construct the Project, but it also knew that it was purchasing this rock as a building material, and not as an end product. Nugget would use rock, gravel and other building material to produce a structure--in this case a revetment--just as it would use lumber, steel, concrete, etc., to produce a building. Admittedly, the rock is a key component of the revetment, but it is no more important that the bedding gravel, which cushions the rock, or the classified fill, which stabilizes the top of the revetment and provides a road bed, or the keying of the stone. In short, the revetment is a system, and rock is but one part of the system.

The difficulty with obtaining rock is threefold: (1) finding a source of rock meeting the physical and chemical properties set forth in Project documents; (2) finding a source of rock which is not too naturally fractured; and (3) finding a source of rock that meets requirements (1) and (2) that is not within the boundaries of a national park or otherwise restricted for use.

In this case, where the rock came from was of no concern to Nugget. The three sizes of rock it needed for use on the Project are separate and distinct and not interdependent. All three sizes of rock could have come from one quarry or from several quarries. Nugget is aware of other rock jobs where the prime contractor obtains different classes of rock from different quarries. Toward that end, Nugget accepted bids from several quarries. As it turned out, Spencer had the best price on all three sizes of rock needed for use on the Project and would produce the three sizes of rock from one quarry. Nugget and Spencer executed a Material Contract on January 15, 1997.

Apparently, Spencer had other projects for which it was supplying rock during late 1996 and early 1997. As Spencer explained in a March 10, 1997 letter to Nugget, the "Spencer Quarry" was first developed by the Alaska Railroad in 1917 to provide construction materials for a protective dike. From 1991 through April 1996, "Spencer Quarry" operated continuously with inactive periods only during the winter months. Since 1991, some 500,000 tons of material have been removed, shipped, and incorporated into private, state and federal construction projects around the State of Alaska from the "Spencer Quarry."

From April 1996 through March 1997, customer commitments required Spencer to operate the quarry continuously. During late 1996 through 1997, Nugget believes that one of

Jane Bennett Poling, Esq.
March 3, 1998
Page 3

the projects for which Spencer was providing material was a rip-rap project for the Alaska Railroad Corp. ("ARRC"). Nugget has not seen Shoreside's invoices to Spencer for which Shoreside seeks recovery under the Miller Act. However, Nugget believes that at least some of the fuel in question for which Shoreside seeks recovery was used to produce rock for the ARRC Rip-Rap Project and to replenish and replace fuel from the on-site storage facilities Spencer describes in its March 10, 1997 letter to Nugget.[1] This conclusion is bolstered by the way in which Shoreside delivered fuel to the "Spencer Quarry." Shoreside did not provide any labor in delivering fuel to the quarry. Shoreside merely purchased fuel, FOB, ARRC tanker, at MAPCO's North Pole refinery. ARRC did all handling and MAPCO did the filling. Spencer transferred the fuel from the tanker to its permanent facilities. Shoreside was nothing but a middle man, which provided no equipment or labor in delivering the fuel to the quarry site.

As you know, Spencer had problems fulfilling its customer commitments to Nugget, and on April 23, 1997, Nugget and Spencer executed a "Support Agreement" under which NCI would provide labor and equipment support to Spencer in the production of certain specified rock materials at the quarry site. Ultimately, the quantity of rock required by the Project documents was delivered to the Project site. However, the majority of rock was delivered late. Some of the rock was nonconforming. Nugget spent a great deal of money helping Spencer meet its requirements for which Nugget seeks reimbursement.

Please note that there are essentially three types of charges that Nugget has against Spencer: (1) equipment rental; (2) support costs under the Support Agreement; and (3) back charges based upon Spencer's damage to a barge deck, failure to deliver rock as scheduled, and the costs which Nugget has incurred defending itself against claims from Spencer's vendors.

With this background in mind, we turn to a discussion of Spencer's status as a subcontractor or materialman.

