Herbert A. Viergutz, Esq.
Barokas Martin & Tomlinson
1029 West Third, Suite 280
Anchorage, AK 99501
Phone: (907) 276-8010
Facsimile: (907) 276-5334

Attorneys for United States Fidelity and Guaranty Company

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA AT ANCHORAGE

| | |
|---|---|
| UNITED STATES OF AMERICA for the use of NORTH STAR TERMINAL & STEVEDORE COMPANY, d/b/a NORTHERN STEVEDORING & HANDLING, and NORTH STAR TERMINAL & STEVEDORE COMPANY, d/b/a NORTHERN STEVEDORING & HANDLING, on its own behalf, | |
| Plaintiffs, | |
| and | |
| UNITED STATES OF AMERICA for the use of SHORESIDE PETROLEUM, INC., d/b/a MARATHON FUEL SERVICE, and SHORESIDE PETROLEUM, INC., d/b/a MARATHON FUEL SERVICE, on its own behalf, | |
| Intervening Plaintiffs, | No. 3:98-cv-9 (HRH) |
| and | |
| METCO, INC., | |
| Intervening Plaintiff, | |
| vs. | |
| NUGGET CONSTRUCTION, INC.; SPENCER ROCK PRODUCTS, INC.; UNITED STATES FIDELITY AND GUARANTY COMPANY; and ROBERT A. LAPORE, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF MOTION TO BAR THE INTRODUCTION OF MR. CALLOW S PROFFERED EXPERT OPINION AND TESTIMONY**

1

# I.
# INTRODUCTION

The proffered expert testimony of Grant Callow must be precluded in this case. As a threshold matter, Mr. Callow is not qualified to testify as an expert in the field of surety law. Moreover, even if he was qualified as an expert on surety law, the data he relied upon in forming his opinions is not of the type of data reasonably relied upon by other experts in his field, is speculative, and constitutes inadmissible hearsay. Finally, the probative value of Mr. Callow's testimony is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and is likely to mislead a jury.

# II.
## MR. CALLOW S OPINIONS, TESTIMONY AND REPORT ARE PRECLUDED BY THE FEDERAL RULES OF EVIDENCE AND RELEVANT CASE LAW

The Federal Rules of Evidence address the admissibility of expert testimony generally as well as the independent admissibility of the facts and theories upon which expert witnesses base their opinions and conclusions. Federal Rules 702, 703 and 705 grant expert witnesses testimonial latitude unavailable to other witnesses on the "assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline". <u>Kumho Tire Co. Ltd., et.al., v. Charmichael</u>, 119 S.Ct. 1167 (1999).

Rule 702 of the Federal Rules of Evidence states as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

Rule 703 of the Federal Rules of Evidence provides as follows:

The facts in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or

2

before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subjects, the facts or data need not be admissible in evidence.

Rule 705 of the Federal Rules of Evidence provides that:

The expert may testify in terms of opinion or inference and give reasons therefore without first testifying to the underlying facts or data, unless the court requires otherwise.  The expert may in any event be required to disclose the underlying facts or data on cross-examination.

Rule 703 departs from the common law in permitting an expert to utilize inadmissible facts and data in formulating an opinion that are not admissible in evidence, provided that the facts or data be of the type reasonably relied upon by experts in that particular field of expertise.  <u>Nachtsheim v. Beech Aircraft Corp</u>., 847 F.2d 1261, 1270 (7th Cir. 1988).  None of these rules, however, address whether the expert may reveal to the jury the factual basis of his opinions, if those facts are not independently admissible into evidence. <u>Nachtsheim</u>, <u>supra</u>, at 1270.  Indeed, many Courts have found that Rule 703 does not guarantee the admissibility of all expert testimony that meets its criteria if such testimony runs afoul of other evidentiary requirements. <u>Finchum v. Ford Motor Co.</u>, 57 F.3d 526, 532 (7th Cir. 1995); <u>Estate of Arrowwood v. State of Alaska</u>, 894 P.2d 642, 647 (Alaska 1995) (interpreting Alaska Evidence Rule 703); <u>Alpex Computer Corp. v. Nintendo Co.</u>, 994 WL 139423, at *10 (S.D.N.Y. March 18, 1994); <u>Robertson v. Union Pacific Railroads Corp</u>., 954 F.2d 1433, 1435 (8th Cir. 1992); <u>Gong v. Hirsch</u>, 913 F.2d 1269, 1273 (7th Cir. 1990); <u>Nachtsheim</u>, <u>supra</u>, at 1270; <u>United States v. Schrima</u>, 819 F.2d 996, 1002 (11th Cir. 1987); and <u>Barrel of Fun, Inc. v. State Farm Fire & Casualty Co.</u>, 739 F.2d 1028, 1033 (5th Cir. 1984).

