Steven J. Shamburek
Alaska Bar No. 8606063
LAW OFFICE OF STEVEN J. SHAMBUREK
425 G Street, Suite 630
Anchorage, Alaska 99501
(907) 522-5339 Direct
(907) 522-5393 Fax

Attorney for Plaintiffs
Shoreside Petroleum, Inc.,
d/b/a Marathon Fuel Service
and Metco, Inc.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| UNITED STATES OF AMERICA for the use of NORTH STAR TERMINAL & STEVEDORE COMPANY, d/b/a Northern Stevedoring & Handling, and NORTH STAR TERMINAL & STEVEDORE COMPANY, d/b/a Northern Stevedoring & Handling, on its own behalf,<br><br>　　　　Plaintiffs,<br><br>　and<br><br>UNITED STATES OF AMERICA for the use of SHORESIDE PETROLEUM, INC., d/b/a Marathon Fuel Service, and SHORESIDE PETROLEUM, INC., d/b/a Marathon Fuel Service, on its own behalf,<br><br>　　　　Intervening Plaintiffs,<br><br>　and<br><br>METCO, INC.,<br><br>　　　　Intervening Plaintiff,<br><br>　vs.<br><br>NUGGET CONSTRUCTION, INC.; SPENCER ROCK PRODUCTS, INC.; UNITED STATES FIDELITY AND GUARANTY COMPANY; and ROBERT A. LAPORE,<br><br>　　　　Defendants. | **SHORESIDE'S AND METCO'S MOTION AND MEMORANDUM FOR SUMMARY JUDGMENT AND DETERMINATION OF LAW REGARDING NUGGET CONSTRUCTION**<br><br><br><br><br><br><br>Case No. A98-0009-CV (HRH) |

1

COMES NOW Shoreside Petroleum, Inc., d/b/a Marathon Fuel Service ("Shoreside") and Metco, Inc. ("Metco"), by and through counsel, and file this Motion and Memorandum For Summary Judgment And Determination of Law Regarding Nugget Construction.

## Introductory Note

At many times in this proceeding, the undersigned has observed that this matter should have settled after the exchange of letters between and among the parties in July and August, 1997. That is the typical resolution of Miller Act claims. Oles Morrison has assigned a platoon of attorneys[1] to assist in the project to avoid payment and to perpetuate the fraud against the three claimants in this proceeding (and other entities such as Spencer Rock Products and Chugach Rock Corporation). The attorney's fees spent by the defendants surely are approaching one half million dollars ($500,000.00), whereas Nugget and/or USF&G could have resolved all of the claims for less than half that amount at the outset of the case. What has not emerged is an explanation of why Nugget is committed to defrauding the suppliers and materialmen who contributed necessary goods and critical services to the completion of the Homer Project. Nugget appears to seek to do business by litigation and retains legal counsel who advance its "macho" view of the practice of business and law.

---

[1] The attorneys include John Lukjanowicz, Traeger Machetanz, C. Russell Lewis, William K. Renno, Saphronia R. Young, Christine V. Williams, Gloria Y. Ho, and most recently Thomas Krider.

## I. Factual Basis

Shoreside and Metco develop the factual basis of their claims in careful detail in the companion motion filed against USF&G. To save paper, those factual statements are incorporated by reference in this motion.

No one disputes that Greg Poynor admitted at his deposition that Mr. Lukjanowicz with Oles Morrison prepared at least one if not more of the letters that were printed on Nugget stationery and sent to various entities. One specific letter prepared by Mr. Lukjanowicz even includes a representation that a courtesy copy of the final version was sent to his own firm, Oles Morrison. Nugget's efforts to avoid payment appear to have included the active assistance and participation of counsel.[2]

Mr. John Dennis Stacey, the President of Chugach Rock Corporation, was involved with the Homer Project and has known Mr. Randy Randolph, Nugget's Project Engineer in control of the Homer Project, for some time. In his affidavit, Mr. Stacey avers:

I, John Dennis Stacey, under oath, say:

