Steven J. Shamburek
Alaska Bar No. 8606063
LAW OFFICE OF STEVEN J. SHAMBUREK
425 G Street, Suite 630
Anchorage, Alaska 99501
(907) 522-5339 Direct
(907) 522-5393 Fax

Attorney for Plaintiffs
Shoreside Petroleum, Inc.,
d/b/a Marathon Fuel Service
and Metco, Inc.

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA for the use of NORTH STAR TERMINAL & STEVEDORE COMPANY, d/b/a Northern Stevedoring & Handling, and NORTH STAR TERMINAL & STEVEDORE COMPANY, d/b/a Northern Stevedoring & Handling, on its own behalf, <br><br> Plaintiffs, <br><br> and <br><br> UNITED STATES OF AMERICA for the use of SHORESIDE PETROLEUM, INC., d/b/a Marathon Fuel Service, and SHORESIDE PETROLEUM, INC., d/b/a Marathon Fuel Service, on its own behalf, <br><br> Intervening Plaintiffs, <br><br> and <br><br> METCO, INC., <br><br> Intervening Plaintiff, <br><br> vs. <br><br> NUGGET CONSTRUCTION, INC.; SPENCER ROCK PRODUCTS, INC.; UNITED STATES FIDELITY AND GUARANTY COMPANY; and ROBERT A. LAPORE, <br><br> Defendants. | **SHORESIDE'S AND METCO'S MOTION AND MEMORANDUM FOR SUMMARY JUDGMENT AND DETERMINATION OF LAW REGARDING USF&G** <br><br><br><br><br><br><br><br><br><br> Case No. A98-0009-CV (HRH) |

1

COMES NOW Shoreside Petroleum, Inc., d/b/a Marathon Fuel Service ("Shoreside") and Metco, Inc. ("Metco"), by and through counsel, and file this Motion and Memorandum For Summary Judgment And Determination Of Law Regarding USF&G.

## Introduction

The causes of action against Nugget Construction and against USF&G are coextensive but not exactly the same. The claims against USF&G under the Miller Act and under state law are simple to show and should be addressed via summary judgment. The legal basis of the claim for bad faith is clearly defined as a matter of law in the Ninth Circuit and is supported by overwhelming unrebutted evidence in the record. The claimants seek a determination of law regarding the bad faith cause of action. The quantum of punitive damages against USF&G should be the only remaining issue to present to the trier of fact. The factual and legal basis of these causes of action are discussed below.

## I.  Factual Basis

### The Claimants Set Forth A Detailed Factual Basis For Their Claims

The claimants develop the factual basis of their claims in their discovery responses and disclosures to defendants.

In Metco's Discovery Responses dated November 14, 2005, Metco developed the allegations in greater detail. These discovery responses are part of the current record at Docket Entry No. 478, Exh 2. Metco states as follows:

Response To Interrogatory No. 1 [regarding the factual basis for the claims in paragraph 27]: Metco was always aware that Nugget Construction was involved because it was Nugget's barge. Metco was not actually

2

loading the barge. Metco was moving the rock away from the siding with loaders so that the Alaska Railroad could bring down another load and Metco trucked the rock down to a loading box at the Nugget barge. Metco was loading the rock on both Metco trucks and also Bob LaPore's trucks. Metco beefed up one of our trucks to haul rock. Bob LaPore's trucks were not too good and he asked us to fix flats, fix oil leaks and keep the trucks running the best we could. Metco knew the Homer project was a bonded job by the federal government and knew that Nugget was the prime contractor, so Metco wasn't worried at first when Bob LaPore was slow in paying. Metco could look to the bond for payment.

Frank Dieckgraeff talked to Randy Randolph one time and he expressed that he wanted us to do everything we could to help Bob LaPore with the rock as he felt he was overwhelmed. Barbara Dieckgraeff talked to Randy Randolph on June 27 about Spencer's failure to pay and he admitted that Spencer had not been paid by Nugget. At that time, Barbara Dieckgraeff faxed to Randy Randolph the invoices that had been sent to Spencer Rock through June 11 seeking payment.

Metco notes the statements of Randy Randolph, the central individual who worked with both Nugget and Spencer. He admitted: "The [Support] Agreement was a consensual agreement between Nugget and SRP, and SRP was free to disavow it at any point during the project. The Agreement lasted a limited duration, **specifically between April and July 1997**, and SRP did not disavow the Agreement during that duration." [ER 325, Affidavit of Lynn D. ("Randy") Randolph dated May 14, 2002, p. 2, para. 2 (Emphasis added)].

In addition, Nugget frankly admits this undisputed fact in an Opening Brief filed with the Ninth Circuit in 2003. **"Thus, in March or April 1997 (ER 107), Nugget began providing support services to Spencer Rock pursuant to a Support Agreement formally executed on April 15, 1997. (ER 7-10.)"** (Emphasis added). Nugget Opening Brief, p. 11 at ll. 9 - 11.

In addition, the deposition referenced by Nugget in Nugget's Opening Brief in the Ninth Circuit refers to the deposition of Randy Randolph taken on October 30, 1998. He stated:

Q. Was Nugget Construction providing Nugget employees and/or equipment to Spencer Rock in the Spencer Quarry prior to April 23, 1997, which is the date of this support agreement?
A. Yes

Q.   And when did that type of cost to Nugget
first occur?
A.   Late March, early April.

[ER 107, p. 121, ll. 1 – 7 (Emphasis added)]

In addition, the Court found that Mr. Randolph was
involved with both Nugget and Spencer.   The Court
found:

Other significant undisputed facts in the
record show that Nugget was ideally situated
to take over operations at the Spencer
quarry.   For five years preceding his
position as Nugget's project manager, Lynn D.
Randolph worked as the project manager and
job estimator in the Spencer quarry under its
previous owner, Trecon (for whom Nugget's
general manager and corporate secretary Greg
Poyner also worked as a general manager).
Randolph also worked as senior engineer, bid
estimator, and project manager for Spencer
after Robert LaPore purchases the quarry in
1994.   In fact, prior to the Homer Spit
project, Randolph worked for Nugget as a
consultant, bid estimator, and project
manager at the same time he worked for LaPore
at Spencer.   According to Randolph and
LaPore, most of the calculations resulting in
Spencer's pricing to Nugget on the Homer Spit
bid were prepared by Randolph as a bid
estimator and consultant for Spencer (while
he also worked as a project manager for
Nugget).

[ER 334 at l. 11 – 335, l. 6]

In response to a letter from Metco seeking
payment, the Corps states in pertinent part in a letter
to Nugget dated August 16, 1997 (RRO/33):

SUBJECT:   Letter from METCO, Incorporated,
Contract DACW85-96-C-0020, Homer Spit Repair
and Extension, Homer, Alaska

. . .

Attached is a letter we received from
METCO, Incorporated, dated July 31, 1997,
regarding non-payment for work that they have
conducted for the above project.   METCO
states that they have not been paid for
loading rock from the rail cars to the barges
in Seward.

4

. . .

METCO's letter claims that Spencer Quarry has not paid them because Spencer Quarry has not received payment from Nugget Construction.

. . .

We remind you that under Contract Clause I.55, <u>Payments Under Fixed-Price Construction Contracts</u>, Paragraph c.3 states: "This request for progress payment does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract."

In response to two letters from Nugget, the Corps states in pertinent part in a letter to Nugget in August, 1997 (RRO/40):

SUBJECT: Spencer Quarry, Contract DACW85-96-C-0020, Homer Spit Repair and Extension, Homer, Alaska

. . .

We acknowledge receipt of Serial Letter 611-19, dated August 6, 1997 and Serial Letter 611-21, dated August 11, 1997. We do not necessarily agree that Spencer Rock Products is only a "vendor" for Miller Act purposes.

Based on the supporting costs that you outlined in Serial Letter 611-21, it appears that Nugget Construction has assumed full responsibility for operations at Spencer Quarry for the subject project. Therefore, as primary operator at Spencer Quarry, we believe Nugget Construction is responsible for prompt payment to suppliers and subcontractors who contracted with Spencer Rock Products on this project.

