William Grant Callow
March 31, 2006

A98-009 CIV (HRH)

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE

UNITED STATES OF AMERICA for the )
use of NORTH STAR TERMINAL & )
STEVEDORE COMPANY, d/b/a NORTHERN )
STEVEDORING & HANDLING, and NORTH )
STAR TERMINAL & STEVEDORE COMPANY, )
d/b/a NORTHERN STEVEDORING & )
HANDLING, on its own behalf, )
      Plaintiffs, )
  and )
  )
UNITED STATES OF AMERICA for the )
use of SHORESIDE PETROLEUM, INC., )
d/b/a MARATHON FUEL SERVICE, )
and SHORESIDE PETROLEUM, INC., )
d/b/a MARATHON FUEL SERVICE, )
on its own behalf, )
      Intervening Plaintiffs, )
  and )
  )
METCO, INC., )
      Intervening Plaintiff, )
  vs. )
  )
NUGGET CONSTRUCTION, INC.; SPENCER )
ROCK PRODUCTS, INC.; UNITED STATES )
FIDELITY AND GUARANTY COMPANY; and )
ROBERT LAPORE, )
      Defendants. )
_____)

Case No. A98-009 CIV (HRH)

COPY

DEPOSITION OF WILLIAM GRANT CALLOW

Pages 1 - 90, inclusive

Friday, March 31, 2006, 9:17 a.m.

Taken on behalf of the Defendants
at
Barokas Martin & Tomlinson
1029 West 3rd Avenue, Suite 280
Anchorage, Alaska

Exhibit A
Page 1 of 45

William Grant Callow                                          A98-009 CIV (HRH)
March 31, 2006

Page 4

1      ANCHORAGE, ALASKA; FRIDAY, MARCH 31, 2006
2                    9:17 A.M.
3                    -oOo-
4      (Exhibit 1 marked.)
5            WILLIAM GRANT CALLOW,
6      called as a witness herein, having
7      been first duly sworn upon oath, was
8      examined and testified as follows:
9                  EXAMINATION
10  BY MR. VIERGUTZ:
11      Q. Good morning, Mr. Callow.
12      A. Good morning, Mr. Viergutz.
13      Q. You know the process: I ask questions; you
14  answer them. If you answer them, I have to assume
15  you understood the question. Is that acceptable?
16      A. Yes, sir.
17      Q. And if you don't understand it, you'll ask
18  me to rephrase it; will you do that?
19      A. Yes, I will.
20      Q. Your report is placed before you,
21  Exhibit 1, and I'd ask you to look at -- and that is
22  your report, you authored it, correct?
23      A. Yes. I want to take a look to see that all
24  the pages are here.
25      (Reviews document.)

Page 5

1      Yes, that's correct.
2      Q. Okay. The first paragraph, the last two
3  sentences, it says, "I have been requested to opine
4  as to the treatment of claims by USF&G. I reviewed
5  documents provide to me by the attorneys for the
6  claimants and discussed this case with them."
7      Who did you discuss the case with,
8  Mr. Sewright?
9      A. Yes, sir.
10      Q. And what did you --
11      A. And Mr. Shamburek.
12      Q. And did you talk to Mr. Sewright outside
13  the presence of Mr. Shamburek?
14      A. I don't recall. I may have. I can't
15  remember. I may have, but I think most often I -- I
16  talked to Mr. Shamburek outside the presence of
17  Mr. Sewright, but I don't know that I spoke to
18  Mr. Sewright outside the presence of
19  Mr. Shamburek.
20      Q. So you don't know?
21      A. Yeah, I can't remember. I don't -- it's --
22  I'm just saying it's possible, but I don't have a
23  recollection if I spoke to him.
24      Q. Okay. You never saw any deposition
25  transcripts of any USF&G employees, correct?

Page 6

1      A. Correct.
2      Q. And the documents that you reviewed to
3  author this report are referenced in the last two
4  pages attached to your report; is that correct?
5      A. That's correct.
6      Q. What is the volume of material, estimate,
7  that -- is it two inches, three inches, 20 inches?
8      A. I would estimate it's between three and
9  four inches.
10      Q. Three and four inches.
11      A. Yeah.
12      Q. Okay.
13      A. I want to make clear that we're talking
14  about the documents involved in this case, as
15  opposed to, you know, any cases that I reviewed or
16  something like that, but, yeah. That wouldn't have
17  been a thick -- real thick anyway, but, yes, that's
18  correct.
19      Q. Have you ever represented a surety?
20      A. No.
21      Q. If we'd go to page 3 of your report. Did
22  you review those letters referenced in the quote
23  under the "subject" heading, and then the next
24  paragraph it says, "We acknowledge receipt of serial
25  letter 611-19, dated August 6, '97 and serial letter

Page 7

1  611-21, dated August 11, '97"?
2      A. I'm not sure, as I sit here today. I think
3  that I did. Let's see if these are -- if those are
4  referenced in the last -- in that last page.
5      (Reviews document.)
6      I can't be sure. I suspect that I did.
7      (Exhibit 2 marked.)
8      MR. SHAMBUREK: Now, Herb, I'd just like to
9  note that in an e-mail exchange I had asked you to
10  mark any exhibits that you were going to use for the
11  deposition, and you said there would be no
12  exhibits.
13      MR. VIERGUTZ: Outside what his report is.
14  And this is I believe what you saw as termed on the
15  second to the last page "Documents produced by USF&G
16  and marked 'USF&G' with some blank documents."
17  BY MR. VIERGUTZ:
18      Q. Does this look like what you reviewed?
19      A. What's just been marked as Exhibit 2?
20      Q. Correct.
21      A. Well, I have more documents than this that
22  I reviewed, so it's -- this is only about an inch
23  thick or so. And, yeah, some of these look
24  familiar.
25      MR. SHAMBUREK: Herb, I'll also observe,

4 (Pages 4 to 7)

William Grant Callow
March 31, 2006

A98-009 CIV (HRH)

---

Page 8

1 for the record, that I sent you an e-mail note and
2 said we'd make the documents that he reviewed
3 available for your inspection or copying.
4        MR. VIERGUTZ: Uh-huh. Uh-huh.
5 BY MR. VIERGUTZ:
6     Q. Why is the content of those two letters, do
7 you know, not cited in your report?
8        MR. SEWRIGHT: Object to the form of the
9 question. I --
10       MR. VIERGUTZ: Hold it. Hold it right now.
11 Object to the form of the question, period.
12 Anything further than that I'm not going to put up
13 with. That's the only proper objection, and I think
14 Mr. Shamburek is the attorney representing
15 Mr. Callow; is that correct?
16       MR. SHAMBUREK: Mr. Callow is the expert
17 for all of the claimants, so I have been the one
18 who's talked most with him, but Mr. Sewright
19 represents North Star Stevedoring.
20       MR. VIERGUTZ: Okay.
21       MR. SEWRIGHT: I just didn't understand
22 what letters you're referring to.
23 BY MR. VIERGUTZ:
24     Q. Can you answer my question?
25     A. I understand that you're referring to

Page 9

1 serial letter 611-19 and serial letter 611-21,
2 correct?
3     Q. Right.
4     A. If you could point those out to me, refresh
5 my recollection.
6     Q. No. My question to you is --
7     A. Oh.
8     Q. -- do you recall why those letters are not
9 referenced in your report?
10    A. Well, in fact they are at page 3, and
11 that's the reference I made to them. But I didn't
12 believe that any further reference to them was
13 relevant to the opinions that I was asked to give
14 about USF&G's duties in this case.
15    Q. Okay. In your history, do you find it
16 unusual for a general contractor to dispute a
17 position taken by an owner?
18    A. Certainly it happens. Is it unusual? I
19 wouldn't say it's unusual, no, I wouldn't say that
20 it's like a strange occurrence, if that's what you
21 mean.
22    Q. Is that bad faith?
23    A. Would you explain to me what you mean by is
24 it bad faith, to dispute?
25    Q. For a general contractor to dispute a

Page 10

1 position taken by an owner.
2     A. I don't -- if we're talking about the
3 general contractor, there is an implied duty of good
4 faith and fair dealing in every contract. And if
5 that dispute is based on -- has a good faith basis,
6 then a legitimate dispute is not in and of itself
7 evidence -- or is not in of itself bad faith, that's
8 correct.
9     Q. Would you define bad faith for me, please.
10    A. Well, bad -- there are a couple of
11 different standards for bad faith. But bad faith is
12 the breach of the duty of good faith and fair
13 dealing that is implied in every contract, including
14 every insurance contract. And, according to Alaska
15 case law, every surety contract.
16    Q. I understand that. But bad faith means
17 what?
18    A. Well, it means lots of different things
19 depending on the context of the case. But basically
20 what it means is that a party takes a position that
21 is unreasonable or engages in conduct that is
22 unreasonable. Or -- or in reckless disregard for
23 rights, that can be -- there are numbers
24 of different -- there are different types of bad
25 faith. And I'm speaking now about Alaska law.

Page 11

1     Q. And who determines whether the position is
2 unreasonable?
3     A. Well, I guess the question becomes at what
4 point. But usually that is determined in a court of
5 law, sometimes by a jury, or sometimes by a judge.
6     Q. And if the allegation has no merit, it
7 could potentially never make it to a judge or a
8 jury; is that correct?
9     A. If the -- I want to make sure that we're on
10 the same page. If the allegation of bad faith has
11 no merit, yes, that's true -- well, I guess it could
12 make it to a judge but it could be dismissed on
13 summary judgment, that's correct.
14    Q. If you'd go to the bottom of page 3, the
15 final sentence. It says: The letter states that it
16 was courtesy copied to United States Fidelity &
17 Guarantee Company, Attention Bill Wells, 4220 B
18 Street, Anchorage, Alaska 99503.
19    A. Yes, sir.
20    Q. Do you know whether Mr. Wells works at that
21 location?
22    A. I do not have any independent knowledge of
23 that.
24    Q. Okay. Are you familiar with Willis of
25 Alaska?

5 (Pages 8 to 11)

Exhibit A
Page 3 of 45

William Grant Callow
March 31, 2006

A98-009 CIV (HRH)

---

Page 16

1  other types of product, under those circumstances,
2  the majority of the case law, last time I reviewed
3  it, was that normally those agents are considered
4  the agents of the person purchasing the product.
5  They have their duty to them, but if that duty is
6  breached -- for example, if they don't -- if they
7  don't supply a good product, they can be made
8  liable. But you can't, for their negligence,
9  necessarily hold the insurer liable. There are some
10  exceptions, but that's the general rule.
11      Q. I appreciate that discussion. However, in
12  this case --
13      A. Okay.
14      Q. -- do you intend to offer an opinion that
15  Willis was the agent of USF&G?
16      A. Do I intend to offer -- I haven't been
17  asked that specific question. So based on what I
18  know at this point, I can't answer that. But the
19  opinions that I expect to offer in this case, at
20  this time, are the ones that are set forth in my...
21      Q. In your report, Exhibit 1?
22      A. In my report, yeah.
23      Q. And that's not an opinion contained within
24  Exhibit 1, is it?
25      A. Well, I'm just -- you know, let me -- I

---

Page 17

1  want to make sure that -- I haven't reviewed this.
2      (Reviews document.)
3      I guess -- I guess my position is this,
4  that under certain circumstances if someone
5  voluntarily begins to act in a manner whereby they
6  assume duties, they can therefore become liable for
7  not doing those duties in a reasonable and proper
8  manner.
9      To the extent that Ferguson was involved in
10  this and obtained information that he knew or should
11  have known, should have been supplied to other
12  parties, you know, I think that there is -- there is
13  an argument to be made there that Ferguson could be
14  considered to be an agent of sort.
15      Q. Do you intend to offer an opinion that
16  Mr. Ferguson breached his duties?
17      A. At this point I tend to only offer the
18  opinions that I -- that I have set forth in here.
19      Q. And that's not an opinion contained in
20  Exhibit 1, is it?
21      A. No.
22      Q. What is the general area of your practice?
23  What is -- what law do you practice?
24      A. Well, I have been doing a fair amount of
25  insurance coverage work. And sometimes that has

---

Page 18

1  arisen in the context of personal injury, sometimes
2  the personal injury work spins off into insurance
3  bad faith.
4      I have, in recent years, been
5  undertaking -- I've been doing less of that and
6  doing a variety of other things. I mean, I did --
7  I've done some discrimination claims, Title -- 1981
8  claims.
9      I have been doing -- I have been working
10  with some Scandinavian clients, assisting them in
11  providing -- in obtaining and monitoring the legal
12  work that's done for them in the United States.
13      I have been working on a number of class
14  action suits involving various things, ATM machines,
15  ATM fees.
16      And most recently, I've gotten involved in
17  a case involving a derivative shareholder suit in
18  California. It's a variety of things.
19      Q. What are the differences between --
20      A. No divorces.
21      Q. -- between a surety and an insurer?
22      A. Well, a surety is actually providing
23  protection to -- it's a type of a third-party
24  contract. And the best definition of it and
25  distinction is in a case up here called the Loyal

---

Page 19

1  Order of Moose, I don't know what the cite is, but
2  that will tell you specifically what it is.
3      But in the normal insurance circumstance,
4  an insurer provides protection to the insured
5  against third-party liability. A surety, on the
6  other hand, is really providing protection to a
7  third party. And that's the essential difference.
8      The person who's paying the premium is
9  paying a premium for the protection of third -- of
10  third parties. But the coverage that is being
11  provided is being specifically provided to the third
12  party, so it makes it different than what is called
13  a third-party insurance contract -- or I'm sorry.
14  What's called a third-party claim where, in the
15  average automobile case, someone -- I have insurance
16  on my car and for driving, I run a stop sign, I
17  injure somebody, they sue me, my insurance company
18  defends, that's a third-party claim.
19      Most courts hold that the insurer, even
20  though I bought insurance to maybe protect the
21  person that I might injure, that is -- the courts
22  say, no, you really bought insurance, in that
23  circumstance, to protect yourself.
24      In the case of a surety, there I'm
25  buying -- I'm paying a premium to protect a third

---

7 (Pages 16 to 19)

Exhibit A
Page 4 of 45

Page 20

1   party specifically from a particular contingency,
2   and in this case it's payment.
3       Q.  What are the differences between the duties
4   of a surety and an insurer?
5       A.  Well, I assume you're talking about -- in
6   terms of claims investigation and handling; is that
7   correct?
8       Q.  You can answer that.
9       A.  Okay.  The essential difference -- well, in
10  fact, both have a duty of good faith and fair
11  dealing.  Under Alaska law, I'm speaking of Alaska
12  law.  Alaska law is applicable under the Miller Act,
13  and the duties of good faith and fair dealing in an
14  insurance context, whether for a bonding company or
15  for any liability company, are essentially identical
16  when it comes to duties to investigate claims.  And
17  to investigate them thoroughly, to reasonably pay
18  claims, all the duties that are set forth or the
19  standards that are set forth in the Alaska Insurance
20  Code, Title 36, and in the appropriate
21  administrative regulations.
22      But in terms of their duty to investigate
23  claims and to pay claims, duties are similar.
24      Q.  Does a surety have a duty to the
25  principal?

