```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF ALASKA AT ANCHORAGE


   UNITED STATES OF AMERICA for the
   use of NORTH STAR TERMINAL &
   STEVEDORE COMPANY, d/b/a NORTHERN
   STEVEDORING & HANDLING, and NORTH
   STAR TERMINAL & STEVEDORE COMPANY,
   d/b/a Northern Stevedoring &
   Handling, on its own behalf,

            Plaintiffs,

        and

   UNITED STATES OF AMERICA for the
   use of SHORESIDE PETROLEUM, INC.,
   d/b/a Marathon Fuel Service, and
   SHORE PETROLEUM, INC., d/b/a
   Marathon Fuel Service, on its own
   behalf,
            Intervening Plaintiffs,
        and
   METCO, INC.,
            Intervening Plaintiff,
        vs.
   NUGGET CONSTRUCTION, INC.; SPENCER
   ROCK PRODUCTS, INC.; UNITED
   STATES FIDELITY AND GUARANTY
   COMPANY; and ROBERT A. LAPORE,

            Defendants.
   _____/
   No. A98-009 CIV (HRH)

             DEPOSITION OF JEFFREY "JEFF" BENTZ
                 Pages 1 - 221 (inclusive)
                    November 21, 2005
                       8:33 a.m.
```

COPY

MIDNIGHT SUN COURT REPORTERS * (907) 258-7100

Exhibit 1
Page 1 of 10

```
                                                Page 2
 1
 2
 3              Taken at:
 4   The Law Offices of Oles Morrison Rinker & Baker
        745 West 4th Avenue, Suite 502
 5            Anchorage, Alaska
 6
 7
 8
 9
10   Reported by: Leslie J. Knisley
            Shorthand Reporter
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
                                                Page 4
 1              I-N-D-E-X
 2   JEFFREY "JEFF" BENTZ        NOVEMBER 21, 2005
 3   EXAMINATION
 4                          PAGE
 5   BY MS. HO                6
     BY MR. VIERGUTZ         209
 6
     NUMBER      EXHIBITS           PAGE
 7
       1    Renotice of Deposition,    9
 8          6 pages
 9     2    North Star's Second        35
            Supplemental Disclosures,
10          7 pages
11     3    North Star's Responses to  55
            Defendant's First Set of
12          Discovery Requests,
            17 pages
13
       4    Copy of four business cards,  61
14          1 page
15     5    North Star's Amended Complaint, 70
            26 pages
16
       6    Credit application and various 71
17          documents, 9 pages
18     7    Affidavit of Jack Goodwill,    89
            25 pages
19
       8    Current rates and invoices,    93
20          9 pages
21     9    Daily notes of operations,    110
            13 pages
22
      10    Invoices and timecards,       115
23          34 pages
24
25
```

```
                                                Page 3
 1   A-P-P-E-A-R-A-N-C-E-S
 2
     For Plaintiffs:
 3
         MR. MICHAEL W. SEWRIGHT
 4       Burr, Pease & Kurtz, PC
         810 N Street
 5       Anchorage, AK 99501
              (907) 276-6100
 6
     For Shoreside Petroleum:
 7
         MR. STEVEN J. SHAMBUREK
 8       Law Office of Steven J. Shamburek
         425 G Street, Suite 630
 9       Anchorage, AK 99501
              (907) 250-0044
10
     For Nugget Construction, Inc.:
11
         MS. GLORIA Y. HO
12       MR. TRAEGER MACHETANZ
         Oles Morrison Rinker & Baker, PC
13       745 West 4th Avenue, Suite 502
         Anchorage, AK 99501-2136
14            (907) 258-0106
15   For USF&G:
16       MR. HERBERT A. VIERGUTZ
         Barokas Martin & Tomlinson
17       1029 West 3rd Avenue, Suite 280
         Anchorage, AK 99501
18            (907) 276-8010
19   Also Present:
20       MR. JOHN SMITHSON, Nugget Construction
         MR. DOUG LECHNER, Metco, Inc.
21
     Reported by:
22
         LESLIE J. KNISLEY
23       Shorthand Reporter
24
25
```

```
                                                Page 5
 1              I-N-D-E-X, continued
 2    11   Material Contract, 4 pages       143
 3    12   Support agreement, 1 page        145
 4    13   Bill of sale, 1 page             170
 5    14   Letter to Army Corps of          185
           Engineers, 8/4/97, 2 pages
 6
      15   Copies of two business cards,    188
 7         1 page
 8    16   Letter from U.S. Army Corps of   194
           Engineers, 8/21/97, 1 page
 9
      17   Letter to U.S. Army Corps of     196
10         Engineers, 8/25/97, 3 pages
11
12
...
25
```

