Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2         FOR THE DISTRICT OF ALASKA AT ANCHORAGE
 3   UNITED STATES OF AMERICA for the
     use of NORTH STAR TERMINAL &
 4   STEVEDORE COMPANY, d/b/a NORTHERN
     STEVEDORING & HANDLING, and NORTH
 5   STAR TERMINAL & STEVEDORING COMPANY,
     d/b/a Northern Stevedoring &
 6   Handling, on its own behalf,
 7        Plaintiffs,
 8   vs.
 9   UNITED STATES OF AMERICA for the
     use of SHORESIDE PETROLEUM, INC.,
10   d/b/a Marathon Fuel Service, and
     SHORESIDE PETROLEUM, INC., d/b/a
11   Marathon Fuel Service, on its own
     behalf,
12
          Intervening Plaintiffs,
13
     and
14
     METCO, INC.,
15
          Intervening Plaintiff,
16
     vs.
17
     NUGGET CONSTRUCTION, INC.; SPENCER
18   ROCK PRODUCTS, INC.; UNITED STATES
     FIDELITY AND GUARANTY COMPANY;
19   and ROBERT A. LAPORE,
20        Defendants.
21   _____
     Case No. A98-009 CIV (HRH)
22
              DEPOSITION OF JACK GOODWILL
23
              Taken March 16, 2006
24            Commencing at 12:34 p.m.
25    Volume I - Pages 1 - 91, inclusive
```

MIDNIGHT SUN COURT REPORTERS (907) 258-7100

Exhibit 2
Page 1 of 8

```
                                                      Page 2
 1
 2
           Taken by the Defendants
 3                     at
           Oles Morrison Rinker & Baker, LLP
 4         745 West Fourth Avenue, Suite 502
           Anchorage, Alaska
 5
 6
 7  Reported by:
    Mary A. Vavrik, RMR
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
                                                      Page 3
 1        A-P-P-E-A-R-A-N-C-E-S
 2  For Plaintiff North Star Terminal & Stevedore
    Company and the witness:
 3
         Michael W. Sewright
 4       Burr, Pease & Kurtz
         810 N Street
 5       Anchorage, Alaska 99501
         (907) 276-6100
 6
    For Intervening Plaintiffs Shoreside Petroleum, Inc.
 7  and Metco, Inc.:
 8       Steven J. Shamburek
         Law Office of Steven J. Shamburek
 9       425 G Street, Suite 630
         Anchorage, Alaska 99501
10       (907) 522-5339
11  For Defendants Nugget Construction, Inc. and United
    States Fidelity and Guaranty Company:
12
         Thomas R. Krider
13       Oles Morrison Rinker & Baker, LLP
         701 Pike Street, Suite 1700
14       Seattle, Washington 98101-3930
         (206) 623-3427
15
    For Defendant United States Fidelity and Guaranty
16  Company:
17       Herbert A. Viergutz
         Barokas Martin & Tomlinson
18       1029 West 3rd Avenue, Suite 280
         Anchorage, Alaska 99501
19       (907) 276-8010
20  Also present:
21       John Smithson
         Nugget Construction, Inc.
22
    Witness:
23
         Jack Goodwill
24       P.O. Box 594
         Seward, Alaska 99664
25
```

```
                                                      Page 4
 1
    Taken by:
 2
         Mary A. Vavrik, RMR
 3
 4  BE IT KNOWN that the aforementioned deposition was
 5  taken at the time and place duly noted on the title
 6  page, before Mary A. Vavrik, Registered Merit
 7  Reporter and Notary Public within and for the State
 8  of Alaska.
 9
10
...
25
```

```
                                                      Page 5
 1            P-R-O-C-E-E-D-I-N-G-S
 2       (Exhibit No. 1 marked.)
 3            JACK GOODWILL,
 4  called as a witness herein, being first duly sworn
 5  to state the truth, the whole truth and nothing but
 6  the truth by the Notary, testified under oath as
 7  follows:
 8            EXAMINATION
 9  BY MR. KRIDER:
10  Q    Mr. Goodwill, could you please state and spell
11  your name for the record?
