Steven J. Shamburek
Alaska Bar No. 8606063
LAW OFFICE OF STEVEN J. SHAMBUREK
425 G Street, Suite 630
Anchorage, Alaska 99501
(907) 522-5339 Direct
(907) 522-5393 Fax

Attorney for Plaintiffs
Shoreside Petroleum, Inc.,
d/b/a Marathon Fuel Service
and Metco, Inc.

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA for the use of NORTH STAR TERMINAL & STEVEDORE COMPANY, d/b/a Northern Stevedoring & Handling, and NORTH STAR TERMINAL & STEVEDORE COMPANY, d/b/a Northern Stevedoring & Handling, on its own behalf, <br><br>        Plaintiffs, <br><br>    and <br><br> UNITED STATES OF AMERICA for the use of SHORESIDE PETROLEUM, INC., d/b/a Marathon Fuel Service, and SHORESIDE PETROLEUM, INC., d/b/a Marathon Fuel Service, on its own behalf, <br><br>        Intervening Plaintiffs, <br><br>    and <br><br> METCO, INC., <br><br>        Intervening Plaintiff, <br><br>    vs. <br><br> NUGGET CONSTRUCTION, INC.; SPENCER ROCK PRODUCTS, INC.; UNITED STATES FIDELITY AND GUARANTY COMPANY; and ROBERT A. LAPORE, <br><br>        Defendants. <br> _____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>**SHORESIDE'S AND METCO'S**<br>)<br>**OPPOSITION TO NUGGET'S**<br>)<br>**MOTIONS REGARDING**<br>)<br>**STATE LAW CLAIMS**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. A98-0009-CV (HRH)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

COMES NOW Shoreside Petroleum, Inc., d/b/a Marathon Fuel Service ("Shoreside") and Metco, Inc. ("Metco"), by and through counsel, and file this Opposition To Nugget's Motions Regarding State Law Claims.[1]  This memorandum also supports Shoreside's and Metco's Motion For Summary Judgment Against Nugget.[2]

## Introduction

When a bank robber enters a bank to withdraw funds, he does not make "an oral or written promise to be contractually bound" and does not exhibit "any conduct to manifest the intent to be contractually bound."  Messrs. Randolph and Poynor affiliated with Trecon/Spencer Rock/Nugget Construction working in concert with Mr. Lukjanowicz with Oles Morrison embarked on a campaign starting from the bid protest with Herndon and Thompson in 1996 to deceive the three claimants (in addition to Spencer Rock and Chugach Rock Corporation).  The distilled essence of Nugget's defense is that it did a cunning job creating a paper trail[3] and implementing the fraud[4] and thus it should be relieved of its obligations to pay the three claimants.  The three claimants disagree and seek payment for the goods they provided and the services they performed.  The claims are supported by the Miller

---

[1]    This pleading addresses the motions and memoranda at Docket Entry Nos. 476, 477, 480 and 481.

[2]    Docket Entry No. 507.

[3]    Nugget asserts three times through Mr. Randolph's most recent affidavit that it was careful not to make "an oral or written promise to be contractually bound."

[4]    Nugget asserts three times through Mr. Randolph's most recent affidavit that it was careful not to exhibit "any conduct to manifest the intent to be contractually bound."

Act and by state law and are grounded in both law and equity.

## General Discussion

Nugget executed a contract worth about $3,400,000.00 with the Corps of Engineers to handle the Homer Project, but Nugget did not have the resources to undertake the work.[5]  Nugget required rock that had to be loaded in and transported from Seward to Homer to fulfill the contract.  Mr. John Dennis Stacey is the President of Chugach Rock Corporation which "managed the business activities for the owners of the Spencer Glacier Pit and Quarry mineral materials permit from 1991 - 1997."[6]  Mr. Stacey notes in his recent affidavit that Nugget and Messrs. Randolph and Poynor had been trying to take over the Whittier/Spencer Quarry since at least 1994.  Mr. Stacey specifically described their efforts as a "hostile takeover attempt."[7]  Nugget denied payment for Chugach Rock Corporation's claim based on a Tenth Circuit decision.[8]  Mr. Robert LaPore with Spencer Rock notes in his detailed six page affidavit dated April 4, 2002 that Nugget

---

[5]    Nugget contends that the Homer Project was not profitable.  The taxpayers of the United States of America paid Nugget more than $3,400,000.00 for the project.  Nugget's primary job was to act as project manager and paymaster.  Nugget refused to pay Shoreside, Metco, North Star, Chugach Rock Corporation and underpaid Spencer Rock.  By retaining the funds, Nugget should have made a tremendous windfall profit on the project.  However, the attorney's fees it expends as part of its business plan to fight every claimant impacts its bottom line negatively.  Nugget's incompetence and dishonesty explain its performance.  Whether the Homer Project was profitable to Nugget was outside the control of the claimants and is irrelevant to the resolution of their claims.

[6]    Docket Entry No. 508.

[7]    Id. at p. 2.

