ER 334-35.

Nugget also claims that it did not have prenotice of any real or potential inadequacies which might affect Spencer's ability to perform under the "supply" contract, but LaPore testified in great detail to the contrary, including that he tried to cancel the contract within a week of signing it in January, before any work was to begin, but that Nugget would not let him, nor permit a sensible alternative to Nugget's rigorous schedule, and offered future support instead, even then. ER 148, 208-18, 221-24, 228-37, 239-58, 260. According to LaPore, any financial and equipment problems Spencer anticipated having under that contract as contemplated (and in LaPore's eyes, altered) by Nugget was the subject of much discussion between Nugget and Spencer's representatives, including their shared representative, Randy Randolph. *Id.*

More to the point, those disputed matters were not material to the court's summary judgment ruling. ER 331-49. Neither was the matter from Mr. LaPore's July 1998 affidavit partly repeated at pages 4-5 of Nugget's brief and in Nugget's excerpt of record.[4]

Indeed, the only part of that affidavit material to the subject matter of the district court's ruling was paragraph 19, reproduced at ER 149. It warrants

---

[4]    Exhibits to that affidavit omitted by Nugget are contained at ER 422-25 of North Star's supplemental record being submitted herewith.

43

reading. The district court's focus in granting summary judgment was upon *that* nature of the case. It was upon the *specific, undisputed* evidence establishing that Nugget, through its secretive "support" arrangements with Spencer, immediately and actively financed, controlled, produced and supplied the stone which Spencer was supposed to provide — all the while using Nugget's unique position of control presented by those arrangements to intercept the money it owed Spencer under their first contract and keep that money for itself instead. ER 149, 328-353. As the court's written decision demonstrates, *that* is the nature of this case that most caused the court to deem Spencer a straw party and Nugget as stepping into the shoes of Spencer, thus "telescoping" Nugget into a direct relationship with North Star and the other claimants under the arrangements made by Spencer, *but* taken advantage of and succeeded to by Nugget. ER 349. Who as between Spencer and Nugget was responsible or "at fault" for the circumstances resulting in their "support" arrangement, or whether either or both were (or thought they were) "justified" by their own business interests into entering into that arrangement, was treated by the court as irrelevant to the *material* nature of the case. ER 328-53. *Instead, the fact of the arrangement and Nugget's control and preferential positioning resulting from it are what was relevant.*

Accordingly, Nugget's alleged concerns about Spencer's lack of production leading up to that arrangement (Br. at 6), as reported by Randolph

11

44

(ER 108), are irrelevant to the basis of the summary judgment ruling. Likewise, Nugget's characterizations or beliefs that Spencer was "unable to fulfill its obligations to supply rock", that Nugget was "forced" to provide "support" to Spencer in order to avoid "facing severe financial consequences itself", and that their arrangement was at Spencer's request (Br. at 6), are irrelevant.[5]

Nugget also has the sequence of events wrong. In fact Nugget and Spencer did not at all enter into their "support" arrangement as a "consequence" of (among other things) observing performance problems Spencer was allegedly creating during loading operations at the dock. Br. at 6. To the contrary, those loading operations did not commence until the first week of May. ER 140C-D, 142-43. That was about a month after Nugget, by its own admission, commenced its "support" and backcharges to Spencer, and over a week after those operations were memorialized in Nugget and Spencer's April 23, 1997 written agreement. ER 107.

Nugget's additional representations that it merely "coordinated" North Star's barge loadings, rather than direct North Star in that work, are simply legal conclusions based on Randolph's own conclusory opinions, rather than specific

---

[5]    In addition, those matters were disputed by LaPore, who also testified that any request he made for "support" from Nugget was under duress from Nugget and as a result of unfair, constantly changing demands placed upon him by Nugget and that he did not contemplate the takeover and tremendous backcharges from Nugget which resulted. ER 208-260, 597-601.

12

45

facts or admissible evidence. Indeed, when asked for specifics at his deposition Randolph repeatedly testified only that "I do not recall" at the same pages Nugget and USF&G cite in their brief (ER 109, 123).

On the other hand, Jack Goodwill, North Star's operations manager in Seward, was specific in his representations regarding Randolph's takeover of the loadout work from Spencer and LaPore, and Nugget's demands and subsequent termination of North Star. ER 140C-F, 439, 474, 477. Mr. LaPore added more detail on those points. ER 149, 208-60, 596-601.

Nugget also misstates the nature of this case in at least two additional regards. Nugget represents that Spencer failed to pay "its" vendors, including North Star. Br. at 7. However, the district court held that North Star effectively became *Nugget's* vendor. ER 348-49. Second, whereas North Star filed Miller Act claims against Nugget, as Nugget states (Br. at 7), and whereas this is a Miller Act case, it is not only that. As North Star repeatedly reminded Nugget and the court in the proceedings below, North Star also raised state law claims based on the same nucleus of operative events and facts as its Miller Act claims and coming within the court's supplemental jurisdiction. *See, e.g.,* ER 712-14, 750-51, 765-66.

