Steven J. Shamburek
Alaska Bar No. 8606063
LAW OFFICE OF STEVEN J. SHAMBUREK
425 G Street, Suite 630
Anchorage, Alaska 99501
(907) 522-5339 Direct
(907) 522-5393 Fax

Attorney for Plaintiffs
Shoreside Petroleum, Inc.,
d/b/a Marathon Fuel Service
and Metco, Inc.

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA for the use of NORTH STAR TERMINAL & STEVEDORE COMPANY, d/b/a Northern Stevedoring & Handling, and NORTH STAR TERMINAL & STEVEDORE COMPANY, d/b/a Northern Stevedoring & Handling, on its own behalf, <br><br>          Plaintiffs, <br><br>     and <br><br> UNITED STATES OF AMERICA for the use of SHORESIDE PETROLEUM, INC., d/b/a Marathon Fuel Service, and SHORESIDE PETROLEUM, INC., d/b/a Marathon Fuel Service, on its own behalf, <br><br>          Intervening Plaintiffs, <br><br>     and <br><br> METCO, INC., <br><br>          Intervening Plaintiff, <br><br>     vs. <br><br> NUGGET CONSTRUCTION, INC.; SPENCER ROCK PRODUCTS, INC.; UNITED STATES FIDELITY AND GUARANTY COMPANY; and ROBERT A. LAPORE, <br><br>          Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> **SHORESIDE'S AND METCO'S OPPOSITION TO MOTION TO BAR TESTIMONY OF WILLIAM GRANT CALLOW** <br><br> **MEMORANDUM IN SUPPORT OF MOTION TO TO BAR TESTIMONY OF JOHN L. GEORGE** <br><br> 3:98-cv-0009-TMB |

1

COMES NOW Shoreside Petroleum, Inc., d/b/a Marathon Fuel Service ("Shoreside") and Metco, Inc. ("Metco"), by and through counsel, and file this Opposition To Motion To Bar Testimony of William Grant Callow and Memorandum In Support of Motion To Bar Testimony of John L. George.[1]

### Introduction

The claimants and USF&G each proffered experts and provided expert reports regarding the claims of bad faith against USF&G. The claimants designated Mr. Grant Callow and provided his report.[2]   USF&G designated Mr. John George and provided his report.[3]   The two individuals proffered as experts each present fundamentally different underlying versions of the applicable law.  As a preliminary matter, this court should determine the applicable legal test.  If there is no duty to the claimants as Mr. George assumes, there is no need for testimony.  If there are duties, the testimony of Mr. Callow is helpful under the circumstances.  This issue is briefed separately.

### Basis of Mr. Callow's Testimony

Mr. Callow was provided the documents attached to the letter dated February 8, 2006.[4]   Those documents include the Docket Sheet for this case at the time and the following pleadings:

---

[1]     This pleading addresses the motion and memorandum at Docket Entry Nos. 505 and 506.

[2]     Docket Entry No. 460, Exh. 1.

[3]     Docket Entry No. 527, Exh. D.

[4]     Docket Entry No. 460, Exh. 1, pp. 13 – 14; Docket Entry No. 506, Exh. A, pp. 27 - 28.

Pleadings and Orders at Docket Entry Numbers 24, 25, 27, 42, 44 and 46;
Order dated June 3, 1999 at Docket Entry No. 124;
Memorandum Decision of the Ninth Circuit dated September 27, 2001 at Docket Entry No. 255;
Order dated August 30, 2002 at Docket Entry No. 310;
Memorandum Decision of the Ninth Circuit dated March 3, 2005 at Docket Entry No. 383;
Shoreside Amended Complaint dated August 31, 2005 at Docket Entry No. 406;
Metco Amended Complaint dated August 31, 2005 at Docket Entry No. 407;
North Star Amended Complaint dated August 31, 2005 at Docket Entry No. 409.

The discovery documents include:

Documents produced by USF&G and marked "USF&G" with some blank documents;
Documents produced by Nugget and marked "WEL";
Documents produced by Nugget and marked "Nugget";
Metco's Discovery Responses dated November 14, 2005;
Metco's Supplemental Discovery Response dated November 28, 2005;
Shoreside's Third Supplemental Discovery Responses dated December 9, 2005.

Mr. Callow's resume was provided to the parties as an attachment to his report.[5]  His deposition was taken on March 31, 2006.  A copy of the transcript is attached as Exhibit 1.[6]

### Deposition of Mr. Callow

USF&G refused to pay for any of Mr. Callow's time preparing for the deposition.  Prior to the deposition, the undersigned contacted counsel for USF&G and asked him to mark any exhibits he intended to use at the deposition.[7]  Counsel for USF&G stated that he would not use any exhibits at the deposition.  However,

---

[5]    Docket Entry No. 506, Exhibit A, pp. 39 - 44.

[6]    The references are to the page numbers in the deposition itself.

[7]    This matter is troubling but is nonetheless incidental so none of the e-mail exchanges are printed and included as exhibits.

at the deposition, counsel for USF&G introduced exhibits contrary to this agreement.  Rather than interrupt or terminate the line of questions, the undersigned objected and allowed the questions to proceed.[8]  Then counsel for USF&G introduced some documents that included a letter that had not been previously produced by USF&G to undersigned counsel.[9]  Counsel continued to ask questions regarding information that had not been provided to the

---

[8]    The undersigned objected as follows:

    MR. SHAMBUREK:  Now, Herb, I'd just like to note that in an e-mail exchange I had asked you to mark any exhibits that you were going to use for the deposition, and you said there would be no exhibits.

Exh. 1, p. 7, ll. 8 - 12.


