William Grant Callow                                                A98-009 CIV (HRH)
March 31, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE

UNITED STATES OF AMERICA for the  )
use of NORTH STAR TERMINAL &       )
STEVEDORE COMPANY, d/b/a NORTHERN  )
STEVEDORING & HANDLING, and NORTH  )
STAR TERMINAL & STEVEDORE COMPANY, )
d/b/a NORTHERN STEVEDORING &       )
HANDLING, on its own behalf,       )
          Plaintiffs,              )
     and                           )
                                   )
UNITED STATES OF AMERICA for the   )
use of SHORESIDE PETROLEUM, INC.,  )
d/b/a MARATHON FUEL SERVICE,       )
and SHORESIDE PETROLEUM, INC.,     )
d/b/a MARATHON FUEL SERVICE,       )
on its own behalf,                 )
          Intervening Plaintiffs,  )
     and                           )
                                   )
METCO, INC.,                       )
          Intervening Plaintiff,   )
     vs.                           )
                                   )
NUGGET CONSTRUCTION, INC.; SPENCER )
ROCK PRODUCTS, INC.; UNITED STATES )
FIDELITY AND GUARANTY COMPANY; and )
ROBERT LAPORE,                     )
          Defendants.              )
_____)

Case No. A98-009 CIV (HRH)

DEPOSITION OF WILLIAM GRANT CALLOW

Pages 1 - 90, inclusive

Friday, March 31, 2006, 9:17 a.m.

Taken on behalf of the Defendants
at
Barokas Martin & Tomlinson
1029 West 3rd Avenue, Suite 280
Anchorage, Alaska

COPY

William Grant Callow                                          A98-009 CIV (HRH)
March 31, 2006

Page 2

```
 1                  A-P-P-E-A-R-A-N-C-E-S

 2     For North Star:

 3     BURR, PEASE & KURTZ
       BY:  Michael W. Sewright, Esq.
 4     810 N Street
       Anchorage, AK 99501
 5

 6     For Shoreside and Metco:

 7     LAW OFFICE OF STEVEN J. SHAMBUREK
       BY:  Steven J. Shamburek, Esq.
 8     425 G Street, Suite 630
       Anchorage, AK 99501
 9

10     For Defendants:

11     BAROKAS MARTIN & TOMLINSON
       BY:  Herbert A. Viergutz, Esq.
12     1029 West 3rd Avenue, Suite 280
       Anchorage, AK 99501
13

14     Reported By:

15     Katherine L. Novak, RPR
       Registered Professional Reporter
16

17

18

19

20

21

22

23

24

25
```

William Grant Callow                                                      A98-009 CIV (HRH)
March 31, 2006

Page 3

1                          I-N-D-E-X

2    EXAMINATION                                      PAGE

3       Mr. Viergutz...............................4

4

5

6

7

8

9                       E-X-H-I-B-I-T-S

10   1 - Expert Report of William Grant Callow.........4

11   2 - Miscellaneous Documents; Bates 0001-0129......7

12   3 - Various Letters From Jane Bennett Poling.....45

13   4 - Resume of William Grant Callow...............55

14   5 - North Star's Amended Complaint; Shoreside's
         Amended Complaint; Metco's Amended
15       Complaint...................................56

16

17

18

19

20

21

22

23

24

25

William Grant Callow
March 31, 2006

---

**Page 4**

1      ANCHORAGE, ALASKA; FRIDAY, MARCH 31, 2006
2                    9:17 A.M.
3                     -oOo-
4      (Exhibit 1 marked.)
5              WILLIAM GRANT CALLOW,
6         called as a witness herein, having
7         been first duly sworn upon oath, was
8         examined and testified as follows:
9              EXAMINATION
10   BY MR. VIERGUTZ:
11     Q. Good morning, Mr. Callow.
12     A. Good morning, Mr. Viergutz.
13     Q. You know the process: I ask questions; you
14   answer them. If you answer them, I have to assume
15   you understood the question. Is that acceptable?
16     A. Yes, sir.
17     Q. And if you don't understand it, you'll ask
18   me to rephrase it; will you do that?
19     A. Yes, I will.
20     Q. Your report is placed before you,
21   Exhibit 1, and I'd ask you to look at -- and that is
22   your report, you authored it, correct?
23     A. Yes. I want to take a look to see that all
24   the pages are here.
25        (Reviews document.)

---

**Page 5**

1        Yes, that's correct.
2      Q. Okay. The first paragraph, the last two
3    sentences, it says, "I have been requested to opine
4    as to the treatment of claims by USF&G. I reviewed
5    documents provide to me by the attorneys for the
6    claimants and discussed this case with them."
7        Who did you discuss the case with,
8    Mr. Sewright?
9      A. Yes, sir.
10     Q. And what did you --
11     A. And Mr. Shamburek.
12     Q. And did you talk to Mr. Sewright outside
13   the presence of Mr. Shamburek?
14     A. I don't recall. I may have. I can't
15   remember. I may have, but I think most often I -- I
16   talked to Mr. Shamburek outside the presence of
17   Mr. Sewright, but I don't know that I spoke to
18   Mr. Sewright outside the presence of
19   Mr. Shamburek.
20     Q. So you don't know?
21     A. Yeah, I can't remember. I don't -- it's --
22   I'm just saying it's possible, but I don't have a
23   recollection if I spoke to him.
24     Q. Okay. You never saw any deposition
25   transcripts of any USF&G employees, correct?

---

**Page 6**

1      A. Correct.
2      Q. And the documents that you reviewed to
3    author this report are referenced in the last two
4    pages attached to your report; is that correct?
5      A. That's correct.
6      Q. What is the volume of material, estimate,
7    that -- is it two inches, three inches, 20 inches?
8      A. I would estimate it's between three and
9    four inches.
10     Q. Three and four inches.
11     A. Yeah.
12     Q. Okay.
13     A. I want to make clear that we're talking
14   about the documents involved in this case, as
15   opposed to, you know, any cases that I reviewed or
16   something like that, but, yeah. That wouldn't have
17   been a thick -- real thick anyway, but, yes, that's
18   correct.
19     Q. Have you ever represented a surety?
20     A. No.
21     Q. If we'd go to page 3 of your report. Did
22   you review those letters referenced in the quote
23   under the "subject" heading, and then the next
24   paragraph it says, "We acknowledge receipt of serial
25   letter 611-19, dated August 6, '97 and serial letter

---

**Page 7**

1    611-21, dated August 11, '97"?
2      A. I'm not sure, as I sit here today. I think
3    that I did. Let's see if these are -- if those are
4    referenced in the last -- in that last page.
5        (Reviews document.)
6        I can't be sure. I suspect that I did.
7      (Exhibit 2 marked.)
8        MR. SHAMBUREK: Now, Herb, I'd just like to
9    note that in an e-mail exchange I had asked you to
10   mark any exhibits that you were going to use for the
11   deposition, and you said there would be no
12   exhibits.
13       MR. VIERGUTZ: Outside what his report is.
14   And this is I believe what you saw as termed on the
15   second to the last page "Documents produced by USF&G
16   and marked 'USF&G' with some blank documents."
17   BY MR. VIERGUTZ:
18     Q. Does this look like what you reviewed?
19     A. What's just been marked as Exhibit 2?
20     Q. Correct.
21     A. Well, I have more documents than this that
22   I reviewed, so it's -- this is only about an inch
23   thick or so. And, yeah, some of these look
24   familiar.
25       MR. SHAMBUREK: Herb, I'll also observe,

---

4 (Pages 4 to 7)

William Grant Callow                                                      A98-009 CIV (HRH)
March 31, 2006

Page 8

1  for the record, that I sent you an e-mail note and
2  said we'd make the documents that he reviewed
3  available for your inspection or copying.
4       MR. VIERGUTZ: Uh-huh. Uh-huh.
5  BY MR. VIERGUTZ:
6       Q. Why is the content of those two letters, do
7  you know, not cited in your report?
8       MR. SEWRIGHT: Object to the form of the
9  question. I --
10      MR. VIERGUTZ: Hold it. Hold it right now.
11 Object to the form of the question, period.
12 Anything further than that I'm not going to put up
13 with. That's the only proper objection, and I think
14 Mr. Shamburek is the attorney representing
15 Mr. Callow; is that correct?
16      MR. SHAMBUREK: Mr. Callow is the expert
17 for all of the claimants, so I have been the one
18 who's talked most with him, but Mr. Sewright
19 represents North Star Stevedoring.
20      MR. VIERGUTZ: Okay.
21      MR. SEWRIGHT: I just didn't understand
22 what letters you're referring to.
23 BY MR. VIERGUTZ:
24      Q. Can you answer my question?
25      A. I understand that you're referring to

Page 9

1  serial letter 611-19 and serial letter 611-21,
2  correct?
3       Q. Right.
4       A. If you could point those out to me, refresh
5  my recollection.
6       Q. No. My question to you is --
7       A. Oh.
8       Q. -- do you recall why those letters are not
9  referenced in your report?
10      A. Well, in fact they are at page 3, and
11 that's the reference I made to them. But I didn't
12 believe that any further reference to them was
13 relevant to the opinions that I was asked to give
14 about USF&G's duties in this case.
15      Q. Okay. In your history, do you find it
16 unusual for a general contractor to dispute a
17 position taken by an owner?
18      A. Certainly it happens. Is it unusual? I
19 wouldn't say it's unusual, no, I wouldn't say that
20 it's like a strange occurrence, if that's what you
21 mean.
22      Q. Is that bad faith?
23      A. Would you explain to me what you mean by is
24 it bad faith, to dispute?
25      Q. For a general contractor to dispute a

Page 10

1  position taken by an owner.
2       A. I don't -- if we're talking about the
3  general contractor, there is an implied duty of good
4  faith and fair dealing in every contract. And if
5  that dispute is based on -- has a good faith basis,
6  then a legitimate dispute is not in and of itself
7  evidence -- or is not in of itself bad faith, that's
8  correct.
9       Q. Would you define bad faith for me, please.
10      A. Well, bad -- there are a couple of
11 different standards for bad faith. But bad faith is
12 the breach of the duty of good faith and fair
13 dealing that is implied in every contract, including
14 every insurance contract. And, according to Alaska
15 case law, every surety contract.
16      Q. I understand that. But bad faith means
17 what?
18      A. Well, it means lots of different things
19 depending on the context of the case. But basically
20 what it means is that a party takes a position that
21 is unreasonable or engages in conduct that is
22 unreasonable. Or -- or in reckless disregard for
23 rights, that can be -- there are numbers
24 of different -- there are different types of bad
25 faith. And I'm speaking now about Alaska law.

Page 11

1       Q. And who determines whether the position is
2  unreasonable?
3       A. Well, I guess the question becomes at what
4  point. But usually that is determined in a court of
5  law, sometimes by a jury, or sometimes by a judge.
6       Q. And if the allegation has no merit, it
7  could potentially never make it to a judge or a
8  jury; is that correct?
9       A. If the -- I want to make sure that we're on
10 the same page. If the allegation of bad faith has
11 no merit, yes, that's true -- well, I guess it could
12 make it to a judge but it could be dismissed on
13 summary judgment, that's correct.
14      Q. If you'd go to the bottom of page 3, the
15 final sentence. It says: The letter states that it
16 was courtesy copied to United States Fidelity &
17 Guarantee Company, Attention Bill Wells, 4220 B
18 Street, Anchorage, Alaska 99503.
19      A. Yes, sir.
20      Q. Do you know whether Mr. Wells works at that
21 location?
22      A. I do not have any independent knowledge of
23 that.
24      Q. Okay. Are you familiar with Willis of
25 Alaska?

