1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF ALASKA
2

3   UNITED STATES OF AMERICA for the use   )
    of NORTH STAR TERMINAL & STEVEDORE      )
    COMPANY d/b/a Northern Stevedoring &    )
4   Handling, and NORTH STAR TERMINAL &     )
    STEVEDORE COMPANY, d/b/a Northern       )
5   Stevedoring & Handling, on its own      )
    behalf,                                 )
6                                           )
                    Plaintiffs,             )
7                                           )
       and                                  )
8                                           )
    UNITED STATES OF AMERICA for the use    )
9   of SHORESIDE PETROLEUM, INC., d/b/a     )
    Marathon Fuel Services, and SHORESIDE   )
10  PETROLEUM, INC., d/b/a Marathon Fuel    )
    Services, on its own behalf,            )
11                                          )
                    Intervening Plaintiffs, )
12                                          )
       and                                  )
13                                          )
    METCO, INC.,                            )
14                                          )
                    Intervening Plaintiff,  )
15                                          )
       vs.                                  )
16                                          )
    NUGGET CONSTRUCTION, INC.; SPENCER      )
17  ROCK PRODUCTS, INC.; UNITED STATES      )
    FIDELITY AND GUARANTY COMPANY;          )
18  and ROBERT A. LAPORE,                   )
                                            )
19                  Defendants.             )
    _____)

20  Case No. A98-009 CIV (HRH)

21           DEPOSITION OF JAMES LEROY FERGUSON

22  APPEARANCES:
       FOR THE PLAINTIFF NORTH STAR        MR. MICHAEL W. SEWRIGHT
23     TERMINAL & STEVEDORE CO.:           Burr, Pease & Kurtz
                                           Attorneys at Law
24                                         810 N Street
                                           Anchorage, Alaska  99501
25                                         (907) 276-6100

R & R  COURT  REPORTERS

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit 2
Page _1_ of _35_

1   APPEARANCES (CONTINUED):

2       **FOR THE DEFENDANT SHORESIDE**              **MR. STEVEN J. SHAMBUREK**
        **PETROLEUM, INC & METCO, INC.:**            Attorney at Law
3                                                    425 G Street, Suite 630
                                                     Anchorage, Alaska  99501
4                                                    (907) 522-5339

5       **FOR THE DEFENDANT NUGGET**                 **MR. THOMAS KRIDER**
        **CONSTRUCTION, INC., and UNITED**           Oles, Morrison & Rinker
6       **STATES FIDELITY AND GUARANTY:**            Attorneys at Law
                                                     745 West Fourth Avenue
7                                                    Suite 502
                                                     Anchorage, Alaska 99501
8                                                    (907) 258-0106

9       **FOR USF&G:**                               **MR. HERBERT A. VIERGUTZ**
                                                     Barokas Martin & Tomlinson
10                                                   Attorneys at Law
                                                     1029 West Third Avenue
11                                                   Suite 280
                                                     Anchorage, Alaska 99501
12                                                   (907) 276-8010

13      **FOR THE WITNESS:**                         **MR. DOUGLAS R. DAVIS**
                                                     Keesal, Young & Logan
14                                                   Attorneys at Law
                                                     1029 West Third Avenue
15                                                   Suite 650
                                                     Anchorage, Alaska 99501
16                                                   (907) 279-9696

17                          *  *  *  *  *  *

18

19

20

21

22

23

24

25

Exhibit **2**
Page _2_ of _35_

1    PURSUANT TO NOTICE, the Deposition of **JAMES LEROY**

2    **FERGUSON,** was taken on behalf of the Plaintiff North Star

3    Terminal & Stevedore Company before William Rice, Notary Public

4    in and for the State of Alaska, and Reporter for R & R Court

5    Reporters, at the offices of Keesal, Young and Logan at 1029

6    West Third, Suite 650, Anchorage, Alaska, on the 8th day of

7    March, 2006, commencing at the hour of 9:00 o'clock a.m.

8                    * * * * * *

9              ## TABLE OF CONTENTS

10   Direct Examination by Mr. Sewright                05
     Cross Examination by Mr. Shamburek               126
11   Cross Examination by Mr. Krider                  135
     Redirect Examination by Mr. Sewright             136
12
     EXHIBITS MARKED:
13   1   (Amended Notice of Deposition of James Ferguson)    04
     2   (Fax from D. Davis to M. Sewright dated 3/7/06)      04
14   3   (Memo from April Lee to Staci White dated 3/6/06)    28
     4   (North Star's Amended Complaint)                     38
15   5   (Documents produced on or about 1/10/06 by Mr. Viergutz'
         office)                                              94
16   6   (Compilation of documents)                          103
     7   (Compilation of documents)                          108
17                    * * * * * *

18

19

20

21

22

23

24

25

Exhibit 2
Page _3_ of _35_

## Page 4

(1) PROCEEDINGS
(2)   (Deposition Exhibits 1 and 2 marked)
(3)   (On record)
(4)   COURT REPORTER:   The time is approximately 9:12
(5) a.m. Today is March 8th, 2006. We're at the offices of
(6) Keesal, Young and Logan at 1029 West Third, Suite 650 for the
(7) deposition of James Ferguson taken on behalf of the Plaintiff
(8) in the United States District Court case, United States of
(9) America for the use of North Star Terminal & Stevedore
Company,
(10) et al and United States of America for the use of Shoreside
(11) Petroleum, et al and Metco, Inc. versus Nugget Construction,
(12) Incorporated, et al. Case number A98-009 Civil. My name is
(13) Bill Rice. I'm a court reporter for R & R Court Reporters at
(14) 810 N Street and Notary Public for the State of Alaska.
(15) Sir, would you raise your right hand, please?
(16)   (Oath administered)
(17)   MR. FERGUSON:   I do.
(18) JAMES LEROY FERGUSON
(19) having been first duly sworn under Oath, testified as follows
(20) on:
(21) DIRECT EXAMINATION
(22)   COURT REPORTER:   Will you state your full name
(23) for the record, please, and spell your last?
(24)   A   Okay. It's James Leroy Ferguson, F-e-r-g-u-s-o-n.
(25)   COURT REPORTER:   Do you have a telephone number

## Page 5

(1) where you can be reached during the daytime?
(2)   A   Direct line at the office is 273-4133.
(3)   COURT REPORTER:   And a mailing address, please?
(4)   A   4220 B Street, Anchorage, 99503.
(5)   COURT REPORTER:   Thank you. Counselors, if
(6) you'll identify yourselves for the record you may proceed.
(7)   MR. SEWRIGHT:   Mike Sewright representing the
(8) Plaintiff and Use Plaintiff North Star Terminal & Stevedore
(9) Company.
(10)   MR. SHAMBUREK:   Steve Shamburek representing
(11) Shoreside Petroleum, Inc. and Metco, Inc.
(12)   MR. KRIDER:   Tom Krider representing Nugget
(13) Construction and USF&G.
(14)   MR. VIERGUTZ:   Herb Viergutz USF&G.
(15)   MR. DAVIS:   Doug Davis representing the witness.
(16)   COURT REPORTER:   Thank you.
(17) BY MR. SEWRIGHT:
(18)   Q   Good morning, Mr. Ferguson.
(19)   A   Good morning.
(20)   Q   I just introduced myself to you a little earlier. I'm
(21) Mike Sewright. I will begin the questioning this
(22) morning. First, sir, let me hand you your witness fee
(23) check for the deposition.
(24)   A   Okay.
(25)   Q   Thank you for coming here today. Sir, are you

## Page 6

(1) presently employed?
(2)   A   Yes, I am.
(3)   Q   And who are you employed by?
(4)   A   Willis of Alaska, Inc.
(5)   Q   And how long have you been employed by that
company?
(6)   A   January, 1992.
(7)   Q   Is Willis of Alaska some how affiliated with Willis of
(8) North America?
(9)   A   Yes.
(10)   Q   Please explain how or at least your understanding as to
(11) how the two companies are affiliated?
(12)   A   We are part of Willis which is the way I understand it
(13) the third largest broker in the world. We've got
(14) offices all over the world, several in the United
(15) States. And as far as Willis of Alaska versus Wil- –
(16) the big Willis it's – it's a legal thing. I have no
(17) idea what the legal relationship is other than we're
(18) part of Willis.
(19)   Q   Does Willis of Alaska report to Willis of North
(20) America?
(21)   A   Yes.
(22)   Q . What is your position with Willis of Alaska?
(23)   A   I'm the Alaska surety manager.
(24)   Q   Please explain what that position entails?
(25)   A   Basically I have a three person department. I have two

## Page 7

(1) people working for me within the Surety Department at
(2) Willis and I handle the – me or my department handle
(3) the surety bonds written for Willis' business in the
(4) State of Alaska. Well, I shouldn't even say that
(5) really, the Anchorage office. I help out the Fairbanks
(6) office. They do a lot of their own surety in the
(7) Fairbanks office.
(8)   Q   Is there a surety manager in the Fairbanks office?
(9)   A   No.
(10)   Q   Do you also oversee the surety operations of Willis of
(11) Alaska in the Fairbanks office?
(12)   A   Not really. My title says Alaska surety manager, but I
(13) really don't oversee anything in the Fairbanks office.
(14) Again, they will call me for advice and consultation
(15) maybe.
(16)   Q   Are you manager over the Fairbanks operations?
(17)   A   No.
(18)   Q   When I say Fairbanks operations, I mean, the surety
(19) operations, sorry.
(20)   A   No.
(21)   Q   Okay.
(22)   A   No.
(23)   Q   When you refer to surety bonds what do you mean?
(24)   A   Primarily contractor payment performance bonds, but
we
(25) also deal with notary bonds, court bonds, license and

Exhibit 2
Page 4 of 35

Page 4 to Page 7

## Page 8

(1) permit bonds, even an occasional custom's bond.

(2) Q Are the contractor payment and performance bonds

(3) separate bonds?

(4) A Yes, normally you write a payment and performance bond

(5) for individual contracts.

(6) Q And for what types of jobs are those written?

(7) A Anybody that wants a bond in essence. Most of them we

(8) write to the government in one form or another.

(9) Normally they're written to the Feds, the state, the

(10) city, the Muni. I have occasionally written bonds to

(11) private owners if they want 'em.

(12) Q Do you also handle liability insurance for any of

(13) Willis of Alaska's clients?

(14) A To a minimal degree, yes. My background is both

(15) insurance and surety and I have some involvement.

(16) Q What was your employment before becoming employed with

(17) Willis of Alaska?

(18) A Prior – just prior to going to work for Willis I had

(19) taken a short vacation. I had left the Brady

(20) organization.

(21) Q Is the Brady organization also an insurance and bond

(22) brokerage –.....

(23) A Yeah, they're now Marsh – they're now.....

(24) Q .....brokerage business?

(25) A .....Marsh. Yes.

## Page 9

(1) Q Okay. For purposes of the record and so the Court

(2) Reporter can get everything we say down, I'll try not

(3) to interrupt you and if you'll try not to interrupt me

(4) or anticipate.....

(5) A Okay.

(6) A .....what the question is. In that sense you – in

(7) that case you did anticipate it pretty well. So,

(8) please, explain again so we – we have it clearly on

(9) the record?

(10) A Just prior.....

(11) Q Brady – okay.

(12) A Just prior to going to work for Willis in '92 I had

(13) about a six month break and my prior employment was

(14) Brady & Associates which has since sold and become

(15) Marsh. I believe Marsh of Alaska, but again part of

(16) Marsh National – International.

(17) Q And did your work at Brady & Associates involve the

(18) same kind of work you do for Willis of Alaska?

(19) A Yes, it did.

(20) Q What was your position at Brady & Associates?

(21) A I don't even – I honestly don't even remember the

(22) title they gave me, but I was handling contractors

(23) insurance and surety both at that time. I sold my

(24) insurance agency to Brady so I basically was following

(25) and handling those accounts.

## Page 10

(1) Q Were you a broker and agent at Brady & Associates?

(2) A Yes.

(3) Q And do you still do that kind of work at Willis of

(4) Alaska?

(5) A Yes.

(6) Q When did you start employment at Brady & Associates?

(7) A December of '89, I think.

(8) Q Is that about the same time you sold that company your

(9) company?

(10) A I sold Ferguson & Company, yes, F&C, Inc., d/b/a

(11) Ferguson & Company was sold to Brady in December of

(12) '89.

