Steven J. Shamburek
Alaska Bar No. 8606063
LAW OFFICE OF STEVEN J. SHAMBUREK
425 G Street, Suite 630
Anchorage, Alaska 99501
(907) 522-5339 Direct
(907) 522-5393 Fax

Attorney for Plaintiffs
Shoreside Petroleum, Inc.,
d/b/a Marathon Fuel Service
and Metco, Inc.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| UNITED STATES OF AMERICA for the use of NORTH STAR TERMINAL & STEVEDORE COMPANY, d/b/a Northern Stevedoring & Handling, and NORTH STAR TERMINAL & STEVEDORE COMPANY, d/b/a Northern Stevedoring & Handling, on its own behalf, )<br><br>Plaintiffs, )<br><br>and )<br><br>UNITED STATES OF AMERICA for the use of SHORESIDE PETROLEUM, INC., d/b/a Marathon Fuel Service, and SHORESIDE PETROLEUM, INC., d/b/a Marathon Fuel Service, on its own behalf, )<br><br>Intervening Plaintiffs, )<br><br>and )<br><br>METCO, INC., )<br><br>Intervening Plaintiff, )<br><br>vs. )<br><br>NUGGET CONSTRUCTION, INC.; SPENCER ROCK PRODUCTS, INC.; UNITED STATES FIDELITY AND GUARANTY COMPANY; and ROBERT A. LAPORE, )<br><br>Defendants. | **SHORESIDE'S AND METCO'S REPLY TO OPPOSITION TO MOTION AND MEMORANDUM FOR SUMMARY JUDGMENT AND DETERMINATION OF LAW REGARDING NUGGET CONSTRUCTION**<br><br><br><br><br><br>3:98-cv-0009-TMB |

1

COMES NOW Shoreside Petroleum, Inc., d/b/a Marathon Fuel Service ("Shoreside") and Metco, Inc. ("Metco"), by and through counsel, and file this Reply to Opposition to Motion and Memorandum For Summary Judgment And Determination of Law Regarding Nugget Construction.[1]

Judge Holland observed more than one half dozen years ago: "The course of this litigation has been long and difficult for all the parties."[2]  Judge Holland made that statement even before the first appeal was filed by the defendants.  Judge Holland has expended an extraordinary amount of judicial resources trying to resolve this case.

## Introduction

The Corps of Engineers/Nugget Contract at issue required rock to be placed near the Homer revetment.  The rock came from the "Spencer Quarry" named after the nearby Spencer Glacier on the Kenai Peninsula near Seward, Alaska.  The Spencer Quarry itself was the "quarry" pursued by Nugget Construction, by Trecon, by Spencer Rock Products and by Chugach Rock Corporation for years.

---

[1]     This pleading addresses the Opposition at Docket Entry No. 538 and other arguments asserted against the claimants.  This pleading is a joint reply for two parties relating to oppositions to two motions.  The discussion exceeds the page limits for a single party by three pages.

[2]     Order regarding North Star Motion for Entry of Judgment dated February 23, 2000.  Docket Entry No. 163, p. 2, ll. 12 - 14.  At many times in this proceeding, the undersigned has observed that this matter should have settled after the exchange of letters between and among the parties in July and August, 1997.

The U.S. Forest Service issued a permit to Spruce Sand & Gravel, Inc. to operate the Spencer Quarry.[3]   Spruce Sand & Gravel allowed Chugach Rock Corporation to operate the Quarry. Chugach Rock Corporation allowed Spencer Rock to operate the Quarry.   Spencer Rock contracted with Nugget to provide rock and operate the Quarry until late March or early April, 1997, when Nugget took over the operation.[4]   Nugget did not pay Spencer Rock or Chugach Rock Corporation.[5]

Defendant Nugget was the general contractor on the Homer Project and the paymaster.   Shoreside, Metco, and North Star were three subcontractors to the Homer Project who were, in practice, subcontractors to Nugget.   The rock came from the Spencer Quarry. North Star and Metco assisted in delivering and loading the rock in Seward on the Nugget barge.   Nugget delivered and placed the rock in Homer.   Shoreside fueled and lubed the entire project including the Nugget barge.   These parties were known to and dealing with Nugget regularly during the course of the Homer Project.   As Judge Holland previously found, Messrs. Randolph and Poynor were affiliated with Trecon, with Spencer Rock, and with Nugget.   Neither individual ever conveyed to the claimants when he was wearing a Nugget hard hat versus a Spencer hard hat.

---

[3]    Docket Entry Nos. 508 and 514, Affidavit of John Dennis Stacey, President of Chugach Rock Corporation.   Mr. Stacey discusses these business relationships in his affidavit.

[4]    Docket Entry No. 69, Exhibit 5, Lynn D. "Randy" Randolph Deposition of Oct. 30, 1998, abbreviated transcript p. 121, ll. 1 - 7.

[5]    No one disputes that Chugach Rock paid Spruce Sand & Gravel which in turn paid the U.S. Forest Service for the permit.

Before any of the three claimants in this case (Shoreside, Metco and North Star) began providing goods and performing services, Nugget was in complete control of the Quarry having completed its "hostile takeover" from Spencer Rock Products and Chugach Rock Corporation.  Nugget did not pay Shoreside, Metco and North Star.  In addition, because Nugget did not pay Spencer, Spencer could not pay Shoreside, Metco and North Star.  Nugget knew Spencer's finances and knew that Spencer could not pay Shoreside, Metco and North Star unless Nugget first paid Spencer. Nugget made sure that it did not pay Spencer.  Nugget paid itself instead from what the U.S. Government paid Nugget for the work done by Shoreside, Metco, North Star and Spencer.

