David W. Pease
BURR, PEASE & KURTZ
810 N Street, Suite 300
Anchorage, AK  99501-3293
Telephone:     (907) 276-6100
Fax No.:        (907) 258-2530
Attorneys for North Star

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA for the use of NORTH STAR TERMINAL & STEVEDORE COMPANY, d/b/a Northern Stevedoring & Handling, et al.,<br>　　　　　　　Plaintiffs,<br>　　and<br><br>UNITED STATES OF AMERICA for the use of SHORESIDE PETROLEUM, INC., d/b/a Marathon Fuel Services, et al.,<br>　　　　　　　Intervening Plaintiffs,<br>　　and<br><br>METCO, INC.,<br>　　　　　　　Intervening Plaintiff,<br>　　vs.<br><br>NUGGET CONSTRUCTION, INC.; et al.<br>　　　　　　　Defendants. | Case No. A98-009 CIV (TMB)<br><br>**NORTH STAR'S TRIAL BRIEF** |

Pursuant to the court's Amended Pretrial Order, Docket No. 718, plaintiff North Star Terminal & Stevedore Company ("North Star") hereby submits its pretrial brief.

　　　I.　　　INTRODUCTION

North Star contends that Nugget Construction, Inc. ("Nugget") and USF&G as surety are liable under the Miller Act for North Star's losses in connection with the Homer Spit Extension & Repair Project, executed during 1997-98.  The incidents relevant to this case occurred prior to August 7, 1997, making this a pre-1997 tort reform case for purposes of Alaska law.  Nugget is liable to North Star by virtue of the control it exercised over its subcontractor, Spencer Rock

Products, and Nugget's withholding of funds from Spencer in a manner contrary to the Prompt Pay Act, which governed the construction project. There are three ways by which Nugget can be found liable to North Star for its actions in this case. The first is liability by contract, either express or implied. Because Nugget is directly liable to North Star under the North Star-Spencer contract, Nugget must also pay full attorney's fees and costs. The second is through equitable remedies that attach regardless of contract or agency. The third is through the tort of intentional interference with contract. With a finding that Nugget committed a tort, the jury would then be permitted to determine whether an award of punitive damages should be rendered against Nugget in order to deter it and others from engaging in such conduct.

## II.     PLAINTIFF'S LEGAL THEORIES

### A.     Nugget's Liability Under Contract Theories

The parties do not disagree as to the legal standard for breach of contract, or essentially what the contract in question is. At issue is the contract that existed between Spencer and North Star, whereby North Star would supply labor and equipment for loading rock from the railroad dock at Seward onto Nugget's barge as part of Nugget's Homer Spit upgrade contract. The key divergence between the parties is how Nugget becomes directly liable under the contract between Spencer and North Star. It is North Star's position that Nugget can be held liable under various agency theories for the express terms of the contract between North Star and Spencer Rock. Nugget us also liable under implied contract and liable for the full extent of North Star's contract damages and full attorneys fees under the Miller Act as applied to various contract theories.

### *1.     Agency Theories*

As noted by the court, Docket 636 at 7-8, Nugget can be held liable for the Spencer

contract under agency law if it assumed sufficient control over Spencer. Alaska law provides that if Nugget exercised sufficient control over Spencer, then Nugget is liable for any breach of contract by Spencer. The Alaska Supreme Court has noted that a party is liable for the acts of others to the extent that it has retained control over the performance of work done for his benefit. *See Hammond v. Bechtel, Inc.*, 606 P.2d 1269 (Alaska 1980); *Continental Ins. Co. v. Bayless and Roberts, Inc.*, 608 P.2d 281 (Alaska 1980). An entity is not an agent unless the principal exercises an element of control or has the right to control the conduct of the agent with respect to matters entrusted to him. *See Nicholas v. Moore*, 570 P.2d 174 (Alaska 1977).

The evidence in this case will show that, by virtue of its performance under the Support Agreement between Nugget and Spencer, Nugget exercised essentially total control over Spencer's operations. In April 1997, Nugget brought in its own personnel and equipment to produce rock at the Spencer Quarry—work that Spencer was supposed to do under the Material Contract between Nugget and Spencer. When Spencer did not produce rock fast enough for Nugget, Nugget took control of Spencer Rock's operations. Additionally, documentary and testimonial evidence will show that Randy Randolph, a Nugget employee, began to control and direct operations of Spencer's suppliers at dock operations in Seward. Nugget not only took control over Spencer's operations, it essentially replaced Spencer.

