David W. Pease
BURR, PEASE & KURTZ
810 N Street, Suite 300
Anchorage, AK  99501-3293
Telephone:     (907) 276-6100
Fax No.:        (907) 258-2530
Attorneys for North Star

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA for the use of NORTH STAR TERMINAL & STEVEDORE COMPANY, d/b/a Northern Stevedoring & Handling, et al.<br>      Plaintiffs,<br>  and<br><br>UNITED STATES OF AMERICA for the use of SHORESIDE PETROLEUM, INC., d/b/a Marathon Fuel Services, et al.<br>      Intervening Plaintiffs,<br>  and<br><br>METCO, INC.,<br>      Intervening Plaintiff,<br>  vs.<br><br>NUGGET CONSTRUCTION, INC.; et al.<br>  Defendants. | Case No. A98-009 CIV (TMB)<br><br>**MEMORANDUM OF LAW IN SUPPORT OF DISPUTED JURY INSTRUCTIONS** |

Pursuant to the court's amended pretrial order, Docket No. 718, plaintiff North Star

Terminal & Stevedore Company ("North Star"), by and through counsel, hereby submits this

Memorandum of Law in Support of Disputed Jury Instructions.

### Instruction No. 25

This instruction accurately follows Alaska Civil Pattern Jury Instruction No. 23.03,

Agency and Respondeat Superior Relationships.  Throughout this litigation, it has been

repeatedly stated that the key issue regarding Nugget's liability for Spencer Rock Product's

North Star's Memorandum of Law in Support of Disputed Jury Instructions
North Star Terminal v. Nugget Construction, Case No. 3:98-cv-9 TMB
Page 1 of 18               45-40/ # 91266

breach of its contract with North Star is the extent of control Nugget had over Spencer. The court repeatedly stated this during its order on summary judgment, Docket No. 636. There has never been any allegation by Nugget that Spencer somehow acted outside of any authority; thus, North Star has removed the portion of the pattern instruction addressing that issue.

Nugget claims that in order for it to be liable under any agency theory, the agency relationship between Nugget and Spencer had to exist at the time that Spencer entered into its contract with North Star, citing *Bendix Corp. v. Adams*, 610 P.2d 24 (Alaska 1980) in support of this argument. *Bendix* is of no guidance for two important reasons. First, the case involved a parent-subsidiary relationship, which is not present in this case. The Use Note for Alaska Civil Pattern Jury Instruction No. 23.03 recognizes this limited application of *Bendix* by observing, "If the relationship of parent and subsidiary companies is in dispute, the court may want to modify this instruction and borrow from the *Bendix* decision."

Secondly, the statement upon which Nugget relies is not binding. Following a discussion regarding the parent corporation's control over its subsidiary, the Alaska Supreme Court noted:

> [I]t would not be sufficient to establish that Marine was acting on behalf of Bendix at the time when the contract was formed. Because Adams failed to show that Bendix was a party to the original contract, even if an agency relation were created later between Bendix and Marine … this would not make Bendix a party to the earlier contract on an agency theory so as to be liable for a breach of that contract.[1]

However, this statement is dicta in the case and cites to no authority other than an obscure treatise. No Alaska Supreme Court case has since cited to *Bendix* for this statement of the law. None of the cases that form the backbone of respondeat superior liability law in Alaska cite to *Bendix*. Rather, the primary substantive legal issue for which *Bendix* is cited, other than the

---

[1] *Bendix Corp.*, 610 P.2d at 33.