## DISCUSSION

As you know, the Miller Act, 40 U.S.C. § 270a *et seq.*, requires a prime contractor on a federal project to furnish a payment bond to insure payment to individuals who supply labor and/or materials for federal projects. *United States ex rel. Consolidated Pipe & Supply Co. v. Morrison-Knudson Co.*, 687 F.2d 129, 131 (6th Cir. 1982). The Miller Act was designed as an alternative remedy to the mechanic's lien available in ordinary private construction disputes because a lien cannot attach to government property. *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 122, 94 S. Ct. 2157, 2161, 40 L. Ed. 2d 703 (1974). Although the Miller Act is to be construed liberally, it is limited by the proviso that the payment bond protects only those persons who have a contractual agreement with a prime contractor or

---

[1] A copy of Spencer's March 10, 1997 letter to Nugget is attached hereto as Exhibit A.

0057

Jane Bennett Poling, Esq.
March 3, 1998
Page 4

subcontractor engaged in a federal project. *Id.* Persons supplying labor or material to a mere materialman are not protected. *Id.*

Because Shoreside Petroleum had a contractual agreement with Spencer Rock, and not with NCI, Shoreside Petroleum is entitled to protection under the Miller Act only if Spencer Rock is deemed to be a subcontractor on the Project. Conversely, if Spencer Rock is deemed to be a materialman on the Project, Shoreside Petroleum could not assert a valid Miller Act claim. Thus, the primary issue concerning Shoreside Petroleum's claim is whether Spencer Rock was a subcontractor or a materialman on the Homer Spit Project. As we explain below, we think it is more likely than not that Spencer will be deemed to be a materialman, rather than a subcontractor.

## A.     DEFINITION OF SUBCONTRACTOR

The Supreme Court has defined a subcontractor as "one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract." *MacEvoy Co. v. United States ex rel. Calvin Tompkins Co.*, 322 U.S. 102, 109, 64 S. Ct. 890, 894, 88 L. Ed. 1163 (1944). The test for whether one is a subcontractor is based on the "substantiality and importance of his relationship with the prime contractor." *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 123, 94 S. Ct. 2157, 2162, 40 L. Ed. 2d 703 (1974). In *F.D. Rich*, the court reasoned as follows:

> It is the substantiality of the relationship which will usually determine whether the prime contractor can protect himself, since he can easily require bond security or other protection from those few "subcontractors" with whom he has a substantial relationship in the performance of the contract. . . . [W]hereas, this method of protection is generally inadequate to cope with remote and undeterminable liabilities incurred by an ordinary materialman.

*Id.* at 123-24.

## B.     TEST TO DISTINGUISH SUBCONTRACTOR FROM MATERIALMAN

In distinguishing a subcontractor from a materialman, the Ninth Circuit applies a balancing test with certain factors weighing in favor of a subcontractor relationship, particularly where the company assumed a significant and definable part of the construction project, and other factors weighing in favor of a materialman relationship. *See United States ex rel. Conveyor Rental & Sales Co. v. Aetna Casualty & Surety Co.*, 981 F.2d 448, 451 (9th Cir. 1992).

According to the Ninth Circuit, the following thirteen factors weigh in favor of a subcontractor relationship:

Jane Bennett Poling, Esq.
March 3, 1998
Page 5

1. The product supplied is custom fabricated;

2. The product supplied is a complex integrated system;

3. A close financial interrelationship exists between the companies;

4. A continuing relationship exists with the prime contractor as evidenced by the requirement of shop drawing approval by the prime contractor or the requirement that the supplier's representative be on the jobsite;

5. The supplier is required to perform on site;

6. There is a contract for labor in addition to materials;

7. The term "subcontractor" is used in the agreement;

8. The materials supplied did not come from existing inventory;

9. The supplier's contract constitutes a substantial portion of the prime contract;

10. The supplier is required to furnish all the material of a particular type;

11. The supplier is required to post a performance bond;

12. There is a backcharge for the cost of correcting the supplier's mistakes; and

13. There is a system of progressive or proportionate fee payment.

According to the *Conveyor Rental & Sales Co.* decision, the following five factors tend to weigh in favor of a materialman relationship:

1. A purchase order form is used by the parties;

2. The materials come from preexisting inventory;

3. The item supplied is relatively simple in nature;

4. The contract is a small percentage of the total construction cost; and

5. Sales tax is included in the contract price.

Jane Bennett Poling, Esq.
March 3, 1998
Page 6

## C.    FACTORS APPLIED TO SPENCER ROCK PRODUCTS

### 1.    Custom Fabrication

Was Spencer Rock required to "custom fabricate" the rock to meet the specifications found in NCI's Prime Contract with the Government?  This is a difficult question to answer without conducting some rather extensive discovery into the measures Spencer Rock Products undertook to insure the rock it was required to provide complied with the specifications found in NCI's Prime Contract with the Government.