Admission of evidence under Rule 703 is not compelled merely because otherwise inadmissible evidence "can be styled by one expert witness as something he

relied upon in reaching his opinion". United States v. Mest, 789 F.2d 1069, 1074 (4th Cir. 1986); Polythene Systems, Inc. v. Marina Ventures International, Ltd., 993 F.2d 1201, 1207 (5th Cir. 1993); Emigh v. Consolidated Rail Corp., 710 F.2d 608, 613 (W.D.Pa. 1989); and Rose Hall, Ltd. v. Chase Manhattan Overseas Banking, 576 F.2d 107, 158, n 70 (E.D.Del. 1983). Instead of freely admitting otherwise inadmissible evidence under Rule 703 simply because it was relied on by an expert, Courts should first conduct an "independent analysis" of the evidence before admitting it, i.e. that the facts are of a type reasonably relied upon by experts in this field. Rush Presbyterian St. Luke's Medical Center v. Safco Insurance Co., 722 F. Supp. 485, 498 (N. D. Ill. 1989); Nachtsheim, supra, at 1270 - 71. This line of cases support the conclusion that a party cannot be permitted to present evidence that would otherwise be inadmissible (as hearsay, speculative or lacking in foundation, etc.) through the back door, by characterizing such evidence as items relied upon by their expert witness.

Courts should be especially wary where otherwise inadmissible evidence is proffered under Rule 705 during direct examination. See, C. Mueller, Federal Evidence Section 357, at 689 (2d ed. 1994). Such inadmissible evidence has been found to be "inherently unreliable". Based on this rationale, the evidence was precluded. See, e.g., Marsee v. United States Tobacco Co., 866 F.2d 319, 323 (10th Cir. 1989).

Rule 403 of the Federal Rules of Evidence also addresses the admissibility of evidence by balancing the probative value of the evidence with the prejudicial nature of the evidence. Rule 403 provides:

> Although relevant, evidence may be precluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading a jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Thus, a Court has the discretion to preclude evidence when its probative value is substantially outweighed by the danger of unfair prejudice. An expert's opinion may be based on such erroneous facts or data, such unsound methodology, or such internally inconsistent reasoning that its probative value is minimal, at best. The risk of a special kind of prejudice is created by the presentation of expert testimony. The fact that a witness is qualified as an "expert" under Rule 702 may make the jury more likely to believe the witness's testimony, based solely upon the fact he has been declared an expert and that the jury is not familiar with the field about which the witness is testifying.

Case law also supports the conclusion that Mr. Callow's testimony must be precluded. In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S. Ct. 2786, 125 L. ed. 2d 469 (1993), the United States Supreme Court addressed the predicates for admissibility of scientific expert testimony. It noted that such testimony is admissible only if it is both relevant and reliable, and held that the Federal Rules of Evidence "[a]ssigned to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation, and is relevant to the task at hand." Id. at 597. Among the factors the Court discussed in analyzing the prerequisites for admissibly of expert testimony, were such matters as testing, peer review, error rates and "acceptability" in the relevant scientific community; factors which would prove helpful in determining the reliability of a particular scientific "theory or technique." Id at 593-94.

Following <u>Daubert,</u> The Supreme Court in <u>Khumho Tire Co. Ltd., et.al., v. Charmichael</u>, supra, made clear that <u>Daubert's</u> holdings regarding the gate keeping function of the court, as mandated by the Federal Rules of Evidence, applies not only to expert testimony based on "scientific" knowledge, but to testimony based on "technical" and "other specialized" knowledge. With respect to whether <u>Daubert</u> should be limited to scientific testimony, the Court stated as follows:

> The initial question before us is whether this basic gatekeeping obligation applies only to "scientific" testimony or to all expert testimony. We, like the parties believe that it applies to all expert testimony.

Id. at 5.