My name is John Dennis "Dennis" Stacey. I am the President of Chugach Rock Corporation (CRC), P.O. Box 91219, Anchorage, Alaska 99509, a corporation in good standing. I have been the President of CRC since it was formed in 1991. I make these statements based on personal

---

[2] The Court may become concerned at trial that the testimony of Oles Morrison attorneys is critical. See generally Moog v. National Bank of Alaska, 846 P.2d 806 (Alaska 1993). Oles Morrison knows the extent of its involvement in this conspiracy. The Court can request Oles Morrison to show cause that it is capable of continuing to serve as counsel for the defendants. The claimants are not obligated to pursue this matter at this time, yet written notice of this possible problem is prudent.

knowledge in the capacity of President of Chugach Rock Corporation.

CRC managed business activities for the owners of the Spencer Glacier Pit and Quarry mineral materials permit from 1991-1997. The mineral materials permit was issued by the United States Forest Service (USFS) to Spruce Sand & Gravel Inc.

CRC contracted with various contractors to operate the pit and quarry resource during 1991-1997. TRECON INC. (TRECON) was the operator during 1991- 1994. Spencer Rock Products Inc. (SRPI) was the operator during 1995-1997.

TRECON sold its quarry assets to SRPI around the end of 1994. Greg Poynor and L.D. (Randy) Randolph were employees or consultants to TRECON. Both Poynor and Randolph are believed to have become employees or consultants to Nugget Construction Inc. (NUGGET).

Randolph is also believed to have been a consultant to SRPI on the purchase of TRECON's quarry assets.

CRC was forced to sue TRECON to collect payment of overdue royalties in about 1994. TRECON eventually paid the royalty due in settlement of the lawsuit. Both Poynor and Randolph knew of the royalty lawsuit and that royalties were due when material was taken from the quarry.

During 1994, Spruce Sand & Gravel Inc. was negotiating a critical amendment to the term of its mineral material permit with the USFS. This information was privy to only a few parties, including Poynor and Randolph. Suddenly out of nowhere, NUGGET sent a letter to the Forest Service expressing interest in operating the quarry. I presume this insider information came from TRECON's management team, which included Poynor and Randolph. (Exhibit 1)

In or about 1997 SRPI contracted with NUGGET to supply rock for the Homer Spit project. Once required royalty payments became overdue, CRC contacted SRPI, NUGGET, the US Army Corps of Engineers, and United States Fidelity and Guaranty Company (USF&G), NUGGET's bonding company, regarding the payment. SRPI was involved in litigation with NUGGET and could not pay since they had not been paid by NUGGET. NUGGET took the position that royalties were not recoverable under the Miller Act and that NUGGET had no responsibility to pay CRC, and USF&G agreed. CRC billed SRPI and NUGGET approximately $94,000 for royalty due as of March 1998 on the removed rock. (Exhibit 2)

The non-payment response is a familiar pattern coming from former TRECON management, including Poynor and Randolph. It is another attempt by the Poynor and Randolph team to take rock from the Spencer Quarry without payment. I believe this was a hostile takeover attempt to obtain the operating rights to the quarry held by CRC or its operator.

Spruce Sand & Gravel Inc. paid all of the royalties due to the US Forest Service, despite not having received payment from SRPI or NUGGET for its billings.

I am attaching true and correct copies of: 1. Letter from NUGGET to USFS (Exhibit 1), 2.

Letter from CRC to United States Fidelity and Guaranty Company dated 12 March 1998. (Exhibit 2, note: page 4 includes the Spencer Rock Products, Inc. business card of L.D. "Randy" Randolph). These exhibits were obtained from CRC's business records.

Exhibit 1 and the two exhibits attached to the Affidavit of John Dennis Stacey. The attached letter dated March 2, 1994 from Nugget Construction to the "Chugiak National Park" states in pertinent part that Nugget "would like to officially announce our interest in the Spencer and the Whittier Quarry for rock excavation." Nugget was engaged in an effort as early as 1994 to take control of the Spencer Quarry.