We request that you clarify what support and project management services Nugget Construction provided to Spencer Rock Products to account for the support cost that you have shown in Serial Letter 611-21. Further, please provide information showing what work, if any, has been performed by

5

Spencer Rock Products under its subcontract with Nugget Construction.

The letter states that it was courtesy copied to "United States Fidelity and Guarantee Co., Attn: Bill Wells, 4220 B Street, Anchorage, AK 99503." USF&G was on clear written notice. Nugget was preoccupied with the status of Spencer Rock. However, the Corps of Engineers notes that Nugget was obligated "not to request for progress payments that which you intend to withhold from a subcontractor or supplier." Nugget may have been successful in the first appeal to the Ninth Circuit in characterizing Spencer Rock Products as a supplier rather than a subcontractor. However, that does not relieve Nugget of paying all the suppliers and subcontractors pursuant to this contract as construed by the agency charged with administering the contract. Nugget continued to request progress payments and nonetheless withheld payment to the three claimants. Documents from the Corps noted as RRO/33, RRO/38, RRO/40, RRO/44, RRO/48 and Nugget documents 611-11, 611-21, 611-25, 611-30 and 611/33 are also responsive.

The following individuals have possible information: John Terwilliger, Randy Randolph, Greg Poyner, John Smithson and Bob Fox with Nugget Construction; Robert LaPore, Vernon Rush, Herschell Hall and Randy Randolph with Spencer Rock Products; Jane Bennett Poling and perhaps Janice Smith with USF&G; Douglas Lechner and Ron Niebrugge with Shoreside; Frank Dieckgraeff, Barbara Dieckgraeff and Dave Dieckgraeff with Metco; Jack Goodwill and Jeff Bentz and others with North Star; John Dennis Stacey with Chugach Rock Corporation; and the individuals who worked with the U.S. Army Corps of Engineers on the Homer Project. Their respective addresses and contact numbers are noted in prior discovery responses and disclosures.

<u>Response To Interrogatory No. 2</u> [regarding the factual basis for the claims in paragraph 29]: Nugget was a large construction company that dictated the activities of Spencer Rock/Robert LaPore almost from the outset of the relationship. Nugget created a secret Support Agreement that effectively gave Nugget complete control of Spencer Rock/Robert LaPore and the Homer Project. Nugget required that the terms of the support agreement not be disclosed to the U.S. Corps of Engineers or to the claimants. Nugget did not pay Spencer Rock which precluded Spencer Rock from paying the three claimants. Nugget knew or should have known that this was the likely consequence of its actions and inactions.

See the Responses To Interrogatory Nos. 1.

<u>Response To Interrogatory No. 3</u> [regarding the factual basis for the claims in paragraph 33]:  See the Responses To Interrogatory Nos. 1 and 2.

<u>Response To Interrogatory No. 4</u> [regarding the factual basis for the claims in paragraph 34]:  Spencer Rock, North Star, Shoreside and Metco were actively involved in the prosecution of the Homer Project as major suppliers of goods and providers of services.  Nugget knew about the identity and activities of each of these entities almost from the outset of the Homer Project. Nugget knew or should have known that the three claimants were providing goods and performing services in reliance on the Miller Act bond and the incentive it provides for payment.  Nugget owed a duty of care not to act negligently toward the claimants.  Nugget acted negligently and carelessly in its dealing with and treatment of the three claimants.  USF&G was aware of the non-payment at a time when Nugget continued to request progress payments in direct contravention of the terms of the contract between Nugget and the Corps. Absent some documents or disclosures to the contrary, USF&G did nothing other than request proofs of claim from the three claimants.

<u>Response To Interrogatory No. 5</u> [regarding damages]: Claimant already proved its contract-based damages and was awarded judgment for those damages by the court in 1999.  In reaching this conclusion, the court also found that the goods were provided and the services performed for the benefit of the Homer Project.  Those findings were not challenged on appeal and thus any challenge has been waived.  <u>Kesselring v. F/T Arctic Hero</u>, 95 F.3d 23, 24-25 (9th Cir. 1996).  The amount of the damages for the other causes of action may be more substantial.  The actual attorney's fees expended may be awarded as damages based on the conduct of the defendants including fraud, misrepresentation, negligence, and/or breach of the covenant of good faith and fair dealing.  These additional damages may also be awarded against USF&G under state law causes of action. Claimant also seeks punitive damages in a sum of $1,000,000.000 as deemed appropriate by the trier of fact.  The claim for punitive damages arose prior to August 7, 1997 and thus is governed by the statute in effect prior to the amendment.  Everyone involved in the Homer Project has some information pertinent to the performance of the work and the computation of the damages.

<u>Response To Request For Production No. 1</u>:  Claimant incorporates all the documents that were disclosed previously including documents attached to prior

motions, oppositions, and replies.

<u>Response To Request For Production No. 2</u>:  See the Response To Interrogatory No. 5.  Metco is seeking the additional sum of $1858.50 for overtime payments and is producing documents supporting that request.  Metco is forwarding the time cards for its employees showing the hours and work performed.

<u>Response To Request For Production No. 3</u>:  Metco notes that it charged Spencer Rock $50 for sales tax during this time, $25 for May and $25 for June, because of the $500 cap for the Kenai Peninsula Borough.  The letter to Doug Wood with the Corps of Engineers with the attachments dated July 31, 1997 is also responsive. The letter from the Corps of Engineers dated August 22, 1997 is also responsive.

<u>Response To Request For Production No. 4</u>:  There is no written agreement.

<u>Response To Request For Production No. 5</u>:  Claimant has already produced any notes, correspondence, memoranda or communications it sent or received during the prosecution of the Homer Project.  Claimants agreed early in the this case to cooperate in the pursuit of the claims and coordinate their activities with the understanding and expectation that any notes, correspondence, memoranda or communications produced or exchanged are protected by the joint defense privilege, the attorney/client privilege and/or other common law privileges.  See Federal Rule of Evidence 503 generally and subsections (a)(5) and (b)(3) specifically.  P. No. 5 & No. 7

      Metco kept in touch with Doug Lechner of Shoreside Petroleum and Jack Goodwill of North Star Terminal & Stevedore Company.  Metco became aware that its bills were also in arrears.  Metco is producing copies of written communications between Metco and others and any notes between Metco and others.

<u>Response To Request For Production No. 6</u>:  There is no written agreement.

<u>Response To Request For Production No. 7</u>:  See the Response To Request For Production No. 5.

<u>Response To Request For Production No. 8</u>:  There is no written agreement.

<u>Response To Request For Production No. 9</u>:  Copies of the billings presented by Metco to Spencer Rock have been produced.  Bob LaPore objected to the overtime

that we charged him for our operators and drivers.  His objection was verbal.  We showed him where he was obligated to pay overtime to his drivers.  We did credit him with the overtime, but he could not pay the billings for the regular time any way as he had not been paid by Nugget.  Any other communications are privileged for reasons similar to those in the Response To Request For Production No. 5.  Notwithstanding this objection, claimant is not aware of any responsive documents.

Response To Request For Production No. 10:  There is no written agreement.

Response To Request For Production No. 11:  Any communications are privileged for reasons similar to those in the Response To Request For Production No. 5.  Notwithstanding this objection, claimant is not aware of any responsive documents.

Response To Request For Production No. 12:  Claimant objects that this request is overbroad and burdensome.  Without waiving these objections, claimant responds that it has produced documents to all the parties in a timely manner throughout this litigation regarding the indicia of work it performed on the Homer Project.  Metco continued to fax invoices to Nugget because it was the prime contractor.  See the Response To Interrogatory No. 5.

Response To Request For Production No. 13:  See the Response To Request For Production No. 12.

Response To Request For Production No. 14:  There are no known photographs.

Response To Request For Production No. 15:  See the Response To Interrogatory No. 5.

Response To Request For Production No. 16:  Claimant objects that this question is overbroad.  Notwithstanding this objection, claimant incorporates all the documents previously produced.