Page 21

1       A.  Well, yes.  Particularly where there
2   is a -- there is an indemnity agreement of some
3   sort.  There is a duty to the principal, there is no
4   question about that.
5       But the -- there is -- there is a duty to
6   the insureds and -- let me -- let me step back.
7       You can't have a surety just recklessly
8   paying claims and then looking to its principal and
9   saying, now you got to pay us back.  They have to
10  act reasonably.  They have to reasonably investigate
11  the claim, do it reasonably promptly, and then --
12  and then pay the claim.  And at that point they can
13  turn to their principal.
14      But if it turns out that they did any of
15  that negligently and paid too much, they have -- to
16  that extent, forfeited their right to collect from
17  the principal.
18      Q.  How is that duty impacted, if you know, by
19  the general agreement of indemnity?
20      A.  How is -- say that again, please.
21      Q.  How is the duty to the principal impacted,
22  if you know, by the general agreement of
23  indemnity?
24      A.  Well, the general agreement in indemnity --
25  maybe the best way to put it is this:  If there were

Page 22

1   none, the principal wouldn't be harmed by the
2   negligence, there would be no interest that the
3   principal would have if the surety overpaid a claim
4   or paid an invalid claim.  The surety would be just
5   out the money.
6       Where there is an indemnity agreement, that
7   indemnity agreement limits the right of the surety
8   to recover from the principal, to the extent that
9   the surety has been negligent and overpaid a claim
10  or paid an invalid claim.
11      So the surety still has the obligation to
12  carefully investigate and pay claims as required by
13  law, always has.  And that obligation is to the --
14  what I will refer to as the thirds, the third -- or
15  the insureds, the third-party beneficiaries.
16      Existence of the indemnity agreement merely
17  means that there is -- there is also, rather than a
18  duty, really -- I hate to rephrase it as a duty, but
19  it's -- it's a circumstance where the negligence of
20  the surety, as I've said before, in failing to
21  properly investigate a claim, paying any claim that
22  is invalid or overpaying a claim, limits the right
23  to indemnity.
24      Q.  I don't see, in the last two pages attached
25  to your report, that you reviewed the general

Page 23

1   agreement of indemnity in this case.  Did you?
2       A.  Well, I'd have to go back and look at my --
3   I'd have to look at my notebook to see that, if I
4   did or not.  I can't -- as I sit here today, I can't
5   remember if I did.  I certainly understood that
6   there was one and I -- and I considered that to be
7   something important to know.
8       Q.  The second to the last page of the
9   attachment to your report, it's a letter dated
10  February 8th, 2006, the final paragraph says, "All
11  of the pleadings, discovery, disclosures and
12  transcribed depositions are readily available for
13  your review.  Please let me know what you would like
14  to review."
15      Did you advise Mr. Shamburek or
16  Mr. Sewright that you wanted to review any documents
17  that are not referenced above this paragraph?
18      A.  That's a good question.  I don't believe
19  so.  I -- you know, I'm trying to think.  I may
20  have, but specifically, I don't recall asking to see
21  that one.
22      Q.  What is the duty of the surety to the
23  obligee?
24      A.  Well, there are lots of duties, but if
25  we're talking about the -- in the claim context,

8 (Pages 20 to 23)

William Grant Callow
March 31, 2006

A98-009 CIV (HRH)

---

Page 24

1  there is the duty to promptly investigate a claim,
2  to reasonably investigate the claim. To pay the
3  claim, any claims that are valid, in a prompt
4  manner. There is a duty to communicate in a timely
5  fashion concerning the claims. And most of the
6  duties, or many of the duties, are embodied in
7  Title 36 of the Alaska Insurance Code and in the
8  corresponding administrative regulations.
9      Q. Do you know Mr. John George?
10     A. I've spoken to him on the phone. Many
11  years ago.
12     Q. Do you have -- based on your knowledge of
13  him, do you intend to offer an opinion that he's
14  either competent or incompetent, or don't you have
15  sufficient knowledge to render an opinion?
16     A. Well, I will say, this is what I know, I
17  don't -- I can't say, as I sit here, that the man is
18  incompetent, by any means. In fact, I contacted him
19  years ago about the possibility of having him serve
20  as an expert witness for me. I didn't hire him. I
21  won't tell you that it was because I thought he was
22  incompetent.
23      In my dealings with him, he was courteous
24  and professional. I know that he has experience in
25  the field. I don't know a great deal about his

---

Page 25

1  background in the industry. I know that he served
2  as the director of the Division of Insurance for a
3  while and that's why I contacted him.
4      (Phone rings, off record.)
5  BY MR. VIERGUTZ:
6      Q. Page 12 of your report, which is the final
7  page prior to your signature there.
8      A. Uh-huh.
9      Q. It says, "Other Testimony," and in the
10  final sentence of that paragraph it says:  I have
11  also taught a continuing legal education course on
12  the subject of discovering and proving insurance bad
13  faith.
14      A. Yes.
15      Q. Have you ever taught a continuing legal
16  education course on the subject of discovering and
17  proving surety bad faith?
18      A. Well, to the extent that I consider
19  sureties and did consider -- have considered
20  sureties to be insurers, the answer is yes. But
21  specifically, in that particular course, I never
22  discussed sureties.
23      Q. Are you aware that there is a body of law
24  called suretyship law?
25      A. Yes.

---

Page 26

1      Q. And was that covered in your continuing
2  education course?
3      A. No, sir.
4      Q. In your practice do you find it unusual for
5  an attorney and a client to take positions
6  contradicting or confrontational to other attorneys
7  and their clients?
8      A. I don't find that -- I don't find that
9  unusual.
10      Q. Page 5 of your report, around the middle of
11  the page. There's a sentence that reads, and my
12  question is going to be...
13      The darkened part. "At this time, I would
14  appreciate it if you could provide me with any
15  information regarding whether this is an ongoing
16  account, because based on the information available
17  to me at this time some of the defenses of the
18  principal may be questionable." Why is that
19  darkened?
20      A. My recollection, as I sit here, without
21  looking at the original document, is that it was --
22  it was originally darkened in the first place.
23      Q. Okay.
24      A. I mean, I put in "emphasis added" and I
25  can't remember -- it may be that I added the

---

Page 27

1  emphasis, but I can't recall.
2      But, you know, clearly that -- that was
3  important, that is important to me, because this was
4  the first time, and this was early on, that we know
5  that Ms. Poling understood that there were -- that
6  the defenses were -- of the principal were
7  questionable, or may be questionable.
8      Q. She's not saying they were questionable, is
9  she?
10      A. No. No. "May be."
11      Q. And you never spoke to Ms. Poling?
12      A. No, sir.
13      Q. Regarding her intent?
14      A. No.
15      Q. The next line, that's no longer a part of
16  Ms. Poling's letter, correct, where you're saying
17  "USF&G acknowledged the questionable defenses of
18  Nugget at least by October '97"?
19      A. Yes.
20      Q. And where did they acknowledge it?
21      A. Oh. If you look up at what I was referring
22  to here, as I recall, is that by Ms. Poling's e-mail
23  to Bill Wells of 10/24, and that actually -- since
24  it's an e-mail, I don't -- I don't believe now that
25  that was originally highlighted, so I guess I

---

9 (Pages 24 to 27)

Exhibit A
Page 6 of 45

William Grant Callow                                                                          A98-009 CIV (HRH)
March 31, 2006

Page 40

1  that were on the documents that were provided by
2  USF&G.
3  BY MR. VIERGUTZ:
4    Q. Okay. And then No. 44 on the bottom left.
5    A. Yes, I'm here.
6    Q. Do you see that letter?
7    A. Yes, the 17th.
8    Q. That's December 17th?
9    A. Correct.
10   Q. You've seen that letter before today?
11   A. Yeah, I believe so.
12   Q. And there Nugget's attorneys are responding
13 to USF&G; is that correct?
14   A. That's correct.
15   Q. And then if you turn to the same exhibit,
16 No. 2, page 52.
17   A. Yes.
18   Q. That's February 17, '98, and that's Poling
19 receiving a letter again from Oles Morrison, Nugget
20 attorneys?
21   A. That's correct. Dealing with the Chugach
22 rock claim, yes.
23   Q. And then if we could go to page 74.
24   A. Yes, I'm there.
25   Q. This is a September 1 letter from Oles

Page 41

1  Morrison to USF&G thanking them for talking to them
2  about the subpoena for the records deposition and
3  asking that USF&G forward their records to them;
4  correct?
5    A. May I just take a moment here and just
6  review this?
7    Q. Sure.
8    A. (Reviews document.)
9      Yes, that's correct.
10   Q. Where did you come to the understanding
11 that USF&G did not receive the briefs for the Ninth
12 Circuit and the pleadings and summary judgment and
13 such?
14   A. Because nothing that I reviewed indicated
15 to me that they got that information.
16   Q. And so you never saw a couple boxes of
17 documents forwarded by USF&G which contained those
18 materials; is that correct?
19   A. That's correct.
20     MR. SHAMBUREK: Herb, there's still an
21 objection to foundation, to the extent you say there
22 were boxes, because I don't think there were any
23 boxes of information provided by USF&G during the
24 document review in November and December.
25     MR. VIERGUTZ: You and I stand at odds on

Page 42

1  that issue. Be that as it may, it's neither your
2  nor my deposition.
3  BY MR. VIERGUTZ:
4    Q. Now, if we could go back to 055. That's a
5  March 3rd, '98 letter.
6    A. Yes.
7    Q. That's after January 5th, '98, referenced
8  in Exhibit 1, your report, at paragraph 3 that we're
9  talking about, correct?
10   A. Yes.
11   Q. And this is a letter that's -- goes to
12 page 66, is that correct, that would be 11 pages
13 long?
14     MR. SHAMBUREK: Herb, I'm just going to
15 object to the extent that this letter was not in the
16 documents that were provided by USF&G to us, and it
17 thus cannot be in the materials conveyed to
18 Mr. Callow, because he did not receive anything
19 beyond what you provided to us.
20     MR. SHAMBUREK: Then it was by your omission
21 and not mine, because I provided it to you with a
22 cover letter a couple days after realizing that
23 omission from these documents.
24     MR. SHAMBUREK: I don't recall the cover
25 letter or the document. Do you have a copy of it?

Page 43

1      MR. VIERGUTZ: No.
2      MR. SEWRIGHT: Herb, have you totally
3  reordered these by date from what you produced?
4      MR. VIERGUTZ: I'm not being deposed and
5  I'm not --
6      MR. SHAMBUREK: Herb, I'm going to
7  object.
8      MR. VIERGUTZ: -- prepared to answer
9  questions.
10     MR. SEWRIGHT: Yeah, but -- yeah, but --
11     MR. SHAMBUREK: These are not the documents
12 that were provided by you in this order that were
13 then provided to Mr. Callow. I sent an e-mail and I
14 said if you wanted to review those documents I would
15 provide them. These are more, they're different,
16 and they're marked with other numbers. So we're
17 going to object to any of these questions.
18 BY MR. VIERGUTZ:
19   Q. Now, page 55.
20   A. Yes.
21   Q. You've never seen that letter before?
22   A. I don't recall seeing this letter, that's
23 correct.
24   Q. Would you say that that is an additional
25 document?