2 (Pages 2 to 5)

MIDNIGHT SUN COURT REPORTERS * (907) 258-7100

Exhibit 1
Page 2 of 10

Page 78

1 rocket science.
2  A  Do we solicit our customers to grant
3 them credit?
4  Q  Well, yes. I mean, do you say, okay,
5 our company has lines of credit which we can
6 grant to a business?
7  A  We don't grant lines of credit.
8  Q  Do you solicit them?
9  A  We don't solicit lines of credit.
10  Q  Okay. Then, do potential customers
11 reveal to you that they might have a financial
12 difficulty in working with North Star and do
13 they, these potential customers, ask North Star,
14 do you have any way of assisting us so that we
15 can consummate this agreement to work with North
16 Star?
17      MR. SEWRIGHT: Objection to form of the
18 question.
19  A  That's not our general way of doing
20 business as you have posed the question.
21 BY MS. HO:
22  Q  Then how does North Star generally do
23 this business regarding its commercial accounts
24 and credit applications?
25  A  Most of our customers have been

Page 79

1 long-time customers of North Star. When we come
2 across a new business, depending on the volume of
3 business, the length and duration of the
4 business, the type of business, whether or not
5 it's a federally-funded project, a bondable
6 project, not bonded project, we may or may not do
7 any number of variety of different ways to try to
8 secure our future.
9  Q  Thank you, Mr. Bentz. That's what I
10 needed clarification on.
11      If you would please turn to page 4 of
12 this nine-page document. It says Agreement on
13 top. And it looks to be Spencer Rock Products
14 and a signature of what looks to be Robert LaPore
15 and what looks to be dated January 28th, 1997.
16      Do you disagree with what's stated on
17 this agreement?
18  A  Do I disagree with what's stated on the
19 agreement?
20  Q  In terms of what I've just noted. The
21 company name, the signature and the date.
22  A  Yes, that's right.
23      MR. SEWRIGHT: Objection. Counsel, the
24 document speaks for itself.
25      MS. HO: Well, I just want to be sure

Page 80

1 that Mr. Bentz is reading what I am.
2  Q  Mr. Bentz, paragraph 3, would you
3 please read that aloud for the record?
4  A  Well, I don't have my reading glasses
5 with me and this is fairly illegible. But,
6 "Applicant agrees to notify North Star Terminal &
7 Stevedore Company promptly of any changes in
8 ownership of the business conducted under the
9 account name and agrees to liability for all
10 charges to the business conducted under the
11 account name unless and until North Star Terminal
12 reviews written notice of a change in ownership
13 of that business."
14  Q  And then it looks like Mr. LaPore has
15 signed that agreement. Was there any dispute by
16 North Star that this particular agreement signed
17 by Mr. LaPore was unacceptable to North Star?
18  A  Not that I know of.
19  Q  Now, during the time that Mr. LaPore
20 and Spencer Rocks had a business engagement with
21 North Star, did Mr. LaPore or anyone at Spencer
22 Rocks notify North Star that there was an
23 ownership of business?
24      MR. SEWRIGHT: Object to the form of
25 the question.