12  A    Jack Goodwill. J-A-C-K G-O-O-D-W-I-L-L.
13  Q    Mr. Goodwill, my name is Tom Krider. I'm an
14  attorney for Nugget and USF&G in this matter. Have
15  you ever had your deposition taken before?
16  A    Maybe once.
17  Q    Do you recall what that was for?
18  A    It was for a ship that we had loaded in Seward
19  years ago, and they didn't pay the money that they
20  owed for the services rendered, and I think at some
21  point in time they came back into the country. We
22  had a -- we seized the ship, so I had to give a
23. statement about the loading of the ship.
24            MR. SEWRIGHT: Mr. Goodwill, you are
25  going to have to make an extra effort to speak up.
```

Page 42

1 accurate?
2  A  Yes.
3  Q  In paragraph 5 of your affidavit on page 3,
4 toward the latter part of that there is a
5 discussion. It says, "Also, when I had questions
6 regarding the suitability of the wear deck on the
7 barge for the large stones being loaded, it was
8 Mr. Randolph, project manager for Nugget
9 Construction, who provided me with a letter." Do
10 you see that?
11  A  Yes.
12  Q  What made you question the wear deck?
13      MR. SEWRIGHT: Where is that again,
14 Counsel?
15      MR. KRIDER: Paragraph 5, second to
16 last sentence.
17      THE WITNESS: I didn't want to -- a
18 wear deck is a wear deck, and it's put on there for
19 normal wear and tear of loading the barge. And I
20 didn't want to put some little cracks in it or have
21 another special -- if it was going to go on to be
22 used for something else, I was just concerned; I
23 didn't want to damage that wear deck. So I wanted
24 to know what his intent was with it. He said, no,
25 that the wear deck is going to come off. It's just

Page 43

1 put on there just for loading the rock.
2 BY MR. KRIDER:
3  Q  So you had some concern that you might damage
4 the wear deck?
5  A  Yes.
6  Q  And did Mr. Randolph assure you that wasn't an
7 issue?
8  A  Yes.
9      (Exhibit No. 6 marked.)
10 BY MR. KRIDER:
11  Q  Mr. Goodwill, you have been handed what's been
12 marked as Exhibit 6, which is a Nugget Construction,
13 Inc. material contract to Spencer Rock Products.
14 I'm going to presume you have never seen this
15 before, but is that accurate on my part?
16  A  Yes.
17  Q  The reason I have handed it to you is I'd like
18 you to turn to the second page and have you read
19 Section 3.
20  A  Okay.
21  Q  The first part of it, it says, "All material
22 furnished under this agreement is to be furnished
23 F.O.B., contractor provided barge deck, Seward,
24 Alaska." Do you understand what that means?
25      MR. SEWRIGHT: Object to the form of

Page 44

1 the question, Counsel. He said -- you haven't laid
2 a foundation that he had anything to do with this
3 agreement or what it would agree.
4      MR. KRIDER: I'm asking if he
5 understands what "F.O.B., contractor provided barge
6 deck" means.
7      MR. SEWRIGHT: Continuing objection
8 because I've seen that mean many things, and I've
9 seen legal disputes over that term before, sir.
10      MR. KRIDER: I'm asking for his
11 understanding.
12      MR. SHAMBUREK: I object to the
13 extent that it calls for a legal conclusion.
14      MR. KRIDER: That's fine.
15 BY MR. KRIDER:
16  Q  Do you have an understanding of what "F.O.B.,
17 contractor...barge deck" means?
18  A  F.O.B., free on board.
19  Q  Free on board, contractor...barge deck, what's
20 your understanding of what that means in your
21 industry?
22      MR. SEWRIGHT: Continuing objections.
23      THE WITNESS: This is between Nugget
24 and Spencer.