[8]    Id. at Exh. 2.

had taken over control of the Quarry by April, 1997.[9]

According to Nugget, it took over control of the Spencer Quarry by March, 1997, which was weeks before any of the three claimants first provided goods or performed services to and for the benefit of the Homer Project. "Spencer Rock" was little more than a subsidiary of Nugget and a mailing address for the invoices. "Spencer Rock" was the paper parapet for the fraud perpetrated by Nugget on the Corps, the claimants and others. Nugget destroyed Spencer Rock and debilitated Chugach Rock Corporation, the operator, in the process.[10]

No one disputes that Nugget had no fuel and required Shoreside's timely and conforming deliveries of fuel throughout the project. Without the Shoreside fuel, no truck or barge would have moved. Nugget could not have performed without the timely and diligent services of Metco and North Star Stevedoring. The claimants were unaware that while they were providing goods and performing services, Nugget was preparing documents and engaging in conduct to cheat them. This court should find and hold as it has previously found and held that Nugget's behavior violates the Miller Act and the laws of the state of Alaska.

The Miller Act does not preempt state law causes of action and rather encourages state law to supplement and fulfill the

---

[9]     Docket Entry No. 284.

[10]    Nugget misrepresents the claimants' arguments regarding the fraudulent activity. Spencer was not involved in any fraudulent activity; Spencer and Mr. LaPore were victims. Spencer's bank was not involved because it merely foreclosed on its security interest and promissory note when Spencer fell behind on its payments as a result of Nugget's refusal to pay Spencer. Only Nugget and USF&G have breached their duties.

purposes of the Act.  K-W Industries v. National Surety Corp.,
855 F.2d 640, 643 (9th Cir. 1988).  Most experienced counsel
settle these Miller Act cases with an exchange of letters.
Nugget's and USF&G's actions and inaction required the parties to
file complaints to be taken seriously by Nugget and USF&G.[11]
Shoreside asserted separate state law causes of action in its
initial complaint in 1998,[12] but no party had any reason to bring
claims for bad faith against Nugget and USF&G at the time.  Most
experienced counsel who wait to see whether a claimant timely
files a complaint nonetheless settle these Miller Act cases soon
after a timely filing.  Nugget and USF&G refused even to discuss
settlement.  The claimants learned more about the bigger picture
despite Nugget's and USF&G's efforts to maintain secrecy.  In the
Amended Complaints, the claimants carefully set forth the state
law causes of action in more detail and note that jurisdiction is
grounded in the supplemental jurisdiction of this court.  The
state law claims are critical at this time because Nugget focused
its efforts and energy in 1996 and 1997 on circumventing the
obligations of the Miller Act and failed to concoct defenses to
the applicable state law causes of action.  Nugget, Shoreside,
Metco and North Star are all corporations in good standing in the
state of Alaska who undertook all the work in the state of
Alaska.  These parties are subject to and these causes of action
arise under the laws of the state of Alaska.

---

[11]    Chugach Rock Corporation asserted claims against Nugget and
USF&G but did not file a complaint.

[12]    Docket Entry No. 9.

I.  Factual Discussion

Nugget's Activities And Inactivity

No one disputes that Nugget's counsel drafted the written contracts with Spencer Rock.  The "Material Contract" and "Support Agreement" should be construed against the drafter (Nugget) and in favor of the other party (Spencer Rock) and the three claimants.  No ones disputes that Nugget never discussed the terms of the "Support Agreement" with the three claimants. Nugget kept the "Support Agreement" a secret from the claimants and then produced it to justify its failure to pay them.  Nugget and USF&G could have required Spencer Rock to obtain and provide a payment bond to answer for the claims of the claimants which is standard practice in the construction industry.  Any person providing goods to or performing services for a federal project reasonably understands that there is a bond to provide for prompt payment of claims.  No one disputes that all three claimants relied on the existence of a payment bond in providing goods and performing services.  Nugget never conveyed its failure to require Spencer to obtain a payment bond to the three claimants. Nugget never conveyed to the claimants that it would not provide enough funds to Spencer to make payments to the claimants. Nugget placed all the claimants in a "pay when and if paid" situation and then did not pay Spencer.  Nugget knew or should have known that the claimants were acting on the express assumption that Nugget would pay Spencer so that Spencer could pay the claimants.  In addition, Nugget was in a position to make checks co-payable to both Spencer and the specific claimants

which is standard practice in the construction industry. However, Nugget never intended to pay or to secure payment for the claimants and thus did not follow this simple standard business practice. Nugget displayed a pattern and practice of negligent and intentional conduct that injured the three claimants.

The interpretation of the contract between Nugget and the Corps of Engineers, the owner of the project and the agency charged with its administration, is entitled to deference. Pursuant to an express material provision in the contract, Paragraph c.3 of Contract Clause I.55, Nugget was precluded from requesting progress payments from the Corps if Nugget withheld or intended to withhold payment from a supplier or subcontractor. The Corps timely reminded Nugget of this clear written requirement in the contract.  The Corps states in a letter to Nugget dated August 16, 1997 (RRO/33) as follows:

> Attached is a letter we received from METCO, Incorporated, dated July 31, 1997, regarding non-payment for work that they have conducted for the above project.  METCO states that they have not been paid for loading rock from the rail cars to the barges in Seward.
>
> . . .
>
> METCO's letter claims that Spencer Quarry has not paid them because Spencer Quarry has not received payment from Nugget Construction.
>
> . . .
>
> We remind you that under Contract Clause I.55, <u>Payments Under Fixed-Price Construction Contracts</u>, Paragraph c.3 states: "This request for progress payment does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract."

Nugget disregarded this express contractual duty and instead requested and obtained progress payments from the Corps and yet retained all the funds.