## B.    COURSE OF PROCEEDINGS

As noted in Nugget's brief, North Star initiated suit in this matter over five years ago, on January 16, 1998, and Shoreside and Metco intervened. Br. at 7;

13

ER 12-18.[6]

As Nugget also notes, the district court previously granted summary

judgment to North Star and the other claimants, on the basis that Spencer should be

treated as a subcontractor of Nugget, thereby rendering Nugget and USF&G liable

to them. The court did so, as regards North Star, in its June 3, 1999 decision which

Nugget includes at ER 179-93, together with a follow-up decision ordering entry of

judgment (Clerk's Docket No. 163), subsequent orders awarding North Star its

attorneys' fees, late payment charges/interest and costs in accordance with federal

law (ER 490-502), and a judgment filed April 12, 2000 reflecting those

determinations (ER 503-05).

Unfortunately, Nugget and USF&G lift a portion of that June 3, 1999

decision out of context and mischaracterize it in their present brief (Br. at 7-8).

Contrary to their representation, North Star's unjust enrichment claim made then,

roughly four years ago, was not the same implied-in-fact claim on which the court

granted summary judgment on August 30 and September 4, 2002. ER 328-354.

Furthermore, any "uncertainties" that caused the district court to decline granting

summary judgment upon some claims as they were presented in 1999 did not exist

as to the claims presented last year and now on appeal. It should not be presumed

---

[6]    The clean copy of North Star's Complaint on file with the district court is
included within North Star's supplemental excerpt. ER 398-404.

14

otherwise. As the district court emphasized, in a portion of its June 3, 1999

decision which Nugget and USF&G delete from the same passage they now take

out of context in their brief, the court was not, at that time, "taking any position on

this [unjust enrichment] matter one way or the other". ER 182-83. That was

precisely because the court, at that time, clearly considered the alternative claim

based on Spencer's subcontractor status on which it granted summary judgment

(*see* ER 188-192) *to be so strong* that, as the court stated then, it really did "not

believe there is *any realistic possibility* of this situation evolving in a fashion

which would leave North Star with no remedy except a claim for unjust enrichment

. . . ." ER 182-183.

As Nugget notes, the district court's confidence that Spencer

constituted a Miller Act "subcontractor" under the law proved mistaken, according

to an unpublished decision of a three-member panel of this Court dated

September 27, 2001. ER 295-96. North Star, firmly believing that appellate

decision to be mistaken, petitioned for a rehearing of it (ER 506-28), which was

denied (ER 535).

In its unpublished decision the Ninth Circuit panel specifically

addressed only the "subcontractor" issue before it. ER 296. On that issue, and on

that issue alone, the panel concluded that "The Support Agreement does not affect

our analysis." *Id.* At the same time, however, that Court noted that, by agreeing to

15

provide "help" to Spencer under that agreement, "NCI may have *exposed itself to direct suit by SRP's suppliers*", adding "we express no opinion on this issue because it is not before us." *Id.* (Emphasis added). That Court instead remanded all matters *including that matter* to the district court "for further proceedings". *Id.*

On remand Nugget and USF&G, North Star, Shoreside and Metco filed cross-motions for summary judgment on that issue, commencing with Shoreside's motion (ER 297). North Star's opposition to Nugget's motion and its cross-motion and supporting materials were filed April 9, 2002. ER 536-650, 194-262. In response to those motions, the district court issued its written decision and order granting summary judgment to the claimants. ER 328-53. As is set out in that decision, it and the parties' cross-motions relied both on the evidence and factual representations presented in support of the parties' cross-motions decided in 1999 and upon new, supplemental factual presentations. ER 328-53. Because these cross-appeals concern cross-motions for summary judgment being reviewed *de novo* by this Court, portions of those filings material to the district court's decision on appeal and not already included within the excerpt of record filed by Nugget and USF&G are being replicated in the supplemental excerpt of record being submitted herewith. ER 405-89, 536-706, 708-14, 717-20.

The district court's decision speaks for itself more accurately than the characterization of it contained in Nugget's brief, or in any characterization North

16

Star might give it. Following that decision, and the September 4, 2002 entry of

judgment upon it (ER 354), the district court also considered North Star's motions

and related filings to award it attorney fees, late payment charges and interest as

provided by contract and statute, and costs. ER 721-81. The court subsequently

entered orders denying any award of attorney fees or late payment charges,

although it had awarded those fees and charges to North Star in this case before.

ER 357-69, 782-83. It granted prejudgment and postjudgment interest, but only in

amounts substantially below those sought by the claimants, including North Star.

ER 366-69, 707. As previously noted in this brief, the district court also awarded

costs (which are not being appealed) pursuant to an order upon motion to amend

judgment and a stipulation of the parties. ER 782-83, 789-91. An amended

judgment reflecting those amounts was distributed on March 4, 2003 and included

within North Star's second amended notice of cross-appeal filed April 3, 2003 (ER

707, 795-97), which also incorporated North Star's Civil Appeals Docketing

Statement filed February 21, 2003 (ER 787-88).