[9]    The undersigned objected as follows:

    MR. SHAMBUREK:  Herb, I'm just going to object to the extent that this letter was not in the documents that were provided by USF&G to us, and it thus cannot be in the materials conveyed to Mr. Callow, because he did not receive anything beyond what you provided to us.
    MR. VIERGUTZ:  Then it was by your omission and not mine, because I provided it to you with a cover letter a couple days after realizing that omission from these documents.
    MR. SHAMBUREK:  I don't recall the cover letter or the document.  Do you have a copy of it?
    MR. VIERGUTZ:  No.
    MR. SEWRIGHT:  Herb, have you totally reordered these by date from what you produced?
    MR. VIERGUTZ:  I'm not being deposed and I'm not --
    MR. SHAMBUREK:  Herb, I'm going to object.
    MR. VIERGUTZ:  -- prepared to answer questions.
    MR. SEWRIGHT:  Yeah, but -- yeah, but --
    MR. SHAMBUREK:  These are not the documents that were provided by you in this order that were then provided to Mr. Callow.  I sent an e-mail and I said if you wanted to review those documents I would provide them.  These are more, they're different, and they're marked with other numbers.  So we're going to object to any of these questions.

Id. at p. 42, l. 14 – p. 43, l. 17.

undersigned and perforce could not have been provided to Mr. Callow.    Mr. Callow returned from California in part to accommodate Mr. Viergutz' schedule and avoid motion practice.

Mr. Callow testified that he has not served as an expert witness regarding bad faith practices of a surety or insured.  He stated that he has testified a number of times, although he did now know whether he testified as an expert.  He noted that he testified in the <u>Weiford</u> case that was addressed in a written opinion by the Alaska Supreme Court.

At his deposition, Mr. Callow discussed his background as follows:

Q.   What is the general area of your practice? What is -- what law do you practice?

A.   Well, I have been doing a fair amount of insurance coverage work.   And sometimes that has arisen in the context of personal injury, sometimes the personal injury work spins off into insurance bad faith.   I have, in recent years, been undertaking -- I've been doing less of that and doing a variety of other things.

<u>Id.</u> at p. 17, l. 22 – p. 18, l. 6.  Mr. Callow was asked about other testimony and educational programs as follows:

Q.   Page 12 of your report, which is the final page prior to your signature there.

A.   Uh-huh.

Q.   It says, "Other Testimony," and in the final sentence of that paragraph it says:  I have also taught

a continuing legal education course on the subject of discovering and proving insurance bad faith.

A. Yes.

Q. Have you ever taught a continuing legal education course on the subject of discovering and proving surety bad faith?

A. Well, to the extent that I consider sureties and did consider -- have considered sureties to be insurers, the answer is yes. But specifically, in that particular course, I never discussed sureties.

Q. Are you aware that there is a body of law called suretyship law?

A. Yes.

Q. And was that covered in your continuing education course?

A. No, sir.

Id. at p. 25, l. 6 – p. 26, l. 3. Mr. Callow was asked to define bad faith in an exchange as follows:

Q. Would you define bad faith for me, please.

A. Well, bad -- there are a couple of different standards for bad faith. But bad faith is the breach of the duty of good faith and fair dealing that is implied in every contract, including every insurance contract. And, according to Alaska case law, every surety contract.

Q. I understand that. But bad faith means what?

A. Well, it means lots of different things depending

6

on the context of the case.  But basically what it
means is that a party takes a position that is
unreasonable or engages in conduct that is
unreasonable.  Or -- or in reckless disregard for
rights, that can be -- there are numbers of different -
- there are different types of bad faith.  And I'm
speaking          now          about          Alaska          law.
Q.  And who determines whether the position is
unreasonable?
A.  Well, I guess the question becomes at what point.
But usually that is determined in a court of law,
sometimes by a jury, or sometimes by a judge.

Id. at p. 10, l. 9 – p. 11, l. 5.

Mr. Callow was also asked about the differences between an
insurer and a surety.

Q.  What are the differences between --
A.  [. . .]
Q.  -- between a surety and an insurer?
A.  Well, a surety is actually providing protection to
-- it's a type of a third-party contract.  And the best
definition of it and distinction is in a case up here
called the Loyal Order of Moose, I don't know what the
cite is, but that will tell you specifically what it
is.

But in the normal insurance circumstance, an
insurer provides protection to the insured against
third-party liability.  A surety, on the other hand, is

really providing protection to a third party. And
that's the essential difference.

The person who's paying the premium is paying a
premium for the protection of third -- of third
parties. But the coverage that is being provided is
being specifically provided to the third party, so it
makes it different than what is called a third-party
insurance contract -- or I'm sorry. What's called a
third-party claim where, in the average automobile
case, someone -- I have insurance on my car and for
driving, I run a stop sign, I injure somebody, they sue
me, my insurance company defends, that's a third-party
claim.

Most courts hold that the insurer, even though I
bought insurance to maybe protect the person that I
might injure, that is -- the courts say, no, you really
bought insurance, in that circumstance, to protect
yourself.

In the case of a surety, there I'm buying -- I'm
paying a premium to protect a third party specifically
from a particular contingency, and in this case it's
payment.

Q.   What are the differences between the duties of a
surety and an insurer?

A.   Well, I assume you're talking about -- in terms of
claims investigation and handling; is that correct?

Q.   You can answer that.

8

A.   Okay.  The essential difference -- well, in fact, both have a duty of good faith and fair dealing.  Under Alaska law, I'm speaking of Alaska law.  Alaska law is applicable under the Miller Act, and the duties of good faith and fair dealing in an insurance context, whether for a bonding company or for any liability company, are essentially identical when it comes to duties to investigate claims.    And to investigate them thoroughly, to reasonably pay claims, all the duties that are set forth or the standards that are set forth in the Alaska Insurance Code, Title 36, and in the appropriate administrative regulations.

But in terms of their duty to investigate claims and to pay claims, duties are similar.

Q.   Does a surety have a duty to the principal?

A.   Well, yes.  Particularly where there is a -- there is an indemnity agreement of some sort.  There is a duty to the principal, there is no question about that.