5 (Pages 8 to 11)

William Grant Callow
March 31, 2006

---

Page 12

1    A. Yes, uh-huh.
2    Q. And what do they do?
3    A. They're insurance brokers. They procure
4  insurance for clients.
5    Q. Or surety bonds?
6    A. Uh-huh, I believe so.
7    Q. Have you ever dealt with Bill Wells?
8    A. I have not.
9    Q. Do you know what the relationship is
10  between Willis and a surety?
11    A. I don't. I have no specific knowledge of
12  what the relationship was. I mean, you could make
13  some assumptions from these documents, but no, I
14  don't.
15    Q. Okay. If I represented to you that Bill
16  Wells was an underwriter, do you know what the
17  duties of an underwriter are?
18    A. Yes.
19    Q. And what are they?
20    A. The duties of an underwriter are to
21  assess a -- basically a risk and determine a
22  premium, essentially.
23    Q. Have you ever dealt with Jim Ferguson of
24  Willis?
25    A. No, sir.

---

Page 13

1    Q. You've never met him?
2    A. No, sir.
3    Q. Did you discuss Mr. Ferguson's deposition
4  in this case with Mr. Shamburek or Mr. Sewright?
5    A. Not that I recall. The name Ferguson, of
6  course, certainly rings a bell, but the specifics of
7  the deposition I don't recall right now.
8    Q. Okay. And I don't believe that deposition
9  was transcribed, but if it was --
10    A. Oh.
11    Q. -- I'm an idiot, because I don't have a
12  copy. But have you ever read --
13    A. No, sir.
14    Q. -- such a transcript?
15    A. No, I have not.
16    Q. Did you review the surety file of Willis?
17    MR. SHAMBUREK: I'd just like to object to
18  the extent that I don't know if any of us are really
19  sure what the surety file of Willis is. If you
20  could just clarify which documents you're referring
21  to.
22    MR. VIERGUTZ: The surety file was
23  represented to be the surety file in Mr. Ferguson's
24  deposition, and we had the opportunity to have that
25  copied.

---

Page 14

1  BY MR. VIERGUTZ:
2    Q. Do you recall reviewing such a file?
3    A. No. I can't say that I ever -- I may have
4  seen documents that were in that file, but no, I
5  never saw anything that was called the surety
6  file.
7    Q. Okay. Do you know what the relationship of
8  Mr. Wells is when you, on page 4 under "Early
9  Correspondence" of your report, Exhibit 1, the first
10  two lines you mention Mr. Ferguson and Mr. Wells.
11    Do you know what the relationship is
12  between Mr. Ferguson and Mr. Wells?
13    A. Well, obviously they work together. When
14  you say "Do I know what their relationship is," my
15  understanding is that Mr. Ferguson works here in
16  Anchorage for the broker, and Mr. Wells works for
17  USF&G.
18    Other than that, I can't -- I don't
19  really -- when you say what their relationship is, I
20  think that they have probably a fairly close working
21  relationship to the extent that -- that Willis,
22  basically sells product of USF&G.
23    Q. Do you have enough knowledge to opine as
24  whether Mr. Ferguson would be an agent, in the legal
25  sense of the word, of USF&G?

---

Page 15

1    A. Well, that's -- that's an interesting legal
2  question. And I will tell you this: That in the
3  normal course of things, as a legal matter, there
4  are -- there may be certain circumstances where
5  the -- the insurance seller would be, what we'd
6  normally call an agent, in this case, Ferguson,
7  might be considered an agent in certain
8  circumstances. But normally that person is the
9  agent -- when you have an insurance agency that
10  provides a variety of product from a variety of
11  different sources, under those circumstances, the
12  agent is not considered to be a specific agent of
13  any one of the particular insurers but instead is
14  considered to be the agent of the person purchasing
15  the insurance.
16    There are some exceptions. For example,
17  dedicated -- what I refer to as a dedicated
18  insurance office, such as State Farm. A State Farm
19  agent only sells a State Farm product, and therefore
20  is considered to be a State Farm agent in the legal
21  sense of the word. Whereas if you have -- and same
22  with Allstate.
23    Whereas if you have -- I'm trying to think
24  of one of the other brokerage firms. I guess where
25  they might sell Horace Mann and they might sell

---

6 (Pages 12 to 15)

William Grant Callow
March 31, 2006

A98-009 CIV (HRH)

**Page 16**

1  other types of product, under those circumstances,
2  the majority of the case law, last time I reviewed
3  it, was that normally those agents are considered
4  the agents of the person purchasing the insurance.
5  They have their duty to them, but if that duty is
6  breached -- for example, if they don't -- if they
7  don't supply a good product, they can be made
8  liable.  But you can't, for their negligence,
9  necessarily hold the insurer liable.  There are some
10  exceptions, but that's the general rule.
11     Q.  I appreciate that discussion.  However, in
12  this case --
13     A.  Okay.
14     Q.  -- do you intend to offer an opinion that
15  Willis was the agent of USF&G?
16     A.  Do I intend to offer -- I haven't been
17  asked that specific question.  So based on what I
18  know at this point, I can't answer that.  But the
19  opinions that I expect to offer in this case, at
20  this time, are the ones that are set forth in my...
21     Q.  In your report, Exhibit 1?
22     A.  In my report, yeah.
23     Q.  And that's not an opinion contained within
24  Exhibit 1, is it?
25     A.  Well, I'm just -- you know, let me -- I

**Page 17**

1  want to make sure that -- I haven't reviewed this.
2        (Reviews document.)
3     I guess -- I guess my position is this,
4  that under certain circumstances if someone
5  voluntarily begins to act in a manner whereby they
6  assume duties, they can therefore become liable for
7  not doing those duties in a reasonable and proper
8  manner.
9        To the extent that Ferguson was involved in
10  this and obtained information that he knew or should
11  have known, should have been supplied to other
12  parties, you know, I think that there is -- there is
13  an argument to be made there that Ferguson could be
14  considered to be an agent of sort.
15     Q.  Do you intend to offer an opinion that
16  Mr. Ferguson breached his duties?
17     A.  At this point I tend to only offer the
18  opinions that I -- that I have set forth in here.
19     Q.  And that's not an opinion contained in
20  Exhibit 1, is it?
21     A.  No.
22     Q.  What is the general area of your practice?
23  What is -- what law do you practice?
24     A.  Well, I have been doing a fair amount of
25  insurance coverage work.  And sometimes that has

**Page 18**

1  arisen in the context of personal injury, sometimes
2  the personal injury work spins off into insurance
3  bad faith.
4        I have, in recent years, been
5  undertaking -- I've been doing less of that and
6  doing a variety of other things.  I mean, I did --
7  I've done some discrimination claims, Title -- 1981
8  claims.
9        I have been doing -- I have been working
10  with some Scandinavian clients, assisting them in
11  providing -- in obtaining and monitoring the legal
12  work that's done for them in the United States.
13        I have been working on a number of class
14  action suits involving various things, ATM machines,
15  ATM fees.
16        And most recently, I've gotten involved in
17  a case involving a derivative shareholder suit in
18  California.  It's a variety of things.
19     Q.  What are the differences between --
20     A.  No divorces.
21     Q.  -- between a surety and an insurer?
22     A.  Well, a surety is actually providing
23  protection to -- it's a type of a third-party
24  contract.  And the best definition of it and
25  distinction is in a case up here called the Loyal

**Page 19**

1  Order of Moose, I don't know what the cite is, but
2  that will tell you specifically what it is.
3        But in the normal insurance circumstance,
4  an insurer provides protection to the insured
5  against third-party liability.  A surety, on the
6  other hand, is really providing protection to a
7  third party.  And that's the essential difference.
8        The person who's paying the premium is
9  paying a premium for the protection of third -- of
10  third parties.  But the coverage that is being
11  provided is being specifically provided to the third
12  party, so it makes it different than what is called
13  a third-party insurance contract -- or I'm sorry.
14  What's called a third-party claim where, in the
15  average automobile case, someone -- I have insurance
16  on my car and for driving, I run a stop sign, I
17  injure somebody, they sue me, my insurance company
18  defends, that's a third-party claim.
19        Most courts hold that the insurer, even
20  though I bought insurance to maybe protect the
21  person that I might injure, that is -- the courts
22  say, no, you really bought insurance, in that
23  circumstance, to protect yourself.
24        In the case of a surety, there I'm
25  buying -- I'm paying a premium to protect a third

7 (Pages 16 to 19)

William Grant Callow
March 31, 2006

A98-009 CIV (HRH)

Page 20

1  party specifically from a particular contingency,
2  and in this case it's payment.
3      Q. What are the differences between the duties
4  of a surety and an insurer?
5      A. Well, I assume you're talking about -- in
6  terms of claims investigation and handling; is that
7  correct?
8      Q. You can answer that.
9      A. Okay. The essential difference -- well, in
10  fact, both have a duty of good faith and fair
11  dealing. Under Alaska law, I'm speaking of Alaska
12  law. Alaska law is applicable under the Miller Act,
13  and the duties of good faith and fair dealing in an
14  insurance context, whether for a bonding company or
15  for any liability company, are essentially identical
16  when it comes to duties to investigate claims. And
17  to investigate them thoroughly, to reasonably pay
18  claims, all the duties that are set forth or the
19  standards that are set forth in the Alaska Insurance
20  Code, Title 36, and in the appropriate
21  administrative regulations.
22      But in terms of their duty to investigate
23  claims and to pay claims, duties are similar.
24      Q. Does a surety have a duty to the
25  principal?

Page 21

1      A. Well, yes. Particularly where there
2  is a -- there is an indemnity agreement of some
3  sort. There is a duty to the principal, there is no
4  question about that.
5      But the -- there is -- there is a duty to
6  the insureds and -- let me -- let me step back.
7      You can't have a surety just recklessly
8  paying claims and then looking to its principal and
9  saying, now you got to pay us back. They have to
10  act reasonably. They have to reasonably investigate
11  the claim, do it reasonably promptly, and then --
12  and then pay the claim. And at that point they can
13  turn to their principal.
14      But if it turns out that they did any of
15  that negligently and paid too much, they have -- to
16  that extent, forfeited their right to collect from
17  the principal.
18      Q. How is that duty impacted, if you know, by
19  the general agreement of indemnity?
20      A. How is -- say that again, please.
21      Q. How is the duty to the principal impacted,
22  if you know, by the general agreement of
23  indemnity?
24      A. Well, the general agreement in indemnity --
25  maybe the best way to put it is this: If there were

Page 22

1  none, the principal wouldn't be harmed by the
2  negligence, there would be no interest that the
3  principal would have if the surety overpaid a claim
4  or paid an invalid claim. The surety would be just
5  out the money.
6      Where there is an indemnity agreement, that
7  indemnity agreement limits the right of the surety
8  to recover from the principal, to the extent that
9  the surety has been negligent and overpaid a claim
10  or paid an invalid claim.
11      So the surety still has the obligation to
12  carefully investigate and pay claims as required by
13  law, always has. And that obligation is to the --
14  what I will refer to as the thirds, the third -- or
15  the insureds, the third-party beneficiaries.
16      Existence of the indemnity agreement merely
17  means that there is -- there is also, rather than a
18  duty, really -- I hate to rephrase it as a duty, but
19  it's -- it's a circumstance where the negligence of
20  the surety, as I've said before, in failing to
21  properly investigate a claim, paying any claim that
22  is invalid or overpaying a claim, limits the right
23  to indemnity.
24      Q. I don't see, in the last two pages attached
25  to your report, that you reviewed the general

Page 23

1  agreement of indemnity in this case. Did you?
2      A. Well, I'd have to go back and look at my --
3  I'd have to look at my notebook to see that, if I
4  did or not. I can't -- as I sit here today, I can't
5  remember if I did. I certainly understood that
6  there was one and I -- and I considered that to be
7  something important to know.
8      Q. The second to the last page of the
9  attachment to your report, it's a letter dated
10  February 8th, 2006, the final paragraph says, "All
11  of the pleadings, discovery, disclosures and
12  transcribed depositions are readily available for
13  your review. Please let me know what you would like
14  to review."
15      Did you advise Mr. Shamburek or
16  Mr. Sewright that you wanted to review any documents
17  that are not referenced above this paragraph?
18      A. That's a good question. I don't believe
19  so. I -- you know, I'm trying to think. I may
20  have, but specifically, I don't recall asking to see
21  that one.
22      Q. What is the duty of the surety to the
23  obligee?
24      A. Well, there are lots of duties, but if
25  we're talking about the -- in the claim context,