(13) Q And how long did you operate Ferguson & Company?

(14) A Started Ferguson & Company April 1 of 1980.

(15) Q And did you work in the insurance brokerage business

(16) before that?

(17) A I worked for Corroon & Black prior to that.

(18) Q And when did you leave Corroon & Black?

(19) A 1980 when I started Ferguson & Company.

(20) Q And when did you start at Corroon & Black?

(21) A You said don't anticipate, but let me just back up.

(22) Q Okay.

(23) A I came to Alaska in 1973, went to work for Dawson &

(24) Company. I left Dawson & Company in 1975 for roughly

(25) six months working for Clary Pioneer Insurance on the

## Page 11

(1) Kenai Peninsula. At which point I came back to Dawson

(2) & Company, worked for Dawson & Company until they sold

(3) to Corroon & Black and worked there until I started

(4) Ferguson & Company April 1 of 1980.

(5) Q So you have been working in your profession for over 30

(6) years?

(7) A Since 1973, correct.

(8) Q During that entire period did you work as an insurance

(9) agent?

(10) A Yes.

(11) Q Did you work as an insurance and surety broker?

(12) A I probably did not get into – I don't remember when I

(13) became a broker versus an agent. I believe the law

(14) requires you to be an agent for a couple years before

(15) you can be a broker, but I don't honestly recall. And

(16) I did not get into surety until I had been working for

(17) Dawson for two or three years probably, so my surety

(18) goes back to the mid-'70s.

(19) Q What is the difference between an insurance agent and

(20) insurance broker?

(21) A Legally an insurance agent I understand represents the

(22) company and a broker represents the client. In reality

(23) we do both all the time.

(24) Q Sir, do you serve both as an agent and broker for

(25) Nugget Construction?

Exhibit 2
Page 5 of 35

Page 13

(1)   Q   Okay.

(2)   A   Again. I don't remember when my insurance involvement

(3)   really started. Some time in the mid-1990s.

(4)   Q   And why did you personally start handling that

(5)   insurance business for Nugget Construction?

(6)   A   Because I was the only one in Anchorage that had a

(7)   relationship with Nugget and when they transferred the

(8)   account from Anchorage – from Fairbanks to Anchorage

(9)   they requested that I handle it.

(10)  Q   Who requested?

(11)  A   The account. Nugget, John Terwilliger.

(12)  Q   Okay. John Terwilliger requested that you handle the

(13)  account?

(14)  A   Yes.

(15)  Q   Okay. I also noticed in looking at the insurance

(16)  policies that one of the insureds listed was JT

(17)  Construction, is that correct?

(18)  A   Correct.

(19)  Q   What is JT Construction?

(20)  A   I believe that had something to do with Union

(21)  activities. One was a Union firm. I believe Nugget

(22)  was Union. JT was non-Union. There was literally no

(23)  activity that I can recall ever in JT Construction. It

(24)  was just an entity that John had available to him.

(25)  Q   Do you also obtain insurance coverage for John T.

Page 12

(1)   A   Yes.

(2)   Q   And how long have you been doing that?

(3)   A   I'm guessing here '92 or '93, shortly after I came back

(4)   to Willis.

(5)   Q   I seem to notice in some of the insurance policies,

(6)   which for the record were provided by Mr. Davis' office

(7)   for inspection starting Monday I believe, but I seem to

(8)   notice in some of those at least the earlier ones some

(9)   Fairbanks office stamp. Did the Fairbanks office at

(10)  some point handle Nugget Construction's business?

(11)  A   In the early '90s I did handle the surety for the

(12)  Fairbanks office directly out of Anchorage. I would

(13)  travel back and forth. Nugget's insurance was handled

(14)  by the Fairbanks office and I handled the surety.

(15)  Q   And do you recall when you began handling both for

(16)  Nugget Construction?

(17)  A   Some time in the '90s the account was transferred from

(18)  Fairbanks to Anchorage at which point I became more

(19)  involved in the insurance as well as the surety. I do

(20)  not remember the exact time.

(21)  Q   Is it fair to say that you were involved in both the

(22)  surety business and the insurance business for Nugget

(23)  Construction since 1992 or 1993?

(24)  A   I was not involved in the insurance at all in 1992 or

(25)  '93.

Page 14

(1)   Terwilliger individually?

(2)   A   No, we do not handle his personal insurance.

(3)   Q   I'm sorry, may have misspoken, John F. or John T.?

(4)   A   I honestly don't know. It's John Terwilliger.

(5)   Q   Okay. And I'm sorry, I missed that. Do you handle it.

(6)   his personal insurance?

(7)   A   No, we do not.

(8)   Q   Do you obtain the personal insurance for anybody else

(9)   in the Terwilliger family?

(10)  A   No.

(11)  Q   Do you obtain insurance for Randy Randolph?

(12)  A   No.

(13)  Q   Do you know who he is?

(14)  A   Yes, I've met Randy.

(15)  Q   How is it that you've met Mr. Randolph?

(16)  A   When he was working as a consultant for Nugget.

(17)  Q   Do you recall what particular matter you and Mr.

(18)  Randolph discussed at any time?

(19)  A   No.

(20)  Q   Was it a particular claim?

(21)  A   I don't recall ever discussing a claim with Randy, no.

(22)  Q   Do you obtain insurance for LDR Engineering Services?

(23)  A   Don't even know who they are.

(24)  Q   Who told you that Randy Randolph was a consultant for

(25)  Nugget?

Page 15

(1)   A   I'm not sur– I'm not sure.

(2)   Q   Were you ever told that he served as a project manager

(3)   for Nugget Construction?

(4)   A   No.

(5)   Q   Do you obtain liability insurance or any kind of

(6)   insurance really for Greg Poynor personally?

(7)   A   No.

(8)   MR. DAVIS:   When you say you, Counsel, are you

(9)   talking about the witness himself or Willis of Alaska or.....

(10)  MR. SEWRIGHT:   That's a good question.

(11)  Q   (By Mr. Sewright) Would it make a difference if I

(12)  asked if Willis of Alaska provided insurance for any of

(13)  these individual or other individuals.....

(14)  A   It's possible for Willis to write something I'm unaware

(15)  of, but probably not and Willis as a policy does not

(16)  write personal insurance. They only write business

(17)  insurance as a general policy.

(18)  Q   Well, I'll ask this question, have either you or to

(19)  your knowledge Willis of Alaska obtained insurance for

(20)  John Smithson personally?

(21)  A   No.

(22)  Q   Have you met John Smithson?

(23)  A   Yes.

(24)  Q   Have you met him in connection with his employment with

(25)  Nugget Construction?

Exhibit **2**

Page **6** of **35**

Page 16

(1) A   Yes.
(2) Q   Do you serve as an attorney in fact for USF&G?
(3) A   Yes.
(4) Q   Is USF&G still in business to your knowledge?
(5) A   They are part of the Travelers St. Paul. I believe we
(6) are still using USF&G paper, but to be honest my staff
(7) would be more familiar with that than I am because
(8) they're the ones that type the bonds.
(9) Q   And by my reference to USF&G do you understand me
to be
(10) referring to United States Fidelity and Guaranty
(11) Company?
(12) A   Yes.
(13) Q   Do you still serve as an attorney in fact for USF&G?
(14) A   Again, I'm an attorney in fact for the Travelers St.
(15) Paul Companies. I believe USF&G is still one of them.
(16) Q   When did you first become an attorney in fact for
(17) USF&G?
(18) A   Probably – I don't know. I can't answer that 100
(19) percent. I don't know for sure.
(20) Q   Were you an attorney in fact for USF&G by 1995?
(21) A   Yes.
(22) Q   Are you an attorney in fact, and I'm referring to you
(23) personally, for any other bonding or insurance
(24) companies?
(25) A   Yes.

Page 17

(1) Q   How many others?
(2) A   I don't know, several.
(3) Q   What's entailed in being an attorney in fact for a
(4) bonding or insurance company?
(5) A   Basically I get a power of attorney from the different
(6) surety companies to sign as a power of attorney on
(7) bonds issued through those companies.
(8) Q   Does being an attorney in fact for USF&G or the
(9) Travelers St. Paul companies involve any reporting
(10) responsibilities by you to those companies?
(11) A   I would have to report any bonds that I issued under my
(12) power of attorney and I would not issue those bonds
(13) through my power of attorney without their authority.
(14) Q   Would you report claims made against any of those
bonds
(15) to those companies?
(16) A   If I received a claim on a bond I would forward it to
(17) the company, correct.
(18) Q   I think I saw a reference in one of the documents that
(19) was produced by Mr. Davis' office on your behalf in
(20) reference to an L&M bond, what is that or have you seen
(21) that reference before?
(22) A   Don't know.
(23) Q   Is it a phrase you would use?
(24) A   L&M?
(25) Q   Yeah.

Page 18

(1) A   No.
(2) Q   Do you have other clients, by that I mean other than
(3) Nugget Construction, for whom you obtain both the
(4) liability insurance coverage and the bonding coverage?
(5) A   Yes.
(6) Q   How many? I don't need an exact number, sir, I'm
(7) looking for.....
(8) A   Three or four.
(9) MR. DAVIS:   Again, Mr. Sewright, is your
(10) question with respect to the witness personally or Willis of
(11) Alaska?
(12) MR. SEWRIGHT:   I'm asking him personally.
(13) Q   (By Mr. Sewright) He's already testified that he
(14) personally handles the liability insurance needs and
(15) bonding needs of Nugget Construction, correct?
(16) A   Yes, I'm the lead on it, correct.
(17) Q   Okay. Sir, how many clients at Willis of Alaska are
(18) you lead on?
(19) A   Again, three or four. I mean, we're getting into
(20) terminology. When I – I am directly involved on the
(21) insurance in probably three or four accounts. The rest
(22) of them I'm handling purely the surety. Someone else
(23) is in the lead on the insurance side of the house.
(24) Q   And why do you handle both needs for some clients?
(25) A   Their request.

Page 19

(1) Q   By that do you mean it's a personal relationship you
(2) have with them?
(3) A   I wouldn't call it a personal relationship, but a
(4) strong business relationship where they trust me to
(5) handle the account and therefore they prefer that.
(6) Q   How many clients does Willis of Alaska serve and I'm
(7) just asking for a ballpark figure?
(8) A   A thousand, I don't know. A bunch.
(9) Q   Sir, I direct your attention to Exhibit 1, go ahead and
(10) place that in front of yourself. Please take a moment
(11) to look at it. It should look familiar, but if it
(12) doesn't let me know.
(13) A   Okay.
(14) Q   Do you recognize Exhibit 1?
(15) A   Yes.
(16) Q   Did you receive this document?
(17) A   This one or one very similar to it, yes.
(18) Q   Do you have any reason to believe that this exhibit is
(19) any different than what you received in order to appear
(20) at this deposition today?
(21) A   No.
(22) Q   For the record it's entitled Amended Notice of
(23) Deposition of James Ferguson of Willis of Alaska, Inc.
(24) and that's the first half of the exhibit and then the
(25) second part is Subpoena In A Civil Case to James

**Exhibit 2**
Page _7_ of _35_

## Page 60

(1) make them an exhibit. Any counsel can obtain copies of
(2) these files that were produced by you and I'm referring
(3) right now to what Mr. Davis has referred to as the
(4) surety files that you.....
(5)    A    Um-hum. (Affirmative)
(6)    Q    .....produced. Directing your attention to the folder
(7) labeled USF&G file L. Generally speaking what's
(8) contained in that file?
(9)    A    Generally speaking that is your payment performance
(10) bond.
(11)    Q    And who is the attorney in fact listed on those bonds?
(12)    A    Myself.
(13)    Q    And those bonds are for which project?
(14)    A    Project number DACW85-96-C-0020.
(15)    Q    Is the Homer Spit and Repair Extension Project named
(16) there?
(17)    A    I can't see it, that's what I'm looking for. I'm
(18) assuming that's what the contract number is, is the
(19) Homer Spit contract.
(20)    Q    Hold a second, I'll – in any event you identified the
(21) number of the project, correct?
(22)    A    Yes.
(23)    Q    Okay. Let's move on. Going to the next file folder
(24) that you have produced from the surety file.
(25)    A    Um-hum. (Affirmative)