Shoreside and Metco provided careful and detailed responses to the discovery requests propounded by the defendants. Shoreside and Metco diligently and completely answered each and every interrogatory with specific references to letters and documents.  The responses are properly verified and supported with copies of documents provided to or obtained from defendants. Nugget and USF&G did not like the responses and made a strategic decision to disregard the discovery responses in their briefing and try instead to create confusion.  Nugget largely disregarded the discovery requests propounded to it by the claimants.  Nugget also disregards the legal issues in controversy.  The history of this case is insightful.

## History

Shoreside filed a carefully-prepared Complaint asserting a number of causes of action under 1) the Miller Act 2) Breach of

Contract/Detrimental Reliance; 3) Unjust Enrichment/Quantum Meruit; and 4) Restitution.[6] Shoreside previously briefed four arguments under the Miller Act. Shoreside also briefed the breach of contract and quantum meruit causes of action. Neither Nugget nor USF&G ever filed an opposition to Shoreside's first argument that Shoreside provided direct notice to Nugget pursuant to a contract with Nugget. The District Court has not addressed the first argument. North Star's Complaint also raised state law causes of action and claimed a direct contract with Nugget.[7]

In the first round of briefing, Judge Holland addressed the subcontractor relationship issue and found that Spencer Rock was a subcontractor. The three claimants relied on and Judge Holland discussed and developed the two applicable Supreme Court decisions[8] in a detailed decision.[9] The four-paragraph decision of the Ninth Circuit which followed was based on much less and incomplete information provided primarily by Nugget. Nugget relied on the "Material Contract" and "Support Agreement" which it dictated and imposed on Spencer Rock and on Robert LaPore despite his objections and kept secret from the three claimants and the Corps. The Ninth Circuit panel in the first appeal held that Spencer Rock was not a "subcontractor" to Nugget as that term is treated under a different, multi-factored test in one

---

[6]    Docket Entry No. 9.

[7]    Docket Entry No. 1.

[8]    MacEvoy Co. v. United States ex rel. Tomkins Co., 322 U.S. 102 (1944) and F.D. Rich Company, Inc. v. United States ex rel. Industrial Lumber Company, Inc., 417 U.S. 116 (1974).

[9]    Docket Entry No. 124.

Ninth Circuit case.[10]  The panel elected to focus only on this heavily-briefed issue regarding the relationship of Nugget and Spencer.  The first Ninth Circuit decision did not address any of the claims by the claimants asserted directly against Nugget or other claims under the Miller Act or pursuant to state law against Nugget and USF&G.  As noted above, in its pleadings in 1999, Shoreside contended that it had a direct contractual relationship with Nugget.  Shoreside presented the argument in the alternative in its briefing before the Ninth Circuit, but the argument is not even mentioned by the panel and thus was not addressed.[11]  Metco contended that the general contractor has a duty to pay everyone who contributes to the project.  Both claimants note that each provided goods and performed services in reliance on the payment bond.

After remand, the claimants focused on the activities of Nugget before and after the signing of the document described as the "Support Agreement."  On the basis of the factual findings that emerged, Judge Holland issued a careful and detailed decision.[12]  On appeal, the Ninth Circuit panel reversed on the

---

[10]    United States ex rel. Conveyor Rental & Sales Company v. Aetna Casualty & Surety Company, 981 F.2d 448 (9th Cir. 1992). After relying on the two applicable Supreme Court decisions, Judge Holland also analyzed this same decision and reached a different decision.

[11]    The decision in Kesselring v. F/T Arctic Hero, 95 F.3d 23, 24-25 (9th Cir. 1996) is not applicable to the claims that were appealed but not addressed.  The undersigned was involved in the Arctic Hero case and briefed the issues.

[12]    Docket Entry No. 310.  Judge Holland looked at the date on the "Support Agreement."  There is now overwhelming evidence including admissions by Nugget that Nugget had taken over control of the Quarry by late March, 1997.

ground that there was substantial but not enough evidence in the record to support the entry of summary judgment against Nugget and USF&G.

After remand, the claimants moved to amend their complaints to develop the elements of the causes of action in more detail. Judge Holland carefully considered the motions and the lengthy oppositions filed by Nugget and USF&G and allowed amendment. Nugget took the depositions of representatives of Shoreside and of Metco and multiple depositions of representatives of North Star. For the first time, Shoreside, Metco and North Star further developed their cases via deposition testimony. The detailed responses of the Shoreside and Metco representatives are set forth in the memorandums and bolstered by the exhibits.

Mr. Lechner stated that Shoreside entered into the exact same contract, the "Credit Application", with each company, Nugget and Spencer Rock, before providing fuel for the use and benefit of the Homer Project.[13] Shoreside could look to either entity and also to the payment bond. Shoreside provided fuel to Nugget before and after providing fuel for the use and benefit of the Homer Project. Judge Holland already found that the Shoreside "Credit Application" is a written contract. The

---

[13]     The District Court found that there was a written contract between Shoreside and Spencer Rock Products providing for an award of attorney's fees and interest at the rate of 1.0% per month. See the Order dated May 30, 1998 at Docket Entry No. 37 and the Shoreside Opposition dated April 15, 1998 at Docket Entry No. 28 including Exhibits 1 and 2. Judge Holland found that settled law allows Miller Act claimants with a written contract that provides for attorney's fees, costs and interest to move for attorney's fees, costs and interest. See the Order dated February 23, 2000 at Docket Entry No. 165.

provision regarding attorney's fees in the Credit Application provides for an award of attorney's fees.

Ms. Barbara Dieckgraeff with Metco notes that Metco could look to Nugget because Nugget was the general contractor. She stated that when Metco is the general contractor on construction projects, Metco recognizes and meets the duties of the general contractor and pays obligations. She also stated that Metco could look to Spencer Rock and to the payment bond.