Aside from the traditional control principles routinely recognized by the Alaska Supreme Court, this court has noted that Nugget could also be held liable as an undisclosed principle. *See* Docket No. 636 at 6-7 n.23. The standard principles of agency will still apply. "In order for an agency relationship to exist, the agent must have 'a power to alter the legal relations between the principal and third persons.' The principal, in turn, must have 'the right to control the conduct of the agent with respect to matters entrusted to him.'" *Manes v. Coats*, 941 P.2d 120, 124 (Alaska

1997) (*Restatement (Second) of Agency* §§ 12, 14 (1958)).  In this case, Nugget was an undisclosed principal exercising control over Spencer Rock for <u>Nugget's</u> own benefit.  Nugget fits this principle precisely because it altered Spencer's contract with the railroad for its own benefit and simply ignored other contracts, again for Nugget's benefit.  Section 186 of the *Restatement (Second) of Agency* provides, "An undisclosed principal is bound by contracts and conveyances made on his account by an agent acting within his authority, except that the principal is not bound by a contract which is under seal or which is negotiable, or upon a contract which excludes him."  *See also Indiana Gas Co. v. Home Ins. Co.*, 141 F.3d 314, 319 (7th Cir. 1998) (noting the "venerable rule" that an undisclosed principal can be held liable on a contract); *United States v. Everett Monte Cristo Hotel, Inc*., 524 F.2d 127, 140 (9th Cir. 1975) (noting liability of an undisclosed principal for acts of agent acting within his authority).

There is a third agency theory under which Nugget could become expressly liable on the contract between Spencer and North Star.  As noted previously by the court, the Alaska Supreme Court looks to the *Restatement (Second) of Agency* with favor in deciding agency issues.  Additional authority for Nugget's liability can be found in the *Restatement*, which provides, "A creditor who assumes control of his debtor's business for the mutual benefit of himself and his debtor, may become a principal, with liability for the acts and transactions of the debtor in connection with the business."  *Restatement (Second) of Agency* § 14O.  The creditor must exercise a significant degree of control, however, before it will be held liable as a principal:

> A security holder who merely exercises a veto power over the business acts of his debtor by preventing purchases or sales above specified amounts does not thereby become a principal. <u>However, if he takes over the management of the debtor's business</u> either in person or through an agent, <u>and directs what contracts may or may not be made, he becomes a principal, liable as any</u>

>   <u>principal for the obligations incurred thereafter</u> in the normal course of business by the debtor who has not become his general agent. The point at which the creditor becomes a principal is that at which he assumes *de facto* control over the conduct of his debtor, whatever the terms of the formal contract with his debtor may be. (emphasis added)

*Restatement (Second) of Agency* § 14O, cmt a. The leading authorities on this issue confirm that something akin to day-to-day management of the debtor's business is required before a creditor can be held liable under an agency theory. *See A. Gay Jenson Farms Co. v. Cargill, Inc.*, 309 N.W.2d 285, 290-93 (Minn. 1981); *Buck v. Nash-Finch Co.*, 102 N.W.2d 84, 89-91 (S.D. 1960). One very sensible interpretation of Nugget's actions was that it became a creditor of Spencer. Nugget took control of Spencer operations under the Support Agreement in order to benefit itself. Nugget then paid itself first with money due Spencer by asserting "back charges" against Spencer. Because of Nugget's total control over Spencer, there was no money paid to Spencer after April 1997 and Spencer couldn't pay its suppliers. Moreover, Nugget modified Spencer Rock's contract with the Alaska Railroad, again for Nugget's benefit.

Nugget will argue that in order for it to be liable under any agency theory, the agency relationship between Nugget and Spencer had to exist at the time that Spencer entered into its contract with North Star, citing to *Bendix Corp. v. Adams*, 610 P.2d 24 (Alaska 1980). *Bendix* is of no guidance for two important reasons. First, the case involved a parent-subsidiary relationship, which is not present in this case. The Use Note for Alaska Civil Pattern Jury Instruction No. 23.03, Agency and Respondeat Superior Relationships, recognizes this limited application of *Bendix* by observing, "If the relationship of parent and subsidiary companies is in dispute, the court may want to modify this instruction and borrow from the *Bendix* decision." Ours is not a parent/subsidiary case.