North Star's Memorandum of Law in Support of Disputed Jury Instructions
North Star Terminal v. Nugget Construction, Case No. 3:98-cv-9 TMB
Page 2 of 18                                                                                       45-40/ # 91266

standard of review for directed verdicts, is its guidance on the tort of intentional interference with contract. *Bendix* is also cited as a piercing the corporate veil case.[2]

The *Bendix* case does not mean what Nugget thinks it means. Its suggestion that liability only attaches when the principal-agent relationship existed at the time the contract was originally executed would turn law on its head. Even if the *Bendix* dicta could somehow require that the agency relationship between Nugget and Spencer existed at the time that Spencer and North Star entered into its "contract," this would not bar a finding that Nugget was the principal. The contract between North Star and Spencer was not executed until North Star started to perform. And under Nugget's theory of this case, where North Star did not have an exclusive right to load rock but one based on a per-order basis, each separate request for unloading rock could be construed as a separate contract. North Star did not first load rock for Spencer until well after Nugget and Spencer executed their Support Agreement. Thus, for all intents and purposes, when Spencer entered into its contract with North Star, it was acting as an agent of Nugget.

### Instruction No. 26

This is a proper instruction as this court has noted that Nugget could also be held liable to North Star as an undisclosed principle of Spencer.[3] The jury must still determine if Nugget exercised some sort of control over Spencer. "In order for an agency relationship to exist, the agent must have 'a power to alter the legal relations between the principal and third persons.' The principal, in turn, must have 'the right to control the conduct of the agent with respect to

---

[2] *See*, *e.g.*, *Eagle Air v. Corroon & Black/Dawson & Co.*, 648 P.2d 1000 (Alaska 1982); *Uchitel Co. v. Telephone Co.*, 646 P.2d 229 (Alaska 1982); *General Constr. Co. v. Tyonek Timber*, 629 P.2d 981 (Alaska 1981); *Volkswagenwerk, A. G. v. Klippan, GmbH*, 611 P.2d 498 (Alaska 1980).

[3] *See* Docket No. 636 at 6-7 n.23.

North Star's Memorandum of Law in Support of Disputed Jury Instructions
North Star Terminal v. Nugget Construction, Case No. 3:98-cv-9 TMB
Page 3 of 18                                                              45-40/ # 91266

matters entrusted to him.'"[4]  Section 186 of the *Restatement (Second) of Agency* provides, "An undisclosed principal is bound by contracts and conveyances made on his account by an agent acting within his authority, except that the principal is not bound by a contract which is under seal or which is negotiable, or upon a contract which excludes him."[5]

   North Star reiterates its prior analysis of the *Bendix* decision.  Additionally, the Alaska Supreme Court's dicta in that case is silent as to the application of this aspect of agency.   This instruction merely allows the jury to decide whether Spencer entered into any agreements to benefit Nugget and whether the contract in question was within that authority.  As noted previously, the issue is whether, at the time of each request for North Star to load rock, Spencer was acting on behalf of Nugget.

### Instruction No. 27

   Equally with undisclosed principal, this instruction correctly fits the facts of this case. *Restatement (Second) of Agency* § 14O provides,  "A creditor who assumes control of his debtor's business for the mutual benefit of himself and his debtor, may become a principal, with liability for the acts and transactions of the debtor in connection with the business." Consistent with other agency theories, the creditor must exercise a significant degree of control, however, before it will be held liable as a principal:

> A security holder who merely exercises a veto power over the business acts of his debtor by preventing purchases or sales above specified amounts does not thereby become a principal. However, if he takes over the management of the

---

[4] *Manes v. Coats*, 941 P.2d 120, 124 (Alaska 1997) (*Restatement (Second) of Agency* §§ 12, 14 (1958)).

[5] *See also Indiana Gas Co. v. Home Ins. Co*., 141 F.3d 314, 319 (7th Cir. 1998) (noting the "venerable rule" that an undisclosed principal can be held liable on a contract); *United States v. Everett Monte Cristo Hotel, Inc*., 524 F.2d 127, 140 (9th Cir. 1975) (noting liability of an undisclosed principal for acts of agent acting within his authority).