A copy of the Specification Section 02270 is attached hereto as Exhibit B.  Under Section 1 of the NCI/Spencer Rock Products Material Contract, Spencer Rock Products agreed to furnish rock "[i]n accordance with the CONTRACT DOCUMENTS . . . all of which shall be considered part of [Spencer's Material Contract] by reference thereto." Although the applicable Prime Contract specification sections appear rather detailed, our initial assessment is that Spencer Rock Products did not have to "custom fabricate" rock to meet the specifications found in the Prime Contract.  After all, the rock from the Spencer Quarry either met the specification requirements, or it did not.  The only thing that Spencer Rock had to insure was that enough of each type of rock was produced.  It is NCI's position that providing the required amount of each type of rock does not constitute "custom fabrication" of the rock to meet the specifications of the Prime Contract.

In other words, subject to our further discovery efforts, NCI believes that producing enough of every type of rock is not the type of highly intricate customized fabrication necessary to be deemed a "subcontractor" rather than a "materialman." *See, e.g., Miller Equipment Co. v. Colonial Steel & Iron Co.*, 383 F.2d 669 (4th Cir. 1967) (where agreement called not for the mere supply of material but for the custom fabrication of massive girders and their accessories, key and integral components of the bridge, designed and fabricated to mesh precisely in their final assembly on the jobsite, subcontractor relationship found); *United States ex rel. Wellman Engineering v. MSI Corp.*, 350 F.2d 285, 287 (2d Cir. 1965) (where mechanism was built to the prime contract specifications for the unique task of rapid movement of a heavy concrete roof for missile launchers, entity deemed subcontractor rather than material supplier).

Instead, Nugget believes that the specifications in its Prime Contract with the Government, which were incorporated by reference into Spencer Rock's Material Contract, are more like the specifications in those cases finding a materialman relationship.  For example, in *Aetna Casualty & Surety Co. v. United States ex rel. Gibson Steel Co.*, 382 F.2d 615 (5th Cir. 1967), the Fifth Circuit found that the custom manufacturing of some steel and iron products used in a building "is simply not enough in itself to establish the relationship of responsibility and importance necessary to render a middle party a subcontractor." *See also United States ex rel. Pioneer Steel Co. v. Ellis Constr. Co.*, 398 F. Supp. 719, 721 (E.D. Tenn. 1975) (custom fabrication of trusses and pipe bridges for building not enough to establish subcontractor relationship); *Brown & Root, Inc. v. Gifford-Hill & Co.*, 319 F.2d 65, 66 (5th Cir. 1963) (involving sand and gravel specifications).

Jane Bennett Poling, Esq.
March 3, 1998
Page 7

The Tenth Circuit, in *United States ex rel. Bryant v. Lembke Constr. Co.*, 370 F.2d 293 (10th Cir. 1966), found a materialman relationship in circumstances where the specifications for concrete in the prime contract were "merely descriptive of what was to be furnished." *See also United States ex rel. Potomac Rigging Co. v. Wright Contracting Co.*, 194 F. Supp. 444, 447 (D. Md. 1961) (descriptive specifications for cribbing in retaining wall were "necessary whether the supplier is a subcontractor or only a material supplier").

The specifications in this case, which appear to be merely descriptive of what was to be furnished, are similar to the relatively uncomplicated specifications for steel products required for a building (*Gibson*), trusses and pipe bridges for a building (*Pioneer Steel*), sand and gravel for navigation locks (*Brown & Root*), concrete for buildings (*Lembke*), and cribbing for retaining walls (*Potomac Rigging*). The Corps of Engineers specifications in the present case were "necessary whether the supplier is a subcontractor or only a material supplier." *United States ex rel. Potomac Rigging Co. v. Wright Contracting Co.*, 194 F. Supp. 444, 447 (D. Md. 1961).