The Court indicated that Daubert's general principles applied to the expert matters described in Rule 702, which establishes a standard of evidentiary reliability, requiring a valid connection to the pertinent inquiry as a pre-condition to admissibility. The Court went on to indicate that "where such testimony's factual basis, data, principles, methods, or other application are called sufficiently into question, the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline." Id at 6.

Subsequent to Daubert, the Ninth Circuit Court of Appeals developed a four-part test to determine the admissibility of expert testimony. To be admissible, the testimony must: (1) be by a qualified expert; (2) be on a proper subject; (3) be in conformity to a generally accepted explanatory theory; and (4) have a probative value which outweighs any prejudicial effects. Beech Aircraft v. U.S., 51 F.3d 834 (9th Cir. 1995). Expert testimony must satisfy all four prongs to be admissible. Therefore, although an expert may be qualified to testify on a particular subject, he or she must also rely upon proper facts and methodology in forming his or her opinion. Likewise, such opinion is still inadmissible if its prejudicial effect outweighs its probative value. In this case, none of these prongs have been satisfied. As demonstrated more fully below, Mr. Callow is not qualified as an expert in surety law. His opinions are based on speculation and hearsay, are totally lacking in foundation and the probative value of the testimony is far outweighed by the prejudice of its admission. Accordingly, his testimony is inadmissible under the Beech standard.

Expert testimony must also be excluded where it is based on unfounded assumptions. In Target Market Publishing, Inc., v. ADVO, Inc., 136 F. 3rd 1139 (7th Cir. 1998), the Seventh Circuit Court of Appeals considered an appeal from a grant of summary judgment in favor of the defendant, which included, as a part of its ruling, a rejection of proffered expert testimony of an accountant and business appraiser, finding that the expert's opinion relied upon "mere assumption . . . from which no reasonable inference of lost profits could be drawn." Id. at 1142. The Target Market court also concluded (a year before Khumho Tire was decided) that even in a "non-scientific" field, the district court should still act as a "gatekeeper" to exclude testimony from an expert based on assumptions that do not support the conclusions. Quoting from General Electric Co. v. Joiner, 118 S.Ct. 512, 139 L.Ed.2d 508, 515 (1997), the court indicated its approval of a decision to exclude expert testimony on the grounds that it "did not rise above subjective belief or unsupported speculation." 136 F.3d at 1143.

Similarly, in Ebker v. Tan Jay Int'l Ltd., 741 F. Supp. 448 (S.D.N.Y. 1990), the court also precluded expert testimony that was based on assumptions. In Ebker, plaintiff brought an action alleging defendants wrongfully repudiated an oral agreement by firing and excluding her from being a part of a joint venture, and sought an accounting from the defendants for their acts. The defendants denied the allegations and asserted via counterclaim that plaintiff interfered with their business operations, resulting in lost profits. In an attempt to establish the value of the assets, plaintiff relied upon the testimony of two accountants. On cross-examination, the accountants conceded that their opinions were based upon various assumptions that the venture would continue for a period of five years. The defendants objected to the accountants' testimony on the ground that the testimony was irrelevant and inadmissible under Rule 703. The Court agreed that the testimony, although presented by knowledgeable and

credible experts, was based on the assumption that the joint venture would continue for a period of five years and struck the testimony in its entirety. Id. at 464. See Imigh v. Consolidated Rail Corp., 710 F Supp. 608 (W.D.Pa. 1989), (expert medical testimony precluded on ground that basis for the testimony was "so unreliable as to render it more prejudicial than probative, making it inadmissible under Rule 403, Rule 703 cannot be used as a back door to get the evidence before the jury.") See also, Abdulghani v. Virgin Islands Seaplane Shuttle, 740 F Supp. 371 (D. Virgin Islands 1989)(estimates used by the expert were based on interviews without verifiable documentation, and thus the methods used to calculate damages were faulty, making the factual predicates that supported the expert's calculations too speculative to admit his testimony).

Thus, pursuant to the dictates of the Federal Rules of Evidence, Mr. Callow's "expert" testimony must be precluded. As will be demonstrated below, Mr. Callow is not qualified to testify as an expert witness in the field of surety law. The data he relied upon is not of the type of data reasonably relied upon by other experts in his field; his opinions are no more than mere speculation and his testimony constitutes inadmissible hearsay; and, finally, any probative value of his testimony is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and is very likely to mislead a jury.