Attached to Mr. Stacey's Affidavit is a copy of the three page letter dated March 12, 1998 from him to Ms. Jane Poling with USF&G setting forth the activities of Nugget and Spencer Rock in detail. He discusses the inability to obtain payment and the strained excuses he confronted. The Affidavit includes a copy of the "Assignment of Stock" dated November 30, 1994 from Mr. Robert A. LaPore to Mr. Randy Randolph asserting that 20 percent of Mr. LaPore's stock is "dedicated" to Mr. Randolph. In addition, a copy of the business card of Randy Randolph with "Spencer Rock Products Inc." is attached as an exhibit to his Affidavit.

By early 1997, Spencer Rock had assumed operation of the Spencer Quarry from Trecon, at least on paper. At the same time that Nugget was taking the Spencer Quarry from Spencer Rock, Nugget was using Spencer Rock as a strawman and a shield to attempt to avoid the payment of obligations related to the completion of the Homer Project.

The "Support Agreement" prepared by Mr. Lukjanowicz with Oles Morrison represents the formal takeover by Nugget of the

5

Spencer Quarry from Spencer Rock. The "Support Agreement" is the merger and acquisition agreement. Nugget effectively took over control and management of the Spencer Quarry in March, 1997 and then memorialized the takeover in the April, 1997 "Support Agreement." Spencer Rock was little more than a captive entity or a wholly controlled subsidiary of Nugget from the outset of the work undertaken by the three claimants on the Homer Project in late March, 1997.

Nugget intended to and did take the benefit of the goods and services from the three claimants. The Corps of Engineers, the owner of the Homer Project, regarded Nugget as the responsible party for the obligations when Nugget took over operations at the Spencer Quarry. The contract between the Corps of Engineers and Nugget precluded Nugget from making any requests for progress payments if Nugget intended to withhold payments to any suppliers and subcontractors. Nugget intended to and did withhold payments to many suppliers and subcontractors and yet continued to request progress payments from the Corps of Engineers.

The three affidavits of Mr. Randy Randolph in support of the recently filed motions by Nugget are more revealing because of what they do not say than what they say. Docket Entry Nos. 479, 483 and 490. Mr. Randolph asserts the defense mantra that Nugget did not have a meeting of the minds with the claimants. Nugget did not have a meeting of the minds because it sought to withhold material information and defraud the claimants by its actions, statements, letters and contracts. Mr. Randolph's statements do not raise any genuine issue of material fact relevant to the

matters at issue.

## II. Legal Basis

### Miller Act

#### A. First-Tier Claims

Shoreside has previously noted and argued in prior pleadings that it had a contract with Nugget and with Spencer Rock. Nugget had completed and provided the same Credit Application to Shoreside that Spencer Rock had completed and provided to Shoreside. Both entities were approved for and were given credit by Shoreside. Shoreside provided fuel to Nugget for other projects before the start of the Homer Project. Shoreside entered into a contractual relationship with Nugget and with Spencer Rock through the actions, statements and representations of Mr. Randolph who represented both Nugget and Spencer at various times. In the previously filed affidavit of Doug Lechner, the Vice-President of Marketing for Shoreside, he noted that Randy Randolph led him to believe that Randy Randolph and Nugget were personally and financially involved with Spencer Rock. At his deposition, Mr. Lechner stated:

> Q   Who did you understand would be paying for the fuel delivered at the Spencer Rock quarry?
>
> A   At the time, Spencer Rock was the company that we were billing the invoices to. But we did know that Nugget Construction was the general contractor.
>
> Q   During the initial contact for the delivery of rock -- or the delivery of fuel to the quarry, did Mr. LaPore or Mr. Randolph ever indicate that Nugget was

7

going to guarantee payment of the billings to Spencer Rock for the fuel?

A   The only thing that was mentioned about Nugget's payment was when Bob LaPore said he was getting paid by Nugget to pay for his -- for the portion of fuel -- he'd be paying directly -- being paid directly by Nugget.