Response To Request For Production No. 17:  Claimant is not aware of any responsive documents.

Response To Request For Production No. 18:  Claimant objects that this question is overbroad.  Notwithstanding this objection, claimant incorporates all the documents previously produced.

Response To Request For Production No. 19:  All of

Metco's agreements with Bob LaPore of Spencer Rock for the work with the rock were verbal except for the actual billings for the work which reflected the terms and conditions of the agreement. Copies of the billings have been produced previously.

Response To Request For Production No. 20: Claimant objects that this question is overbroad. Notwithstanding this objection, claimant incorporates all the documents previously produced.

The foregoing objections to these discovery requests were made on the recommendation and advice of the undersigned.

Docket Entry No. 478, Exh. 2.

In Metco's Supplemental Discovery Responses dated November 28, 2005, Metco developed the allegations in greater detail as follows:

Supplemental Response To Interrogatory Nos. 1, 2, 3, 4 and 5: This answer also supplements claimant's allegations in paragraph 38 of the Amended Complaint.

The "Material Agreement" entered into between Nugget Construction, Inc. and Spencer Rock Products, Inc. dated January 15, 1997 states in Section 3 that the agreement is to start approximately March 15, 1997. Nugget and Spencer then entered into an oral support agreement in late March, 1997. Nugget and Spencer entered into the written "Support Agreement" dated April 23, 1997 that provides in pertinent part: "SRP agrees to indemnify and save harmless NCI and the Owner . . . from and against any and all suits, claims, actions, losses, costs, penalties and damages of whatever kind of nature . . . ." Nugget imposed an adhesion contract on Spencer and afforded itself the absolute right to run the Spencer Quarry and bring an action against Spencer for the type of claims asserted by the three claimants in this case. In addition, the three claimants are third-party beneficiaries of this Support Agreement. Nugget already brought that legal action against Spencer in Alaska state court with knowledge of the three claimants and their claims. In that action, Nugget either asserted or waived the opportunity to assert the claims and resulting damages against Spencer.

In addition, the District Court found that Mr. Randolph, the signatory on both the "Material

Agreement" and "Support Agreement" on behalf of Nugget, was involved with Nugget, Spencer and Trecon.    The District Court found:

> Other significant undisputed facts in the record show that Nugget was ideally situated to take over operations at the Spencer quarry.  For five years preceding his position as Nugget's project manager, Lynn D. Randolph worked as the project manager and job estimator in the Spencer quarry under its previous owner, Trecon (for whom Nugget's general manager and corporate secretary Greg Poyner also worked as a general manager). Randolph also worked as senior engineer, bid estimator, and project manager for Spencer after Robert LaPore purchased the quarry in 1994.    In fact, prior to the Homer Spit project, Randolph worked for Nugget as a consultant, bid estimator, and project manager at the same time he worked for LaPore at Spencer.    According to Randolph and LaPore, most of the calculations resulting in Spencer's pricing to Nugget on the Homer Spit bid were prepared by Randolph as a bid estimator and consultant for Spencer (while he also worked as a project manager for Nugget).

[ER 334 at l. 11 – 335, l. 6 in the second appeal to the Ninth Circuit Court of Appeals]    A copy of a business card stating that Mr. Randolph works for Spencer, another one stating that he works for Nugget, and another one stating that he works for LDR have been produced in this litigation.  None of the cards state any periods of employment and/or engagement on them.

Mr. Randolph, the central individual who worked with Nugget, Spencer and Trecon, admitted:    "The [Support] Agreement lasted a limited duration, **specifically between April and July 1997**, and SRP did not disavow the Agreement during that duration."  [ER 325, Affidavit of Lynn D. ("Randy") Randolph dated May 14, 2002, p. 2, para. 2 (Emphasis added)].

In addition, Nugget frankly admits this undisputed fact in an Opening Brief filed with the Ninth Circuit in 2003.    **"Thus, in March or April 1997 (ER 107), Nugget began providing support services to Spencer Rock pursuant to a Support Agreement formally executed on April 15, 1997.  (ER 7-10.)"**  (Emphasis added).  Nugget Opening Brief, p. 11 at ll. 9 – 11.  (Note:    The Agreement states a date of "April 23, 1997.")

11

In addition, Nugget's Opening Brief in the Ninth Circuit refers to the deposition of Randy Randolph taken in this case on October 30, 1998.  Mr. Randolph states:

> **Q.  Was Nugget Construction providing Nugget employees and/or equipment to Spencer Rock in the Spencer Quarry prior to April 23, 1997, which is the date of this support agreement?**
> **A.   Yes**
> **Q.   And when did that type of cost to Nugget first occur?**
> **A.   Late March, early April.**

[ER 107, p. 121, ll. 1 – 7 (Emphasis added)].   By Nugget's actions and own admissions, Nugget also was responsible for all obligations of Spencer after "late March, 1997."

Shoreside made a delivery of fuel in relation to the Spencer and Nugget rock work on April 8, 1997 and was never paid for the delivery of fuel.  [ER 340 at ll. 2 – 3 and n. 32 to the most recent appeal to the Ninth Circuit]  That fuel was not consumed in the prosecution of the work for the Homer Project until after April 8 and into the first three weeks of May because the next delivery of fuel was not made until May 21, 1997.  [ER 340 at l. 3 and n. 32]  As noted above, the terms of the Support Agreement were imposed by Nugget in March, 1997 before the April delivery of fuel by Shoreside.   Metco and North Star, the other claimants, provided their respective services after April 23 and thus all of their respective invoices are the responsibility of Nugget.

Nugget directed Spencer not to disclose the terms of the Support Agreement to the claimants and the owner of the Homer Project, namely the Corps of Engineers. Nugget was hiding its scheme from the parties who could be hurt by it.  Nugget has suggested that the claimants should have disclosed their contracts and/or personal guaranties.  The claimants had nothing to hide.  Nugget never requested any contracts because it sought to contend that it was unaware of the contracts.  However, Nugget was aware of the three claimants and their contracts to provide goods to and perform services for the Homer Project.

The District Court previously found:   "It is undisputed that Shoreside made it known to Nugget that it sought payment from Nugget Construction for past fuel and lubricant delivered to the quarry and not paid for by Spencer." [ER 341 at l. 18 – 342, l. 2]  Nugget

was aware of the contractual relationships between Spencer and the three claimants at the time the claimants were providing goods and performing services to the Homer Project. The District Court also previously found that the three claimants provided goods to and performed services for the use and benefit of the Homer Project. This finding and the other findings noted above were never appealed by Nugget and USF&G and are binding on the parties.

USF&G knew or should have known of the problems Nugget was creating with respect to the claimants in this case by the summer of 1997. However, Nugget may have withheld and/or deliberately concealed some of this information and its secretive arrangements with Spencer from USF&G much like it did the claimants and the Corps of Engineers. For example, in response to two letters from Nugget to the Corps of Engineers, the Corps states in pertinent part in a letter to Nugget dated August 26, 1997 (RRO/40):

SUBJECT: Spencer Quarry, Contract DACW85-96-C-0020, Homer Spit Repair and Extension, Homer, Alaska

Nugget Construction, Incorporated
Attn: Mr. Randolph
8726 Corbin Drive
Anchorage, Alaska 99507-3411

Gentlemen:

We acknowledge receipt of [Nugget's] Serial Letter 611-19, dated August 6, 1997 and [Nugget's] Serial Letter 611-21, dated August 11, 1997. We do not necessarily agree that Spencer Rock Products is only a "vendor" for Miller Act purposes.

Based on the supporting costs that you outlined in Serial Letter 611-21, it appears that Nugget Construction has assumed full responsibility for operations at Spencer Quarry for the subject project. Therefore, as primary operator at Spencer Quarry, we believe Nugget Construction is responsible for prompt payment to suppliers and subcontractors who contracted with Spencer Rock Products on this project.

We request that you clarify what support and project management services Nugget Construction provided to Spencer Rock Products to account for the support cost that

you have shown in Serial Letter 611-21.
Further, please provide information showing
what work, if any, has been performed by
Spencer Rock Products under its subcontract
with Nugget Construction.