13 (Pages 40 to 43)

Exhibit A
Page 7 of 45

William Grant Callow
March 31, 2006

A98-009 CIV (HRH)

Page 44

1　　A. Dealing with Shoreside?
2　　Q. Explaining the position of Nugget to USF&G.
3　　A. Well, let me say this. It depends on how
4　much time you want me -- I haven't -- I'd like to
5　review it, but would you like me to just review it
6　briefly and say --
7　　Q. Whatever you need to answer that question.
8　　A. All right. Let me just take a moment here.
9　　　(Reviews document.)
10　　MR. SHAMBUREK: While we're still on
11　record, Herb, do you have a copy of the transmittal
12　letter of this document?
13　　Do you recall seeing a transmittal letter,
14　Mr. Sewright?
15　　MR. SEWRIGHT: We can talk off the record
16　about it, Mr. Shamburek, I'm not going to get into
17　that right now.
18　　MR. SHAMBUREK: Okay.
19　　Do you have a transmittal letter, Herb?
20　　MR. VIERGUTZ: I'm not responding to
21　questions at a deposition of a witness.
22　　MR. SEWRIGHT: Do you want to go off the
23　record, Steve?
24　　MR. SHAMBUREK: Let's go off the record.
25　　THE WITNESS: Meanwhile, I'm going to

Page 45

1　review this.
2　　MR. VIERGUTZ: My only question is, is it a
3　letter that appears to respond.
4　　MR. SEWRIGHT: It's a multi-paged letter,
5　Mr. Viergutz.
6　　Can we go off the record for a moment?
7　It's about time to break anyway. It's about 10:30.
8　　Are we off record? We're not going to go
9　off record until Mr. Viergutz says we can.
10　　COURT REPORTER: I'm waiting until
11　everybody agrees to go off record.
12　　MR. VIERGUTZ: Okay. Fine.
13　　COURT REPORTER: Off record.
14　　(Off record.)
15　　(Exhibit 3 marked.)
16　　MR. SHAMBUREK: Herb, I'd just like to
17　point out that Exhibit 2 was represented to be the
18　documents provided to the claimants from USF&G.
19　Some of these documents were provided to the
20　claimants as a group.
21　　Now, I don't recall this March 3rd, 1998
22　letter; we can deal with that later. But I don't
23　think you're representing that it was included
24　initially in the packet of material that you
25　provided.

Page 46

1　　MR. VIERGUTZ: No, I'm not. 055 was a
2　letter, through 066, that for some reason I omitted
3　from the package, and it was either the day after or
4　the day after that, I forwarded it to both of you,
5　Mr. Sewright and yourself, as well as, I believe,
6　Traeger Machetanz at that time.
7　　And I think, and I'll look, and I could be
8　wrong, but I believe my correspondence said just put
9　it in there in date order. Which should have been
10　in there.
11　　But, in any event --
12　　THE WITNESS: I need to know what the
13　question was again.
14　BY MR. VIERGUTZ:
15　　Q. My question simply on this letter is, does
16　this letter appear to provide USF&G with information
17　from Nugget on the claims?
18　　A. Correct, yes.
19　　Q. Then Exhibit 3, if we could.
20　　MR. SHAMBUREK: Herb, again, I have to
21　object because I had sent you the e-mail and just
22　asked you to pre-mark any exhibits that were going
23　to be used and you said there would be none.
24　BY MR. VIERGUTZ:
25　　Q. This is a letter that's within Exhibit 2.

Page 47

1　　A. You're referring to the top letter on
2　Exhibit 3?
3　　Q. Yeah. Some of the others may not, but I
4　assumed these are all produced.
5　　If you go to the bottom of page 6.
6　　A. Of my report?
7　　Q. Yeah.
8　　A. Okay.
9　　Q. That's Exhibit 1.
10　　A. Yes.
11　　Q. And there you're saying, about in the third
12　or fourth sentence, there does not appear ever to
13　have been a discussion of the possible liability for
14　the claims of Shoreside Petroleum or Metco, although
15　I understand their claims and defenses are similar
16　to North Star, blah, blah, blah.
17　　A. I need to -- you lost me. Where was this?
18　　Q. Oh, down here. Third or four sentence - --
19　　A. I see.
20　　Q. -- from the penultimate paragraph.
21　　A. Got it.
22　　Q. And maybe you should read that to the
23　bottom.
24　　A. (Reviews document.)
25　　Okay.

14 (Pages 44 to 47)

William Grant Callow
March 31, 2006

A98-009 CIV (HRH)

Page 48

1    Q. Then if you'd go to page 4 of Exhibit 3.
2        MR. SEWRIGHT: You mean the fourth page?
3        MR. VIERGUTZ: Yeah.
4        THE WITNESS: That's the letter dated
5    December 3?
6    BY MR. VIERGUTZ:
7    Q. Yeah. That's to Shoreside, correct?
8    A. Yes.
9    Q. From USF&G?
10   A. Yes.
11   Q. And then the next page is a letter to
12   Shoreside dated April 7th?
13   A. Yes.
14       MR. SEWRIGHT: 19 --
15       THE WITNESS: '98.
16   BY MR. VIERGUTZ:
17   Q. Yeah. One is December 3, '97, one is
18   April 7, '98. Have you ever seen those before?
19   A. I think so. I'm not sure.
20   Q. Are they not documents that discuss the
21   potential liability of Shoreside?
22   A. You just told me that these had been part
23   of the packet, but let me just see. Repeat the
24   question, please.
25   Q. No. I said page 1 was. The others had

Page 49

1    been produced.
2    A. Okay. So the question is what?
3    Q. Are not pages -- the two letters we talked
4    about, to Shoreside, pages 4 and 5 of Exhibit 3.
5    A. Yes, the December 3 and the December 7th,
6    yes.
7    Q. Are they not documents that --
8    A. Or April 7th.
9    Q. You've got a sentence in your report here,
10   and that's what I was trying to get you to read.
11   "There does not appear ever to have been a
12   discussion of the possible liability for the claims
13   of Shoreside Petroleum, Inc. and/or Metco, although
14   I understand that their claims, and defenses to
15   them, are similar to ones involving North Star
16   Terminal and Stevedoring."
17       MR. SHAMBUREK: Herb, I'm going to object
18   to this exhibit. Your letter of March 21, 2006,
19   which we can mark, said: He, Mr. Callow, should
20   know what his report says and there will be no
21   further exhibits, Herb Viergutz.
22       MR. VIERGUTZ: Well, yeah. And I assume
23   he's read, from what he's attached here to his
24   report, the correspondence and things that are being
25   referred to.

Page 50

1        MR. SHAMBUREK: In his report.
2        MR. VIERGUTZ: Yeah.
3        MR. SHAMBUREK: Not to these boxes of
4    documents that you refer to, or other documents.
5        In your letter you stated here that you
6    wouldn't pay for any of the time to prepare for the
7    deposition. So he couldn't be tasked with taking a
8    look at the entire court file or all the other
9    documents. That was the understanding going into
10   the deposition.
11       THE WITNESS: Well, isn't -- let's go back
12   to my letter at page 6. There does not appear ever
13   to have been a discussion of the possible liability
14   for the claims of Shoreside Petroleum and/or Metco,
15   although I understand their claims, defenses to
16   them, are similar to the ones involving North Star
17   Terminal and Stevedoring.
18       This, what we're talking about here in the
19   exchanges between Mr. Lukjanowiez and Ms. Poling,
20   this is an exchange from Ms. Poling and
21   Mr. Niebrugge, and so I mean, that's consistent.
22   BY MR. VIERGUTZ:
23   Q. Okay. Maybe it's my mistake. What I
24   understood you to be saying there is that neither
25   the Shoreside nor Metco claims were ever addressed

Page 51

1    by USF&G.
2    A. Well, no. Here -- I mean, the April 7th
3    letter they're certainly being addressed.
4    Q. Okay.
5    A. April 7 of '98.
6    Q. Do you recall ever seeing a Shoreside proof
7    of claim in any document you reviewed?
8    A. I don't recall. I don't recall seeing
9    one.
10   Q. Do you recall ever seeing, in what you
11   reviewed, any letter from Shoreside to USF&G
12   transmitting documents to prove up their claim?
13   A. No, I don't. I can't recall that. I --
14   for the purpose of my report, I assumed that the
15   proof of claim had been made and filed. I figured
16   that this case wouldn't have gotten where it did if
17   there hadn't been an appropriate proof of claim
18   filed.
19   Q. Is the same true for answers regarding
20   Metco?
21   A. Well -- yeah.
22   Q. Did you assume -- my question is, did you
23   assume that they filed a proof of claim and
24   transmitted documents to USF&G?
25   A. Well, when I say "I assumed," as I went

15 (Pages 48 to 51)

William Grant Callow                                          A98-009 CIV (HRH)
March 31, 2006

Page 52

1  through this, I can't sit here and say that I recall
2  specifically any proof of claim. I guess the best
3  way to say it is, if I went back through the
4  documents to see if they were there, I'm sure I
5  would have noticed if there wasn't a proof of claim.
6      Q. And do you recall seeing -- I think you
7  answered this question, and I don't want to be
8  redundant. But you don't recall seeing any letter
9  from Shoreside or Metco transmitting documents to be
10 reviewed by USF&G?
11     A. As I sit here today, no, and I have to say
12 I didn't -- I didn't review those.
13     Q. Okay. And then the page following the
14 April 7, '98 letter in Exhibit 3 is a letter to
15 Nugget. And that deals with the Shoreside claim,
16 correct?
17     A. Yes, that's correct.
18     Q. Now, do you know whether, at page 2 of
19 Exhibit 3 --
20     A. Okay.
21     Q. -- the Spencer rock claim referenced in
22 sentence one there, 1,426,707, do you know whether
23 that claim included Metco's claim?
24     A. As I sit here today, I don't recall.
25     Q. Page 7 of your report. The first

Page 53

1  paragraph, the second sentence -- before we do that.
2  I take it you and I can agree that there's nothing
3  unusual about a surety tendering a claim to the
4  principal --
5      A. Correct.
6      Q. -- in defense of a claim, correct?
7      A. Uh-huh.
8      Q. Okay. The second and third sentence, do
9  you know whether pleadings that you did not review
10 were transmitted to the surety by Nugget's
11 attorney?
12     A. I don't know that.
13     Q. Do you know -- apparently you've seen a
14 status report, page 055 in Exhibit 2, that you've
15 never seen before today; is that correct?
16     A. That's the 55 through 67?
17     Q. Yeah.
18     A. Yes.
19     Q. Do you opine that the status reports which
20 you did see, which we went through in Exhibit 2 --
21     A. Uh-huh.
22     Q. -- and the additional one, which you did
23 not see, in your opinion, were they sufficient or
24 should there have been more or less?
25     A. Let me answer the question carefully. From

Page 54

1  Nugget's position, there's no question, I believe,
2  that Nugget considered them to be sufficient.
3  The -- I think what you're getting at, and I don't
4  want to put words in your mouth, but I think what
5  you're getting at is, should they have been
6  sufficient for USF&G to simply rely on them.
7      Because my position has always been that
8  USF&G had a duty itself to independently
9  investigate, to not simply just take the word of
10 Nugget.
11     So I don't -- I don't mean to parse your
12 question, I just want to make sure that you and I
13 are on the same page.
14     Q. Just as far as status reports, in cases
15 you've dealt with, are there sufficient status
16 reports? That was my question.
17     A. I would say that that is a typical kind of
18 status report. That's right.
19     Q. Then we go to -- well, let's just ask this
20 general question. In cases that you represent
21 clients, do you always have clients review the
22 pleadings prior to filing?
23     A. If you're talking about pleadings meaning a
24 complaint or an answer, yes.
25     Q. Other pleadings.

Page 55

1      A. You mean like motions or whatever?
2      Q. Yes.
3      A. No, no, not at all. I usually tell them
4  about motions that I file, you know, other than
5  something routine. And I -- but in terms of sitting
6  down and going over them point by point, no, I do
7  not.
8      Q. I'm going to do this just so we don't have
9  any further, hopefully, issue on exhibits. I'm
10 going to mark two more. One is your resume, which
11 was given to me by Mr. Callow.
12     A. No, that would be given to you by
13 Mr. Shamburek, I think.
14     Q. Excuse me, Mr. Shamburek.
15     MR. VIERGUTZ: Can we mark that 4.
16     (Exhibit 4 marked.)
17 BY MR. VIERGUTZ:
18     Q. Is that your resume, sir, Exhibit 4?
19     A. I believe so, yeah.
20     Q. And does that accurately depict your
21 experience and education and such?
22     A. Pretty much, uh-huh.
23     Q. Have you written any articles on surety
24 law?
25     A. I have not.

16 (Pages 52 to 55)

Exhibit A
Page 10 of 45

William Grant Callow                                          A98-009 CIV (HRH)
March 31, 2006

Page 56

1    Q. No publications of any type on surety?
2    A. No, sir.
3    Q. Okay. And then exhibit -- the last
4  exhibit, 5 -- and I do this because of a statement
5  that comes up in your report. And we'll get to it.
6  But it talks about paragraph, I believe, 38,
7  containing bad faith allegations in the complaints
8  by the plaintiffs. And I just want to make sure
9  we're talking about the same thing.
10       So I'd ask these three complaints, North
11 Star's amended complaint, Metco's amended complaint,
12 and Shoreside's amended complaint be marked together
13 as Exhibit 5.
14       MR. SHAMBUREK: Herb, if we could just
15 note, those are also the docket entries 406, 407,
16 and 409?
17       MR. VIERGUTZ: Yeah.
18       MR. SHAMBUREK: Okay.
19       (Exhibit 5 marked.)
20 BY MR. VIERGUTZ:
21    Q. Now, Exhibit 5, North Star's amended
22 complaint.
23    A. Yes.
24    Q. If you could go to page 24. That's
25 paragraph 38 that you're referencing, right?