Page 81

1 BY MS. HO:
2  Q  Mr. Bentz?
3  A  Did anybody notify us of ownership of
4 Spencer?
5  Q  No. Did anyone -- first, did
6 Mr. LaPore notify you --
7  A  Hold on just a second. Could you
8 reread the question back to me that she asked?
9      (Question read by the reporter.)
10 BY MS. HO:
11  Q  Let me rephrase that.
12  A  Doesn't make any sense.
13  Q  The question is: First, did Mr. LaPore
14 at any time notify North Star that Spencer Rocks,
15 Incorporated had a change of ownership in terms
16 of its business?
17  A  Define "change in ownership."
18  Q  Well, you tell me. When North Star
19 became doing business as a limited liability
20 company, didn't it have to go through legal steps
21 to make sure that the form of the entity was --
22  A  There are some customers, some people
23 that we had contracts with that we had to notify.
24 We didn't have to notify a lot of people.
25  Q  Right. And in this case with Spencer

Page 130

1  contract as a prime contractor, say, with the
2  federal government?
3      A   I don't think as a prime contractor,
4  no. It depends on what you're talking about. We
5  do work for the military where it's a sole-source
6  contract, but not where we have necessarily subs
7  working underneath us or anything like that.
8      Q   But North Star has had dealings with
9  the federal government and how those contracts
10 work, correct?
11     A   Yeah. Usually we're somewhere down the
12 line, though, as a subcontractor or something of
13 that nature.
14     Q   Does North Star inquire -- say, for
15 example, if North Star considers itself a
16 supplier to a supplier on a federal bonded
17 contract, is North Star's normal business custom
18 and practice to inquire of the first tier
19 supplier what their role and position would be?
20         MR. SEWRIGHT: Object to the form of
21 the question.
22     A   Give me an example.
23 BY MS. HO:
24     Q   Well, for example, in this case. Did
25 North Star actively inquire of Spencer Rock what

Page 131

1  its role would be in the project?
2      A   We did not -- I don't know what all we
3  inquired on at the time that the job was set up.
4      Q   So you don't know, but who in North
5  Star would know?
6      A   Who would remember?
7      Q   Who would recall, or who do you think
8  would recall?
9      A   I don't know.
10     Q   Would Jack Goodwill?
11     A   He may recall. I don't know. You'd
12 have to ask him.
13     Q   I probably will. But to your
14 recollection, you never inquired of Spencer Rock
15 what their role in the Homer Spit project was?
16     A   I don't remember what all inquiries
17 that I had in '97.
18     Q   But to your understanding, Spencer Rock
19 Products was a separate and distinct company from
20 Nugget Construction Company, correct?
21     A   I don't know that.
22     Q   Well, what information did you have
23 from Spencer Rock?
24     A   Back then we had the information that's
25 been presented to you. But, you know, it seemed

Page 132

1  to be rather confusing, I guess, to some agree.
2      Q   Well, if it was confusing, didn't North
3  Star at least inquire and clarify the confusion
4  for itself at least for purposes of the project?
5      A   What confusion are you referring to?
6      Q   Well, you're the one who said
7  confusion. You tell me.
8      A   Tell you about the confusion?
9      Q   Yes.
10     A   Well, I mean, originally the job was
11 set up -- apparently was set up from Spencer, but
12 it appears that we were taking direction from
13 what we thought was a Nugget employee at the
14 time, and as it turned out, it appears that he
15 was employed by several people.
16     Q   It appears, but at the same time did
17 you actively inquire of the role of the
18 individuals you're referring to?
19     A   I did not actively inquire.
20     Q   And did anybody at North Star?
21     A   I don't know.
22     Q   So there's no representation by Nugget
23 that any of its employees were taking control of
24 the operations of Spencer Rock.
25     A   Is that a statement?

Page 133

1          MR. SEWRIGHT: Objection to the form of
2  the question.
3  BY MS. HO:
4      Q   I'm asking you.
5      A   You didn't ask me a question.
6      Q   Well, then let me ask you: To your
7  knowledge do you know if Nugget Construction
8  Company or any of its representatives or
9  employees made representations to anyone at North
10 Star that it was taking control of the operation?
11     A   Through their actions they did.
12     Q   There was no oral representation, was
13 there?
14     A   Certainly there was.
15     Q   There was -- can you specify them?
16         MR. SEWRIGHT: There's Jack Goodwill's
17 affidavit and everything.
18         MS. HO: No, I'm talking about --
19         MR. SEWRIGHT: Are you talking about
20 him personally or representations made to North
21 Star?
22 BY MS. HO:
23     Q   No, this is on your knowledge, Mr.
24 Bentz, and North Star's knowledge to provide
25 specific --