25 BY MR. KRIDER:

Page 45

1  Q  Correct.
2  A  I don't know what their intent is there.
3  Q  Did you have an understanding during the course
4 of the project as to who was responsible for the
5 rock until it was loaded onto the barge?
6      MR. SEWRIGHT: Object to the form,
7 foundation.
8      THE WITNESS: No.
9 BY MR. KRIDER:
10  Q  You didn't know whose rock it was that you were
11 loading?
12  A  We were loading Nugget rock.
13  Q  And what gave you that impression?
14  A  It was my impression that this whole operation
15 was a Nugget Construction project. I mean,
16 that's -- everything was done per Nugget.
17  Q  Who was your contract with for loading of the
18 barge?
19      MR. SEWRIGHT: Object to the form of
20 the question, calls for legal conclusion.
21 BY MR. KRIDER:
22  Q  Who did you understand your contract to be with
23 for loading of the barge in 1997 while the work was
24 being performed?
25      MR. SEWRIGHT: Same objection.

Page 46

1  THE WITNESS: I always thought it was
2  Spencer and Nugget.
3  BY MR. KRIDER:
4  Q   Why would you think it was Nugget?
5  A   Because they were the ones that were directing
6  everything. They were the ones that told us when to
7  load the barge, how much on the barge, what type of
8  rock on the barge, when to expect the barge back.
9  Randy was the -- was the guy in charge. He told me
10 how he wanted the invoices done. I mean, he was --
11 he didn't let one thing go by him. He was --
12 Q   And who were those invoices sent to,
13 Mr. Goodwill?
14         MR. SEWRIGHT: Object to the form of
15 the question. Which invoices?
16 BY MR. KRIDER:
17 Q   Invoices for this project.
18 A   They were sent to -- they were supposedly sent
19 to Nugget Construction and -- Nugget Construction
20 barge and/or owner, Spencer Rock. That's how they
21 were supposed to be sent.
22 Q   In your declaration -- or your affidavit on
23 page 2 on paragraph 4, it says, the last full
24 sentence at the bottom of the page, "Mr. LaPore
25 requested that Northern Stevedore & Handling load

Page 47

1  the rock upon the barge which Nugget would be
2  providing starting in the springtime." Do you see
3  that?
4  A   Yes.
5  Q   Did you understand that it was Mr. LaPore at
6  Spencer who made the request for you to perform this
7  work?
8          MR. SEWRIGHT: Mr. Krider, where are
9  you? I haven't caught up yet.
10         MR. KRIDER: Page 2, paragraph 4.
11         MR. SEWRIGHT: What's the question,
12 again?
13         MR. KRIDER: Could you please read
14 back the question?
15    (The requested record was read.)
16         MR. SEWRIGHT: Object to the form of
17 the question, and particularly unless you time it
18 to -- object to the form of the question.
19 BY MR. KRIDER:
20 Q   Was it your understanding that Mr. LaPore
21 requested that you perform this work?
22         MR. SEWRIGHT: I'm going to object to
23 the form of the question as to timing. There is a
24 reference to mid-August here, 1996. Then later he
25 said LaPore called him. And that's -- it's in the

Page 48

1  context of that call that the rest of this sentence
2  is here, that call that Nugget had gotten the job.
3         THE WITNESS: To me you are taking
4  that sentence out of context. I mean, my intent in
5  making this statement was Bob called me and said
6  Nugget was awarded the job. We got the work and we
7  are going to have you put that rock on the barge
8  that Nugget is going to provide.
9  BY MR. KRIDER:
10 Q   Who was going to have you do that?
11 A   Nugget was.
12 Q   Why was Mr. LaPore calling on behalf of Nugget,
13 if you know?
14 A   Just like I said there, he called and said --
15 informed me that Nugget Construction had obtained
16 the contract. He was very happy. So was I.
17 Q   And who did you believe you were working for at
18 the time you loaded those barges?
19 A   Nugget.
20 Q   And why is that?
21 A   Because Nugget was in charge. They were the
22 people that were there. They -- they were the ones
23 that were telling us what to do, what type of rock,
24 how much rock.