The Corps noted that it regarded Nugget as directly responsible for the payments to the subcontractors once Nugget took over control of the Spencer Quarry. The Corps states in a letter to Nugget dated August 26, 1997 (RRO/40) as follows:

> We acknowledge receipt of [Nugget's] Serial Letter 611-19, dated August 6, 1997 and [Nugget's] Serial Letter 611-21, dated August 11, 1997. We do not necessarily agree that Spencer Rock Products is only a "vendor" for Miller Act purposes.
>
> Based on the supporting costs that you outlined in Serial Letter 611-21, it appears that Nugget Construction has assumed full responsibility for operations at Spencer Quarry for the subject project. Therefore, as primary operator at Spencer Quarry, we believe Nugget Construction is responsible for prompt payment to suppliers and subcontractors who contracted with Spencer Rock Products on this project.
>
> We request that you clarify what support and project management services Nugget Construction provided to Spencer Rock Products to account for the support cost that you have shown in Serial Letter 611-21. Further, please provide information showing what work, if any, has been performed by Spencer Rock Products under its subcontract with Nugget Construction.

Nugget states to the Corps in Nugget's Serial Letter 611-21 that Nugget was in control of the Spencer Quarry. The Corps charges Nugget with the responsibility to make prompt payment for goods provided and services performed after the date that Nugget took over the Quarry, namely March, 1997. This letter also reminds Nugget that it must make "prompt payment" due the claimants. This duty is grounded in the Prompt Pay Act discussed in other pleadings. In addition, the Corps notes that the contract

requires Nugget to pay all "suppliers and subcontractors" not the ones that Nugget opts to pay.  Nugget opted not to pay any of these "suppliers and subcontractors" and instead, with the assistance of Mr. Lukjanowicz, continued its effort to create a paper parapet.  Nugget did not do anything to pay the claimants or to provide that the claimants would be paid for their goods and services and instead did everything to defeat payment and concoct a defense.

<u>The Claimants' Activities</u>

<u>A. Shoreside's Activities</u>

Nugget admits that the project was impossible or at least much more expensive without the fuel provided by Shoreside. Nugget and Shoreside had entered into a prior written agreement requiring Shoreside to provide fuel to or for the benefit of Nugget.  The contract includes a provision for attorney's fees and interest.  Nugget admits that Shoreside provided the fuel in a timely and conforming manner.  Shoreside could look directly to Nugget and/or to Spencer Rock and then to the bond if necessary for payment.

Shoreside had written contracts with both Spencer Rock and Nugget to provide for their fuel requirements.  Docket Entry No. 482, Lechner Deposition, p. 9, ll. 24 – 25; p. 10, ll. 21 – 22.[13] Shoreside looked to both entities for payment because the fuel was used in the completion of the work on the one Homer Project undertaken by both of them.  Nugget desperately attempts to

---

[13]    The references are to the page numbers in the deposition itself.

defeat the Shoreside claim by contending that there was a credit limit on Spencer Rock that was less than the amount of fuel delivered for the use and benefit of the Homer Project. In April 25, 1995, Shoreside wrote an in-house document that the "amount of approved credit" on that date was $20,000.00.[14] The initial approved credit for a new customer does not preclude Shoreside from delivering more fuel to a customer. In addition, the amount of fuel delivered to the Homer Project does appear to have exceeded the approved credit of Nugget. Mr. Lechner testified that the approved credit amounts are guidelines. Nugget desperately needed the fuel.[15] Mr. Lechner states:

Q    Let's turn now to the Homer Spit project itself. Tell me how Shoreside became involved in that project.

A    We became involved in the project when we were contacted to supply fuel for the project from Spencer Rock and Nugget Construction. We provided fuel and

---

[14]    Shoreside delivered fuel for the use of the Homer Project and billed $24,028.73; Nugget paid Spencer; Spencer paid Shoreside. After that delivery, Nugget took over control of the Quarry and used the fuel. Shoreside then delivered fuel for the use of the Homer Project and billed $21,503.30; Nugget refused to pay Spencer; Spencer could not pay Shoreside. The Project still required fuel. Shoreside then delivered fuel for the use of the Homer Project and billed $21,278.53; Nugget refused to pay Spencer; Spencer could not pay Shoreside. Nugget's arguments are a desperate and strained attack on one of the critical subcontractors.

[15]    Nugget suggested that Shoreside could have reclaimed the fuel. Nugget does business by litigation. Shoreside promotes business and supports other businesses even though it does not desire to finance fuel purchases. Shoreside could not reclaim the fuel at any time because Shoreside could not state in good faith that it was in danger of non-payment. Shoreside could look to Nugget, to Spencer and to the bond for payment. Reclaiming the fuel would have brought the entire project to a halt.

lube for the Spencer pit rock quarry operation and also
provided fuel for the tug boats that Nugget was using
to haul the rock from Seward to Homer.

Q    Let's break those down separately.  Who contacted
you about providing fuel for - initially - for the
Spencer pit?

A    Well, initially Bob LaPore was one of the
contacts.  And then there was also an individual by the
name of Randy Randolph that I spoke with also.  Both
those individuals I talked with.

Q    For the Spencer pit?

A    Yeah, that's correct.

Q    Who did you understand at the time - when did
these contacts take place?

A    For this project - this would be the winter of
'96-97 - it would be either - maybe that fall.  I don't
know specifically the exact time, but it would be
someplace in that window of time of winter of '96-97.

Q    And at the time of this contact, who did you
understand you would be providing fuel to at the
Spencer pit?

A    For the Spencer pit project, Spencer Rock was
supposedly going to be doing rock work out there at the
quarry, and that's who we'd be delivering the fuel to
for this initial part of the project.