     As noted in Nugget's brief, no summary judgment action was taken

with respect to defendants Spencer and LaPore. ER 312. That was by agreement

of the parties. *Id.* Contrary to the representation in Nugget and USF&G's brief

(Br. at 9), the judgment that was entered (ER 354, 707) was entered only against

Nugget and USF&G, and not against Spencer or LaPore (since no motion was filed

17

50

against either of them). *Id.*

## C.    DISPOSITION BELOW

North Star accepts the statement of disposition contained in Nugget

and USF&G's brief, subject to and as supplemented by North Star's Course of

Proceedings statement and the judgment in this case as last amended (ER 707).

## VII. STATEMENT OF FACTS

For the most part, Nugget and USF&G's characterization of the

general facts repeated in this portion of their brief is already contained in their

Statement of Case already addressed in this brief. In addition to its response there,

North Star makes the following additional material observations:

1.    Whereas Nugget bid the revetment project on August 21, 1996

and the federal government sought to award Nugget the contract on September 28,

1996, in fact the contract was delayed, owing to a formal challenge by the next

lowest bidder, Herndon & Thompson, stemming from errors in Nugget's bid.

ER 467-72. That postponed the effective date of the award of contract and the

ability to proceed until after that challenge was resolved by a federal court ruling

on or about December 20, 1996. *Id.* ER 331, 588.

2.    Without the beneficial Spencer pricing to Nugget, Nugget never

would have obtained the prime contract over Herndon & Thompson, whose bid of

$3,467,774 was just $90,000 more than Nugget's revised bid of $3,378,491.60.

18

ER 468-69.[7] According to Randy Randolph, Nugget's project engineer who also worked for Spencer, Herndon & Thompson, which had its own quarry, would have charged Nugget $33 a ton for producing the specified stone from its quarry — *i.e.*, $714,000 more than did Spencer — and according to Randolph that may not have even included the cost of loading the stone which Nugget now seeks to avoid. ER 102-103. Randolph agreed that Spencer's price, which he helped prepare, was "much better" for Nugget. *Id.*

      3.      The record is clear that, whereas Spencer quoted its price per ton to Nugget in August 1996, Nugget and Spencer were still developing the terms of their contract dated January 15, 1997 at least as late as January 10, 1997, and that Spencer understood that Nugget's "rigorous schedule" of about 100 days was actually subject to "railcar availability [to transport the rock from the quarry on the state-owned railway], weather, holidays, barge delays and etc." ER 586-87. Moreover, that rigorous schedule imposed at that time on Spencer was entirely of Nugget's choosing; the federal contract allowed Nugget fully two years, until December 18, 1998, to complete the project. ER 619. Nugget in fact took almost that long, including obtaining about 8,000 tons of rock for the project from Herndon & Thompson during the summer of 1998, at $33 per ton, which Nugget

---

[7]    The slight difference between those bid amounts and the Government's permission to Nugget to correct its bid after the bids were opened resulted in the bid protest. ER 467-472.

#60571
EXHIBIT 1
Page 40 of 83

then backcharged to Spencer.  ER 428-35, 102, 108.

4.     North Star agrees with the specific facts set out in that portion of Nugget's brief insofar as actually taken from the December 7, 1998 affidavit of Jack Goodwill submitted with Nugget's brief (ER 140A-143).[8]  However, this Court should consider all of Mr. Goodwill's affidavit, as did the district court (ER 335-36), including those portions which report upon Nugget's direction and control of North Star's work through Randolph and support North Star's understanding of its contractual relationship with Nugget, not just Spencer.  ER 140A-143, 438-39. Lapore corroborated those facts (*see, e.g.*, ER 595-601), as did Mr. Goodwill in a second affidavit detailing the "open account" basis whereby the necessary stevedores and North Star equipment were repeatedly made available for the rock loadouts onto the Nugget barge that summer as directed by Randolph, not LaPore (ER 473-78).

5.     Nugget's further representations that Nugget was unaware of the arrangements for North Star's services and did not receive or see any of North Star's invoices related to the project work until August 21, 1997 (Br. at 14-15) are also unsupported by specific, admissible fact (in addition to being immaterial to the basis for the district court's ruling).  As North Star demonstrated in the

---

[8]     Several exhibits to that affidavit, which North Star submitted with its initial December 7, 1998 motion for summary judgment, have been omitted by Nugget and are included within North Star's supplemental excerpt of record at ER 438-37.

20

proceedings below, the purported sources on which Nugget relied for those arguments were nonspecific and unsupported, whereas other, specific evidence demonstrated that Nugget either received those invoices or took pains to avoid them and knew and accepted North Star's standard terms and prices for the loading work. ER 547-53, 561-62, 672-73, 473-89.