But the -- there is -- there is a duty to the insureds and -- let me -- let me step back.

You can't have a surety just recklessly paying claims and then looking to its principal and saying, now you got to pay us back.  They have to act reasonably.  They have to reasonably investigate the claim, do it reasonably promptly, and then -- and then pay the claim.  And at that point they can turn to their principal.

But if it turns out that they did any of that negligently and paid too much, they have -- to that extent, forfeited their right to collect from the principal.

Q.   How is that duty impacted, if you know, by the general agreement of indemnity?

A.   How is -- say that again, please.

Q.   How is the duty to the principal impacted, if you know, by the general agreement of indemnity?

A.   Well, the general agreement in indemnity -- maybe the best way to put it is this:  If there were none, the principal wouldn't be harmed by the negligence, there would be no interest that the principal would have if the surety overpaid a claim or paid an invalid claim.  The surety would be just out the money.

Where there is an indemnity agreement, that indemnity agreement limits the right of the surety to recover from the principal, to the extent that the surety has been negligent and overpaid a claim or paid an invalid claim.

So the surety still has the obligation to carefully investigate and pay claims as required by law, always has.  And that obligation is to the -- what I will refer to as the thirds, the third -- or the insureds, the third-party beneficiaries.

Existence of the indemnity agreement merely means

that there is -- there is also, rather than a duty, really -- I hate to rephrase it as a duty, but it's -- it's a circumstance where the negligence of the surety, as I've said before, in failing to properly investigate a claim, paying any claim that is invalid or overpaying a claim, limits the right to indemnity.

Q. I don't see, in the last two pages attached to your report, that you reviewed the general agreement of indemnity in this case. Did you?

A. Well, I'd have to go back and look at my -- I'd have to look at my notebook to see that, if I did or not. I can't -- as I sit here today, I can't remember if I did. I certainly understood that there was one and I -- and I considered that to be something important to know.

Id. at p. 18, l. 19 - p. 23, l. 7. Mr. Callow was asked about the duties of a surety to the obligee as follows:

Q. What is the duty of the surety to the obligee?

A. Well, there are lots of duties, but if there is the duty to promptly investigate a claim, to reasonably investigate the claim. To pay the claim, any claims that are valid, in a prompt manner. There is a duty to communicate in a timely fashion concerning the claims. And most of the duties, or many of the duties, are embodied in Title 36 of the Alaska Insurance Code and in the corresponding administrative regulations.

Id. at p. 23, l. 22 - p. 24, l. 8.

The deposition discussed the notice and supporting documents provided by the claimants to USF&G and USF&G's response in internal correspondence as follows:

Q.   Page 5 of your report, around the middle of the page.  There's a sentence that reads, and my question is going to be...

The darkened part.  "At this time, I would appreciate it if you could provide me with any information regarding whether this is an ongoing account, because based on the information available to me at this time some of the defenses of the principal may be questionable."  Why is that darkened?

A.   My recollection, as I sit here, without looking at the original document, is that it was -- it was originally darkened in the first place.

Q.   Okay.

A.   I mean, I put in "emphasis added" and I can't remember -- it may be that I added the emphasis, but I can't recall.

But, you know, clearly that -- that was important, that is important to me, because this was the first time, and this was early on, that we know that Ms. Poling understood that there were -- that the defenses were -- of the principal were questionable, or may be questionable.

Q.   She's not saying they were questionable, is she?

A.   No.  No.  "May be."

12

Q.   And you never spoke to Ms. Poling?

A.   No, sir.

Q.   Regarding her intent?

A.   No.

Q.   The next line, that's no longer a part of Ms. Poling's letter, correct, where you're saying "USF&G acknowledged the questionable defenses of Nugget at least by October '97"?

A.   Yes.

Q.   And where did they acknowledge it?

A.   Oh.  If you look up at what I was referring to here, as I recall, is that by Ms. Poling's e-mail to Bill Wells of 10/24, and that actually -- since it's an e-mail, I don't -- I don't believe now that that was originally    highlighted,    so    I    guess    I highlighted, that's why emphasis is added.

     But we know from her e-mail that US -- when I say acknowledged, USF&G, by October 24, the date of that e-mail, was aware of -- that Nugget had questionable defenses.  That's what I meant.

Q.   That they had them or may have had them?

A.   Well, they may have them.  At least that they were on notice -- they appeared to be on notice that there needed to be an investigation, at least, that's what -- that's what that tells me.

Q.   Do you recall reviewing anywhere where USF&G was saying that they agreed that the defenses of Nugget

13

were questionable?

A.   I want to make sure that I answer that question carefully, because to my -- the way I interpreted this e-mail is that they were aware that there were issues concerning whether defenses were viable, that there were questionable defenses.   And that therefore, at that point, I would say yes, they were aware that there were issues concerning viability or the legitimacy of the defenses, of some of the defenses.

     So did they say that they were questionable?   It says -- here it says they may be questionable.   I don't know how to say that other than -- I don't think anybody would have written that if they didn't believe that there were -- there were things that needed to be discovered or to be investigated to determine if they were valid defenses.

     So I don't know whether I've answered your question, but I think that's -- I have to be very careful here because I think -- you know, somebody writes this and they say, well, the defenses of the principal may be questionable.

     In this context, I believe a reasonable interpretation is that this woman wrote this because she believed that those questions may be really meant, are questionable, or that there is -- there are -- there is evidence that we're aware of that makes us believe that they're not legitimate.   Is that

clear?

Q.   It's clear.  It did not answer my question.

A.   Okay.

Q.   My question is, do you recall ever reading specifically where USF&G says:  Nugget is forwarding questionable defenses?    Not that they may be questionable, that they are questionable.

A.   The answer is, that that's how I would interpret this e-mail, as saying that, but I -- using those words, correct, I did not see that.