8 (Pages 20 to 23)

William Grant Callow
March 31, 2006

A98-009 CIV (HRH)

Page 24

1  there is the duty to promptly investigate a claim,
2  to reasonably investigate the claim.  To pay the
3  claim, any claims that are valid, in a prompt
4  manner.  There is a duty to communicate in a timely
5  fashion concerning the claims.  And most of the
6  duties, or many of the duties, are embodied in
7  Title 36 of the Alaska Insurance Code and in the
8  corresponding administrative regulations.
9      Q.  Do you know Mr. John George?
10     A.  I've spoken to him on the phone.  Many
11  years ago.
12     Q.  Do you have -- based on your knowledge of
13  him, do you intend to offer an opinion that he's
14  either competent or incompetent, or don't you have
15  sufficient knowledge to render an opinion?
16     A.  Well, I will say, this is what I know, I
17  don't -- I can't say, as I sit here, that the man is
18  incompetent, by any means.  In fact, I contacted him
19  years ago about the possibility of having him serve
20  as an expert witness for me.  I didn't hire him.  I
21  won't tell you that it was because I thought he was
22  incompetent.
23      In my dealings with him, he was courteous
24  and professional.  I know that he has experience in
25  the field.  I don't know a great deal about his

Page 25

1  background in the industry.  I know that he served
2  as the director of the Division of Insurance for a
3  while and that's why I contacted him.
4      (Phone rings, off record.)
5  BY MR. VIERGUTZ:
6      Q.  Page 12 of your report, which is the final
7  page prior to your signature there.
8      A.  Uh-huh.
9      Q.  It says, "Other Testimony," and in the
10  final sentence of that paragraph it says:  I have
11  also taught a continuing legal education course on
12  the subject of discovering and proving insurance bad
13  faith.
14      A.  Yes.
15      Q.  Have you ever taught a continuing legal
16  education course on the subject of discovering and
17  proving surety bad faith?
18      A.  Well, to the extent that I consider
19  sureties and did consider -- have considered
20  sureties to be insurers, the answer is yes.  But
21  specifically, in that particular course, I never
22  discussed sureties.
23      Q.  Are you aware that there is a body of law
24  called suretyship law?
25      A.  Yes.

Page 26

1      Q.  And was that covered in your continuing
2  education course?
3      A.  No, sir.
4      Q.  In your practice do you find it unusual for
5  an attorney and a client to take positions
6  contradicting or confrontational to other attorneys
7  and their clients?
8      A.  I don't find that -- I don't find that
9  unusual.
10     Q.  Page 5 of your report, around the middle of
11  the page.  There's a sentence that reads, and my
12  question is going to be...
13      The darkened part.  "At this time, I would
14  appreciate it if you could provide me with any
15  information regarding whether this is an ongoing
16  account, because based on the information available
17  to me at this time some of the defenses of the
18  principal may be questionable."  Why is that
19  darkened?
20     A.  My recollection, as I sit here, without
21  looking at the original document, is that it was --
22  it was originally darkened in the first place.
23     Q.  Okay.
24     A.  I mean, I put in "emphasis added" and I
25  can't remember -- it may be that I added the

Page 27

1  emphasis, but I can't recall.
2      But, you know, clearly that -- that was
3  important, that is important to me, because this was
4  the first time, and this was early on, that we know
5  that Ms. Poling understood that there were -- that
6  the defenses were -- of the principal were
7  questionable, or may be questionable.
8      Q.  She's not saying they were questionable, is
9  she?
10     A.  No.  No.  "May be."
11     Q.  And you never spoke to Ms. Poling?
12     A.  No, sir.
13     Q.  Regarding her intent?
14     A.  No.
15     Q.  The next line, that's no longer a part of
16  Ms. Poling's letter, correct, where you're saying
17  "USF&G acknowledged the questionable defenses of
18  Nugget at least by October '97"?
19     A.  Yes.
20     Q.  And where did they acknowledge it?
21     A.  Oh.  If you look up at what I was referring
22  to here, as I recall, is that by Ms. Poling's e-mail
23  to Bill Wells of 10/24, and that actually -- since
24  it's an e-mail, I don't -- I don't believe now that
25  that was originally highlighted, so I guess I

9 (Pages 24 to 27)

William Grant Callow
March 31, 2006

Page 28

1  highlighted, that's why emphasis is added.
2      But we know from her e-mail that US -- when
3  I say acknowledged, USF&G, by October 24, the date
4  of that e-mail, was aware of -- that Nugget had
5  questionable defenses. That's what I meant.
6      Q. That they had them or may have had them?
7      A. Well, they may have them. At least that
8  they were on notice -- they appeared to be on notice
9  that there needed to be an investigation, at least,
10 that's what -- that's what that tells me.
11     Q. Do you recall reviewing anywhere where
12 USF&G was saying that they agreed that the defenses
13 of Nugget were questionable?
14     A. I want to make sure that I answer that
15 question carefully, because to my -- the way I
16 interpreted this e-mail is that they were aware that
17 there were issues concerning whether defenses were
18 viable, that there were questionable defenses. And
19 that therefore, at that point, I would say yes, they
20 were aware that there were issues concerning
21 viability or the legitimacy of the defenses, of some
22 of the defenses.
23     So did they say that they were
24 questionable? It says -- here it says they may be
25 questionable. I don't know how to say that other

Page 29

1  than -- I don't think anybody would have written
2  that if they didn't believe that there were -- there
3  were things that needed to be discovered or to be
4  investigated to determine if they were valid
5  defenses.
6      So I don't know whether I've answered your
7  question, but I think that's -- I have to be very
8  careful here because I think -- you know, somebody
9  writes this and they say, well, the defenses of the
10 principal may be questionable.
11     In this context, I believe a reasonable
12 interpretation is that this woman wrote this because
13 she believed that those questions may be really
14 meant, are questionable, or that there is -- there
15 are -- there is evidence that we're aware of that
16 makes us believe that they're not legitimate. Is
17 that clear?
18     Q. It's clear. It did not answer my question.
19     A. Okay.
20     Q. My question is, do you recall ever reading
21 specifically where USF&G says: Nugget is forwarding
22 questionable defenses? Not that they may be
23 questionable, that they are questionable.
24     A. The answer is, that that's how I would
25 interpret this e-mail, as saying that, but I --

Page 30

1  using those words, correct, I did not see that.
2      Q. Okay. As an attorney, does a decision of
3  the Ninth Circuit trump a decision of a federal
4  court judge?
5      A. If you're talking about a federal district
6  court judge?
7      Q. Yes.
8      A. And one who is in the Ninth Circuit?
9      Q. Yes.
10     A. The answer is that the Ninth Circuit would
11 control over anything that might be inconsistent
12 with the lower court, would be, as you say, trumped
13 by the Ninth Circuit, yes.
14     Q. Now, again on page 5, in the final
15 paragraph, it's a quote from the Ninth Circuit. It
16 says, "On the record before us, the appellees have
17 presented sufficient evidence to create a material
18 issue of fact as to subterfuge or collusion."
19     Do you read that to say that there was
20 subterfuge or collusion?
21     A. No, sir.
22     Q. It was just an issue of fact; is that
23 correct?
24     A. Correct.
25     And I would add, a material issue of fact.

Page 31

1      Q. Now, if we could go to page 6, the first
2  paragraph above "Proofs of Claim," the final
3  sentence. It says, USF&G knew or should have known
4  that Nugget was attempting to prevent this evidence
5  from being disclosed as early as September or
6  October '97, and should have undertaken greater
7  scrutiny of Nugget's representations to it.
8      Now, if we could break that sentence down,
9  please. First of all, do you know what USF&G knew
10 or didn't know that date?
11     A. I certainly know some of what they knew. I
12 knew that they were -- yes, to answer your question,
13 yes.
14     Q. And what did they know?
15     A. Well, they knew enough to know that, as we
16 referred earlier, that Nugget's -- there were
17 questionable defenses by Nugget, and that -- that
18 Nugget had -- they had sufficient knowledge to know
19 that Nugget was attempting to prevent the evidence
20 from being disclosed.
21     Q. Do you know what reasons Nugget had for its
22 actions or inactions?
23     A. Well, the simple answer is that I believe
24 that what Nugget was trying to do was to maximize
25 its income from the project at the expense of the

10 (Pages 28 to 31)

William Grant Callow
March 31, 2006

---

**Page 32**

1  subs.
2  Q. And how do you come to that conclusion?
3  A. Well, because Nugget was seeking payment on
4  this job and was not paying the subcontractors.
5  Q. And for your answer are you assuming that
6  Shoreside or North Star were subcontractors to
7  Metco?
8  A. Well, yes.
9  Q. Now, the final -- after your 1997 in that
10  sentence, it says: "And should have undertaken
11  greater scrutiny of Nugget's representations to it."
12  What does that mean?
13  A. Well, let me see if I can refer you to
14  another section where I explain this. If you look
15  at page 11 of my report in the third paragraph down,
16  I -- that summarizes. But at the end of that
17  paragraph: Figuratively speaking, USF&G allowed the
18  fox into the hen house and then abandoned the three
19  hens it had a duty to reasonably protect.
20  USF&G's primary duty was to protect the
21  obligees. And to that extent, had a duty to
22  carefully, reasonably, and in good faith scrutinize
23  the information that was provided to it or that it
24  became aware of concerning Nugget's representations.
25  It can't just simply say "I'm going to --

---

**Page 33**

1  USF&G can't just say, well, whatever Nugget tells us
2  we're just going to believe, particularly where, as
3  here, they have reason to believe that there needs
4  to be an independent investigation of some of --
5  where things aren't making sense.
6  In any case, the surety has an obligation
7  to investigate in good faith on the claims. And to
8  pay them if they're valid. So that's what I --
9  that's what I intended to convey here.
10  Q. When you have a client and a client tells
11  you something, do you investigate what that client's
12  telling you?
13  A. Yes. I usually -- I mean, I have -- I
14  usually make it clear, and I believe I have a
15  standard clause in my contract, that if it
16  becomes -- that if I learn that the client has
17  failed to disclose material facts or has
18  misrepresented material facts, that I have a right
19  to withdraw. I think that's how -- it's worded
20  something like that.
21  Q. How do you go about investigating what the
22  client tells you?
23  A. Well, that's a good question. I usually --
24  it depends on what kind of case it is. But if the
25  client tells me about certain events occurring where

---

**Page 34**

1  other people were present, I will talk to the other
2  people that were present, or I will have an
3  investigator do that.
4  If the client tells me -- I'm just trying
5  to think of some good examples. I almost -- I mean,
6  I can't even think of when I haven't investigated to
7  make sure that what the client tells me is correct.
8  Because it's my professional reputation
9  that's on the line, and the last thing I want to do
10  is get involved in a court case and have something
11  come out of left field that not only guts the case,
12  but really professionally embarrasses me, so I feel
13  like, yes, I've got a duty to look at that. I don't
14  take what clients tell me at face value.
15  Q. Hypothetically, you're USF&G, what would
16  you have done in this case?
17  A. I would have undertaken an independent
18  investigation of the facts. I would have
19  interviewed the individuals involved. I would have
20  determined what work had been done, and the quality
21  of that work.
22  I would have asked Nugget to explain in
23  detail and in writing the reasons why it had not
24  been paying these contractors, subcontractors. I
25  would have -- having tendered the defense to Nugget,