## Page 61

(1)    Q    The folder is labeled USF&G 1 with a circle around the
(2) 1. What is contained in that folder?
(3)    A    Invoice for the Homer Spit Repair.
(4)    Q    Anything else?
(5)    A    And it looks like the final report that the job is
(6) closed out. It gives the contract price and the
(7) government says it came from USF&G which says this
(8) contractor's been final pay since 9/17/98 so it's
(9) basically the final billing.
(10)    Q    Final.....
(11)    A    Project billing on the project.
(12)    Q    .....building (sic).....
(13)    A    Billing.
(14)    Q    Fin- – I'm sorry, final.....
(15)    A    Billing.
(16)    Q    ....billing from whom to whom?
(17)    A    Well, we billed Nugget Construction and it has the
(18) paperwork in here where USF&G billed us.
(19)    Q    Does this signify that.....
(20)    A    Actually I said billed us, it's a credit.
(21)    Q    There was a credit of $202.00, correct?
(22)    A    Correct. That's correct.
(23)    Q    Okay. And is that based on the final contract amount?
(24)    A    Correct.
(25)    Q    And by that do you mean the final contract amount paid

## Page 62

(1) by the government to Nugget?
(2)    A    That's what it would indicate, yes.
(3)    Q    And could that amount be less than the previously
(4) anticipated amount for the contract?
(5)    A    It indicates that it is.
(6)    Q    Okay. And does that explain the credit?
(7)    A    Correct.
(8)    Q    By that do you mean that the amount charged Nugget
(9) Construction for the bonds is based on the amount of
(10) the contract that Nugget had with the government?
(11)    A    That's correct.
(12)    Q    Does the third page in this folder just mean that the
(13) project work has been completed?
(14)    A    Again, this is a clerical function that my ladies
(15) handle, but it indicates – yeah, this looks to me like
(16) it's USF&G's final notification from the Department of
(17) the Army that this job is closed out and done and the
(18) final contract price.
(19)    Q    Okay. To your knowledge does that have any effect on
(20) the integrity of the payment bond once a claim has been
(21) made during the course of the project?
(22)    A    I don't now what you mean?
(23)    Q    Well, is the payment bond still in effect as to claims
(24) made during the course of the project?
(25)    MR. KRIDER:    Objection (ph).....

## Page 63

(1)    MR. DAVIS:    Object to the form of the question.
(2)    MR. KRIDER:    Same objection.
(3)    Q    (By Mr. Sewright) If you – if you know, sir, or if
(4) you have an understanding?
(5)    A    There's, you know, the – I – I don't know what the
(6) time limits are on a bond. All I know is the bond
(7) covers the contract.
(8)    Q    That – that's a fair answer. I – I'm just
(9) asking.....
(10)    A    Yeah, I – I don't know.....
(11)    Q    .....your – for your understanding.
(12)    A    I don't know, that's why I forward it on to the bonding
(13) company. I really don't know what the limits are on
(14) it.
(15)    Q    Turning to the folder labeled USF&G 2.
(16)    A    Okay.
(17)    Q    What is the first document contained in that folder?
(18)    A    It's a letter from USF&G to Greg Poynor, general
(19) manager, Nugget Construction dated February 13th, '98.
(20)    Q    Does that letter essentially refer to this lawsuit and
(21) tender defense of the lawsuit to Nugget Construction or
(22) do you know?
(23)    A    I don't know unless I read it. They're referencing the
(24) indemnity agreement. They're saying that they
(25) understand Nugget has retained legal services of Oles

Exhibit 2
Page 8 of 35

Page 60 to Page 63

Page 64

(1) Morris (sic) and it says USF&G hereby tenders its'
(2) defense in this litigation to its' bond principal and
(3) indemnitors.
(4)    Q    And at the bottom is that tender of defense accepted by
(5) John Terwilliger for Nugget Construction?
(6)    A    John Terwilliger on behalf of Nugget Construction
(7) hereby accepts the tender of defense.
(8)    Q    Okay. The post-it on the front of that document
(9) indicates to Jim Ferguson, Willis Corroon from.....
(10)    A    Um-hum. (Affirmative)
(11)    Q    .....G. Poynor NCI?
(12)    A    Correct.
(13)    Q    Why would Mr. Poynor send this to you?
(14)    A    Primarily so that I know basically what is going on.
(15) All of my accounts are told that any time there is any
(16) type of a – of a lawsuit I want to at least be aware
(17) of it because I've got to let the underwriters know
(18) about it. Also, I want to make sure that I can discuss
(19) with the underwriter to my knowledge what is going on,
(20) that's all. I mean, that's – that's not a very good
(21) answer, but basically it's just for information
(22) purposes is what it amounts to, keeping me informed of
(23) what's going on.
(24)    Q    Was it sent to you because you were expected to
(25) transmit it to USF&G?

Page 66

(1)    Q    .....question.
(2)    A    .....you know, in order to do my job I need to know
(3) generally what's going on. Past that I don't know why
(4) anybody would or would not send me information.
(5)    Q    Tell me this, in your experience is there any reason
(6) why Nugget Construction would not bring an amended
(7) complaint in a lawsuit to your attention for five or
(8) six months?
(9)    MR. VIERGUTZ:    Objection, calls for
(10) speculation.
(11)    Q    He just states that for the record.
(12)    A    It would be pure speculation on my part as – as to why
(13) they might not.
(14)    Q    I asked in your experience with Nugget.....
(15)    A    Yeah, in my – in my – in my experience with – with
(16) accounts in general if – if it would not be pertinent
(17) to me then there would be no reason for me to be
(18) informed. In other words, if – if it didn't have any
(19) impact on me or the insurance or the bond then it –
(20) that's really what I need to be informed on is what
(21) kind of an impact is it going to have on the insurance
(22) or the surety or the – or something like that and if
(23) they didn't think it was going to have any impact, then
(24) why give me a copy.
(25)    Q    Sir, the next document in that folder looks like it was

Page 65

(1)    MR. KRIDER:    Objection (simultaneous
(2) speech).....
(3)    A    Oh, absolutely not.
(4)    Q    (By Mr. Sewright) Do you know if Mr. Terwilliger or
(5) Mr. Poynor or anybody else at Nugget Construction
(6) transmitted this document directly to USF&G?
(7)    A    Not really. I mean, I would assume so, but no, I don't
(8) know.
(9)    Q    Sir, you just testified that something to the effect
(10) that you advise all of your clients to bring claims or
(11) lawsuits to your attention. Is there any reason in
(12) your experience why an insured such as Nugget
(13) Construction would not do so?
(14)    MR. DAVIS:    I've got to object – object
(15) to –.....
(16)    Q    Let me – let me – what – what I'm getting at.....
(17)    MR. DAVIS:    Excuse me, object to the form of
(18) the question. I'm not sure how the witness is supposed to
(19) speculate what Nugget would do or not do. I don't think that's
(20) a – any way.....
(21)    MR. SEWRIGHT:    Okay.
(22)    MR. DAVIS:    .....that's my objection.
(23)    Q    (By Mr. Sewright) He objects – objects for
(24) speculation. You can answer the.....
(25)    A    I – I – I can't –.....

Page 67

(1) also transmitted to you by Greg Poynor.
(2)    A    Um-hum. (Affirmative)
(3)    Q    Do you remember that document?
(4)    A    No.
(5)    Q    Tell me this, sir, if it were sent to you would you
(6) have once looked at it?
(7)    A    I would have glanced at it and probably forwarded it
(8) right through to – if I get a piece of correspondence
(9) from the – from my client relating to a surety bond I
(10) will normally just pass it right through to the surety
(11) company, that's.....
(12)    Q    Okay. Sir, directing your attention to the last two
(13) pages of what's in that folder.
(14)    A    Okay.
(15)    Q    Those two pages – strike that. Would you agree that
(16) those two pages look like parts of one letter dated
(17) February 17, 1998?
(18)    A    If they would what now?
(19)    Q    Do you agree that those two – oh, you have something
(20) different than what I have I think.
(21)    MR. DAVIS:    What – what the witness has from
(22) the file, Mr. Sewright, is the original copy, I believe, and
(23) then a facsimile cover page that shows receipt of the
(24) document.
(25)    MR. SEWRIGHT:    Okay.
(26)    Q    (By Mr. Sewright) Is that basically a letter dated

## Page 84

(1) Q  By that you mean the manager of this territory for
(2) US.....
(3) A  For underwriting.
(4) Q  .....F&G?
(5) A  For – for underwriting only.
(6) Q  For underwriting for USF&G only?
(7) A  Yes.
(8) Q  Looking at the next page is this another claim letter
(9) dated October 1, 1997 this one addressed to you?
(10) A  Yes.
(11) Q  And did you also pouched this one to Bill Wells?
(12) A  Yes.
(13) Q  And is that your handwriting at the bottom to that
(14) effect?
(15) A  Yes, it is.
(16) Q  And this was a claim by Chugach Rock Corporation,
(17) correct?
(18) A  Yes.
(19) Q  Did you ever talk with Shoreside Petroleum about their
(20) claim?
(21) A  Not that I recall.
(22) Q  Did you ever talk with anybody at Chugach Rock
(23) Corporation about that company's claim?
(24) A  Not that I recall.
(25) Q  Here I'll – we don't want to go through every page.

## Page 85

(1) There's a letter dated September 5, 1997 from Spencer
(2) Rock Products, did you receive a copy of that letter?
(3) A  If it was in my file I probably did.
(4) MR. DAVIS:  We'll stipulate that all of the
(5) correspondence in his file are copies of documents that were
(6) received by Willis.
(7) MR. SEWRIGHT:  Okay.
(8) MR. DAVIS:  If that helps.
(9) MR. SEWRIGHT:  Well, I'm also asking if he
(10) received a copy of it, but – and in some cases he may not
(11) recall and in some cases he might.
(12) MR. DAVIS:  It's your deposition.
(13) A  Yes, I mean, I if I got a note on it that I sent it
(14) somewhere that would indicate that I saw it. Some of
(15) the other stuff I may or may not have. It might have
(16) just been routinely processed.
(17) Q  (By Mr. Sewright) This – look at the second page of
(18) this letter from Spencer Rock Products. It's addressed
(19) CC U.S. Fidelity and Guaranty Company, 4220 B Street.
(20) A  Yes.
(21) Q  Did U. S. Fidelity and Guaranty Company at that time
(22) have an office at 4- – 4220 B Street?
(23) A  No, they did not.
(24) Q  Did Willis & Corroon have an office at that time at
(25) that address?

## Page 86

(1) A  Yes.
(2) Q  And that is now the company known as Willis of Alaska,
(3) correct?
(4) A  Correct.
(5) Q  Please turn to the next document. It's a facsimile
(6) transmission dated September 12, 1997 Nugget/Northern
(7) Stevedoring claim, is that in your handwriting?
(8) A  Yes, it is.
(9) Q  Was that a transmittal to Bill Wells?
(10) A  Yes, it – yes, it is.
(11) Q  Do you remember what document was sent with that
(12) transmittal?
(13) A  No, I do not.
(14) Q  Next document also a transmittal sheet dated
September
(15) 12, 1997, copy of letter to attorney representing
(16) Northern Stevedoring. Did you receive a copy of that
(17) document?
(18) A  Again, it's in my file so I probably did. It was
(19) addressed to me.
(20) Q  And is that letter the one that followed dated
(21) September 12, 1997 to Michael W. Sewright?
(22) A  That is my assumption.
(23) Q  Okay. Let's – we don't want to go through everything.
(24) I'm sure Mr. Davis doesn't want us to. Directing your
(25) attention to a letter dated September 19, 1997.....

## Page 87

(1) A  Um-hum. (Affirmative)
(2) Q  ..... from Michael W. Sewright to John Lukjanowicz.
(3) A  Okay.
(4) Q  Did you receive a copy of this letter, you personally?
(5) A  Me personally, I have no idea.
(6) Q  Do you recall seeing this letter?
(7) A  No.
(8) Q  Do you recall if this letter was sent to Mr. Wells?
(9) A  No.
(10) Q  Meaning you don't recall?
(11) A  I do not recall.
(12) Q  Looking at that letter in the middle do you see where
(13) it is stated in addition Nugget Construction had a
(14) direct relationship with Northern Stevedoring?
(15) A  I see where it says that in there.
(16) Q  Do you understand that to be different than a
(17) subcontractor relationship issue?
(18) A  I don't know. I mean – let me read it. I don't – I
(19) don't know what to tell you. I don't know what – what
(20) your real question is there. I mean, this letter from
(21) Michael Sewright, you, I mean, says that Nugget
(22) Construction had a direct relationship. I don't know
(23) what that means.
(24) Q  Did you ask anybody what does this mean?
(25) A  I – I repeat. I don't even remember seeing the letter.