Messrs. Jeff Bentz and Jack Goodwill with North Star developed the claims on behalf of North Star. North Star contracted with and looked to Nugget for payment and to the bond.

Mr. John Dennis Stacey with Chugach Rock Corporation exposes the efforts by Messrs. Randolph and Poynor with Trecon/Spencer Rock/Nugget to complete their "hostile takeover" of the Quarry in his affidavit. Nugget has pursued and perpetuated a fraud on the claimants and the court.

Mr. Robert A. LaPore with Spencer Rock Products discusses the relationship with Nugget and the take over of the Quarry in his affidavit.

Robert A. LaPore, being first duly sworn, deposes and states as follows:

1.      I am the former president and majority owner of Spencer Rock Products, Inc. (hereinafter "SRP"). SRP once operated the Spencer rock quarry. It did so from early 1995 until Nugget Construction Company, Inc. ("Nugget") took over in April 1997. SRP is no longer doing business.

2.      On June 7, 1999, I gave extensive testimony by deposition in the litigation brought by Nugget against SRP and myself in the Superior Court for the State of Alaska, Third Judicial District at Anchorage, Case No. 3AN-97-9509 CI (hereinafter "the Nugget/SRP litigation"). I also testified by affidavit in that litigation.

3.      The Nugget/SRP litigation resulted from the work SRP had contracted in January 1997 to do for Nugget in relation to the Homer Spit Repair and Extension Project and from Nugget's early takeover of that work.  In mid-April 1997 Nugget took control of that work, including the rock production and loading operations, which Nugget had originally contracted to have SRP do.  Nugget then intercepted the federal funds it had contracted to pay SRP for that work, paying itself instead.  The only payment SRP or I received from Nugget for that work was $147,184.66 for filter, toe and armor rock produced by SRP from the quarry before April 1997 and delivered "FOB Railhead, Seward" by April 15, 1997.  That is also reflected in the documents attached as Exhibit 1 to this Affidavit, including Nugget's Pay Estimate No. 1 for that amount approved for payment by the Army Corps of Engineers on April 22, 1997.  That all happened well before Northern Stevedoring ("North Star") loaded any of the rock for the project onto Nugget's barge at Seward.  After that initial payment to SRP, Nugget only allowed SRP a few payroll draws for SRP's few remaining employees, and I had to beg Nugget for those.  Nugget allowed only seven such draws, starting June 27, 1997 and ending August 8, 1997, in the total sum of $45,000.  Nugget kept all of the rest of the money the federal government paid for the rock furnished to the Homer project from the Spencer quarry for itself.

4.      Nugget, through its project manager Randy Randolph, also directed and controlled the loading of the rock by North Star from the Alaska Railroad Dock at Seward onto the Nugget barge docked there.  That work started in early May 1997.  Although I had understood I would continue to supervise that work, in fact Mr. Randolph directed it too.  He dealt directly with North Star.  I was pretty much reduced to driving a truck, transporting rock from where it had been dumped from the railcars adjacent to the ARR Dock onto the dock for loading by North Star's crane operator and stevedoring crew onto the barge.  If someone told North Star to send its bills for that loading work to "Nugget Construction c/o Spencer Rock Products", I think it would have been Randy Randolph.  I do not recall doing that.  I recall forwarding whatever bills I received from North Star to Nugget.  I am also pretty sure that I gave a copy of North Star's ratesheet to Randy Randolph early on, I believe during the project's bidding stage, way before North Star did any work.

5.      Randy Randolph and Nugget also made the decision to move the barge loading operation away from the ARR Dock and North Star, which were located on the Seward side of the bay, to the City Dock on the other side of the bay.  That switch occurred about halfway through the barge loading operation that summer, after North Star had already loaded about half the Nugget bargeloads of rock from the Spencer quarry.  When North Star didn't get paid for its work and advised it would cut off stevedoring services at the ARR Dock, which it operated, until paid, Randy Randolph moved the rock loading operation across Resurrection Bay rather than pay North Star.  That decision, like several other decisions Mr. Randolph made, greatly increased the expense of the work SRP had originally contracted with Nugget to do.  Nugget, however, then "backcharged" that added

expense against SRP. For example, after Nugget switched the loading operation to the other side of the Bay, we could no longer use SRP's trucks to transport the rock to the Nugget barge, because SRP's trucks were not approved for use upon the highway, which had to be used to travel to the dock on that side of the Bay. We had to use Nugget's trucks instead, at greater expense, and Nugget then backcharged SRP for that. Nugget also backcharged SRP for other, additional equipment and damage to the Nugget barge related to that loading operation across the bay. That Nugget-directed and controlled operation was a very different, more expensive one than the rock loading methods I had contemplated using and had based SRP's bid to Nugget on, using, in particular, the Alaska Railroad Dock and North Star. If it had been left up to SRP, the rock loading operation would have remained at the ARR Dock using North Star.

6.      In virtually every regard, the rock production and loading decisions made by Nugget and Randy Randolph after Nugget took over the Spencer quarry in April 1997 were made to benefit Nugget and disadvantaged SRP at greater expense to SRP. After it gained control, Nugget did what it wanted to do and then simply charged the added cost to SRP and paid itself from the project funds to cover that cost instead of paying SRP. For example, while Nugget ran the Spencer quarry it chartered many expensive plane flights in and out of the quarry and charged that added cost to SRP. Nugget replaced SRP's longtime shooter in the quarry with Nugget's own shooter and placed its own supervisor, employees and equipment in the quarry. From what I observed, Nugget used more equipment and paid its people more money to do work less efficiently than had been the case before, when SRP made the decisions. Nugget used more people and equipment to increase overall production, but it was a less cost-efficient operation. Nugget often used equipment ill-suited to the work and paid its people lots of overtime. It did so in an apparent effort to meet its own, self-imposed accelerated production schedule which the federal contract for the project did not require.