Secondly, the statement upon which Nugget will rely is not binding. Following a

discussion regarding the parent corporation's control over its subsidiary, the Alaska Supreme Court noted:

> [I]t would not be sufficient to establish that Marine was acting on behalf of Bendix at the time when the contract was formed. Because Adams failed to show that Bendix was a party to the original contract, even if an agency relation were created later between Bendix and Marine … this would not make Bendix a party to the earlier contract on an agency theory so as to be liable for a breach of that contract.

*Bendix Corp.*, 610 P.2d at 33. However, this statement is dicta in the case and cites to no authority other than an obscure treatise. No Alaska Supreme Court case has since cited to *Bendix* for this statement of the law. None of the cases that form the backbone of respondeat superior liability law in Alaska cite to *Bendix*. Rather, the primary substantive legal issue for which *Bendix* is cited, other than the standard of review for directed verdicts, is its guidance on the tort of intentional interference with contract. *Bendix* is also cited as a piercing the corporate veil case.[1]

The *Bendix* case does not mean what Nugget wants it to mean. Its suggestion that liability only attaches when the principal-agent relationship existed at the time the contract was originally executed would turn law on its head. Even if the *Bendix* dicta could somehow require that the agency relationship between Nugget and Spencer existed at the time that Spencer and North Star entered into its "contract," this would not bar a finding that Nugget was the principal. North Star and Spencer never had a written contract to perform specific work. They had an agreement for equipment and services, backed by the terms of a written credit application, which was not enacted until North Star started to perform. This occurred well after Nugget and

---

[1] *See*, *e.g.*, *Eagle Air v. Corroon & Black/Dawson & Co.*, 648 P.2d 1000 (Alaska 1982); *Uchitel Co. v. Telephone Co.*, 646 P.2d 229 (Alaska 1982); *General Constr. Co. v. Tyonek Timber*, 629 P.2d 981 (Alaska 1981); *Volkswagenwerk, A. G. v. Klippan, GmbH*, 611 P.2d 498 (Alaska 1980).

Spencer executed their Support Agreement. Moreover, it was Nugget and not Spencer that instructed North Star when and how to perform rock loading operations. Thus, for all intents and purposes, when Spencer entered into its contract with North Star, it was acting as an agent of Nugget.

### 2.   *Implied-in-fact Contract*

If the jury concludes there was no agency relationship, and therefore no express contract, it can still consider whether there was an implied-in-fact contract between North Star and Nugget. The Alaska Supreme Court has noted:

> [A] contract implied in fact arises under circumstances which, according to the ordinary course of dealing and common understanding of men, show a mutual intention to contract . . . . A contract is implied in fact where the intention is not manifested by direct or explicit words between the parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used or things done by them, or other pertinent circumstances attending the transaction.

*Brigdon v. Lamb*, 929 P.2d 1274, 1278 (Alaska 1997) (quoting John D. Calamari & Joseph M. Perillo, *Contracts* § 2-19, at 89). The court has held that an implied-in-fact contract, like an express contract, is based on the intentions of the parties. "It arises where the court finds from the surrounding facts and circumstances that the parties intended to make a contract but failed to articulate their promises and the court merely implies what it feels the parties really intended." *Martens v. Metzgar,* 524 P.2d 666, 672 (Alaska 1974). "A party cannot rely on its subjective intent to defeat the existence of a contract if its words and actions objectively and reasonably led another to believe a contract had been entered." *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1281 (Alaska 1985).

One scenario where an implied-in-fact contract may exist involves what the Alaska Supreme Court has referred to as a "solicited submission." *See Reeves v. Alyeska Pipeline Svc. Co.*, 926 P.2d 1130, 1141 (Alaska 1996). "Here, a request by the recipient for disclosure of the

idea usually implies a promise to pay for the idea if the recipient uses it." *Id.* Reeves had offered to Alyeska to build a visitor center at a turnout along the Trans-Alaska Pipeline where merchandise could be sold, with Alyeska receiving a share in the profits. The turnout would include a "pig" and cross-section of pipe. When Alyeska accepted his suggestions and later took his ideas to create its own visitor center, Reeves argued that Alyeska had impliedly entered into a contract for payment. Modified to fit this case, the "solicited submission" here would involve a specific request by the defendant for a particular thing, which implies a promise to pay for the item if the defendant accepts it.

The implied-in-fact contract would be created first by the solicitation of North Star's services through the conduct of Nugget's agents in Seward seeking the assistance of North Star employees in loading the barges. Nugget even directed the loading of the rock by North Star onto Nugget's barge. Certainly, there was an implication that North Star would be paid for its services. This is an implied contract under Alaska law. The breach of that contract occurred through Nugget's deliberate actions that ensured North Star was not paid, either by preventing Spencer from paying North Star or refusing to pay North Star itself.