North Star's Memorandum of Law in Support of Disputed Jury Instructions
North Star Terminal v. Nugget Construction, Case No. 3:98-cv-9 TMB
Page 4 of 18                                                                   45-40/ # 91266

debtor's business either in person or through an agent, and directs what contracts may or may not be made, he becomes a principal, liable as any principal for the obligations incurred thereafter in the normal course of business by the debtor who has not become his general agent. The point at which the creditor becomes a principal is that at which he assumes *de facto* control over the conduct of his debtor, whatever the terms of the formal contract with his debtor may be.[6]

The leading authorities on this issue confirm that something akin to day-to-day management of the debtor's business is required before a creditor can be held liable under an agency theory.[7]

In *A. Gay Jenson Farms Co.*, the Minnesota Supreme Court looked to several factors to determine that Cargill was a creditor who had taken control over its debtor, Warren Seed & Grain Co. ("Warren"). Some of these factors included Cargill's constant recommendations to its Warren, Cargill's right to inspect Warren's premises and carry on audits, Cargill's criticism of Warren's finances, Cargill's determination that Warren needed "strong paternal guidance," Cargill's financing of Warren's operations, and its power to discontinue that financing.[8]

Applying this analysis, Nugget acted very similar to Cargill. Nugget essentially forced Spencer to enter into the Support Agreement, whereby Nugget would "help" Spencer with its performance. Nugget took control of Spencer operations under the Support Agreement in order to further its own contract with the Corps of Engineers. Nugget then paid itself with money due Spencer by asserting "back charges" against Spencer, essentially taking control of the only

---

[6] *Restatement (Second) of Agency* § 14O, cmt a.

[7] *See A. Gay Jenson Farms Co. v. Cargill, Inc*., 309 N.W.2d 285, 290-93 (Minn. 1981); *Buck v. Nash-Finch Co*., 78 S.D. 334, 102 N.W.2d 84, 89-91 (S.D. 1960).

[8] *See A. Gay Jenson Farms Co.*, 309 N.W.2d at 291.

North Star's Memorandum of Law in Support of Disputed Jury Instructions
North Star Terminal v. Nugget Construction, Case No. 3:98-cv-9 TMB
Page 5 of 18                                                                    45-40/ # 91266

source of income for Spencer during this time period[9] and ultimately driving Spencer out of business as a result. Additionally, Nugget replaced Spencer personnel and equipment with its own and relegated Spencer's owner, Robert Lapore, to the role of a driver. Nugget assumed Spencer's obligations on the railroad contract because it was essential to move rock, but declined to honor any other contracts with Spencer's suppliers and put itself first. Nugget's agent, Randy Randolph, additionally began to direct and control Spencer's suppliers in Seward. This instruction is clearly appropriate given the pages of changes submitted by Nugget to Spencer under the Support Agreement.

### Instruction No. 28, 28A & 29

North Star's legal argument in support of these three instructions finds its origins in the plain language of the Prompt Pay Act. The contract between the U.S. Army Corps of Engineers and Nugget specifically incorporated the Prompt Pay Act.[10] The Corps specifically reminded Nugget in correspondence that it was not permitted to withhold payments from suppliers when receiving progress payments. It is North Star's position that there can be only two possibilities: (1) Spencer Rock Products was a subcontractor and therefore Nugget was permitted to withhold funds from Spencer under the Prompt Pay Act (Instruction No. 28); or (2) Spencer was not a subcontractor and therefore, under the Prompt Pay Act, Nugget was not permitted to withhold funds (Instruction No. 28A).

---

[9] This factor is very similar to one considered by the court in *King v. Hartford Packing Co.*, 189 F. Supp. 2d 917, 929 (N.D. Ind. 2002) (noting that the creditor had forwarded all of the debtor's income to itself).

[10] *See* Bidding Documents, Homer Spit Repair & Extension Project, Section I.55(c)(2).

North Star's Memorandum of Law in Support of Disputed Jury Instructions
North Star Terminal v. Nugget Construction, Case No. 3:98-cv-9 TMB
Page 6 of 18                                                          45-40/ # 91266

The latter is reached if it is concluded that the Ninth Circuit's prior holding regarding Spencer's status as a materialman is binding despite the Prompt Pay Act. The former position is reached based on the plain language of the Prompt Pay Act and the Army Corps of Engineers' resumption of progress payments to Nugget in the face of the Corps' awareness that Nugget was withholding payment from Spencer.