NCI therefore believes that the "custom fabrication" factor tends to support a materialman relationship between itself and Spencer Rock Products given the relatively simple requirements of the Corps of Engineers specifications incorporated by reference into Spencer Rock Products' Material Contract. After all, by its own admission, from 1991 Spencer had removed, shipped, and incorporated into private, state and federal construction projects some 500,000 tons of material not dissimilar to the material required on this Project. Indeed, Spencer was providing rip-rap to ARRC contemporaneously with providing it to Nugget. Moreover, Nugget had quotes from other vendors for rock. These factors tend to indicate there was no custom fabrication.

### 2.    Is the Rock a "Complex Integrated System"

We believe our discussion under the "custom fabrication" factor, above, conclusively establishes that the rock Spencer Rock Products was to provide does not constitute a "complex integrated system." Nugget submits that the revetment it constructed was a "complex integrated system." However, this system was comprised of several key components, all of which were brought to the Project site and assembled by NCI. The rock supplied by Spencer was only one part of this system.

### 3.    Financial Interrelationship Between NCI and Spencer

There is no close financial interrelationship between NCI and Spencer, except for NCI's charges against Spencer. Nugget hardly believes that its charges can be characterized as a close financial relationship between the parties.

As stated above, there really are three types of damages NCI has against Spencer:

1.    Equipment rental charges, separate from the Support Agreement;

2.    Charges under the Support Agreement; and

Exhibit B
Page 7 of 12

Jane Bennett Poling, Esq.
March 3, 1998
Page 8

3.    "Backcharges" not based on (1) and (2) above, but on Spencer's acts or omissions during performance, including:

    a.      Spencer's damage to a barge deck;

    b.      Spencer's failure to deliver rock as scheduled;

    c.      Spencer's delivery of nonconforming material; and

    d.      Spencer's failure to pay its vendors.

These are acts or omissions under the Material Contract for which Nugget incurred charges and for which it can validly backcharge Spencer. This latter group of charges has little, if anything, to do with the material Spencer provided.

4.    **Continuing Relationship Between NCI and Spencer**

Courts have found that a continuing relationship between the supplier and the prime contractor could be indicative of a "substantial and important" subcontractor relationship. For example, this factor has weighed in favor of a subcontract relationship where there is a close financial interrelationship between the companies, see *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 94 S. Ct. 2157, 40 L. Ed. 703 (1974), a requirement of shop drawing approval by the prime contractor, *United States ex rel. Consolidated Pipe & Supply v. Morrison-Knudson Co.*, 687 F.2d 129 (6th Cir. 1982), or a requirement that a supplier's representative be on the jobsite. *Id.*

In the present circumstance, there is no evidence of a close financial relationship between NCI and Spencer Rock Products, except for the charges as described above which arose from the Support Agreement between Nugget and Spencer. Although NCI did provide workmen and equipment under the Support Agreement, this relationship was not as ongoing or symbiotic as those in cases described above. Moreover, the fact that NCI worked alongside Spencer Rock Products to enable it to meet its contract completion deadline shows less than a complete transfer of the responsibility for this part of the work to Nugget. Therefore, Nugget believes that this factor weighs in favor of a materialman relationship.

5.    **On Site Performance**

The on site performance of a supplier has been regarded as a factor in support of a subcontract relationship by the Ninth Circuit. *See Basich Brothers Constr. Co. v. United States ex rel. Turner*, 159 F.2d 182, 183 (9th Cir. 1946) (supplier delivered material to prime contractor at site). In the present case, this factor weighs in favor of a materialman relationship because Spencer Rock Products did not perform any work on site. Its work effort concluded "FOB Barge Deck" at Seward, Alaska.

Jane Bennett Poling, Esq.
March 3, 1998
Page 9

### 6.    Contract for Labor

There was no separate contract for labor in addition to the materials.  This factor weighs in favor of a materialman relationship.