Additionally, the facts and assumptions Mr. Callow relied on in formulating his opinions are so unreliable as to render his opinions prejudicial. His assertions are based entirely upon unfounded, unverifiable information. There is absolutely no documentation to support the information he relied on, nor did he do anything to verify the information that was given to him, which he used in forming his opinions. It is evident from his testimony that his theories are almost entirely based upon speculation, unsupported by documentation, and without any basis in fact. Similarly, as is evident

from his deposition transcript and exhibits, Mr. Callow relied almost exclusively on input from counsel, Discovery Responses prepared by counsel and various correspondences which sources lack reliability and credibility, rendering such opinions more prejudicial than probative. Consequently, his testimony must be precluded.

### III.
### THE DEPOSITION TESTIMONY OF MR. CALLOW REVEALS THAT HE IS NOT QUALIFIED TO SERVE AS AN EXPERT WITNESS IN THIS CASE

Mr. Callow's deposition testimony reveals, without question, that he is not competent to render an expert opinion in the field of surety law. His education, training, professional history and experience are completely devoid of any connection to the field of surety. Moreover, he admits that he has never testified as an expert witness in the field of surety law.

Attached as Exhibit A is Mr. Callow's deposition transcript and exhibits. At page 12 of his Report (Appendix 1 to Exhibit A), Mr. Callow admits:

> I have not served as an expert witness regarding bad faith practices of an insured or surety. However, I have undertaken many cases involving conduct and/or claims of bad faith against <u>insureds</u> in the past (20) years. I also taught a continuing legal education course on the subject of discovering and proving <u>insurance</u> bad faith (emphasis added).

At pages 17 and 18 of his deposition, in response to a question as to his general area of practice he states "Well, I have been doing a fair amount of insurance coverage work and sometimes that has arisen in the context of personal injury, sometimes the personal injury spins off into insurance bad faith. I have, in recent years, been undertaking - - I've been doing less of that and doing a variety of other things. . ." There is no dispute that, Mr. Callow's practice does not and never has involved bad faith of a surety and/or bad faith surety practices. At page 6 of his deposition, he concedes that

he has never represented a surety.[1]  At pages 25 - 26, he further concedes that his teaching experience has not included anything with respect to surety law.[2]  To demonstrate his lack of knowledge with respect to surety law, one need only look at his testimony on page 25 that he has considers sureties to be insurers, which is legally incorrect under Alaska law.[3]  Moreover, a review of Mr. Callow's resume (Appendix 4 to exhibit A) further documents that he has no experience, background, or history of dealing with any cases involving surety law.  Finally, he never served as an expert on the issue of surety law.[4]  Because Mr. Callow is not qualified to testify as an expert

---

[1] 19    Q. Have you ever represented a surety?
    20    A. No.

[2] 15    Q. Have you ever taught a continuing legal
    16  education course on the subject of discovering and
    17  proving surety bad faith?
    18    A. Well, to the extent that I consider
    19  sureties and did consider -- have considered
    20  sureties to be insurers, the answer is yes. But
    21  specifically, in that particular course, I never
    22  discussed sureties.
    23    Q. Are you aware that there is a body of law
    24  called suretyship law?
    25    A. Yes.

    1    Q. And was that covered in your continuing
    2  education course?
    3    A. No, sir.

[4] At page 87, lines 4-11, Mr. Callow admits:
    4    Q. Have you ever served as an expert witness
    5  in any case?
    6    A. I'm trying to think.
    7  I've testified a number of times; I don't

witness in this litigation involving surety issues (not insurance issues) neither his testimony nor his opinions should be admitted into evidence.

An opinion, such as that proffered by Mr. Callow, which is not supported by credentials must be excluded. Certainly, the probative value of such testimony, if any, is substantially outweighed by the danger of unfair prejudice that unwarranted emphasis will be placed on the testimony of an expert whose opinions are lacking in credible foundation. The advisory committee notes to Rule 403 define "unfair prejudice" as "an undue tendency to suggest decision on an improper basis". A jury comprised of lay persons unfamiliar with the technicalities of a particular field of expertise may be persuaded to improperly base its decision upon the seemingly impressive credentials of an expert, and the opinion rendered by such expert, despite a lack of sufficient facts or data which would properly lead to the conclusion reached.