Q   So you understood that you would be supplying fuel to Spencer, who would be supplying rock to Nugget?

A   Well, we didn't feel -- as supplier, we felt he was a contractor, a subcontractor for the project, and that it was a bonded project.

Q   That was significant to you?

A   Maybe not as much at the time as it is now, but we definitely recognized that any job, especially a federal job, that they are bonded projects.

Q   And was it fair to say that, when you learned that this was -- at the time you understood this was a federal project, did that have any significance on your decision to extend credit at that time or is that something that's simply become more important to you once Spencer ceased to pay your bills?

A   Both companies, Nugget and Spencer, both had credit at the time before this project, so that wasn't a decision.  That didn't play any part, you know, in the decision.

Q   The bonded nature of the project?

A   I should say that wouldn't be a decision because they

8

    already had established credit, so that wouldn't be necessary at that time.  Although, you know, we certainly view those projects in a different light.

Exhibit 482, Lechner Deposition, p. 17, l. 8 - p. 18, l. 20.[3] Shoreside looked to both Nugget and Spencer for payment and then to the payment bond when Nugget intercepted and retained the funds from the U.S. Government.  The relationship between Nugget and Spencer is not as critical because Shoreside looked to both entities for payment.  Nugget structured the fraud so that Shoreside did not get paid until Spencer got paid, and then Nugget acting as paymaster did not pay Spencer.  Nugget's efforts to insulate itself from liability by concocting a "pay when and if paid" provision with Spencer is in conflict with the requirements of the Miller Act because Nugget did not pay Spencer.  <u>U.S., Walton Technology v. Westar Engineering</u>, 290 F.3d 1199, 1206 (9th Cir. 2002).  The Credit Applications signed by Nugget and by Spencer Rock include an attorney's fee provision that formed the basis for the prior award of attorney's fees to Shoreside.  For these reasons, Shoreside should be treated as a first-tier subcontractor with Nugget/Spencer Rock.  This Court should find that Shoreside is a first-tier contractor to Nugget/Spencer Rock and entitled to bring and maintain a Miller Act claim directly against Nugget.  Shoreside is also entitled to attorney's fees against Nugget as expressly set forth in the Credit Application.

---

[3] The references are to the page numbers in the deposition itself.

9

Ms. Barbara Dieckgraeff with Metco testified that Metco is a Seward family business that conducts business with a hand shake. Exhibit 478, Dieckgraeff Affidavit, p. 6, l. 14 – p. 7, l. 10. She also testified:

> Q. What do you do if you don't get a payment?
>
> A. Well, usually we do. But there are – usually we look for – sometimes we contact the person, personally we contact them and ask what the problem is and why it isn't available. If it is a bonded job, which this one was, we look towards the general contractor.
>
> Q. Why is that?
>
> A. Because we're in a small town, but everybody knows that if it's a federally-contracted bonded job, they're responsible for payment. If it's an [in] arrears – and that's why I contacted Randy Randolph right away.

Id. at p. 8, ll. 5 – 14. She also testified:

> Q. At that time, did you believe your contract was with Spencer Rock?
>
> A. We believed our contract was with Spencer Rock, but we expected him to get paid by Nugget and Nugget would be responsible. We do work for general contractors all the time and the general is the one that covers it. It's his umbrella that covers it.
>
> Q. Okay. . . .

Id. at p. 10, ll. 13 – 20. She also testified:

> Q. Why – if you haven't been paid, why did you continue to provide services?

10

>    A.   Because it was a bonded job and we were sure he would
> be paid.
>
>    Q.   So one of your -- your understanding was that if Mr.
> LaPore didn't pay you because it was a bonded job, you could
> get payment from Nugget?
>
>    A.   Right.  And Nugget was aware that we were involved.
>
>    Q.   Okay. . . .

Id. at p. 28, ll. 15 - 24.  She also testified:

>    Q.   But you were comfortable you would ultimately get paid
> because this was a bonded project?
>
>    A.   Yes, we were.  It was Nugget's barge and they were a
> federally-bonded job.