The letter states in the lower left corner that it was
courtesy copied to "United States Fidelity and
Guarantee Co., Attn: Bill Wells, 4220 B Street,
Anchorage, AK 99503." USF&G was on clear written
notice of the unpaid claims and of Nugget's assumption
of Spencer's responsibilities. Mr. Bill Wells appears
to be or to have been affiliated with Willis Corroon
insurance company. He may have been an agent of USF&G
and/or of Nugget, but he was not an agent of any one of
the three claimants in this proceeding. There are
other letters that state that they were courtesy copied
to USF&G and/or Willis Corroon.

The letter from the Corps of Engineers references
Serial Letter 611-19, dated August 6, 1997 and Serial
Letter 611-21, dated August 11, 1997. These letters
reference the letters from claimants noting that they
have not been paid and demanding payment.

Nugget was preoccupied with its paperwork scheme
to insulate itself from responsibility and liability
for its and Spencer Rock's actions while taking over
Spencer. Nugget was the paymaster of the Homer
Project. The Corps of Engineers notes in other
correspondence that Nugget was obligated "not to
request for progress payments that which you intend to
withhold from a subcontractor or supplier." Nugget,
however, withheld payments from the three claimants who
were either subcontractors and/or suppliers. In
addition, Nugget continued to request progress payments
from the Corps of Engineers in complete disregard of
this contract requirement. Nugget's strained
rationalization of its decisions to withhold payment is
inadequate to excuse its failure to pay.

Nugget may have been successful in the first
appeal to the Ninth Circuit in characterizing Spencer
Rock Products as a supplier rather than a
subcontractor. The Ninth Circuit decision opted to
disregard the clear United States Supreme Court
decisions relied on by the District Court and instead
to place weight on a prior decision written by one of
the judges on the panel. However, that does not
relieve Nugget of paying all the subcontractors and
suppliers pursuant to the contract as construed by the
agency charged with administering the contract. Nugget
continued to request progress payments and nonetheless
withheld payment to the three claimants. Documents

14

from the Corps noted as RRO/33, RRO/38, RRO/40, RRO/44, RRO/48 and Nugget documents 611-11, 611-21, 611-25, 611-30 and 611/33 are also responsive.

USF&G's records indicate that it never did anything with the information it had regarding the three claims. If USF&G did anything, there is no record of what it did.

USF&G may have made demands on Nugget to review the claims candidly and in good faith. If it did, it has not produced any supporting documents.

There were a number of settlement opportunities in this case. The three claimants each expended resources preparing settlement offers in earnest throughout this litigation which appear never to have been considered in good faith by the defendants. In any other case like this one that spanned eight years, one or more of the defendants individually or jointly should have made at least a reasonable settlement offer or offers. In the alternative, USF&G should have made an offer in good faith or required Nugget to make an offer in good faith.

When an insurance company provides coverage for an automobile owner, it is committing to defend and indemnify claims by the entire world against the insured subject to terms and conditions of the policy. In this case, USF&G provided a payment bond that answered the claims of only a small number of known claimants. USF&G was aware of the three claimants and could have required Nugget to satisfy the claims asserted by the three claimants. USF&G appears to have obtained personal guaranties and other indemnity guaranties from John Terwilliger and Nugget and thus has always been able to protect itself.

The Alaska Supreme Court discusses some of the duties of a surety in <u>Loyal Order of Moose, Lodge 1392 v. International Fidelity Ins. Co.</u>, 797 P.2d 622 (Alaska 1990). State law causes of action for bad faith are not preempted by the Miller Act. <u>K-W Industries v. National Surety Corp.</u>, 855 F.2d 640 (9th Cir. 1988). USF&G had and has responsibilities as set forth by law and pursuant to its payment bond provided for the use and benefit of the claimants. The duty of good faith attaches under Alaska law and contemplates awards of compensatory and punitive damages when the duty is breached.

Exhibit 1.

In Shoreside's Discovery Responses dated November 14, 2005,

15

Shoreside developed the allegations in greater detail. These discovery responses are part of the current record at Docket Entry No. 482, Exh 2. Shoreside states as follows:

> Response To Interrogatory No. 1 [regarding the factual basis for the claims in paragraph 27]: Douglas Lechner with Shoreside Petroleum was aware that Lynn D. ("Randy") Randolph had worked with Trecon in 1992 and with Spencer Rock Products in 1996 or 1997. Randy Randolph also worked with Nugget in 1997. Doug Lechner received or acquired a business card from Randy Randolph stating that Randolph worked for or was affiliated with Spencer Rock. Doug Lechner was aware as early as late 1996 or early 1997 that the Homer Project was a federal project of the Corps of Engineers. Doug Lechner knew or believed that Shoreside would be paid if Spencer Rock could not pay. Shoreside's decisions were undertaken with this understanding and assumption.
>
> Nugget appears to have structured all its activities from the outset with the goal of using Spencer Rock as a shield to avoid paying North Star, Shoreside, and Metco. Some of the Nugget documents state expressly that they are being courtesy copied to Oles, Morrison which suggests that the law firm assisted in the effort to create impediments to payment.
>
> The District Court previously found: "It is undisputed that Shoreside made it known to Nugget that it sought payment from Nugget Construction for past fuel and lubricant delivered to the quarry and not paid for by Spencer." [ER 341 at l. 18 – 342, l. 2] Nugget has never suggested that it was unaware of the contractual relationships between Spencer and the three use plaintiffs at the time they were performing services and providing goods to the Project.
>
> Shoreside made a delivery of fuel on April 8, 1997 and was never paid for the delivery. [ER 340 at ll. 2 – 3 and n. 32 to the most recent appeal to the Ninth Circuit] The fuel was not completely consumed in the prosecution of the work on the Homer Project until late April and the first three weeks of May because the next delivery of fuel was not made until May 21, 1997. [ER 340 at l. 3 and n. 32] In addition, the terms of the Support Agreement were discussed and negotiated by Nugget and Spencer in March, 1997 before the April delivery of fuel by Shoreside.

Shoreside notes the statements of Randy Randolph, the central individual who worked with both Nugget and Spencer. He admitted: "The [Support] Agreement was a consensual agreement between Nugget and SRP, and SRP was free to disavow it at any point during the project. The Agreement lasted a limited duration, **specifically between April and July 1997**, and SRP did not disavow the Agreement during that duration." [ER 325, Affidavit of Lynn D. ("Randy") Randolph dated May 14, 2002, p. 2, para. 2 (Emphasis added)].

In addition, Nugget frankly admits this undisputed fact in an Opening Brief filed with the Ninth Circuit in 2003. **"Thus, in March or April 1997 (ER 107), Nugget began providing support services to Spencer Rock pursuant to a Support Agreement formally executed on April 15, 1997. (ER 7-10.)"** (Emphasis added). Nugget Opening Brief, p. 11 at ll. 9 – 11.

In addition, the deposition referenced by Nugget in Nugget's Opening Brief in the Ninth Circuit refers to the deposition of Randy Randolph taken on October 30, 1998. He stated:

Q.  Was Nugget Construction providing Nugget employees and/or equipment to Spencer Rock in the Spencer Quarry prior to April 23, 1997, which is the date of this support agreement?
A.  Yes
Q.  And when did that type of cost to Nugget first occur?
A.  Late March, early April.

[ER 107, p. 121, ll. 1 – 7 (Emphasis added)]

In addition, the Court found that Mr. Randolph was involved with both Nugget and Spencer. The Court found:

Other significant undisputed facts in the record show that Nugget was ideally situated to take over operations at the Spencer quarry. For five years preceding his position as Nugget's project manager, Lynn D. Randolph worked as the project manager and job estimator in the Spencer quarry under its previous owner, Trecon (for whom Nugget's general manager and corporate secretary Greg Poyner also worked as a general manager). Randolph also worked as senior engineer, bid estimator, and project manager for Spencer after Robert LaPore purchased the quarry in 1994. In fact, prior to the Homer Spit

project, Randolph worked for Nugget as a consultant, bid estimator, and project manager at the same time he worked for LaPore at Spencer. According to Randolph and LaPore, most of the calculations resulting in Spencer's pricing to Nugget on the Homer Spit bid were prepared by Randolph as a bid estimator and consultant for Spencer (while he also worked as a project manager for Nugget).