Page 57

1    A. Right.
2       MR. SEWRIGHT: What page again?
3       MR. VIERGUTZ: Page 24 of North Star's
4  complaint.
5  BY MR. VIERGUTZ:
6    Q. Paragraph 38 says: "Upon information and
7  belief, and subject to such further evidence as is
8  disclosed by discovery, USF&G is also liable to
9  North Star, under Alaska law, for the bad faith
10 nonpayment, nonsettlement and/or refusal to discuss
11 settlement of North Star's claim previously brought
12 under the Miller Act herein, of which USF&G was
13 notified."
14       Where do you see a claim for bad faith
15 failure to investigate in that paragraph?
16    A. I don't.
17    Q. Now, if we could go to Metco's amended --
18    A. May I just say this?
19    Q. Sure.
20    A. When you say bad faith nonpayment, in order
21 to make the payment, there has to be an
22 investigation. So it's sort of a summary conclusion
23 to say -- to say -- when you say there's a bad faith
24 nonpayment, you can't make a payment, obviously,
25 until you've reasonably investigated.

Page 58

1       And so a bad faith nonpayment is legitimate
2  to say it incorporates failure to investigate.
3    Q. Let's go to Shoreside's amended complaint,
4  and that's page 19.
5    A. All right. I am there.
6    Q. At page 38.
7       MR. SHAMBUREK: Paragraph 38.
8       MR. VIERGUTZ: Paragraph 38, I'm sorry,
9  page 19. Thanks.
10 BY MR. VIERGUTZ:
11    Q. There's a little additional verbiage on
12 that paragraph, but there's no specific claim for
13 bad faith failure to investigate, would you agree?
14 It's again for bad faith nonpayment, nonsettlement,
15 and/or refusal to discuss settlement.
16    A. Yes, that's correct. The word -- the word
17 bad faith failure to investigate, the words do not
18 appear there. My answer is the same, though, about
19 bad faith nonpayment. I think that, in the liberal
20 rules of pleadings, that's...
21       MR. VIERGUTZ: Can we go off for a second?
22       (Off record)
23 BY MR. VIERGUTZ:
24    Q. Page 7 of your report, Exhibit 1,
25 "Settlement Efforts." Was USF&G obligated to

Page 59

1  discuss settlement?
2    A. Yes.
3    Q. Why?
4    A. Because they have -- their primary
5  obligation is the obligees. And they need -- under
6  Alaska law, they need to investigate and promptly
7  settle claims. Legitimate claims. And so if they
8  fail to promptly and adequately investigate,
9  obviously they can't -- they can't settle, but if
10 they -- they can't get around the settlement duty by
11 failing to properly investigate.
12    Q. Could you and I agree that if you have a
13 client and I sue you, you don't have any obligation
14 to participate in a settlement conference?
15    A. If I have a client and you sue my client?
16    Q. Uh-huh. You don't have to settle a case
17 with me?
18    A. If it's not an insurance matter, absolutely
19 not.
20    Q. But if it's an insurance case and I sue
21 you, and your client is a carrier, you have an
22 obligation to attend a settlement conference.
23       MR. SEWRIGHT: Object to the form.
24       THE WITNESS: Well, no. I mean, do I as
25 the lawyer for the carrier have an obligation to

17 (Pages 56 to 59)

Exhibit A
Page 11 of 45

Page 60

1 attend the settlement conference? I suppose, if
2 there's a settlement conference and it's my client,
3 I have a legal obligation.
4 BY MR. VIERGUTZ:
5     Q. But does your client have the option to
6 say, no, I don't want to settle and I don't want to
7 go to a settlement conference and we're going to
8 trial?
9     A. In the insurance context of what we're --
10 let's be specific. Are we talking about in the
11 USF&G circumstance?
12     Q. And it's not insurance, it's surety.
13     A. Okay. All right. Surety. Okay.
14         In that circumstance, I believe that a
15 surety is bound to the same rules as an insurance
16 company. I just think it's a subset of insurance
17 companies. And I think that they have a duty to
18 investigate and promptly settle claims under
19 Title 36, and also under -- you know, I've been
20 saying Title 36, and I should be saying -- it's
21 21.36.125, and so anywhere I've been saying Title 36
22 because I -- just my notations I write 36 and then
23 125, but it's really Title 21.
24         MR. SEWRIGHT: So you mean Chapter 36.
25         THE WITNESS: Yes, that's right. Yes,

Page 61

1 that's right.
2         So it's Title 31, Chapter 36.125. And
3 under, I think it's 3 AAC 030 point whatever, I
4 can't remember the 226, that -- there are -- there
5 are duties that insurance companies have to promptly
6 settle claims.
7 BY MR. VIERGUTZ:
8     Q. If they have merit?
9     A. Yes, that's correct.
10     Q. And if your client, the surety, says these
11 claims do not have merit, or they have questionable
12 merit, can they then refuse to settle the claims?
13     A. If they have -- if they have a good faith
14 basis for believing that the claims have no merit,
15 absolutely they can refuse to settle the case.
16     Q. You discuss in your report at page 7 at
17 sentence 3: I understand that prior to the
18 settlement conference, Nugget offered to settle
19 North Star's claim for 20,000, Shoreside claims for
20 5,000, and Metco's claim for 10,000.
21         Were you made aware that Nugget offered to
22 settle the three plaintiffs' claims at the
23 settlement conference for $120,000?
24     A. I don't recall that specific number, that's
25 correct.

Page 62

1         MR. SEWRIGHT: Never communicated to us.
2 BY MR. VIERGUTZ:
3     Q. Do you know who Steven Schoenhaar is in
4 paragraph 2 under "Settlement Efforts" on page 2 of
5 Exhibit 1?
6     A. I just know that he's an employee of
7 USF&G.
8     Q. You don't know what his job description is
9 or where he is?
10     A. Well, the answer to that is, as I sit here
11 no, today, I can't remember. I mean, if he's a --
12 if he's counsel or an adjuster, I can't remember.
13     Q. And it is not bad faith to refuse to settle
14 if the surety has a good faith basis to believe that
15 the claim is without merit?
16     A. That's correct.
17         And I want to make sure that I'm clear with
18 you on this. By that, I don't want you to take it
19 that I am saying that the -- that USF&G can simply
20 rely on the principal to provide the investigation
21 and the analysis of the claim. USF&G has an
22 independent duty, and only by fulfilling that duty
23 can it end up with a good faith basis for making
24 those decisions.
25     Q. And page 8, under "Later Correspondence

Page 63

1 Between USF&G and Oles Morrison."
2     A. Yes.
3     Q. The second sentence says, "There is no
4 evidence any copies of those requested documents
5 were ever mailed" -- I think you omitted the "M."
6     A. Yes, I saw that and actually I meant to
7 correct that.
8     Q. Sure. -- "to Mr. Schoenhaar or anyone else
9 at USF&G," right?
10     A. Yes. And I will amend that by saying there
11 is no evidence that I was aware.
12     Q. And those documents are the appeal briefs
13 and such that you're speaking of?
14     A. Yes. I saw no evidence that those were
15 reviewed.
16     Q. And are you relying on what your counsel
17 told you and what your counsel provided to you to
18 come to that conclusion?
19     A. Well, I'm -- what my counsel -- or my
20 counsel. What the people who hired me provided to
21 me, that's what I'm relying on. I don't know that
22 they specifically -- I wouldn't -- if they said
23 there is no evidence, I certainly would have looked
24 to see if there was any evidence. And if they
25 withheld it, I suppose I would -- I took in good

18 (Pages 60 to 63)

William Grant Callow                                                    A98-009 CIV (HRH)
March 31, 2006

Page 76

1  information it had regarding the three claims.  If
2  USF&G did anything, there is no record of what it
3  did."
4        Isn't that disputed by Exhibit 3, the
5  letters, pages 4, 5, 6?
6     A.  Exhibit 3, pages 4, 5, 6, we're talking
7  about --
8     Q.  Any of those claims.  LaPore's claims,
9  Chugach Rock's claim, North Star's claim,
10  Shoreside's claim.  Aren't they writing the
11  claimants asking for additional information and
12  trying to get more from them to be knowledgeable?
13     A.  Well, let me say this.  The allegations
14  said they never did anything with the information it
15  had regarding the three claims, that's a little bit
16  different than -- but anyway, I understand what
17  you're saying.
18        Certainly those letters refer to the
19  claims, but I think the allegation said they never
20  did anything with the information that they
21  obtained.
22     Q.  The information that had been provided by
23  the claimants resulted in USF&G denying the claims;
24  isn't that correct?
25        MR. SEWRIGHT:  Object to the form of the

Page 77

1  question.
2        THE WITNESS:  Well, the answer is, yes,
3  USF&G denied the claims.
4  BY MR. VIERGUTZ:
5     Q.  And in those letters requesting further
6  information from the claimants, was it not the
7  obligation of the claimants then to provide
8  additional information?
9        MR. SEWRIGHT:  Object to the form of the
10  question.  And also out of context, Mr. Viergutz,
11  from some --
12        MR. VIERGUTZ:  You object to the form,
13  period.
14        MR. SEWRIGHT:  -- of these letters there
15  was a lawsuit filed.
16        Object to the form.
17        MR. VIERGUTZ:  Just object to the form.
18  The running objection is unnecessary.
19        THE WITNESS:  Let's -- may I have the
20  question again, please.
21     (Question read back.)
22        MR. SEWRIGHT:  And the objection is to the
23  form.
24        THE WITNESS:  When -- an insurer or a
25  surety has a right to seek reasonable information

Page 78

1  from the obligees, that's correct.
2  BY MR. VIERGUTZ:
3     Q.  And then the next paragraph, or the third
4  one on page 10 under that heading, says, "There were
5  a number of settlement opportunities in this case.
6  The three claimants each expended resources
7  preparing settlement offers in earnest throughout
8  this litigation which appear never to have been
9  considered in good faith by the defendants."
10        What evidence are you aware of that that
11  statement is accurate?
12     A.  What evidence am I aware of?
13     Q.  Uh-huh.  Yes.
14     A.  I'm aware of representations made to me by
15  Mr. Shamburek and Mr. Sewright.  I don't recall
16  actually preparing the settlement -- or reviewing
17  any settlement offers in this case.
18     Q.  Would you agree it's standard practice in
19  the industry for a surety to require general
20  agreement of indemnity to be signed by the
21  indemnitors?
22     A.  I can't speak to whether it is standard
23  practice.  It's not uncommon.  That's my
24  understanding.
25     Q.  Page 11 under "Conclusion."  I don't

Page 79

1  understand the third sentence where it says,
2  "Neither Nugget nor USF&G contested those
3  assertions." I don't understand what the Ninth
4  Circuit appeal was all about if those assertions
5  weren't contested.  Can you tell me what you're
6  speaking to?
7     A.  Just give me a moment here, I want to just
8  put this...
9        (Reviews document.)
10        MR. VIERGUTZ:  Can we go off for just a
11  second?
12     (Off record.)
13        THE WITNESS:  Let's go back on record.
14        Your question is, what was the Ninth
15  Circuit opinion all about?
16  BY MR. VIERGUTZ:
17     Q.  Yeah, what is that appeal all about?
18     A.  Well, are you talking about the one -- the
19  Ninth Circuit appeal referred to where the panel
20  came out with a decision in March of 2005?
21     Q.  The most recent one, yeah.
22        MR. SEWRIGHT:  I'm going to object to the
23  form of the question, to that line of questioning.
24        THE WITNESS:  Well, my understanding is
25  that the Ninth Circuit opinion, the one from

22 (Pages 76 to 79)

Exhibit A
Page 13 of 45

William Grant Callow
March 31, 2006

A98-009 CIV (HRH)

**Page 84**

1  marked?
2      MR. SEWRIGHT: Are we off the record?
3      MR. VIERGUTZ: Yeah, go off the record.
4      (Off record)
5  BY MR. VIERGUTZ:
6      Q. The last complaint, amended complaint in
7  Exhibit 5, is the Metco amended complaint --
8      A. Yes.
9      Q. -- dated August 31, '05. And paragraph 38
10  at that --
11      A. I'm there.
12      Q. -- amended complaint --
13      A. Page 18.
14      Q. Yeah. That's the same identical language
15  as the Shoreside amended complaint at paragraph 38,
16  correct?
17      A. That's correct.
18      Q. Now, back to Exhibit 1.
19      A. Yes.
20      Q. In that first paragraph of page 12.
21      A. Yes.
22      Q. The second sentence there, it says, "The
23  litigation tactics of Nugget and USF&G have
24  reportedly escalated the costs unreasonably."
25      A. Yes.