Page 134

1  MR. SEWRIGHT: Okay. Objection;
2  compound question. Which one do you want?
3  BY MS. HO:
4    Q  Well, let's go through both.
5    First, let's talk about North Star's
6  understanding and belief of which individuals
7  within Nugget Construction Company represented to
8  North Star that they were taking control of the
9  operations or alleged control.
10   A  It appeared that way through their
11 actions by the fact that Mr. LaPore was not
12 making contact with Jack to schedule and do the
13 work and discuss the work with him; it was Randy
14 Randolph. And at the time Randy Randolph was
15 presenting himself as a Nugget employee --
16   Q  But the barge loadings --
17   A  -- is what the business cards indicate,
18 I believe.
19   Q  And it also indicated that Mr. Randolph
20 was an LDR Engineering employee.
21   A  Well, we don't know when that timecard
22 was -- or when that name card was actually
23 received, do we?
24   Q  Well, that's why I'm asking you. They
25 were produced from your files. I want to know if

Page 135

1  you know what time period they were produced.
2    A  Everything that I've read in the case,
3  which a lot of what I understand is from reading
4  the documents, just like a lot of what you
5  understand is from reading the documents because
6  I was not in Seward at the time.
7    Q  Well, Mr. Bentz, I appreciate your
8  understanding, but please don't impose your
9  understanding of what I understand in the case.
10   A  I would never do that.
11   Q  Thank you. Now, in terms of what
12 Nugget Construction employees or representatives
13 allegedly indicated to North Star's personnel, do
14 you have a specific communication, a specific
15 time frame that you're referring to that would
16 substantiate this alleged conduct?
17   A  I believe if you look in Mr. Goodwill's
18 document where -- under his statement it says
19 that the loading was directed by Randy Randolph.
20   Q  Now, did North Star have an exclusive
21 agreement with Nugget to load the barges?
22     MR. SEWRIGHT: Object to the form of
23 the question.
24 BY MS. HO:
25   Q  They didn't, did they?

Page 136

1    A  What do you mean did we have an
2  exclusive --
3    Q  Well, when North Star loads these
4  barges, the original agreement was with Spencer
5  Rock, correct?
6    A  That's correct.
7    Q  And then there was no subsequent
8  agreement to modify that relationship between
9  Spencer Rock and North Star, correct?
10     MR. SEWRIGHT: Objection to the form of
11 the question; calls for a legal conclusion.
12 BY MS. HO:
13   Q  To your understanding of the facts of
14 this case, was there any communications written
15 or oral that would have altered that relationship
16 between Spencer Rock and North Star?
17     MR. SEWRIGHT: Same objections.
18   A  If you read all the documents, it
19 appears that way.
20 BY MS. HO:
21   Q  That no written or oral communications
22 or documentation changed the relationship between
23 Spencer Rock and North Star?
24     MR. SEWRIGHT: Continuing objection.
25   A  Well, I think that the relationship

Page 137

1  changed as a function of -- if you read the
2  entire story, if you read the whole novel,
3  instead of one chapter, to me it seems rather
4  obvious what happened.
5  BY MS. HO:
6    Q  I'm not asking for the whole chapter.
7  We're talking about a specific time frame, 1997,
8  when Mr. LaPore and Spencer Rock entered an
9  agreement with North Star.
10     Do you disagree with that event
11 occurring?
12   A  Disagree with what event occurring?
13 They contracted us to do work.
14   Q  Right.
15   A  Uh-huh, Mr. LaPore did contract us to
16 do some work.
17   Q  Right. And then there's no subsequent
18 agreement or alteration between North Star or
19 Spencer Rock that changed that relationship?
20     MR. SEWRIGHT: Same continuing
21 objections.
22 BY MS. HO:
23   Q  Is that correct, Mr. Bentz?
24   A  No, I don't agree with what you're
25 saying, the way you're wording it.