25 Q   Did Nugget ever pay you for any of those

Page 49

1  loadings?
2  A   I'm not supposed to give a smart answer, but --
3  Q   Strike that. Did Nugget ever promise to pay
4  you for any of those loadings?
5  A   No.
6         MR. SEWRIGHT: Object to the form of
7  the question.
8  BY MR. KRIDER:
9  Q   If your contract was with Nugget, why was there
10 a credit application sent to Spencer Rock Products?
11        MR. SEWRIGHT: Object to the form.
12        THE WITNESS: That was done in
13 Anchorage. I mean, I didn't -- I did not do that.
14 BY MR. KRIDER:
15 Q   So who told Anchorage that Mr. LaPore required
16 a credit report -- a credit application?
17        MR. SEWRIGHT: Object to the form,
18 foundation.
19        THE WITNESS: Of course, I informed
20 Anchorage that we were going to load rock from the
21 Spencer quarry to a Nugget Construction barge. They
22 took it from there to have Bob fill out the
23 paperwork, evidently.
24 BY MR. KRIDER:
25 Q   And you never told them you would be working on

Page 54

1  A  Yep. Yes, sir, I did. I think that's what it
2  was.
3  Q  Were those letters that you sent to the Corps
4  of Engineers intending to be honest statements of
5  your position on this project?
6         MR. SEWRIGHT: Object to the form of
7  the question.
8         THE WITNESS: Yes.
9  BY MR. KRIDER:
10 Q  So please explain for me, then, if you turn
11 back to Exhibit 7 at the back of your affidavit, why
12 it is that in the first sentence of your letter
13 dated August 4, 1997 you told the Corps of Engineers
14 that "Northern Stevedoring has been working for
15 Spencer Rock Products, Inc. from May 1 to June 26,
16 1997"?
17        MR. SEWRIGHT: Let's let the witness
18 read the whole letter. Go ahead and take time, sir,
19 to read the whole letter.
20        THE WITNESS: Yeah, I read that. I
21 should have made mention of Nugget at the same time.
22 BY MR. KRIDER:
23 Q  Well, now, if you believed you were working for
24 Nugget, why did you tell the Army Corps of Engineers
25 that you had been working for Spencer Rock Products?

Page 55

1  A  He's the one that initially set it up.
2  Spencer -- what I'm saying is I probably should have
3  said in that letter working for Spencer and Nugget.
4  Q  So Mr. Goodwill, did you ever ask Bob LaPore
5  for payment on your invoices?
6  A  Yes.
7  Q  And if you believe you were working for Nugget,
8  why did you ask Mr. LaPore for payment on your
9  invoices?
10 A  That's where Randy told me to send the bill to.
11 Q  But if you believe you were working for Nugget,
12 why were you asking Mr. LaPore to pay your invoices?
13        MR. SEWRIGHT: Asked and answered.
14        MR. KRIDER: I don't believe he did
15 answer it.
16        MR. SEWRIGHT: He did answer it,
17 Counsel. You want to argue about it, we can, but he
18 did answer it. Asked and answered. He said Randy
19 Randolph said to send the bills to Spencer.
20        MR. KRIDER: That doesn't explain why
21 he then asked Spencer for payment.
22        MR. SEWRIGHT: Counsel, it does to
23 me.
24        THE WITNESS: Randy said that's how
25 to direct the bills for us to get paid, so that's

Page 56

1  what I did. And once the bills were sent, we didn't
2  get paid. So I figured it must be -- need to be a
3  change here or something, but a lot of work taking
4  place with no payment being received from anyone.
5  BY MR. KRIDER:
6  Q  And who is the first person you asked for
7  payment, Mr. Randolph or Mr. LaPore?
8  A  I first asked Randy how he wanted the bills to
9  be directed, and that's -- he said that's what he
10 wanted done. And so --
11 Q  But, sir, my question was: Who did you first
12 ask for payment from, Mr. LaPore or Mr. Randolph?