Q    Who did you understand would be paying for the
fuel delivered at the Spencer Rock quarry?

11

A     At the time, Spencer Rock was the company that we were billing the invoices to.   But we did know that Nugget Construction was the general contractor.

Q     During the initial contact for the delivery of rock – or the delivery of fuel to the quarry, did Mr. LaPore or Mr. Randolph ever indicate that Nugget was going to guarantee payment of the billings to Spencer Rock for the fuel?

A     The only thing that was mentioned about Nugget's payment was when Bob LaPore said he was getting paid by Nugget to pay for his – for the portion of fuel – he'd be paying directly – being paid directly by Nugget.

Q     So you understood that you would be supplying fuel to Spencer, who would be supplying rock to Nugget?

A     Well, we didn't feel – as supplier, we felt he was a contractor, a subcontractor for the project, and that it was a bonded project.

Q     That was significant to you?

A     Maybe not as much at the time as it is now, but we definitely recognized that any job, especially a federal job, that they are bonded projects.

Q     And was it fair to say that, when you learned that this was – at the time you understood this was a federal project, did that have any significance on your decision to extend credit at that time or is that something that's simply become more important to you once Spencer ceased to pay your bills?

> A    Both companies, Nugget and Spencer, both had
> credit at the time before this project, so that wasn't
> a decision.    That didn't play any part, you know, in
> the decision.

Id. at p. 16, l. 3 – p. 18, l. 15.  Mr. Lechner also states:

> A    Our agreement was with – Spencer Rock was the one
> we were providing fuel to; that is correct.  We were
> still looking – we view the project as a bonded job.
> It's a federal project.  So we still know that there is
> still some coverage, as well.

Id. at p. 24, ll. 3 – 7.    Mr. Lechner also discusses Mr.
Randolph's activities as follows:

> A    I spoke with Randy Randolph.  And I guess that was
> still – the unclear question at the time was who he was
> representing, was whether he was with Spencer or
> whether he was with Nugget.  Randy was the one I had
> the conversation with in particular to both of those
> contacts.

Id. at p. 25, ll. 2 – 6.    Mr. Lechner also notes his
conversations with Mr. LaPore as follows:

> A    I know there were some conversations.    I
> personally had a couple conversations with Bob LaPore
> and our accounting staff as well – that we had several
> discussions on getting payment.  And at the time, Bob
> LaPore said he hadn't been paid by Nugget and was
> awaiting payment from Nugget.

Id. at p. 32, ll. 6 – 11.  Mr. Lechner notes Mr. Randolph's dual representation of both Spencer and Nugget as follows:

> A    You know, they actually may have been some contacts with Nugget in and around that time.  I know I had, like I mentioned, several conversations with Randy Randolph, who I didn't know was working with Nugget until he actually provided me that he was specifically with Nugget.    I thought he was Spencer Rock involvement.   But he was essentially stepping in as a Nugget representative.   And I had several conversations with him, and he was speaking poorly about Spencer and
>
> Q    Did that cause you concern, that he was speaking poorly about Spencer?   Was he telling you that he had concerns about Spencer's performance?
>
> A    He was – he had some specific comments about Bob LaPore, but I can't recall exactly what they were.  But since he was a partner in Spencer, I couldn't understand why.
>
> Q    How did you know he was a partner in Spencer?
>
> A    Well, this is what I was told by Bob LaPore.
>
> Q    Okay.   You were told that by Bob LaPore.  When were you told that?
>
> A    I don't have that exact time.  And that was just in conversation.   I don't know that's a fact, but that's what I was told, that he was a partner.
>
> Q    Did you ever ask Randy if he was a partner of Spencer Rock Products?

A    No, I didn't.

Id. at p. 38, l. 1 – p. 39, l. 1.  He discusses Nugget's involvement as follows:

Q    Now, when you agreed to provide the next rail car in May of '97, did the fact that this was a bonded job have any influence on that decision?

A    We definitely had some comfort that Nugget was the general contractor, and that it was a bonded job.

Q    What comfort did the -- I understand you receiving comfort from the fact that it was a bonded job. What comfort did you take from the fact that Nugget was the general contractor on the project?

A    We had some prior business dealings with them before, and we hadn't had any problems with them.

Q    They seemed like a stand-up company to you?

A    We didn't have any problems with them, yeah, from the one job we did prior to that.

Id. at p. 42, ll. 3 – 16.  Mr. Lechner also addressed the following areas:

Q    You sent a letter to the Army Corps of Engineers and stated that Shoreside hadn't been paid for the product, correct?

A    That is correct.

Q    And you received a response or a copy of a response from the Corps of Engineers to Nugget?

A    That is correct.

15

Q    Were you aware from that letter that the contract between Nugget and the Corps of Engineers included a provision that Nugget not ask for any future progress payments unless all suppliers and subcontractors were paid?

A    That is correct.

Q    And are you aware if Nugget made requests for progress payments after that letter?

MR. MACHETANZ:  Leading.  Foundation.

THE WITNESS:  Meaning that –

BY MR. SHAMBUREK:

Q    They requested payments from the Corps of Engineers after you had made demand for payment?

MR. MACHETANZ:  Same objection.

BY MR. SHAMBUREK:

Q    You can answer.

A    Could you repeat the first –

Q    Is it your understanding that Shoreside sent a letter to the Corps of Engineers –

A    That is correct.

Q    -- stating that they hadn't been paid?