      6.    The court below also considered a series of correspondence between North Star, the Corps of Engineers and Nugget among the relevant facts in its decision. ER 338-39. That correspondence is found at ER 152-53 and within North Star's supplemental excerpt of record at ER 436-37, 592-94, 717-20. In an August 21, 1997 letter to Nugget, the Corps requested "an immediate explanation of why Northern Stevedoring has not been paid for work that has been paid by the Government [to Nugget]" and reminded Nugget that under the terms of its own contact implementing the Prompt Pay Act, 31 U.S.C. §§ 3903(b), 3905(b)-(h), Nugget was not to request (or receive) money for progress payments that it intended "to withhold from a subcontractor or supplier", although it had obviously done so. ER 339, 436, 592-94, 596-97, 622, 629-48, 692-706. In another letter to Nugget dated August 26, 1997, the Federal Government referred to earlier correspondence from Nugget to the Corps dated August 6, 1997[9] and August 11,

---

[9]    That was the date on which Nugget, for the first time, advised the Corps of Nugget's January 1997 "material contract" and April 1997 "support agreement" with Spencer, *stressing* that "these documents are confidential and are supplied for

21

54

1997 ("Serial Letter 611-21"),[10] and concluded:

> Based on the supporting costs that you outlined in
> serial letter 611-21 it appears that Nugget Construction
> *has assumed full responsibility for operations at Spencer*
> *Quarry for the subject project. Therefore, as primary*
> *operator at Spencer Quarry, we believe Nugget*
> *Construction is responsible for prompt payment to*
> *suppliers and subcontractors who contracted with*
> *Spencer Rock Products on this project.*

ER 339, 437 (emphasis added).

7. The court also considered the facts contained in LaPore's

uncontested April 4, 2002 affidavit identifying documents (including the

deposition transcripts submitted by Nugget and USF&G at ER 194-262) and

testifying to the takeover relationship between Nugget and Spencer. ER 333-36.

That information included the fact that LaPore's role at the loading dock had been

reduced to driving a truck, that Nugget had told Spencer to keep their "support"

arrangements a secret from everyone else, and that *Nugget* made the decision to

---

informational purposes only" and requesting *"that you do not release these*
*documents to anyone outside your office without our permission."* ER 426
(emphasis added).

[10]    Nugget's serial letter 611-21 was also submitted to the district court as an
exhibit to North Star's summary judgment memorandum. ER 592-94. The early
"support costs" which Nugget alleged in that August 11, 1997 correspondence
should be compared to the more detailed "costs" and "backcharge" listings *of over*
*$4 million* later prepared by Nugget and submitted as Exhibit 2 to Robert LaPore's
April 4, 2002 affidavit also submitted to the court (ER 601, 629-50; USDC Docket
No. 282) and explained in LaPore's deposition testimony (ER 242-49, 252-54) and
in North Star's memoranda (ER 546-47, 659).

55

take the rock-loading work away from North Star and increased the cost of that work to Spencer by using Nugget's own equipment and backcharging Spencer (ER 333, 335-36, 596-601) — facts Nugget did not deny.[11]

       8.    In the end, Nugget sued Spencer for $2,789,041 as "support" costs and backcharges in a separate lawsuit. ER 629. That was *in addition to* the $1,295,772 Nugget calculated it had owed but already withheld from Spencer[12] and *included* $400,044 attributable to "Amounts Due SRP Suppliers Under Miller Act Claims". ER 629. In the end, Spencer lost its quarry and LaPore, who lost his business, was required to take work as a plumber. ER 256-58, 601, 658-59, 676-81. North Star, having done the work for which the Federal Government fully paid Nugget, went unpaid.

### VIII. SUMMARY OF ARGUMENT

      The court correctly concluded that an implied contract existed between North Star and Nugget. That ruling is supported by application of the undisputed material facts to the district court's stated rationale granting summary judgment and also to the alternative rationales presented by North Star, including

---

[11]    Indeed, in a deposition taken of Randolph in Nugget's litigation against Spencer, Randolph testified that Nugget would not allow Spencer's employees to operate the machinery at all because, in his words, "*they were the most inept bunch of clowns you ever saw in your life.*" ER 668-69, 683.

[12]    Spencer, on the other hand, placed that intercepted amount at $1,426,707.84. ER 628. It is an insignificant difference for purposes of this summary judgment.

#60571
EXHIBIT 1
Page 44 of 83

56

the rationale of imputed agency. Although Spencer and Nugget obviously disagree on the cause and circumstances of their "support" agreement, it is uncontroverted that as a result of that agreement Nugget assured itself of access to and control over the source of rock it needed most at the price on which it had based its bid for the project, together with the ability to pay itself for that rock, rather than pay Spencer or anyone with whom Spencer had initially contracted. Nugget's legal responsibility to North Star and others similarly situated arises from the consequences and effect of that agreement. It arises from Nugget's conduct effectively supplanting Spencer as the principal contracting party from North Star's services under the arrangements made by Spencer, without even disclosing that substitution to North Star. As a result of Nugget's usurpation of Spencer under the circumstances of this case, Nugget impliedly assumed Spencer's contractual arrangements with North Star and became directly responsible and liable to North Star under the prevailing law. Accordingly, the district court correctly granted summary judgment to North Star.

As a further legal consequence of Nugget's assumption of those contractual arrangements, Nugget was also liable to North Star for its late payment charges and collection costs including attorney fees provided by contract. The district court, after initially granting that relief, erred in denying it. The court also erred by failing to apply the alternative bases for liability North Star requested

24

which entitled North Star to the attorney fees, late payment charges and interest not otherwise awarded. In addition, the district court applied an incorrect measure for prejudgment interest under the single Miller Act claim on which it relied.