Id. at p. 26, l. 10 – p. 30, l. 1.  Mr. Callow also states:

Q.   Now, if we could go to page 6, the first paragraph above "Proofs of Claim," the final sentence.  It says, USF&G knew or should have known that Nugget was attempting to prevent this evidence from being disclosed as early as September or October '97, and should have undertaken greater scrutiny of Nugget's representations to it.

Now, if we could break that sentence down, please.  First of all, do you know what USF&G knew or didn't know on that date?

A.   I certainly know some of what they knew.  I knew that they were -- yes, to answer your question, yes.

Q.   And what did they know?

A.   Well, they knew enough to know that, as we referred earlier, that Nugget's -- there were questionable defenses by Nugget, and that -- that

Nugget had -- they had sufficient knowledge to know that Nugget was attempting to prevent the evidence from being disclosed.

Q.    Do you know what reasons Nugget had for its actions or inactions?

A.    Well, the simple answer is that I believe that what Nugget was trying to do was to maximize its income from the project at the expense of the subs.

Q.    And how do you come to that conclusion?

A.    Well, because Nugget was seeking payment on this job and was not paying the subcontractors.

Q.    And for your answer are you assuming that Shoreside or North Star were subcontractors to Metco?

A.    Well, yes.

Q.    Now, the final -- after your 1997 in that sentence, it says: "And should have undertaken greater scrutiny of Nugget's representations to it." What does that mean?

A.    Well, let me see if I can refer you to another section where I explain this. If you look at page 11 of my report in the third paragraph down, I -- that summarizes. But at the end of that paragraph: Figuratively speaking, USF&G allowed the fox into the hen house and then abandoned the three hens it had a duty to reasonably protect.

        USF&G's primary duty was to protect the obligees.

16

And to that extent, had a duty to carefully, reasonably, and in good faith scrutinize the information that was provided to it or that it became aware of concerning Nugget's representations.

It can't just simply say "I'm going to -- USF&G can't just say, well, whatever Nugget tells us we're just going to believe, particularly where, as here, they have reason to believe that there needs to be an independent investigation of some of -- where things aren't making sense.

In any case, the surety has an obligation to investigate in good faith on the claims. And to pay them if they're valid. So that's what I -- that's what I intended to convey here.

Q. When you have a client and a client tells you something, do you investigate what that client's telling you?

A. Yes. I usually -- I mean, I have -- I usually make it clear, and I believe I have a standard clause in my contract, that if it becomes -- that if I learn that the client has failed to disclose material facts or has misrepresented material facts, that I have a right to withdraw. I think that's how -- it's worded something like that.

Q. How do you go about investigating what the client tells you?

A. Well, that's a good question. I usually -- it

depends on what kind of case it is.  But if the client tells me about certain events occurring where other people were present, I will talk to the other people that were present, or I will have an investigator do that.

If the client tells me -- I'm just trying to think of some good examples.  I almost -- I mean, I can't even think of when I haven't investigated to make sure that what the client tells me is correct.

Because it's my professional reputation that's on the line, and the last thing I want to do is get involved in a court case and have something come out of left field that not only guts the case, but really professionally embarrasses me, so I feel like, yes, I've got a duty to look at that.  I don't take what clients tell me at face value.

Q.  Hypothetically, you're USF&G, what would you have done in this case?

A.  I would have undertaken an independent investigation of the facts.  I would have interviewed the individuals involved.  I would have determined what work had been done, and the quality of that work.

I would have asked Nugget to explain in detail and in writing the reasons why it had not been paying these contractors, subcontractors.  I would have -- having tendered the defense to Nugget, I would have monitored Nugget's defense extremely carefully.

18

For example, one of the things that happened in here, that I think was very bizarre and really inexcusable, was some defense that was made saying that this wasn't a federal project, this was not a -- yeah, it wasn't a federal project. And I think that's the kind of thing that -- I mean, it's -- according to my interpretation of the standards in Title 36, that's -- that's the kind of litigation tactic that is completely unacceptable, and I think USF&G had to determine that Nugget was defending this, there's a good faith standard. USF&G can't get around good faith standards by saying, well, we're just going to tender to Nugget and wash our hands of this.

I'll give you -- I'll give you another example. In the circumstance of an insurance -- underinsured motorist claim, that's a first-party claim that's similar, where a person who has been hit by an uninsured motorist has to file a claim against their own insurer.

And there is an adversarial position there, but the insurer in that circumstance has duties to its insured, good faith duties to its insured, even in the context of that adversarial relationship, to investigate carefully the claim and pay the claim. That was the <u>Weiford</u> case up here. And in the surety circumstance, the surety has that similar type of obligation to the obligees.

Q.   You pointed out the, what you called, bizarre defense.  Why wasn't Nugget able to make that defense?  Again, hypothetically, you're USF&G.  If they want to make a defense, aren't they entitled to assert it?

A.   Well, remember, USF&G has tendered the defense, but in so doing it has -- and it actually, in this case, undertook or assumed the obligation of monitoring how that defense was being provided and -- or how the defense was being conducted.

     And if you ask me do they have a right to assert any defenses that they want, the answer is that Nugget can do whatever it wants, USF&G, however, has to make sure that Nugget is not just vexatiously litigating the case, trying to drive the claimants away from the claim by running up costs.  I mean, that's an insurance bad faith practice right there.

Q.   You're USF&G in this case.  And you're sitting there seeing this defense being made.  Okay?

A.   Uh-huh.

Q.   Just hypothetically again.  Don't you have an obligation to allow the principal to assert a defense if the principal believes it has merit?

A.   Well, the answer is, you can't defer -- if you're USF&G, you can't simply defer to Nugget, because you have an obligation to the obligees.  So if in fact there are legitimate defenses to the obligee's claim, those can be -- those can be presented and conducted.