---

**Page 35**

1  I would have monitored Nugget's defense extremely
2  carefully.
3  For example, one of the things that
4  happened in here, that I think was very bizarre and
5  really inexcusable, was some defense that was made
6  saying that this wasn't a federal project, this was
7  not a -- yeah, it wasn't a federal project. And I
8  think that's the kind of thing that -- I mean,
9  it's -- according to my interpretation of the
10  standards in Title 36, that's -- that's the kind of
11  litigation tactic that is completely unacceptable,
12  and I think USF&G had to determine that Nugget was
13  defending this, there's a good faith standard.
14  USF&G can't get around good faith standards by
15  saying, well, we're just going to tender to Nugget
16  and wash our hands of this.
17  I'll give you -- I'll give you another
18  example. In the circumstance of an insurance --
19  underinsured motorist claim, that's a first-party
20  claim that's similar, where a person who has been
21  hit by an uninsured motorist has to file a claim
22  against their own insurer.
23  And there is an adversarial position there,
24  but the insurer in that circumstance has duties to
25  its insured, good faith duties to its insured, even

---

Page 36

1   in the context of that adversarial relationship, to
2   investigate carefully the claim and pay the claim.
3   That was the Weiford case up here. And in the
4   surety circumstance, the surety has that similar
5   type of obligation to the obligees.
6       Q. You pointed out, the what you called,
7   bizarre defense. Why wasn't Nugget able to make
8   that defense? Again, hypothetically, you're USF&G.
9   If they want to make a defense, aren't they entitled
10  to assert it?
11      A. Well, remember, USF&G has tendered the
12  defense, but in so doing it has -- and it actually,
13  in this case, undertook or assumed the obligation of
14  monitoring how that defense was being provided
15  and -- or how the defense was being conducted.
16      And if you ask me do they have a right to
17  assert any defenses that they want, the answer is
18  that Nugget can do whatever it wants, USF&G,
19  however, has to make sure that Nugget is not just
20  vexatiously litigating the case, trying to drive the
21  claimants away from the claim by running up costs.
22  I mean, that's an insurance bad faith practice right
23  there.
24      Q. You're USF&G in this case. And you're
25  sitting there seeing this defense being made.

Page 37

1   Okay?
2       A. Uh-huh.
3       Q. Just hypothetically again. Don't you have
4   an obligation to allow the principal to assert a
5   defense if the principal believes it has merit?
6       A. Well, the answer is, you can't defer -- if
7   you're USF&G, you can't simply defer to Nugget,
8   because you have an obligation to the obligees. So
9   if in fact there are legitimate defenses to the
10  obligee's claim, those can be -- those can be
11  presented and conducted.
12      If, on the other hand, there are not
13  legitimate defenses to the obligee's claim, then --
14  or if some of the defenses that are raised are not
15  legitimate themselves, then USF&G has a duty to stop
16  that. That's why they're -- that's why they're
17  monitoring. They're in a position where they
18  have -- their principal duty, as I see it, is to the
19  obligees, the insured.
20      Q. Isn't it a fact that the only duty to the
21  obligee is to pay a claim of the principal if the
22  principal doesn't pay that claim?
23      MR. SHAMBUREK: I've got to object. Asked
24  and answered. About five minutes ago you asked for
25  the duties and he set them forth.

Page 38

1       MR. VIERGUTZ: The objection has been made
2   as to form, I believe.
3       MR. SEWRIGHT: Yeah. And I object also as
4   to form on other grounds.
5   BY MR. VIERGUTZ:
6       Q. Would you please answer the question.
7       A. Could you repeat the question again.
8       MR. VIERGUTZ: Would you read the question
9   to the witness.
10      (Question read back.)
11      THE WITNESS: No, I disagree with that.
12  BY MR. VIERGUTZ:
13      Q. The next paragraph on page 6 under Proofs
14  Of Claim, the second sentence says, "Ms. Poling sent
15  a letter dated January 14th, '98 to Robert LaPore,
16  president of Spencer Rock Products, Inc.
17  acknowledging that Spencer provided a proof of claim
18  and supporting documents but denying the claim."
19      Do you recall that letter also asking for
20  additional documents?
21      A. I don't have an independent recollection of
22  that. I'd have to review it.
23      Q. Okay. We will.
24      A. Okay.
25      Q. The next paragraph, the final sentence

Page 39

1   says, "USF&G does not appear to have undertaken any
2   more investigation of the claim or to have sought
3   any additional information from Shoreside."
4       What is that statement based on?
5       A. That is based on the fact that, from what I
6   know, USF&G did not -- I have no -- I have no
7   information that's provided to me that USF&G
8   undertook any more investigation of the claim. That
9   was my conclusion, that there was no follow up.
10      Q. After December 16, '97?
11      A. Let me make sure here.
12      (Reviews document.)
13      Yes, that's -- after -- well, after
14  January 5, '98, I guess you would say. Because
15  really Poling is asking Nugget to provide more
16  information, so...
17      Q. Okay. And if you'd look at Exhibit 2 in
18  front of you, page 40. There's numbered pages in
19  the bottom left. 40.
20      A. Yes, I've got it. Uh-huh.
21      Q. That's the December 16th letter you're
22  referring to; is that correct?
23      A. Yes, I believe that's correct, uh-huh.
24      MR. SHAMBUREK: Herb, I just note, this
25  number says 40 and it doesn't have the USF&G numbers

12 (Pages 36 to 39)

William Grant Callow
March 31, 2006

A98-009 CIV (HRH)

Page 40

1  that were on the documents that were provided by
2  USF&G.
3  BY MR. VIERGUTZ:
4     Q. Okay. And then No. 44 on the bottom left.
5     A. Yes, I'm here.
6     Q. Do you see that letter?
7     A. Yes, the 17th.
8     Q. That's December 17th?
9     A. Correct.
10    Q. You've seen that letter before today?
11    A. Yeah, I believe so.
12    Q. And there Nugget's attorneys are responding
13  to USF&G; is that correct?
14    A. That's correct.
15    Q. And then if you turn to the same exhibit,
16  No. 2, page 52.
17    A. Yes.
18    Q. That's February 17, '98, and that's Poling
19  receiving a letter again from Oles Morrison, Nugget
20  attorneys?
21    A. That's correct. Dealing with the Chugach
22  rock claim, yes.
23    Q. And then if we could go to page 74.
24    A. Yes, I'm there.
25    Q. This is a September 1 letter from Oles

Page 41

1  Morrison to USF&G thanking them for talking to them
2  about the subpoena for the records deposition and
3  asking that USF&G forward their records to them;
4  correct?
5     A. May I just take a moment here and just
6  review this?
7     Q. Sure.
8     A. (Reviews document.)
9        Yes, that's correct.
10    Q. Where did you come to the understanding
11  that USF&G did not receive the briefs for the Ninth
12  Circuit and the pleadings and summary judgment and
13  such?
14    A. Because nothing that I reviewed indicated
15  to me that they got that information.
16    Q. And so you never saw a couple boxes of
17  documents forwarded by USF&G which contained those
18  materials; is that correct?
19    A. That's correct.
20    MR. SHAMBUREK: Herb, there's still an
21  objection to foundation, to the extent you say there
22  were boxes, because I don't think there were any
23  boxes of information provided by USF&G during the
24  document review in November and December.
25    MR. VIERGUTZ: You and I stand at odds on

Page 42

1  that issue. Be that as it may, it's neither your
2  nor my deposition.
3  BY MR. VIERGUTZ:
4     Q. Now, if we could go back to 055. That's a
5  March 3rd, '98 letter.
6     A. Yes.
7     Q. That's after January 5th, '98, referenced
8  in Exhibit 1, your report, at paragraph 3 that we're
9  talking about, correct?
10    A. Yes.
11    Q. And this is a letter that's -- goes to
12  page 66, is that correct, that would be 11 pages
13  long?
14    MR. SHAMBUREK: Herb, I'm just going to
15  object to the extent that this letter was not in the
16  documents that were provided by USF&G to us, and it
17  thus cannot be in the materials conveyed to
18  Mr. Callow, because he did not receive anything
19  beyond what you provided to us.
20    MR. VIERGUTZ: Then it was by your omission
21  and not mine, because I provided it to you with a
22  cover letter a couple days after realizing that
23  omission from these documents.
24    MR. SHAMBUREK: I don't recall the cover
25  letter or the document. Do you have a copy of it?

Page 43

1     MR. VIERGUTZ: No.
2     MR. SEWRIGHT: Herb, have you totally
3  reordered these by date from what you produced?
4     MR. VIERGUTZ: I'm not being deposed and
5  I'm not --
6     MR. SHAMBUREK: Herb, I'm going to
7  object.
8     MR. VIERGUTZ: -- prepared to answer
9  questions.
10    MR. SEWRIGHT: Yeah, but -- yeah, but --
11    MR. SHAMBUREK: These are not the documents
12  that were provided by you in this order that I sent
13  then provided to Mr. Callow. I sent an e-mail and I
14  said if you wanted to review those documents I would
15  provide them. These are more, they're different,
16  and they're marked with other numbers. So we're
17  going to object to any of these questions.
18  BY MR. VIERGUTZ:
19    Q. Now, page 55.
20    A. Yes.
21    Q. You've never seen that letter before?
22    A. I don't recall seeing this letter, that's
23  correct.
24    Q. Would you say that that is an additional
25  document?

13 (Pages 40 to 43)

William Grant Callow
March 31, 2006

A98-009 CIV (HRH)

Page 44

1    A. Dealing with Shoreside?
2    Q. Explaining the position of Nugget to USF&G.
3    A. Well, let me say this. It depends on how
4  much time you want me -- I haven't -- I'd like to
5  review it, but would you like me to just review it
6  briefly and say --
7    Q. Whatever you need to answer that question.
8    A. All right. Let me just take a moment here.
9    (Reviews document.)
10    MR. SHAMBUREK: While we're still on
11  record, Herb, do you have a copy of the transmittal
12  letter of this document?
13    Do you recall seeing a transmittal letter,
14  Mr. Sewright?
15    MR. SEWRIGHT: We can talk off the record
16  about it, Mr. Shamburek, I'm not going to get into
17  that right now.
18    MR. SHAMBUREK: Okay.
19    Do you have a transmittal letter, Herb?
20    MR. VIERGUTZ: I'm not responding to
21  questions at a deposition of a witness.
22    MR. SEWRIGHT: Do you want to go off the
23  record, Steve?
24    MR. SHAMBUREK: Let's go off the record.
25    THE WITNESS: Meanwhile, I'm going to

Page 45

1  review this.
2    MR. VIERGUTZ: My only question is, is it a
3  letter that appears to respond.
4    MR. SEWRIGHT: It's a multi-paged letter,
5  Mr. Viergutz.
6    Can we go off the record for a moment?
7  It's about time to break anyway. It's about 10:30.
8    Are we off record? We're not going to go
9  off record until Mr. Viergutz says we can.
10    COURT REPORTER: I'm waiting until
11  everybody agrees to go off record.
12    MR. VIERGUTZ: Okay. Fine.
13    COURT REPORTER: Off record.
14    (Off record.)
15    (Exhibit 3 marked.)
16    MR. SHAMBUREK: Herb, I'd just like to
17  point out that Exhibit 2 was represented to be the
18  documents provided to the claimants from USF&G.
19  Some of these documents were provided to the
20  claimants as a group.
21    Now, I don't recall this March 3rd, 1998
22  letter; we can deal with that later. But I don't
23  think you're representing that it was included
24  initially in the packet of material that you
25  provided.