Exhibit 2.
Page 10 of 35

Page 84 to Page 87

Page 88

(1)    Q    Has anyone informed you that in a ruling in this case
(2)  the judge held that as a result of the subterfuge
(3)  evidence and strawman evidence that I referred to
(4)  earlier Nugget Construction was in a direct
(5)  relationship with Northern Stevedoring?
(6)    A    No.
(7)    Q    And is it your testimony you don't know if this was
(8)  sent to Bill Wells?
(9)    MR. DAVIS:    Asked and answered.
(10)    MR. SEWRIGHT:    Okay.
(11)    Q    (By Mr. Sewright) That's the one I'm looking for, too.
(12)  Go ahead – I'm done with those that you just had in
(13)  your hand. Directing your attention to a note, it
(14)  looks like it's dated September 2, 1997 to Bill Wells.
(15)    A    Um-hum. (Affirmative)
(16)    Q    Is that note in your handwriting?
(17)    A    Yes, it is.
(18)    Q    And it states we will get a back up – or we will get
(19)  back-up from Nugget and a letter from their attorney
(20)  and then it goes on to say some other stuff, correct?
(21)    A    Yes.
(22)    Q    My copy is cut off at the bottom. What does your's say
(23)  at the very bottom? And.....
(24)    A    This is a copy that it was sent, this is –.....
(25)    Q    Oh, okay.

Page 89

(1)    A    .....right underneath you'll see what it really says.
(2)    Q    Right. And it goes on to state on the next page that I
(3)  have, as I said Nugget is handling this, correct?
(4)    A    Correct.
(5)    Q    I'm sorry.
(6)    A    That's correct, that's what I said.
(7)    Q    And by – what did you mean by that?
(8)    A    The only thing that I can think of that I would mean by
(9)  that, I mean, and again, we're – we're going back to
(10)  '97, but in general terms the bonding companies expect
(11)  their account to keep them informed and handle the
(12)  defense so I – I suspect I was letting Bill know that
(13)  Nugget is still on top of this and they're working on
(14)  it.
(15)    Q    Did you ask anyone with USF&G to conduct their own
(16)  investigation of the claims?
(17)    A    No, that's not my job. I wouldn't have done that.
(18)  Again, I would just pass it on. I don't know what
(19)  they're supposed to do.
(20)    Q    Turning to the next document it's a letter from the
(21)  Corps of Engineers dated August 26th, 1997.
(22)    A    Um-hum. (Affirmative)
(23)    Q    At the bottom CC United States Fidelity and Guaranty
(24)  Company attention Bill Wells, 4220 B Street.
(25)    A    Yes.

Page 90

(1)    Q    Do you have an understanding as to why the Corps of
(2)  Engineers would send a copy of this letter to Willis
(3)  and Corroon's address?
(4)    A    No doubt because if you look at the bond we wrote we
(5)  put our address down for USF&G address with my power of
(6)  attorney.
(7)    Q    Okay. As an agent for USF&G?
(8)    A    Yes.
(9)    Q    Now, looking at that letter – well, tell me this, do
(10)  you recall seeing this letter before?
(11)    A    No.
(12)    Q    And you'll have to speak up, sir.
(13)    A    No. No, I do not.
(14)    Q    Do you see the statement in this letter starting the
(15)  second paragraph, based on the supporting costs that
(16)  you, Nugget, outlined in serial letter 611-21 it
(17)  appears that Nugget Construction has assumed full
(18)  responsibility for operations at Spencer Quarry for the
(19)  subject project, therefore, as primary operator at
(20)  Spencer Quarry we believe Nugget Construction is
(21)  responsible for prompt payment to suppliers and
(22)  subcontractors who contracted with Spencer Rock
(23)  Products on this project. Do you recall being informed
(24)  that the Corps of Engineers had taken that position in
(25)  writing as stated in this letter?

Page 91

(1)    A    No.
(2)    Q    And one thing I'm asking you, sir, did you become
aware
(3)  that the Corps of Engineers had taken that position
(4)  from some source of information other than seeing the
(5)  letter itself?
(6)    A    I don't recall any of it, no. Too many years back.
(7)    Q    Directing your attention to the page within the
(8)  documents contained in this folder, it looks to be –
(9)  well, it says corporate certificate, Greg Poynor.
(10)    A    Um-hum. (Affirmative)
(11)    Q    And below that there's a signature next to the
(12)  corporate seal.
(13)    A    Okay.
(14)    Q    Do you see that?
(15)    A    Yes.
(16)    Q    Do you know if that is Greg Poynor's signature?
(17)    A    No, I really don't.
(18)    MR. SEWRIGHT:    Off the record for a moment.
(19)    (Off record - 1:52 p.m.)
(20)    (On record - 1:53 p.m.)
(21)    Q    (By Mr. Sewright) Bringing your attention to a
(22)  document with Willis Corroon at the top and your name,
(23)  Jim Ferguson and handwriting, do you see that document?
(24)    A    Well, I see my init- – oh, up there, okay. Yes.
(25)    Q    Do you recall this document being brought to your

Exhibit 2

Page 11 of 35

Page 92

(1) attention by anybody?

(2)    A    No.

(3)    Q    Can you tell me whose handwriting is at the very

(4) bottom, it looks like under our line authority issue

(5) dated August 14, 1996?

(6)    A    That would be me.

(7)    Q    Okay. And what did you mean by that note?

(8)    A    I'm not 100 percent certain without checking our

(9) records, but I assume this means that we had a line of

(10) authority with USF&G to issue bonds up to this

(11) $3,250,000 level preauthorized.

(12)    Q    For Nugget Construction?

(13)    A    Nugget Construction. The bonding company sometimes

(14) will give us a specific line for a specific account or

(15) if it fits within these parameters we can issue and

(16) then just advise them we did it and that's what that

(17) note would indicate.

(18)    Q    And that would be for performance and payment bonds

(19) within (ph).....

(20)    A    A bid bond.

(21)    Q    .....relation.....

(22)    A    A bid bond

(23)    Q    A bid bond, okay. Now, was a – strike that. Was the

(24) same procedure with a predetermined line of authority

(25) in place for Nugget Construction as to performance

---

Page 94

(1)    (Deposition Exhibit 5 marked)

(2)    (On record - 1:53 p.m.)

(3)    Q    (By Mr. Sewright) Sir, directing your attention to the

(4) compilation of documents that's been marked as Exhibit

(5) 5 to your deposition.

(6)    A    Okay.

(7)    Q    For the record there is no representation that these

(8) are documents that you produced or Willis produced in

(9) response to the subpoena applying to your deposition

(10) today. What I will represent is these are documents

(11) that were produced on or about January 10 of 2006 by

(12) Mr. Viergutz' office in relation to this litigation.

(13)    A    Okay.

(14)    Q    And so you know what I will be going ahead of time, I'm

(15) basically going to go through most of these and ask are

(16) any of these in your handwriting or from you to you,

(17) that kind of thing and maybe.....

(18)    A    Okay.

(19)    Q    .....ask you a few questions if you recognize

(20) something.

(21)    MR. KRIDER:    Mike, how about if I make a

(22) suggestion we go off the record, he goes through it and put

(23) post-its.....

(24)    UNIDENTIFIED VOICE:    (Simultaneous speech).....

(25)    MR. KRIDER:    .....next to the ones that he

---

Page 93

(1)  bonds or payment bonds?

(2)    A    No, we never had authority except on bid bonds that I

(3) can recall.

(4)    Q    Before USF&G would issue a payment bond would it make

(5)  an independent determination?

(6)    A    They always make an independent determination in the

(7)  sense that they're kept up to date on the financial

(8)  situation on the file and how much work is out there

(9)  and they will pull that line that I said we – it looks

(10)  like we were operating under if they deem the account

(11)  has any kind of a problem at that point in time, that

(12)  they would want to pull the – pull the power. And

(13)  it's our obligation if we issue under our line, we let

(14)  them know right away we did it so that they're aware of

(15)  it and then we definitely will get their authority

(16)  before we would issue any payment performance bond.

(17)    Q    So in the base of Nugget Construction the predetermined

(18)  line of authority was only for bid bonds?

(19)    A    Correct, to the best of my knowledge, yes. I don't –

(20)  again, I don't think we've got it from any company on

(21)  anything but bid bonds.

(22)    Q    I'm done with that folder.

(23)    A    Okay.

(24)    MR. SEWRIGHT:    Off the record.

(25)    (Off record - 1:52 p.m.)

---

Page 95

(1) actually knows or has his handwriting on and then go back

(2) through 'em?

(3)    MR. VIERGUTZ:    How about if we try this, I'll

(4) represent to you I went through this file with this gentleman

(5) and he didn't find any paper that was in his handwriting.

(6)    MR. SEWRIGHT:    Well, I appreciate that and

(7) we'll find out.

(8)    Q    (By Mr. Sewright) Turning to the document and

(9) handwriting date 11/20 at the top, have you seen this

(10) before?

(11)    A    No.

(12)    Q    Was it received by your or.....

(13)    A    I haven't – I've.....

(14)    Q    Okay. You're had.....

(15)    A    .....never seen it.

(16)    Q    .....nothing to do with it?

(17)    A    I had nothing to do with it.

(18)    Q    Do you know who Dee Schoenhaar (ph) is, the.....

(19)    A    No.

(20)    Q    .....name at the top?

(21)    A    No.

(22)    Q    Do you know who Janice Wipfield is?

(23)    A    No.

(24)    Q    Next page, a compilation of notes showing some dollar

(25) figures, settlement offer, that kind of thing, have you

---

Exhibit 2

Page 12 of 35

Page 92 to Page 95

Page 100

(1)    A    I will.
(2)    Q    Please.
(3)    MR. DAVIS:    Why don't we go off record and
(4)    we'll take (indiscernible - away from microphone).....
(5)    MR. SEWRIGHT:    Sounds good.
(6)    (Off record - 2:05 p.m.)
(7)    (On record - 2:14 p.m.)
(8)    Q    (By Mr. Sewright) Mr. Ferguson, have you had a
chance
(9)    to review the rest of the documents contained within
(10)    Exhibit 5 to your deposition?
(11)    A    Yes, I have.
(12)    Q    And have you found any that you can identify or think
(13)    you had anything to do with either by conversation or
(14)    because they're your notes or anything like that?
(15)    A    Yes, two pieces.
(16)    Q    Okay. Do they have Bates numbers at the bottom?
Some
(17)    of these do and some don't. See where it says – on
(18)    some it says USF&G whatever?
(19)    A    No, there's no numbers on either one.
(20)    Q    On either one. Where is the first one?
(21)    A    About – sort of, 25, 30 percent of the way through.
(22)    It's basically a buck slip.....
(23)    Q    Okay. I'm –.....
(24)    A    .....which.....
(25)    Q    .....I'm going to try and find it. Is it the one that

Page 101

(1)    has Jim Ferguson at the bottom?
(2)    A    It is. Dated 9/10/97.
(3)    Q    Okay.
(4)    A    We call it a buck slip. Basically it indicates that I
(5)    wrote this piece of paper. I addressed it to Bill
(6)    Wells, USF&G, marked the little box that says For Your
(7)    Information.
(8)    MR. DAVIS:    Wait for a question.
(9)    A    Okay.
(10)    Q    (By Mr. Sewright) So what does it – what does it
(11)    show?
(12)    A    It shows that I forwarded information to Bill Wells at
(13)    USF&G.
(14)    Q    And are the remarks and handwriting there yours?
(15)    A    Yes, they are.
(16)    Q    Stating again, Nugget is handling, we are going to get
(17)    a letter from – it looks like, his attorney this week,
(18)    thanks, is that your remark?
(19)    A    That's my remark.
(20)    Q    And that was to Bill Wells?
(21)    A    Yes.
(22)    Q    And do you recall what you bucked with this?
(23)    A    No.
(24)    Q    Is there another document in here that.....
(25)    A    The next one underneath it.