7.      In my deposition and affidavit testimony previously given in the Nugget/SRP litigation I gave several other examples of Nugget's control and actions disadvantaging SRP and increasing the cost of the work SRP had originally agreed to do but Nugget did instead and charged SRP for. In that dispute Nugget also listed its "costs" and "backcharges" allegedly incurred during the course of Nugget's takeover of the Spencer operations. That documentation from Nugget is attached as Exhibit 2 to this affidavit.

8.      During the period Nugget ran the Spencer quarry in 1997 it also produced substantial quantities of saleable rock which was not used for the Homer project. This included over 10,000 cubic yards of riprap rock of a type SRP had produced before and sold to the Alaska Railroad. Although the cost of producing that rock is included in Nugget's "costs" charged to SRP (*see* Exhibit 2), Nugget liened that rock, probably worth over $200,000, for itself. In addition, Nugget produced many more thousands of cubic yards of saleable rock which it spread out several

feet deep over much of the Spencer quarry work area.  I understand that rock remains in the quarry.  SRP lost its rights to that quarry in September 1997.

9.    Nugget, through Randy Randolph, also directed me in 1997 to keep Nugget's arrangements with SRP related to the project a secret.  That included the terms of the April 1997 "support" agreement between Nugget and SRP.  Randy Randolph told me not to disclose that information to anyone.

10.    In the Nugget/SRP litigation commenced by Nugget, Nugget sued SRP and me for over $2,000,000 more than what Nugget had already taken from SRP from the Homer project payments.  *See* Exhibit 2.  SRP counterclaimed in that lawsuit, but the case settled and neither I nor SRP recovered any money from it.  I now work as a plumber in Juneau.

The affidavit is filed at Docket Entry Nos. 282 and 284.

### Summary Judgment Pursuant To Rule 56

One score years ago, the United States Supreme Court established the contemporary test for summary judgment in the trilogy of decisions in <u>Celotex</u>, <u>Anderson</u>, and <u>Matsushita</u>.  In the instant case, there is no disputed testimony.  Nugget and USF&G disregard the overwhelming factual record which may be Nugget's and USF&G's only available strategy at this time.  Nugget disregards clear settled applicable Ninth Circuit authority and instead proffers an older irrelevant Maryland district court case (a court in the Fourth Circuit) and an older irrelevant Eleventh Circuit case that have nothing to do with this case.  In desperation, Nugget even suggests that Washington state law should apply.  Because there are no genuine issues of material fact and the claimants are entitled to judgment as a matter of law, this court should enter judgment in favor of the claimants on the Miller Act and the state law claims.

### Payment Bond

Nugget could have required Spencer to obtain a payment bond

to address the claims of the claimants. Nugget did not because it intended to and did take over the Quarry before the three claimants even began providing goods and performing services. In MacEvoy Co. v. United States, 322 U.S. 102, 110 (1944), the Supreme Court states: "The relatively few subcontractors who perform part of the original contract represent in a sense the prime contractor and are well known to him. It is easy for the prime contractor to secure himself against loss by requiring the subcontractors to give security by bond, or otherwise, for the payment of those who contract directly with the subcontractors." Spencer Rock was known to Nugget and had been known to it for years. Nugget could have required Spencer to post a bond. Nugget did not. Nugget did not require Spencer to post a bond because Spencer was a subsidiary of Nugget. All the parties reasonably looked to the payment bond for payment. The claimants are looking to the payment bond posted by Nugget.

## Fraud Claims

Proving fraud is often challenging because an individual testifies that he or she did not intend at the time to defraud another person or entity. Fraud can be shown from circumstantial evidence since the affirming party cannot be expected to admit that he committed fraud. Adams v. Adams, 131 P.3d 464 (Alaska 2006) ("Adams II"). However, in this case, Mr. Randolph's testimony is unwittingly candid. He makes the same statements in three recent affidavits that the claimants could not get him to concede at his deposition. The claimants have contended that Nugget never intended to pay the claimants. Mr. Randolph makes

that very assertion under oath three times.  Nugget advances the
Randolph statements for the proposition that Nugget should not be
held liable because it does not want to be held liable.  That is
not the test in any court or circuit.  Nugget did not intend to
pay at the time and continues to assert that position.

### Pattern And Practice Of Fraud

This case is not a situation where one claim is denied
because the claim is untimely or the quality and/or timeliness
the goods and/or services are challenged.[14]  Nugget engaged in a
pattern and practice of not paying the entities that allowed
Nugget to fulfill the requirements of the contract.    The
Affidavit of John Dennis Stacey with Chugach Rock Corporation
establishes that Nugget sought to take over the Spencer Quarry
since at least 1994.   He discusses the efforts of Messrs.
Randolph and Poynor working with various companies to take over
the Spencer Quarry.  Nugget did take over the Quarry and then did
not pay Chugach Rock Corporation or Spencer Rock, the two
displaced operators.    The affidavit of Robert L. LaPore
establishes that Nugget intended to and did take over the Quarry
and made it impossible for him or his company to pay the
subcontractors.  Mr. LaPore's deposition testimony discusses the
takeover efforts in detail.

None of this testimony is even challenged by Nugget.  Nugget
simply asserts that there is no factual basis despite the

---

[14]    Nugget never claimed that the Shoreside fuel was
contaminated with water or delivered late, etc.   Nugget never
claimed that Metco did not provide enough personnel to complete
the task or missed deadlines, etc.

overwhelming evidence.