    3.    *Legal Justification for Breach*

A final area where the parties disagree on the agency and breach of contract issues is whether Nugget had any legal basis for withholding funds from Spencer. Any legal justification for breaching the contract between Spencer and North Star must comply with the Prompt Pay Act, which was incorporated into the contract between Nugget and the U.S. Army Corps of Engineers. This creates a conflicting legal issue for the court and the parties. Contradicting controlling U.S. Supreme Court precedent, the Ninth Circuit has already held that Spencer Rock Products was not a subcontractor. However, the Ninth Circuit did so under the standards set

North Star's Trial Brief
*North Star v. Nugget Construction, et al.*, Case No. A98-009 CV
Page 8 of 16    45-40/ # 91235

forth in *United States v. Aetna Cas. & Surety Co. (Conveyor Rental)*, 981 F.2d 448 (9th Cir. 1992), not the Prompt Pay Act.  Yet, the Prompt Pay Act was explicitly incorporated into the contract between Nugget and the U.S. Army Corps of Engineers.  *See* Bidding Documents, Homer Spit Repair & Extension Project, Section I.55(c)(2).  Thus, the Prompt Pay Act governs whether it was appropriate for Nugget to take actions that prevented other parties on a Miller Act project from being paid.

Under the Prompt Pay Act, a contractor may not withhold payments from its suppliers and contractors.  This is provided in the statute and was specifically communicated to Nugget from the Corps after North Star and other suppliers brought to the Corps' attention that they were not getting paid.  In order to receive progress payments, the contractor must certify that all subcontractors and suppliers have been paid from previous payments on the contract.  *See* 31 U.S.C. § 3903(b)(1)(B)(ii).  However, a contractor may withhold payment from a *subcontractor* if the contract between the two parties includes a provision permitting the contractor or subcontractor to make a determination that part or all of the *subcontractor's* request for payment may be withheld in accordance with the agreement between the parties.  *See* 31 U.S.C. § 3905(d)(1).  This exception also allows the contractor to withhold funds if it gives notice to the subcontractor of its intent to withhold funds and a copy of such notice is provided to the federal government.  *See* 31 U.S.C. § 3905(d)(3).

Thus, under the Prompt Pay Act, the only legally permissible means by which Nugget could have withheld payments from Spencer was if Spencer was a subcontractor, not a supplier. Section 3905 specifically uses the term "subcontractor" and excludes the term "supplier," while using those two terms together in Section 3903.  The only permissible inference is that Congress specifically intended that a prime contractor could only contractually withhold funds from a

subcontractor.[2] The rationale is simple. If funds on a Miller Act project are being withheld from a subcontractor as permitted by a contract, then the subcontractor's suppliers are still protected by the Miller Act bond. The same cannot be said if a prime contractor has a contractual agreement with a supplier that allows the withholding of funds – a supplier to a supplier is not protected by the Miller Act bond. It is also worth noting that the Supreme Court has observed that the legislative history of the Miller Act makes it clear that the term "subcontractor" did not include materialmen and laborers.[3]

However, if the Ninth Circuit's prior ruling, which excluded any reference to the Prompt Pay Act, is binding, then Spencer was a vendor or supplier, not a subcontractor. If Spencer was a supplier, then under no circumstances could Nugget withhold payments. If Spencer was a subcontractor, Nugget failed to comply with its notice obligations under the Prompt Pay Act. There is therefore, as a matter of law, no legal justification under the Prompt Pay Act for Nugget to have withheld funds from Spencer, despite the language of the Support Agreement.

### B.    Nugget's Liability Under Equitable Theories

North Star is pursuing several equitable remedies that serve as alternate theories to the contract claims. Thus, the jury should consider the equitable claims only if it finds no contract, either express, by agency, or implied. These claims are: quasi-contract, quantum meruit, unjust enrichment, equitable subordination, and constructive trust.

As the court noted previously, the elements for quasi-contract, quantum meruit and

---

[2] *See Boudette v. Barnette*, 923 F.2d 754, 756-57 (9th Cir. 1991) (noting that the *expressio unius est exclusio alterius* canon "creates a presumption that when a statute designates certain . . . manners of operation, all omissions should be understood as exclusions"); *In re Gerwer*, 898 F.2d 730, 732 (9th Cir. 1990) ("The express enumeration [of an exception] indicates that other exceptions should not be implied.").