Instruction No. 28 is designed to instruct the jury on the application of the Prompt Pay Act, which is very clear on this issue, in the context of whether Nugget, through its control over Spencer, was legally justified in causing the breach of contract between North Star and Spencer. The law does recognize that a party may have a legal justification for breach.[11] Theoretically, the Prompt Pay Act could provide such a justification to Nugget, so long as the statutory requirements are met. Under the Prompt Pay Act, a contractor may not withhold payments from its suppliers and contractors. This is provided in the statute and was specifically communicated to Nugget from the Corps after North Star and other suppliers brought to the Corps' attention that they were not getting paid. In order to receive progress payments, the contractor must certify that all subcontractors and suppliers have been paid from previous payments on the contract. *See* 31 U.S.C. § 3903(b)(1)(B)(ii). However, a contractor may withhold payment from a *subcontractor* if the contract between the two parties includes a provision permitting the contractor or subcontractor to make a determination that part or all of the *subcontractor's*

---

[11] 5A A. Corbin, *Corbin on Contracts* § 1228 (1963); 11 S. Williston, A *Treatise on the Law of Contracts* § 1290 (3d ed. 1968) ("[A] breach of contract is a failure, without legal excuse, to perform any promise which forms the whole or part of a contract.").

North Star's Memorandum of Law in Support of Disputed Jury Instructions
North Star Terminal v. Nugget Construction, Case No. 3:98-cv-9 TMB
Page 7 of 18                                                                45-40/ # 91266

request for payment may be withheld in accordance with the agreement between the parties. *See* 31 U.S.C. § 3905(d)(1). This exception also allows the contractor to withhold funds if it gives notice to the subcontractor of its intent to withhold funds and a copy of such notice is provided to the federal government. *See* 31 U.S.C. § 3905(d)(3).

Thus, under the Prompt Pay Act, the only legally permissible means by which Nugget could have withheld payments from Spencer was if Spencer was a subcontractor, not a supplier. Section 3905 specifically uses the term "subcontractor" and excludes the term "supplier," while using those two terms together in Section 3903. The only permissible inference is that Congress specifically intended that a prime contractor could only contractually withhold funds from a subcontractor.[12] The rationale is simple. If funds on a Miller Act project are being withheld from a subcontractor as permitted by a contract, then the subcontractor's suppliers are still protected by the Miller Act bond. The same cannot be said if a prime contractor has a contractual agreement with a supplier that allows the withholding of funds – a supplier to a supplier is not protected by the Miller Act bond.

Nugget argues that the Federal Acquisition Regulations, by including "material suppliers" within the definition of "subcontractor," control as to whether 31 U.S.C. § 3905 allows funds to be withheld from a supplier of labor or materials for purposes of the

---

[12] *See Boudette v. Barnette*, 923 F.2d 754, 756-57 (9th Cir. 1991) (noting that the *expressio unius est exclusio alterius* canon "creates a presumption that when a statute designates certain . . . manners of operation, all omissions should be understood as exclusions"); *In re Gerwer*, 898 F.2d 730, 732 (9th Cir. 1990) ("The express enumeration [of an exception] indicates that other exceptions should not be implied.").

North Star's Memorandum of Law in Support of Disputed Jury Instructions
North Star Terminal v. Nugget Construction, Case No. 3:98-cv-9 TMB
Page 8 of 18                                                                    45-40/ # 91266

Miller Act. Yet, this directly conflicts with the U.S. Supreme Court's holding in *MacEvoy Co. v. United States ex rel. Tomkins Co.*,[13] where the court held that the term "subcontractor" in the Miller Act *excluded* materialmen and suppliers. By Nugget's argument, if suppliers and materialmen *are* subcontractors, then Miller Act liability would be greatly expanded. However, 48 C.F.R. §52.232-27, cited by Nugget, similarly only provides for withholding of funds from a "subcontractor."