### 7.    Use of the Term "Subcontractor" in the Agreement

In accordance with the cases addressing this particular issue, the Ninth Circuit affords only *de minimus* consideration to the fact that the agreement was a "material contract" rather than a subcontract.  However, the *de minimus* consideration of the type of document the parties executed weighs in favor of a materialman status.

### 8.    Materials from Existing Inventory

Courts have found supplying noninventory materials to be a factor supporting a subcontractor relationship.  Conversely, supplying preexisting inventory would be a factor supporting a materialman relationship.  Once again, NCI will need to do some additional discovery to determine what part, if any, of the material Spencer Rock Products provided prior to the time of the Support Agreement came from existing inventory versus what part, if any, of the material Spencer provided was generated specifically for this Project.  However, to the extent that preexisting inventory was used, this would tend to indicate a materialman, rather than a subcontract, relationship.

### 9.    Proportionate Responsibility for the Prime Contract

In determining whether there is a "substantial and important" relationship between the companies, courts also look at the secondary contract's percentage of the prime contract. Nugget's Prime Contract with the Government totaled $3,378,491.60.  Of this amount, Spencer Rock Products was to provide 12,540 cubic yards of filter stone, 33,600 cubic yards of armor stone, and 7,320 cubic yards of toe stone, for a total of 53,460 cubic yards of rock.  Under the Material Contract, Nugget was to pay Spencer Rock Products $22.50 per ton for acceptable material provided.  Using a factor of 1.25 to convert per ton prices to cubic yard prices reveals that Spencer Rock's portion of the Prime Contract was $1,503,562.50 ($28.125 per cubic yard for 53,460 estimated cubic yards of material), or 44.5% of the prime contract value.

This factor weighs in favor of a subcontractor, rather than a materialman relationship.

### 10.    Supplier Required to Furnish All Material of a Particular Type

There is no question that Spencer Rock Products was to furnish all of the filter, armor and toe stones.  This would militate in favor of a subcontract, rather than a materialman, relationship.  However, please note that Nugget did have one subcontractor to perform on-site work--Quality Asphalt Paving.  Another supplier provided the bedding material.  Still another was to provide classified fill, but this ultimately came from the fines Spencer had in its filter

Jane Bennett Poling, Esq.
March 3, 1998
Page 10

stone. The point here is that there were other vendors besides Spencer which Nugget used on the Project.

### 11. Performance Bond

Nugget did not require Spencer Rock Products to furnish a performance bond. This factor militates in favor of a materialman relationship.

### 12. Backcharge for Cost of Correcting Supplier's Mistakes

Nugget's charges against Spencer Rock Products are significant. However, the backcharges for cost of correcting the supplier's mistakes are not very large. Instead, the majority of the charges relate to Nugget's efforts in helping Spencer Rock Products achieve a production rate that would allow Spencer to meet its schedule requirements under the Material Contract. Had Spencer delayed the Project more than it did, and had Nugget not worked along with Spencer to ameliorate the effect of Spencer's delay, the damages to Spencer would have been even greater. Nugget believes that this factor is neutral, but acknowledges that it could militate in favor of a subcontractor relationship. *See also* Item C(3) above.

### 13. Form of Payment

Courts have found that suppliers receiving progress payments or proportionate payments are more likely to be subcontractors, while suppliers receiving a fixed payment (*e.g.*, payment within 90 days) are more likely to be materialmen. This factor weighs on the subcontractor side because the Material Contract between Nugget and Spencer provided for payment within seven days of receipt of payment from the Owner for properly stored materials under Clause I57, "Payments Under Fixed Price Construction Contracts." Note, however, that this Prime Contract clause does not distinguish between "Subcontractors" and "Suppliers." Moreover, the sole determination as to when Spencer got paid was the Corps' approval of the rock delivered close to the Project site. This may weigh in favor of a materialman standing.

### 14. Other Factors

We note that Spencer Rock Products did not pay wages to its workmen pursuant to the Davis-Bacon Act. Spencer did not submit certified payrolls through Nugget to the Government to show compliance with the Davis-Bacon Act. This would militate in favor of a materialman, rather than a subcontractor, relationship.