Thus as a threshold matter, regardless of the basis of his testimony, Mr. Callow's testimony must be stricken because he is not a competent expert in the field of surety law. Even if he was competent to testify as a surety expert, which USF&G denies, his deposition testimony demonstrates that his opinions are based on nothing more than speculation and hearsay, and are therefore inadmissible and that he relied extensively on file letters; Discovery Responses and representations of counsel for Plaintiffs in arriving at his opinion. Further, in many respects, the deposition testimony was

---

8   know whether I have been asked to testify as an
9   expert. I was -- I testified in the Weiford case.
10   I don't -- I don't believe that I've been asked to
11   testify as an expert previously.

unintelligible and/or contrary to established law. The following excepts demonstrate this point.

```
9      Q.  Would you define bad faith for me, please?
10     A.  Well, bad -- there are a couple of
11   different standards for bad faith.  But bad faith is
12   the breach of the duty of good faith and fair
13   dealing that is implied in every contract, including
14   every insurance contract.  And, according to Alaska
15   case law, every surety contract.
```

**(Page 10, lines 2-15).**

```
19     Q.  What are the differences between --
21     Q.  -- between a surety and an insurer?
22     A.  Well, a surety is actually providing
23    protection to -- it's a type of a third-party
24    contract.  And the best definition of it and
25   distinction is in a case up here called the Loyal
1    Order of Moose, I don't know what the cite is, but
2    that will tell you specifically what it is.
3        But in the normal insurance circumstance,
4    an insurer provides protection to the insured
5    against third-party liability.  A surety, on the
6    other hand, is really providing protection to a
7    third party.  And that's the essential difference.
```

**(Page 18, line 19 - Page 19, line 7).**

```
22     Q:  Do you know what reasons Nugget had for its actions or inactions?
23     A.  Well, the simple answer is that I believe
24   that what Nugget was trying to do was to maximize
25   its income from the project at the expense of the
1    subs.
2    Q.  And how do you come to that conclusion?
3    A.  Well, because Nugget was seeking payment on
4     this job and was not paying the subcontractors.
5    Q.  And for your answer are you assuming that
6    Shoreside or North Star were subcontractors to
7    Metco?
8    A.  Well, yes.
```

**(Page 23, Line 22 - Page 24, Line 8).**

```
1      A.  You're referring to the top letter on
```

```
 2   Exhibit 3?
 3      Q. Yeah.  Some of the others may not, but I
 4   assumed these are all produced.
 5         If you go to the bottom of page 6.
 6      A. Of my report?
 7      Q. Yeah.
 8      A. Okay.
 9      Q. That's Exhibit 1.
10      A. Yes.
11      Q. And there you're saying, about in the third
12   or fourth sentence, there does not appear ever to
13   have been a discussion of the possible liability for
14   the claims of Shoreside Petroleum or Metco, although
15   I understand their claims and defenses are similar
16   to North Star…

 1      Q. Then if you'd go to page 4 of Exhibit 3.
 2         MR. SEWRIGHT:  You mean the fourth page?
 3         MR. VIERGUTZ:  Yeah.
 4         THE WITNESS:  That's the letter dated
 5   December 3?
 6   BY MR. VIERGUTZ:
 7      Q. Yeah.  That's to Shoreside, correct?
 8      A. Yes.
 9      Q. From USF&G?
10      A. Yes.
11      Q. And then the next page is a letter to
12   Shoreside dated April 7th?
13      A. Yes.
14         MR. SEWRIGHT:  19 --
15         THE WITNESS:  '98.
16   BY MR. VIERGUTZ:
17      Q. Yeah.  One is December 3, '97, one is
18   April 7, '98.  Have you ever seen those before?
19      A. I think so.  I'm not sure.
20      Q. Are they not documents that discuss the
21   potential liability of Shoreside? . . .
 5      A. Yes, the December 3 and the December 7th,
 6   yes.
```

**(Page 47, Line 1 - Page 49, Line 6).**

```
 2      A. Well, no.  Here -- I mean, the April 7th
 3   letter they're certainly being addressed.
 4      Q. Okay.
 5      A. April 7 of '98.
 6      Q. Do you recall ever seeing a Shoreside proof
 7   of claim in any document you reviewed?
 8      A. I don't recall.  I don't recall seeing
 9   one.
```