Id. at p. 32, ll. 1 - 4.  She also testified:

>    Q.   I asked Randy if Bob had been paid and he said, no, he
> hadn't been.  So then I understood that Bob had not been
> paid and was having trouble paying us and I assumed that
> Nugget would eventually pay him, that he could pay us, but
> if they didn't, I felt that we had a way of being covered by
> their bond.
>
>    A.   Okay.

Id. p. 33, ll. 17 - 23.  she also testified:

>    A.   I guess I would just have to restate that I believe
> that -- that -- that when you were bonded, all the little
> people were supposed to get paid.
>
>    Q.   Okay.
>
>    A.   And we were one of the little people.  And it's from -
> even though we had an oral contract, that's really how we

11

>    operate there and we've never had such a problem before.
>
>    Q.   Okay.
>
>    A.   And when we acted as a general, we had to inform the head guys that everybody was paid.
>
>    Q.   Do you believe that Nugget ever defrauded you?
>
>    A.   You mean on this whole thing?
>
>    Q.   Yes.
>
>    A.   I kind of feel they didn't hold up to their responsibility.

Id. at p. 34, l. 23 – p. 35, l. 16.  She also testified:

>    Q.   Okay.  If he got the money, would that change your view towards Nugget?
>
>    A.   Not really, because it was Nugget's responsibility to make sure that the bills were paid.  They were the big guys and they had to make sure that all this stuff was handled in a kosher way.

Id. at p. 36, ll. 17 – 22.  Metco, one of the "little people" from the "small town" contends that Nugget, one of the "big guys," is directly responsible for the unpaid services performed by Metco.  This Court should find that Metco is a first-tier contractor to Nugget/Spencer Rock and entitled to bring and maintain a Miller Act claim directly against Nugget.

   Nugget's fraudulent business practices threaten the traditional Alaska way of conducting business.  Metco expected to be paid by Spencer and/or Nugget and looked to both Nugget and the bond for payment when Nugget refused to pay Spencer.  As a matter of equal protection, Metco should be provided the same

award of attorney's fees that are awarded to a business with a formal written contract.

### B.  First-Tier Claims Because Of
### Subterfuge, Straw Man, Telescoping and Fraud

Throughout this proceeding, Nugget has set up "straw man" arguments in its motions and then knocked them down.  Nugget again disregards the "straw man" argument advanced in the alternative by the claimants and recognized by the Ninth Circuit.  Nugget also disregards the other arguments including subterfuge, fraud, misrepresentation, bad faith and unfair dealing.  In its March 3, 2005 decision, the Ninth Circuit states in pertinent part:

> On the record before us, the appellees have presented sufficient evidence to create a material issue of fact as to subterfuge or collusion.  The evidence, although not conclusive, tends to show that Nugget secretly converted Spencer Rock into a strawman in its ongoing dealings with the appellees.  The support agreement with Spencer Rock on its face purports to insulate Nugget from Miller Act liability, yet Nugget directed Spencer Rock to conceal the terms of this agreement and keep secret Nugget's arrangements with Spencer Rock relating to the project.  Nugget also began performing some of Spencer Rock's functions at the quarry and interacted directly with some of the appellees - the extent to which remains in dispute.

Docket Entry No. 383, p. 6.  This District Court reached many findings of fact in its detailed Order dated August 30, 2002 that are generally incorporated in the decision of the Ninth Circuit holding that there is sufficient evidence for the claimants to proceed.  Docket Entry No. 310.  This case involves subterfuge, collusion and conspiracy by Nugget to mislead all the claimants and the Corps of Engineers and to avoid the payment of otherwise

uncontested obligations. The additional factual developments noted above and in the companion motion filed against USF&G support a motion for summary relief in favor of the three claimants on these grounds.