[ER 334 at l. 11 – 335, l. 6]

In response to a letter from Doug Lechner with Shoreside dated August 28, 1997, the Corps states in pertinent part in a letter to Nugget dated September 9, 1997 (RRO/44):

SUBJECT: Letter from Northern Stevedoring and Handling Corporation [Northern Stevedoring is scratched out and Shoreside Petroleum handwritten on some copies], Contract DACW85-96-C-0020, Homer Spit Repair and Extension, Homer, Alaska

. . .

Attached is a letter we received from Shoreside Petroleum, Incorporated, dated August 28, 1997. This letter is regarding services that they have provided for the above project for which they have not received payment.

. . .

We request an immediate explanation of why Shoreside Petroleum Incorporated has not been paid for the services that they have provided to the Homer project.

In response to two letters from Nugget, the Corps states in pertinent part in a letter to Nugget in August, 1997 (RRO/40):

SUBJECT: Spencer Quarry, Contract DACW85-96-C-0020, Homer Spit Repair and Extension, Homer, Alaska

. . .

We acknowledge receipt of Serial Letter 611-19, dated August 6, 1997 and Serial Letter 611-21, dated August 11, 1997. We do

18

not necessarily agree that Spencer Rock Products is only a "vendor" for Miller Act purposes.

Based on the supporting costs that you outlined in Serial Letter 611-21, it appears that Nugget Construction has assumed full responsibility for operations at Spencer Quarry for the subject project. Therefore, as primary operator at Spencer Quarry, we believe Nugget Construction is responsible for prompt payment to suppliers and subcontractors who contracted with Spencer Rock Products on this project.

We request that you clarify what support and project management services Nugget Construction provided to Spencer Rock Products to account for the support cost that you have shown in Serial Letter 611-21. Further, please provide information showing what work, if any, has been performed by Spencer Rock Products under its subcontract with Nugget Construction.

The letter states that it was courtesy copied to "United States Fidelity and Guarantee Co., Attn: Bill Wells, 4220 B Street, Anchorage, AK 99503." USF&G was on clear written notice. Nugget was preoccupied with the status of Spencer Rock. However, the Corps of Engineers notes that Nugget was obligated "not to request for progress payments that which you intend to withhold from a subcontractor or supplier." Nugget may have been successful in the first appeal to the Ninth Circuit in characterizing Spencer Rock Products as a supplier rather than a subcontractor. However, that does not relieve Nugget of paying all the suppliers and subcontractors pursuant to this contract as construed by the agency charged with administering the contract. Nugget continued to request progress payments and nonetheless withheld payment to the three claimants. Documents from the Corps noted as RRO/33, RRO/38, RRO/40, RRO/44, RRO/48 and Nugget documents 611-11, 611-21, 611-25, 611-30 and 611/33 are also responsive.

The following individuals have possible information: John Terwilliger, Randy Randolph, Greg Poyner, John Smithson and Bob Fox with Nugget Construction; Robert LaPore, Vernon Rush, Herschell Hall and Randy Randolph with Spencer Rock Products; Jane Bennett Poling and perhaps Janice Smith with USF&G; Douglas Lechner and Ron Niebrugge with Shoreside; Frank Dieckgraeff, Barbara Dieckgraeff and Dave Dieckgraeff with Metco; Jack Goodwill and Jeff

19

Bentz and others with North Star; John Dennis Stacey
with Chugach Rock Corporation; and the individuals who
worked with the U.S. Army Corps of Engineers on the
Homer Project.   Their respective addresses and contact
numbers are noted in prior discovery responses and
disclosures.

Response To Interrogatory No. 2 [regarding the factual
basis for the claims in paragraph 29]: Nugget was a
large construction company that dictated the activities
of Spencer Rock/Robert LaPore almost from the outset of
the relationship.   Nugget created a secret Support
Agreement that effectively gave Nugget complete control
of Spencer Rock/Robert LaPore and the Homer Project.
Nugget required that the terms of the support agreement
not be disclosed to the U.S. Corps of Engineers or to
the claimants.   Nugget did not pay Spencer Rock which
precluded Spencer Rock from paying the three claimants.
Nugget knew or should have known that this was the
likely consequence of its actions and inactions.
     See the Responses To Interrogatory No. 1.

Response To Interrogatory No. 3 [regarding the factual
basis for the claims in paragraph 33]:   See the
Responses To Interrogatory Nos. 1 and 2.

Response To Interrogatory No. 4 [regarding the factual
basis for the claims in paragraph 34]:   Spencer Rock,
North Star, Shoreside and Metco were actively involved
in the prosecution of the Homer Project as major
suppliers of goods and services.   Nugget knew about the
identity and activities of each of these entities
almost from the outset of the Homer Project.   Nugget
and USF&G each owed a duty of care not to act
negligently toward the claimants.   Nugget acted
carelessly in its dealing with and treatment of the
three claimants.   Nugget deliberately and/or
intentionally requested progress payments from the
Corps of Engineers without and after not paying the
three claimants in contravention of the contract with
the Corps.   USF&G negligently handled the resolution of
the three claims.   Absent some documents or disclosures
to the contrary, USF&G requested proofs of claim but
appears not to have reviewed or addressed the claims.

Response To Interrogatory No. 5 [regarding damages]:
Claimant already proved its contract-based damages and
was awarded judgment for those damages by the court in
1999.   In reaching this conclusion, the court also
found that the goods were provided and the services
performed for the benefit of the Homer Project.   Those
findings were not challenged on appeal and thus any
challenge has been waived.   Kesselring v. F/T Arctic
Hero, 95 F.3d 23, 24-25 (9th Cir. 1996).   The amount of

the damages for the other causes of action may be more
substantial. The actual attorney's fees expended may
be awarded as damages based on the conduct of the
defendants including fraud, misrepresentation,
negligence, and/or breach of the covenant of good faith
and fair dealing. These additional damages may also be
awarded against USF&G under state law causes of action.
Claimant also seeks punitive damages in a sum of
$1,000,000.000 as deemed appropriate by the trier of
fact. The claim for punitive damages arose prior to
August 7, 1997 and thus is governed by the statute in
effect prior to the amendment. Everyone involved in
the Homer Project has some information pertinent to the
performance of the work and the computation of the
damages.

Response To Request For Production No. 1: Claimant
incorporates all the documents that were disclosed
previously including documents attached to prior
motions, oppositions, and replies. The letter from
Douglas Lechner to Doug Wood with the U.S. Army Corps
of Engineers dated August 28, 1997 with enclosures, the
letter from Ron Niebrugge to Greg Poyner with Nugget
Construction dated October 1, 1997, and the letter from
Ron Niebrugge to Jane Poling with USF&G dated December
16, 1997 with attachments (Nugget Nos. 009112 – 009152)
are specifically noted and incorporated.

Response To Request For Production No. 2: See the
Response To Interrogatory No. 5.

Response To Request For Production No. 3: The letter
to the Corps of Engineers with attachments dated August
28, 1997 noted above.

Response To Request For Production No. 4: There is no
written agreement.

Response To Request For Production No. 5: Claimant has
already produced any notes, correspondence, memoranda
or communications it sent or received during the
prosecution of the Homer Project. Claimants agreed
early in the this case to cooperate in the pursuit of
the claims and coordinate their activities with the
understanding and expectation that any notes,
correspondence, memoranda or communications produced or
exchanged are protected by the joint defense privilege,
the attorney/client privilege and/or other common law
privileges. See Federal Rule of Evidence 503 generally
and subsections (a)(5) and (b)(3) specifically.

Response To Request For Production No. 6: There is no
written agreement.

<u>Response To Request For Production No. 7</u>:  See the Response To Request For Production No. 5.