**Page 85**

1      Q. Is that based on representations made to
2  you by Mr. Shamburek and Sewright?
3      A. Yes.
4      Q. Then the last sentence, "Nugget and USF&G
5  have apparently committed enormous sums to litigate
6  this case which are far out of line with the total
7  amount in controversy." And that would be equally
8  true for the claimants, correct?
9      A. Yes, that's correct.
10      Q. And then the next paragraph -- my question
11  simply is the first sentence, it says, "...whether
12  the notice discussed above was accurate." I'm
13  wondering what notice are we talking about? I
14  couldn't follow that.
15      A. Where are you now?
16      Q. The second paragraph where --
17      A. Yes.
18      Q. -- it starts "Shoreside contends."
19      A. Yes.
20      Q. And toward the end of that sentence it
21  says, "...and whether the notice discussed above was
22  adequate."
23      A. (Reviews document.)
24      I wonder if this is an editing thing. Let
25  me just take a moment and find where there's a

**Page 86**

1  reference to the notice in it.
2      Well, I don't know right now, looking back
3  through the report, I don't want to waste a lot of
4  time, but that's my understanding, is that this
5  is -- they were litigating whether the notice of the
6  claim was adequate, and...
7      Q. Okay.
8      A. Yeah.
9      Q. Now, the paragraph right under that --
10      A. Yes.
11      Q. -- one sentence, it says, "A strategy of
12  trying to economically overwhelm an intended
13  contract beneficiary that asserts a valid claim by
14  trying to force that party into submission by
15  litigating frivolous issues and defenses that cause
16  the claimants to incur inordinate legal fees is bad
17  faith."
18      A. Yes.
19      Q. That presupposes that the contention has
20  merit, correct?
21      A. Yes. That's why it says "asserts a valid
22  claim," yes.
23      Q. And that's a question of fact, isn't it?
24      A. It is a question of fact.
25      Q. You have not served as an expert witness

**Page 87**

1  regarding bad faith practices of a surety or
2  insured, correct?
3      A. Correct.
4      Q. Have you ever served as an expert witness
5  in any case?
6      A. I'm trying to think.
7      I've testified a number of times; I don't
8  know whether I have been asked to testify as an
9  expert. I was -- I testified in the Weiford case.
10  I don't -- I don't believe that I've been asked to
11  testify as an expert previously.
12      Q. Do you know Mr. Shamburek socially?
13      A. Yes, somewhat, uh-huh.
14      Q. How long have you known him?
15      A. Oh, I would say probably 20 years. I got
16  to know him when he was practicing with Randy
17  Farleigh, when it was Farleigh & Shamburek. And
18  actually, he was on the other side of a case that I
19  had briefly. But I had met him professionally from
20  Mr. Shamburek -- I mean, Mr. Farleigh.
21      We had this case together, or where he was
22  on the other side, and he now has -- maintains an
23  office down the hall, office sharing, from me. So I
24  see him fairly regularly when he stops into that
25  office.

24 (Pages 84 to 87)

Exhibit A
Page 14 of 45

Law Offices
of
### William Grant Callow
A Professional Corporation
425 G Street, Suite 610, Anchorage, Alaska 99501
Tel (907) 276-1221    Fax (907) 258-7329

North Star Terminal & Stevedoring, et al. v. Nugget Construction, Inc., et al.
A98-009 (HRH)
United States District Court for the District of Alaska

Expert Report of William Grant Callow

Introduction

I understand that this case involves a construction project undertaken by the United States Army Corps of Engineers for repair and revetment work for the Homer spit in Homer, Alaska ("Homer Project") from about March until about October, 1997. Nugget Construction, Inc. was the general contractor. United Stated Fidelity and Guaranty ("USF&G") provided the payment and performance bonds required to undertake work on federal projects pursuant to the Miller Act. Spencer Rock Products, Inc. entered into a contract with Nugget to provide the rock for the Homer Project. North Star Terminal and Stevedoring provided stevedoring work (about $125,000), Metco, Inc. provided other labor (about $34,000), and Shoreside Petroleum, Inc d/b/a Marathon Fuel provided fuel and lube (about $53,000) for the Homer Project. A lawsuit was filed in early January, 1998 by North Star in the United States District Court for the District of Alaska and joined by Shoreside and Metco. There have been two major summary judgment decisions by the district judge and two appeals to the Ninth Circuit Court of Appeals and remands. The three claimants filed amended complaints on or about August 31, 2005 asserting among other claims bad faith causes of action against USF&G. I have been requested to opine as to the treatment of the claims by USF&G. I reviewed documents provided to me by the attorneys for the claimants and discussed this case with them.

Correspondence From The Claimants and the Corps of Engineers
To Nugget Construction and USF&G

In a letter from the Corps of Engineers dated August 6, 1997 to Nugget Construction, the Corps states in pertinent part:

```
SUBJECT:  Letter  from  METCO,  Incorporated,  Contract
DACW85-96-C-0020,  Homer  Spit  Repair  and  Extension,
Homer, Alaska
```

. . .

```
    Attached  is  a  letter  we  received  from  METCO,
Incorporated,  dated  July  31,  1997,  regarding  non-
payment  for  work  that  they  have  conducted  for  the
```

1



above project.   METCO states that they have not been
paid for loading rock from the rail cars to the barges
in Seward.

. . .

METCO's letter claims that Spencer Quarry has not
paid them because Spencer Quarry has not received
payment from Nugget Construction.

. . .

We remind you that under Contract Clause I.55,
Payments  Under  Fixed-Price  Construction  Contracts,
Paragraph c.3 states: "This request for progress
payment does not include any amounts which the prime
contractor intends to withhold or retain from a
subcontractor or supplier in accordance with the terms
and conditions of the subcontract."

(RRO/33; Nugget 001583 - 001586).  The letter attaches a copy of the letter from Metco, Inc.
dated July 31, 1997 demanding payment.

In a letter from the Corps of Engineers dated August 21, 1997 to Nugget Construction,
the Corps states in pertinent part:

SUBJECT:    Letter from Northern Stevedoring and
Handling Corporation, Contract DACW85-96-C-0020, Homer
Spit Repair and Extension, Homer, Alaska

. . .

Attached is a letter we received from Northern
Stevedoring & Handling Corporation regarding work that
they have conducted for the above project which they
have not received payments.   Northern Stevedoring
claims that they have not been paid for loading five
barges in Seward.

. . .

We request an immediate explanation of why
Northern Stevedoring has not been paid for the
services that they have provided to the Homer project.

2

> We remind you that under Contract Clause I.55, <u>Payments Under Fixed-Price Construction Contracts</u>, you are not to request for progress payments that which you intend to withhold from a subcontractor or supplier.

(RRO/38; Nugget 001563 - 001565). The letter attaches a copy of the letter from Northern Stevedoring and Handling dated August 4, 1997 demanding payment.

In a letter from the Corps of Engineers dated August 26, 1997 to Nugget Construction, the Corps states in pertinent part:

> SUBJECT:    Spencer Quarry, Contract DACW85-96-C-0020, Homer Spit Repair and Extension, Homer, Alaska
>
> . . .
>
> We acknowledge receipt of Serial Letter 611-19, dated August 6, 1997 and Serial Letter 611-21, dated August 11, 1997. We do not necessarily agree that Spencer Rock Products is only a "vendor" for Miller Act purposes.
>
> Based on the supporting costs that you outlined in Serial Letter 611-21, it appears that Nugget Construction has assumed full responsibility for operations at Spencer Quarry for the subject project. Therefore, as primary operator at Spencer Quarry, we believe Nugget Construction is responsible for prompt payment to suppliers and subcontractors who contracted with Spencer Rock Products on this project.
>
> We request that you clarify what support and project management services Nugget Construction provided to Spencer Rock Products to account for the support cost that you have shown in Serial Letter 611-21. Further, please provide information showing what work, if any, has been performed by Spencer Rock Products under its subcontract with Nugget Construction.

(RRO/40; Nugget 001561). The letter states that it was courtesy copied to "United States Fidelity and Guarantee Co., Attn: Bill Wells, 4220 B Street, Anchorage, AK 99503."

3

In a letter from the Corps of Engineers dated September 9, 1997 to Nugget Construction, the Corps states in pertinent part:

```
SUBJECT:    Letter    from    Northern    Stevedoring    and
Handling    Corporation    [Northern    Stevedoring    is
scratched out and Shoreside Petroleum handwritten on
the  copy],  Contract  DACW85-96-C-0020,  Homer  Spit
Repair and Extension, Homer, Alaska
```

. . .

```
        Attached is a letter we received from Shoreside
Petroleum, Incorporated, dated August 28, 1997.  This
letter is regarding services that they have provided
for the above project for which they have not received
payment.
```

. . .

```
        We   request   an   immediate   explanation   of   why
Shoreside Petroleum Incorporated has not been paid for
the  services  that  they  have  provided  to  the  Homer
project.
```

(RRO/44; Nugget 001554 - 001555).  The letter attaches a copy of the letter from Shoreside Petroleum dated August 28, 1997 demanding payment.

### Early Correspondence

A handwritten note from a person identified as "Jim Ferguson" of the Anchorage office of the brokerage firm Willis Corroon dated August 28, 1997 to Bill Wells of USF&G states: "Nugget is handling + will continue to handle to keep us clean + out of this. Thanks. [signed Jim]." (WEL000051). A facsimile transmission from James L. Ferguson, Senior Vice President, Alaska Surety Manager of Willis Corroon Corporation of Anchorage dated September 2, 1997 to Bill Wells with USF&G re: Nugget/Spencer Quarry Northern Stevedoring states in handwriting: "Bill, We will get back up from Nugget + a letter from their Attorney. Spencer Rock Products was a Vender Not a Sub + as I said Nugget is handling this. Thanks. [signed Jim]." (WEL000056). Another note from Jim Ferguson with Willis Corroon in Anchorage dated September 10, 1997 to Bill Wells with USF&G states: "Again - Nugget is handling – We are to get a letter from his attorney this week. Thanks. [signed Jim]." (WEL000060).

Attorney Michael W. Sewright, counsel for Northern Stevedoring and Terminal, sent a letter to Nugget Construction dated August 29, 1997 with a courtesy copy to "U.S. Fidelity & Guaranty Co, 4220 B Street, Anchorage, AK 99503" referencing the August 4, 1997 letter from Northern Stevedoring and again demanding payment. (Unmarked document). Attorney John Lukjanowicz of Oles, Morrison & Rinker, counsel for Nugget Construction, Inc., sent a letter to

Mr. Sewright dated September 12, 1997 discussing his letter dated August 29, 1997 regarding the North Star Terminal claim. (WEL000064). Mr. Sewright responded by letter dated September 19, 1997 and noted among other observations that Nugget had a direct relationship with Northern Stevedoring. (Unmarked document). Robert LaPore with Spencer Rock Products discussed the problems with Nugget Construction's operation of the quarry in detail in a letter dated October 20, 1997 and stated that at the end of his letter that it was also sent to the "Bonding Co." (Unmarked document). Shoreside also noted that it had a direct relationship with Nugget Construction. (Shoreside's Third Supplemental Discovery Response, p. 2).

A copy of an e-mail from Jane Poling employed by USF&G dated "10/24/97 at 05:27 PM" to "Bill Wells/USFG" with a courtesy copy to "Bryan Martin/USFG, John Phinney/USFG" and with the subject line referring to the "Principal: Nugget Construction, Inc.," states:

> Please be advised that I received a claim from underwriting on the above principal. At this time there are the following claims:
>
> > (1)  Spencer Rock - $1,426,707.84
> > (2)  Northern Stevedoring - $124,724.98
> > (3)  Chugach Rock Corporation - $86,444.00
> > (4)  Shoreside d/b/a Marathon Fuel - $53,062.00
> > (5)  Metco – undisclosed amount
>
> At this time, I would appreciate it if you could provide me with any information regarding whether this is an on-going account, **because based on the information available to me at this time some of the defenses of the principal may be questionable.** Also, please provide me with any status reports if you have any, and I will keep you advised of this matter as it progresses.

(USF&G 001013; Emphasis added). USF&G acknowledged the questionable defenses of Nugget at least by October, 1997.

I understand that Nugget Construction and Spencer Rock Products entered into a Support Agreement dated April 23, 1997. In the Decision of the Ninth Circuit Court of Appeals dated March 3, 2005, the panel stated in pertinent part:

> On the record before us, the appellees have presented sufficient evidence to create a material issue of fact as to subterfuge or collusion. The evidence, although not conclusive, tends to show that Nugget secretly converted Spencer Rock into a strawman in its ongoing dealings with the appellees. The support agreement with Spencer Rock on its face purports to insulate Nugget from Miller Act liability, yet Nugget directed Spencer Rock to conceal the terms of this agreement and keep secret Nugget's arrangements with Spencer Rock relating to the project. Nugget also began performing some of Spencer Rock's functions at the quarry and interacted directly with some of the appellees – the extent to which remains in dispute.

(Decision dated March 3, 2005 at docket entry no. 383 at p. 6). Judge Holland previously found: "None of the parties that Spencer contracted with for goods and services (North Star, Shoreside, or Metco) were made aware of the support agreement because Nugget insisted that Spencer not inform those parties of it." (Order dated August 30, 2002 at docket entry no. 310 at p. 6). USF&G knew or should have known that Nugget was attempting to prevent this evidence from being disclosed as early as September or October, 1997 and should have undertaken greater scrutiny of Nugget's representations to it.

### Proofs of Claim

Ms. Poling of USF&G sent a letter dated October 28, 1997 to Robert LaPore, President of Spencer Rock Products, Inc. acknowledging the claim for $1,426,707.84. (USF&G 001637). Ms. Poling sent a letter dated January 14, 1998 to Robert LaPore, President of Spencer Rock Products, Inc. acknowledging that Spencer provided a proof of claim and supporting documents but denying the claim. (USF&G 001636).

Shoreside Petroleum, Inc. submitted a letter to Ms. Poling and a formal USF&G Proof of Claim dated December 16, 1997 with supporting documents to USF&G (Nugget 009113 - 009152). Ms. Poling sent a letter to Nugget dated January 5, 1998 asking Nugget to explain its position in the matter. (Nugget 009112). There is no response from Nugget in the materials I reviewed. USF&G does not appear to have undertaken any more investigation of the claim or to have sought any additional information from Shoreside.