Page 138

1  Q  Well, then can you point to any
2  particular document or communications that would
3  show that that relationship between North Star
4  and Spencer Rock changed?
5  A  Yeah.
6  Q  Okay. Go ahead.
7  A  Jack's affidavit, for one, says that
8  Randy Randolph was the one directing him. If you
9  go and you read in the testimony of all this, it
10 says that Bob LaPore ended up driving a truck and
11 that he wasn't actually doing what he was hired
12 to do. If you read it, it says that there was a
13 support agreement in place that we were never
14 informed of.
15 Q  Never informed of the support
16 agreement. When was the first time you had
17 knowledge of the support agreement?
18 A  After all the work had been done.
19 Q  And did you expect that those kind of
20 agreements that were privy between my client,
21 Nugget Construction Company, and Spencer Rock
22 would have been shown to the world?
23     MR. SEWRIGHT: Objection to the form of
24 the question, Counsel.
25 A  No, what I would expect is that if I

Page 139

1  received money from somebody that wasn't mine, it
2  belonged to somebody else because they performed
3  the work, that I'd make sure they got the money
4  for it. That's what I would expect.
5  BY MS. HO:
6  Q  And that enforcement of your monies due
7  should have been between North Star and Spencer
8  Rock because that was the agreement between the
9  two entities, correct?
10 A  I disagree with you wholeheartedly.
11 Q  I disagree with you, too, sir.
12 A  That's your prerogative. We disagree
13 with each other, Mrs. Ho.
14     MR. SEWRIGHT: Since we've established
15 we disagree, can we just end right now?
16 BY MS. HO:
17 Q  Let's not do that. Let's turn to
18 Exhibit 7, which is Mr. Jack Goodwill's
19 affidavit, and then you look at page 5, paragraph
20 10, last sentence starting with --
21 A  Page 5, you said?
22 Q  Page 5, yes.
23 A  Okay.
24 Q  Read that to yourself.
25     MR. SEWRIGHT: Did you point out a

Page 140

1  particular paragraph?
2     MS. HO: Yes, paragraph 10.
3     MR. SEWRIGHT: Thank you.
4  BY MS. HO:
5  Q  Now, after reading that --
6     MR. SEWRIGHT: Have you had a chance to
7  look at all of paragraph 10?
8     THE WITNESS: No, no.
9  BY MS. HO:
10 Q  Go ahead and look at that. Just that
11 last sentence.
12 A  What? Nugget was calling the shots?
13 Q  No, that's a complete
14 mischaracterization of Mr. Goodwill's affidavit.
15 I'm asking you to read the last --
16    MR. SEWRIGHT: Objection, Counsel. I'm
17 going to read from this affidavit, top of page 6,
18 "Which also demonstrates to me that Nugget was
19 calling the shots." Now, how is that a
20 mischaracterization of the exhibit?
21    MS. HO: Counsel, I'm asking Mr. Bentz
22 to read paragraph 10 on page 5.
23 Q  Why are you on paragraph 6, sir?
24 A  It's not. It's page 6; it's still
25 paragraph 10, the end of paragraph 10.

Page 141

1  Q  The sentence before that. I already
2  stated for the record starting with the word
3  "when."
4  A  Do you want me to comment on one
5  sentence?
6  Q  I will ask -- and if you read it for
7  the record, please. "When I" -- or if you want,
8  I'm happy to read it for the record. Whichever
9  way you want.
10 A  Go ahead.
11 Q  Okay. "When I" -- meaning Jack
12 Goodwill -- "demanded payment from Nugget through
13 Randy Randolph, Mr. Randolph told me that Nugget
14 believed Spencer Rock owed Northern Stevedoring
15 the money and that, as far as he was concerned,
16 payment was a matter between Spencer Rock and
17 Northern Stevedoring."
18    He said it was not Nugget's problem.
19 A  In his opinion.
20 Q  Do you disagree with that?
21 A  Do I disagree with his opinion? I
22 can't disagree with his opinion; it's his
23 opinion.
24 Q  Well, then your opinion is,
25 essentially, that you think my clients are owing

**Page 142**

1  you monies, right?
2     A   Absolutely.
3     Q   Well, that's absolutely incorrect
4  because at any time to North Star's knowledge --
5        MR. SEWRIGHT: Counsel, will you ask
6  questions and not argue your case? If you want
7  to argue your case, do it in front of the judge
8  and the jury. Don't argue with the witness, who
9  is my client.
10 BY MS. HO:
11    Q   Okay, Mr. Bentz. I don't want to argue
12 with you, but to your knowledge was there any
13 time that my client, Nugget Construction Company,
14 orally or writtenly (ph) said that it was ever
15 going to assume Mr. LaPore's responsibilities in
16 its agreement with --
17    A   Absolutely.
18    Q   Okay. Cite that time, sir.
19    A   When they entered into the support
20 agreement without our knowledge and went in and
21 took over the quarry.
22    Q   They went in with a support agreement;
23 that has nothing to do with North Star. That
24 agreement was with Spencer Rock and with Nugget
25 Construction Company.