13 A  Mr. LaPore.
14 Q  And do you recall approximately when you had
15 the first conversation with Mr. Randolph about
16 payment?
17 A  Not offhand. I'm trying to think. I know we
18 had done work because we did, like, three barges in
19 one month, so -- so normally you had to give them
20 like 30 days, anyway. So I don't recall the actual
21 date, but I -- I know it would more than likely have
22 been in June sometime, I think. But I'm not
23 certain.
24 Q  Do you know if it was before or after you had
25 performed your last loading of the barges?

Page 57

1  A  Like I say, I'm not -- not sure on that time
2  frame. It all went so fast. We did three barges in
3  one month.
4  Q  But your recollection is that it wouldn't have
5  been prior to the first of June?
6  A  I wouldn't think so.
7  Q  Now, did Mr. Randolph ever tell you that you
8  would be paid by Nugget?
9  A  Not directly. He said that -- send your bills
10 to Spencer Rock and get your payment.
11 Q  And who will get your payment?
12 A  We will get paid.
13 Q  By sending your invoices to Spencer?
14 A  Yeah.
15 Q  Did he ever tell you that Nugget would pay you?
16 A  He just said we'd get paid.
17 Q  Did he ever tell you whether Nugget would pay
18 you?
19 A  He didn't make reference to that.
20        MR. SEWRIGHT: Object to the form of
21 the question.
22 BY MR. KRIDER:
23 Q  On page 5, paragraph 9, in the middle of the
24 paragraph you say, "I understood it was a federal
25 project and had no doubt Northern Stevedoring would

Page 58

1  be paid, if necessary from the payment bond, because
2  I was dealing directly with the owner of Spencer
3  Rock and the product manager for Nugget
4  Construction." Do you see that?
5  A  Yes, sir.
6  Q  Other than your knowledge that it was a federal
7  job, was there any other reason that you had for
8  believing that Northern Stevedore would be paid?
9       MR. SEWRIGHT: Object to the form of
10 the question.
11      THE WITNESS: What are you saying,
12 again?
13 BY MR. KRIDER:
14 Q  You say here that you had no doubt you would be
15 paid because there was a bond. Did you have any
16 other assurances from anybody else that you would be
17 paid, other than the fact that the bond was in
18 existence?
19 A  I'm not --
20      MR. SEWRIGHT: Asked and answered,
21 and continuing objection to form.
22 BY MR. KRIDER:
23 Q  You can answer the question.
24 A  I think my train of thought at the time was
25 that it was a federal job, and I was kind of under

Page 59

1  the impression -- I'm not a lawyer or anything, but
2  I was -- being as it was a federal job, I always
3  thought that it was -- they came in and made sure
4  all the -- the little guys were paid before they
5  made the final payment to the main -- the main
6  worker.
7  Q  And did you believe that Northern Stevedore was
8  covered under that bond for that purpose?
9  A  Yes, sir.
10 Q  Did you feel you had any other protection for
11 assuring that you would get paid?
12      MR. SEWRIGHT: Object to the form of
13 the question.
14      THE WITNESS: I never gave it any
15 other thought. I mean, I'd put my time in for our
16 company and go home at night.
17 BY MR. KRIDER:
18 Q  Down in paragraph 10, in the middle of the
19 paragraph there is a sentence that says, "He
20 acknowledged that the money was due Northern
21 Stevedoring, he had no quarrel there, but said he
22 was unable to pay." Do you see that?
23 A  Yes.
24 Q  Did Mr. LaPore acknowledge to you that he was
25 responsible to pay you the sums you had invoiced?

Page 60

1       MR. SEWRIGHT: Object to the form of
2  the question.
3       THE WITNESS: Well, that's when it
4  kind of all came out that Nugget hadn't paid him is
5  what he was saying, so he couldn't pay us.
6  BY MR. KRIDER:
7  Q  But did he acknowledge that he was responsible
8  for paying you?