A    That's correct.

Q    Are you aware if Nugget Construction made requests for progress payments to the Corps of Engineers after that time?

A    Yes, they did.

Q    And they didn't make - Nugget didn't make a payment to - or all the payments to the suppliers and subcontractors?

MR. MACHETANZ:  Leading.  Foundation.

THE WITNESS:  They didn't make a payment to us or Spencer Rock.

BY MR. SHAMBUREK:

Q    Do you view that as an act of bad faith?

A    Yes, I do.

Q    And were you aware from your review of the pleadings if the defendants challenged whether or not this was a federal project?

A    Yes.

Q    Were you aware that this was a federal project?

A    Yes, I was.

Q    And do you view that as an act of bad faith?

A    Yes, I do.

Q    And is it your understanding that Shoreside made a number of attempts to settle this case?

A    Many.  Yes, I'm -

MR. MACHETANZ:  Leading.  And also irrelevant.

THE WITNESS:  Yes, I was aware.

BY MR. SHAMBUREK:

Q    And are you aware if USF&G actually ever initiated any settlement conferences with - settlement conferences with Shoreside?

MR. MACHETANZ:  Same objections.

17

THE WITNESS:  I'm not aware of any.

BY MR. SHAMBUREK:

Q    Now, have you seen a business card of Randy Randolph that states that he was affiliated with Spencer Rock Products?

A    I had seen one, yes.

Q    And had you seen a business card that indicated that Randy Randolph was affiliated with Nugget Construction Company?

A    Yes.

Q    Did you ever receive any communication from Randy Randolph when he clarified when he was working for one company versus another?

A    Yes.

Q    When did he communicate with you?

A    He communicated to me in the spring of this project and also later into summer.

Q    And what was the nature of his communication?

A    It was regarding fueling for equipment for Spencer and for the whole entire project.

Q    Did he ever indicate that he ceased working for Spencer Rock Products?

A    There is no indication given to us that he was.

Q    And you had provided fuel to Nugget Construction prior to the spring of 1997?

A    That is correct.

Q    And that was pursuant to a credit application that
Nugget Construction had filled out and provided to
Shoreside Petroleum?

A    That is correct.

Q    And you hadn't had any problem with payment from
Nugget at that time?

A    No, we hadn't.

Q    You had dealt with an entity previously called
Trecon (ph); isn't that correct?

A    Yes, that's correct.

Q    And is it your understanding that Craig Pointer
[Greg Poynor - corrected by deponent] had an
affiliation with Trecon?

A    That is correct.

MR. MACHETANZ:  Leading.

BY MR. SHAMBUREK:

Q    Are you aware if - well, what was Trecon's
involvement with the Spencer quarry?

A    They had done a project at the Spencer quarry as
well.  And I can't recall what they provided the
material for the specific project on.

Q    And in response to some questions from - I'm
sorry.

A    Oh, no.  Go ahead.

Q    In response to some questions from Mr. Machetanz
you were talking about the credit practices.  Is it
possible that credit was extended in this case because

Shoreside was confident it would be paid from one of the parties that it could look to for payment?

MR. MACHETANZ: Leading. Foundation.

THE WITNESS: Well, again, I'll repeat what I've said all along, is, we did look to the general contractor, as a bonded project, for payment.

BY MR. SHAMBUREK:

Q    And when Shoreside provided fuel directly to Nugget, did they dispute any of the charges or the quality of the fuel?

A    Not to my knowledge.

Q    And did Bob LaPore and/or Spencer Rock Products question the – any of the billing that you provided them for the fuel, lube, and diesel?

A    No.

Q    They had no dispute over quality or date of delivery?

A    No.

Q    Now, if you had attempted to retrieve the fuel from that delivery in May, is it possible that that could have resulted in perhaps even some legal action by Bob LaPore to challenge your reclamation?

MR. MACHETANZ: Leading. Speculation.

THE WITNESS: We didn't have any legal recourse to repossess that fuel at the time – at the time of that product, to my knowledge.

Id. at p. 65, l. 1 – p. 70, l. 11.   Mr. Lechner also testifies in response to questions as follows:

Q    Would you take a look at paragraph five of the LaPore affidavit.  And if I could read this, does it say, "No other material was ordered by Spencer Rock. Mr. Randy Randolph ordered all remaining rail cars of fuel on behalf of Nugget Construction Company, Inc."

Is it possible that Mr. LaPore viewed that order, purchase number three on May 21, 1997, as an order by Randy Randolph in his capacity with Nugget Construction Company, Inc.?

. . .

THE WITNESS:  If you could --

MR. SHAMBUREK:  I'll rephrase the question again.

BY MR. SHAMBUREK:

Q    Is it possible that Mr. LaPore viewed that third purchase of fuel, on or about May 21, 1997, as having been made by Randy Randolph in his capacity as a representative of Nugget Construction Company, Inc.?

A    Yes.

MR. MACHETANZ:  Foundation, leading, speculation.

BY MR. SHAMBUREK:

Q    And paragraph six says, "Once Nugget Construction Company, Inc., became involved in the pit through the support agreement, Spencer Rock had no control over Nugget, the ordering of the fuel, or the running of the pit whatsoever."

Having read that statement in Mr. LaPore's affidavit, might that explain why he did not regard his company, Spencer Rock Products, as liable for that third purchase?

MR. MACHETANZ: Speculation, leading, foundation.

THE WITNESS: Yes, that's correct.