## IX. ARGUMENT

### A.    STANDARD OF REVIEW

#### 1.    Upon the Issue Raised by Nugget and USF&G's Appeal

North Star agrees that the issue raised by Nugget and USF&G's appeal involves the grant of summary judgment to North Star, which this court reviews *de novo*. Nugget's Br. at 20, *citing Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1990). As this court has previously made clear, that review is limited to the same evidentiary materials squarely presented by the parties in relation to their cross-motions under consideration. *See Fair Housing Counsel of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1135 (9th Cir. 2001), *cited* by the district court below at ER 342; *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1030-31 (9th Cir. 2001). Moreover, as the district court correctly noted below, although the moving party

> bears the initial responsibility of informing the district court of the basis for its motions and demonstrating the absence of a material issue of fact . . . Once the moving party meets this burden, summary judgment is mandated unless the non-moving party sets forth specific facts which sufficiently rebut the moving party's contentions and disclose the existence of a *genuine* issue of *material* fact.

25

#60571
EXHIBIT 1
Page 46 of 83

*See* August 30, 2002 Order at ER 342-43 (emphasis added), *citing Celotex Corporation v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). *Accord, Margolis*, 140 F.3d at 852.

  As those and other recent opinions of this and other appellate courts attest, the laudable purpose of the summary judgment procedure has been noticeably strengthened in federal court decisions in recent years. *See, e.g., Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 992, 996-97 (9th Cir. 2001) (stating modern summary judgment standards and concluding "the appellants failed to set forth specific facts or identify with reasonable particularity the evidence that precluded summary judgment"); 10 A Wright, Miller & Kane, Federal Practice & Procedure, § 2712 at 198-200, § 2727 at 467-68 (1998 ed. & 2002 pocket part).

  The authorities emphasize that the issue must be *genuine* and the fact *material* in order to preclude summary judgment; the nonmoving party may not rest upon its silence, upon conclusory representations even by affidavit, upon specific showings of fact immaterial to the real issue presented. *Far Out Productions*, 247 F.3d at 992, 996-97. As the district court stated in its summary judgment order below: "In this instance, the *material* facts are not disputed." ER 343 (emphasis added).

  Those governing principles are to be contrasted with Nugget and USF&G's heavy reliance in their brief upon one 1979 case, *Sherman v. British*

26

*Leyland Motors, Ltd*, 601 F.2d 429 (9th Cir. 1979). Among other things, questions of "motive, purpose and economic effects" were not *material* to the *genuine* issues determined by the court below, or they were admitted or otherwise uncontroverted. *Accord, e.g., Far Out Productions*, 247 F.3d at 996-97.

Finally, since Nugget and USF&G do not argue that court denial of their own motion for summary judgment was in error, North Star does not address all factual or legal issues which prevented summary judgment to them, as it did in its briefing below. ER 536-37. In this brief, North Star addresses only the *material* facts pertinent to the court's grant of summary judgment against them.

2.    Upon the Issues Raised by North Star's Cross-Appeal

Whether the district court applied the correct legal standards in its denial of attorney fees, late payment charges, and prejudgment and postjudgment interest requested by North Star is also a matter for *de novo* review by this court. *United States ex rel. Leno v. Summit Constr. Co.*, 892 F.2d 788, 790-91 (9th Cir. 1989); *United States ex rel. Reed v. Callahan*, 884 F.2d 1180, 1184-85 (9th Cir. 1989); *United States ex rel. Maddux Supply Co. v. St. Paul Fire & Marine Ins. Co.*, 86 F.3d 332, 334, 336 (4th Cir. 1996) (*de novo* affirmation of attorney fees and late payment charges awarded under Miller Act according to terms of credit application).

*De novo* appellate review also applies to the district court's failure to

27

apply the alternative bases for liability North Star requested under the Miller Act

and under North Star's other claims coming within the court's mandatory

supplemental jurisdiction, so as to award North Star its attorney fees, late payment

charges and interest not otherwise awarded. *Leno*, 892 F.2d at 790-91; *Fidelity &*

*Deposit Co. of Maryland v. Harris*, 360 F.2d 402, 411 (9th Cir. 1966); *Executive*

*Software North America, Inc. v. U. S. Dist. Court*, 24 F.3d 1545, 1556-58 (9th Cir.

1994); *United States ex rel. Chicago Bldg. Restoration, Inc. v. Tazzioli Constr.*

*Co.*, 796 F. Supp. 1130, 1132 (N.D. Ill. 1992).

B.    THE DISTRICT COURT CORRECTLY DETERMINED
THAT NUGGET AND USF&G ARE DIRECTLY LIABLE
TO NORTH STAR.

Nugget and USF&G make four general arguments to support their

contention that the district court incorrectly determined them directly liable to

North Star. Those arguments are without merit.

1.    The District Court Correctly Applied Federal Law to
Its Construction and Application of the Miller Act.

Nugget's argument that the district court erred by applying a remedy

distinctly recognized in the federal law construing the Miller Act is without merit.

The district court should not have felt constrained to apply state law in order to

ignore a remedy already developed under the federal law specific to the Miller Act,

as Nugget contends. That argument should be denied.