20

If, on the other hand, there are not legitimate defenses to the obligee's claim, then -- or if some of the defenses that are raised are not legitimate themselves, then USF&G has a duty to stop that. That's why they're -- that's why they're monitoring. They're in a position where they have -- their principal duty, as I see it, is to the obligees, the insured.

Q. Isn't it a fact that the only duty to the obligee is to pay a claim of the principal if the principal doesn't pay that claim?

. . .

A. No, I disagree with that.

p. 31, l. 1 - 38, l. 11.

There was a discussion of the duty to investigate and some letters. One letter is an Oles Morrison letter to Jane Poling with USF&G that was not previously produced to the undersigned.[10]

---

[10]    Counsel discussed the lack of disclosure as follows:

Q. And so you never saw a couple boxes of documents forwarded by USF&G which contained those materials; is that correct?

A. That's correct.

MR. SHAMBUREK: Herb, there's still an objection to foundation, to the extent you say there were boxes, because I don't think there were any boxes of information provided by USF&G during the document review in November and December.

MR. VIERGUTZ: You and I stand at odds on that issue. Be that as it may, it's neither your nor my deposition.

BY MR. VIERGUTZ:

Q. Now, if we could go back to 055. That's a March 3rd, '98 letter.

A. Yes.

Q. That's after January 5th, '98, referenced in Exhibit 1, your report, at paragraph 3 that we're talking about, correct?

He notes:  "Because my position has always been that USF&G had a duty itself to independently investigate, to not simply just take the word of Nugget."  Id. at p. 54, ll. 7 - 10.  Mr. Callow discusses the bad faith cause of action as follows:

> Q.   Paragraph 38 says:  "Upon information and belief, and subject to such further evidence as is disclosed by discovery, USF&G is also liable to North Star, under

---

A.   Yes.

Q.   And this is a letter that's -- goes to page 66, is that correct, that would be 11 pages long?

Id. at p. 41, l. 20 - p. 42, l. 13.  The lack of disclosures surfaced again in a discussion as follows:

MR. SHAMBUREK:  Herb, I'd just like to point out that Exhibit 2 was represented to be the documents provided to the claimants from USF&G.  Some of these documents were provided to the claimants as a group.

Now, I don't recall this March 3rd, 1998 letter; we can deal with that later.  But I don't think you're representing that it was included initially in the packet of material that you provided.

MR. VIERGUTZ:  No, I'm not.  055 was a letter, through 066, that for some reason I omitted from the package, and it was either the day after or the day after that, I forwarded it to both of you, Mr. Sewright and yourself, as well as, I believe, Traeger Machetanz at that time.

And I think, and I'll look, and I could be wrong, but I believe my correspondence said just put it in there in date order.  Which should have been in there.

But, in any event --

THE WITNESS:  I need to know what the question was again.

BY MR. VIERGUTZ:

Q.   My question simply on this letter is, does this letter appear to provide USF&G with information from Nugget on the claims?

A.   Correct, yes.

Q.   Then Exhibit 3, if we could.

MR. SHAMBUREK:  Herb, again, I have to object because I had sent you the e-mail and just asked you to pre-mark any exhibits that were going to be used and you said there would be none.

Alaska law, for the bad faith nonpayment, nonsettlement and/or refusal to discuss settlement of North Star's claim previously brought under the Miller Act herein, of which USF&G was notified."

Where do you see a claim for bad faith failure to investigate in that paragraph?

A.    I don't.

Q.    Now, if we could go to Metco's amended –

A.    May I just say this?

Q.    Sure.

A.    When you say bad faith nonpayment, in order to make the payment, there has to be an investigation.  So it's sort of a summary conclusion to say -- to say -- when you say there's a bad faith nonpayment, you can't make a payment, obviously, until you've reasonably investigated.

And so a bad faith nonpayment is legitimate to say it incorporates failure to investigate.

Q.    Let's go to Shoreside's amended complaint, and that's page 19.

. . .

Q.    There's a little additional verbiage on that paragraph, but there's no specific claim for bad faith failure to investigate, would you agree?  It's again for bad faith nonpayment, nonsettlement, and/or refusal to discuss settlement.

---

Id. at p. 45, l. 16 – p. 46, l. 23.

A.   Yes, that's correct.   The word -- the word bad
faith failure to investigate, the words do not appear
there.   My answer is the same, though, about bad faith
nonpayment.   I think that, in the liberal rules of
pleadings, that's...

. . .

Q.   Page 7 of your report, Exhibit 1, "Settlement
Efforts."   Was USF&G obligated to discuss settlement?

A.   Yes.

Q.   Why?

A.   Because they have -- their primary obligation is
the obligees.   And they need -- under Alaska law, they
need to investigate and promptly settle claims.
Legitimate claims.   And so if they fail to promptly and
adequately investigate, obviously they can't -- they
can't settle, but if they -- they can't get around the
settlement duty by failing to properly investigate.

Id. at p. 57, l. 6 – p. 59, l. 11.   Mr. Callow also notes and
discusses the state statutes as follows:

A.   Okay.   All right.   Surety.   Okay.   In that
circumstance, I believe that a surety is bound to the
same rules as an insurance company.   I just think it's
a subset of insurance companies.   And I think that they
have a duty to investigate and promptly settle claims
under Title 36, and also under -- you know, I've been
saying Title 36, and I should be saying -- it's 21
21.36.125, and so anywhere I've been saying Title 36

24

because I -- just my notations I write 36 and then
125, but it's really Title 21.

MR. SEWRIGHT: So you mean Chapter 36.

THE WITNESS: Yes, that's right. Yes, that's right.
So it's Title 31, Chapter 36.125. And under, I think
it's 3 AAC 030 point whatever, I can't remember the
226, that -- there are -- there are duties that
insurance companies have to promptly settle claims.