Page 46

1    MR. VIERGUTZ: No, I'm not. 055 was a
2  letter, through 066, that for some reason I omitted
3  from the package, and it was either the day after or
4  the day after that, I forwarded it to both of you,
5  Mr. Sewright and yourself, as well as, I believe,
6  Traeger Machetanz at that time.
7    And I think, and I'll look, and I could be
8  wrong, but I believe my correspondence said just put
9  it in there in date order. Which should have been
10  in there.
11    But, in any event --
12    THE WITNESS: I need to know what the
13  question was again.
14  BY MR. VIERGUTZ:
15    Q. My question simply on this letter is, does
16  this letter appear to provide USF&G with information
17  from Nugget on the claims?
18    A. Correct, yes.
19    Q. Then Exhibit 3, if we could.
20    MR. SHAMBUREK: Herb, again, I have to
21  object because I had sent you the e-mail and just
22  asked you to pre-mark any exhibits that were going
23  to be used and you said there would be none.
24  BY MR. VIERGUTZ:
25    Q. This is a letter that's within Exhibit 2.

Page 47

1    A. You're referring to the top letter on
2  Exhibit 3?
3    Q. Yeah. Some of the others may not, but I
4  assumed these are all produced.
5    If you go to the bottom of page 6.
6    A. Of my report?
7    Q. Yeah.
8    A. Okay.
9    Q. That's Exhibit 1.
10    A. Yes.
11    Q. And there you're saying, about in the third
12  or fourth sentence, there does not appear ever to
13  have been a discussion of the possible liability for
14  the claims of Shoreside Petroleum or Metco, although
15  I understand their claims and defenses are similar
16  to North Star, blah, blah, blah.
17    A. I need to -- you lost me. Where was this?
18    Q. Oh, down here. Third or four sentence - --
19    A. I see.
20    Q. -- from the penultimate paragraph.
21    A. Got it.
22    Q. And maybe you should read that to the
23  bottom.
24    A. (Reviews document.)
25    Okay.

14 (Pages 44 to 47)

William Grant Callow                                                      A98-009 CIV (HRH)
March 31, 2006

---

Page 48

1    Q.  Then if you'd go to page 4 of Exhibit 3.
2        MR. SEWRIGHT:  You mean the fourth page?
3        MR. VIERGUTZ:  Yeah.
4        THE WITNESS:  That's the letter dated
5    December 3?
6    BY MR. VIERGUTZ:
7    Q.  Yeah.  That's to Shoreside, correct?
8    A.  Yes.
9    Q.  From USF&G?
10   A.  Yes.
11   Q.  And then the next page is a letter to
12   Shoreside dated April 7th?
13   A.  Yes.
14       MR. SEWRIGHT:  19 --
15       THE WITNESS:  '98.
16   BY MR. VIERGUTZ:
17   Q.  Yeah.  One is December 3, '97, one is
18   April 7, '98.  Have you ever seen those before?
19   A.  I think so.  I'm not sure.
20   Q.  Are they not documents that discuss the
21   potential liability of Shoreside?
22   A.  You just told me that these had been part
23   of the packet, but let me just see.  Repeat the
24   question, please.
25   Q.  No.  I said page 1 was.  The others had

---

Page 49

1    been produced.
2    A.  Okay.  So the question is what?
3    Q.  Are not pages -- the two letters we talked
4    about, to Shoreside, pages 4 and 5 of Exhibit 3.
5    A.  Yes, the December 3 and the December 7th,
6    yes.
7    Q.  Are they not documents that --
8    A.  Or April 7th.
9    Q.  You've got a sentence in your report here,
10   and that's what I was trying to get you to read.
11   "There does not appear ever to have been a
12   discussion of the possible liability for the claims
13   of Shoreside Petroleum, Inc. and/or Metco, although
14   I understand that their claims, and defenses to
15   them, are similar to ones involving North Star
16   Terminal and Stevedoring."
17       MR. SHAMBUREK:  Herb, I'm going to object
18   to this exhibit.  Your letter of March 21, 2006,
19   which we can mark, said:  He, Mr. Callow, should
20   know what his report says and there will be no
21   further exhibits, Herb Viergutz.
22       MR. VIERGUTZ:  Well, yeah.  And I assume
23   he's read, from what he's attached here to his
24   report, the correspondence and things that are being
25   referred to.

---

Page 50

1        MR. SHAMBUREK:  In his report.
2        MR. VIERGUTZ:  Yeah.
3        MR. SHAMBUREK:  Not to these boxes of
4    documents that you refer to, or other documents.
5        In your letter you stated here that you
6    wouldn't pay for any of the time to prepare for the
7    deposition.  So he couldn't be tasked with taking a
8    look at the entire court file or all the other
9    documents.  That was the understanding going into
10   the deposition.
11       THE WITNESS:  Well, isn't -- let's go back
12   to my letter at page 6.  There does not appear ever
13   to have been a discussion of the possible liability
14   for the claims of Shoreside Petroleum and/or Metco,
15   although I understand their claims, defenses to
16   them, are similar to the ones involving North Star
17   Terminal and Stevedoring.
18       This, what we're talking about here in the
19   exchanges between Mr. Lukjanowicz and Ms. Poling,
20   this is an exchange from Ms. Poling and
21   Mr. Niebrugge, and so I mean, that's consistent.
22   BY MR. VIERGUTZ:
23   Q.  Okay.  Maybe it's my mistake.  What I
24   understood you to be saying there is that neither
25   the Shoreside nor Metco claims were ever addressed

---

Page 51

1    by USF&G.
2    A.  Well, no.  Here -- I mean, the April 7th
3    letter they're certainly being addressed.
4    Q.  Okay.
5    A.  April 7 of '98.
6    Q.  Do you recall ever seeing a Shoreside proof
7    of claim in any document you reviewed?
8    A.  I don't recall.  I don't recall seeing
9    one.
10   Q.  Do you recall ever seeing, in what you
11   reviewed, any letter from Shoreside to USF&G
12   transmitting documents to prove up their claim?
13   A.  No, I don't.  I can't recall that.  I --
14   for the purpose of my report, I assumed that the
15   proof of claim had been made and filed.  I figured
16   that this case wouldn't have gotten where it did if
17   there hadn't been an appropriate proof of claim
18   filed.
19   Q.  Is the same true for answers regarding
20   Metco?
21   A.  Well -- yeah.
22   Q.  Did you assume -- my question is, did you
23   assume that they filed a proof of claim and
24   transmitted documents to USF&G?
25   A.  Well, when I say "I assumed," as I went

---

15 (Pages 48 to 51)

William Grant Callow
March 31, 2006

A98-009 CIV (HRH)

### Page 52

1  through this, I can't sit here and say that I recall
2  specifically any proof of claim. I guess the best
3  way to say it is, if I went back through the
4  documents to see if they were there, I'm sure I
5  would have noticed if there wasn't a proof of claim.
6      Q. And do you recall seeing -- I think you
7  answered this question, and I don't want to be
8  redundant. But you don't recall seeing any letter
9  from Shoreside or Metco transmitting documents to be
10 reviewed by USF&G?
11     A. As I sit here today, no, and I have to say
12 I didn't -- I didn't review those.
13     Q. Okay. And then the page following the
14 April 7, '98 letter in Exhibit 3 is a letter to
15 Nugget. And that deals with the Shoreside claim,
16 correct?
17     A. Yes, that's correct.
18     Q. Now, do you know whether, at page 2 of
19 Exhibit 3 --
20     A. Okay.
21     Q. -- the Spencer rock claim referenced in
22 sentence one there, 1,426,707, do you know whether
23 that claim included Metco's claim?
24     A. As I sit here today, I don't recall.
25     Q. Page 7 of your report. The first

### Page 53

1  paragraph, the second sentence -- before we do that.
2  I take it you and I can agree that there's nothing
3  unusual about a surety tendering a claim to the
4  principal --
5      A. Correct.
6      Q. -- in defense of a claim, correct?
7      A. Uh-huh.
8      Q. Okay. The second and third sentence, do
9  you know whether pleadings that you did not review
10 were transmitted to the surety by Nugget's
11 attorney?
12     A. I don't know that.
13     Q. Do you know -- apparently you've seen a
14 status report, page 055 in Exhibit 2, that you've
15 never seen before today; is that correct?
16     A. That's the 55 through 67?
17     Q. Yeah.
18     A. Yes.
19     Q. Do you opine that the status reports which
20 you did see, which we went through in Exhibit 2 --
21     A. Uh-huh.
22     Q. -- and the additional one, which you did
23 not see, in your opinion, were they sufficient or
24 should there have been more or less?
25     A. Let me answer the question carefully. From

### Page 54

1  Nugget's position, there's no question, I believe,
2  that Nugget considered them to be sufficient.
3  The -- I think what you're getting at, and I don't
4  want to put words in your mouth, but I think what
5  you're getting at is, should they have been
6  sufficient for USF&G to simply rely on them.
7      Because my position has always been that
8  USF&G had a duty itself to independently
9  investigate, to not simply just take the word of
10 Nugget.
11     So I don't -- I don't mean to parse your
12 question, I just want to make sure that you and I
13 are on the same page.
14     Q. Just as far as status reports, in cases
15 you've dealt with, are there sufficient status
16 reports? That was my question.
17     A. I would say that that is a typical kind of
18 status report. That's right.
19     Q. Then we go to -- well, let's just ask this
20 general question. In cases that you represent
21 clients, do you always have clients review the
22 pleadings prior to filing?
23     A. If you're talking about pleadings meaning a
24 complaint or an answer, yes.
25     Q. Other pleadings.

### Page 55

1      A. You mean like motions or whatever?
2      Q. Yes.
3      A. No, no, not at all. I usually tell them
4  about motions that I file, you know, other than
5  something routine. And I -- but in terms of sitting
6  down and going over them point by point, no, I do
7  not.
8      Q. I'm going to do this just so we don't have
9  any further, hopefully, issue on exhibits. I'm
10 going to mark two more. One is your resume, which
11 was given to me by Mr. Callow.
12     A. No, that would be given to you by
13 Mr. Shamburek, I think.
14     Q. Excuse me, Mr. Shamburek.
15     MR. VIERGUTZ: Can we mark that 4.
16     (Exhibit 4 marked.)
17 BY MR. VIERGUTZ:
18     Q. Is that your resume, sir, Exhibit 4?
19     A. I believe so, yeah.
20     Q. And does that accurately depict your
21 experience and education and such?
22     A. Pretty much, uh-huh.
23     Q. Have you written any articles on surety
24 law?
25     A. I have not.

16 (Pages 52 to 55)

SUMMIT COURT REPORTING  907/264-6776

William Grant Callow
March 31, 2006

A98-009 CIV (HRH)

Page 56

1    Q. No publications of any type on surety?
2    A. No, sir.
3    Q. Okay. And then exhibit -- the last
4  exhibit, 5 -- and I do this because of a statement
5  that comes up in your report. And we'll get to it.
6  But it talks about paragraph, I believe, 38,
7  containing bad faith allegations in the complaints
8  by the plaintiffs. And I just want to make sure
9  we're talking about the same thing.
10       So I'd ask these three complaints, North
11  Star's amended complaint, Metco's amended complaint,
12  and Shoreside's amended complaint be marked together
13  as Exhibit 5.
14       MR. SHAMBUREK: Herb, if we could just
15  note, those are also the docket entries 406, 407,
16  and 409?
17       MR. VIERGUTZ: Yeah.
18       MR. SHAMBUREK: Okay.
19       (Exhibit 5 marked.)
20  BY MR. VIERGUTZ:
21    Q. Now, Exhibit 5, North Star's amended
22  complaint.
23    A. Yes.
24    Q. If you could go to page 24. That's
25  paragraph 38 that you're referencing, right?