Page 102

(1)    Q    The one dated September 12, 1997?
(2)    A    Correct.
(3)    Q    Which simply states under remarks Nugget, Northern
(4)    Stevedoring Claim?
(5)    A    Correct.
(6)    Q    And the signature on that is from you?
(7)    A    Correct.
(8)    Q    To Bill Wells, right?
(9)    A    Correct.
(10)    Q    Do you recall what you sent with this slip?
(11)    A    No.
(12)    Q    What about the next page that says Contact Jim
(13)    Ferguson, does that – do you recognize that document?
(14)    A    Not really, no.
(15)    Q    Please, go down to the documents, there's a letter
(16)    dated December 16, 1997 from John Lukjanowicz copied to
(17)    James L. Ferguson. The letter itself is to Jane
(18)    Bennett Poling.
(19)    A    Okay.
(20)    Q    Do you recall receiving that letter?
(21)    A    No.
(22)    MR. SEWRIGHT:    Off the record for a moment.
(23)    (Off record - 2:18 p.m.)
(24)    (On record - 2:19 p.m.)
(25)    Q    (By Mr. Sewright) Looking through this compilation of

Page 103

(1)    documents marked Exhibit 5 have you found a letter
(2)    addressed to you dated August 14, 1998 from Oles
(3)    Morrison, Rinker & Baker lawyers?
(4)    A    I see it here.
(5)    Q    Do you recall receiving this letter?
(6)    A    No.
(7)    Q    Basically it refers to documents and a – described in
(8)    a notice of deposition or subpoena or production or
(9)    something like that, do you recall being involved in
(10)    that?
(11)    A    No, I really don't.
(12)    MR. SEWRIGHT:    Off the record.
(13)    (Off record - 2:20 p.m.)
(14)    (Deposition Exhibit 6 marked)
(15)    (On record - 2:35 p.m.)
(16)    MR. DAVIS:    Go ahead, I'm going to grab my note
(17)    pad, don't stop for me I'll be right back.
(18)    MR. SEWRIGHT:    Okay.
(19)    Q    Sir, you've been handed a compilation of documents
(20)    marked as Exhibit 6.
(21)    A    Um-hum, yes, I have.
(22)    Q    And did we take a break during which you looked at
(23)    those documents?
(24)    A    Yes, we did.
(25)    Q    And do you recognize any of the documents contained

Exhibit 2
Page _13_ of _35_

## Page 104

(1) within this exhibit?

(2) A   Yes.

(3) Q   And which is the first one?

(4) A   WEL000051 and, again, it's a buck slip.

(5) Q   And this is a buck slip from you to Bill Wells dated
(6) August 28, 1997?

(7) A   Correct.

(8) Q   Stated Nugget is handling and will continue to handle
(9) to keep us clean and out of this. Thanks.

(10) A   That's what it says.

(11) Q   Okay. These documents – I'll represent that these
(12) documents were received in October 1998 from Nugget
(13) Construction's attorneys as part of the production of
(14) document process.

(15) A   Okay.

(16) Q   And the buck slip you just identified directly follows
(17) a letter Bates stamped at the bottom WEL000050.

(18) A   Okay, 50.

(19) Q   And – 50?

(20) A   Okay, yeah.

(21) Q   And that letter is dated August 26, 1997. Your buck
(22) slip is dated August 28, 1997. Does it make sense to
(23) you that the buck slip transmitted this letter, Bates
(24) WEL000050 to Mr. Wells?

(25) A   The dates are right, but other than that I have no

## Page 105

(1) idea.

(2) Q   And this letter dated August 26, 1997 numbered
(3) WEL000050 that same letter I asked you about earlier
(4) in connection with one of the other compilation of
(5) documents, correct? It's the one that states – it's
(6) from the Corps and it states to Nugget based on
(7) supporting costs that you outlined in serial letter
(8) 611-21, it appears that Nugget Construction has assumed
(9) full responsibility for operations at Spencer Quarry
(10) for the subject.....

(11) A   I remember that statement.....

(12) Q   .....project.....

(13) A   .....from the previous,.....

(14) Q   Okay.

(15) A   .....yes.

(16) Q   Looking at these two do you have an understanding as
to
(17) whether you forwarded this letter from the Corps of
(18) Engineers which was copied to attention Bill Wells, but
(19) at your office address, to Bill Wells?

(20) A   If it was received at my office I'm 99 percent
(21) certain, yes, it would have been forwarded on.

(22) Q   Okay. By you to him?

(23) A   Me or somebody on my staff.

(24) Q   Okay. Directing your attention to the next letter it
(25) has a Bates number at the bottom WEL000054. The letter

## Page 106

(1) is dated August 29, 1997. It's a letter from yours
(2) truly. The second is WEL000055.

(3) A   Um-hum. (Affirmative)

(4) Q   Do you see the buck slip directly following that,
(5) WEL000056?

(6) A   That's a fax cover sheet, but yes.

(7) Q   Thank you. Thanks for the clarification. Is this a
(8) fax sheet that identifies a facsimile from you to Mr.
(9) Wells?

(10) A   Yes.

(11) Q   Is that your signature at the bottom?

(12) A   Yes, it is.

(13) Q   Is all of the handwriting on this fax sheet Bates
(14) numbered WEL000056 your handwriting?

(15) A   Yes, it is.

(16) Q   And that note ends and as I said Nugget is handling
(17) this, correct?

(18) A   That's correct.

(19) Q   And that fax sheet is dated September 2, 1997, correct?

(20) A   Correct.

(21) Q   And the letter just before it is dated August 29,
(22) correct?

(23) A   That's correct.

(24) Q   And that letter signed by yours truly is copied among
(25) others to U. S. Fidelity & Guaranty Company at the

## Page 107

(1) Willis & Corroon address in Anchorage, correct? At the
(2) bottom of the second page.

(3) A   Yes.

(4) Q   Do you now think that you faxed this letter to Mr.
(5) Wells?

(6) A   I think I probably got that letter down to him one way
(7) other, yes.

(8) Q   What about that letter that we looked at earlier where
(9) the ascertain was made in a letter from me that
(10) Northern Stevedoring had a direct relationship with
(11) Nugget, are you sure that was sent to Mr. Wells, too?

(12) A   I believe that every piece of correspondence we had
(13) regarding these claims and Nugget would have been
(14) forwarded to Bill Wells at USF&G.

(15) Q   Okay.

(16) A   I can't recall any piece of paper.

(17) Q   Directing your attention to the letter dated September
(18) 5, 1997 from Spencer Rock Products.

(19) A   Okay.

(20) Q   Bates numbered in this collection of letters WEL000057
(21) through 58 and then 59 is a certified letter envelope
(22) to U.S. Fidelity & Guaranty Company at the Willis &
(23) Corroon office, correct?

(24) A   Correct.

(25) Q   And then the document immediately following that is

## Page 10

(1) what?

(2) A   That's a buck slip again.

(3) Q   Okay. And this is one from you dated September 10,

(4) 1997 to Mr. Wells?

(5) A   It is.

(6) Q   Saying among other things, again, Nugget is handling?

(7) A   Yes.

(8) Q   We are done with that exhibit.

(9) A   Okay.

(10) MR. SEWRIGHT:   Off the record.

(11) (Off record - 2:43 p.m.)

(12) 1(Deposition Exhibit 7 marked)

(13) (On record - 2:47 p.m.)

(14) Q   (By Mr. Sewright) Mr. Ferguson, while we took a short

(15) break did you have an opportunity to go through the

(16) documents that have been handed you? It's a

(17) compilation of documents marked Exhibit 7 to your

(18) deposition?

(19) A   I did, yes.

(20) Q   Did you identify any documents there that contain your

(21) handwriting or that you had anything to do with?

(22) A   No, I did not.

(23) Q   Or that reflect conversation you may have been involved

(24) in?

(25) A   No.

## Page 110

(1) A   No.

(2) Q   Going down to the bottom of the third paragraph in that

(3) letter where Chugach Rock Corporation through J. Dennis

(4) Stacey who signed at the end at page 3 of this letter

(5) states, after Spencer began quarrying rock, its

(6) operations were taken over by Nugget, see enclosed

(7) Support Agreement. At that point Nugget became

(8) directly, and directly is underlined, responsible for

(9) payment for all rock removed from the quarry for the

(10) prime contract. Does that refresh your recollection as

(11) to whether you've seen this letter before?

(12) A   No.

(13) Q   Has anybody ever mentioned that basis for a claim to

(14) you prior to today and prior to your seeing the amended

(15) complaint?

(16) A   Not that I can recall, no.

(17) Q   Nugget never brought that to your attention?

(18) A   The only thing that was ever brought to my attention,

(19) again, is there was a problem at the pit and Nugget had

(20) to go in and fix it and that's all I really know.

(21) Q   And, frankly, to – to clarify I should add, there's

(22) nothing to indicate at the end that this letter was

(23) sent to Nugget either so I don't want to, you know,

(24) have the reference to Nugget misunderstood. Looking at

(25) the fourth paragraph where the statement is made, Mr.

## Page 109

(1) Q   Okay. I do want to ask you about.....

(2) MR. KRIDER:   Objection, lack of foundation.

(3) MR. SEWRIGHT:   Well, we'll see, we'll see.

(4) Q   (By Mr. Sewright) Directing your attention to the

(5) document – look for that one.

(6) MR. KRIDER:   No Bates number?

(7) MR. SEWRIGHT:   It has a Bates number at the

(8) bottom, thanks, Mr. Krider, USF&G 001402.

(9) A   I just turned to that one as you said it.

(10) Q   Sir, did you get a chance to look at that letter while

(11) you were reviewing documents?

(12) A   I – I glanced – yes, I saw this. I mean, I didn't

(13) read it. Obviously I didn't read everything in here,

(14) but I –.....

(15) A   .....I scanned this, yes.

(16) Q   Looking at the top this letter is from Chugach Rock

(17) Corporation to Jane Bennett Poling, Esquire, correct?

(18) A   Yes, it is.

(19) Q   Surety Claims Specialist United States Fidelity and

(20) Guaranty Company?

(21) A   Um-hum. (Affirmative)

(22) Q   Have you ever talked with Ms. Poling?

(23) A   I don't recall.

(24) Q   Do you know who she is?

## Page 111

(1) Randolph, do you know who Mr. Randolph is?

(2) A   Yes, I've meet Randy Randolph.

(3) Q   See the statement made there, Mr. Randolph has a hidden

(4) 20 percent interest in Spencer Rock and he helped

(5) Spencer prepare its bid for this job, see enclosure.

(6) Prior to my pointing this out have you ever heard a

(7) claim that Randy Randolph has a hidden 20 percent

(8) interest in Spencer Rock?

(9) A   This is the first time in my life I've ever heard that

(10) and my first indication that Randy had any involvement

(11) was the deposition I read this weekend – or not the

(12) deposition, but the......

(13) Q   The amended complaint?

(14) A   .....amended complaint.

(15) Q   Okay. Now, going back about three pages behind that,

(16) see that document.....

(17) MR. DAVIS:   Bates number?

(18) Q   (By Mr. Sewright) Bates numbered – thank you. There

(19) are two Bates numbers, but let's use the USF&G 001405?

(20) A   Okay.

(21) Q   It's an assignment of stock dated November 30, 1994,

(22) have you ever seen this before?

(23) A   No.