**Applicable Federal Law**

In its pleadings before the Ninth Circuit, Nugget argued that state law applied to the determination of the causes of action under the Miller Act that involve fraud and misrepresentation.   The Ninth Circuit held that federal law developed under the Miller Act applies to the Miller Act causes of action.

Nugget now argues that under Eleventh Circuit law, state law claims should not be allowed to supplement the Miller Act.[15]  However, the Supreme Court and the Ninth Circuit have clearly held that state law applies.   The three claimants brief the law of the state of Alaska in careful detail.   That law is not fundamentally challenged by Nugget.   Nugget cuts and pastes the same arguments in it briefs.

Shoreside repeats its position that it was in a direct relationship with Nugget.[16]   The Court addressed the breach of contract and quantum meruit arguments raised in Shoreside's Motion in an Order.[17]   The Court found that Shoreside delivered all three shipments of fuel for use in the prosecution of the work on the Homer Project.   The only question of fact was whether

---

[15]    Nugget cites U.S. for Use of Krupp Steel v. Aetna Ins. Co., 923 F.2d 1521 (11th Cir. 1991) in support of its argument, although the case has nothing to do with the issue.

[16]    That argument was developed previously in five pleadings, namely a Motion And Memorandum For Summary Judgment, three Replies, and an Opposition To Nugget Construction, Inc.'s Motion For Summary Judgment.   Docket Entry Nos. 65 (Motion); 106, 107, 108 (Replies); and 91 (Opposition).

[17]    Docket Entry No. 123.

the third shipment was ordered by a representative of Spencer Rock or by a representative of Nugget.[18]  In the Order, the Court states: "Shoreside urges that it is entitled to recover on theory of <u>quantum</u> <u>meruit</u>.  Depending upon how the facts develop, this theory may or may not have application."[19]

Shoreside renewed its breach of contract and quantum meruit claims under the Miller Act against Nugget and USF&G.  In <u>United States ex rel. Leno v. Summit Construction Co.</u>, 892 F.2d 788, 791 (9th Cir. 1989), the Ninth Circuit states:  "Both the breach of contract and quantum meruit claims are permitted under the Miller Act.  <u>See</u> <u>United States v. Western Casualty and Surety Co.</u>, 498 F.2d 335, 338 (9th Cir. 1974); <u>Central Steel Erection Co. v. Will</u>, 304 F.2d 548, 551 (9th Cir. 1962)."

Judge Holland invested considerable judicial time in attempting to resolve this case.  The previous efforts and activity by the claimants and by Judge Holland have honed the remaining issues.  The Court's Orders effectively resolve the quantum meruit claim under the Miller Act.  Shoreside provided

---

[18]   This question of fact is not relevant for purposes of the cause of action for quantum meruit.  Nugget had taken over control of the operation of Spencer Rock and Mr. Randolph was speaking on behalf of the enterprise, so this is not a disputed question of fact.

[19]   Docket Entry No. 123, p. 3, ll. 6 – 9 (Footnote omitted).  To date, Shoreside has also asserted its claim for restitution.  The Ninth Circuit appears to regard quantum meruit and restitution as similar.  In its discussion of quantum meruit in <u>United States ex rel. Leno v. Summit Construction Co.</u>, 892 F.2d 788, 791 (9th Cir. 1989), the Ninth Circuit cites <u>United States v. Western Casualty and Surety Co.</u>, 498 F.2d 335, 338 (9th Cir. 1974).  That court held that "the remedy of restitution is used to put him in as good a position as he held before the contract was made."  <u>Id.</u>

the fuel and lube to the Homer Project.  Nugget utilized the fuel
and lube in the course of completing the Homer Project.  Metco
and North Star provided critical services to the prosecution of
the work on the Homer Project.  Nugget represented to the owner
of the Homer Project, the Corps of Engineers of the United States
Army, that all the suppliers and subcontractors had been paid by
requesting additional progress payments.  However, Shoreside,
Metco and North Star (and Chugach Rock Corporation) had not and
have not been paid.  This Court should and must order Nugget and
USF&G to pay these claimants.

### Corps Of Engineers' Interpretation

Throughout this case, the claimants have reminded the
defendants that the Army Corps of Engineers expects Nugget to pay
the three claims.  The United States government through the Corps
is the owner of the Homer Project and charged with the
administration of the contract.  In a long line of settled cases,
the United States Supreme Court holds that the interpretation of
a provision by the agency charged with its administration is
entitled to deference by the courts.  Udall v. Tallman, 380 U.S.
1 (1965); Chevron v. Natural Resources Defense Council, 467 U.S.
837 (1984).  The interpretation of the Corps/Nugget Contract by
the Corps of Engineers is entitled to deference by this court.
The letters between and among the parties are already part of the
record.[20]

---

[20]    Copies of the letters and attachments provided by the
defendants are attached for the record.
RRO/33 with attachments.  NUGGET 001583 – 001586.  Metco claim.

Mr. Walter D. Wood, P.E., Administrative Contracting Officer with the Corps, states in correspondence to Nugget (RRO/33 regarding Metco) that Nugget was obligated "not to request for progress payments that which you intend to withhold from a subcontractor or supplier." Nugget, however, withheld payments from the three claimants (and others such as Spencer Rock and Chugach Rock Corporation) who were either subcontractors and/or suppliers. In addition, Nugget continued to request progress payments from the Corps of Engineers in complete disregard of this contract requirement. Nugget's strained rationalization of its decisions to withhold payment is inadequate to excuse its failure to pay because it is contrary to the clear interpretation of the contract by the agency charged with its administration. USF&G had no reasonable basis to accept Nugget's strained rationalization rather than the Corp's clear interpretation. USF&G's internal files indicate that it also believed that

---

RRO/38 with attachments. NUGGET 001563 - 001565. North Star claim.