[3] *Clifford F. MacEvoy Co. v. United States*, 322 U.S. 102, 110 (1944).

unjust enrichment are identical. The jury must find: (1) a benefit conferred upon Nugget by North Star, (2) appreciation by Nugget of such a benefit, and (3) acceptance and retention by Nugget of such a benefit under such circumstances that it would be inequitable for it to retain it without paying the value thereof. *See Reeves v. Alyeska Pipeline Svc. Co.*, 926 P.2d 1130, 1143 (Alaska 1996); *Parliament v. Yukon Flats Sch. Dist.*, 760 P.2d 513, 518 (Alaska 1988); *Alaska Sales & Serv. v. Millet*, 735 P.2d 743, 746 (Alaska 1987).

The uncontroverted evidence in this case easily supports the first two elements of these claims. North Star conferred a benefit directly to Nugget by providing the barge loading services that allowed the rock produced from Spencer Quarry to move from dock to barge so that it could be shipped to Homer. The Homer Spit contract was Nugget's contract, so any service provided that would assist in moving that contract toward completion conferred a benefit on Nugget. There is also no doubt that Nugget appreciated the benefit, as Nugget was eventually paid nearly $3.4 million by the federal government for the completion of the contract within the required period. A part of that money was supposed to pay North Star and others for services provided that assisted rock movement. The final issue is a judgment call that the jury has to make, but the evidence will support a conclusion that it would be patently inequitable for Nugget to retain this benefit without paying for it. Nugget continued to reap the benefit of the services provided by North Star and others, knowing that North Star could not be paid because Nugget was withholding funds from Spencer that were needed to satisfy its obligations to North Star.

The Alaska Supreme Court has recognized the doctrine of equitable subordination, whereby the court may "undo or offset any inequity in the claim position of a creditor that would produce injustice or unfairness to other creditors in terms of bankruptcy results," and applied it outside of the standard bankruptcy context. *Nerox Power Sys. v. M-B Contr. Co.*, 54 P.3d 791,

795 (Alaska); *White v. State ex rel. Block*, 597 P.2d 172, 175-76 (Alaska 1979). A need for equitable subordination arises in situations of "fraud, unfairness, or breach of the rules of 'fair play.'" *White*, 597 P.2d at 176. The claim to be subordinated "is acquired or asserted contrary to established equitable principles." *Id.*

In this case, Nugget and Spencer secretly entered into a contract that, as implemented by Nugget, guaranteed that none of Spencer's creditors would be paid. It allowed Nugget to use its own equipment and personnel to "help" Spencer meet its obligations, and then permitted Nugget to back charge Spencer for such services and other perceived expenses. It essentially obliterated the debtor-creditor relationship between Spencer and its various suppliers and laborers, replacing Nugget for all other creditors. This rearrangement of creditor relationships combined with the fact that Nugget sought to keep the agreement secret certainly amounts to a breach of the rules of fair play.

> The Alaska Supreme Court has recognized the constructive trust doctrine:
>
> The constructive trust may be defined as a device used by chancery to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs. When a court of equity finds that a defendant is the holder of a property interest which he retains by reason of unjust, unconscionable, or unlawful means, it takes such interest from the defendant and vests it in the wronged party.

*McKnight v. Rice, Hoppner, Brown & Brunner*, 678 P.2d 1330, 1335 (Alaska 1984) (quoting G. Bogert, *Trust and Trustees* § 471, at 3 (rev. 2d ed. 1978)). This doctrine determines, in effect, that certain property justly belongs to a party other than that which presently holds it. *See id.* It is imposed as a remedy to prevent unjust enrichment. *See Restatement of Restitution* §160.

There is no indication in the case law that a separate determination of agency is required in order for the jury to award damages to North Star on these claims. Agency involves a legal determination of liability, not an application of equitable principles. The key issue is whether a

benefit was conferred and appreciated, or whether some breach of fair play or inequitable conduct occurred. As is set out above, North Star's loading of rock was a benefit conferred on and appreciated by Nugget. Failure by Nugget (who controlled Spencer's funds) to pay North Star was clearly inequitable under the constructive trust theory.

### C.   Nugget's Liability Under Tort

The parties do not dispute the elements of the tort of intentional interference with contract, as stated in Alaska Civil Pattern Jury Instruction No. 19.01 and *Bendix Corp. v. Adams*, 610 P.2d 24 (Alaska 1980). However, North Star contends that the jury is only required to find the last two elements proven by preponderance of the evidence, as the court has noted that the first four elements are "undisputed." Docket No. 636 at 18.