However, if the Ninth Circuit's prior ruling, which excluded any reference to the Prompt Pay Act, is binding, then Spencer was a vendor or supplier, not a subcontractor. If Spencer was a supplier, then under no circumstances could Nugget withhold payments. If Spencer was a subcontractor, Nugget failed to comply with its notice obligations under the Prompt Pay Act. There is therefore, as a matter of law, no legal justification under the Prompt Pay Act for Nugget to have withheld funds from Spencer, despite the language of the Support Agreement.

Nugget's argument regarding the application of the Uniform Commercial Code to its asserted justification for withholding funds from Spencer is unavailing. Nugget's contract with the Army Corps of Engineers incorporated the Prompt Pay Act, not the UCC. As the Miller Act was incorporated into the contract, the Prompt Pay Act is incorporated into North Star's Miller Act claim. As the Prompt Pay Act is incorporated, and North Star has always alleged that Nugget's withholding of funds from Spencer was without justification, these instructions should be included.

---

[13] 322 U.S. 102, 110 (1944).

North Star's Memorandum of Law in Support of Disputed Jury Instructions
North Star Terminal v. Nugget Construction, Case No. 3:98-cv-9 TMB
Page 9 of 18                                                                45-40/ # 91266

Since North Star's Instruction No. 28. requires the jury to make a finding that Spencer Rock Products was Nugget's subcontractor, North Star believes it is only prudent to inform the jury how to determine if Spencer is a subcontractor.  Unfortunately, the case law is thin on this issue.  The proposed instruction is gleaned from *MacEvoy Co. v. United States ex rel. Tomkins Co.*,[14] where the Court noted that the Miller Act fails to define the term and observed,

> In a broad, generic sense a subcontractor includes anyone who has a contract to furnish labor or material to the prime contractor. In that sense Miller was a subcontractor. But under the more technical meaning, as established by usage in the building trades, a subcontractor is one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and materialmen.[15]

However, the Court later observed that this was not an accurate description of a subcontractor in the Miller Act sense based on the legislative history, and that the term "subcontractor" excluded materialmen and laborers.[16]  The Court then observed,

> Congress cannot be presumed, in the absence of express statutory language, to have intended to impose liability on the payment bond in situations where it is difficult or impossible for the prime contractor to protect himself. The relatively few subcontractors who perform part of the original contract represent in a sense the prime contractor and are well known to him. It is easy for the prime contractor to secure himself against loss by requiring the subcontractors to give security by bond, or otherwise, for the payment of those who contract directly with the subcontractors.[17]

Thus, the instruction as written seeks to incorporate these concepts and give the jury some guidance as to how it should make a finding that Spencer was a subcontractor of Nugget.

---

[14] 322 U.S. 102 (1944).

[15] *Id.* at 108-09.

[16] *See id.* at 110.

[17] *Id.*

North Star's Memorandum of Law in Support of Disputed Jury Instructions
North Star Terminal v. Nugget Construction, Case No. 3:98-cv-9 TMB
Page 10 of 18                                                    45-40/ # 91266

**Instruction No. 31**

This instruction is an accurate statement of the law and should be given, as this claim remains viable per the court's order at Docket No. 636.  While Instruction No. 30 ostensibly addresses the issue of implied contract, it does so utilizing principles usually found in a case involving alter ego analysis.  North Star requests this instruction because it provides the jury a means to find that North Star and Nugget entered into a contract not based on the relationship between Nugget and Spencer, but based on Nugget's own conduct.  Additionally, the authorities cited by the court in Docket No. 636 also contemplate this approach.