On balance, we believe that the foregoing analysis indicates that the scales tip in favor of a materialman relationship between Nugget and Spencer Rock. There was no significant custom fabrication because the specifications in the Prime Contract were merely descriptive of what was to be furnished; there was no continuing relationship between Nugget and Spencer Rock Products; Spencer did not perform on site; and Spencer's Material Contract was not a subcontract. The factors tending to show a subcontractor relationship were the progressive, rather than the fixed, nature of payment and the relatively large percentage of the Prime

0064

Jane Bennett Poling, Esq.
March 3, 1998
Page 11

Contract that Spencer was to perform. We believe, however, these factors are outweighed by the other factors and that Spencer Rock Products will be deemed to be found a materialman, rather than a subcontractor under relevant Ninth Circuit precedent. *See United States ex rel. Conveyor Rental & Sales Co. v. Aetna Casualty & Surety Co.*, 981 F.2d 448 (9th Cir. 1982).

D.    DEFENSE TO SHORESIDE'S CLAIM

Even if Spencer is found to be a subcontractor, rather than a materialman, we believe that Nugget has valid defenses to Shoreside Petroleum's claim. We are unaware of any authority under which a supplier of fuel for equipment which apparently was owned by Spencer Rock Products can recover under the Miller Act for fuel utilized in operating that owned equipment. As we previously advised, assuming that the equipment that was fueled by Shoreside Petroleum was owned by Spencer Rock Products, the charges for such equipment could not properly be recoverable under the payment bond. *See Balzer Pacific Equipment Co. v. Fidelity and Deposit Co. of Maryland*, 895 F.2d 546 (9th Cir. 1990). If the owned equipment is not properly "lienable" under the Miller Act, NCI's position would be that charges by a fuel supplier for fueling that equipment would likewise not be "lienable."

Moreover, it appears as though Shoreside Petroleum may not have timely made claim under the Miller Act bond. As you know, Shoreside's claim would have to have been asserted within 90 days after the date that Shoreside Petroleum last provided fuel to Spencer Rock Products. The first that Nugget became aware of Shoreside Petroleum's claim was by way of an August 28, 1997 letter from Shoreside Petroleum's Vice President of Marketing to the Army Corps of Engineers. In that letter, Shoreside Petroleum asserted that Spencer Rock Products was "five months past due and that Shoreside Petroleum had not received any payments since March of 1997 from Spencer Rock Products. Although Nugget will need to undertake further discovery concerning this issue, it appears as though this notice may be untimely, coming more than ninety days after Shoreside last supplied fuel in connection with the Project.

Finally, we question whether Shoreside provided the appropriate type of "labor" or "materials" covered under the Miller Act. "Labor" recoverable under the Miller Act traditionally has been limited to the concept of physical toil at the job site. *United States ex rel. Naberhaus-Burke, Inc. v. Butt & Head, Inc.*, 535 F. Supp. 1155, 1158 (S.D. Ohio 1982). As explained above, Shoreside served as a middleman and did not provide any sort of labor in loading, delivering or unloading fuel. As also noted, the material that Shoreside allegedly provided could have been used for other projects or to replace existing inventory and not for specific use on this Project. If so, it would be NCI's position that such fuel is not lienable under the Miller Act.

We trust this letter adequately responds to your concerns concerning the Shoreside Petroleum claim. If not, or if you have any additional questions, please feel free to contact me.

After drafting this letter, but before sending it, I learned that Shoreside had been allowed to intervene in Northern Stevedoring's Miller Act lawsuit as a party plaintiff. Notification of this

0065

Jane Bennett Poling, Esq.
March 3, 1998
Page 12

fact is attached hereto as Exhibit C. Although this does not change our analysis herein, it does make for a more complicated lawsuit.

Very truly yours,

OLES MORRISON & RINKER LLP

John Lukjanowicz

JL:sda
C-JL LE-POLING 0217 983270002.doc

cc:     Nugget Construction, Inc. (w/o encl.)

0066