13

```
10      Q.  Do you recall ever seeing, in what you
11   reviewed, any letter from Shoreside to USF&G
12   transmitting documents to prove up their claim?
13      A.  No, I don't.  I can't recall that.  I --
14   for the purpose of my report, I assumed that the
15   proof of claim had been made and filed.  I figured
16   that this case wouldn't have gotten where it did if
17   there hadn't been an appropriate proof of claim
18   filed.
19      Q.  Is the same true for answers regarding
20   Metco?
21      A.  Well -- yeah.
22      Q.  Did you assume -- my question is, did you
23   assume that they filed a proof of claim and
24   transmitted documents to USF&G?
25      A.  Well, when I say "I assumed," as I went

1    through this, I can't sit here and say that I recall
2    specifically any proof of claim.  I guess the best
3    way to say it is, if I went back through the
4    documents to see if they were there, I'm sure I
5    would have noticed if there wasn't a proof of claim.
6       Q.  And do you recall seeing -- I think you
7    answered this question, and I don't want to be
8    redundant.  But you don't recall seeing any letter
9    from Shoreside or Metco transmitting documents to be
10   reviewed by USF&G?
11      A.  As I sit here today, no, and I have to say
12   I didn't -- I didn't review those.
```

**(Page 51, Line 2   Page 52, Line 12).**

```
6       Q.  Paragraph 38 says:  "Upon information and
7    belief, and subject to such further evidence as is
8    disclosed by discovery, USF&G is also liable to
9    North Star, under Alaska law, for the bad faith
10   nonpayment, nonsettlement and/or refusal to discuss
11   settlement of North Star's claim previously brought
12   under the Miller Act herein, of which USF&G was
13   notified."
14         Where do you see a claim for bad faith
15   failure to investigate in that paragraph?
16      A.  I don't.
```

**(Page 57, Lines 6   16).**

```
10      Q.  And if your client, the surety, says these
11   claims do not have merit, or they have questionable
12   merit, can they then refuse to settle the claims?
13      A.  If they have -- if they have a good faith
14   basis for believing that the claims have no merit,
```

14

```
15    absolutely they can refuse to settle the case.
```

**(Page 61, Lines 10 – 15).**

```
14       A.  I'm aware of representations made to me by
15    Mr. Shamburek and Mr. Sewright.  I don't recall
16    actually preparing the settlement -- or reviewing
17    any settlement offers in this case.
```

**(Page 78, Lines 14 – 17).**

```
22       Q.  The second sentence there, it says, "The
23    litigation tactics of Nugget and USF&G have
24    reportedly escalated the costs unreasonably."
25       A.  Yes.

1        Q.  Is that based on representations made to
2     you by Mr. Shamburek and Sewright?
3        A.  Yes.
```

**(Page 84, Line 22 - Page 85, Line 3).**

## V.

## CONCLUSION

Thus, pursuant to the Federal Rules of Evidence and established case law, Mr. Callow's "expert" testimony must be precluded.  Initially, there can be no dispute that he does not have the qualifications to testify as an expert on surety law issues.  Even, if he was qualified to testify as a surety expert, the substance of his opinion and foundation for the same is speculative at best, based on unsupported assumptions and inadmissible hearsay, as well as significant input from counsel.  Based on the above, any probative value of his testimony is substantially outweighed by the danger of unfair prejudice of its admission.  Therefore, exercise of this court's gatekeeper function requires that his testimony and opinions be precluded as a matter of law.

Dated this 1st day of May, 2006.

        /s Herbert A. Viergutz
        _____
        Barokas Martin & Tomlinson
        1029 West Third, Suite 280
        Anchorage, AK 99501
        Phone:  (907) 276-8010
        Facsimile:  (907) 276-5334
        **barmar@gci.net**
        Alaska Bar No. 8506088

**CERTIFICATE OF SERVICE**
I HEREBY CERTIFY that a copy of this document was served by electronic notification on this 1st day of May, 2006, to:

Michael W. Sewright, Esq.
Burr, Pease & Kurtz
810 N Street
Anchorage, AK  99501

Paul Stockler, Esq.
1309 West 16th Avenue
Anchorage, AK  99501

Traeger Machetanz, Esq/Tom Krider, Esq.
Oles Morrison Rinker & Baker, LLP
745 4th Avenue, Suite 502
Anchorage, AK 99501-2136

Steven J. Shamburek, Esq.
Law Office of Steven J. Shamburek
425 G Street, Suite 630
Anchorage, AK  99501-5872

S/Herbert A. Viergutz