### State Law Causes Of Action

In <u>Carter v. Hoblit</u>, 755 P.2d 1084, 1086 - 87 (Alaska 1988), the Alaska Supreme Court states:

> Fraud can also be committed in the absence of fiduciary duty where the defendant's statements are half truths, or true remarks which omit material information. The Restatement (Second) of Torts Section 529 (1977) provides that a literally true statement may be fraudulent if it omits additional qualifying information likely to affect the listener's conduct. "A representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent representation." <u>Id.</u>; <u>see also</u> <u>Prosser on Torts</u> section 106, at 738 ("[I]f the defendant does speak, he must disclose enough to prevent his words from being misleading. . . .")

The record is replete with half truths and misstatements by Nugget to the claimants and the Corps. Some of these half truths and material misrepresentations are discussed by the Court in the Order at Docket Entry No. 310.

In <u>Old Harbor Native Corp. v. Afognak Joint Venture</u>, 30 P.3d 101, 107 (Alaska 2001), the Alaska Supreme Court states: "And we have also made clear that we will 'generally treat actions brought upon the theories of unjust enrichment, quasi-contract, contracts implied in law and quantum meruit as essentially the same.'" The defendants have overlooked the fundamental fact that the Court previously found that the goods were provided and the services performed in a timely and conforming manner for the use

and benefit of the Homer Project. Nugget was unfairly benefited and unjustly enriched and must satisfy payment for the goods and services under any of these state law causes of action.

The Alaska Supreme Court states that the covenant of good faith and fair dealing is incorporated into all contracts in the state of Alaska. All of the contracts in this case were executed and/or performed in the state of Alaska. Nugget Construction acted in bad faith and dealt unfairly with the three claimants throughout their dealings with the claimants.

As this Court has previously held, these state law causes of action arose before August 7, 1997. Docket Entry No. 430 at p. 2. Thus Shoreside and Metco are entitled to interest upon the causes of action at the statutory rate of 10.5% pursuant to AS 09.30.070 prior to amendment effective August 7, 1997. In addition, Shoreside has noted that the Credit Agreement includes a contractual rate of 1% interest per month that should be applied in this instance.

## Conclusion

This motion is filed on Law Day, a day to celebrate our heritage of liberty, justice and equality under the law and to promote the rule of law in a democracy. This Court has so far issued more than one hundred pages of timely legal decisions attempting to resolve these three claims. This case is an example of the injustice that results when a party resolves to fight each and every possible legal matter and commits unlimited resources to that end. Justice delayed truly is justice denied.

The Defendants have committed tremendous resources to wear

15

out these individuals and entities who seek to be paid for their goods and services.  Spencer Rock Products was destroyed; Bob LaPore was broken.  Chugach Rock Corporation is limping along; Dennis Stacey is getting by.  The three claimants in this proceeding are hanging on and hoping to be paid for the goods and services they provided and performed in 1997.

This Court should enter summary judgment against Nugget and in favor of Shoreside Petroleum, Inc. in the sum of $53,501.01 with interest at 12 or 10.5 percent and in favor of Metco, Inc. in the sum of $36,785.27 with interest at 10.5 percent.  The Court should also allow the claimants to move for and develop the claim for attorney's fees.

The claim for bad faith and the amount of punitive damages against Nugget should be presented to the trier of fact.

DATED this 1st day of May, 2006 at Anchorage, Alaska.

> THE LAW OFFICE OF STEVEN J. SHAMBUREK
> Attorney for Plaintiffs
> Shoreside Petroleum, Inc., d/b/a Marathon Fuel Service and Metco, Inc.
>
> By: s/ Steven J. Shamburek
> _____
> Steven J. Shamburek
> Alaska Bar No. 8606063
> LAW OFFICE OF STEVEN J. SHAMBUREK
> 425 G Street, Suite 630
> Anchorage, Alaska 99501
> (907) 522-5339 Direct
> (907) 522-5393 Fax
> shamburek@gci.net
> shamburekbank@gci.net

**CERTIFICATE OF SERVICE**

The undersigned certifies that on the 1st day of May, 2006, a copy of the foregoing was served by the Electric Case Filing.

s/ Steven J. Shamburek
_____
Steven J. Shamburek