<u>Response To Request For Production No. 8</u>:  There is no written agreement.

<u>Response To Request For Production No. 9</u>:  Any communications are privileged for reasons similar to those in the Response To Request For Production No. 5. Notwithstanding this objection, claimant is not aware of any responsive documents.

<u>Response To Request For Production No. 10</u>:  There is no written agreement.

<u>Response To Request For Production No. 11</u>:  Any communications are privileged for reasons similar to those in the Response To Request For Production No. 5. Notwithstanding this objection, claimant is not aware of any responsive documents.

<u>Response To Request For Production No. 12</u>:  Claimant objects that this request is overbroad and burdensome. Without waiving these objections, claimant responds that it has produced documents to all the parties in a timely manner throughout this litigation regarding the indicia of work it performed on the Homer Project. See the Response To Interrogatory No. 5.

<u>Response To Request For Production No. 13</u>:  See the Response To Request For Production No. 12.

<u>Response To Request For Production No. 14</u>:  There are no known photographs.

<u>Response To Request For Production No. 15</u>:  See the Response To Interrogatory No. 5.

<u>Response To Request For Production No. 16</u>:  Claimant objects that this question is overbroad. Notwithstanding this objection, claimant incorporates all the documents previously produced.

<u>Response To Request For Production No. 17</u>:  Claimant is not aware of any responsive documents.

<u>Response To Request For Production No. 18</u>:  Claimant objects that this question is overbroad. Notwithstanding this objection, claimant incorporates all the documents previously produced.

<u>Response To Request For Production No. 19</u>:  Shoreside produced the written agreement with Spencer Rock as an exhibit to a prior pleading.  Shoreside also produced a

copy of a personal guaranty executed by Robert LaPore as an exhibit to a prior pleading.

Response To Request For Production No. 20: Claimant objects that this question is overbroad. Notwithstanding this objection, claimant incorporates all the documents previously produced.

The foregoing objections to these discovery requests were made on the recommendation and advice of the undersigned.

Entry No. 482, Exh 2.

In Shoreside's Third Supplemental Discovery Responses dated December 9, 2005, Shoreside developed the factual allegations in greater detail as follows:

Shoreside joins in and incorporates by reference Metco's Supplemental Discovery response dated November 28, 2005.

Shoreside adds the following discussion at the outset of the response:

Nugget completed and submitted a Credit Application to Shoreside that is the same or similar to the Credit Application completed and submitted by Trecon and also by Spencer Rock Products to Shoreside. Thus, Shoreside had a direct contractual relationship with Nugget. As asserted in prior pleadings, Shoreside is looking directly to Nugget for payment and for attorney's fees, interest and costs in bringing and maintaining this action. Shoreside has asserted this argument as part of its claims without any decision from the District Court to date.

Shoreside adds the following sentences to the end of the first paragraph:

If Nugget did back charge or assert a claim for compensation or indemnification against Spencer Rock and Robert LaPore in the state court case for the goods provided and services performed by the three claimants in this lawsuit, then Nugget holds the funds it received from the U.S. Government attributable to those services which it claimed against Spencer Rock and Robert LaPore in trust for the three claimants. If Nugget settled with Spencer Rock and Robert LaPore for less than recovery of the full amounts for these goods and services including appropriate attorney's fees and interest, Nugget did so without the consent and/or

approval of the respective claimants and remains liable
to the claimants for the full sums.

Shoreside adds the following paragraph to the last
paragraph of the response.

USF&G knew or should have known that Nugget was
requesting progress payments from the United States
Government through the Corps of Engineers in violation
of Nugget's contract with the Corps and after written
reminder of its obligations by the Corps of Engineers.
The Corps expressly stated that Nugget could not
request progress payments if it was withholding any
payments to suppliers and subcontractors. The
obligation to pay did not depend on the narrower
definitions of suppliers and subcontractors in the
Miller Act.

USF&G knew or should have known that Nugget was
secretly structuring its transactions so that Nugget
could deceive the Corps of Engineers and the three
claimants regarding the actual relationship between and
obligations of Nugget and Spencer Rock. USF&G should
have inquired into the reasons that Nugget was engaging
in this deception and subterfuge.

USF&G knew or should have known that Oles,
Morrison may have been involved in structuring the
transactions to create a straw man relationship with
Spencer Rock and a hollow shell constituting a
subterfuge under the Miller Act in order to seek to
excuse Nugget's willful non-payment to the three
claimants.

USF&G appears to have relied exclusively or
primarily on representations from Oles, Morrison,
Nugget's attorneys, regarding the facts and the
defenses of Nugget and of USF&G. USF&G should have
undertaken its own independent investigation of the
facts and law and its own analysis and handling of the
claims.

After the lawsuits were filed, Nugget filed a
motion to declare that this federal project was not a
federal project. USF&G did not file an opposition or
any response to the Nugget motion. USF&G provided
Miller Act bonding for a federal project and should
have filed an opposition or response to the Nugget
motion because Nugget's motion was contrary to the
unchallenged facts including the written statements of
the Corps of Engineers. The claimants expended
additional attorney's fees to challenge and defeat the
unfounded Nugget motion.

24

The decision by the District Judge in this case finding that Spencer Rock Products was a subcontractor to Nugget under the Miller Act was and is a correct interpretation of the relevant decisions of the United States Supreme Court. USF&G also agreed or should have agreed that the decision was correct as a matter of law based on the same decisions. However, USF&G joined with Nugget and appealed the decision of the District Court. Nugget's election to appeal was a shrewd gamble that proved fortuitous for Nugget based on the brief, unpublished decision of the Ninth Circuit panel citing no Supreme Court authority. The decision of the Ninth Circuit is in conflict with settled Supreme Court authority. There were and are substantial costs to the claimants to defend the appeal and to continue this litigation after remand.

Shoreside reserves the right to amend and/or develop this response if and after Nugget and USF&G release documents that are currently marked as privileged and/or after additional disclosures and discovery.

Exhibit 2. The claimants assert additional facts in the companion motion against Nugget that are incorporated by reference.

## By Contrast, USF&G Admits That There Is No Factual Basis To Its Affirmative Defenses

North Star served discovery requests asking USF&G at Interrogatory Number 10 to "[d]escribe in full detail each factual basis which supports, or tends to support, the allegations in each of the affirmative defenses stated in your Answer and Affirmative Defenses dated September 21, 2005 to North Star's Amended Complaint." In its response dated March 14, 2006, USF&G does not state any factual basis to support any of its affirmative defenses. USF&G does not provide a factual basis to challenge the claims of bad faith maintained by the claimants or to support the statute of limitations defense advanced by USF&G. Therefore, the claimants and this court can conclude that USF&G

by its own responses admits that there is no factual basis underpinning its defenses.

The statute of limitations defense, which USF&G has not properly presented, is also contradicted by the record. When the three complaints were first filed in 1998, the claimants did not know how USF&G had handled and mishandled their claims. USF&G's treatment and mistreatment of the claims did not emerge until recently. Many of the documents were first disclosed last November, 2005. USF&G did not waive its asserted privilege and produce other documents and correspondence until January, 2006. The acts of bad faith continue to this day. The statute of limitations for torts is two years; the statute will not expire until two year after the breaches cease.

## II.  Legal Basis

### Miller Act Claims

In <u>U.S., Walton Technology v. Westar Engineering</u>, 290 F.3d 1199, 1206 (9th Cir. 2002), the Ninth Circuit states:

> Although general rules of suretyship law apply to Miller Act cases, <u>Am. Cas. Co. of Reading v. Arrow Road Construction Co.</u>, 309 F.2d 923, 924 (9th Cir. 1962), Defendants assume that coextensive liability between a surety and its principal is in every case defined and limited by the principal's contractual liability. In the context of Miller Act cases, however, we must look beyond the principal's contractual liability, to the Miller Act itself, in defining the limits of coextensive liability between a surety and its principal.
>
> . . .
>
> Thus, the liability of a surety and its principal on a Miller Act payment bond is coextensive with the contractual liability of the principal only to the extent that it is consistent with the rights and obligations created under the Miller Act.