The records do not indicate whether USF&G ever asked Metco, Inc. to provide a Proof of Claim even though USF&G was aware that Metco asserted a claim as indicated in the e-mail note from Ms. Poling. (USF&G 001013).

### Correspondence from Oles, Morrison

Attorney Lukjanowicz of Oles, Morrison & Rinker sent two letters to Ms. Poling dated December 16 and 17, 1997 discussing the North Star Terminal and Stevedoring claim and the Chugach Rock Corporation claims, respectively. (USF&G unmarked document). Mr. Lukjanowicz also sent a letter to Ms. Poling dated February 17, 1998 discussing the Chugach Rock Corporation claim again. (USF&G 001413 - 001415). There does not appear ever to have been a discussion of the possible liability for the claims of Shoreside Petroleum, Inc. and/or Metco, Inc., although I understand that their claims, and the defenses to them, are similar to the ones involving North Star Terminal and Stevedoring. The three claimants contend that the one letter that relates to their claims does not completely and candidly discuss the exposure of Nugget Construction and USF&G to the claims of the three claimants. USF&G does not appear to have sought additional information from these three claimants. Instead, USF&G simply tendered its defense to Nugget Construction in a letter dated February 13, 1998. (Nugget 008466 - 008467).

Nugget Construction accepted USF&G's tender of defense in February, 1998 in accordance with a contract provision that states in pertinent part:

Should you agree to accept the surety's tender of defense you will be required to provide a copy of all pleadings. Those pleadings filed on behalf of the surety must be reviewed and approved by the surety prior to such filing. We also request that your attorney provide us with regular status reports concerning the litigation. It is also a condition of this tender of defense that we have the right with reasonable notice, to have full access to all of your files concerning this matter. We also specifically reserve the right to revoke the tender of this defense at any time and for any reason.

(USF&G 001535). In the records I reviewed, there are some facsimile transmittal sheets, but not documents indicating that there was any review and/or written approval of pleadings by USF&G prior to their filing. I also have not seen any evidence to suggest that USF&G ever revoked the tender of defense.

## Settlement Efforts

Shoreside Petroleum filed a motion seeking a settlement conference on April 6, 1998 at docket entry no. 24. North Star Terminal and Stevedoring filed a joinder on April 9, 1998 at docket entry no. 25. Neither Nugget nor USF&G joined the motion or pursued the opportunity to discuss settlement. The court denied the motion on April 14, 1998 at docket entry no. 27. Shoreside Petroleum filed a renewed motion seeking a settlement conference on June 18, 1998 at docket entry no. 42. Spencer Rock filed an opposition on June 29, 1998 at docket entry no. 44. Shoreside filed a reply on July 1, 1998 at docket entry no. 47. The court denied the motion on July 1, 1998 at docket entry no. 46. North Star filed a Joinder in the renewed motion for a settlement conference at docket entry no. 48. USF&G disregarded another opportunity to discuss settlement of the claims.

Steven W. Schoenhaar of USF&G sent a letter dated November 18, 1998 to Mr. Lukjanowicz acknowledging a voicemail message from Mr. Schoenhaar that Nugget Construction was unable to settle the claims of the three claimants and requesting a copy of the settlement offers made to each of these three (3) entities. (USF&G unmarked document). There is nothing in the file to indicate that Nugget made any settlement offers or otherwise responded to this request by Mr. Schoenhaar. The three claimants contend that Nugget did not make any settlement offers at this time.

In September, 1999, the parties were encouraged by the Court to explore settlement as noted by the Order at docket entry no. 139. I understand that the three claimants carefully prepared settlement offers and presented them to Nugget. I understand that Nugget rejected all of them and made no counteroffers.

The Court ordered a settlement conference for on June 7, 2005 as indicated by the Order at docket entry no. 385. Another judge conducted the settlement conference as indicated by the Order at docket entry no. 386. I understand that prior to the settlement conference, Nugget offered to settle North Star's claim for $20,000, Shoreside's claim for $5,000, and Metco's claim for $10,000. The three claimants made higher settlement offers for the principal sums with interest and attorney's fees. The settlement conference was terminated because the settlement

judge concluded that the parties were too far apart to reach a resolution as indicated by the Order at docket entry no. 388.

<u>Later Correspondence Between USF&G And Oles, Morrison</u>

Mr. Schoenhaar sent a letter dated November 15, 2002 to attorney William K. Renno of Oles Morrison Rinker & Baker requesting copies of all briefs filed by any party in connection with the appeal. (Unmarked document). There is no evidence any copies of those requested documents were ever ailed to Mr. Schoenhaar or anyone else at UDF&G.

Janice S. Smith with USF&G sent a letter dated March 24, 2005 to attorney Traeger Machetanz of Oles Morrison Rinker & Baker requesting in pertinent part: "Please provide a brief history of the case as well as a written status of the referenced suit. Please provide me with all relevant dates set, including, but not limited to, trial dates, hearing dates, arbitration/mediation, etc. Also, please provide me with a written update of the current positions of the parties to this action, including the most current settlement demands made, if any." (USF&G unmarked document). Attorney Christine V. Williams of Oles Morrison Rinker & Baker sent a three page letter to Ms. Smith dated March 29, 2005 providing some information concerning the status of the case. (USF&G unmarked document). In Ms. William's letter, the principal amounts of two of the claims (Shoreside and Metco) were understated, the possible exposure of Nugget and USF&G was not even acknowledged, and there was no discussion of settlement offers by the parties. This appears to be the only discussion of the case of any substance in writing since the first complaint was filed in January, 1998 by North Star.

<u>Claimaints' Challenges To USF&G's Actions And Inactions</u>

All three claimants assert causes of action for bad faith against UFS&G in paragraph 38 of the three Amended Complaints at docket entry numbers 406, 407, and 409. In Shoreside's Third Supplemental Discovery Responses, Shoreside states:

> USF&G knew or should have known that Nugget was requesting progress payments from the United States Government through the Corps of Engineers in violation of Nugget's contract with the Corps and after written reminder of its obligations by the Corps of Engineers. The Corps expressly stated that Nugget could not request progress payments if it was withholding any payments to suppliers and subcontractors. The obligation to pay did not depend on the narrower definitions of suppliers and subcontractors in the Miller Act.

> USF&G knew or should have known that Nugget was secretly structuring its transactions so that Nugget could deceive the Corps of Engineers and the three claimants regarding the actual relationship between

8

and obligations of Nugget and Spencer Rock. USF&G should have inquired into the reasons that Nugget was engaging in this deception and subterfuge.

USF&G knew or should have known that Oles, Morrison may have been involved in structuring the transactions to create a straw man relationship with Spencer Rock and a hollow shell constituting a subterfuge under the Miller Act in order to seek to excuse Nugget's willful non-payment to the three claimants.

USF&G appears to have relied exclusively or primarily on representations from Oles, Morrison, Nugget's attorneys, regarding the facts and the defenses of Nugget and of USF&G. USF&G should have undertaken its own independent investigation of the facts and law and its own analysis and handling of the claims.

After the lawsuits were filed, Nugget filed a motion to declare that this federal project was not a federal project. USF&G did not file an opposition or any response to the Nugget motion. USF&G provided Miller Act bonding for a federal project and should have filed an opposition or response to the Nugget motion because Nugget's motion was contrary to the unchallenged facts including the written statements of the Corps of Engineers. The claimants expended additional attorney's fees to challenge and defeat the unfounded Nugget motion.

The decision by the District Judge in this case finding that Spencer Rock Products was a subcontractor to Nugget under the Miller Act was and is a correct interpretation of the relevant decisions of the United States Supreme Court. USF&G also agreed or should have agreed that the decision was correct as a matter of law based on the same decisions. However, USF&G joined with Nugget and appealed the decision of the District Court. Nugget's election to appeal was a shrewd gamble that proved fortuitous for Nugget based on the brief, unpublished decision of the Ninth Circuit panel citing no Supreme Court authority. The decision of the Ninth Circuit is in conflict with

settled Supreme Court authority.  There were and are substantial costs to the claimants to defend the appeal and to continue this litigation after remand.

(Shoreside's Third Supplemental Discovery Responses, pp. 2 – 4).  In Metco's Supplemental Discovery Responses, Metco states:

USF&G's records indicate that it never did anything with the information it had regarding the three claims.  If USF&G did anything, there is no record of what it did.

USF&G may have made demands on Nugget to review the claims candidly and in good faith.  If it did, it has not produced any supporting documents.

There were a number of settlement opportunities in this case.  The three claimants each expended resources preparing settlement offers in earnest throughout this litigation which appear never to have been considered in good faith by the defendants.  In any other case like this one that spanned eight years, one or more of the defendants individually or jointly should have made at least a reasonable settlement offer or offers.  In the alternative, USF&G should have made an offer in good faith or required Nugget to make an offer in good faith.

When an insurance company provides coverage for an automobile owner, it is committing to defend and indemnify claims by the entire world against the insured subject to terms and conditions of the policy. In this case, USF&G provided a payment bond that answered the claims of only a small number of known claimants.  USF&G was aware of the three claimants and could have required Nugget to satisfy the claims asserted by the three claimants.  USF&G appears to have obtained personal guaranties and other indemnity guaranties from John Terwilliger and Nugget and thus has always been able to protect itself.

The Alaska Supreme Court discusses some of the duties of a surety in Loyal Order of Moose, Lodge 1392 v. International Fidelity Ins. Co., 797 P.2d 622 (Alaska 1990).  State law causes of action for bad faith are

10

not preempted by the Miller Act.  <u>K-W Industries v.</u>
<u>National Surety Corp.</u>, 855 F.2d 640 (9th Cir. 1988).
USF&G had and has responsibilities as set forth by law
and pursuant to its payment bond provided for the use
and benefit of the claimants.  The duty of good faith
attaches under Alaska law and contemplates awards of
compensatory and punitive damages when the duty is
breached.

Conclusion

After it became aware of these three claims in September, 1997, USF&G was on notice
that both it and Nugget faced substantial exposure.  USF&G was on notice that the three
claimants had performed services and provided goods for the use and benefit of the bonded
Homer Project.  Neither Nugget nor USF&G contested those assertions, and the district court
found that the claimants had in fact performed services and provided goods in a timely and
conforming manner for the use and benefit of the Homer Project.

The three claimants performed services and provided goods in reliance on the protection
afforded by the Miller Act payment bond.  USF&G knew or should have known that Nugget was
not being candid with the Corps of Engineers and the claimants in particular when Nugget
sought to conceal the Support Agreement dated April 23, 1997.  USF&G knew or should have
known that the Support Agreement and subsequent activities changed the legal relationship of
the parties.

USF&G owed a duty to the three claimants to investigate the claims with due care.
USF&G breached that duty.  USF&G tendered defense of the claims to Nugget without first
fulfilling its duty to undertake a reasonable investigation of the claims.  After acceptance of the
tender by Nugget, USF&G appears to have done little if anything to review and approve
pleadings before they were filed or to monitor the case.  USF&G appears to have done little if
anything to discuss settlement of the claims.  Figuratively speaking, USF&G allowed the fox into
the hen house and then abandoned the three hens it had a duty reasonably to protect.

USF&G has a right to defend against invalid or reasonably questionable claims and a
right not to settle such claims.  However, USF&G must fairly balance these rights with its duties
to the three claimants who are its intended contract beneficiaries.  The three claimants relied on
the fact that the Homer Project was a bonded project and continue to seek the coverage
reasonably expected by that protection.  USF&G acted in bad faith by failing to investigate the
claims with reasonable care, by failing to engage seriously in settlement efforts, and by failing to
monitor and actively assert the rights it had to participate in the case.

Litigating a case that involves less than $100,000 is often uneconomical for all involved.
A party can defend against any claim, but committing a disproportionate sum to challenge well-
founded claims is problematic and usually economically irrational.  A party that commits
resources that are disproportionate to the amount in controversy and appeals every unfavorable
trial court ruling, no matter how clearly that ruling may be based on evidence or within the ambit

11

of the reasonable discretion accorded the trial court, employs a strategy that seeks to win not upon the merits but by economic coercion. I understand that the cost of bringing and maintaining the claims in this case has been staggering. The litigation tactics of Nugget and USF&G have reportedly escalated the costs unreasonably. Nugget and USF&G have apparently committed enormous sums to litigate this case which are far out of line with the total amount in controversy.

Shoreside contends that Nugget drove up the costs of litigation by raising and litigating frivolous issues, such as whether this federal project is a federal project and whether the notice discussed above is adequate. The record reveals that Nugget and USF&G have enlisted at least eight (8) lawyers in this eight (8) year defense campaign.

A strategy of trying to economically overwhelm an intended contract beneficiary that asserts a valid claim by trying to force that party into submission by litigating frivolous issues and defenses that cause the claimants to incur inordinate legal fees is bad faith.

This report is subject to further amendment as other discovery documents and information are brought to my attention.

Other Testimony

I have not served as an expert witness regarding bad faith practices of an insured or surety. However, I have undertaken many cases involving conduct and/or claims of bad faith against insurers in the past twenty (20) years. I also have taught a continuing legal education course on the subject of discovering and proving insurance bad faith.

Compensation

I am charging my hourly rate of $200 per hour.