**Page 143**

1        MR. SEWRIGHT: Objection.
2     A   Ms. Ho, they stepped into the shoes of
3  the client that we were supposed to be working
4  for and they directed us to do the work. They
5  then collected the money, intercepted the money
6  that never got paid to the person that we were
7  supposed to work for so that we could get our
8  money.
9  BY MS. HO:
10    Q   Mr. Bentz, those are serious
11 allegations against my client. If you have any
12 particular knowledge or fact of a specific
13 incident that shows that, please cite that.
14       Now, Mr. Bentz, I will submit to you
15 the support agreement as between my client and
16 Spencer Rock and Robert LaPore.
17       Would you please mark this as an
18 exhibit?
19    A   Are we done with Exhibit 10 for now?
20    Q   For now.
21       (Exhibit 11 marked.)
22       MR. SEWRIGHT: Do you want him to look
23 at the whole exhibit or just the last page?
24 BY MS. HO:
25    Q   While you're at it, why don't you look

**Page 144**

1  at the whole exhibit, which consists of five
2  pages. Is that what you have, Mr. Bentz?
3     A   Yeah, five pages.
4     Q   Okay. Great. Now, this is Exhibit No.
5  11, which contains the material contract between
6  Spencer Rock Products and Nugget Construction
7  Company and also the subsequent support agreement
8  between Nugget Construction Company and Spencer
9  Rock Products dated April 23rd, 1997.
10       Do you disagree with that?
11    A   I haven't finished reading it yet.
12       MR. SEWRIGHT: Counsel, for the record,
13 let's establish these documents are really two
14 separate documents; the four-page what is
15 entitled Material Contract dated on or about the
16 middle of January, 1997; and then a subsequent
17 support agreement, a separate document, dated
18 April 23, a one-pager. I mean, because you have
19 them stapled together as one exhibit, I wanted to
20 point out they're separate documents.
21       MS. HO: I'll identify them as Nugget
22 007224 through Nugget 00728.
23       MR. SHAMBUREK: Would it help to mark
24 the Support Agreement as Exhibit 12?
25       MR. SEWRIGHT: I think so.

**Page 145**

1        MS. HO: Let's go ahead and do that.
2  That's fine.
3        (Exhibit 12 marked.)
4  BY MS. HO:
5     Q   Now, Mr. Bentz, you've reviewed
6  Defendants' Exhibit No. 11 and Defendants'
7  Exhibit No. 12, have you not?
8     A   I've read 11, yeah.
9     Q   Okay. And Exhibit 11 is the Material
10 Contract between Nugget Construction Company and
11 Spencer Rock Products; is that correct?
12    A   That's what it says.
13    Q   Okay. If you turn to page 2 of Exhibit
14 No. 11 and go to Section No. 4 on the bottom of
15 the page --
16    A   Yeah.
17    Q   -- you can read that paragraph to
18 yourself, and it runs over to the next page,
19 Nugget 007226.
20       MR. SEWRIGHT: Section what?
21       MS. HO: Section 5. Section 5 runs at
22 the end of the second page and goes into the top
23 of the third page.
24       THE WITNESS: Okay.
25       MR. SEWRIGHT: Which one do you want