9       MR. SEWRIGHT: Continuing objection,
10 calls for a legal conclusion.
11      THE WITNESS: I don't know. Alls I
12 wanted was the money. We wasn't getting any, and it
13 was getting pretty outstanding, I mean, months into
14 it.
15 BY MR. KRIDER:
16 Q  Did Mr. LaPore ever indicate to you that he
17 owed you the money?
18      MR. SEWRIGHT: Continuing objection.
19      THE WITNESS: I don't recall if it
20 was his actual words or --
21 BY MR. KRIDER:
22 Q  Did he ever tell you words to the same effect?
23 A  Alls I recall is that he said he wasn't --
24 hasn't received his funds yet. He couldn't pay us
25 until he received his funding.

Page 61

1  Q  In your mind, did that acknowledge that he was
2  responsible to pay you?
3  A  Not necessarily.
4  Q  What else would it have meant, in your view?
5  A  It means the money was forthcoming either from
6  Nugget or the only other player there.
7  Q  But it was your impression that Mr. LaPore
8  intended to be the one to pay you?
9  A  That's where we sent the bill.
10 Q  So you expected to be paid by Spencer?
11      MR. SEWRIGHT: Object to the form of
12 the question.
13      THE WITNESS: You know, that's --
14 that's the way Randy wanted it set up, and that's
15 what we did.
16 BY MR. KRIDER:
17 Q  Did you expect to be paid by Spencer?
18 A  I just expected to be paid.
19 Q  You had no expectation as to who you were going
20 to get that money from?
21      MR. SEWRIGHT: Object to the form.
22      THE WITNESS: I figured the money was
23 going to come from Nugget.
24 BY MR. KRIDER:
25 Q  Directly or through Spencer?

16 (Pages 58 to 61)

MIDNIGHT SUN COURT REPORTERS (907) 258-7100

Exhibit 2
Page 6 of 8

```
 1              C-E-R-T-I-F-I-C-A-T-E
 2         I hereby certify that I have read the
 3    foregoing transcript and accept it as true and
 4    correct, with the following exceptions:
 5    =================================================
 6    PAGE        LINE        CORRECTION
 7    24          12          that in there? I don't recall.
 8    25          22          a should be &
 9    25          25          close enough
10    38          20          no, over the phone no tape recording
11    38          22          no
12    44          24          and Spencer?
13    46          20          barge and/or owner, c/o Spencer
14                            Rock. That's how they
15    49          5           no, not in those words
16    52          7    change To both, although it seemed to be really
17                     to    for Nugget when loading the barges.
18
      April 26, 2006              Jack Goodwill
19    Date                        JACK GOODWILL
20    (March 16, 2006)
21
              (Use additional paper to note corrections
22    as needed, signing and dating each page.)
      (MV)
23
24
25
```

RECEIVED APR 27 2006 BURR, PEASE & KURTZ

```
 1                C-E-R-T-I-F-I-C-A-T-E
 2          I hereby certify that I have read the
 3     foregoing transcript and accept it as true and
 4     correct, with the following exceptions:
 5     ===================================================
 6     PAGE       LINE         CORRECTION
 7     58         3            change product to project
 8     79         8            change That's true to I don't recall
 9     82         23           change to No there are other items as stated in my
10     < through >              previous testimony and affidavits.
11     83         5
12     84         4            change to Spencer Rock & Nugget Construction on the
13                             second line.
14     84         5            change to I think they would be sent in that fashion
15     84         9            change to I can't say, the fact is he was in charge
16                             and we loaded the barges per his
17                             instructions.
18
       April 26, 2006                    [signature] Jack Goodwill
19     Date                              JACK GOODWILL
20     (March 16, 2006)
21
              (Use additional paper to note corrections
22     as needed, signing and dating each page.)
       (MV)
23
24
25
```

MIDNIGHT SUN COURT REPORTERS (907) 258-7100

Exhibit 2
Page 8 of 8