BY MR. SHAMBUREK:

Q    And you don't see anything in his affidavit here where he challenges the quantity of fuel provided by Shoreside Petroleum?

A    Quantity or quality, that is correct.

Q    And he doesn't question here, based on your review, that it was used for the Homer project; is that correct?

A    That is correct.

Id. at p. 75, l. 11 - p. 78, l. 3.  Shoreside had a direct contract with both Nugget and Spencer and looked to both of these entities and to the bond for payment.  These facts are uncontroverted by the defendants.

### B.  Metco's Activities

Nugget admits that Metco's services were indispensable during what Nugget describes as the third phase of the work (the transport of rock from the railroad to the dockside).  Nugget admits that it was not required to divert any of its manpower, equipment, truck, loaders, direction or otherwise to the prosecution of Metco's work because of the undisputed stellar performance by Metco.  Nugget admits that it did not need to

provide any guidance, direction or assistance to Metco.  Nugget does not claim any offset or back charge against Metco.  Metco testified that it looked to the general contractor, Nugget, in addition to Spencer Rock for payment and performed in reliance on the existence of a payment bond.

No one disputes that several days after Metco commenced performance, Mr. LaPore requested that Metco provide oil, lubrication and maintenance services on trucks and loaders that had transported rock from the siding to the Seward dock for loading on Nugget's barge prior to Metco's engagement, and that continued to transport rock from the siding to the Seward dock during the same period that Metco was also transporting rock.  No one disputes that Metco agreed, wanting to "offer Bob [LaPore] as much support as possible," because Metco "knew he had a deadline to meet."  No one disputes that Metco agreed to provide truck drivers and loader operators to operate Spencer Rock trucks and loaders when Spencer Rock was unable to staff its trucks and loaders with Spencer Rock employees.  No one disputes that during the course of Metco's performance, Mr. Frank Dieckgraeff had a conversation with Mr. Randolph, the Project Manager for Nugget, most likely at the Seward dock, during which Randolph expressed his desire that Metco support Spencer Rock during the course of performance on the project.

No one disputes that Metco continued to perform services for Spencer Rock "[b]ecause it was a bonded job and [Metco was] sure [LaPore] would get paid."  Metco also continued its performance during this period upon the belief that Metco was "covered by

23

[Nugget's bond]" and that, "because it was a bonded job, [Metco] could get the payment from Nugget," in the event that Spencer Rock did not pay Metco.  No one disputes that on June 27, 1997, Ms. Dieckgraeff contacted Mr. Randolph, during which conversation Ms. Dieckgraeff discussed Spencer Rock's nonpayment to Metco.  No one disputes that following this conversation, Ms. Dieckgraeff faxed to Mr. Randolph the invoices for its work that were outstanding and overdue.  Metco looked to both Nugget and Spencer and to the bond for payment.  These facts are uncontroverted by the defendants.

## II.  Legal Discussion

### Breach of Contract

Nugget breached its written contract with Shoreside.  Nugget breached its oral contract with Metco.  These two claimants seek the damages for these breaches proximately caused by Nugget.  The covenant of good faith and fair dealing is incorporated into every contract in the state of Alaska.  Nugget clearly breached these duties.

Nugget argues that an implied-in-fact contract "arises where the court finds from the surrounding facts and circumstances that the parties intended to make a contract but failed to articulate their promises and the court merely implies what it feels the parties intended."  Reeves v. Alyeska Pipeline Serv. Co., 926 P.2d 1130, 1140 (Alaska 1996).  No party failed to articulate their promise.  Nugget made both oral and written promises to be bound contractually to both Shoreside and Metco when it accepted the benefit of the bargain, encouraged them to continue

performing and requested copies of the invoices.  Moreover, Nugget did not exhibit any conduct to manifest an intent not to be bound under the circumstances.  Nugget did not dispute the terms and conditions of the business relationship.  During the claimants' course of performance, Nugget expressly and impliedly obligated Nugget to pay for Metco's services and Shoreside's goods that were invoiced in the first instance to Spencer Rock.

## Quasi-Contract

Nugget argues that under Alaska law a party to an express contract typically may not seek recovery on extra-contractual theories such as quantum meruit or implied contract.  See Mitford v. de Lasala, 666 P.2d 1000, 1006 n.1 (Alaska 1983).  Shoreside and Metco agree that if they are able to collect from Nugget based on the direct express contract each had with Nugget, their claims for quantum meruit are unnecessary.  Nugget is denying that there is an direct express contract and then is defending the claim for quantum meruit on the ground that there is a direct express contract.

## Promissory Estoppel

Metco's and Shoreside's claims for promissory estoppel, detrimental reliance and misrepresentation and nondisclosure claims are supported by the record.  Nugget argues that under Alaska law, there are four requirements for a promissory estoppel claim: "(1) the action induced amounts to a substantial change of position; (2) it was either actually foreseen or reasonably foreseeable by the promissor; (3) an actual promise was made and itself induced the action or forbearance in reliance thereon; and

(4) enforcement is necessary in the interest of justice." <u>Reeves v. Alyeska Pipeline Serv. Co.</u>, 926 P.2d 1130, 1142 (Alaska 1996). The first three elements are present in this case and enforcement is necessary in the interest of justice.