The "telescoping" remedy which the district court applied in its

28

decision (ER 346) arose precisely under the federal law construing the scope and

substance of the Miller Act federal cause of action. That remedy — by which an

otherwise too remote contractual relationship [Spencer/North Star] is, in effect,

telescoped directly to the prime contractor [Nugget] by ignoring the "paper" party

[Spencer] in the chain of parties — is particular to the Miller Act. *Id.*; *Fidelity*,

360 F.2d at 410. It arises specifically in cases involving "*subterfuge*, collusion

. . . *or circumstances indicating the interposition of straw men, presumably* for the

purpose of *insulating* the prime contractor and surety company from extensive

*Miller Act liability*". *Id.*

　　　　Therefore, Nugget's discussion as to whether state law should govern

in other contexts of a Miller Act action,[13] such as the interpretation of a

subcontract, is misplaced. As the district court below noted, it was not being

requested to interpret the terms of a subcontract. ER 345. Rather, it was

construing and applying a recognized claim for recovery under the Miller Act

---

[13]　　Actually, as this Court has clarified, the rule it follows in Miller Act cases is
that where no federal law or policy already applies, state law will often be looked
to, to fill the "interstices" in the federal law, particularly where "the applicable
state law reflects general contract principles". As this Court has emphasized,
statements in this Court's opinions that state law "controls" resolution of some
issues arising under the Miller Act must be considered in a manner consistent with
that "practical approach." *See, e.g., United States ex rel. A. V. DeBlasio Const.,
Inc. v. Mountain States Const. Co.*, 588 F.2d 259, 262 n. 1 (9th Cir. 1978)
(construing footnote 4 of *United States ex rel. Building Rentals Corp. v. Western
Cas. & Sur. Co.*, 498 F.2d 335, 338 (9th Cir. 1974), relied on by Nugget at page 22
of its brief).

29

#60571

EXHIBIT 1
Page 50 of 83

developed solely within the federal case law. ER 345-46. Within that context, at least, the court was clearly correct in its conclusion that the federal law controlled, with or without resort to the rule of law on which the court relied citing *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 127, 94 S. Ct. 2157, 2164 (1974). *Id.*

Nugget's reliance upon the venerable case of *Continental Casualty Co. v. Schaefer*, 173 F.2d 5 (9th Cir. 1949), is equally mistaken. Whereas the Washington substantive law on contracts was applied to some aspects of that case, the court's opinion made it clear that that would not be the case where the issue involves "construction or application" of the Miller Act. 173 F.2d at 8. The district court in this case correctly applied the same principle, at least in the instance of the "telescoping" theory for recovery it applied.

Nugget's arguments that, under Alaska state law, an express contract can only exist upon express assent and an implied-in-fact contract can only exist upon implied assent miss the point. The correct point is that, under the specific federal law recognized and applied by the court below, a federal cause of action exists under the Miller Act, irrespective of state law. It exists in order to avoid a presumed circumvention of the Miller Act. ER 343; 40 U.S.C. §§ 270a(a)(2), 270b(a); *Fidelity*, 360 F.2d at 410. As the district court recognized, in such a situation the federal law implies the direct contractual relationship from the prime

30

63

contractor's acts and conduct showing subterfuge or control over a "straw" party, irrespective of the prime contractor's "assent" or intent to pay. Indeed, in the instance where the telescoping remedy applies the opposite of "assent" must be presumed, since the presumed purpose of the conduct is to avoid payment, not "assent" to it. In that instance, where the court applies a cause of action already developed in the federal law construing the Miller Act, there is no need or justification to turn to state law to determine whether the cause of action exists or what its elements are. That much is already established under the federal law.

> 2. An Express, Implied-In-Fact, and/or Quasi-Contract Also Existed According to State Law and General Contract Principles Applicable to the Miller Act.

However, application of Alaska state law reflecting generally accepted legal principles does support the alternative bases for recovery urged by North Star in the proceedings below and now on *de novo* review, as follows.

First, as Nugget concedes and indeed emphasizes in its brief, there was express assent and an express contract between Spencer and North Star. Br. at 14, 34. Further, Nugget, by its actions and conduct, at least impliedly assumed that contract, even under recognized contract principles consistent with, but independent of, the federal telescoping cause of action on which the district court relied.

In the proceedings below, North Star particularly requested summary

31

judgment on the basis that Nugget, through its control and overreaching with

respect to Spencer's affairs and its interception of funds for itself otherwise owed

Spencer, became Spencer's principal, thus liable to North Star for the acts of its

agent, especially those of which Nugget took advantage such as Spencer's

arrangements with North Star. ER 567-570, 661-671. In support, North Star cited

and discussed the seminal case of *A. Gay Jenson Farms Company v. Cargill, Inc.*,

309 N.W. 2d 285 (Minn. 1981), Restatement (Second) of Agency §§ 14 O and 208,

and *Save Way Oil Company v. Mehlman*, 496 N.Y.S. 2d 537 (N.Y. App. Div.

1985), and compared those cases to this case. *Id.* North Star also asserted that

Nugget was liable to it under other, similar legal principals recognized in Alaska

and federal law including the doctrine of equitable subordination. *Id.*; ER 570-71,

665, 732.