Id. at p. 60, l. 13 – p. 61, l. 6. Mr. Callow also discusses the
duty to investigate in the context of settlement as follows:

Q. And it is not bad faith to refuse to settle if the
surety has a good faith basis to believe that the claim
is without merit?

A. That's correct. And I want to make sure that I'm
clear with you on this. By that, I don't want you to
take it that I am saying that the -- that USF&G can
simply rely on the principal to provide the
investigation and the analysis of the claim. USF&G has
an independent duty, and only by fulfilling that duty
can it end up with a good faith basis for making
those decisions.

Id. at p. 62, ll. 13 – 24. Mr. Callow discusses the duties to
the obligees as follows:

Q. The final paragraph of page 8, USF&G knew or
should have known that Nugget was secretly structuring
its transactions so that Nugget could deceive the Corps
of Engineers and the three claimants regarding the

25

actual contractual relationship, yadda, yadda, yadda.

How should USF&G have known that?

A.   Well, by doing an independent investigation.

Q.   If it was a secret, how would they have known it?

A.   Well, if it was a secret it was -- it was Nugget that was trying to set this up and keep it a secret. USF&G would have known by talking to the obligees themselves and finding out the nature of the transactions.

Q.   And would they have an affirmative duty to believe, over the principal, the positions of the obligees?

A.   Well, that -- my position has been that legally they owe a duty to the obligees that I consider to be paramount to their duty to the principal.

And they are -- that is -- but that doesn't mean that they should necessarily believe.  They need to do an independent investigation and make a determination.

Q.   And that analysis is based upon your position that there is a duty to the obligee more than simply paying the claim of the obligee in the event the principal does not pay it, correct?

A.   There is a duty to the obligee -- repeat that again, please.

. . .

THE WITNESS:  Let me say that there's a duty beyond -- that's the phrase you used.  There is a duty

to pay legitimate claims and that is the ultimate duty,
so when you say there's a duty beyond, I want to say
this, it's really not be beyond, it's a precursor duty
to properly investigate, but I think we're
understanding each other.

Id. at p. 68, l. 22 - p. 70, l. 18. Mr. Callow also discusses
the federal regulations at Title 31 CFR section 223.18 as
follows:

Q.  The only duty of the surety is to pay a claim to
an obligee in the event it is not paid by the
principal.  And you disagree with that proposition, do
you not?

A.  Well --

MR. SHAMBUREK:  Asked and answered; but go ahead.

THE WITNESS:  The answer is yes; but there's -- there's
a question of timing here.  And there is -- I think
it's 31 CFR, it's like 223.18, that provides that the
surety has the duty to timely pay if -- pay the
obligee, if the -- if the principal does not pay.
So where a principal refuses to timely pay and without
just cause, the surety can't just wait for as long as
the principal wants and drag out the payment of the
claim.

So you can't just say, well, the principal --
we're just working through this, the principal is
fighting this claim and working this out.  The surety
would have a duty to independently investigate and

27

determine if in fact the claim to the surety's mind is
a valid claim, the surety pays the claimant, and then
seeks indemnity if the surety -- this gets back to the
beginning of my testimony. If the surety overpays,
pays a claim it shouldn't have, the surety is out the
money.

Id. at p. 71, l. 12 - p. 72, l. 13. Mr. Callow also discusses
the Support Agreement as follows:

Q. Okay. Do you know what you're talking about when
you say "subsequent activities"; do you recall?

A. Well, that support agreement, if I recall, was in
-- I think it's in '97. And I can't remember when the
support agreement was right now. But there were,
particularly with Spencer Rock, and Nugget's
relationship was basically taking over Spencer Rock,
I think that was -- I think that's -- as I recall,
that's what I was referring to.

Q. The last paragraph, it says, "Litigating a case
that involves less than $100,000 is often uneconomical
for all involved. A party can defend against any
claim, but committing a disproportionate sum to
challenging well-founded claims is problematic and
usually economically irrational."

Isn't that true of the plaintiffs equally?

A. It -- well, it is -- it is true in litigation in
general, both plaintiffs and defendants, that
litigation for relatively small amounts is

28

uneconomical, that's correct.

And with the costs of litigation being what they are today, you know, $100,000 is -- well, from my point of view, I won't even take a case that's less than $100,000 at issue, just because of the cost of litigation.

And in my experience insurers know that it is economically -- it creates a great economic hardship to force -- force people to litigate.

Q.   On page 12, the second line, you talk about economic coercion.   Is it your position USF&G is guilty of that despite they weren't paying any attorney fees in this litigation?

A.   Well, it's my position that it is economically coercive for USF&G not to have investigated and paid a valid claim for these claimants.   That itself is economic coercion.   It is the whole purpose of the Miller Act to make sure that claimants get paid and in a timely fashion for valid claims.

And so to the extent that USF&G failed to fulfill its obligations and forced these obligees not only to litigate, but to forgo the income, that is economically coercive, absolutely.

And I think if you look at the applicable statutes and the Miller Act itself and that CFR that I was telling you about, that is precisely the purpose for why there are these duties.

And all those -- all those State statutes and the

applicable CFRs are incorporated by reference in the --

in the surety contract itself.

P. 81, l. 13 – p. 83, l. 11.

### **Legal Discussion**

Expert testimony is admissible under Rule 702 of the Federal

Rules of Evidence.  The Rule provides:

> If scientific, technical, or other specialized
> knowledge will assist the trier of fact to understand
> the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form
> of opinion or otherwise, if (1) the testimony is based
> upon sufficient facts or data, (2) the testimony is the
> product of reliable principles and methods, and (3) the
> witness has applied the principles and methods reliably
> to the facts of the case.

Rule 702 requires the court to make a number of determinations

before admitting expert testimony.  The court must determine if

the testimony that the witness desires to give will assist the

trier of fact to understand the evidence or determine a fact in

issue.  The court must also decide whether the witness purporting

to be an "expert" is so qualified by either "knowledge, skill,

experience, training, or education."  The court must determine

whether the expert's testimony is reliable.