Page 57

1    A. Right.
2       MR. SEWRIGHT: What page again?
3       MR. VIERGUTZ: Page 24 of North Star's
4  complaint.
5  BY MR. VIERGUTZ:
6    Q. Paragraph 38 says: "Upon information and
7  belief, and subject to such further evidence as is
8  disclosed by discovery, USF&G is also liable to
9  North Star, under Alaska law, for the bad faith
10  nonpayment, nonsettlement and/or refusal to discuss
11  settlement of North Star's claim previously brought
12  under the Miller Act herein, of which USF&G was
13  notified."
14       Where do you see a claim for bad faith
15  failure to investigate in that paragraph?
16    A. I don't.
17    Q. Now, if we could go to Metco's amended --
18    A. May I just say this?
19    Q. Sure.
20    A. When you say bad faith nonpayment, in order
21  to make the payment, there has to be an
22  investigation. So it's sort of a summary conclusion
23  to say -- to say -- when you say there's a bad faith
24  nonpayment, you can't make a payment, obviously,
25  until you've reasonably investigated.

Page 58

1       And so a bad faith nonpayment is legitimate
2  to say it incorporates failure to investigate.
3    Q. Let's go to Shoreside's amended complaint,
4  and that's page 19.
5    A. All right. I am there.
6    Q. At page 38.
7       MR. SHAMBUREK: Paragraph 38.
8       MR. VIERGUTZ: Paragraph 38, I'm sorry,
9  page 19. Thanks.
10  BY MR. VIERGUTZ:
11    Q. There's a little additional verbiage on
12  that paragraph, but there's no specific claim for
13  bad faith failure to investigate, would you agree?
14  It's again for bad faith nonpayment, nonsettlement,
15  and/or refusal to discuss settlement.
16    A. Yes, that's correct. The word -- the word
17  bad faith failure to investigate, the words do not
18  appear there. My answer is the same, though, about
19  bad faith nonpayment. I think that, in the liberal
20  rules of pleadings, that's...
21       MR. VIERGUTZ: Can we go off for a second?
22       (Off record)
23  BY MR. VIERGUTZ:
24    Q. Page 7 of your report, Exhibit 1,
25  "Settlement Efforts." Was USF&G obligated to

Page 59

1  discuss settlement?
2    A. Yes.
3    Q. Why?
4    A. Because they have -- their primary
5  obligation is the obligees. And they need -- under
6  Alaska law, they need to investigate and promptly
7  settle claims. Legitimate claims. And so if they
8  fail to promptly and adequately investigate,
9  obviously they can't -- they can't settle, but if
10  they -- they just can't get around the settlement duty by
11  failing to properly investigate.
12    Q. Could you and I agree that if you have a
13  client and I sue you, you don't have any obligation
14  to participate in a settlement conference?
15    A. If I have a client and you sue my client?
16    Q. Uh-huh. You don't have to settle a case
17  with me?
18    A. If it's not an insurance matter, absolutely
19  not.
20    Q. But if it's an insurance case and I sue
21  you, and your client is a carrier, you have an
22  obligation to attend a settlement conference.
23       MR. SEWRIGHT: Object to the form.
24       THE WITNESS: Well, no. I mean, do I as
25  the lawyer for the carrier have an obligation to

17 (Pages 56 to 59)

William Grant Callow
March 31, 2006

A98-009 CIV (HRH)

Page 60

1　attend the settlement conference? I suppose, if
2　there's a settlement conference and it's my client,
3　I have a legal obligation.
4　BY MR. VIERGUTZ:
5　　Q. But does your client have the option to
6　say, no, I don't want to settle and I don't want to
7　go to a settlement conference and we're going to
8　trial?
9　　A. In the insurance context of what we're --
10　let's be specific. Are we talking about in the
11　USF&G circumstance?
12　　Q. And it's not insurance, it's surety.
13　　A. Okay. All right. Surety. Okay.
14　　In that circumstance, I believe that a
15　surety is bound to the same rules as an insurance
16　company. I just think it's a subset of insurance
17　companies. And I think that they have a duty to
18　investigate and promptly settle claims under
19　Title 36, and also under -- you know, I've been
20　saying Title 36, and I should be saying -- it's
21　21.36.125, and so anywhere I've been saying Title 36
22　because I -- just my notations I write 36 and then
23　125, but it's really Title 21.
24　　MR. SEWRIGHT: So you mean Chapter 36.
25　　THE WITNESS: Yes, that's right. Yes,

Page 61

1　that's right.
2　　So it's Title 31, Chapter 36.125. And
3　under, I think it's 3 AAC 030 point whatever, I
4　can't remember the 226, that -- there are -- there
5　are duties that insurance companies have to promptly
6　settle claims.
7　BY MR. VIERGUTZ:
8　　Q. If they have merit?
9　　A. Yes, that's correct.
10　　Q. And if your client, the surety, says these
11　claims do not have merit, or they have questionable
12　merit, can they then refuse to settle the claims?
13　　A. If they have -- if they have a good faith
14　basis for believing that the claims have no merit,
15　absolutely they can refuse to settle the case.
16　　Q. You discuss in your report at page 7 at
17　sentence 3: I understand that prior to the
18　settlement conference, Nugget offered to settle
19　North Star's claim for 20,000, Shoreside claims for
20　5,000, and Metco's claim for 10,000.
21　　Were you made aware that Nugget offered to
22　settle the three plaintiffs' claims at the
23　settlement conference for $120,000?
24　　A. I don't recall that specific number, that's
25　correct.

Page 62

1　　MR. SEWRIGHT: Never communicated to us.
2　BY MR. VIERGUTZ:
3　　Q. Do you know who Steven Schoenhaar is in
4　paragraph 2 under "Settlement Efforts" on page 2 of
5　Exhibit 1?
6　　A. I just know that he's an employee of
7　USF&G.
8　　Q. You don't know what his job description is
9　or where he is?
10　　A. Well, the answer to that is, as I sit here
11　no, today, I can't remember. I mean, if he's a --
12　if he's counsel or an adjuster, I can't remember.
13　　Q. And it is not bad faith to refuse to settle
14　if the surety has a good faith basis to believe that
15　the claim is without merit?
16　　A. That's correct.
17　　And I want to make sure that I'm clear with
18　you on this. By that, I don't want you to take it
19　that I am saying that the -- that USF&G can simply
20　rely on the principal to provide the investigation
21　and the analysis of the claim. USF&G has an
22　independent duty, and only by fulfilling that duty
23　can it end up with a good faith basis for making
24　those decisions.
25　　Q. And page 8, under "Later Correspondence

Page 63

1　Between USF&G and Oles Morrison."
2　　A. Yes.
3　　Q. The second sentence says, "There is no
4　evidence any copies of those requested documents
5　were ever mailed" -- I think you omitted the "M."
6　　A. Yes, I saw that and actually I meant to
7　correct that.
8　　Q. Sure. -- "to Mr. Schoenhaar or anyone else
9　at USF&G," right?
10　　A. Yes. And I will amend that by saying there
11　is no evidence that I was aware.
12　　Q. And those documents are the appeal briefs
13　and such that you're speaking of?
14　　A. Yes. I saw no evidence that those were
15　reviewed.
16　　Q. And are you relying on what your counsel
17　told you and what your counsel provided to you to
18　come to that conclusion?
19　　A. Well, I'm -- what my counsel -- or my
20　counsel. What the people who hired me provided to
21　me, that's what I'm relying on. I don't know that
22　they specifically -- I wouldn't -- if they said
23　there is no evidence, I certainly would have looked
24　to see if there was any evidence. And if they
25　withheld it, I suppose I would -- I took in good

18 (Pages 60 to 63)

A98-009 CIV (HRH)

William Grant Callow
March 31, 2006

Page 64

1  faith what I understood to be that there is no
2  evidence that those documents were ever mailed to
3  Mr. Schoenhaar.
4      Q. Do you feel that you had an independent
5  duty to investigate what Mr. Shamburek told you?
6      A. Well, let me say this. I had -- in my
7  capacity as an expert witness, I relied upon what
8  Mr. Shamburek and Mr. Sewright provided to me as
9  being the information -- I was not an independent
10  investigator. If I -- if I had been hired by the
11  court or if I had a duty to any of the other
12  parties, I would not have relied simply on what they
13  provided.
14      But in this case I was retained to provide
15  my opinion and was provided with documents, and I
16  relied upon the documents that they provided me.
17      Q. If you'd go to page 8 of Exhibit 1. The
18  section above claimant's challenges to USF&G's
19  actions and inactions?
20      A. The part that starts "Janice S. Smith";
21  yes. That paragraph?
22      Q. Yeah, that paragraph, but the second to the
23  last, the penultimate sentence of that paragraph.
24      A. Ms. Williams' letter?
25      Q. Yeah. Yeah. There in the last sentence,

Page 65

1  "This appears to be the only discussion of the case
2  of any substance in writing since the first
3  complaint was filed in January '98 by North Star."
4      Can we agree now that that is not correct
5  based on the status reports we've gone through and
6  No. 55 through 66 that you've seen?
7      A. Let me take a moment and read the whole
8  paragraph to make sure I put this in context.
9      Q. Sure.
10      A. (Reviews document.)
11      MR. SHAMBUREK: And, Herb, I just observe
12  the continuing objection --
13      MR. VIERGUTZ: Sure.
14      MR. SHAMBUREK: -- to the letter included
15  in the Exhibit 2, that number 55 to -- 62?
16      MR. VIERGUTZ: Uh-huh. 66.
17      THE WITNESS: Well, when we're talking
18  about the only discussion of the case of any
19  substance in writing, there was this -- there was
20  this March letter from Oles Morrison to USF&G,
21  correct.
22  BY MR. VIERGUTZ:
23      Q. And there were other status reports; isn't
24  that correct?
25      MR. SEWRIGHT: Object to the form of the

Page 66

1  question. I think that misstates the testimony,
2  or what --
3      THE WITNESS: Well, let me just say this --
4      MR. SEWRIGHT: -- you've presented,
5  Mr. Viergutz.
6      THE WITNESS: -- the one that I -- the one
7  that I -- I'm sorry. I know better.
8      MR. VIERGUTZ: He can say object to form,
9  period --
10      MR. SEWRIGHT: Object to form.
11      MR. VIERGUTZ: -- the rest of it was
12  irrelevant anyway.
13      MR. SEWRIGHT: It wasn't irrelevant, but --
14      MR. VIERGUTZ: Go ahead.
15      MR. SEWRIGHT: Anyway, go ahead.
16      THE WITNESS: Gentlemen, I'm sorry that I
17  interrupted you. I know better as a lawyer that I
18  should let you guys talk.
19      But let me just say this. What I recall is
20  that -- I recall that March letter that was pages 55
21  through 67, that's the one that I recall is of
22  substance.
23      I don't -- the others -- and you say, well,
24  they're -- were there any -- were the other letters
25  of any substance. That's a question of were they

Page 67

1  really of substance in terms of what we're talking
2  about in terms of what USF&G needed to do. The
3  answer is no, but certainly that March '98 letter
4  was of substance, that's correct.
5  BY MR. VIERGUTZ:
6      Q. Then on page 8 under the "Claimants'
7  Challenges To USF&G's Actions And Inactions," and
8  you quote the next -- through page 11, to the
9  conclusion.
10      A. Yes.
11      Q. You're just quoting the third supplemental
12  discovery response of Shoreside?
13      A. Yes, that's right.
14      Q. And Metco's supplemental discovery
15  response?
16      A. Yes.
17      Q. Are you relying on those as true and
18  accurate in the construction of your report?
19      A. Yes. I'm relying on those as providing
20  information that should have -- that should have
21  been known by USF&G, that's correct.
22      Q. Let's go through it, then. On page 8, the
23  first paragraph of the quote, your last sentence.
24  And you may need to read that first full paragraph
25  of the quote. The last sentence says, "The

19 (Pages 64 to 67)

William Grant Callow
March 31, 2006

A98-009 CIV (HRH)