(24) Q   Have you ever seen that business card at the top before

(25) or what purports to be a business card, Spencer Rock

Exhibit 2
Page 15 of 35          Page 108 to Page 111

Page 112

(1) Products, Inc.. L. D. Randy Randolph, Senior Engineer
(2) Project Manager?
(3)   A   No.
(4)   Q   Now, looking at the next document it says Support
(5) Agreement, that's the Support Agreement we talked about
(6) earlier today as found in part of your surety files,
(7) correct?
(8)   A   I don't recall to be honest, but it could very well be.
(9)   Q   Okay.
(10)   A   I'd have to go back and look.
(11)   MR. SEWRIGHT:   Off the record.
(12)   (Off record - 2:53 p.m.)
(13)   (On record - 2:54 p.m.)
(14)   Q   (By Mr. Sewright) Sir, looking at the documents
(15) you know, with a circle around the 4,.....
(16) 4, you know, with a circle around the 4,.....
(17)   A   Um-hum. (Affirmative)
(18)   Q   .....that is part of what you produced at the
(19) deposition today, do you find that same support
(20) agreement?
(21)   A   Yes, I do.
(22)   Q   Okay. So that's something you had a copy of before,
(23) correct?
(24)   A   Yes. Obviously, yeah.
(25)   Q   Directing your attention again to the first page of

Page 113

(1) that letter to Jane Bennett Poling,.....
(2)   A   Okay.
(3)   Q   .....dated – the letter dated Jane – to Jane Bennett
(4) Poling dated March 12, 1998, are you there again.....
(5)   A   I'm there.
(6)   Q   .....at the beginning? Looking at the bottom paragraph
(7) where Ms. Poling is informed in this letter Nugget
(8) stepped into the subcontractor's role in operating the
(9) quarry and Nugget and its' surety must accept the
(10) payment obligations for the quarry material shipped to
(11) the project. Have you ever heard of that claim being
(12) made before other than when you read the amended
(13) complaint?
(14)   A   No.
(15)   Q   Directing your attention to the letter on USF&G
(16) stationary, I think, dated February 5, 1998 that is
(17) part of this collection, have you found it?
(18)   A   Yes.
(19)   Q   The one that has at the top, it looks like the
(20) stationary of Jane Bennett Poling, Esquire?
(21)   A   Correct, that's the one I'm looking at.
(22)   Q   The Bates number for the record is USF&G 001503, did
(23) you receive a copy of this letter?
(24)   A   It indicates I did 'cause it indicates a carbon copy.
(25) Let me read it. Again, I don't recall it, but it

Page 114

(1) indicates I was carbon copied.
(2)   Q   Okay. And the documents which follow that – let me
(3) back up. That letter, the one Bates numbered USF&G
(4) 001503, February 5, 1998 from Jane Bennett Poling to
(5) Greg Poynor refers to denial letters, correct? Denial
(6) of claim.....
(7)   A   Yes......
(8)   Q   .....letters?
(9)   A   .....copy of denial letters.
(10)   Q   And then the next document in this collection USF&G
(11) 001504 is actually a denial letter to Robert LaPore
(12) from Ms. Poling, do you recall whether you saw –
(13) whether you seen this letter before as either
(14) separately or as an enclosure to the letter we were
(15) just looking at?
(16)   A   No.
(17)   Q   And then the next letter dated January 28, 1998 USF&G
(18) 001505 does that look like a denial letter to Mr.
(19) Sewright, Northern Stevedoring & Handling from Jane
(20) Bennett Poling surety claims specialist?
(21)   MR. DAVIS:   We'll stipulate the letter says
(22) accordingly we respectfully deny your claim.
(23)   Q   (By Mr. Sewright) Is it a letter you've seen before?
(24)   A   Again, I don't recall.
(25)   Q   Okay. Now, do you know whether by that point,
January

Page 115

(1) 28, 1998, USF&G had been sued by Northern Stevedoring?
(2)   A   No, I really don't.
(3)   Q   Okay. Looking at the next document Bates numbered
(4) USF&G 001534 it's a February 13, 1998 letter apparently
(5) to Greg Poynor, general manager at Nugget, the second
(6) page apparently signed by Jane Bennett Poling, surety
(7) claims specialist, you've seen this letter before,
(8) haven't you?
(9)   A   Again, I don't recall it. I might have, but I don't
(10) recall it.
(11)   Q   Wasn't this the tender of defense letter that we looked
(12) at earlier signed by Mr. Terwilliger?
(13)   A   (Inaudible response)
(14)   Q   Look at the next page, USF&G 001531?
(15)   MR. DAVIS:   Mr. Sewright, he's asked – you've
(16) asked the question is he's seen the document before and he's
(17) answered that he doesn't recall other than his – at his
(18) deposition here today.....
(19)   MR. SEWRIGHT:   And I'm – I'm.....
(20)   MR. DAVIS:   .....I assume is what you meant?
(21)   Q   And I'm asking does looking at this in this context
(22) refresh your recollection as to whether you've seen it
(23) before?
(24)   A   No, it really doesn't.
(25)   Q   Part of what I'm doing, sir. is I'm probing your

Exhibit 2
Page 16 of 35

BSA

## Page 124

(1)  A   No.
(2)  Q   Sir, have you received any evidence of any type or
(3)  information that Nugget Construction has tried to
(4)  settle any of the claims stated in the claim letters
(5)  that are contained within your USF&G surety files
(6)  number 6?
(7)  A   I don't recall anything like that, no.
(8)  MR. SEWRIGHT:   Off the record for a moment.
(9)  (Off record - 3:27 p.m.)
(10) (On record - 3:27 p.m.)
(11) Q   (By Mr. Sewright) When I asked that last question,
(12) sir, did you understand me to be referring to the
(13) various claims letters from Shoreside and Northern
(14) Stevedoring and Chugach Rock and various others
(15) contained in this surety file as you and Mr. Davis have
(16) referred to it which we previously went through labeled
(17) USF&G 6?
(18) MR. DAVIS:   Do you understand.....
(19) A   Okay, what is the question again?
(20) Q   When I asked you – well, I as– – what I asked is are
(21) you aware of Nugget ever trying to settle any of those
(22) claims made by claimants in particular the claims
(23) expressed in these letters contained in that file?
(24) A   No, I really don't know.
(25) Q   Has anybody at Nugget ever talked with you about
making

## Page 125

(1)  any settlement offers to North Star, Shoreside or Metco
(2)  which are some of the claimants?
(3)  A   Not that I can recall, no.
(4)  Q   Has anyone at Nugget ever talked with you about
making
(5)  any settlement offers to North Star, Shoreside or Metco
(6)  as plaintiffs in this case?
(7)  A   Don't recall anything, no.
(8)  Q   Have you heard anyone discuss that subject of
(9)  settlement offers by Nugget at all in this case?
(10) A   No.
(11) Q   Do you know if Nugget has ever made any settlement
(12) offer to any of the claimants in this case?
(13) A   No, I do not.
(14) Q   Do you know if any of the claimants in this case have
(15) made settlement offers or demands to Nugget?
(16) A   Well, I know there's demands, that's what the lawsuits
(17) are about, but I don't know of any settlement offers,
(18) no.
(19) Q   Okay. I mean, specific. Do you know if – have you
(20) heard of any settlement offers in terms of specific
(21) dollars being made by any of the claimants or demands
(22) by any of the claimants in the – you know, in specific
(23) dollars to Nugget?
(24) MR. DAVIS:   Asked and answered.
(25) A   I don't know. Yeah, I've.....

## Page 126

(1)  Q   (By Mr. Sewright) You haven't heard of any of that?
(2)  A   No.
(3)  MR. SEWRIGHT:   And the reason I followed up,
(4)  Mr. Davis is because I wanted him to know I was talking about
(5)  specific dollar figures.
(6)  Q   Sir, I have no further questions. Thank you very much
(7)  for your attendance and patience.
(8)  A   Okay.
(9)  MR. SEWRIGHT:   Should we take a break before
(10) Mr. Shamburek starts or maybe he can tell us?
(11) MR. DAVIS:   Do you need a break or do you want
(12) to keep going?
(13) A   I'm fine.
(14) MR. DAVIS:   Let's go.
(15) CROSS EXAMINATION
(16) BY MR. SHAMBUREK:
(17) Q   Mr. Ferguson, my name is Steve Shamburek and I'm
the
(18) attorney for Shoreside Petroleum, Inc. and for Metco,
(19) Inc. If you would take a look.....
(20) COURT REPORTER:   You need a microphone, I'm
(21) sorry.
(22) MR. SHAMBUREK:   I'm sorry.
(23) Q   If you could take a look at Exhibit 3?
(24) MR. SEWRIGHT:   Could we go off the record for a
(25) moment while we – while I help Mr. Davis and the witness with

## Page 127

(1)  these – get these back in order.
(2)  (Off record - 3:31 p.m.)
(3)  (On record - 3:32 p.m.)
(4)  Q   (By Mr. Shamburek) If we could look at Exhibit 3 it
(5)  references an amended complaint and then the
(6)  attachments. It says U.S. Ex-Rail (ph) North Star
(7)  versus Nugget Construction than .TIFF. I believe your
(8)  previous testimony was that that's the amended
(9)  complaint that was filed by North Star Stevedoring some
(10) time in late August or early September of last year?
(11) A   Yes, but I didn't get it at that time.
(12) Q   Right. But you just – you had a chance to take a look
(13) at it this weekend?
(14) A   Correct.
(15) Q   And this is a copy of an e-mail note from April Lee to
(16) Staci White and it says in here attached is the amended
(17) complaint which needs to be reported to the carrier.
(18) A   Um-hum. (Affirmative)
(19) Q   Is there anything more that North Star has to do to
(20) tender those claims to the carrier or carriers?
(21) A   North Star.....
(22) MR. KRIDER:   Objection, form of the question,
(23) assumes facts not in evidence.
(24) Q   (By Mr. Shamburek) Let me just note, the reason I'm
(25) asking about North Star is I was going to see if

Exhibit 2
Page 17 of 35

Page 124 to Page 127

## Page 136

(1) depositions coming. We knew there were attorneys
(2) involved. Whenever there's attorneys involved I advise
(3) corporate that there's attorneys involved and my
(4) corporate in-house attorney said do not give anybody
(5) inf- -- any information. Don't let any information
(6) leave this office without subpoena.
(7)   Q   I have no further questions.
(8)   MR. SEWRIGHT:   I have a -- do you have any,
(9) Doug?
(10)   MR. DAVIS:   No.
(11)   MR. SEWRIGHT:   I have a follow-up question.
(12) REDIRECT EXAMINATION
(13)   BY MR. SEWRIGHT:
(14)   Q   Again, wasn't it somebody at Nugget or Nugget's
(15) attorney who represented to you that you were going to
(16) be deposed?
(17)   A   Yes.
(18)   Q   That's the -- they were the first people who did that?
(19)   A   That's my recollection, yes.
(20)   Q   Did they request any insurance policies or any copies
(21) of insurance policies from you prior to informing you
(22) of that, that you were going to be deposed?
(23)   A   Not that I recall, no.
(24)   Q   Are you aware that it was Nugget's attorney's idea that
(25) you be subpoenaed and deposed and it's in writing?

## Page 137

(1)   A   No.
(2)   Q   He didn't tell you that, huh?
(3)   A   No.
(4)   Q   Thank you, sir, no further questions.
(5)   (END OF PROCEEDINGS)
(6)   * * * * *
(7)
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 138

(1) S I G N A T U R E
(2)
(3) UNITED STATES OF AMERICA)
(4) )ss.
(5) STATE OF ALASKA )
(6)
(7) I, JAMES LEROY FERGUSON, having read the
(8) foregoing deposition testimony, do hereby certify it to be true
(9) and accurate, subject to corrections, if any, as indicated on
(10) the attached errata sheet.
(11)
(12) JAMES LEROY FERGUSON
(13)   DATE:
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 139

(1) C E R T I F I C A T E
(2) I, Suzan Kay Olson, Notary Public in and for the State
(3) of Alaska, and Reporter for R & R Court Reporters, Inc., do
(4) hereby certify:
(5) THAT the annexed and foregoing Deposition of JAMES
(6) LEROY FERGUSON, was taken before William Rise on the 8th day of
(7) March, 2006, commencing at the hour of 9:00 o'clock a.m. at the
(8) offices of Keesal, Young & Logan, Attorneys at Law, 1029 West
(9) Third Avenue, Suite 650, Anchorage, Alaska, pursuant to Notice
(10) to take said Deposition of said Witness on behalf of the
(11) Plaintiff;
(12) THAT this Deposition, has heretofore annexed, is a true
(13) and correct transcription of the testimony of said Witness,
(14) taken by William Rice and thereafter transcribed by me to the
(15) best of my ability;
(16) THAT the original of the Deposition will be loaded in a
(17) sealed envelope, and lodged with the attorney requesting
(18) transcription of same, as required by Civil Rule 30(f)(1)
(19) amended, that being: MR. MICHAEL SEWRIGHT, Attorney at Law,
(20) Burr, Pease & Kurtz, Attorneys at Law, 810 N Street, Anchorage,
(21) Alaska.
(22) IN WITNESS WHEREOF, I have hereunto set my hand and
(23) affixed my seal this 24th day of April, 2006.
(24) Notary Public in and for Alaska
(25) My Commission expires: 08/01/07

Exhibit 2
Page 18 of 35

DATE _11/20_

## M E M O

TO _S. Schroenhaar_

### FROM

### JANICE WIPFIELD

410=685-

See from 1100

Courthouse Copy

Called about

~~UNPaid~~ UNPaid

INVOICE Attached.

Please call her.

This is on File Jane

transferred to you.