RRO/40. NUGGET 001561. All claims.

RRO/40. USF&G 001093. All claims.

RRO/44 with attachments. NUGGET 001554 - 001555. Shoreside claim.

RRO/48 with attachments. NUGGET 001545 - 001548. Spencer Rock claim.

Docket Entry No. 570, Exhibit 1. The copies from the files of Nugget include a "RECEIVED" stamp in the lower right corner of each respective letter and initials of members affiliated with Trecon/Spencer Rock/Nugget. Both Shoreside and Nugget refer expressly to these documents in their discovery responses and as part of their motions for summary judgment as follows: "Documents from the Corps noted as RRO/33, RRO/38, RRO/40, RRO/44, RRO/48 and Nugget documents 611-11, 611-21, 611-25, 611-30 and 611/33 are also responsive." Docket Entry No. 478, pp. 4 - 6 (Metco) and Docket Entry No. 482, pp. 5 - 6 (Shoreside).

Spencer was a "subcontractor" as that term is defined by the two relevant Supreme Court cases.[21]

Mr. Thomas A. Johnson, P.E., Administrative Contracting Officer with the Corps who took over administrative contracting duties from Mr. Wood, reaffirms in correspondence to Nugget (RRO/38 - North Star) that Nugget is not to request progress payments if it intends to withhold payment to a "subcontractor or supplier."

Mr. Johnson with the Corps acknowledges that the Corps considered Nugget's explanation of events and concludes in one of its letters to Nugget (RRO/40) as follows:

> We acknowledge receipt of [Nugget's] Serial Letter 611-19, dated August 6, 1997 and [Nugget's] Serial Letter 611-21, dated August 11, 1997. We do not necessarily agree that Spencer Rock Products is only a "vendor" for Miller Act purposes.
>
> Based on the supporting costs that you outlined in Serial Letter 611-21, it appears that Nugget Construction has assumed full responsibility for operations at Spencer Quarry for the subject project. Therefore, as primary operator at Spencer Quarry, we believe Nugget Construction is responsible for prompt payment to suppliers and subcontractors who contracted with Spencer Rock Products on this project.

This letter was also copied to "Bill Wells" with "United States Fidelity and Guarantee Co." As of August, 1997, Nugget and USF&G were on notice that:

1)    The Corps does "not necessarily agree that Spencer Rock Products is only a 'vendor' for Miller Act purposes."

2)    "Nugget        Construction    has        assumed        full

---

[21]    The argument is developed at Docket Entry No. 549, p. 6.

responsibility for operations at Spencer Quarry for the subject project."

3)    "Nugget Construction is responsible for prompt payment to the suppliers and subcontractors who contracted with Spencer Rock Products on this project."

Mr. Johnson with the Corps in another letter to Nugget (RRO/44 - Shoreside) demands: "We request an immediate explanation of why Shoreside Petroleum, Incorporated has not been paid for the services that they have provided to the Homer project."

Mr. Johnson with the Corps in yet another letter to Nugget (RRO/48 - Spencer Rock) demands an explanation of the inconsistencies in the statements that Nugget provided the Corps in response to Spencer Rock's claim. Mr. Johnson also states: "Additionally, we are still awaiting your response to Serial Letter RRO/40."

The letters between and among the Corps, Nugget and the claimants referred to and incorporated by the claimants are part of the record. Their admissibility has not been challenged in the past. Judge Holland previously relied upon the letters in reaching decisions.

The United States of America does not bring and maintain the causes of action against the responsible parties and the surety under the Miller Act. Each claimant brings and maintains the Miller Act claims in the name of the United States and on its own behalf and thus is described as a "use plaintiff." In addition,

each claimant also asserts state law claims and is described as a "plaintiff." Although the Corps of Engineers is not involved as a party in a Miller act case, the interpretations of the Corps regarding the Corps/Nugget Contract are entitled to deference in this court.

## Applicable State Law

In earlier filings, when the state law rate of interest was less than the federal rate, Nugget argued that the state rate of interest applied. At another time, when the federal law rate of interest was less than the state rate or interest, Nugget argued that the federal rate applied. Nugget argues whatever law suits its purpose at the moment.

Nugget now complains that the claimants have waited too long to bring the state law claims and cites a Maryland case that denied a motion to amend on different facts. The Maryland case contradicts settled Ninth Circuit authority and the decision of Judge Holland.[22] Judge Holland addressed this matter in his decision regarding the motions to amend the three complaints as follows: "The passage of time in this instance is, for the most part, the result of tactical decisions defendants made. They will not now be heard to complain that they will be prejudiced because so much time has passed."[23] That is the law of this case. The claims are appropriate and timely.

---

[22]    Nugget cites <u>U.S. for Use of Allied Bldg. Prod. Corp. v. Federal Ins. Corp.</u>, 729 F. Supp. 477, 479 (D. Md. 1998) which is contrary to Ninth Circuit authority and the law of this case. Judge Holland has already addressed and granted the motions to amend.  Docket Entry No. 401.

[23]    Docket Entry No. 401, p. 4.

Another of Nugget's new twists on the law is that the court should apply one corpus of Alaska state law to the Shoreside and Metco claims and another corpus of Alaska state law to the North Star claims.[24]   The law is the law.   The claimants have sought to coordinate the pleadings to avoid unnecessary duplication. Shoreside and Metco incorporated and incorporate the discussions of law presented by North Star.   North Star has incorporated the discussions of law presented by Shoreside and Metco.   Nugget's desperate arguments are beyond absurd, preposterous and not in good faith.