The other area where the parties disagree relates to the issue of justification. Nugget maintains that, for the first prong of the justification instruction, it is sufficient that Nugget act "to protect Nugget's own financial interests from being impaired or destroyed." However, this does not reflect the case law on the issue. The only area the Alaska Supreme Court has found a mere financial interest sufficient to establish a privilege to interfere is where a parent corporation had a direct financial interest in the contract of a subsidiary corporation. *See Bendix Corp. v. Adams*, 610 P.2d 24, 29 (Alaska 1980). There, the court noted that a person may be privileged to interfere in certain business relations in order to protect an investment. *See id.* The type of interest that a defendant is justified to protect through interfering with another's contract, however, must be a "direct financial interest," as distinguished from a commercial interest which the defendants may have in the contract of a competitor. *Bendix Corp.*, 610 P.2d at 30. The justification for the distinction is that typically a person with a direct financial interest would not cause a breach in a contract because it would cause him to incur personal loss or jeopardize the

value of his investment. *See id.* In *Bendix*, the court found that a corporate shareholder was justified in interfering with the contract of a subsidiary corporation. There, the court held it was proper for Bendix to decide that its subsidiary, in which Bendix had invested considerably, would no longer be permitted to conduct survey work in the Arctic Ocean absent a firm contract. This caused a loss to the barge company that had been servicing the subsidiary.

Thus, under *Bendix*, Nugget can only be justified if it shows that it had a "direct financial interest" in the contract between North Star and Spencer. However, the facts do not reflect this. Nugget had nothing to gain or lose in the contract between Spencer and North Star. Nugget had no direct financial interest in that agreement, nor had it in any way invested financially in the work being performed in Seward. North Star did nothing to cause any delay in loading rock onto the barge; rather, North Star was on call to load barge when requested. Nugget's only interest was in ensuring that Spencer was capable of quarrying rock as required by the Material Contract, as modified by the Support Agreement. Once that was completed, Nugget's interest ceased as the rest was up to the various suppliers to Spencer. Of course, Nugget took an interest in the contract between Spencer and the Alaska Railroad, as Spencer's inability to pay the Railroad threatened Nugget's ability to get the quarried rock to Seward. Nugget cannot have it both ways. It cannot be permitted to argue that it has a direct financial interest in Spencer's contracts with its suppliers, yet turn around and say it has no legal financial obligations with regard to payment on those contracts.

### D. Attorney's Fees

North Star contends that Nugget is contractually liable for full attorney's fees, not merely reasonable attorney's fees under Alaska Civil Rule 82. If a jury determines that Nugget is

directly liable for the contract between Spencer and North Star, then Nugget and USF&G are bound by the language of that contract, which provided for full attorney's fees.

The Ninth Circuit's 2005 decision in this case at page 7 states: "Attorney's fees are not available under the Miller Act unless expressly provided for by the terms of the direct contracts between the parties or in the Miller Act bond itself." The court then goes on to state that if the fact finder concludes there was an implied-in-fact contract between Nugget and North Star based on telescoping, "that would not suffice to create terms providing for attorney's fees." The only sensible reading of this decision is that where the contract is *implied*, there can be no certain terms. The decision is silent as to liability for express contract based on agency. Therefore, if there is a contract with certain terms by which Nugget is bound, and that contract contains a provision for attorney's fees, then Nugget and USF&G are liable for attorney's fees under that contract.

### E.    Punitive Damages

Nugget is liable for punitive damages under North Star's tort claims theories if North Star can show by clear and convincing evidence that Nugget acted with reckless indifference to North Star's rights.[4] As noted by the court in its May 2006 order, this remains a viable cause of action for North Star against Nugget.

---

[4] "To support a claim for punitive damages, 'the plaintiff must prove by clear and convincing evidence that the defendant's conduct was outrageous, such as acts done with malice, bad motive, or reckless indifference to the interests of another.'" *Chizmar v. Mackie*, 896 P.2d 196, 210 (Alaska 1995).

Dated:  July 30, 2007.

    s/ David W. Pease
    Burr, Pease & Kurtz
    810 N Street, Suite 300
    Anchorage, AK  99501
    Telephone:  (907) 276-6100
    Fax:  (907) 258-2530
    E-mail:  dwp@bpk.com
    Alaska Bar # 8706041

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 30, 2007, a copy of the foregoing Trial Brief was served electronically on Tom Krider, Steven S. Shamburek, and Herbert A. Viergutz.

/s David W. Pease