The Alaska Supreme Court has noted:

> [A] contract implied in fact arises under circumstances which, according to the ordinary course of dealing and common understanding of men, show a mutual intention to contract . . . . A contract is implied in fact where the intention is not manifested by direct or explicit words between the parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used or things done by them, or other pertinent circumstances attending the transaction.[18]

The court has held that an implied-in-fact contract, like an express contract, is based on the intentions of the parties. "It arises where the court finds from the surrounding facts and circumstances that the parties intended to make a contract but failed to articulate their promises and the court merely implies what it feels the parties really intended."[19]  "A party cannot rely on its subjective intent to defeat the existence of a contract if its words and actions objectively and reasonably led another to believe a contract had been entered."[20]

---

[18] *Brigdon v. Lamb*, 929 P.2d 1274, 1278 (Alaska 1997) (quoting John D. Calamari & Joseph M. Perillo, *Contracts* § 2-19, at 89).

[19] *Martens v. Metzgar,* 524 P.2d 666, 672 (Alaska 1974).

[20] *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1281 (Alaska 1985).

North Star's Memorandum of Law in Support of Disputed Jury Instructions
North Star Terminal v. Nugget Construction, Case No. 3:98-cv-9 TMB
Page 11 of 18                                                                45-40/ # 91266

One scenario where an implied-in-fact contract may exist involves what the Alaska Supreme Court has referred to as a "solicited submission."[21]  For more detailed analysis on that point, North Star refers the court to its Trial Brief.  Modified to fit this case, this scenario would involve a specific request by a defendant for a particular thing, which implies a promise to pay for the item if the defendant accepts it.[22]

Thus, in order to prevail on this claim, North Star would need to produce evidence that Nugget or its agents, by words or conduct, solicited North Star to load rock from the rail onto Nugget's barges for delivery to Homer.  There is ample evidence in this case that Nugget, through its agents, acted in a manner indicating that it directly sought the services of North Star. This is especially true since the Support Agreement between Spencer and Nugget was unknown to North Star in the summer of 1997.  Randy Randolph, a known employee of Nugget, was regularly in Seward directing, controlling, coordinating and requesting action of North Star.  The reasonable inference for North Star was that it was providing services on behalf of Nugget.

**Instruction Nos. 32, 33, & 34**

 This instruction is an accurate statement of the law and should be given, as these claims remain viable per the court's order at Docket No. 636.  As the court has noted, the elements for these three causes of action are very similar.[23]  The jury must find: (1) a benefit conferred upon Nugget by North Star, (2) appreciation of Nugget for such a benefit, and (3) acceptance and retention by Nugget of such a benefit under such circumstances that it would be inequitable for it

---

[21] *See Reeves v. Alyeska Pipeline Svc. Co.*, 926 P.2d 1130, 1141 (Alaska 1996).

[22] *See id.*

[23] *See* Docket No. 636 at 19.

North Star's Memorandum of Law in Support of Disputed Jury Instructions
North Star Terminal v. Nugget Construction, Case No. 3:98-cv-9 TMB
Page 12 of 18                                                                            45-40/ # 91266

to retain it without paying the value thereof.[24]

  Nugget disputes the need for these instructions, asserting that an agency relationship between Spencer and Nugget must exist in order for these claims to be viable. Nugget makes this assumption based on statements by the court in Docket No. 636: "Each of the elements that make up the claims – Nugget's receipt of a benefit, Nugget's appreciation of that benefit, and the inequity of allowing Nugget to retain the benefit – depend upon the relationship between Nugget and Spencer."[25] However, Nugget's assertion misconstrues the court's statement. None of the case law cited by the court and supporting this instruction requires such a showing. Rather, the court must have merely been referring to the equitable considerations of how North Star was not paid for services that Nugget ultimately enjoyed because of the strange contractual relationship between Spencer and Nugget by virtue of the Support Agreement.

  If the court deems it appropriate, North Star would be willing to consolidate these three instructions into one.