The surety in that case attempted to avoid liability by arguing that a "pay when and if paid" clause in the contract constitutes a waiver of the claimant's Miller Act rights.  The Ninth Circuit discusses the "highly remedial" nature of the Miller Act and held that the passage of time rather than the "pay when and if paid" limitation on payment in the contract is controlling.  The fundamental legal principle is that a contract cannot constrict or curtail Miller Act liability.  In this case, the contracts between the Corps and Nugget and between Nugget/Spencer and the claimants read together in light of the remedial nature of the Miller Act require the surety to satisfy the unpaid claims of the claimants promptly.

The three claimants brought and maintain the claims for the "use and benefit" of the United States of America.  The three claimants are intended beneficiaries under the Miller Act and the payment bond which was provided by USF&G for the Homer Project. All three claimants testified that each claimant relied on the existence of the bond in providing goods and performing services to the Homer Project.

The contract between the U.S. Army Corps of Engineers and Nugget Construction includes a payment provision noted by the Corps in correspondence with Nugget.  In response to a letter from Metco seeking payment, the Corps states in pertinent part in a letter to Nugget dated August 16, 1997 (RRO/33):

> We remind you that under Contract Clause I.55, <u>Payments Under Fixed-Price Construction Contracts</u>, Paragraph c.3 states: "This request for progress payment does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the

27

subcontract."

The contract is unambiguous. Nevertheless, Nugget requested progress payments from the Government and yet withheld payment to Spencer Rock and the three claimants. Nugget's appropriate remedy under the circumstances is customary in the construction industry. Nugget could have made the checks jointly payable to both Spencer Rock Products and the specific claimant, but it did not. Nugget instead took the money for itself. USF&G was on notice of the actions and inaction by Nugget.

In response to two letters from Nugget, the Corps states in pertinent part in a letter to Nugget in August, 1997 (RRO/40):

> Based on the supporting costs that you outlined in Serial Letter 611-21, it appears that Nugget Construction has assumed full responsibility for operations at Spencer Quarry for the subject project. Therefore, as primary operator at Spencer Quarry, we believe Nugget Construction is responsible for prompt payment to suppliers and subcontractors who contracted with Spencer Rock Products on this project.

The Corps of Engineers states that Nugget "is responsible for prompt payment to suppliers and subcontractors who contracted with Spencer Rock Products on this project." The related Federal Prompt Pay Act, 31 U.S.C. Sections 3903(b), 3905(b)-(h) is also applicable. North Star's Notice of Supplemental Authorities at Docket Entry No. 306 addresses this issue. The Prompt Pay Act, including Nugget's responsibilities under it referenced by the Corps in the letter above, effectively served to amend and supplement the Miller Act. United States ex rel. Cal's A/C & Electric v. Famous Const. Corp. & Capitol Indemnity Corp., 34 F.Supp.2d 1042, 1043-44 (W.D. La. 1999). The surety's duties discussed below include a duty to address and pay valid claims

promptly. The Corps of Engineers did not make the hypertechnical distinction concocted by counsel for Nugget to try to justify Nugget's refusal to pay. Nugget's distended characterization of the three claimants was and is irrelevant to a determination of USF&G's responsibility to pay under the applicable contracts, the Miller Act, the Prompt Pay Act and the statutory and common law duties of a surety.

By August, 1997, Nugget, USF&G, the Corps and the three claimants were aware that the three claimants had not been paid. USF&G was under a duty to the claimants to act. USF&G was under a duty to independently investigate and properly handle the claims. USF&G was under a duty to pay valid claims in a timely manner. USF&G breached all of its duties.

Claimants already proved their contract-based damages and were awarded judgment for those damages by the Court in 1999. In reaching this conclusion, the District Court also found that the goods were provided and the services performed for the use and benefit of the Homer Project. These findings and others were not challenged on appeal. Any challenge may have been waived. Kesselring v. F/T Arctic Hero, 95 F.3d 23, 24-25 (9th Cir. 1996). On this basis alone, USF&G should have paid the three claims with appropriate interest at a minimum back in 1999 if not earlier.

In its March 3, 2005 decision, the Ninth Circuit states in pertinent part:

> On the record before us, the appellees have presented
> sufficient evidence to create a material issue of fact
> as to subterfuge or collusion. The evidence, although
> not conclusive, tends to show that Nugget secretly
> converted Spencer Rock into a strawman in its ongoing

> dealings with the appellees. The support agreement
> with Spencer Rock on its face purports to insulate
> Nugget from Miller Act liability, yet Nugget directed
> Spencer Rock to conceal the terms of this agreement
> and keep secret Nugget's arrangements with Spencer
> Rock relating to the project. Nugget also began
> performing some of Spencer Rock's functions at the
> quarry and interacted directly with some of the
> appellees - the extent to which remains in dispute.

Docket Entry No. 383, p. 6. Thus, USF&G has known since March, 2005 that there is evidence of subterfuge by Nugget and yet USF&G has not undertaken to fulfill its duties. When USF&G should have investigated and seriously considered paying the claims, its records indicate that it breached and disregarded its duties. The actions and inactions continue to this day and are more egregious because USF&G now has more knowledge of Nugget's activities and misrepresentations to it. However, USF&G's recent statements and actions ratify and reaffirm its bad faith.

No one disputes that the USF&G files recently disclosed include statements by Mr. James Ferguson, USF&G's and Nugget's agent and broker working with Willis of Alaska, that USF&G will let Nugget take care of things. Indeed, USF&G turned the entire defense of this case over to Nugget and Nugget's attorneys, the Oles Morrison law firm, and washed its hands of the matter. At his recent deposition on March 8, Mr. Ferguson was asked about the detailed letter from Mr. John Dennis Stacey with Chugach Rock Corporation to Ms. Jane Bennett Poling with USF&G dated March 18, 1998 that evidenced Nugget's control and surreptitious conduct aimed at taking over the Spencer Quarry. A copy of the letter is attached to the Affidavit of John Dennis Stacey filed in the

companion motion against Nugget. USF&G was aware of the fraud and subterfuge and still refused to undertake or fulfill its duties.

USF&G has ignored another basis for liability that the claims by the claimants arise from a direct contractual relationship with Nugget. Shoreside received the same signed Credit Application from Nugget that it received from Spencer Rock Products. The District Court previously found that the Shoreside Credit Application created a direct contractual relationship and provided a contractual basis for an award of attorney's fees. Shoreside had done work for Nugget prior to April, 1997 and subsequent to the termination of work billed in the first instance to Spencer Rock Products during the summer of 1997. This issue was briefed to but not addressed by the District Court in 1999. Metco also reasonably looked directly to Nugget for payment. North Star also claims a direct contractual relationship with Nugget as has been developed previously in this case. All three claimants present direct actions against Nugget, yet USF&G never investigated the claims.

Nugget and USF&G have done little to resolve the case throughout the last eight years. They made a total offer of $35,000.00 to the three claimants for the first time in June, 2005. The offer is a benchmark of bad faith, because the sum is a little more than merely the pre-judgment interest on Metco's claim alone. USF&G recently offered to settle with all three claimants for one dollar ($1.00). This offer in light of the findings and record to date is another act of bad faith. USF&G

31

continues to engage in more bad faith and is regressing from rather than moving toward resolution.

## **Bad Faith Claims**

In <u>Alvarez v. Insurance Co. of North America</u>, 667 F.Supp. 689, 696 (N.D. Cal. 1987), the district court discusses the bad faith cause of action in a Miller Act case.  The court notes: "In this case, Nueva Castilla has brought a <u>separate</u> action for unfair insurance practices under <u>state</u> statute.  In other words, rather than asking this court to expand the federal remedy, plaintiff brings an additional but separate state claim." <u>Id.</u> at 694 (Emphasis in original).  The decision notes the applicability of 31 C.F.R. Section 223.18, among other provisions.  <u>Id.</u> at 696. 31 C.F.R. Section 223.18 states in pertinent part:  "Every company shall promptly honor its bonds naming the United States or one of its agencies or instrumentalities as obligee."[1]  This and other regulations establish the duties of a surety toward the beneficiaries.   Mr. Callow discussed this statute at his deposition.