Dated this 14th day of February, 2006 at Anchorage, Alaska.

William Grant Callow

12

SHAMBUREK LAW OFFICE, LLC DBA
LAW OFFICE OF

# STEVEN J. SHAMBUREK

SUITE 630
425 G STREET
ANCHORAGE, ALASKA
99501
shamburek@gci.net
www.shamburek.com

DIRECT:       (907) 522-5339                              FACSIMILE: (907) 522-5393
CELL PHONE: (907) 250-0044

February 8, 2006

William Grant Callow
425 G Street, Suite 610
Anchorage, Alaska  99501

Dear Grant:

I am enclosing a number of documents for your review.   The Docket
Sheet is attached and the pleadings include:

Pleadings and Orders at Docket Entry Numbers 24, 25, 27, 42, 44
and 46;
Order dated June 3, 1999 at Docket Entry No. 124;
Memorandum Decision of the Ninth Circuit dated September 27, 2001
at Docket Entry No. 255;
Order dated August 30, 2002 at Docket Entry No. 310;
Memorandum Decision of the Ninth Circuit dated March 3, 2005 at
Docket Entry No. 383;
Shoreside Amended Complaint dated August 31, 2005 at Docket Entry
No. 406;
Metco Amended Complaint dated August 31, 2005 at Docket Entry No.
407;
North Star Amended Complaint dated August 31, 2005 at Docket
Entry No. 409.

The discovery documents include:

Documents produced by USF&G and marked "USF&G" with some blank
documents;
Documents produced by Nugget and marked "WEL";
Documents produced by Nugget and marked "Nugget";
Metco's Discovery Responses dated November 14, 2005;
Metco's Supplemental Discovery Response dated November 28, 2005;
Shoreside's Third Supplemental Discovery Responses dated December
9, 2005.

        All of the pleadings, discovery, disclosures and transcribed
depositions are readily available for your review.   Please let me
know what you would like to review.   If you have any questions,
please contact me.   Thank you for your attention to this matter.
Best wishes.

Sincerely,

THE LAW OFFICE OF STEVEN J. SHAMBUREK

By: _Steven J. Shamburek_
    Steven J. Shamburek

Enclosures as noted

DATE _11/20_

**M E M O**

TO _J. Schoenhaar_

**FROM**

**JANICE WIPFIELD**

410=685-

See from 1100 #
Courthouse Copy
Called about
~~UNPaid~~ UNPaid
INVOICE attached.
Please call her.
This is on file Jane
transferred to you.
9901-209083 01-1



EXHIBIT
2
Callow



U S F+G
INSURANCE

Surety Group - Claim

Jane Bennett Poling, Esquire
Ph.: 410-205-1044
Fax: 410-205-0605
Mail Stop: LB0201

January 28, 1998

Northern Stevedoring & Handling c/o
Michael W. Sewright, Esquire
Burr, Pease & Kurtz
810 N Street
Anchorage, Alaska 99501-3293

RE:     Principal:        Nugget Construction
        Obligee:          Department of the Army
        Claimant:         Northern Stevedoring & Handling
        Claim No.:        9901-S-209083-01-1
        Bond No.:         99-0120-50298-96-5
        Project:          Homer Spit Repair and Extension
        Subcontractor:    Spencer of Rock Products

Dear Mr. Sewright:

As you know on October 28, 1997, USF&G acknowledged receipt of your response alleging that
you are owed money from Spencer of Rock Products for materials furnished on the above-
referenced project. In our letter, we advised that in order for us to properly investigate your
claim, you must complete and execute a Proof of Claim form (which was provided) and provide
copies of documentation supporting your claim. As the date of this letter, we have not received
your completed Proof of Claim form nor do we have any documentation in support of your
claim. USF&G has not been provided sufficient documentation and information to investigate
your claim. Accordingly, we respectfully deny your claim. If you believe, however, that review
of additional documentation or information would alter our analysis, please provide same
immediately to the undersigned.

This correspondence and all prior or subsequent communications are made with express
reservation of all rights and defenses that may be available to USF&G/FGIC or Nugget
Construction, Inc. at law or in equity under the terms and provisions of the bond and contract
documents.

Very truly yours,

Jane Bennett Poling
Surety Claims Specialist

JBP/jms



EXHIBIT
3
Callow



**U S F + G**
INSURANCE



Surety Group - Claim

**Jane Bennett Poling, Esquire**
Ph.:    410-205-1044
Fax:    410-205-0605
Mail Stop:   LB0201

October 28, 1997

Robert LaPore, President
Spencer Rock Products, Inc.
P.O. Box 244063
Anchorage, Alask 99524

RE:    Principal:          Nugget Construction, Inc.
       Claim Number:       9901-S-209083-01-1
       Bond Number:        99-0120-50298-96-5
       Project:            Homer Spit Repair and Extension
       Claimant:           Spencer Rock Products, Inc.
       Obligee:            Department of the Army

Dear Mr. LaPore:

This letter acknowledges receipt of your correspondence dated September 5, 1997 wherein you allege that Spencer Rock Products, Inc. is owed $1,426,707.84 from Nugget Construction, Inc. for labor and/or materials furnished on the above-captioned project. In order for us to properly investigate your claim, we request that you complete and execute the enclosed Proof of Claim form. Please include as much detail as possible and attach copies of all documentation, including but not limited to, any relevant subcontracts, signed purchase orders, signed invoices, signed delivery tickets and a statement of account.

Please note that the Proof of Claim form must be signed by an authorized representative of your company and that the form must be witnessed, dated and notarized. If this matter has been resolved please notify the undersigned as soon as possible. In the interim, we shall continue our investigation of your claim which will include contact with our principal to determine its position with regard to your assertions.

This correspondence, the release of the Proof of Claim form, and all prior or subsequent communications are made with express reservation of all rights and defenses that may be available to USF&G/FGIC or Nugget Construction, Inc. at law or in equity, under the terms and provisions of the bond and contract documents.

Very truly yours,

Jane Bennett Poling
Surety Claims Specialist

cc: Nugget Construction, Inc.

Enclosure

JBP/jms

Exhibit A
Page 31 of 45



**U S F+G°**
INSURANCE
Surety Group - Claim

Jane Bennett Poling, Esquire
Ph.: 410-205-1044
Fax: 410-205-0605
Mail Stop: LB0201

January 14, 1998

Robert LaPore, President
Spencer Rock Products, Inc.
P.O. Box 244063
Anchorage, Alaska 99524

RE:    Principal:    Nugget Construction, Inc.
           Obligee:     Department of the Army
           Claimant:    Spencer Rock Products, Inc.
           Claim No.:   9901-S-209083-01-1
           Bond No.:   99-0120-50298-96-5
           Project:     Homer Spit Repair and Extension

Dear Mr. LaPore:

As you know, on October 28, 1997 we acknowledged receipt of your correspondence alleging that you are owed money from the principal for materials furnished on the above-referenced project. In our letter, we advised that in order for us to properly investigate your claim, you must complete and execute a proof of claim form (which was provided) and provide copies of all documentation supporting your claim. As of the date of this letter, we have not received your completed proof of claim form nor do we have documentation in support of your claim. USF&G has not been provided sufficient documentation and information to investigate your claim.

We have, however, contacted Nugget Construction and requested documentation in support of their backcharge. They have provided us a copy of the Support Agreement indicating that you will be responsible for costs associated with support provided by Nugget in the attempt to meet scheduling guidelines. Furthermore, we received documentation evidencing additional backcharge. All of these costs are in excess of your claim. Accordingly, we respectfully deny your claim. If you believe, however, that review of additional documentation or information would alter our analysis, please provide same immediately to the undersigned.

This correspondence and all prior or subsequent communications are made with express reservation of all rights and defenses that may be available to USF&G/FGIC or Nugget Construction, Inc. at law or in equity under the terms and provisions of the bond and contract documents.

Very truly yours,

Jane Bennett Poling
Surety Claims Specialist

JBP/jms

Exhibit A
Page 32 of 45





Surety Group - Claim

Jane Bennett Poling, Esquire
Ph.:    410-205-1044
Fax:    410-205-0605
Mail Stop:    LB0201

December 3, 1997

Ron Niebrugge
Shoreside Petroleum, Inc.
P.O. Box 1189
700 Port Avenue
Seward, Alaska 99664-1189

> RE:    Principal:        Nugget Construction, Inc.
>        Claim Number:     9901-S-209083-01-1
>        Bond Number:      99-0120-50298-96-5
>        Project:          DACW85-96-C-0020, Homer Spit Repair and Extension
>        Claimant:         Shoreside Petroleum, Inc.
>        Obligee:          Department of the Army

Dear Mr. Niebrugge:

This letter acknowledges receipt of your correspondence dated November 26, 1997 wherein you allege that Shoreside Petroleum, Inc. is owed $53,501.00 from Nugget Construction, Inc. for labor and/or materials furnished on the above-captioned project. In order for us to properly investigate your claim, we request that you complete and execute the enclosed Proof of Claim form. Please include as much detail as possible and attach copies of all documentation, including but not limited to, any relevant subcontracts, signed purchase orders, signed invoices, signed delivery tickets and a statement of account.

Please note that the Proof of Claim form must be signed by an authorized representative of your company and that the form must be witnessed, dated and notarized. If this matter has been resolved please notify the undersigned as soon as possible. In the interim, we shall continue our investigation of your claim which will include contact with our principal to determine its position with regard to your assertions.

This correspondence, the release of the Proof of Claim form, and all prior or subsequent communications are made with express reservation of all rights and defenses that may be available to USF&G/FGIC or Nugget Construction, Inc. at law or in equity, under the terms and provisions of the bond and contract documents.

Very truly yours,

Jane Bennett Poling
Surety Claims Specialist

cc: Nugget Construction, Inc.

Enclosure

JBP/jms

Exhibit A
Page 33 of 45





Surety Group - Claim

Jane Bennett Poling, Esquire
Ph.: 410-205-1044
Fax: 410-205-0605
Mail Stop: LB0201

April 7, 1998

Mr. Ron Niebrugge
Shoreside Petroleum, Inc.
Corporate Office
P. O. Box 1189, 700 Port Avenue
Seward, Alaska    99664-1189

    RE:   Principal:    Nugget Construction, Inc.
           Claimant:    Shoreside Petroleum, Inc.
           Claim No.:   9901-S-209083-01-1
           Bond No.:   99-0120-40298-96-6
           Project:    DACW85-96-C-0020, Homer Spit Repair and Extension
           Obligee:    Department of the Army

Dear Mr. Niebrugge:

We have completed our review of your client's proof of claim and supporting documentation. It is my understanding that it is your contention that you supplied the fuel to Spencer Rock Products, Inc. It is the claimant's duty to provide documentation in order to demonstrate that all materials supplied were used on the above-referenced job.

After our review of the documentation provided by Shoreside Petroleum, Inc., we were unable to identify any delivery tickets which relate to the above-referenced project. Therefore, USF&G respectfully denies your claim. If, however, you feel you possess additional information which may compel a decision in the alternative, please provide same immediately.

This correspondence and all prior or subsequent communications are made with express reservation of all rights and defenses that may be available to USF&G/FGIC or Nugget Construction, Inc. at law or in equity under the terms and provisions of the bond and contract documents.

Very truly yours,

Jane Bennett Poling
Surety Claims Specialist

JBP/jaw

Exhibit A
Page 34 of 45





U S F+G*
INSURANCE

Surety Group - Claim
Jane Bennett Poling, Esquire
Ph.:   410-205-1044
Fax:   410-205-0605
Mail Stop:   LB0201

December 3, 1997

Greg Poyner, General Manager
Nugget Construction, Inc.
8726 Corbin Drive
Anchorage, Alaska 99507

RE:     Principal:            Nugget Construction, Inc.
        Claim Number:        9901-S-209083-01-1
        Bond Number:         99-0120-50298-96-5
        Project:             DACW85-96-C-0020, Homer Spit Repair and Extension
        Claimant:            Shoreside Petroleum, Inc.
        Obligee:             Department of the Army

Dear Mr. Poyner:

Enclosed, please find correspondence dated November 26, 1997, which we have received from Shoreside Petroleum, Inc. wherein it is alleged that your company owes $53,501.00 for labor or materials supplied on the above-captioned project.

We request that you promptly review this documentation and provide us with your written position and your intentions regarding this claim within fifteen (15) days. Please include all documentation that supports your position. If this claim has been paid or resolved, or is in the process of being paid, please forward to us a copy of your check or documentation evidencing the resolution of the claim.

Thank you for your cooperation in this matter.

Very truly yours,

Jane Bennett Poling
Surety Claims Specialist

Enclosure

JBP/jms



Surety Group - Claim

Jane Bennett Poling, Esquire
Ph.: 410-205-1044
Fax: 410-205-0605
Mail Stop: LB0201

February 17, 1998

J. Dennis Stacey, President
Chugach Rock Corporation
P.O. Box 91219
Anchorage, Alaska 99509-1219

RE:    Principal:       Nugget Construction, Inc.
       Obligee:         Department of the Army
       Claimant:        Chugach Rock Corporation
       Claim No.:       9901-S-209083-01-1
       Bond No.:        99-0120-50298-96-5
       Project:         Homer Spit Repair and Extension

Dear Mr. Stacey:

As you know, on November 17, 1997, we acknowledged receipt of your claim alleging that you are owed monies from the Principal for the materials furnished on the above-referenced project. Thereafter, we sent your information to the Principal and requested their position.