Page 150

1  objection is noted for the record.
2      THE WITNESS: Just hold on a second.
3  Could you please reread her question as she
4  stated it?
5      (Question read back by the reporter.)
6      MR. SEWRIGHT: Same objections.
7  A  I'm not sure how to answer your
8  question.
9  BY MS. HO:
10  Q  Okay. Let me break it down for you.
11     In North Star's understanding, there
12  was North Star and Spencer Rock which had the
13  business relations, is that correct, in 1997 that
14  North Star provide stevedoring job duties on the
15  project for Spencer Rock; is that correct?
16     MR. SEWRIGHT: Continuing objection to
17  the form of the question; legal conclusion.
18  A  We were originally contacted by
19  Mr. LaPore to load rock onto a barge pending
20  their successful outcome at getting the work, was
21  how it was originally parlayed to me. That's my
22  understanding of how the whole situation started.
23  BY MS. HO:
24  Q  Okay.
25  A  You know, but whether or not Spencer

Page 151

1  did something negligent or not, which would lead
2  to clause 10 being held -- you know...
3  Q  I just want to show you now that you
4  have a chance to look -- you're saying that my
5  clients didn't disclose this contract to you and
6  whatnot. There are terms and conditions that are
7  specific between the parties who are engaged in
8  the agreement just like North Star has certain
9  obligations and duties under its contract with
10  its vendors or suppliers; isn't that correct?
11  A  Yes.
12     MR. SEWRIGHT: I'm going to object to
13  the form of the question.
14     You can go ahead and try to answer.
15  I'm just objecting for the record.
16  A  If I receive money for services that I
17  provided because of a subcontract and somebody
18  actually produced that work so that I could get
19  that money for that, I'd make sure they got paid
20  for their services. That's their money.
21  BY MS. HO:
22  Q  But then --
23  A  It's a federal job. The reason there's
24  bonding on federal jobs is so the federal
25  government ensures that their general contractors

Page 152

1  have paid the people that they have to pay.
2  Q  And that's what Nugget Construction
3  Company has done. Your counsel has revealed all
4  the documents on vendors and subcontractors and
5  whatnot on this particular project.
6      But with respect between North Star and
7  Spencer Rock and the business arrangement there,
8  it was Spencer Rock who was responsible for
9  ultimately paying for North Star's services.
10  A  Originally that's what we thought, but
11  there's, you know, after we'd done the work, we
12  learned of all these other things that indicate
13  that in fact we weren't really even working for
14  Spencer Rock. We were working for Nugget.
15  Q  But there's no oral or written
16  communications in effect that would indicate
17  that, sir.
18  A  I think there are plenty of facts here
19  to indicate that.
20  Q  You're being ambiguous. I don't know
21  what facts you're referring to.
22     MR. SEWRIGHT: Counsel, I'm really, I'm
23  really -- in the jurisdiction you just don't make
24  those kind of statements and argue with a witness
25  at a deposition. I'm really starting -- I'm not

Page 153

1  going to get upset -- but I'm pointing out to you
2  that that's unusual, so...
3      MS. HO: Counsel, I appreciate your
4  objection.
5      MR. SEWRIGHT: And I'm going to have a
6  continuing objection to your argumentative
7  questions, your assuming facts not in evidence,
8  your speeches, et cetera. And just because you
9  end your speech with an "isn't that correct,"
10  doesn't turn it into a question and it doesn't
11  turn it into a proper question. So I will
12  continue to object. I have a continuing line of
13  objections to these types of questions.
14     MS. HO: Counsel, I appreciate your
15  objections. They're noted for the record. I
16  have not been discourteous to your client. We're
17  just trying to ascertain the validity of the
18  claims and the allegations.
19     MR. SEWRIGHT: I didn't claim you were
20  being discourteous.
21     MS. HO: I'm not being argumentative.
22     MR. SEWRIGHT: That I do claim.
23  BY MS. HO:
24  Q  Mr. Bentz, if North Star is a party to
25  this litigation, then my clients are entitled to

Page 166

1  Q  You cannot pinpoint any specific
2  communication that would indicate Nugget
3  directed --
4  A  Other than what's on record already, I
5  don't know of anything else.
6  Q  Okay. So in North Star's beliefs and
7  your beliefs, for that matter, when did Nugget
8  start directing the activities of the barge -- do
9  you consider it after the first barge loading by
10 North Star?
11 A  You already asked that question. I've
12 answered it twice. Starting with the first
13 barge.
14 Q  Okay. Now, if that's the case then,
15 was there any indication by North Star that in
16 its minds and its belief that Nugget had taken
17 over the agreement between Spencer and North
18 Star?
19 A  Through their actions.
20 Q  Well, what actions are you referring
21 to?
22 A  The fact that an employee that's
23 supposedly a Nugget employee, but as it turns out
24 is a Spencer owner and has got his own business
25 and everything else going on, was directing us to