## Detrimental Reliance

Nugget argues that detrimental reliance occurs when the party seeking to invoke the doctrine of equitable estoppel has relied reasonably on the representation of the adverse party. <u>See</u> <u>State Dept. of Revenue v. Northern TV, Inc.</u>, 670 P.2d 367, 370 (Alaska 1983). Nugget argues that a party claiming equitable estoppel must prove four elements: "(1) assertion of a position by conduct or word; (2) reasonable reliance thereon; (3) resulting prejudice; and (4) the estoppel will be enforced only to the extent that justice so requires." <u>Ogar v. City of Haines</u>, 51 P.3d 333, 335 (Alaska 2002). The first three elements are present in this case and the estoppel should be enforced in the interest of justice.

## Negligent Misrepresentation

Nugget argues that negligent misrepresentation arises when: (1) a party accused of misrepresentation made a statement in the course of his business, profession, or employment, or in any other transaction in which he has pecuniary interest, (2) the representation supplied false information, (3) there was justifiable reliance on the false information, and (4) the accused party failed to exercise reasonable care or competence in

obtaining or communicating information.   See Reeves v. Alyeska Pipeline Serv. Co., 56 P.3d 660, 670-671 (Alaska 2002).   All four elements are present in this case.

### Fraudulent Misrepresentation and Non-Disclosure

The claimants contend that the Support Agreement was illegal and void as a matter of law to the extent it is interposed by Nugget to justify non-payment to the three claimants.   Nugget structured the contracts and engaged in conduct intended to defraud the claimants into providing goods and performing services even though Nugget never intended to pay the claimants or to make the funds available to pay the claimants.

### Negligence

Under Alaska law, "[t]he initial step in deciding whether an action for negligence can be maintained is to consider whether a duty exists."   Mesiar v. Heckman, 964 P.2d 445, 448 (Alaska 1998).   "Whether an actionable duty exists is a question of law and public policy."   Id.   "'Duty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection."   Id. (quoting City of Kotzebue v. McLean, 702 P.2d 1309, 1313 (Alaska 1985)).   Alaska courts will "first define the class of cases to which [its] rulings apply, then weigh the factors which support and oppose the imposition of liability in that class of cases."   Id.   In circumstances in which a negligence claim is predicated upon an inaction or omission, there must be "some definite relation

between the parties, of such a character that social policy justifies the imposition of a duty to act," or "a special relationship creating that duty," for negligence liability to attach. <u>Ballum v. Weinrick's, Inc.</u>, 633 P.2d 272, 273, 276 (Alaska 1981). The claimants set forth some of the duties imposed on Nugget by law and contract under the circumstances in this case at pages six through nine above.

This court can identify a class of cases to which its ruling would apply namely the claimants who provide goods and perform services for the use and benefit of a federal project and expect to be treated in a non-negligent manner by the general contractor. The second phase of its analysis involves a weighing of the factors that support and oppose the imposition of liability:

> [1] The foreseeability of harm to the plaintiff, [2] the degree of certainty that the plaintiff suffered injury, [3] the closeness of the connection between the defendant's conduct and the injury suffered, [4] the moral blame attached to the defendant's conduct, [5] the policy of preventing future harm, [6] the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and [7] the availability, cost and prevalence of insurance for the risk involved.

<u>Kooly v. State</u>, 958 P.2d 1106, 1108 (Alaska 1998); <u>see also</u> <u>D.S.W. v. Fairbanks North Star Borough School District</u>, 628 P.2d 554, 555 (Alaska 1981).

This is the sort of relationship that defines a class of cases to which a court should apply a ruling and impose a duty under a negligence theory. Such relationships are bound by a duty under statute and common law, or as a matter of public

policy, that gives rise to a cause of action in negligence.  The Alaska Supreme Court has held that a lack of privity does not preclude recovery for pure economic loss upon a negligence theory.  Thousands of cases involving motor vehicle accidents are brought against those who lack privity with the tortfeaser every year.

In this case, "the defendants knew or reasonably should have foreseen both that particular plaintiffs or an identifiable class of plaintiffs were at risk and that ascertainable economic damages would ensue from the conduct."  <u>Mattingly v. Sheldon Jackson College</u>, 743 P.2d 356, 360 (Alaska 1987).  Nugget asserts the preposterous assertion that "there is absolutely no way that Nugget could have foreseen that Mr. LaPore would fail to pay Spencer Rock's suppliers, including Metco."  As a matter of fact that assertion is a fraud on the parties and this court.  Nugget knew that Spencer could not pay the claimants unless Nugget first paid Spencer.  Nugget only paid itself and not Spencer.  Nugget acted both fraudulently and negligently toward the claimants.

First, the foreseeability of the harm to all three claimants is clear, absolute and certain.  Second, the claimants were unambiguously injured by Nugget.  Third, Nugget's conduct was the cause of the claimants' injuries.  Fourth, Nugget's conduct is outrageous and shocking.  Fifth, the policy of preventing future harm can be advanced by holding Nugget accountable.  Sixth, Nugget should be required to recognize and adhere to the duties and practices that are customary in the construction industry and are part of the good faith and fair dealing that a member of the

public reasonably expects in this situation. Seventh, there is insurance for the risk involved.

On the final point, the availability of insurance, Nugget represented to the court that there was no insurance to cover these claims. After expensive and protracted motion practice, this court's order, and the issuance of subpoenas by claimants, the insurance polices were finally disclosed. Mr. Ferguson with Willis of Alaska, the agent and broker for USF&G and Nugget for liability insurance and bonds, was deposed on March 8, 2006 and expressed great surprise regarding these claims asserted by the claimants because Nugget had never even presented the claims to him. Mr. Smithson with Nugget had made representations to the contrary at his earlier deposition. Shoreside and Metco understand that North Star is developing this argument.