The district court found merit in those arguments. ER 350-51. After

referencing North Star's argument and the *Cargill* decision, it concluded:

> This court is persuaded that the substantive principles
> behind finding an agency relationship from the facts in
> *Cargill* are very similar to the [federal telescoping]
> principle which the court adopts and applies in this
> instance. Like Cargill in the Minnesota case, Nugget
> controlled Spencer Rock completely and to its own
> advantage. Nugget took over virtually all aspects of the
> work that Spencer Rock had contracted with it to
> perform.

ER 351. The district court concluded that it was "inclined under the

32

circumstances to find that a principal/agent relationship existed between Nugget and Spencer" by virtue of Nugget's control over Spencer, which was the material point. *Id.* The court stated it declined to do so only because it was "not convinced" that doing so would make Nugget and USF&G liable to North Star. It considered Nugget an "undisclosed" principal and considered it "unanswered" whether "contracts entered into by an agent [can] be construed as binding an undisclosed principal" under Alaska or federal law. *Id.*

In its motion for reconsideration requesting the district court to revise that part of its order and recognize this second basis for legal liability, North Star answered that question. It demonstrated that the district court had misconstrued the one Alaska case the court had cited, *Jensen v. Alaska Valuation Service, Inc.,* 688 P.2d 161, 165 (Alaska 1984), and that under both federal law and Alaska law the *Cargill* analysis finding the undisclosed principal (Nugget) liable should be applied to this case. ER 708-12.

The district court declined to grant reconsideration, however. It determined that consideration of "an alternative theory upon which the use plaintiff might have prevailed" was unnecessary where it would not change "the outcome of this case" under which North Star had already prevailed, citing *Lee v. Burlington Northern Santa Fe Railway,* 245 F.3d 1102 (9th Cir. 2001).[14] ER 715-716.

---

[14]    In *Lee* this Court ruled, at 245 F.3d 1107, that alternative theories upon

33

This Court should exercise its *de novo* review to uphold and enlarge upon the district court's grant of summary judgment to North Star by applying this alternative basis to Nugget and USF&G's liability. It should particularly do so if it declines to uphold the district court's application of the federal "telescoping" basis for recovery in this case or otherwise determines that application of this alternative basis for recovery enlarges North Star's monetary recovery, including its entitlement to attorney fees, late charges and/or interest,[15] as will be discussed more later in this brief.

Summary judgment for North Star was also warranted on the basis of a contract implied at law, or quasi-contract. As North Star demonstrated in the proceedings below, it was entitled to summary judgment upon that alternative basis, according to Alaska law as applied to the Miller Act and/or as a separate state law remedy to be applied within the lower court's supplemental jurisdiction. *See* ER 575-79, 673, 712-14, 732-33, 750-51, 765-66. The district court did not apply that cause of action and remedy, apparently because it had chosen to apply the federal telescoping cause of action, because it considered this "a Miller Act case", and because it understood the implied contractual relationship that is

---

which a party might have prevailed are preserved on appeal as long as properly raised below and need not be separately noticed on appeal unless they would result in impacting a party's right to monetary recovery.

[15]    *Cf. Lee*, 245 F.3d at 1107.

34

sufficient to create a direct relationship with the prime contractor within the intendment of the Miller Act to include contracts implied-in-fact but exclude implied-in-law quasi-contracts. It cited *Interform Company v. Mitchell*, 575 F.2d 1270, 1279 (9th Cir. 1978). ER 329, 344, 346.

However, as the court concluded in *Fidelity*, even were recovery not to be permitted upon a quasi-contractual concept of recovery under the Miller Act, it would still be allowed against the prime contractor where state law allows for it and where, as here, the state law "cause of action is inseparably bound with and arises from the same facts which support a substantial [Miller Act] federal cause of action". *Fidelity*, 360 F.2d at 409, 411. That conclusion is even more inescapable since enactment of 28 U.S.C. § 1367 in 1990 making such supplemental jurisdiction mandatory.

The district court also failed to recognize that the distinction made by the court in *Interform* does not apply where an implied-at-law relationship has "a firm and significant transactional link" with a preexisting express or implied-in-fact contract. *Interform*, 575 at 1279. In that instance, the limitations under the Miller Act "intended to reduce the number of claimants *unknown to the contractor*" are inapplicable. *Id*. That is particularly the case given the "highly remedial" nature and "liberal construction and application" to which the Miller Act is entitled. ER 343, 350; *United States ex rel. Walton Technology, Inc. v. Weststar*

35

*Engineering, Inc.*, 290 F.3d 1199, 1205 (9th Cir. 2000). North Star was by no means "unknown" to Nugget.

Furthermore, the correctness and very underpinnings of the distinction made between "implied-in-fact" and "implied-at-law" contracts in *Interform* are questionable and warrant re-examination by this Court.[16]

> 3. The District Court Correctly Determined the *Material* Facts Not *Genuinely* In Dispute and Correctly Applied the Federal "Telescoping" Cause of Action to Those Undisputed Material Facts to Find Nugget and USF&G Liable.

> a. The District Court Correctly Decided the *Material* Facts Not *Genuinely* in Dispute.