The first inquiry requires an evaluation of whether the

expert testimony will assist the trier of fact.  "The test for

admissibility is whether the jury will receive 'appreciable

help.'" Little Oil Co. v. Atlantic Richfield Co., 852 F.2d 441,

446 (9th Cir. 1988) (quoting United States v. Gwaltney. 790 F.2d

1378, 1381 (9th Cir. 1986)).

The second inquiry requires the court to determine whether the expert has appropriate qualifications on the subject matter on which he wishes to express an opinion. _United States v. Hankey_, 203 F.3d 1160, 1168 (9th Cir. 2000) (_citing_ _Jones v. Lincoln Elec. Co._, 188 F.3d 709 (7th Cir. 1999)). "'Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.'" _Jones_, 188 F.3d at 723 (_quoting_ _Carroll v. Otis Elevator Co._, 896 F.2d 210, 212 (7th Cir. 1990)).

The third inquiry in Rule 702 requires the trial court to make a reliability determination, i.e., is the proffered expert testimony reliable?  This requirement was added to the rule in 2000 in response to _Daubert v. Merrell Dow Pharmaceuticals, Inc._, 509 U.S.579 (1993), and _Kumho Tire Co. v. Carmichael_, 526 U.S. 137 (1999).  _Daubert_ assigned a gate keeping function to trial judges to exclude unreliable scientific expert testimony.  _Kumho Tire_ extended this gate keeping function not only to scientific testimony, but also to all expert testimony.  As the advisory committee notes to the 2000 amendments indicate, "[c]onsistently with _Kumho_, the Rule as amended provides that all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful."  Rule 702 provides a framework for the court to use in exercising its gate keeping function.

In order to determine if the proffered expert testimony is reliable and thus admissible, the court must consider if "(1) the

testimony is based upon sufficient facts and data; (2) the
testimony is the product of reliable principles and methods; and
(3) the witness has applied the principles and methods reliably
to the facts of the case." Rule 702 of the Federal Rules of
Evidence.

The facts and data upon which an expert may base an opinion
are specified in Rule 703 of the Federal Rules of Evidence. The
Rule states:

> The facts or data in the particular case upon
> which an expert bases an opinion or inference may be
> those perceived by or made known to the expert at or
> before the hearing. If of a type reasonably relied
> upon by experts in the particular field in forming
> opinions or inferences upon the subject, the facts or
> data need not be admissible in evidence in order for
> the opinion or inference to be admitted. Facts or data
> that are otherwise inadmissible shall not be disclosed
> to the jury by the proponent of the opinion or
> inference unless the court determines that their
> probative value in assisting the jury to evaluate the
> expert's opinion substantially outweighs
> their prejudicial effect.

The facts and data in this case involve the record of activities
and inactivity of USF&G over the past almost nine years as
revealed in the court file, the disclosures and discovery
responses of the parties and the transcribed depositions.

Rule 403 of the Federal Rules of Evidence also permits the
exclusion of otherwise relevant evidence if it is more
prejudicial than probative and for other reasons such as
prejudice, confusion or delay.

In United States ex rel. Poong Lim/Pert Joint Venture v.
Dick Pacific/Ghemm Joint Venture et al., 3:03-cv-00290-JWS, 2006
U.S. Dist. Lexis 19281 (March 2, 2006), a Miller Act case in this

district, the court confronted a similar challenge to bar the testimony of an expert. The court notes:

> _Daubert_ requires the district court to perform the role of a gatekeeper to determine the admissibility of all forms of expert testimony, even the non-scientific testimony at issue here. The Supreme Court has emphasized that "the inquiry envisioned by Rule 702 . . . a flexible one" and must be "tied to the facts of a particular case." Concerning the reliability of non-scientific testimony such as [the proposed experts], the _Daubert_ factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the _knowledge and experience_ of the expert, rather than the methodology or theory behind it.

_Id._ at p. 2 (Citations omitted; emphasis in original). The court cites both _Daubert_ and _Kumho Tire_ in the omitted footnotes. The court also states:

> To the extent Poong Lim seeks to challenge the correctness of the testimony of DPG's experts, its recourse is not exclusion of the testimony, but, rather, refutation of it by cross-examination and by the testimony of its own expert witnesses. Indeed, the Supreme Court stated in _Daubert_: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."

_Id._ at p. 4 (Citations omitted). The court also notes: "In cases where the subject of the expert testimony is non-scientific, as the case at bar, education, training and experience, not necessarily methodology or theory, are more appropriate benchmarks for determining reliability." _Id._ at p. 5. The court concludes:

> In this case, both [experts] have set forth in considerable detail the information that each reviewed, the source of that information, and the steps they took, if any, to verify the information. That is all that is necessary. Poong Lim's arguments regarding the conflict between the opinion of its expert and that of DPG's expert are, simply put, irrelevant to the issue

of the admissibility of the opinion of either. The
reasonableness of the assumptions underlying the
experts' opinions and criticisms of an expert's methods
are for consideration by the trier of fact in weighing
the evidence, i.e., in the so-called "battle of
experts," the power to determine the victor lies with
the jury. The same is true of the efforts of Poong Lim
to impose on the court the burden of reviewing the
testimony of the experts in detail to determine the
credibility of the expert's rationale in the context of
a <u>Daubert</u> hearing--that is likewise an issue for the
trier of fact to resolve at trial.

<u>Id.</u> at p. 5 (Citations omitted).