---

Page 68

1   obligation to pay did not depend on the narrower
2   definitions of suppliers and subcontractors in the
3   Miller Act." And I want to know, why not?
4       A. Well, there is a -- as I recall, there
5   is a -- there's a CFR on that, as I recall. Or was
6   it the -- I -- I can't -- I can't tell you right
7   now, but I remember that there is -- there is a
8   legal reason for that statement.
9       You know, let me just say this. Where I --
10  where -- I mean, I read that and I didn't flinch
11  because I -- as you know, there are the letters from
12  the Corps saying: We remind you that under contract
13  clause I.55, payments under fixed-price, you're not
14  to request -- let me see here.
15      "This request for progress payment does not
16  include any amounts which the prime contractor
17  intends to withhold or retain from a subcontractor
18  or supplier."
19      I don't know. As I sit here today, I can't
20  tell you specifically.
21      Q. Okay. That's fair.
22      The final paragraph of page 8, USF&G knew
23  or should have known that Nugget was secretly
24  structuring its transactions so that Nugget could
25  deceive the Corps of Engineers and the three

---

Page 69

1   claimants regarding the actual contractual
2   relationship, yadda, yadda, yadda.
3       How should USF&G have known that?
4       A. Well, by doing an independent
5   investigation.
6       Q. If it was a secret, how would they have
7   known it?
8       A. Well, if it was a secret it was -- it was
9   Nugget that was trying to set this up and keep it a
10  secret. USF&G would have known by talking to the
11  obligees themselves and finding out the nature of
12  the transactions.
13      Q. And would they have an affirmative duty to
14  believe, over the principal, the positions of the
15  obligees?
16      A. Well, that -- my position has been that
17  legally they owe a duty to the obligees that I
18  consider to be paramount to their duty to the
19  principal.
20      And they are -- that is -- but that doesn't
21  mean that they should necessarily believe. They
22  need to do an independent investigation and make a
23  determination.
24      Q. And that analysis is based upon your
25  position that there is a duty to the obligee more

---

Page 70

1   than simply paying the claim of the obligee in the
2   event the principal does not pay it, correct?
3       A. There is a duty to the obligee -- repeat
4   that again, please.
5       MR. VIERGUTZ: Would you read it back.
6       (Question read back.)
7       MR. SHAMBUREK: I just object to the
8   question, because it's been asked and answered.
9       MR. SEWRIGHT: Also the form, beyond asked
10  and answered.
11      THE WITNESS: Let me say that there's a
12  duty beyond -- that's the phrase you used. There is
13  a duty to pay legitimate claims and that is the
14  ultimate duty, so when you say there's a duty
15  beyond, I want to say this, it's really not be
16  beyond, it's a precursor duty to properly
17  investigate, but I think we're understanding each
18  other.
19  BY MR. VIERGUTZ:
20      Q. Isn't it correct that the surety has no
21  duty whatsoever to the obligee if the principal pays
22  the claim?
23      MR. SHAMBUREK: Object; asked and answered.
24      MR. SEWRIGHT: Object to the form
25  otherwise, too.

---

Page 71

1       THE WITNESS: Okay. If -- if the principal
2   pays the claim, the surety has no further duty to
3   the obligee, that's correct.
4   BY MR. VIERGUTZ:
5       Q. So your entire analysis on the duties of
6   the obligee -- you and I aren't communicating. I'm
7   saying --
8       A. The duties of the obligee?
9       Q. I'm saying to you -- excuse me, the duty of
10  the surety.
11      A. Okay.
12      Q. The only duty of the surety is to pay a
13  claim to an obligee in the event it is not paid by
14  the principal. And you disagree with that
15  proposition, do you not?
16      A. Well --
17      MR. SHAMBUREK: Asked and answered; but go
18  ahead.
19      THE WITNESS: The answer is yes; but
20  there's -- there's a question of timing here. And
21  there is -- I think it's 31 CFR, it's like 223.18,
22  that provides that the surety has the duty to timely
23  pay if -- pay the obligee, if the -- if the
24  principal does not pay.
25      So where a principal refuses to timely pay

---

20 (Pages 68 to 71)

William Grant Callow
March 31, 2006

---

Page 72

1  and without just cause, the surety can't just wait
2  for as long as the principal wants and drag out the
3  payment of the claim.
4      So you can't just say, well, the
5  principal -- we're just working through this, the
6  principal is fighting this claim and working this
7  out. The surety would have a duty to independently
8  investigate and determine if in fact the claim to
9  the surety's mind is a valid claim, the surety pays
10  the claimant, and then seeks indemnity if the
11  surety -- this gets back to the beginning of my
12  testimony. If the surety overpays, pays a claim it
13  shouldn't have, the surety is out the money.
14  BY MR. VIERGUTZ:
15      Q. Okay. And in this case, are you saying
16  that the claims should have been paid?
17      A. Yes.
18      Q. Why?
19      A. I think that -- well --
20      MR. SHAMBUREK: If I could just object to
21  asked and answered.
22      THE WITNESS: Let me say this. I think
23  that these claims -- well... These claims weren't
24  properly investigated by USF&G. Had they been
25  properly investigated -- it's difficult to say what

---

Page 73

1  would have happened if USF&G had properly
2  investigated.
3      But the fact that USF&G did not properly
4  investigate leads to sort of a begging of the
5  question of whether it had done so, those claims
6  would have been properly paid.
7  BY MR. VIERGUTZ:
8      Q. Why, because the court hasn't even
9  determined that they're valid claims yet.
10      MR. SHAMBUREK: Lacks foundation.
11      THE WITNESS: Well, let me say this. If
12  the defenses are -- isn't this -- isn't it true that
13  this case has gone up to the Ninth Circuit twice? I
14  think it has. And the Ninth Circuit has reversed,
15  but my understanding is that there has -- that the
16  claims are valid, there's just a question of value;
17  is that correct?
18  BY MR. VIERGUTZ:
19      Q. And if that's not correct, would that
20  change your analysis?
21      A. If the claims are not valid and it's
22  determined that they're not valid, then in that case
23  there is -- there is -- there would be no duty on
24  the part of the surety to pay an invalid claim,
25  that's correct.

---

Page 74

1      Q. Now, paragraph 2 of page 9. "USF&G knew or
2  should have known that Oles Morrison may have been
3  involved in structuring the transactions to create a
4  straw man relationship with Spencer Rock and a
5  hollow shell constituting subterfuge under the
6  Miller Act in order to seek to excuse Nugget's
7  willful nonpayment to the three claimants."
8      How should USF&G have known that Oles
9  Morrison may have been involved in structuring the
10  transactions to create --
11      A. Well, simply by -- by just doing an
12  investigation. Remember, this is -- these are
13  allegations in the complaint, they're not -- they're
14  not what I wrote. But had USF&G properly
15  investigated and determined what the -- what the
16  nature of the transactions were, apparently that --
17  the allegation here is that they certainly would
18  have -- USF&G would have known that Oles Morrison
19  was protecting its client, Nugget; and, therefore,
20  would have been alerted to the need to -- USF&G
21  would have been alerted to the need to undertake its
22  own investigation.
23      Q. But that paragraph assumes that that
24  happened; isn't that correct?
25      A. It assumes -- yes, that's correct. Yes,

---

Page 75

1  that's correct.
2      Q. If it didn't happen, then there's no basis
3  for that in that paragraph, that allegation,
4  correct?
5      A. Well, if the facts don't support -- it's an
6  allegation, if the facts don't support it, that's
7  correct.
8      Q. Now, the final paragraph at page 9. "The
9  decision by the District Judge in this case finding
10  that Spencer Rock Products was a subcontractor to
11  Nugget under the Miller Act was and is a correct
12  interpretation of the relevant decisions of the
13  United States Supreme Court."
14      However, Mr. Callow, that's not what the
15  opinion of the Ninth Circuit is, is it?
16      A. That's correct.
17      Q. And we've gone through this again, so it's
18  asked and answered, but the Ninth Circuit is the law
19  of the land over the --
20      A. That's correct. Over the district court.
21      Q. Thank you. Page 10.
22      A. Yes.
23      Q. The first paragraph under Metco's
24  supplemental language. It says, "USF&G's records
25  indicate that it never did anything with the

---

21 (Pages 72 to 75)

William Grant Callow
March 31, 2006

A98-009 CIV (HRH)

---

Page 76

1  information it had regarding the three claims.  If
2  USF&G did anything, there is no record of what it
3  did."
4       Isn't that disputed by Exhibit 3, the
5  letters, pages 4, 5, 6?
6       A. Exhibit 3, pages 4, 5, 6, we're talking
7  about --
8       Q. Any of those claims.  LaPore's claims,
9  Chugach Rock's claim, North Star's claim,
10 Shoreside's claim.  Aren't they writing the
11 claimants asking for additional information and
12 trying to get more from them to be knowledgeable?
13      A. Well, let me say this.  The allegations
14 said they never did anything with the information it
15 had regarding the three claims, that's a little bit
16 different than -- but anyway, I understand what
17 you're saying.
18      Certainly those letters refer to the
19 claims, but I think the allegation said they never
20 did anything with the information that they
21 obtained.
22      Q. The information that had been provided by
23 the claimants resulted in USF&G denying the claims;
24 isn't that correct?
25      MR. SEWRIGHT:  Object to the form of the

---

Page 77

1  question.
2       THE WITNESS:  Well, the answer is, yes,
3  USF&G denied the claims.
4  BY MR. VIERGUTZ:
5       Q. And in those letters requesting further
6  information from the claimants, was it not the
7  obligation of the claimants then to provide
8  additional information?
9       MR. SEWRIGHT:  Object to the form of the
10 question.  And also out of context, Mr. Viergutz,
11 from some --
12      MR. VIERGUTZ:  You object to the form,
13 period.
14      MR. SEWRIGHT:  -- of these letters there
15 was a lawsuit filed.
16      Object to the form.
17      MR. VIERGUTZ:  Just object to the form.
18 The running objection is unnecessary.
19      THE WITNESS:  Let's -- may I have the
20 question again, please.
21      (Question read back.)
22      MR. SEWRIGHT:  And the objection is to the
23 form.
24      THE WITNESS:  When -- an insurer or a
25 surety has a right to seek reasonable information

---

Page 78

1  from the obligees, that's correct.
2  BY MR. VIERGUTZ:
3       Q. And then the next paragraph, or the third
4  one on page 10 under that heading, says, "There were
5  a number of settlement opportunities in this case.
6  The three claimants each expended resources
7  preparing settlement offers in earnest throughout
8  this litigation which appear never to have been
9  considered in good faith by the defendants."
10      What evidence are you aware of that that
11 statement is accurate?
12      A. What evidence am I aware of?
13      Q. Uh-huh.  Yes.
14      A. I'm aware of representations made to me by
15 Mr. Shamburek and Mr. Sewright.  I don't recall
16 actually preparing the settlement -- or reviewing
17 any settlement offers in this case.
18      Q. Would you agree it's standard practice in
19 the industry for a surety to require general
20 agreement of indemnity to be signed by the
21 indemnitors?
22      A. I can't speak to whether it is standard
23 practice.  It's not uncommon.  That's my
24 understanding.
25      Q. Page 11 under "Conclusion."  I don't

---

Page 79

1  understand the third sentence where it says,
2  "Neither Nugget nor USF&G contested those
3  assertions."  I don't understand what the Ninth
4  Circuit appeal was all about if those assertions
5  weren't contested.  Can you tell me what you're
6  speaking to?
7       A. Just give me a moment here, I want to just
8  put this...
9       (Reviews document.)
10      MR. VIERGUTZ:  Can we go off for just a
11 second?
12      (Off record)
13      THE WITNESS:  Let's go back on record.
14      Your question is, what was the Ninth
15 Circuit opinion all about?
16 BY MR. VIERGUTZ:
17      Q. Yeah, what is that appeal all about?
18      A. Well, are you talking about the one -- the
19 Ninth Circuit appeal referred to where the panel
20 came out with a decision in March of 2005?
21      Q. The most recent one, yeah.
22      MR. SEWRIGHT:  I'm going to object to the
23 form of the question, to that line of questioning.
24      THE WITNESS:  Well, my understanding is
25 that the Ninth Circuit opinion, the one from

---

22 (Pages 76 to 79)