9901-209083-01-1

Date: **3-8-6** Exh# **5**

Witness: **Ferguson**
R & R Court Reporters
(907) 277-0572

Exhibit **2**
Page _19_ of _35_

To: USF+G Sur. ty
Attention: Bill Wells

☐ As You Requested          ☐ Please Complete
☑ For Your Information       ☐ Please Sign & Return

Remarks:

Again — Nugget
is handling — we
are to get a letter
from his Attorney
this week

WILLIS CORROON ♦♦♦
ANCHORAGE                    Thanks

By Jim Fergusn        Date 9/10/97

Exhibit 2
Page 20 of 35



## OLES MORRISON RINKER & BAKER LLP

L A W Y E R S

Giona Y Ho
907-258-0106 (Main Line)
907-258-0721 (Direct Line)
ho@oles.com

November 23, 2005

*VIA U.S. MAIL*

Steven J. Shamburek, Esq.
425 G Street, Suite 630
Anchorage, Alaska 99501

RE:  *North Star, et al., v. Nugget, et al.*
     Case No. A98-009-CIV (HRH)
     Our File No. 99310.2

Dear Steve:

        Enclosed you will find the following USF&G and Nugget
documents you requested on November 11, 2005, in response to
Metco's and Shoreside's discovery requests:

        1.   USF&G 000001-000002
        2.   USF&G 000056
        3.   USF&G 001023
        4.   USF&G 001264
        5.   USF&G 001402-001407
        6.   USF&G 001502-001505
        7.   USF&G 001531-001535
        8.   USF&G 001605
        9.   USF&G 001638-001646
        10.  NUGGET 005878-005879
        11.  NUGGET 005954-005957
        12.  NUGGET 005966-005967
        13.  NUGGET 007096-007097

        I have attached the original lists you provided me
that indicated which documents you wanted copied.  If there are

.e: *3-8-6* Exh# *7*

.ness: *Ferguson*
  R Court Reporters
7) 279-0572

EST FOURTH AVENUE. SUITE 502. ANCHORAGE, ALASKA 99501
TELEPHONE  907-258-0106  FAX  907-258-5519

Exhibit **2**
Page *21* of *35*

Steven J. Shamburek, Esq.
November 23, 2005
Page 2


missing documents from another list which you have, but which
was not provided to me on November 11th, please advise.  Feel
free to contact me should you have any questions.

Very truly yours,

OLES MORRISON RINKER & BAKER LLP

Gloria Ho


Enclosures
GH/ksg:046 GYH Shamburek trans copies 112005
cc: Traeger Machetanz

Exhibit 2
Page 22 of 35

# CHUGACH ROCK CORPORATION

P. O. Box 91219 / Anchorage, Alaska  /  99509 - 1219
Phone (907) 277 - 4423  Fax (907) 279 - 6084

12 March 1998

Jane Bennett Poling, Esquire
Surety Claims Specialist
United States Fidelity and Guaranty Co.
P. O. Box 1138
Baltimore, MD 21203-1138

MAR 1 6 1998

CERTIFIED MAIL RRR: Z 129 534 076

Re.: Nugget Construction, Inc., Payment bond claim
Claim No.: 9901-S-209083-01-1
Bond No.: 99-0120-50298-96-5 (payment and performance)
Homer Spit (Alaska) Project, U. S. Army Corps of Engineers

Dear Ms. Poling:

I have just received your letter dated February 17 regarding the above claim. The letter was postmarked February 20. I have no idea why it took so long to arrive, but I am responding promptly as you requested, regarding our claim for payment.

Nugget has cited _Woods Construction Co. vs. Pool Construction Co._, 348 F2d 687 (1965) in an attempt to allege that Chugach Rock Corporation is not a materialman pursuant to the Miller Act, and thus is not entitled to make a valid claim on Nugget's Miller Act bonds. Nugget's reliance on that case is misplaced, as it is very different from the present situation where Nugget itself took rock from our quarry directly to its jobsite to prosecute work on the prime contract.

Spencer Rock Products Inc., a sub-contractor for Nugget Construction, issued the purchase order to Chugach for the rock. Spencer and Nugget both shipped rock from Spencer Quarry to the jobsite. After Spencer began quarrying rock, its operations were taken over by Nugget (see enclosed Support Agreement). At that point Nugget became _directly_ responsible for payment for all rock removed from the quarry for the prime contract.

Some of the key management of Nugget Construction, (L. D. Randolph and Greg Poynor), were well aware of Chugach Rock's agreement with Spencer Rock and the requirement to pay for materials which were taken. Mr. Randolph has a hidden 20% interest in Spencer Rock and he helped Spencer prepare its bid for this job (see enclosure). Thus the General Contractor's management were directly involved and had constructive knowledge of the requirement to make payment for materials which were shipped to prosecute work on the prime contract, and they knew of Chugach Rock's right to claim on the bonds. By its actions, Nugget implicitly accepted Spencer's obligations to pay for the rock it took to its job from the quarry under a validly issued Purchase Order for its prime contract.

Nugget, stepped into the sub-contractor's role in operating the quarry, and Nugget and its surety must accept the payment obligations for the quarry material shipped to the project. Nugget has asserted offsetting claims against Spencer Rock and for this reason

CRC/USF&G 3/12/98

_1_

USF&G 001402

Exhibit 2
Page 23 of 35

It has not paid Spenc__, however Nugget does not have any offsetting claims against Chugach Rock, and the set-off defense is not available. Chugach must be paid and it is entitled to receive payment from Nugget's surety bond.

Your letter requested more information regarding the quantities of rock supplied. Chugach has submitted billings to Spencer, Nugget and USF&G for materials furnished to the project. The billings state with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied (Miller Act 40 USCS §270b(a). The billings are substantially accurate, and reflect the _minimum amounts_ of rock which Chugach believes were shipped from the quarry for the referenced project. Spencer Rock has stated that Nugget Construction was systematically overloading railcars with rock shipped from the site, and that it cannot rely on Nugget's shipping reports for accurate quantities. Chugach Rock believes that the surveyed quantities of rock provide the most accurate method of ascertaining _minimum_ quantities. This is the quantity of rock which Nugget has billed the Owner for.

The Army Corps of Engineers has informed Chugach Rock Corporation that there is a substantial quantity of rock material from the Spencer quarry at the Homer jobsite which does not meet specifications and which was not included in the quantity survey letter from the Corps dated 11/24/97. It is Nugget's responsibility to pay for this non-conforming material. Nugget quarried the material, it inspected and accepted it prior to shipment, and it took the material from the quarry to prosecute work under the prime contract. If the material did not meet specs after delivery that is the fault of Nugget, for it accepted the material at the quarry railspur. Chugach Rock is entitled to be paid for all rock taken from the quarry site to prosecute work on the Homer job regardless of whether it was used on the Homer project or not.

> In order to recover it is not required of a materialman that he prove that his materials were actually used in work of prime contract, but only that in good faith he reasonably believed that materials were so intended; and where materialman gave proper notice to prime contractor within ninety days of furnishing material under reasonable belief that material was to be so used in work project, he was entitled to recover therefor although material was not used on such project. _U. S. for Westinghouse Electric Supply Co. v. Enderbrock-White Co._ (1960, CA4 Bs) 275 F2d 57, 39 CCH LC ¶ 66256, 79 ALR2d 836.

Based upon Nugget's reports to Bob LaPore, Spencer Rock reported 87,173 tons of rock were extracted in its Third Quarter Extraction Report to Chugach Rock, (item 5 of my letter of 11/10/97). The in-place survey which Nugget submitted in November 1997 indicates a quantity of approximately 90,465 tons of material which have been accepted for the project, (item 3 of my letter of 12/1/97). The quantity in the stockpile of out-of-spec material has never been accounted for. Chugach Rock has billed the project for 101,376 tons of rock based upon the project plans. Chugach Rock's billings comply with the substantial accuracy requirements for filing a Miller Act claim.

Spencer Rock has stated that some rock fell off of over-loaded railcars, other rock that exceeded barge capacity was left in Seward and that it believes that Nugget has sold some of the out-of-spec rock to local projects in Homer. Nugget's employees told Spencer Rock that Nugget shipped 2,000 tons more rock than it estimated the project would require in order to cover anticipated shortfalls. With these quantities unaccounted for it not possible for Chugach Rock to make a closer estimate of the total quantities shipped by Nugget than what it has given. At the minimum we have 87,173 tons documented by Spencer Rock's Third Quarter Extraction Report, and the 90,465 tons in the quantity survey.

CRC/USF&G 3/12/98

Exhibit 2
Page 24 of 35

Chugach Rock wou   prefer an amicable resolution of this matter and is willing to consider an adjustment in the quantities which it has billed for if Nugget will agree to make payment and provide satisfactory documentation that the billed quantities are in error. However, to date Nugget has not offered to do this and instead has asserted that it has no responsibility at all to pay for the rock materials which it took from our quarry and which it has sold for its benefit. Please advise us regarding your principal's position on this matter as soon as possible.

This correspondence and all prior or subsequent communications are made with express reservation all rights and remedies that may be available to Chugach Rock Corporation at law or in equity under the terms and provisions of the payment and performance bonds and contract the documents.

Sincerely,

J. Dennis Stacey
President

enclosure:
Letter dedicating 20% of Spencer Rock stock to L. D. Randolph
Support Agreement
Statement of Account, March 1998

USF&G 001404

CRC/USF&G 3/12/98

3

**Exhibit 2**
**Page 25 of 35**

L.D. "Randy" Randolph, PE
Senior Engineer, Project Manager

1301 Downing #109
P.O. Box 244061
Anchorage, Alaska 99524
Phone 907-563-1405
Fax   907-563-1458

November 30, 1994

ASSIGNMENT OF STOCK

Let it be known to all men, That I Robert
A. La Pore do hereby dedicate 20% of my
Spencer Rock Products, Inc. Stock to Mr.
Randy Randolph for services to be renderd
to Spencer Rock for biding projects and
helping with the quarry planing and oper-
ations.

Sincerely  *Robert A. La Pore*
          Robert A. La pore, President

USF&G 001405

EXHIBIT _____A_____
Page __1__ of __1__

SPE000083

**Exhibit 2**
Page 26 of 35

# SUPPORT AGREEMENT

This Agreement by and between Nugget Construction, Inc., hereinafter NCI, and Spencer Rock Products, hereinafter SRP, is for the providing of labor and equipment support to SRP by NCI in the production of certain specified rock materials at the Spencer Glacier Quarry.

The rock being produced is for the fulfillment of SRP's Material Agreement to supply certain quarry materials for NCI's construction contract with the U.S. Army Corps of Engineers, Alaska District, hereinafter Owner, project more particularly known as Homer Spit Repair and Extension, Contract No. DACW85-96-C-0020.

NCI shall keep a separate accounting of the costs associated with said support and charge an additional G&A expense fee. NCI agrees not to charge a profit on such costs. NCI shall deduct from the partial pay estimates earned by SRP sufficient funds to keep the account of SRP current with the goal of minimizing any impact on SRP funds for their payment of lines of credit.

In no way can is Support Agreement be construed as a subcontract between the parties. SRP agrees to indemnify and save harmless NCI and the Owner and their respective employees, agents, licensees and representatives from and against any and all suits, claims, actions, losses, costs, penalties and damages of whatsoever kind of nature (including, without limitation, court costs, expenses and reasonable attorney's fees) arising out of injuries to or death of any and all persons (including without limitation to the Owner, NCI and any subcontractor and property of their respective employees, agents, licensees and representatives), or damage to or destruction of property (including, without limitation, property of the Owner, NCI or any subcontractor and property of their respective employees, agents, licensees and representatives) in any manner by, resulting from, incident to, connected with or growing out of the performance of this Support Agreement, unless caused solely by the negligent acts or omission of the NCI. If it becomes necessary for the NCI to take legal action to enforce any term or condition contained in this section, SRP shall be liable to the NCI for all costs incurred in such legal action including reasonable attorney's fees.

AGREED TO this _23rd_ day of _April_ , 1997.