Yet another of Nugget's misapplications of the law is that Washington state law applies.[25]   Nugget and North Star and Shoreside and Metco and Chugach Rock Corporation are all corporations organized under the laws of and doing business in the state of Alaska.   Nugget's arguments regarding application of foreign state law run afoul of Rule 11 of the Federal Rules of Civil Procedure.

### Negligence Claims

As discussed in the prior pleadings of all three claimants, Nugget was negligent in its business dealings with the three claimants.   Nugget's negligence damaged the three claimants. Nugget's negligence is the proximate cause of the claimants' damages.   Claimants' damages include the amount of the unpaid

---

[24]   Docket Entry No. 558, p. 10, n. 4.   <u>Alioto v. United States</u>, 593 F. Supp. 1402, 1413 (N.D. Cal. 1984) does not address this issue in any way.   The decision says nothing about one party incorporating the pleading of another party.

[25]   Docket Entry No. 558, p. 17.

principal sums, interest and attorney's fees necessary to make the claimants whole.

### Insurance Coverage

Nugget has engaged in negligent conduct and project mismanagement toward these claimants in addition to its fraudulent activities. The claimants were required to move to compel the production of the insurance policies. Judge Holland was required to commit more precious judicial attention to this issue and compel the production of the policies.[26] He states:

> Plaintiffs seek full and complete disclosure/discovery responses with respect to defendants' insurance agreements (Fed. R. Civ. P. 26(a)(1)(D)), Northstar's first discovery interrogatories, Nos. 2, 3, and 5, and requests for production, Nos. 3, 4, 5, 6, 7 and 8, and a Rule 30(b)(6) deposition of defendant Nugget. **The motion is granted in its entirety.** Nugget shall provide full and complete disclosure as sought by plaintiffs through its Interrogatories Nos. 2, 3, and 5, Requests for Production Nos. 3 through 8, and by Rule 30(b)(6) deposition or a conventional deposition of Nugget's insurance broker. The parties shall enter into the stipulated confidentiality order that Northstar proffers.
>
> Relying upon AS 09.17.020, Nugget contends that much of the discovery sought by the plaintiffs at this time is premature. As Nugget points out, AS 09.17.020(e) precludes discovery of evidence relevant to the amount of a punitive damage claim "until after the fact finder has determined that an award of punitive damages is allowed...." That statute has no application to this case for two reasons. Section .020 does not apply with respect to claims accruing before the effective date of that statute, August 7, 1997. Norcon, Inc. v. Kotowski, 971 P.2d 158, 175 n.21 (Alaska 1999). The facts upon which plaintiffs' punitive damages claim in this case is founded took place well before August 7, 1997. Moreover, discovery and the timing of discovery is a matter of procedural law governed by the Federal Rules of Civil Procedure.

---

[26]    Docket Entry No. 430.

The timing of discovery is not a substantive matter as to which local law is applicable.

Nugget argues that Rule 26, Federal Rules of Civil Procedure, as currently formulated, restricts discovery to matters not privileged which are "relevant to the claim ... of any party...." Admittedly, discovery is not as broad today as it once was. However, the financial worth and stability of a defendant is, in the view of this court, highly relevant to the claims asserted by the plaintiffs. If such information were not generally discoverable, there would be a huge impediment to the pretrial settlement of civil litigation. Were discovery so restricted, defendants could keep plaintiffs embroiled in protracted litigation such as this while the defendant business wastes away, by accident or design, to the great detriment of the civil justice system that depends substantially upon the willingness and ability of parties to make reasonably full disclosures of their respective situations such that intelligent judgments as regards how and when cases should be settled may be made.

Nugget contends that its insurance policies and claims data should not be produced because, it asserts, there is no coverage for any claim made by the plaintiffs here. As plaintiffs point out, the insurance broker and the insured are not always the best judges of whether or not coverage is available. The court deems Nugget to have discharged its disclosure responsibility under Rule 26(a)(1)(D), but that does not end the matter. It is by no means beyond the realm of possibility that Nugget had the benefit of a liability policy that could afford coverage as regards one or more of the claims asserted by the plaintiffs. Therefore, plaintiffs are entitled to the production of any and all of Nugget's insurance policies which afford any type of third-party liability coverage; and the plaintiffs are entitled to follow up on that discovery if they choose, either through a continuation of plaintiffs' Rule 30(b)(6) deposition of Nugget or a deposition of Nugget's insurance broker.

Nugget points out that its principal is not in the best of health. The court is confident that counsel for plaintiffs can and will be sensitive to this situation and will make all necessary, reasonable accommodations as regards a Rule 30(b)(6) deposition of Nugget's principal. In this regard, it does appear to the court that Nugget has not produced the person most knowledgeable of matters into which plaintiffs desired and were entitled to inquire through a Rule 30(b)(6)

deposition.    In    addition,    plaintiffs    may    depose
Nugget's insurance broker.

(Emphasis added).

There    appears    to    be    coverage    under    Nugget's    insurance
policies,    although    Nugget    took    no    steps    to    find    out    and    tried    to
hide    that    fact.    Nugget's    current    Project    Manager,    Mr.    John
Smithson,    stated    at    his    deposition    o    November    16,    2005    that    he
presented    the    claims    of    the    three    claimants    to    Nugget's    insurance
carriers    through    Nugget's    insurance    agent.    However,    Mr.    Ferguson
with    Willis    of    Alaska,    the    "agent    and    broker    for    Nugget
Construction,"[27]    stated    at    his    deposition    on    March    8,    2006    that
Nugget    never    presented    the    claims    of    the    three    claimants    to    him
or    to    Nugget's    insurance    carriers.    He    testified    that    he    did    not
even    become    aware    of    the    parties'    Amended    Complaints    until    the
weekend    before    his    deposition,    some    four    months    after    Mr.
Smithson    was    deposed.    Nugget    has    filed    lengthy    briefs    in    this
case    and    owes    a    duty    of    candor    to    this    court    to    at    least    attest
that    it    has    taken    any    and    all    action    to    present    the    claims    to    its
insurance    carriers    and    to    specify    to    the    court    what    actions    it
now    has    taken.