### Instruction No. 35

  This instruction is an accurate statement of the law and should be given, as this claim remains viable per the court's order at Docket No. 636. The Alaska Supreme Court has recognized that the doctrine of equitable subordination, whereby the court may "undo or offset any inequity in the claim position of a creditor that would produce injustice or unfairness to other creditors in terms of bankruptcy results," and applied it outside of the standard bankruptcy

---

[24] *See Reeves v. Alyeska Pipeline Svc. Co.*, 926 P.2d 1130, 1143 (Alaska 1996); *Parliament v. Yukon Flats Sch. Dist.*, 760 P.2d 513, 518 (Alaska 1988); *Alaska Sales & Serv. v. Millet*, 735 P.2d 743, 746 (Alaska 1987).

[25] Docket No. 636 at 19.

North Star's Memorandum of Law in Support of Disputed Jury Instructions
North Star Terminal v. Nugget Construction, Case No. 3:98-cv-9 TMB
Page 13 of 18                    45-40/ # 91266

context.[26]  A need for equitable subordination arises in situations of "fraud, unfairness, or breach of 'the rules of 'fair play.'"[27]  The claim to be subordinated "is acquired or asserted contrary to established equitable principles."[28]

In this case, Nugget and Spencer secretly entered into a contract that would by its very terms almost certainly guarantee that none of Spencer's creditors would be paid.  It allowed Nugget to use its own equipment and personnel to "help" Spencer meet its obligations, and then permitted Nugget to back charge Spencer for such services.  It essentially obliterated the debtor-creditor relationship between Spencer and its various suppliers and laborers, replacing Nugget for all other creditors.  This rearrangement of creditor relationships combined with the fact that Nugget sought to keep the agreement secret, even from the Corps initially, certainly amounts to a breach of the rules of fair play.

### Instruction No. 36

This instruction is an accurate statement of the law and should be given, as this claim remains viable per the court's order at Docket No. 636.  The Alaska Supreme Court has recognized the constructive trust doctrine:

> The constructive trust may be defined as a device used by chancery to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs. When a court of equity finds that a defendant is the holder of a property interest which he retains by reason of unjust, unconscionable, or unlawful means, it takes such interest from the defendant and vests it in the wronged party.[29]

---

[26] *Nerox Power Sys. v. M-B Contr. Co.*, 54 P.3d 791, 795 (Alaska); *White v. State ex rel. Block*, 597 P.2d 172, 175-76 (Alaska 1979).

[27] *White*, 597 P.2d at 176.

[28] *Id.*

[29] *McKnight v. Rice, Hoppner, Brown & Brunner*, 678 P.2d 1330, 1335 (Alaska 1984) (quoting G. Bogert, *Trust and Trustees* § 471, at 3 (rev. 2d ed. 1978)).

North Star's Memorandum of Law in Support of Disputed Jury Instructions
North Star Terminal v. Nugget Construction, Case No. 3:98-cv-9 TMB
Page 14 of 18                                                                45-40/ # 91266

This doctrine determines, in effect, that certain property justly belongs to a party other than that which presently holds it.[30]  It is imposed as a remedy to prevent unjust enrichment.[31]

**<u>Instruction No. 37</u>**

As noted in the trial brief, the parties agree as to the essential elements of this claim, with Nugget and North Star essentially following the applicable Alaska civil pattern jury instruction.  The parties disagree as to whether the jury needs to find the first four elements.  It is North Star's position that the court has already determined that these elements have been proven.  The court has observed:  "It is undisputed that a contract existed between Spencer and North Star, that Nugget knew about the contract, that the contract was breached, and that the breach damaged North Star."[32]

The reason for the dispute is that Nugget contends that North Star has never included damages related to Nugget's withholding of funds from Spencer within the tort claim.  However, North Star's amended complaint makes clear that it considers the interference caused by that withholding to be included in the tort:  "Nugget improperly intercepted and rechanneled funds to itself which would otherwise have been available to Spencer and LaPore to pay North Star and other similarly situated creditors."[33]  The court

---

[30] *See id.*

[31] *See Restatement of Restitution* §160.

[32] Docket No. 636 at 18.

[33] Amended Complaint ¶ 39.