In <u>K-W Industries v. National Surety Corp.</u>, 855 F.2d 640 (9th Cir. 1988), the Ninth Circuit states that the Miller Act does not preempt state law bad faith causes of action.  The Court notes:

> The purpose of the Miller Act "is to protect persons supplying materials and labor for federal projects."  <u>United States ex rel. Martin Steel Constructors, Inc. v. Avanti Constructors, Inc.</u>, 750

---

[1]    This regulation appears not to have been amended during the pendency of this litigation.

F.2d 759, 761 (9th Cir. 1984), cert. denied, 474 U.S. 817 (1985). National has pointed to nothing in the Miller Act or in its legislative history to suggest that Congress intended the Act to protect sureties from liability for torts or other violations of state laws or regulations that they may commit in connection with payment bonds executed pursuant to the Act. We see no conflict whatsoever between Montana's bad faith insurance practices law and the purpose of the Miller Act. Indeed, the Congressional purpose of protecting suppliers of goods and services for federal projects is advanced if sureties are deterred by state law from bad faith practices in responding to claims on Miller Act payment bonds. We agree with the Tenth Circuit's observation that the Miller Act, like the mechanic's lien it replaces, "is not the exclusive remedy in regard to the obligation which such lien secures," but rather, "is 'separate from and independent of any in personam rights . . . which the supplier might have against the owner, a contractor, or a subcontractor, by way of a contract, or otherwise.'" . . . For the purpose of preemption analysis, we see no reason to distinguish between remedies that a supplier may have against an owner, contractor, or subcontractor as opposed to a surety. The Miller Act simply provides the equivalent of a mechanic's lien; it does not supplant any other remedies the supplier may have against any party involved in a federal construction project.

Id. at 642 - 43 (Footnote and citations omitted). This is the settled law in the Ninth Circuit.

In Loyal Order of Moose, Lodge 1392 v. International Fidelity Ins. Co., 797 P.2d 622 (Alaska 1990), the Alaska Supreme Court discusses some of the duties of a surety under Alaska state law. The Court states:

In our view, the relationship of a surety to its obligee - an intended creditor third-party beneficiary - is more analogous to that of an insurer to its insured than to the relationship between an insurer and an incidental third-party beneficiary. . . . A surety may satisfy its duty of good faith to its obligee by acting reasonably in response to a claim by its obligee, and by acting promptly to remedy or perform the principal's duties where default is clear.

Id. at 628. Alaska Statute 21.36.125 addressing "Unfair claim

settlement practices" and other provisions sets forth some of the duties.    In <u>State Farm Mutual Automobile Insurance Co. v. Weiford</u>, 831 P.2d 1264 (Alaska 1992), the Alaska Supreme Court observes that standards of conduct contained in the Alaska Unfair Claims Settlement Practices Act, AS 21.36.125, could be considered as evidence of bad faith investigation, handling or settlement of a claim in an action brought against the insurer. Notably, that statute and standards also apply to a surety such as USF&G in the treatment of its assureds, the claimant beneficiaries in this case.    Alaska Statute 21.90.900(24) and (26) include a surety within the definitions of "insurance" and "insurer" under the statute.    Mr. Callow discussed AS 21.36.125 at his deposition.

### Expert Report of William Grant Callow

The Expert Report of William Grant Callow, produced to the defendants on February 14, 2006, discusses the legal import of USF&G's activity and inactivity.    In his Conclusion, he states:

After it became aware of these three claims in September, 1997, USF&G was on notice that both it and Nugget faced substantial exposure.  USF&G was on notice that the three claimants had performed services and provided goods for the use and benefit of the bonded Homer Project.  Neither Nugget nor USF&G contested those assertions, and the district court found that the claimants had in fact performed services and provided goods in a timely and conforming manner for the use and benefit of the Homer Project.

The three claimants performed services and provided goods in reliance on the protection afforded by the Miller Act payment bond.  USF&G knew or should have known that Nugget was not being candid with the Corps of Engineers and the claimants in particular when Nugget sought to conceal the Support Agreement dated April 23, 1997. USF&G knew or should have known that the Support Agreement and subsequent activities changed the legal relationship of the parties.

USF&G owed a duty to the three claimants to investigate the claims with due care. USF&G breached that duty. USF&G tendered defense of the claims to Nugget without first fulfilling its duty to undertake a reasonable investigation of the claims. After acceptance of the tender by Nugget, USF&G appears to have done little if anything to review and approve pleadings before they were filed or to monitor the case. USF&G appears to have done little if anything to discuss settlement of the claims. Figuratively speaking, USF&G allowed the fox into the hen house and then abandoned the three hens it had a duty reasonably to protect.

USF&G has a right to defend against invalid or reasonably questionable claims and a right not to settle such claims. However, USF&G must fairly balance these rights with its duties to the three claimants who are its intended contract beneficiaries. The three claimants relied on the fact that the Homer Project was a bonded project and continue to seek the coverage reasonably expected by that protection. USF&G acted in bad faith by failing to investigate the claims with reasonable care, by failing to engage seriously in settlement efforts, and by failing to monitor and actively assert the rights it had to participate in the case.

Litigating a case that involves less than $100,000 is often uneconomical for all involved. A party can defend against any claim, but committing a disproportionate sum to challenge well-founded claims is problematic and usually economically irrational. A party that commits resources that are disproportionate to the amount in controversy and appeals every unfavorable trial court ruling, no matter how clearly that ruling may be based on evidence or within the ambit of the reasonable discretion accorded the trial court, employs a strategy that seeks to win not upon the merits but by economic coercion. I understand that the cost of bringing and maintaining the claims in this case has been staggering. The litigation tactics of Nugget and USF&G have reportedly escalated the costs unreasonably. Nugget and USF&G have apparently committed enormous sums to litigate this case which are far out of line with the total amount in controversy.

Shoreside contends that Nugget drove up the costs of litigation by raising and litigating frivolous issues, such as whether this federal project is a federal project and whether the notice discussed above was adequate. The record reveals that Nugget and USF&G have enlisted at least eight (8) lawyers in this eight (8) year defense campaign.

A strategy of trying to economically overwhelm an intended contract beneficiary that asserts a valid claim by trying to force that party into submission by litigating frivolous issues and defenses that cause the claimants to incur inordinate legal fees is bad faith.

This report is subject to further amendment as other discovery documents and information are brought to my attention.

Docket Entry No. 460, Exh. 1.

## Conclusion

USF&G contends as a matter of law that it was and is free to sit on its hands and do nothing. USF&G also concedes without reservation that as a matter of fact it sat on its hands and did nothing and continues to sit on its hands and do nothing. USF&G's undisputed course of conduct, however, is inconsistent with the settled law discussed above.

This Court should enter summary judgment against USF&G and in favor of Shoreside Petroleum, Inc. in the sum of $53,501.01 with interest and in favor of Metco, Inc. in the sum of $36,785.27 with interest. The Court should also allow the claimants to move for and develop the claim for attorney's fees.

The claim for bad faith and the amount of punitive damages should be presented to the trier of fact.

DATED this 1st day of May, 2006 at Anchorage, Alaska.

THE LAW OFFICE OF STEVEN J. SHAMBUREK
Attorney for Plaintiffs
Shoreside Petroleum, Inc., d/b/a Marathon
Fuel Service and Metco, Inc.

s/ Steven J. Shamburek
By:_____
Steven J. Shamburek
Alaska Bar No. 8606063
LAW OFFICE OF STEVEN J. SHAMBUREK
425 G Street, Suite 630
Anchorage, Alaska 99501
(907) 522-5339 Direct
(907) 522-5393 Fax
shamburek@gci.net
shamburekbank@gci.net

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 1st day of May, 2006, a

copy of the foregoing was served by the Electric Case Filing.

s/ Steven J. Shamburek

_____
Steven J. Shamburek