Nugget Construction's position regarding this matter is that Chugach Rock Corporation was not a materialman pursuant to the Miller Act because Chugach never "furnished" or "supplied materials." The case upon which they refer is *Woods Construction Company vs. Pool Construction Company*, 348 F 2d 687 (1965). We have read this case and have determined that Nugget has a reasonable defense to this claim. Furthermore, by letter dated November 10, 1997, you explained how you arrived at the amounts requested in your proof of claim, which is basically an estimated figure from the estimated job guarantees of the Project Engineer. You further explained that this figure is not exact and that once a final survey is received by the Corps of Engineers, the true total qualities will be revealed. Therefore, based on Nugget's argument that Chugach Rock Corporation is not a materialman or supplier pursuant to the Miller Act and the fact that you have not provided the necessary documentation to support your claim, your claim is respectfully denied. If you believe, however, that review of additional documentation or information will alter our analysis, please provide same immediately.

This correspondence and all prior or subsequent communications are made with express reservation of all rights and defenses that may be available to USF&G/FGIC or Nugget Construction, Inc. at law or in equity under the terms and provisions of the bond and contract documents.

Very truly yours,

Jane Bennett Poling
Surety Claims Specialist

JBP/jms

cc:    Greg Poyner, General Manager, Nugget Construction
       John Lukjanowicz, Esquire, Otes Morrison & Rinker, LLP
       Jim Ferguson, Senior Vice President, Willis Corroon Corp. of Anchorage
       Bill Wells, USF&G



**U S F + G**
INSURANCE

Surety Group - Claim

Jane Bennett Poling
Surety Claims Specialist
Ph.: 410-205-1044
Fax: 410-205-0605
Mail Stop: LB0201

March 9, 1998

J. Dennis Stacey, President
Chugach Rock Corporation
P.O. Box 91219
Anchorage, Alaska  99509-1219

      RE:    Principal:    Nugget Construction, Inc.
               Obligee:    Department of the Army
               Claimant:    Chugach Rock Corporation
               Claim No.:    9901-S-209083-01-1
               Bond No.:    99-0120-50298-96-5
               Project:    Homer Spit Repair and Extension

Dear Mr. Stacey:

I have enclosed a copy of my letter dated February 17, 1998.  Please refer to the second paragraph wherein Nugget Construction's defense regarding  this matter is that Chugagh Rock Corporation was not a materialman or a supplier pursuant to the Miller Act because Chugach never "furnished" or "supplied materials".   Again, the case upon which they refer is <u>Woods Construction Company vs. Pool Construction Company</u>, 348 F.2d 687 (1965). After reviewing this case and determining that Nugget has a reasonable defense to this claim, USF&G has respectfully denied your claim. If you believe, that review of additional documentation or information would alter our analysis, please provide this documentation immediately.

This correspondence and all prior or subsequent communications are made with express reservation of all rights and defenses that may be available to USF&G/FGIC or our principal, at law or in equity under the terms and provisions of the bond and contract documents.

Very truly yours,

Jane Bennett Poling
Surety Claims Specialist

Enclosure

JBP/mlm

**Exhibit A
Page 37 of 45**



June 11, 1998

Mr. J. Dennis Stacey, President
Chugach Rock Corporation
P. O. Box 91219
Anchorage, Alaska 99509-1219

| | | |
|---|---|---|
| RE: | Principal: | Nugget Construction, Inc. |
| | Claim No.: | 9901-209083-01-1 |
| | Bond No.: | 99-0120-50298-96-5 |
| | Claimant: | Chugach Rock Corporation |
| | Project: | Homer Spit Repair and Extension |

Dear Mr. Stacey:

Please be advised that we have received Nugget's response to your previous correspondence
dated March 12, 1998.

After reviewing your correspondence along with Nugget's correspondence and revisiting the
Woods Case, we have not deviated from our previous decision to deny your claim. Your
correspondence indicated that Nugget itself took rock from the quarry directly to its job site to
prosecute work under the prime contract. The issue is not whether or not Nugget itself took rock
from the quarry, but whether royalty payments constitute labor and materials pursuant to the
Miller Act. Again, as stated in the Woods case, royalty payments from materials extracted from
a quarry are not recoverable under the Miller Act.

This correspondence and all prior or subsequent communications are made with express
reservation of all rights and defenses that may be available to USF&G/FGIC or Nugget
Construction, Inc., at law or in equity, under the terms and provisions of the bond and contract
documents

Very truly yours,

Jane Bennett Poling
Surety Claims Specialist
Ph.: 410-205-1044
Fax: 410-205-0605
Mail Code: LB0201

Enclosures

USF&G Corporation
PO Box 1138
Baltimore, MD 21203

Exhibit A
Page 38 of 45

# William Grant Callow – Resume

## Professional Information

Law Offices of William Grant Callow
425 G Street, Suite 610
Anchorage, Alaska 99501
Telephone: 907-276-1221
Facsimile: 907-258-7329
Description of practice: Trial and appellate practice.
Martindale-Hubbell rating: AV

**Admitted to Practice**:   State of Alaska
U.S. District Court for the District of Alaska
United States Court of Appeals, 9th Circuit
United States Supreme Court
State of Wisconsin
United States District Court for the Western District of
Wisconsin

**Alaska Commissioner**: National Conference of Commissioners on Uniform Laws
Term: 1987 to 2005.
Member: NCCUSL Executive Committee. Appointed: 1999 to 2001
Member: NCCUSL Scope and Program Committee, 1997-1999
Member: NCCUSL Committee to Draft Uniform Testimony of Minors Act, 1999 to
present
Member: NCCUSL Committee to Revise the Uniform Rules of Evidence, 1997-99
Member: NCCUSL Committee to Revise the Uniform Certifications of Questions of
State Law Act, 1993 - 95
Member: NCCUSL Committee to Redraft the Periodic Payment of Judgments Act,
1987-1990

## Professional Organizations

Fellow: American Academy of Appellate Lawyers, elected 1991



# William Grant Callow – Resume

## Professional Information

Law Offices of William Grant Callow
425 G Street, Suite 610
Anchorage, Alaska 99501
Telephone: 907-276-1221
Facsimile: 907-258-7329
Description of practice:  Trial and appellate practice.
Martindale-Hubbell rating: AV

**Admitted to Practice:**    State of Alaska
U.S. District Court for the District of Alaska
United States Court of Appeals, 9th Circuit
United States Supreme Court
State of Wisconsin
United States District Court for the Western District of
Wisconsin

**Alaska Commissioner**: National Conference of Commissioners on Uniform Laws
Term: 1987 to 2005.
Member: NCCUSL Executive Committee.  Appointed: 1999 to 2001
Member: NCCUSL Scope and Program Committee, 1997-1999
Member: NCCUSL Committee to Draft Uniform Testimony of Minors Act, 1999 to
present
Member: NCCUSL Committee to Revise the Uniform Rules of Evidence, 1997-99
Member: NCCUSL Committee to Revise the Uniform Certifications of Questions of
State Law Act, 1993 - 95
Member: NCCUSL Committee to Redraft the Periodic Payment of Judgments Act,
1987-1990

## Professional Organizations

Fellow:  American Academy of Appellate Lawyers, elected 1991

Member:  American Bar Association
Member:  Alaska Academy of Trial Lawyers
Member:  Association of Trial Lawyers of America
Member:  Alaska Bar Association
Member:  Anchorage Inns of Court (President, 1998-99)
Member:  Anchorage Bar Association

## Work Experience

Private Practice, 1984 to present
425 G Street, Suite 610
Anchorage, Alaska 99501
Description of practice:  General litigation and appellate practice.

Discovery Master of the  Alaska Superior Court

General Counsel – Alaska Court System, 1979-1981
303 K Street
Anchorage, Alaska 99501

Reviser of the Alaska Rules of Court, 1979-1981
Alaska Supreme Court (appointed by the Chief Justice, 1979)

Commissioner – Alaska Code Revision Commission, 1979- 81
(Commission charged with revising the Alaska Corporation Code
and the Alaska Not-For-Profit Corporation Code.  Appointed by
the Chief Justice of the Supreme Court of Alaska, 1979)

Member: Alaska Rules of Court Civil Rules Committee, 1979-81

Member: Alaska Bar Examiners Committee, 1983-87

Member: Alaska Pattern Civil Jury Instructions Committee, 1989-94

Moderator:  New Ethics Rules of the State Bar of Wisconsin, 1991.

Trial Attorney, 1978-79
Alaska Public Defender Agency
Anchorage, Alaska

Law Clerk, 1977-78
Hon. Edmond W. Burke
Alaska Supreme Court
Anchorage, Alaska

## Education

University of Wisconsin
Madison, Wisconsin
Major:  Economics
Degree:  BA (Honors), 1973

### Academic Honors and Awards

President, University of Wisconsin Class of 1973

Brittingham Reverse Viking Scholar, 1972

Iron Cross Society – University of Wisconsin (University of Wisconsin senior men's honorary society for scholarship and service to the university community). Elected: 1973

Society of the Mace - University of Wisconsin (University of Wisconsin junior men's honorary society for scholarship and service to the university community). Elected: 1972

Outstanding Junior Student Award – University of Wisconsin Alumni Association, 1972

Outstanding Senior Student Award – University of Wisconsin Alumni Association, 1973

International Summer School (Brittingham RV Scholarship)
University of Oslo
Oslo, Norway
Diploma: 1972

University of Cambridge (Queens' College)
Cambridge, England
Diploma – Latin American Studies, 1974
Member: Queens' College Rowing Club, 1977-78

University of Wisconsin Law School
University of Wisconsin
Madison, Wisconsin
Degree: J.D., 1977
Honors: Dean's List

## Community Service and Organizations

Distinguished Public Service Award – Anchorage Bar Association (2003)

Member: Steering Committee
            Fundraising Committee – Alaska Legal Services Corporation
            1998 to 2001

Commentator/Reviewer – Student Showcase Awards – University of Alaska, Anchorage, 2001.

Member: Alaska Lawyer Pro Bono Program, 1986 to present

Co-Chairman – Alaskans for an Independent Judiciary, 1999 to present
Master of Ceremonies – Ceremony to honor Chief Justice Jay A. Rabinowitz upon his retirement

Member, Board of Directors, University of Wisconsin Alumni Association, 1973-1975.

President, University of Wisconsin Alumni Club of Alaska, 1991-93.

Member: Midnight Sons Barbershop Chorus, 1984-88

Member: Anchorage Community Chorus, 1977- 1981

Member: KAKM Public Television Community Advisory Board, 1978-80

## Personal Information

Date of Birth:  May 14, 1951
Place of Birth:  Milwaukee, Wisconsin
Raised: Waukesha, Wisconsin

Father:  Hon. William G. Callow
   Justice – Supreme Court of Wisconsin (retired)
Mother: Jean Z. Callow
   Homemaker (not retired)
Sisters:  Christine Callow
          Katherine Wilkie

Graduated:  Waukesha High School, 1969
          Rotary International Scholar to Brazil, 1968-69

Languages:  Portuguese; Spanish; Norwegian (limited); Danish (very limited)

## References:

Mr. Jørgen M. Clausen
President – Danfoss A/S
Nordborgvej 81
DK 6430 Nordborg
Denmark

Hon. Alexander O. Bryner
Chief Justice - Supreme Court of Alaska
303 K Street
Anchorage, Alaska 99501

99310.2
**RECEIVED**

Michael W. Sewright
BURR, PEASE & KURTZ
810 N Street
Anchorage, AK  99501-3293
Telephone:     (907) 276-6100
Fax No.:        (907) 258-2530
Attorneys for North Star

**DOCKETED**
Due Date 9/22/05
ᴀɴꜱᴡᴇʀ
☐ NO ACTION NECESSARY

SEP 0 2 2005

**OMR & B, Anc.**
Cc: ꞩᴍꞀᴛʜ/ᴛᴍ
        Seattle
        Client

Cc: John ᴇ
        Greg
        JMIH
        TM
        ENH

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ALASKA
### AT ANCHORAGE

UNITED STATES OF AMERICA for the use of
NORTH STAR TERMINAL & STEVEDORE
COMPANY, d/b/a Northern Stevedoring &
Handling, and NORTH STAR TERMINAL &
STEVEDORE COMPANY, d/b/a Northern
Stevedoring & Handling, on its own behalf,

     Plaintiffs,

  and

UNITED STATES OF AMERICA for the use of
SHORESIDE PETROLEUM, INC., d/b/a Marathon
Fuel Service, and SHORESIDE PETROLEUM,
INC., d/b/a Marathon Fuel Service, on its own
behalf,

     Intervening Plaintiffs,

  and

METCO, INC.,

     Intervening Plaintiff,

  vs.

NUGGET CONSTRUCTION, INC.; SPENCER
ROCK PRODUCTS, INC.; UNITED STATES
FIDELITY AND GUARANTY COMPANY; and
ROBERT A. LAPORE,

     Defendants.

Case No. A98-009 CIV (HRH)

**NORTH STAR'S
AMENDED COMPLAINT**


EXHIBIT
5
Catlow

BURR, PEASE
& KURTZ
- PROFESSIONAL CORPORATION
N STREET
E, AK 99501
, 276-6100

NORTH STAR'S AMENDED COMPLAINT
*United States ex rel. North Star, et al. v. Nugget Construction,
et al.*, A98-009 CIV (HRH)
Page 1 of 26

45-40/#79199