Page 167

1  do the work.
2  Q  Directing you to do the work. What
3  work are you referring to? These are Nugget's
4  barges. They had an interest in ensuring that no
5  damage would have been done to these barges;
6  isn't that true?
7      MR. SEWRIGHT: Object to the form of
8  the question; compound. You had about three or
9  four things in there topped off with "isn't that
10 true."
11     MS. HO: Thank you, Counsel. Let me
12 rephrase.
13 Q  First of all, when Nugget was at the
14 barges and so-called what you testified as
15 directing the barge loadings, isn't it true that
16 Nugget had an interest in these barges and how
17 these barges were handled?
18     MR. SEWRIGHT: Same objection.
19 A  I can't --
20     THE WITNESS: Traeger, do you want to
21 switch places with her? Because if you're going
22 to be feeding her the questions, I might as well
23 be sitting across the table from you, which I'll
24 be more than happy to do.
25     MR. SEWRIGHT: Do you want to respond,

Page 168

1  Traeger?
2      MR. MACHETANZ: I'd be happy to do
3  that.
4      THE WITNESS: Let's go.
5      MR. MACHETANZ: Do you have any
6  objections to it, Counsel?
7      MR. SEWRIGHT: Let's just go off the
8  record for a moment.
9      (Short discussion off the record.)
10     MS. HO: Let's go back on the record,
11 then.
12 Q  Now, we were talking about tonnage.
13 Do you know or does anybody at North
14 Star know who determined the number of trucks
15 that would arrive at the barge?
16 A  I don't know.
17 Q  Who would know at North Star?
18 A  Probably Spencer and Nugget would know
19 how many trucks were arriving.
20 Q  Was Goodwill there? Was Goodwill
21 present at the barges when the trucks were
22 arriving?
23 A  You'll have to ask him.
24 Q  But to your knowledge you don't
25 personally know.

Page 169

1      Now, when did Spencer Rock ever tell
2  Nugget to your knowledge or to anyone at North
3  Star's knowledge that it had a contract with my
4  client, Nugget Construction Company?
5  A  I'm sorry?
6  Q  When to your knowledge or North Star's
7  knowledge did Spencer Rock ever communicate to
8  North Star that Nugget had a contract with North
9  Star?
10 A  Did -- could you please repeat the
11 question?
12     MR. MACHETANZ: You used the word
13 Spencer.
14     THE WITNESS: I'd like for her to
15 repeat the question.
16     MR. SEWRIGHT: Object to the form. Do
17 you want to rephrase, or do you want her to read
18 it?
19     (Question was read by the reporter.)
20 A  I can't answer that. I don't know the
21 answer to that question.
22 BY MS. HO:
23 Q  Okay. So there was no purported
24 communication that you know of from Spencer?
25 A  From Spencer to us that Nugget had a

43 (Pages 166 to 169)

Case No. A98-009 Civil (HRH)                                    Jeffery Bentz

                                                                Page 220

1                    WITNESS CERTIFICATE

2   JEFFREY "JEFF" BENTZ     Taken November 21, 2005

3   I hereby certify that I have read the foregoing
    deposition and accept it as true and correct,

4   with the following exceptions:

5   ================================================

6   PAGE        LINE        CORRECTION

7   44          4           "EGC" should say "AGC"

8   69          22          "Lapure" should say "Randolph"

9   101         11          "cuff off" should say "cut off"?

10  152         23          This jurisdiction

11  152         24          Kinds

12  181         21          It collected

13  182         6           By Nugget

14  185         13 & 14     "They" means Nugget

15  195         23          "Corp" should be Court

16  ___         ___         _____

17  ___         ___         _____

18

19

20

21

22   1-10-06                    [signature]
     Date                       JEFFREY BENTZ

23

24  (Use additional paper to note corrections as needed,
    signing and dating each page.)        (LK)

25

MIDNIGHT SUN COURT REPORTERS * (907) 258-7100

Exhibit 1
Page 10 of 10