<u>Unjust Enrichment, Restitution, Quantum Meruit</u>

Shoreside and Metco also allege equitable causes of action, including unjust enrichment, restitution, quantum meruit, equitable subordination and constructive trust. The concepts of quasi-contract, unjust enrichment, contract implied-in-law, and quantum meruit are similar and interrelated. Nugget argues that the three elements for a quasi-contract or quantum-meruit claim are as follows: 1) a benefit was conferred upon the defendant by the plaintiff; 2) an appreciation by the defendant of such benefit; and 3) acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable for him to retain it without paying the value thereof. <u>See Reeves v. Alyeska Pipeline Serv. Co.</u>, 926 P.2d 1130, 1143 (Alaska 1996).

The enrichment to the defendant must be unjust. Nugget has been unjustly enriched. Nugget has received a true windfall or "something for nothing." <u>Alaska Sales and Serv., Inc.</u>, 735 P.2d at 746. Nugget contends that it did not make a profit on the project but does not even support this irrelevant argument with anything other than bald figures. The claimants did their individual parts for Nugget and fully performed their contracts.

## Equitable Subordination

The doctrine of equitable subordination will apply in order to "offset any inequity in the claim position of a creditor that would produce injustice or unfairness to other creditors." <u>Nerox Power Systems, Inc. v. M-B Contracting Co., Inc.</u>, 54 P.3d 791, 795 (Alaska 2002) (Citations omitted). This court should equitably subordinate Nugget's claim to the funds disbursed by the Corps of Engineers to the claims asserted by the three claimants.

## Constructive Trust

A constructive trust will be ordered to "compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs. When a court finds that a defendant is the holder of a property interest which he retains by reason of unjust, unconscionable, or unlawful means, it takes such interest from the defendant and vests it in the wronged party." The funds received by Nugget from the Corps of Engineers should be deemed to be held in trust by Nugget for the three claimants.

## Agency

Shoreside and Metco join in the discussion of law regarding agency recently developed by North Star. Nugget's and USF&G's arguments against Shoreside's and Metco's agency causes of action do not address that claim as it is alleged in their Amended Complaints or the law applicable to the claim. Nugget and USF&G instead avoid that claim and argue against their own strawman diversion. They baldly assert that the "factual allegations fail to support a claim of agency between Nugget and Spencer Rock on their face" only by ignoring the established law applicable to those allegations.

The agency cause of action actually alleged in the Amended Complaints was factually and legally supported in detail in North Star's motions for summary judgment in this case four years ago.[16] The argument is also addressed in North Star's recent motions for summary judgment on that subject.[17]   Those filings are incorporated by reference in response to Nugget's and USF&G's motion.

## Punitive Damages

Under Alaska law, punitive damages serve two purposes: "to punish the wrongdoer and to deter the wrongdoer and others like him from repeating the offensive act."   State Farm Mut. Auto. Ins. Co. v. Weiford, 831 P.2d 1264, 1266 (Alaska 1992) (Citation omitted).   The availability of such damages "turn[s] on the wrongdoer's motive, state of mind, and degree of culpability."

---

[16]    Docket Entry Nos. 282 and 300.

[17]    Docket Entry No. 504.

Alyeska Pipeline Serv. Co. v. O'Kelley, 645 P.2d 767, 774 (Alaska 1982). A plaintiff seeking punitive damages must prove that the defendant's conduct was outrageous, such as acts done with malice, bad motive, or reckless indifference to the interests of another. A showing of actual malice is not required. Further "[m]alice may be inferred if the acts exhibit 'a callous disregard for the rights of others.'" State Farm, 831 P.2d at 1266 (Citation omitted). Whether malice is present is a question of fact. In this case, Nugget does not raise a genuine issue of material fact regarding whether Nugget exhibited a "callous disregard for the rights of others." In this case, there is more than enough evidence of outrageous conduct and bad faith conduct to support the claim for punitive damages. The only issue to present to the trier of fact is the amount of punitive damages.

## Conclusion

The bank robber stole from the federal fisc and the three claimants. The law allows the claimants to assert claims in the name of the United States of America in a civil action to recover that money. The Miller Act allows a claimant to bring and maintain state law claims. Each and every state law claim asserted in the three Amended Complaints is supported by the record. This court should deny Nugget's motion and grant Shoreside's and Metco's pending related motion on these issues. This court should also find that there is no genuine issue of material fact regarding the claim for punitive damages. The claimants should be allowed to move for attorney's fees and costs. Only the amount of punitive damages should be held over

for trial.

DATED this 12th day of May, 2006 at Anchorage, Alaska.

THE LAW OFFICE OF STEVEN J. SHAMBUREK
Attorney for Plaintiffs
Shoreside Petroleum, Inc., d/b/a Marathon
Fuel Service and Metco, Inc.

s/ Steven J. Shamburek
By:_____
Steven J. Shamburek
Alaska Bar No. 8606063
LAW OFFICE OF STEVEN J. SHAMBUREK
425 G Street, Suite 630
Anchorage, Alaska 99501
(907) 522-5339 Direct
(907) 522-5393 Fax
shamburek@gci.net
shamburekbank@gci.net

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 12th day of May, 2006, a copy of the foregoing was served by the Electric Case Filing.

s/ Steven J. Shamburek
_____
Steven J. Shamburek