Nugget and USF&G first argue, in very conclusory fashion, that the

---

[16]    That distinction repeated by the district court below from *Interform* was not made by the United States Supreme Court in *J. W. Bateson Company v. United States ex rel. Board of Trustees*, 434 U.S. 586, 589, 98 S. Ct. 873, 877 (1978), cited in *Interform*, and was dictum in *Interform* given the holding in *Interform* at 575 F.2d 1279 noted above. Furthermore, in support of the distinction, the *Interform* court cited the *Fidelity* decision, which in turn relied on just two federal *district* court decisions decided in 1946 and 1949. For such a distinction, the *Interform* court also cited *Central Steel Erection Co. v. Will*, 304 F.2d 548, 552 (9th Cir. 1962), *see Interform*, 575 F.2d at 1279, but the *Central Steel* decision does not support that distinction and, if anything, supports the contrary conclusion. *See Central Steel*, 304 F.2d at 551-52 (finding an implied contract and entitlement to *quantum meruit* relief although "there was never any meeting of the minds of the parties upon any arrangement or system of compensating them" and relying upon *Continental Casualty*, 173 F.2d at 9, for the proposition that implied direct relationships with the prime contractor come within the construction and purposes of that Act "Whether the theory is called implied-in-fact contract, *quasi-contract* or promissory estoppel . . . .").

36

district court determinations as to Nugget's control over Spencer supporting

summary judgment were in error, because allegedly "hotly disputed" by Nugget at

the district court level. Br. at 28. However, as this Court has repeatedly

emphasized, general allegations and emotional pitch are insufficient to defeat

summary judgment on the district court level or obtain its reversal on appeal. *See,*

*e.g., Far Out Productions,* 247 F.3d at 992, 996-97. It is instead Nugget and

USF&G's burden "to set forth specific facts or identify with reasonable

particularity the evidence that precluded summary judgment". *Id.* They have

failed to do so in their opening brief. It is fair to expect that this Court will not

permit them to do so for the first time in their reply, thereby leaving North Star no

reasonable opportunity to respond.

Nugget and USF&G next argue that the district court's determination

of control by Nugget "implicates fraud", that fraud contains the element of intent,

and that fraudulent intent was not conclusively established. Br. at 28-29.

However, both the presumption and conclusion are incorrect.

First, the telescoping remedy applied by the district court requires only

subterfuge, collusion, _or_ *circumstances indicating* the interposition of straw men.

*Fidelity,* 360 F.2d at 410. It does not require finding all three, or finding fraudulent

intent, or finding  fraudulent intent against a particular party. *Id.*

Nugget's subterfuge was unequivocally established. Jack Goodwill,

37

#60571
EXHIBIT 1
Page 58 of 83

North Star's operations manager, testified to it (ER 140F), Robert LaPore testified to it (ER 600), the correspondence between Nugget and the Corps of Engineers established it (ER 426, 436-37, 717-720), and Nugget nowhere has genuinely denied it with specific facts or evidence.

Nugget's control and substitution of itself for Spencer over the project work it had originally contracted to Spencer was also established. ER 333-39, 346-49. It was unnecessary to establish also that Nugget did so with a fraudulent intent, or with the intent specifically to defraud North Star, as Nugget and USF&G now propose.

Nor was it necessary to show that Nugget intended to insulate itself from liability (Br. at 29). That much is *presumed*. *Fidelity*, 360 F.2d at 410. In any event, as the court below observed, that too was established, by Nugget's own "insulation from liability" provisions it inserted in its "support" arrangement with Spencer and other established facts. ER 333-34, 347.

Contrary to Nugget's sole reference to the conclusory, self-serving refutations of Randy Randolph (Br. at 29), the specific evidence, including Nugget's own records and specific testimony, also established that Nugget did in fact control Spencer's officers and employees and its finances and ability to pay its creditors. It did so by, among other things, replacing Spencer's employees with its own, relegating Spencer's president to driving a truck, making all significant

38

performance and management decisions relating to the work originally contracted

with Spencer (including when, where and how to load the rock onto Nugget's

barge utilizing North Star's services and then terminating North Star when it suited

Nugget's purposes), backcharging Spencer for the cost of those substitutions and

decisions benefitting Nugget, and then intercepting and paying itself first among

Spencer's creditors from the funds it otherwise owed Spencer. ER 333-39,

346-349. Although it need not be shown, Nugget also apparently did so in

violation of the Federal Prompt Pay Act, 31 U.S.C. §§ 3903(b), 3905(b)-(h) (as

amended 1988), which effectively served to amend and supplement the Miller Act.

ER 426, 436-37, 622, 692-706. *See also United States ex rel. Cal's A/C & Electric

v. Sustamos Const. Corp. & Capitol Indemnity Corp.*, 34 F. Supp. 2d 1042, 1043-

44 (W. Dist. La. 1999).

Furthermore, as Mr. Goodwill specifically testified, Nugget did

represent itself to North Star as being in control of the loading operations — while

at the same time it deliberately withheld the full extent of that control, including its

control over Spencer's purse strings, from North Star, which served to delay North

Star demanding payment from it. ER 140C-F, 473-75. Nugget represents that it

had contact with North Star only "for the barge loading operations" (Br. 30), but of

course that was North Star's entire scope of work for the project.

Nugget's further argument that it was under no duty to disclose the

39

72