The concern that proposed testimony is more prejudicial than probative is at the heart of both Rules 703 and 403 of the Federal Rules of Evidence. Resolution of the issue turns in large part on a determination of the applicable law. If there is no duty, there is no need for testimony. If there is a duty, the testimony of Mr. Callow is helpful under the circumstances. Counsel for USF&G (and Nugget) are free to inquire and cross-examine Mr. Callow.[11]

### Mr. Callow's Testimony

Mr. Callow's opinions have been properly disclosed pursuant to Rule 26(a) of the Federal Rules of Civil Procedure. Mr. Callow is qualified to render an opinion pursuant to Rule 702 of the Federal Rules of Evidence based on his knowledge and experience. His report sets forth the facts and data he relied upon in reaching the opinions. Consistent with the statements in Judge Sedwick's decision noted above, he "set forth in

---

[11]    The claimants will object if counsel for USF&G produces
documents for the first time at trial that should have been
turned over as part of the initial disclosures or in response to
discovery requests. That matter can be addressed when it arises.

considerable detail the information that [he] reviewed, the source of that information, and the steps [he] took, if any, to verify the information."  The testimony he proposes to offer is reliable for purposes of Rule 702.  The testimony is also based on appropriate facts and data as required in Rule 703 of the Federal Rules of Evidence.  The probative value of his testimony substantially outweighs any tendency of his testimony to confuse or mislead the finder of fact.  Rule 403 of the Federal Rules of Evidence.

The differences between a typical liability insurance policy and a surety policy are illuminated by real-life examples.  The hybrid nature of a surety policy which is not a "third party" policy and yet is not precisely a "first party" policy also requires examples.  Mr. Callow is able to discuss the duties of a surety to both the principal and the obligees.  Fulfilling the duties to investigate completely and pay valid claims promptly cans be explored in his testimony.  Mr. Callow is aware of the developments in this case over the last eight years and is able to discuss the multiple and continuing breaches of the duties by USF&G.

## Mr. George's Testimony

Mr. George's four paragraph conclusory letter opinion fails to meet the disclosure requirements.  He simply asserts that the surety has no duties and that USF&G did not fulfill any duties.  Rule 26(a)(2)(B) provides in pertinent part that the report of an expert witness shall be disclosed and that:

.  .  .  The report shall contain a complete statement of all opinions to be expressed and the basis

> and reasons therefor; the data or other information
> considered by the witness in forming the opinions; any
> exhibits to be used as a summary of or support for the
> opinions; the qualifications of the witness, including
> a list of all publications authored by the witness
> within the preceding ten years; the compensation to be
> paid for the study and testimony; and a listing of any
> other cases in which the witness has testified as an
> expert at trial or by deposition within the preceding
> four years.

Among many problems, he fails to disclose the data or other
information used in reaching the opinions which he gave.  This
problem is marked because he contends that the surety did not owe
any duties to the claimants and does not opine whether USF&G
fulfilled any duties, even hypothetically.  The compensation he
was paid is not disclosed.  He does not list the other cases in
which he has testified as an expert at trial or by deposition
within the preceding four years.  He simply states that he has
been a "Consultant and lobbyist" for the last eighteen years.

Mr. George's incomplete disclosure should be treated as a
failure to disclose which should in turn result in a preclusion
order.  Rule 37(a)(3) and (c)(1) of the Federal Rules of Civil
Procedure.  Rule 37(a)(2)(A) makes provision for sanctions in the
event of a party failing to make disclosures required by Rule
26(a).  Rule 37(a)(3) further provides that, "[f]or purposes of
this subdivision an evasive or incomplete disclosure, answer, or
response, is to be treated as a failure to disclose, answer, or
respond."

Whether complete or incomplete, plaintiff's disclosure of
his expert opinion constitutes a failure of disclosure for
purposes of Rule 37.  Because this case has a long and difficult
history, discovery is closed, and substantial and substantive

36

cross-motions for summary judgment have already been filed, it is too late for any form of cure with respect to USF&G's failure to make disclosures as to his expert testimony.  In a case such as this under consideration, an appropriate disposition is to preclude the testimony of the witness.  Because Mr. George's disclosures were at best incomplete as to all of the opinions which he offered, he should not be permitted to testify at trial. Because his comments assume that there are no legal duties, his testimony is certain to be more prejudicial that probative.

<h3 align="center">Conclusion</h3>

Mr. Callow should be allowed to testify consistent with the areas addressed and developed in his report and at his deposition.  He has the knowledge and experience to assist the jury.

Mr. George states that the surety has no duties and thus that USF&G was not obligated to fulfill any duties.  That conclusion is wrong as a matter of law.  That issue of law is the province of this court.  There is nothing in Mr. George's conclusory brief that is outside the province of the court.  His report does not comply with Rule 26 disclosure requirements.  His testimony is not admissible pursuant to Rule 702.  His testimony is not reliable and would not assist the fact-finder in this case.  He does not base his report on the type of facts and data that are specified in Rule 703.  Finally, his testimony is more prejudicial than probative because it is premised on a mistaken perception of the law and thus should be rejected pursuant to Rule 403.

37

For these reasons, the motion to strike Mr. Callow's testimony should be denied. The motion to strike Mr. George's testimony should be granted.

DATED this 19th day of May, 2006 at Anchorage, Alaska.

THE LAW OFFICE OF STEVEN J. SHAMBUREK
Attorney for Plaintiffs
Shoreside Petroleum, Inc., d/b/a Marathon
Fuel Service and Metco, Inc.

s/ Steven J. Shamburek
By:_____
Steven J. Shamburek
Alaska Bar No. 8606063
LAW OFFICE OF STEVEN J. SHAMBUREK
425 G Street, Suite 630
Anchorage, Alaska 99501
(907) 522-5339 Direct
(907) 522-5393 Fax
shamburek@gci.net
shamburekbank@gci.net

**CERTIFICATE OF SERVICE**

The undersigned certifies that on the 19th day of May, 2006, a copy of the foregoing was served by the Electric Case Filing.

s/ Steven J. Shamburek
_____
Steven J. Shamburek