William Grant Callow                                                    A98-009 CIV (HRH)
March 31, 2006

|  | Page 80 |
|---|---|
| 1 | March 3rd of 2005, merely said that there was -- |
| 2 | there was sufficient evidence to create a material |
| 3 | issue of fact around subterfuge and collusion; |
| 4 | that's different than saying that Nugget contested |
| 5 | the assertions that services had been performed or |
| 6 | services hasn't been provided. |
| 7 | BY MR. VIERGUTZ: |
| 8 | Q. But the services were provided or goods |
| 9 | were provided for the use and benefit of the bonded |
| 10 | Homer project, correct? And that's been contested; |
| 11 | isn't that correct? |
| 12 | MR. SEWRIGHT: Object to the form. |
| 13 | THE WITNESS: That the goods and services |
| 14 | have been provided, yes, that is -- that has been |
| 15 | contested, that's correct. |
| 16 | BY MR. VIERGUTZ: |
| 17 | Q. And then the next paragraph, the final |
| 18 | sentence it says, "USF&G knew or should have known |
| 19 | that the support agreement and subsequent activities |
| 20 | changed their legal relationship of the parties." |
| 21 | How were the legal relationships changed? |
| 22 | A. Well -- |
| 23 | MR. SEWRIGHT: I'm going to object to the |
| 24 | form. |
| 25 | /// |

|  | Page 81 |
|---|---|
| 1 | BY MR. VIERGUTZ: |
| 2 | Q. Are you speaking there to the fact that by |
| 3 | the position of Nugget they would not then have been |
| 4 | covered under the bond? |
| 5 | A. Well, that's the Nugget position, that's |
| 6 | correct. Yes. |
| 7 | Q. Okay. And that changed the legal |
| 8 | relationship? |
| 9 | A. Uh-huh. |
| 10 | Q. Okay. Do you know what you're talking |
| 11 | about when you say "subsequent activities"; do you |
| 12 | recall? |
| 13 | A. Well, that support agreement, if I recall, |
| 14 | was in -- I think it's in '97. And I can't remember |
| 15 | when the support agreement was right now. But there |
| 16 | were, particularly with Spencer Rock, and Nugget's |
| 17 | relationship was basically taking over Spencer Rock, |
| 18 | I think that was -- I think that's -- as I recall, |
| 19 | that's what I was referring to. |
| 20 | Q. The last paragraph, it says, "Litigating a |
| 21 | case that involves less than $100,000 is often |
| 22 | uneconomical for all involved. A party can defend |
| 23 | against any claim, but committing a disproportionate |
| 24 | sum to challenging well-founded claims is |
| 25 | problematic and usually economically irrational." |

|  | Page 82 |
|---|---|
| 1 | Isn't that true of the plaintiffs |
| 2 | equally? |
| 3 | A. It -- well, it is -- it is true in |
| 4 | litigation in general, both plaintiffs and |
| 5 | defendants, that litigation for relatively small |
| 6 | amounts is uneconomical, that's correct. |
| 7 | And with the costs of litigation being what |
| 8 | they are today, you know, $100,000 is -- well, from |
| 9 | my point of view, I won't even take a case that's |
| 10 | less than $100,000 at issue, just because of the |
| 11 | cost of litigation. |
| 12 | And in my experience insurers know that it |
| 13 | is economically -- it creates a great economic |
| 14 | hardship to force -- force people to litigate. |
| 15 | Q. On page 12, the second line, you talk about |
| 16 | economic coercion. Is it your position USF&G is |
| 17 | guilty of that despite they weren't paying any |
| 18 | attorney fees in this litigation? |
| 19 | A. Well, it's my position that it is |
| 20 | economically coercive for USF&G not to have |
| 21 | investigated and paid a valid claim for these |
| 22 | claimants. That itself is economic coercion. It is |
| 23 | the whole purpose of the Miller Act to make sure |
| 24 | that claimants get paid and in a timely fashion for |
| 25 | valid claims. |

|  | Page 83 |
|---|---|
| 1 | And so to the extent that USF&G failed to |
| 2 | fulfill its obligations and forced these obligees |
| 3 | not only to litigate, but to forgo the income, that |
| 4 | is economically coercive, absolutely. |
| 5 | And I think if you look at the applicable |
| 6 | statutes and the Miller Act itself and that CFR that |
| 7 | I was telling you about, that is precisely the |
| 8 | purpose for why there are these duties. |
| 9 | And all those -- all those State statutes |
| 10 | and the applicable CFRs are incorporated by |
| 11 | reference in the -- in the surety contract itself. |
| 12 | Q. And that's true despite the fact that the |
| 13 | claimants twice prevailed at the Ninth Circuit? |
| 14 | MR. SEWRIGHT: Object to the form of the |
| 15 | question. |
| 16 | THE WITNESS: Well, the answer is, correct, |
| 17 | it is true in spite of the fact -- what I just said |
| 18 | is true in spite of the fact that the claimants |
| 19 | prevailed at the Ninth Circuit. |
| 20 | MR. SHAMBUREK: Herb, this is the amended |
| 21 | complaint that supplants the other one? |
| 22 | THE WITNESS: Am I going back to Exhibit 5? |
| 23 | MR. VIERGUTZ: We can handle that quick if |
| 24 | you want to. |
| 25 | THE WITNESS: Are we going to have this |

23 (Pages 80 to 83)

---

Page 84

1   marked?
2       MR. SEWRIGHT:  Are we off the record?
3       MR. VIERGUTZ:  Yeah, go off the record.
4       (Off record)
5   BY MR. VIERGUTZ:
6       Q.  The last complaint, amended complaint in
7   Exhibit 5, is the Metco amended complaint --
8       A.  Yes.
9       Q.  -- dated August 31, '05.  And paragraph 38
10  at that --
11      A.  I'm there.
12      Q.  -- amended complaint --
13      A.  Page 18.
14      Q.  Yeah.  That's the same identical language
15  as the Shoreside amended complaint at paragraph 38,
16  correct?
17      A.  That's correct.
18      Q.  Now, back to Exhibit 1.
19      A.  Yes.
20      Q.  In that first paragraph of page 12.
21      A.  Yes.
22      Q.  The second sentence there, it says, "The
23  litigation tactics of Nugget and USF&G have
24  reportedly escalated the costs unreasonably."
25      A.  Yes.

Page 85

1       Q.  Is that based on representations made to
2   you by Mr. Shamburek and Sewright?
3       A.  Yes.
4       Q.  Then the last sentence, "Nugget and USF&G
5   have apparently committed enormous sums to litigate
6   this case which are far out of line with the total
7   amount in controversy."  And that would be equally
8   true for the claimants, correct?
9       A.  Yes, that's correct.
10      Q.  And then the next paragraph -- my question
11  simply is the first sentence, it says, "...whether
12  the notice discussed above was accurate."  I'm
13  wondering what notice are we talking about?  I
14  couldn't follow that.
15      A.  Where are you now?
16      Q.  The second paragraph where --
17      A.  Yes.
18      Q.  -- it starts "Shoreside contends."
19      A.  Yes.
20      Q.  And toward the end of that sentence it
21  says, "...and whether the notice discussed above was
22  adequate."
23      A.  (Reviews document.)
24      I wonder if this is an editing thing.  Let
25  me just take a moment and find where there's a

Page 86

1   reference to the notice in it.
2       Well, I don't know right now, looking back
3   through the report, I don't want to waste a lot of
4   time, but that's my understanding, is that this
5   is -- they were litigating whether the notice of the
6   claim was adequate, and...
7       Q.  Okay.
8       A.  Yeah.
9       Q.  Now, the paragraph right under that --
10      A.  Yes.
11      Q.  -- one sentence, it says, "A strategy of
12  trying to economically overwhelm an intended
13  contract beneficiary that asserts a valid claim by
14  trying to force that party into submission by
15  litigating frivolous issues and defenses that cause
16  the claimants to incur inordinate legal fees is bad
17  faith."
18      A.  Yes.
19      Q.  That presupposes that the contention has
20  merit, correct?
21      A.  Yes.  That's why it says "asserts a valid
22  claim," yes.
23      Q.  And that's a question of fact, isn't it?
24      A.  It is a question of fact.
25      Q.  You have not served as an expert witness

Page 87

1   regarding bad faith practices of a surety or
2   insured, correct?
3       A.  Correct.
4       Q.  Have you ever served as an expert witness
5   in any case?
6       A.  I'm trying to think.
7       I've testified a number of times; I don't
8   know whether I have been asked to testify as an
9   expert.  I was -- I testified in the Weiford case.
10  I don't -- I don't believe that I've been asked to
11  testify as an expert previously.
12      Q.  Do you know Mr. Shamburek socially?
13      A.  Yes, somewhat, uh-huh.
14      Q.  How long have you known him?
15      A.  Oh, I would say probably 20 years.  I got
16  to know him when he was practicing with Randy
17  Farleigh, when it was Farleigh & Shamburek.  And
18  actually, he was on the other side of a case that I
19  had briefly.  But I had met him professionally from
20  Mr. Shamburek -- I mean, Mr. Farleigh.
21      We had this case together, or where he was
22  on the other side, and he now has -- maintains an
23  office down the hall, office sharing, from me.  So I
24  see him fairly regularly when he stops into that
25  office.

24 (Pages 84 to 87)

William Grant Callow                                          A98-009 CIV (HRH)
March 31, 2006

Page 88

1        MR. VIERGUTZ:  I appreciate you being here
2    today.  Thank you.
3        THE WITNESS:  Sure.
4    (Proceedings concluded at 11:53 a.m.)
5    (Signature reserved.)
6                -oOo-
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SUMMIT COURT REPORTING  907/264-6776

William Grant Callow                                                    A98-009 CIV (HRH)
March 31, 2006

Page 89

1                    REPORTER'S CERTIFICATE

2

3

4              I, KATHERINE L. NOVAK, RPR, Registered

5    Professional Reporter, hereby certify:

6              That I am a Court Reporter and Notary

7    Public for the State of Alaska; that the deponent

8    was duly sworn; that the foregoing proceedings were

9    taken by me in Stenotype Shorthand and thereafter

10   transcribed by me; that the transcript constitutes a

11   full, true and correct record of said proceedings

12   taken on the date and time indicated therein; and

13   that signature is reserved.

14             Further, that I am a disinterested

15   person to said action.

16             IN WITNESS WHEREOF, I have hereunto

17   subscribed my hand and affixed my official seal this

18   10th day of April 2006.

19

20

21

22                    _____
                      Katherine L. Novak, RPR,
23                    and Notary Public for the
                      State of Alaska.

24                    My Commission Expires 6-10-09

25

William Grant Callow                                          A98-009 CIV (HRH)
March 31, 2006

Page 90

1                        WITNESS CERTIFICATE

2            USA, ET AL. VS. METCO VS. NUGGET, ET AL.
            WILLIAM GRANT CALLOW - MARCH 31, 2006
3                  CASE NO. A98-009 CIV (HRH)

4     I hereby certify that I have read the foregoing
     deposition and accept it as true and correct, with
5     the following exceptions:

6     ==================================================
     Page    Line    Description/Reason for Changes
7     ==================================================

8      _51_    _8_    _After the deposition I reviewed_

9      ___    ___    _the documents again and found_

10     ___    ___    _the proof of claim by_

11     ___    ___    _Shoreside, so it was among_

12     ___    ___    _the written materials that_

13     ___    ___    _I reviewed prior to preparing_

14     ___    ___    _my report._

15     ___    ___    _____

16     ___    ___    _____

17     ___    ___    _____

18     ___    ___    _____

19     ___    ___    _____

20     ___    ___    _____

21

22     _May 12, 2006_    _____
     Date Read            Witness Signature
23

24     (Use additional paper to note corrections as needed,
     dating and signing each one.)            (KN)
25

SUMMIT COURT REPORTING  907/264-6776