_____          _____
Nugget Construction, inc.                    Spencer Rock Products

USF&G 001406

SPE000076

EXHIBIT 2

Exhibit 2
Page _27_ of _35_

**CHUGACH ROCK CORPORATION**

P. O. Box 91219 / Anchorage, Alaska / 99509 - 1219
Phone (907) 277 - 4423   Fax (907) 279 - 6084

# ACCOUNT STATEMENT

12 March 1998

BOB LAPORE
SPENCER ROCK PRODUCTS, INC.
P. O. Box 244063
Anchorage, AK 99524

ph. 563-1405

Re.: Homer Spit Material:

CURRENT BALANCE:

HOMER SPIT ROCK (prior month's balance) $ 92.301.$^{72}$

        interest at 1.$^{50}$ %/mo.     1,384.$^{53}$

        BALANCE DUE     $ 93,686.$^{25}$

NOTE:  ENTIRE ACCOUNT BALANCE IS SERIOUSLY OVERDUE.. A PORTION OF THE BALANCE IS OVER 210 DAYS LATE.  PLEASE SEND PAYMENT IMMEDIATELY!!!

USF&G 001407

**Exhibit 2**
**Page _28_ of _35_**

**DEPARTMENT OF THE AIR**
U.S. ARMY ENGINEER DISTRICT, ALASKA
RICHARDSON RESIDENT OFFICE
P.O. BOX 898
ANCHORAGE, ALASKA 99506-0898

REPLY TO
ATTENTION OF:

August 26, 1997

Quality Assurance Branch - Construction                    RRO/40

SUBJECT:  Spencer Quarry, Contract DACW85-96-C-0020, Homer Spit
Repair & Extension, Homer, Alaska.

Nugget Construction, Incorporated
Attn:  Mr. Randolph
8726 Corbin Drive
Anchorage, Alaska  99507-3411

Gentlemen:

    We acknowledge receipt of Serial Letter 611-19, dated August
6, 1997, and Serial Letter 611-21, dated August 11, 1997.  We do
not necessarily agree that Spencer Rock Products is only a
"vendor" for Miller Act purposes.

    Based on the supporting costs that you outlined in Serial
Letter 611-21, it appears that Nugget Construction has assumed
full responsibility for operations at Spencer Quarry for the
subject project.  Therefore, as primary operator at Spencer
Quarry, we believe Nugget Construction is responsible for prompt
payment to suppliers and subcontractors who contracted with
Spencer Rock Products on this project.

    We request that you clarify what support and project
management services Nugget Construction provided to Spencer Rock
Products to account for the support cost that you have shown in
Serial Letter 611-21.  Further, please provide information
showing what work, if any, has been performed by Spencer Rock
Products under its subcontract with Nugget Construction.

    Please direct any questions you have in this matter to the
Project Engineer, Mr. David Scott, at (907) 384-7442.

        Sincerely,

        Thomas A. Johnson, P.E.
        Administrative Contracting
        Officer

Cc:  United States Fidelity
    and Guarantee Co.
    Attn:  Bill Wells
    4220 B Street
    Anchorage, AK  99503

USF&G 001093

**Exhibit 2**
**Page 29 of 35**



**Surety Group - Claim**

Jane Bennett Poling, Esquire
Ph.: 410-205-1044
Fax: 410-205-0605
Mail Stop: LB0201

February 5, 1998

Greg Poynor, General Manager
Nugget Construction, Inc.
8726 Corbin Drive
Anchorage, AK 99507

RE:    Principal:        Nugget Construction, Inc.
       Obligee:          Department of the Army
       Claimant:         Northern Stevedoring & Handling
       Claim No.:        9901-S-209083-01-1
       Bond No.:         99-0120-50298-96-5
       Project:          Homer Spit Repair and Extension
       Subcontractor:    Spencer of Rock Products

Dear Mr. Poynor:

Please find enclosed a copy of the denial letters sent to Northern Stevedoring and Spencer Rock Products. We have, however, been sued by Northern Stevedoring. Please advise us as to who will be handling this matter in order that we might tender our defense. I would appreciate if you would contact me at the above number as soon as you receive this correspondence.

Very truly yours,

Jane Bennett Poling
Surety Claims Specialist

JBP/jms

Enclosure

cc:    John Lukjanowicz, Esquire
       James Ferguson, Agent

USF&G 001503

**Exhibit 2.**
Page _30_ of _35_



Surety Group - Claim
Jane Bennett Poling
Surety Claims Specialist
Ph.: 410-205-1044
Fax: 410-205-0605
Mail Stop. LB0201

February 13, 1998

Greg Poynor, General Manager
Nugget Construction, Inc.
8726 Corbin Drive
Anchorage, AK 99507

RE:    *United States of America for the use of North Star Terminal & Stevedore Company,*
       *d/b/a Northern Stevedoring & Handling, and North Star Terminal & Stevedore Company*
       *d/b/a Northern Stevedoring & Handling vs. Nugget Construction, Inc., Spencer Rock*
       *Products, Inc., United States Fidelity and Guaranty Company and Robert A. LaPore*

|  |  |
|---|---|
| Principal: | Nugget Construction, Inc. |
| Obligee: | Department of the Army |
| Claimant: | Northern Stevedoring & Handling |
| Claim No.: | 9901-S-209083-01-1 |
| Bond No.: | 99-0120-50298-96-5 |
| Project: | Homer Spit Repair and Extension |
| Case No.: | A98 009 CIV, District Court for the District of Alaska at Anchorage |

Dear Mr. Poynor:

Enclosed are a Summons and Complaint filed in the United States District Court for the District of Alaska at Anchorage, case no. A98 009 CIV, entitled *United States of America for the use of North Star Terminal & Stevedore Company, d/b/a Northern Stevedoring & Handling, and North Star Terminal & Stevedore Company d/b/a Northern Stevedoring & Handling vs. Nugget Construction, Inc., Spencer Rock Products, Inc., United States Fidelity and Guaranty Company and Robert A. LaPore.*

This suit is being brought by a subcontractor/supplier that alleges that it is owed monies by your company. Pursuant to the terms of the Master Surety Agreement that your company executed with USF&G/FGIC, you agreed to exonerate, indemnify and keep indemnified the surety from and against any and all liabilities, losses and expenses by reason of having executed bonds on behalf of your company.

United States ... and Guaranty Company    P.O. Box 1138  Baltimore  MD 21203-1138

USF&G 001534

Exhibit 2
Page 31 of 35

Nugget Construction, Inc.
February 13, 1998
Page 2 of 2

We have been advised that you have retained the legal services of John Lukjanowicz, Esquire with Oles Morrison & Rinker, to represent your interests in the above-captioned suit. USF&G/FGIC hereby tenders its defense in this litigation to its bond principal and indemnitors under the conditions as set forth in this letter. Should you agree to accept the surety's tender of defense you will be required to provide a copy of all pleadings. Those pleadings filed on behalf of the surety must be reviewed and approved by the surety prior to such filing. We also request that your attorney provide us with regular status reports concerning the litigation. It is also a condition of this tender of defense that we have the right with reasonable notice, to have full access to all of your files concerning this matter. We also specifically reserve the right to revoke the tender of this defense at any time and for any reason.

If you agree to the terms of the tender of defense as stated in this letter, please sign, have witnessed and date the bottom of this letter and return the original to the attention of the undersigned. Thank you for your attention to this letter and if you have any questions, please do not hesitate to contact me.

If you agree to the terms of the tender of defense as stated in this letter, please sign, have witnessed and date the bottom of this letter and return the original to the attention of the undersigned. Thank you for your attention to this letter and if you have any questions, please do not hesitate to contact me.

Very truly yours,

Jane Bennett Poling
Surety Claims Specialist


I,_____(title). on behalf of (principal) _____, hereby accept the tender of defense of USF&G/FGIC in the above referenced litigation and agree to the terms of such tender as set forth above.


WITNESS_____

_____
NAME AND TITLE

DATE: _____


cc:    John Lukjanowicz, Esquire
       Oles Morrison & Rinker, LLP


JBP/jms

USF&G 001535

Exhibit **2**
Page _32_ of _35_

Nugget Construction, Inc.
February 13, 1998
Page 2 of 2

SURETY CLAIM

MAR 0 2 1998

We have been advised that you have retained the legal services of John Lukjanowicz, Esquire with Oles Morrison & Rinker, to represent your interests in the above-captioned suit. USF&G/FGIC hereby tenders its defense in this litigation to its bond principal and indemnitors under the conditions as set forth in this letter. Should you agree to accept the surety's tender of defense you will be required to provide a copy of all pleadings. Those pleadings filed on behalf of the surety must be reviewed and approved by the surety prior to such filing. We also request that your attorney provide us with regular status reports concerning the litigation. It is also a condition of this tender of defense that we have the right with reasonable notice, to have full access to all of your files concerning this matter. We also specifically reserve the right to revoke the tender of this defense at any time and for any reason.

If you agree to the terms of the tender of defense as stated in this letter, please sign, have witnessed and date the bottom of this letter and return the original to the attention of the undersigned. Thank you for your attention to this letter and if you have any questions, please do not hesitate to contact me.

If you agree to the terms of the tender of defense as stated in this letter, please sign, have witnessed and date the bottom of this letter and return the original to the attention of the undersigned. Thank you for your attention to this letter and if you have any questions, please do not hesitate to contact me.

Very truly yours,

June Bennett Poling
Surety Claims Specialist

I, _JOHN TERWILLIGER_ (title), on behalf of (principal) _NUGGET CONST._ , hereby accept the tender of defense of USF&G/FGIC in the above referenced litigation and agree to the terms of such tender as set forth above.

WITNESS _____

NAME AND TITLE
JOHN TERWILLIGER, PRESIDENT
DATE: _23 FEB 98_

cc:    John Lukjanowicz, Esquire
       Oles Morrison & Rinker, LLP

JBP/jms

USF&G 001531

Exhibit 2
Page _33_ of _35_

1

2 John Lukjanowicz, Esq.
OLES MORRISON & RINKER LLP
3 701 Fifth Avenue, Suite 3300
Seattle, WA 98104-7082
4 Telephone:    (206) 623-3427
Facsimile:    (206) 682-6234
5
William K. Renno, Esq.
6 OLES MORRISON & RINKER LLP
745 West 4th avenue, Suite 502
7 Anchorage, AK 99501
Telephone:    (907) 258-0106
8 Facsimile:    (907) 277-8602

9 Attorneys for Defendants Nugget and USF&G

10

11

12                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF ALASKA
13                              AT ANCHORAGE

14
    UNITED STATES OF AMERICA for the use of
15  NORTH STAR TERMINAL & STEVEDORE
    COMPANY, d/b/a NORTHERN STEVEDORING
16  & HANDLING; and NORTH STAR TERMINAL          NO.  A98 009 CIV
    & STEVEDORE COMPANY d/b/a NORTHERN
17  STEVEDORING & HANDLING on its own            NOTICE OF APPEARANCE
    behalf,
18
19                                 Plaintiffs,

20          v.

21  NUGGET CONSTRUCTION, INC.;
    SPENCER ROCK PRODUCTS, INC.;
22  UNITED STATES FIDELITY AND
    GUARANTY COMPANY; and ROBERT A.
23  LAPORE.

24                                 Defendants

25
          PLEASE TAKE NOTICE that Defendants Nugget Construction, Inc. and United States

    Fidelity, without waiving objections as to improper service of process or lack of jurisdiction, enter

Exhibit 2.
Page 34 of 35

1    an appearance herein by their undersigned attorneys of record.  Service of all future pleadings o

2    papers, exclusive of original process, are to be served upon said attorneys at their address below

3    stated.

4

5    DATED this _27/L_ day of January, 1998.

6                                    OLES MORRISON & RINKER LLP

7

8                                    By _____
                                         John Lukjanowicz, Alaska Bar #9411133
9                                        William K. Renno, Alaska Bar #8811202
                                         Attorneys for Defendants Nugget Construction,
10                                       and United States Fidelity and Guaranty Company

11                        **CERTIFICATE OF SERVICE**

12         The undersigned certifies under penalty of perjury under the laws of the State of

13    Washington and the United States of America that on this day the undersigned deposited in the

      mails of the United States of America a properly stamped and addressed envelope directed to the

14    following attorneys of record:

15         Michael W. Sewright, Esq.
           Burr, Pease & Kurtz
16         801 N Street
           Anchorage, AK  99501
17

18    containing a copy of the document to which this declaration is attached.

19    Signed at Seattle, Washington, this 27th day of January, 1998.

20

21    _____

22

23

24

25

NOTICE OF APPEARANCE - 2
P-JL NOA 873660006 doc

USF&G 001533

**Exhibit 2**
**Page 35 of 35**                    TOTAL P.03