---

[27]    Mr. Ferguson testified:

Q.    Sir, do you serve both as an agent and broker for Nugget
Construction?
A    Yes.
Q    And how long have you been doing that?
A    I'm guessing here '92 or '93, shortly after I came back to Willis.

Docket Entry No. 519, p. 11, l. 24 - p. 12, l. 4.

## **Oles Morrison's Possible Conflict of Interest**

Mr. John Lukjanowicz with Oles Morrison appears to have been involved in Nugget's effort to take the benefit of the goods and services at the same time that Nugget was structuring the documents to avoid paying the claimants for those goods and services.  The claimants have put Oles Morrison on notice of a potential conflict in a prior letter dated October 3, 2005.  The issue is brought to the court's attention in the recent pleading.[28]  The claimants do not have enough information at this time to move to disqualify Oles Morrison, but are not reluctant to call them as witnesses if necessary on the issue.  Only Oles Morrison and Nugget and perhaps USF&G have enough information. The claimants have observed to Oles Morrison that the law firm may be going to extraordinary lengths to protect against a possible claim by Nugget for malpractice.  The court may be able to compel "the whole truth" during questioning of witnesses at trial.  Oles Morrison's involvement may be more apparent at that time and its continued representation of Nugget problematic.  The court may ask what should be done.  What should be done to address the situation should be done now by Oles Morrison.

## **Conclusion**

This is not an academic exercise for Shoreside and Metco. Shoreside and Metco have already paid their employees who handled and delivered the fuel and lube and provided the valuable and indispensable services, respectively.  They have paid the FICA, FUTA and other tax and withholding obligations.  Shoreside and

Metco are small companies in Seward that seek to close the accounts for goods and services going back to the summer of 1997. Shoreside and Metco seek to be paid for their goods and services.

The essence of Nugget's defense is that it cheated the claimants fair and square. Nugget misrepresents the reach of the two prior decisions of the Ninth Circuit and distorts the factual record and the applicable case law.

At this time, the factual record is established in the following documents on file with the court:

1)    the disclosures of Metco,

2)    the interrogatory and production responses of Metco,

3)    the deposition testimony of Ms. Barbara Dieckgraeff with Metco,

4)    the disclosures of Shoreside,

5)    the interrogatory and production responses of Shoreside,

6)    the deposition testimony of Mr. Douglas Lechner with Shoreside,

7)    the affidavit of Mr. Douglas Lechner with Shoreside,

8)    the disclosures of North Star,

9)    the interrogatory and production responses of North Star,

10)   the deposition testimony of Mr. Jeff Bentz with North Star,

11)   the deposition testimony of Mr. Jack Goodwill with North Star,

12)   the two affidavits of Jack Goodwill with North Star,

13)   the two affidavits of Mr. Robert A. LaPore with Spencer Rock Products,

---

[28]    Docket Entry No. 508, p. 3 at n. 2.

14) the deposition testimony of Mr. Robert A. LaPore with Spencer Rock Products,

15) the affidavit of Mr. John Dennis Stacey with Chugach Rock Corporation,

16) the affidavits of Mr. Lynn D. "Randy" Randolph with Nugget dated May 14, 2002 and April 20, 2006,

17) the deposition testimony of Mr. Lynn D. "Randy" Randolph with Nugget dated October 30, 1998,

18) the deposition testimony of Mr. James L. Ferguson dated March 8, 2006 with Willis of Alaska,

19) the letters between and among the claimants, Nugget and the Corps of Engineers,

20) the Contract between the Corps of Engineers and Nugget Construction,

21) other evidence in the record.

These documents provide an uncontroverted factual basis for entry of summary judgment in favor of the claimants.

This Court should enter summary judgment against Nugget and in favor of Shoreside Petroleum, Inc. in the sum of $53,501.01 with interest at 12 or 10.5 percent and in favor of Metco, Inc. in the sum of $36,785.27 with interest at 10.5 percent. The Court should also allow the claimants to move for and develop the claim for attorney's fees. In addition, North Star joined in this motion. This Court should enter summary judgment against Nugget and in favor of North Star in the sum of $176,751.14, consisting of $124,724.98 for unpaid work North Star did in May and June of 1997 and $51,927.16 for lost profits on work Nugget

took away from North Star, together with a 1.5 per cent a month contractual late payment charge[29] or 10.5% per annum prejudgment interest, and attorney's fees and costs.

DATED this 31st day of May, 2006 at Anchorage, Alaska.

THE LAW OFFICE OF STEVEN J. SHAMBUREK
Attorney for Plaintiffs
Shoreside Petroleum, Inc., d/b/a Marathon Fuel Service and Metco, Inc.

                    s/ Steven J. Shamburek
By:_____
        Steven J. Shamburek
        Alaska Bar No. 8606063
        LAW OFFICE OF STEVEN J. SHAMBUREK
        425 G Street, Suite 630
        Anchorage, Alaska 99501
        (907) 522-5339 Direct
        (907) 522-5393 Fax
        shamburek@gci.net
        shamburekbank@gci.net


### CERTIFICATE OF SERVICE

The undersigned certifies that on the 31st day of May, 2006, a copy of the foregoing was served by the Electric Case Filing.

s/ Steven J. Shamburek
_____

Steven J. Shamburek

---

[29]    These were previously awarded at Docket Entry No. 165.