North Star's Memorandum of Law in Support of Disputed Jury Instructions
North Star Terminal v. Nugget Construction, Case No. 3:98-cv-9 TMB
Page 15 of 18                                                                45-40/ # 91266

also recognized this in its order.[34]

### <u>Instruction No. 38</u>

The parties also disagree as to what constitutes "justification" under the tort. Nugget maintains that, for the first prong of the justification instruction, it is sufficient that Nugget act "to protect Nugget's own financial interests from being impaired or destroyed." However, this does not fully reflect the case law on the issue, nor does it give guidance to the jury as to what sort of financial interest is appropriate for the justification. The only area the Alaska Supreme Court has found a mere financial interest sufficient to establish a privilege to interfere is where a parent corporation had a direct financial interest in the contract of a subsidiary corporation. *See Bendix Corp. v. Adams*, 610 P.2d 24, 29 (Alaska 1980). There, the court noted that a person may be privileged to interfere in certain business relations in order to protect an investment. *See id.* The type of interest that a defendant is justified to protect through interfering with another's contract, however, must be a "direct financial interest," as distinguished from a commercial interest which the defendants may have in the contract of a competitor. *Bendix Corp.*, 610 P.2d at 30. The justification for the distinction is that typically a person with a direct financial interest would not cause a breach in a contract because it would cause him to incur personal loss or jeopardize the value of his investment. *See id.*

In *Bendix*, the court found that a corporate shareholder was justified in interfering with the contract of a subsidiary corporation. There, the court held it was proper for Bendix to decide that its subsidiary, in which Bendix had invested considerably, would no longer be permitted to

---

[34] *See* Docket No. 636 ("Plaintiff North Star alleges that Nugget tortiously interfered with its contract with Spencer by taking over control of Spencer and back charging the company.").

North Star's Memorandum of Law in Support of Disputed Jury Instructions
North Star Terminal v. Nugget Construction, Case No. 3:98-cv-9 TMB
Page 16 of 18                                                                 45-40/ # 91266

conduct survey work in the Arctic Ocean absent a firm contract. This caused a loss to the barge company that had been servicing the subsidiary.

Thus, under *Bendix*, Nugget can only be justified if it shows that it had a "direct financial interest" in the contract between North Star and Spencer. However, the facts do not reflect this. Nugget had nothing to gain or lose in the contract between Spencer and North Star. Nugget had no direct financial interest in that agreement, nor had it in any way invested financially in the work being performed in Seward. North Star did nothing to cause any delay in loading rock onto the barge; rather, North Star was on call to load barge when requested. Nugget's only interest was in ensuring that Spencer was capable of quarrying rock as required by the Material Contract, as modified by the Support Agreement. Once that was completed, Nugget's interest ceased as the rest was up to the various suppliers to Spencer. Of course, Nugget took an interest in the contract between Spencer and the Alaska Railroad, as Spencer's inability to pay the Railroad threatened Nugget's ability to get the quarried rock to Seward. Nugget cannot have it both ways. It cannot be permitted to argue that it has a direct financial interest in Spencer's contracts with its suppliers, yet turn around and say it has no legal financial obligations with regard to payment on those contracts.

Dated:  July 30, 2007.

s/ David W. Pease
Burr, Pease & Kurtz
810 N Street, Suite 300
Anchorage, AK  99501
Telephone:  (907) 276-6100
Fax:  (907) 258-2530
E-mail:  dwp@bpk.com
Alaska Bar # 8706041

North Star's Memorandum of Law in Support of Disputed Jury Instructions
North Star Terminal v. Nugget Construction, Case No. 3:98-cv-9 TMB
Page 17 of 18                                                                                45-40/ # 91266

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 30, 2007, a copy of
the foregoing Memo in Support of Jury
Instructions was served electronically on Tom
Krider, Steven S. Shamburek, and Herbert A.
Viergutz.


/s David W. Pease

North Star's Memorandum of Law in Support of Disputed Jury Instructions
North Star Terminal v. Nugget Construction, Case No. 3:98-cv-9 TMB
Page 18 of 18                                                        45-40/ # 91266